## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| THE STATE OF CONNECTICUT;<br>THE STATE OF ALABAMA;<br>THE STATE OF ALASKA;<br>THE STATE OF ARIZONA;<br>THE STATE OF ARKANSAS;<br>THE STATE OF CALIFORNIA;<br>THE STATE OF COLORADO;<br>THE STATE OF DELAWARE;<br>THE DISTRICT OF COLUMBIA;<br>THE STATE OF FLORIDA;<br>THE STATE OF GEORGIA;<br>THE TERRITORY OF GUAM;<br>THE STATE OF HAWAII;<br>THE STATE OF IDAHO;<br>THE STATE OF ILLINOIS;<br>THE STATE OF INDIANA;<br>THE STATE OF IOWA;<br>THE STATE OF KANSAS;<br>THE COMMONWEALTH OF KENTUCKY;<br>THE STATE OF LOUISIANA;<br>THE STATE OF MAINE;<br>THE STATE OF MARYLAND;<br>THE COMMONWEALTH OF<br>   MASSACHUSETTS;<br>THE STATE OF MICHIGAN;<br>THE STATE OF MINNESOTA;<br>THE STATE OF MISSISSIPPI;<br>THE STATE OF MISSOURI;<br>THE STATE OF MONTANA;<br>THE STATE OF NEBRASKA;<br>THE STATE OF NEVADA;<br>THE STATE OF NEW HAMPSHIRE;<br>THE STATE OF NEW JERSEY;<br>THE STATE OF NEW MEXICO;<br>THE STATE OF NEW YORK;<br>THE STATE OF NORTH CAROLINA;<br>THE STATE OF NORTH DAKOTA;<br>THE COMMONWEALTH OF THE NORTHERN<br>   MARIANA ISLAND;<br>THE STATE OF OHIO;<br>THE STATE OF OKLAHOMA;<br>THE STATE OF OREGON;<br>THE COMMONWEALTH OF<br>   PENNSYLVANIA;<br>THE COMMONWEALTH OF PUERTO RICO;<br>THE STATE OF RHODE ISLAND; | **MDL 2724**<br>**16-MD-2724**<br><br><br>**HON. CYNTHIA M. RUFE**<br><br><br>**Civil Action No.  2:20-CV-03539**<br><br><br>**September 9, 2021**<br><br><br>**<u>AMENDED COMPLAINT</u>** |

THE STATE OF SOUTH CAROLINA;
THE STATE OF TENNESSEE;
THE STATE OF UTAH;
THE STATE OF VERMONT;
THE COMMONWEALTH OF VIRGINIA;
THE STATE OF WASHINGTON;
THE STATE OF WEST VIRGINIA;
THE STATE OF WISCONSIN; and
U.S. VIRGIN ISLANDS

     v.

SANDOZ, INC.;
ACTAVIS HOLDCO US, INC.;
ACTAVIS ELIZABETH LLC;
ACTAVIS PHARMA, INC.;
AMNEAL PHARMACEUTICALS, INC.;
AMNEAL PHARMACEUTICALS, LLC;
ARA APRAHAMIAN;
AUROBINDO PHARMA U.S.A., INC.;
BAUSCH HEALTH AMERICAS, INC.;
BAUSCH HEALTH US, LLC;
MITCHELL BLASHINSKY;
DOUGLAS BOOTHE;
FOUGERA PHARMACEUTICALS INC.;
GLENMARK PHARMACEUTICALS INC., USA
JAMES (JIM) GRAUSO;
GREENSTONE LLC;
G&W LABORATORIES, INC.;
WALTER KACZMAREK;
ARMANDO KELLUM;
LANNETT COMPANY, INC.;
LUPIN PHARMACEUTICALS, INC.;
MALLINCKRODT INC.;
MALLINCKRODT LLC;
MALLINCKRODT plc;
MYLAN INC.;
MYLAN PHARMACEUTICALS INC.;
KURT ORLOFSKI;
MICHAEL PERFETTO;
PERRIGO NEW YORK, INC.;
PFIZER INC.;
SUN PHARMACEUTICAL INDUSTRIES, INC.;
TARO PHARMACEUTICALS USA, INC.;
TELIGENT, INC.;
ERIKA VOGEL-BAYLOR;
JOHN WESOLOWSKI; and
WOCKHARDT USA LLC

**TABLE OF CONTENTS**

PAGE

I.    SUMMARY OF THE CASE ................................................................................2

II.   JURISDICTION AND VENUE ........................................................................9

III.  THE PARTIES.................................................................................................10

IV.   FACTS SUPPORTING THE LEGAL CLAIMS .............................................19

      A.  Factual Support For The Allegations ....................................................19

      B.  The Generic Drug Market .....................................................................21

          1.   The Hatch-Waxman Act ..............................................................21

          2.   The Importance Of Generic Drugs ..............................................22

          3.   The Players In The Drug Distribution System...........................24

               a.  Manufacturers/Suppliers ....................................................24
               b.  Wholesalers/Distributors....................................................27
               c.  Group Purchasing Organizations (GPOs)...........................27
               d.  Pharmacy And Supermarket Chains ....................................28
               e.  Customer Incentives............................................................28

          4.   The Cozy Nature Of The Industry And Opportunities For Collusion ...................30

               a.  Trade Association And Customer Conferences ...................30
               b.  Industry Dinners And Private Meetings...............................31

          5.   The Overarching Conspiracy Between Generic Drug Manufacturers -
               *Playing Nice In The Sandbox*.....................................................34

               a.  The General "Fair Share" Understanding  .........................34
               b.  Once Each Competitor Had Its Fair Share, It Was Time To
                   Increase Prices .................................................................49
               c.  Generic Drug Price Spikes Since 2013  .............................51

      C.  The Illegal Schemes ..............................................................................52

          1.   Generic Topical Products – An Overview  .................................52

          2.   The Early Days – Collusion From 2009 To Early 2012 .................54

               a.  Key Relationships Among Generic Topical Manufacturers ...........54

                   1)  Fougera/Perrigo/Taro.....................................................54

2)  Actavis And Taro/Perrigo ..................................................................... 56

3)  Sandoz/Taro ........................................................................................ 57

    i.   Carbamazepine ER Tablets ........................................................... 58

    ii.  Imiquimod Cream ........................................................................ 61
        a)  *Perrigo Entry (April 2010)* ..................................................... 61
        b)  *Sandoz Entry (February 2011)* ............................................... 66
        c)  *Taro Entry (July 2011)* ......................................................... 68

    iii. Triamcinolone Acetonide Cream and Ointment ................................ 75

    iv.  Adapalene Cream ....................................................................... 76

    v.   Betamethasone Dipropionate Lotion  ............................................ 81

    vi.  Clotrimazole Betamethasone Dipropionate Cream and Lotion  ......... 83
        a)  *March And April 2011 – Actavis Raises Prices And Fougera And Taro Follow* .................................................. 83
        b)  *Taro Increases Prices On CBD Cream In April 2012 While Actavis And Fougera Play Nice In The Sandbox* ....... 87
        c)  *Fougera And Taro Raise CBD Lotion Prices In Late 2012/Early 2013* ................................................................ 88

    vii. Fluocinonide Solution ................................................................. 90
        a)  *Fougera Raises Prices In May 2011 And Taro Follows* ............ 90
        b)  *Fougera Raises Prices In February 2012 And Taro Follows* ...... 91

    viii. Erythromycin Base/Ethyl Alcohol Solution ................................... 94

    ix.  Nystatin Ointment ...................................................................... 103

4)  G&W And Its Relationships ................................................................ 108

    i.   G&W/Fougera ........................................................................... 108
        a)  Metronidazole Cream and Lotion ............................................. 110
        b)  Calcipotriene Solution ............................................................ 115
        c)  Fluocinolone Acetonide Cream & Ointment .............................. 117
        d)  Betamethasone Valerate Lotion ................................................ 120
        e)  Metronidazole .75% Gel ......................................................... 123

    ii.  G&W/Glenmark .......................................................................... 130
        a)  Ciclopirox Cream – April 2012 ................................................ 131

5)  Additional Collusive Relationships ...................................................... 137

    i.   Lidocaine Ointment ................................................................... 137

3. Focus On Price Increases Intensifies - Collusion From Late 2012 - 2016 ........... 140

   a. Shifts In The Market Foster Collusion ........................................................... 140

      1) Post-Fougera Acquisition, Sandoz Sales Executives Feel Pressure
         To Demonstrate Their Value .................................................................. 141

      2) Key Relationships Emerge And Existing Relationships
         Strengthen ............................................................................................. 142

         i. Sandoz/Taro ................................................................................... 143
            a) CW-3's Relationships With Defendant Aprahamian And
               H.M. Of Taro ..................................................................... 143
            b) CW-4's Relationship With D.S. Of Taro ..................................... 146

         ii. CW-3's Relationship With T.P. Of Perrigo ........................................ 147

         iii. Defendant Perfetto's Relationship With Defendant Boothe Of
           Perrigo ............................................................................................ 149

      3) Sandoz Management Knew Of, And Encouraged, The Collusion
         With Competitors ................................................................................. 149

   b. Taro Emerges As A Leader Among Generic Topical Manufacturers ........... 151

      1) Increased Focus On Fair Share And Price Increases ............................... 151

         i. Setting The Stage For Future Collusion – Defendant Aprahamian
           And CW-3 Collude On Products Where Sandoz And Actavis
           Competed ........................................................................................ 156
            a) Desonide Lotion ............................................................................ 157
            b) Ciclopirox Shampoo ..................................................................... 160
            c) Betamethasone Valerate Ointment ............................................... 163

         ii. Aprahamian Moves To Taro And Immediately Begins
           Colluding With CW-3 On Products On Which Sandoz And
           Taro Overlap .................................................................................. 166
            a) Nystatin Triamcinolone Cream and Ointment ............................. 167
            b) Fluocinonide Ointment ................................................................. 176
            c) Lidocaine Ointment ...................................................................... 179

         iii. Defendants Aprahamian And Perfetto Orchestrate And Lead
           Price Increases On A Number Of Key Products In May 2013 ........... 183
            a) Aprahamian And Perfetto Communicate And Coordinate
               With Their Competitors In Advance Of The May 2013
               Increases ...................................................................................... 184
            b) Taro's Competitors Uniformly Declined To Bid On Taro
               Customers And Followed The May 2013 Increases .................... 190

   iv. Building Upon Early Successes – Taro's Continued Collusion
    Over The Ensuing Years .................................................................. 195
    a) Alclometasone Dipropionate Ointment ........................... 196
    b) Fluocinonide Solution .................................................... 199
    c) Taro's August 2013 Price Increases ............................... 202
    d) Triamcinolone Acetonide Paste ...................................... 205
    e) Acetazolamide Tablets .................................................... 206
    f) Desonide Ointment .......................................................... 212
    g) Taro's June 2014 Price Increases ................................... 218
     a. Carbamazepine ER Tablets and Clobetasol Propionate .......... 225
     b. Hydrocortisone Valerate Cream ............................. 232
     c. Phenytoin Sodium ER Capsules ............................. 233
    h) Econazole Nitrate Cream ................................................ 238
    i) Fluocinonide .1% Cream ................................................ 240
    j) Metronidazole 1% Gel ..................................................... 246
    k) Clotrimazole 1% Cream .................................................. 250
    l) Ketoconazole Cream and Fluocinonide Gel .................... 253
     a. Ketoconazole Cream ............................................. 253
     b. Fluocinonide Gel ................................................... 258

 c. Sandoz And Its Other Relationships ........................................... 262

  1) Collusion Between Sandoz And Perrigo ..................................... 263
   i. Bromocriptine Mesylate Tablets ........................................ 264
   ii. Adapalene Cream .............................................................. 270
   iii. Calcipotriene Betamethasone Dipropionate Ointment ......... 276
   iv. Tacrolimus Ointment ......................................................... 284
   v. Methazolamide Tablets ...................................................... 287

  2) Collusion Between Sandoz And Glenmark ................................. 291
   i. Fluticasone Propionate Lotion (60ml) ............................... 291
   ii. Desoximetasone Ointment ................................................ 299
    a) *Sandoz Entry (September 2012)* ................................... 300
    b) *Glenmark Entry (September 2013)* .............................. 302

  3) Collusion Between Sandoz And Aurobindo ................................. 305
   i. Oxacillin Sodium and Nafcillin Sodium Injectable Vials .......... 306
   ii. Cefpodoxime Proxetil Oral Suspension and Tablets .......... 309
   iii. Pioglitazone HCL Metformin HCL Tablets ....................... 314

  4) Collusion Between Sandoz And Rising ....................................... 319
   i. Griseofulvin Microsize Tablets ......................................... 320

  5) Collusion Between Sandoz And Mallinckrodt ............................ 327
   i. Methylphenidate HCL Tablets and Methylphenidate HCL
    ER Tablets ........................................................................ 328

  6) Sandoz's Collusion With Greenstone ......................................... 334

          i.   Greenstone Equals Pfizer ................................................. 335

          ii.  Clindamycin Phosphate  ................................................ 341

              a)  *The First Coordinated Price Increase (60 ml Solution –*
                    *Fougera And Greenstone)* ............................................ 342

              b)  *The Second Coordinated Increase (October 2012 – All*
                    *Formulations – Sandoz And Greenstone)* .................................... 345

              c)  *New Entrants On Clindamycin Solution – Perrigo And*
                    *Taro – Do Not Significantly Erode Pricing* ................................. 349

              d)  *The Third Coordinated Price Increase (2014 – All*
                    *Formulations Except Solution – Sandoz And Greenstone)* ........... 358

         iii. Latanoprost Drops .................................................... 360

         iv. Eplerenone Tablets ................................................... 367

   d.     G&W And Its Other Relationships ............................................... 369

       1) Collusion Between G&W And Perrigo .................................... 372

         i.   Halobetasol Propionate Cream and Ointment ................................. 373

              a)  *The First Coordinated Price Increase – September 2012* ........... 373

              b)  *The Second Coordinated Price Increase – March/April 2013* ..... 376

              c)  *Sandoz Launches Halobetasol Cream* ........................... 377

              d)  *Taro Launches Halobetasol Cream and Ointment* ...................... 383

         ii.  Prochlorperazine Maleate Suppositories ................................... 386

         iii. Ciclopirox Solution .................................................. 388

         iv. Hydrocortisone Acetate Suppositories (Anucort HC) ...................... 393

       2) Collusion Between G&W And Actavis ................................... 399

         i.   Promethazine HCL Suppositories ....................................... 400

       3) Collusion Between G&W And Glenmark ................................. 407

         i.   Ciclopirox Cream and Mometasone Furoate ..................... 408

       4) Collusion Between G&W And Lupin .................................... 414

         i.   Ethambutol HCL Tablets ............................................ 414

4.   The Defendants' Profitability Increases Dramatically As A Result Of
    Collusive Conduct ....................................................... 419

   a.    Defendant Taro and Defendant Perrigo's Profits Increased
       Over 1300% From 2008 To Early 2016  ................................. 420

       1) Defendant Taro  ................................................... 420

       2) Defendant Perrigo ................................................. 422

   b.    Other Defendants' Revenues And Profits Also Multiply From 2008
       To Early 2016 .................................................... 424

    5.  Price Increases Slow Dramatically After Government Investigations
        Commence ......................................................................................... 425

  D.   Consciousness Of Guilt ............................................................................. 426

V.    PURCHASES OF GENERIC PHARMACEUTICALS THROUGH MMCAP ................... 429

VI.   TRADE AND COMMERCE.............................................................................. 429

VII.  MARKET EFFECTS ..................................................................................... 430

VIII. CAUSES OF ACTION .................................................................................. 431

COUNT ONE
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT SANDOZ AND ALL OTHER
CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ......................................................................................... 431

COUNT TWO
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT TARO AND ALL OTHER
CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ......................................................................................... 434

COUNT THREE
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT PERRIGO AND ALL OTHER
CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ......................................................................................... 436

COUNT FOUR
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT G&W AND ALL OTHER
CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ......................................................................................... 438

COUNT FIVE
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT ACTAVIS AND ALL OTHER
CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ......................................................................................... 440

COUNT SIX
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT GLENMARK AND ALL
OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ................................................................................................................. 441

COUNT SEVEN
(BY ALL PLAINTIFF STATES AGAINST DEFENDANTS PFIZER AND GREENSTONE
AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL
LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX
PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF
THE SHERMAN ACT ......................................................................................................... 443

COUNT EIGHT
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT AUROBINDO AND ALL
OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ................................................................................................................. 445

COUNT NINE
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT MYLAN AND ALL OTHER
CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OFSECTION 1 OF THE
SHERMAN ACT ................................................................................................................. 446

COUNT TEN
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT SUN AND ALL OTHER
CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES
FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ................................................................................................................. 448

COUNT ELEVEN
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT MALLINCKRODT AND
ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL
LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX
PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1
OF THE SHERMAN ACT ................................................................................................... 449

COUNT TWELVE
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT VALEANT AND ALL OTHER
CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ..................................................................................................................... 451

COUNT THIRTEEN
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT WOCKHARDT AND ALL
OTHER CORPORATE DEFENDANTS UNDER JOINTAND SEVERAL LIABILITY) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ..................................................................................................................... 452

COUNT FOURTEEN
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT AMNEAL AND ALL OTHER
CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ..................................................................................................................... 453

COUNT FIFTEEN
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT LANNETT AND ALL OTHER
CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ..................................................................................................................... 455

COUNT SIXTEEN
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT LUPIN AND ALL OTHER
CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ..................................................................................................................... 456

COUNT SEVENTEEN
(BY ALL PLAINTIFF STATES AGAINST DEFENDANT TELIGENT AND ALL OTHER
CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ..................................................................................................................... 457

COUNT EIGHTEEN
(BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT ARA APRAHAMIAN) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ..................................................................................................................... 459

COUNT NINETEEN
(BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT MITCHELL BLASHINSKY)
– HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGSIN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ........................................................................................................................ 461

COUNT TWENTY
(BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT DOUGLAS BOOTHE) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ........................................................................................................................ 463

COUNT TWENTY-ONE
(BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT JAMES GRAUSO) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ........................................................................................................................ 465

COUNT TWENTY-TWO
(BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT WALTER KACZMAREK)
– HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ........................................................................................................................ 467

COUNT TWENTY-THREE
(BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT ARMANDO KELLUM) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ........................................................................................................................ 469

COUNT TWENTY-FOUR
 (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT KURT ORLOFSKI) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ........................................................................................................................ 472

COUNT TWENTY-FIVE
(BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT MICHAEL PERFETTO) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ........................................................................................................................ 474

COUNT TWENTY-SIX
(BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT ERIKA VOGEL-BAYLOR)
– HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ........................................................................................................................ 476

COUNT TWENTY-SEVEN
(BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT JOHN WESOLOWSKI) –
HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR
MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE
SHERMAN ACT ................................................................................................. 478

COUNT TWENTY-EIGHT
SUPPLEMENTAL STATE LAW CLAIMS ........................................................... 480

    Connecticut ........................................................................................... 480
    Alabama ................................................................................................. 481
    Alaska .................................................................................................... 482
    Arizona .................................................................................................. 483
    Arkansas ................................................................................................ 484
    Colorado ................................................................................................ 485
    Delaware ................................................................................................ 486
    District of Columbia ............................................................................. 487
    Florida ................................................................................................... 487
    Guam ..................................................................................................... 489
    Hawaii ................................................................................................... 490
    Idaho ...................................................................................................... 491
    Illinois ................................................................................................... 491
    Indiana ................................................................................................... 492
    Iowa ....................................................................................................... 493
    Kansas .................................................................................................... 493
    Kentucky ................................................................................................ 494
    Louisiana ............................................................................................... 498
    Maine ..................................................................................................... 498
    Maryland ................................................................................................ 498
    Massachusetts ........................................................................................ 499
    Michigan ................................................................................................ 500
    Minnesota .............................................................................................. 501
    Mississippi ............................................................................................ 505
    Missouri ................................................................................................. 506
    Montana ................................................................................................. 506
    Nebraska ................................................................................................ 508
    Nevada ................................................................................................... 509
    New Hampshire ..................................................................................... 511
    New Jersey ............................................................................................. 514
    New Mexico ........................................................................................... 514
    New York ............................................................................................... 515
    North Carolina ....................................................................................... 516
    North Dakota .......................................................................................... 520
    Northern Mariana Islands ...................................................................... 520
    Ohio ....................................................................................................... 522
    Oklahoma .............................................................................................. 522
    Oregon ................................................................................................... 523

Pennsylvania ....................................................................................................... 523
Puerto Rico.......................................................................................................... 534
Rhode Island ....................................................................................................... 534
South Carolina ..................................................................................................... 535
Tennessee ............................................................................................................ 536
Utah..................................................................................................................... 537
Vermont ............................................................................................................... 538
Virginia ................................................................................................................ 538
Washington .......................................................................................................... 539
West Virginia ....................................................................................................... 540
Wisconsin............................................................................................................. 540
U.S. Virgin Islands .............................................................................................. 541
California ............................................................................................................. 541

PRAYER FOR RELIEF .......................................................................................... 544

JURY DEMAND...................................................................................................... 545

The States of Connecticut, Alabama, Alaska, Arizona, Arkansas, California, Colorado,

Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine,

Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New

Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio,

Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Utah, Vermont, Washington,

West Virginia, Wisconsin, the Commonwealths of Kentucky, Massachusetts, the Northern

Mariana Islands, Pennsylvania, Puerto Rico, and Virginia, the Territory of Guam, the District of

Columbia and U.S. Virgin Islands (the "Plaintiff States"), by and through their Attorneys

General, bring this civil law enforcement action against Sandoz, Inc., Actavis Holdco US, Inc.,

Actavis Elizabeth LLC, Actavis Pharma, Inc., Amneal Pharmaceuticals, Inc., Amneal

Pharmaceuticals, LLC,  Ara Aprahamian, Aurobindo Pharma U.S.A., Inc., Bausch Health

Americas, Inc., Bausch Health US, LLC, Mitchell Blashinsky, Douglas Boothe, Fougera

Pharmaceuticals Inc., Glenmark Pharmaceuticals Inc., USA, James (Jim) Grauso, Greenstone

LLC, G&W Laboratories, Inc., Walter Kaczmarek, Armando Kellum, Lannett Company, Inc.,

Lupin Pharmaceuticals, Inc., Mallinckrodt Inc., Mallinckrodt LLC, Mallinckrodt plc, Mylan Inc.,

Mylan Pharmaceuticals Inc., Kurt Orlofski, Michael Perfetto, Perrigo New York, Inc., Pfizer

Inc., Sun Pharmaceutical Industries, Inc., Taro Pharmaceuticals USA, Inc., Teligent, Inc., Erika

Vogel-Baylor, John Wesolowski, and Wockhardt USA LLC, (collectively, the "Defendants") and

allege as follows: [1]

---

[1] The Plaintiff States are hereby amending their Complaint dated June 10, 2020 as of right as to
all Defendants except Mallinckrodt Inc., Mallinckrodt LLC, and Mallinckrodt plc (collectively,
"Mallinckrodt") due to the pending stay of bankruptcy proceedings in *In re: Mallinckrodt plc, et
al.*, Docket No. 20-12522 (JTD) (Bankr. D. Del.).  All allegations as against Mallinckrodt in the

I.      **SUMMARY OF THE CASE**

1.      Going back many years – from at least 2009 through early 2016 – collusion has been rampant among manufacturers of generic topical products.  Topical products include any drug that is administered by means of contact, most often with an external body surface, including creams, lotions, gels, ointments, and solutions.  Manufacturers of generic topical products typically face higher barriers to entry because technical hurdles associated with demonstrating bioequivalence to branded products are more time consuming and expensive, and manufacturing costs are high compared to other types of generic drugs.

2.      The greater barriers to entry generally associated with topical products limit the number of competitors in any particular topical product market, creating an environment that is ripe for collusion.  Many topical products have only two or three competitors.  As a result, the sales and pricing executives at these companies know each other well and have used those business and personal relationships as a means to collude to limit competition, allocate customers, and significantly raise prices on dozens of generic topical products.

3.      Indeed, the larger and more prominent topical manufacturers – including Defendants Taro, Perrigo, Fougera (now Sandoz), and Actavis – had long-standing agreements over the course of several years not to compete for each other's customers and to follow each other's price increases.  In order to maintain these unlawful agreements, the competitors stayed in nearly constant communication – meeting regularly at trade shows and customer conferences and communicating frequently by phone and text message to reinforce their understandings.  This Complaint is replete with examples demonstrating how these understandings manifested themselves with respect to specific products over a period of many years.

Plaintiff States' Complaint dated June 10, 2020 remain the same and are incorporated herein by reference.

4.      These understandings were not limited to just the largest manufacturers of generic topical products, however.  The other manufacturers of those products – including all the corporate Defendants named in this Complaint – understood the rules of the road and took the necessary steps to limit competition among them.

5.      For many years, the larger generic pharmaceutical industry has operated pursuant to an overarching understanding to avoid competing with each other and to instead settle for what these competitors refer to as their "fair share."  This understanding has permeated every segment of the industry, and the purpose of the agreement was to avoid competition among generic manufacturers that would normally result in lower prices and greater savings to the ultimate consumer.  Rather than enter a particular generic drug market by competing on price in order to gain market share, competitors in the generic drug industry would systematically and routinely communicate with one another directly and divvy up customers to stifle price competition and maintain artificially higher prices.

6.      Nowhere was this understanding more pronounced than with regard to the sale of generic topical products, where the competition is limited and the product overlap extensive. Indeed, companies recognized that reality and celebrated the fact that they operated in this segment of the industry.  For example, Defendant Erika Vogel-Baylor, a senior sales and marketing executive at Defendant G&W, remarked in an internal e-mail from May 2013 "[w]e remain very upbeat to be playing in the topical and suppository market where there continues to be limited to no competition."

7.      Once the competitors had their "fair share" of a particular drug market, it was time to increase prices.  Indeed, it was generally understood that when a competitor increased

prices, the other competitors in the same drug market would either decline to bid for the business or would bid high so as not to take advantage of the price increase. Typically, the competitor would then follow with a comparable price increase of its own.

8.     Although manufacturers of generic topical products have been colluding on price increases since at least 2009, the size and frequency of those increases grew exponentially in 2013 and 2014. During that time period, the prices of hundreds of generic drugs – including many at issue in this Complaint – skyrocketed without explanation, sparking outrage from politicians, payers, and consumers across the country whose costs have doubled, tripled, or even increased by 1,000% or more. Generic drug manufacturers argued publicly that the significant price increases were due to a myriad of lawful factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines.

9.     However, these reasons were far from the truth. In reality, there were several structural and personnel changes among generic topical manufacturers in late 2012 and early 2013 that fostered and facilitated collusion in that segment of the industry. These changes increased opportunities for coordination between competitors – and coordinate they did.

10.     First, in July 2012, Defendant Sandoz finalized its purchase of Fougera, a niche dermatology manufacturer, making Sandoz a much more prominent manufacturer of generic topical products. Sandoz publicly touted that the purchase positioned it "as the new #1 in generic dermatology medicines both globally and in the U.S."

11.     As a result of the acquisition, all of Fougera's sales executives lost their jobs, except for one executive who is now cooperating with the Plaintiff States (referred to herein as CW-3). Because of Sandoz's size, and the fact that it was an active participant in many different product markets, many competitors reached out to CW-3 when they learned he had transitioned

4

to Sandoz because they viewed it as a strategic opportunity to collude on overlapping products. For example, Defendant Mitchell Blashinsky, then a senior executive at Defendant Glenmark approached CW-3 at an industry event in August 2012 and told him – "we can make a lot of money" and "we can work together on pricing."

12.     Over the ensuing years, CW-3 would leverage his competitor relationships – including his contacts at many of the corporate Defendants – to prove his worth to Sandoz management by using those relationships to allocate customers and increase prices on dozens of products.  His competitor contacts included Defendants Blashinsky, Ara Aprahamian, and Walter Kaczmarek, but there were many others.  Indeed, CW-3 took contemporaneous notes to keep track of all the different prices and products he was discussing at any given time.  CW-3 maintained this direct evidence of anticompetitive conduct in a notebook (of which there are two volumes) that his colleague, referred to hereafter as CW-1, coined the "Diary of Collusion." Various excerpts from the notebooks are referred to throughout this Complaint to support the allegations herein.

13.     Second, in the months following the Fougera acquisition, three key Actavis executives – Defendants Douglas Boothe, Michael Perfetto, and Aprahamian – left Actavis to assume senior-level positions at competitor companies that were also prominent manufacturers of topical products.  Boothe became an executive at Defendant Perrigo and Perfetto and Aprahamian became executives at Defendant Taro.  These former colleagues – turned competitors – would use their longstanding relationships and new high-level positions as an opportunity to collude with their key competitors on overlap products.

14.     Defendants Perfetto and Aprahamian, in particular, wasted no time working together to implement changes designed to improve Taro's financial bottom line and firmly

5

position the company as a price increase leader.  Although Taro had been successful in

implementing price increases in the past, the increases taken by Taro in 2013 and 2014 would be

much more significant.  These increases caught the attention of other generic drug manufacturers

across the industry.  Indeed, one sales executive at a generic manufacturer not named in this

Complaint remarked in an internal e-mail that "Taro just continues to amaze me.  How are we

progressing with identifying responsible market areas and options.  Is there a next derm?"  To

that, his colleague responded "[t]his space continues to be appealing as the number of players are

limited and the frequent, significant price increases drive the business."

15.     For example, in June 2014, Taro initiated significant price increases on more than

a dozen different drug products.  As a result of the June 2014 increases, Credit Suisse analysts

increased their price target for Taro and its parent company, Defendant Sun Pharmaceuticals,

from $85 to $150 per share.  As justification for the increase, Credit Suisse emphasized that

Taro's competitors had consistently followed the increases and prices remained high:

**#1: Have previous price increases sustained for Taro?**
Taro has approval for ~140 ANDAs in the US and we have already
seen Taro taking price increase in more than 30 of these products.
Some of these products we have highlighted in Fig 1. It is important to
note (1) there have been multiple instances of price increase in these
products and (2) there has been no roll-backs of prices even once so
far in the last three years.

| Figure 1: Taro has not rolled back price increase so far | | | |
| --- | --- | --- | --- |
| Product | Price increase since Mar-11 | # of instances of price increase | Remarks |
| Nystatin triam - Cream | 59x | 5 | No roll backs |
| Nystatin triam - Ointment | 45x | 5 | No roll backs |
| Clomipramine | 27x | 1 | No roll backs |
| Clobetasol Propionate - Cream | 21x | 2 | No roll backs |
| Clobetasol Propionate - Ointment | 18x | 2 | No roll backs |
| Fluocinonide - Cream | 17x | 3 | No roll backs |
| Fluocinonide - Liquid Lotion | 8x | 3 | No roll backs |
| Nystatin - Cream | 12x | 2 | No roll backs |
| Desonide Cream | 11x | 2 | No roll backs |
| Hydrocortisone Val - Ointment | 8x | 7 | No roll backs |
| Acetazolamide | 5x | 3 | No roll backs |
| Ketocanazole | 2x | 1 | No roll backs |

Source: Price Rx, Credit Suisse estimates.

16.     Defendant Taro's success in implementing price increases depended, in large part, on the strength of the ongoing collusive relationships that Defendants Perfetto and Aprahamian had fostered with their contacts at competitor companies – both with manufacturers of topical products and beyond.  These included individual Defendants Boothe, Blashinsky, Kurt Orlofski, and Vogel-Baylor, but there were others.  Numerous examples of how this collusion unfolded with respect to specific products will be discussed in detail below.

17.     The price increases taken by generic topical manufacturers during this time period resulted in the accrual of significant profits.  Indeed, between 2008 and 2016, Defendants Taro and Perrigo both saw their profits from the sale of generic topical products increase by over 1300%.  The other corporate Defendants profited handsomely from this conduct as well.

18.     In July 2014, the State of Connecticut initiated a non-public investigation into suspicious pharmaceutical price increases.  Over time, the investigation expanded to include the conduct alleged herein and Connecticut was joined in its efforts by more than 50 additional states and U.S. territories.  The allegations in this Complaint are based on, and supported by, information and evidence gleaned directly from the investigation, including: (1) the review of

many thousands of documents produced by dozens of companies and individuals throughout the generic pharmaceutical industry, (2) an industry-wide telephone call database consisting of more than 11 million telephone call records from hundreds of individuals at various levels of the Defendant companies and other generic manufacturers, and (3) information provided by several confidential cooperating witnesses who were directly involved in the conduct alleged herein.

19.     As a result of the information and evidence developed through this investigation, the Plaintiff States allege that the Defendants consistently and systematically, over a period of several years, engaged in contracts, combinations, and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and maintaining prices, and reducing competition in the generic pharmaceutical industry throughout the United States, including but not limited to the markets for at least 80 different generic drugs.

20.     The Plaintiff States also allege that the Defendants participated in an overarching conspiracy, the effect of which was to minimize if not thwart competition across the generic drug industry.  The overarching conspiracy was effectuated by a series of conspiracies that affected and continue to affect the market for the generic drugs identified in this Complaint.

21.     The Plaintiff States focus here on the role of these named Defendants and their participation in, and agreement with, this overarching conspiracy.  The Complaint describes conspiracies regarding the sale of specific drugs, and how these specific conspiracies are also part of the larger overarching conspiracy.

22.     The anticompetitive conduct – schemes to fix and maintain prices, allocate customers, and otherwise thwart competition – has caused, and continues to cause, significant harm to the United States' healthcare system.  Moreover, executives and others at the highest levels in many of the Defendant companies – including the individual Defendants named herein

– conceived, implemented, directed, and ultimately benefited financially from these schemes. The Defendants knew that their conduct was unlawful and typically chose to communicate in person or by cell phone, in an attempt to avoid creating a written record of their illegal conduct.

23.     The Plaintiff States seek a finding that the Defendants' actions violated federal and state antitrust and consumer protection laws; a permanent injunction preventing the Defendants from continuing their illegal conduct and remedying the anticompetitive effects caused by their illegal conduct; disgorgement of the Defendants' ill-gotten gains; damages on behalf of various state and governmental entities and consumers in various Plaintiff States; and civil penalties and other relief as a result of the Defendants' violations of law.

## II.    **JURISDICTION AND VENUE**

24.     This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. §§ 1 and 26, and under 28 U.S.C. §§ 1331 and 1337.

25.     In addition to pleading violations of federal law, the Plaintiff States also allege violations of state law, as set forth below, and seek civil penalties, damages, and equitable relief under those state laws.  All claims under federal and state law are based on a common nucleus of operative fact, and the entire law enforcement action commenced by this Complaint constitutes a single case that would ordinarily be tried in one judicial proceeding.  The Court has jurisdiction over the non-federal claims under 18 U.S.C. § 1367(a), as well as under principles of pendent jurisdiction.  Pendent jurisdiction will avoid unnecessary duplication and multiplicity of actions and should be exercised in the interests of judicial economy, convenience, and fairness.

26.     This Court may exercise personal jurisdiction over all of the Defendants because they either transact business in the District of Connecticut where this action was commenced, or they have engaged in anticompetitive and illegal conduct that has had an impact in the District of

9

Connecticut.  Specifically, the corporate Defendants market and sell generic drugs in interstate and intrastate commerce to consumers nationwide through drug wholesalers and distributors, pharmacy and supermarket chains, and other resellers of generic drugs.  The individual Defendants were executives of various Defendants who engaged in and directed some of the unlawful conduct addressed herein.  The acts complained of have, and will continue to have, substantial effects in the District of Connecticut.

27.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)-(c).  At all times relevant to this Complaint, the Defendants resided, transacted business, were found, or had agents in this District, and a portion of the affected interstate trade and commerce described below has been carried out in this District.

## III.     **THE PARTIES**

28.     The Attorneys General are the chief legal officers for their respective States. They are granted authority under federal and state antitrust and consumer protection laws to bring actions to protect the economic well-being of the Plaintiff States and to obtain injunctive and other relief from the harm that results from the violations of antitrust and consumer protection laws alleged herein.  All Plaintiff States seek equitable and other relief under federal antitrust laws in their sovereign or quasi-sovereign capacities.  Certain Plaintiff States also seek relief under state antitrust and consumer protection laws, including monetary relief for governmental entities and consumers in their States who paid, or reimbursed for, the generic drugs that are the subject of this Complaint.

29.     Defendant Sandoz, Inc. ("Sandoz") is a corporation organized and existing under the laws of the State of Colorado, with its principal place of business in Princeton, New Jersey. Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel,

10

Switzerland.  Sandoz is registered with the Pennsylvania Department of State as a foreign

corporation and maintains a registered agent in Pennsylvania.

30.     Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation

with its principal place of business in Melville, New York.  Fougera is a wholly owned

subsidiary of Defendant Sandoz, Inc.  In 2012, Sandoz acquired and integrated Fougera into its

U.S.-based generic pharmaceutical business.

31.     Unless addressed individually, Fougera and Sandoz are collectively referred to

herein as "Sandoz."  At all times relevant to the Complaint, Sandoz marketed and sold generic

pharmaceuticals in this District and throughout the United States.

32.     Defendant Actavis Holdco US, Inc. ("Actavis Holdco"), is a corporation

organized and existing under the laws of the State of Delaware with its principal place of

business in Parsippany, New Jersey.  In August 2016, Teva Pharmaceuticals USA, Inc. acquired

the Actavis generics business of Allergan plc, including Actavis, Inc.  Upon the acquisition,

Actavis, Inc. – the acquired Allergan plc generics operating company (formerly known as

Watson Pharmaceuticals) – was renamed Allergan Finance, LLC, which in turn assigned all of

the assets and liabilities of the former Allergan plc generics business to the newly formed

Actavis Holdco, including subsidiaries Actavis Pharma, Inc. and Actavis Elizabeth LLC (a

research and development and manufacturing entity for Actavis's generic operations), among

others.  Actavis Holdco is a wholly owned subsidiary of Teva Pharmaceuticals USA, Inc., which

is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.

33.     Defendant Actavis Pharma, Inc. is a Delaware corporation with its principal place

of business in Parsippany, New Jersey. It is a wholly owned subsidiary of Actavis Holdco and is

a principal operating company in the U.S. for generic products acquired from Allergan plc.  It manufactures, markets, and/or distributes generic pharmaceuticals.

34.    Actavis Elizabeth LLC ("Actavis Elizabeth") is a Delaware company with its principal place of business in Elizabeth, New Jersey.  It is a wholly owned subsidiary of Actavis Holdco and is a research, development, and manufacturing entity for Actavis generic operations.

35.    Unless addressed individually, Actavis Holdco, Actavis Pharma, and Actavis Elizabeth are collectively referred to herein as "Actavis."  At all times relevant to the Complaint, Actavis marketed and sold generic pharmaceuticals in this District and throughout the United States.

36.    Defendant Amneal Pharmaceuticals, Inc. ("Amneal Inc.") is a corporation organized and existing under the laws of the state of Delaware, with a principal place of business in Bridgewater, New Jersey.  It is the parent company of Defendant Amneal Pharmaceuticals, LLC.

37.    Defendant Amneal Pharmaceuticals, LLC ("Amneal LLC") is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey.

38.    Unless addressed individually, Amneal Inc. and Amneal LLC are collectively referred to herein as "Amneal."  At all times relevant to the Complaint, Amneal marketed and sold generic pharmaceuticals in this District and throughout the United States.

39.    Defendant Ara Aprahamian ("Aprahamian") is an individual residing in Bardonia, New York.  Aprahamian worked at Defendant Actavis as Director, Pricing and Contracts from August 2010 through March 2013.  From March 2013 through August 2018, Aprahamian was Vice President of Sales and Marketing at Defendant Taro Pharmaceuticals USA, Inc.

40.     Defendant Aurobindo Pharma U.S.A., Inc. ("Aurobindo") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Dayton, New Jersey.  At all times relevant to the Complaint, Aurobindo marketed and sold generic pharmaceuticals in this District and throughout the United States.

41.     Defendant Bausch Health Americas, Inc. (formerly known as Valeant Pharmaceuticals International, Inc.) is a Delaware corporation with its U.S. headquarters located in Bridgewater, New Jersey.

42.     Bausch Health US, LLC (formerly known as Valeant Pharmaceuticals North America LLC) is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey.  Bausch Health US is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

43.     Unless addressed individually, Bausch Health Americas, Inc. and Bausch Health US, LLC are collectively referred to herein as "Valeant."  At all times relevant to the Complaint, Valeant marketed and sold generic pharmaceuticals in this District and throughout the United States.

44.     Defendant Mitchell Blashinsky ("Blashinsky") is an individual residing in Monroe Township, New Jersey.  Blashinsky worked for Defendant Taro Pharmaceuticals USA, Inc. from January 2007 through May 2012 as Vice President of Marketing for Generics.  From June 2012 through March 2014, Blashinsky was Vice President of Sales and Marketing at Defendant Glenmark Pharmaceuticals Inc., USA.

45.     Defendant Douglas Boothe ("Boothe") is an individual residing in Chester, New Jersey. Boothe worked for Defendant Actavis from August 2008 through December 2012 as

13

Chief Executive Officer.  From January 2013 through July 2016, Boothe served as Executive

Vice President and General Manager, Pharmaceuticals at Defendant Perrigo New York, Inc.

46.     Defendant G&W Laboratories, Inc. ("G&W") is a New Jersey corporation with its

principal place of business in South Plainfield, New Jersey.  At all times relevant to the

Complaint, G&W marketed and sold generic pharmaceuticals in this District and throughout the

United States.

47.     Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") is a corporation

organized and existing under the laws of the State of Delaware with a principal place of business

in Mahwah, New Jersey.  At all times relevant to the Complaint, Glenmark marketed and sold

generic pharmaceuticals in this District and throughout the United States.

48.     Defendant James (Jim) Grauso ("Grauso") is an individual residing in Ramsey,

New Jersey.  Grauso worked at Defendant G&W as Vice President of Sales and Marketing from

January 2010 through December 2011.  Grauso worked at Defendant Aurobindo as Senior Vice

President, Commercial Operations from December 2011 through January 2014.  Since February

2014, Grauso has been employed as the Executive Vice President, N.A. Commercial Operations

at Defendant Glenmark.

49.     Defendant Greenstone LLC ("Greenstone") is a limited liability company located

in North Peapack, New Jersey.  Greenstone is a wholly owned subsidiary of Defendant Pfizer

Inc. ("Pfizer"), a global pharmaceutical company headquartered in New York, New York, and

has at all relevant times operated as the generic drug division of Pfizer.  Greenstone operates out

of Pfizer's Peapack, New Jersey campus, and a majority of Greenstone's employees are also

employees of Pfizer's Essential Health Division, including Greenstone's President.  Greenstone

14

employees also use Pfizer for financial analysis, human resources, and employee benefit purposes, making the two companies essentially indistinguishable.

50.     Defendant Pfizer is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York.  Pfizer is a global biopharmaceutical company and is the corporate parent of Defendant Greenstone.

51.     Unless addressed individually, Greenstone and Pfizer are collectively referred to herein as "Greenstone."  At all times relevant to the Complaint, Greenstone – under the direction and control of Pfizer – marketed and sold generic pharmaceuticals in this District and throughout the United States.

52.     Defendant Walter Kaczmarek ("Kaczmarek") is an individual residing in Longboat Key, Florida.  Kaczmarek worked for Defendant Fougera as Senior Director, National Accounts; Vice President, National Accounts; and Senior Vice President, Commercial Operations from November 2004 through November 2012.  Kaczmarek worked for Defendant Mallinckrodt as Vice President - General Manager; and President, Multi-Source Pharmaceuticals from November 2012 through August 2016.

53.     Defendant Armando Kellum ("Kellum") is an individual residing in Huntingdon Valley, Pennsylvania.  At all times relevant to the Complaint, Kellum was the Vice President, Sales and Marketing at Defendant Sandoz.

54.     Defendant Lannett Company, Inc. ("Lannett") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Philadelphia, Pennsylvania.  At all times relevant to the Complaint, Lannett marketed and sold generic pharmaceuticals in this District and throughout the United States.

15

55.     Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a Delaware corporation with its principal place of business in Baltimore, Maryland.  Lupin is a wholly owned subsidiary of Lupin Ltd., an Indian company with its principal place of business in Mumbai, India.  At all times relevant to the Complaint, Lupin marketed and sold generic pharmaceuticals in this District and throughout the United States.

56.     Defendant Mallinckrodt Inc. is a Delaware corporation with its principal place of business in Webster Groves, Missouri.  As a result of a tax inversion acquisition, as of 2013 it is a wholly owned subsidiary of Mallinckrodt plc, which is based in the United Kingdom. Mallinckrodt Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

57.     Defendant Mallinckrodt plc is an Irish public limited company with its principal place of business in Staines-Upon-Thames, Surrey, United Kingdom.  Mallinckrodt plc was incorporated in January 2013 for the purpose of holding the pharmaceuticals business of Covidien plc, which was fully transferred to Mallinckrodt plc in June of that year.  Mallinckrodt plc also operates under the registered business name Mallinckrodt Pharmaceuticals, with its U.S. headquarters in Hazelwood, Missouri.

58.     Defendant Mallinckrodt LLC is a Delaware limited liability corporation headquartered in Hazelwood, Missouri.

59.     Unless addressed individually, Mallinckrodt Inc., Mallinckrodt plc, and Mallinckrodt LLC are collectively referred to herein as "Mallinckrodt."  At all times relevant to the Complaint, Mallinckrodt marketed and sold generic pharmaceuticals in this District and throughout the United States.

16

60.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

61.     Defendant Mylan Pharmaceuticals Inc. ("Mylan Pharma") is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.  It is a subsidiary of Mylan Inc.  Mylan Pharma is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

62.     Unless addressed individually, Mylan Inc. and Mylan Pharma are collectively referred to herein as "Mylan."  At all times relevant to the Complaint, Mylan marketed and sold generic pharmaceuticals in this District and throughout the United States.

63.     Defendant Kurt Orlofski ("Orlofski") is an individual residing in Mountain Lakes, New Jersey.  Orlofski was the President of Defendant G&W from September 2009 through December 2016.

64.     Defendant Mike Perfetto ("Perfetto") is an individual residing in Conklin, New York.  Perfetto worked for Defendant Actavis from August 2003 through January 2013 as Vice President, Sales and Marketing.  Beginning in January 2013, Perfetto worked for Defendant Taro Pharmaceuticals USA, Inc. as its Chief Commercial Officer.

65.     Defendant Perrigo New York, Inc. ("Perrigo") is a Delaware corporation with its executive offices in Allegan, Michigan and its primary business location in Bronx, NY.  It is a subsidiary of Perrigo Company, plc, an Irish company with its principal place of business in Dublin, Ireland.  At all times relevant to the Complaint, Perrigo has marketed and sold generic pharmaceuticals in this District and throughout the United States.

66.     Defendant Sun Pharmaceutical Industries, Inc. ("Sun") is a Michigan corporation with its principal place of business in Cranbury, New Jersey.  Sun is a wholly owned subsidiary

17

of Sun Pharmaceutical Industries Ltd., an Indian corporation, which also owns a majority stake

in Taro Pharmaceutical Industries, Ltd., and Taro's U.S. subsidiary, Defendant Taro

Pharmaceutical USA, Inc.  At all times relevant to the Complaint, Sun marketed and sold generic

pharmaceuticals in this District and throughout the United States.

67.     Defendant Taro Pharmaceuticals USA, Inc. ("Taro") is a corporation organized

and existing under the laws of the State of New York, with its principal place of business in

Hawthorne, New York.  At all times relevant to the Complaint, Taro marketed and sold generic

pharmaceuticals in this District and throughout the United States.

68.     Defendant Teligent, Inc. (formerly known as IGI Laboratories, Inc.) ("Teligent")

is a Delaware corporation with its principal place of business in Buena, New Jersey.  Defendant

Teligent was known as IGI Laboratories, Inc. until 2015.  At all times relevant to the Complaint,

Teligent sold generic pharmaceuticals in this District and throughout the United States.

69.     Defendant Erika Vogel-Baylor ("Vogel-Baylor") is an individual residing in

Milford, New Jersey.  At all times relevant to the Complaint, beginning in July 2011, Vogel-

Baylor worked for Defendant G&W as Vice President, Sales and Marketing.

70.     Defendant John Wesolowski ("Wesolowski") is an individual residing in Delton,

Michigan.  Since February 2004, Wesolowski has worked for Defendant Perrigo as Senior Vice

President of Commercial Operations.

71.     Defendant Wockhardt USA LLC ("Wockhardt") is a Delaware limited liability

company located in Parsippany, New Jersey.  At all times relevant to the Complaint, Wockhardt

has marketed and sold generic pharmaceuticals in this District and throughout the United States.

IV.    **FACTS SUPPORTING THE LEGAL CLAIMS**

A.    **Factual Support For The Allegations**

72.    The allegations in this Complaint are supported and corroborated by facts and evidence obtained from numerous sources, including but not limited to those set forth below.

73.    During their investigation, the Plaintiff States have issued over 30 subpoenas to various generic drug manufacturers, individuals, and third parties, and have compiled over 8 million investigative documents in a shared document review platform.

74.    The Plaintiff States have issued more than 300 subpoenas to various telephone carriers and have obtained phone call and text message reports for numerous companies and individuals throughout the generic pharmaceutical industry.  The Plaintiff States have loaded those call and text records into a software application for communications surveillance, collection and analysis, designed exclusively for law enforcement.  The Plaintiff States have also loaded the names and contact information for over 600 sales and pricing individuals throughout the industry – giving the Plaintiff States a unique perspective to know who in the industry was talking to who, and when.

75.    During their investigation, the Plaintiff States have also obtained valuable cooperation from several individuals.  The expected testimony from certain of those individuals will directly support and corroborate the allegations throughout this Complaint.  Some of those cooperating witnesses include:

(a)    A former senior pricing executive at Defendant Sandoz during the time period relevant to this Complaint [referred to herein as CW-1];

(b)     A former sales and marketing executive at Rising Pharmaceuticals, Inc. and senior sales executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-2];

(c)     A former sales executive at Defendant Fougera, and then senior sales executive at Sandoz, during the time period relevant to this Complaint [referred to herein as CW-3];

(d)     A former senior sales executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-4];

(e)     A former senior executive at Defendant Glenmark during the time period relevant to this Complaint [referred to herein as CW-5]; and

(f)     A former senior sales executive at Fougera and Defendant Aurobindo during the time period relevant to this Complaint [referred to herein as CW-6].

76.     In addition, the Plaintiff States have obtained contemporaneous handwritten notes taken by CW-3 during the time period relevant to this Complaint, containing direct evidence of his collusion with several competitors.  CW-3 maintained these notes in a two-volume notebook that his colleague, CW-1, referred to as the "Diary of Collusion" (referred to herein as the "Notebook").  The Notebook contains CW-3's notes from internal Sandoz meetings, as well as some, but not all, of his phone calls with competitors.  CW-3 took these notes chronologically between 2009 and 2015.  In 2012 and 2013, the notes are fairly comprehensive; however, the Notebook is less comprehensive starting in 2014 because CW-3 changed his note-taking practices.  CW-3 took notes because he was discussing many different prices and products with competitors and he could not keep track of it all without notes.  CW-3 generally traveled with the Notebook and did not hide it from people, including competitors.  Indeed, competitors often

20

joked with him about his "little black books."  References to the Notebook will be discussed throughout this Complaint to support the allegations alleged herein.

**B.    The Generic Drug Market**

**1.    The Hatch-Waxman Act**

77.    In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, commonly known as the "Hatch-Waxman" Act.  Its intention was to balance two seemingly contradictory interests:  encouraging drug innovation and promoting competition between brand and generic drugs to lower drug prices.  To encourage innovation, Hatch-Waxman gave branded drug manufacturers longer periods of market exclusivity for newly approved products; this increased the financial returns for investment in drug research and development.

78.    To promote price competition, the law established a new regulatory approval pathway for generic products to help ensure that generic drugs became available more quickly following patent expiration.  To gain approval for a new drug, drug manufacturers must submit a new drug application ("NDA") to the United States Food and Drug Administration ("FDA") showing that the new drug is safe and effective for its intended use.  Developing a new drug and obtaining an NDA can take many years and cost tens or hundreds of millions of dollars.

79.    The Hatch-Waxman Act encouraged faster approval for generic versions of brand-name drugs through the use of "abbreviated new drug applications" ("ANDAs").  These applications rely on the safety and efficacy evidence previously submitted by the branded drug manufacturer, permitting generic manufacturers to avoid conducting costly and duplicative clinical trials.

80.     Hatch-Waxman succeeded in both of its goals.  Since the law was passed in 1984, generic drugs have moved from being less than 20% of prescriptions filled in the United States to nearly 90% of prescriptions filled.  A recent study found that, in 2011 alone, generic medicines saved consumers $193 billion.  During the same period, innovation has continued to lead to many new and helpful drugs.

### 2.     The Importance Of Generic Drugs

81.     Like their branded counterparts, generic drugs are used in the diagnosis, cure, mitigation, treatment, or prevention of disease and, thus, are integral components in modern healthcare, improving health and quality of life for nearly all people in the United States.  In 2019, sales of generic drugs in the United States were over $115 billion dollars.

82.     A branded drug manufacturer that develops an innovative drug can be rewarded with a patent granting a period of exclusive rights to market and sell the drug.  During this period of patent protection, the manufacturer typically markets and sells its drug under a brand name, and the lack of competition can permit the manufacturer to set its prices extremely high.

83.     Once the brand-name drug's exclusivity period ends, additional firms that receive FDA approval are permitted to manufacture and sell "generic" versions of the brand-name drug. As generic drugs enter the market, competition typically leads to dramatic reductions in price. Generic versions of brand name drugs are priced lower than the brand-name versions.  Under most state laws, generic substitution occurs automatically, unless the prescriber indicates on the prescription that the branded drug must be "dispensed as written."

84.     As additional manufacturers enter a particular drug market, competition pushes the price down much more dramatically.  Often, the price of a generic drug will end up as low as

20% of the branded price or even lower.  The following table, created by Defendants Greenstone

and Pfizer, shows the dramatic effects that competition can have on generic drug prices:



For this reason, generic drugs have long been referred to as one of the few "bargains" in the

United States healthcare system.  Experts have stated that the substantial cost savings gained

from the growing number of generic drugs have played a significant role in keeping health care

costs from increasing more dramatically.

85.     Where there is genuine competition, the savings offered by generic drugs over

their brand-name equivalents provide tremendous benefits to consumers and health care payors.

Patients typically see lower out of pocket expenses, while lower costs for payors and insurers can

lead to lower premiums for those who pay for health insurance, and lower costs to government

health care programs like Medicare and Medicaid mean greater value for taxpayers.

23

### 3.     The Players In The Drug Distribution System

86.     The United States prescription drug distribution system includes entities that can be involved at various stages of the distribution channel through which prescription drugs are delivered to end users.

### a.     Manufacturers/Suppliers

87.     Drug manufacturers are the source of the prescription drugs in the pharmaceutical supply chain.  Unlike branded drug manufacturers, generic manufacturers typically do not develop new drug therapies, but instead manufacture generic drugs that can be substituted (often automatically under state law) for the branded drug after expiration of the brand's exclusivity. Generic drugs can be manufactured in a variety of forms, including tablets, capsules, injectables, inhalants, liquids, ointments, and creams.  A manufacturer seeking to sell a "new drug" in the United States (including generic versions of previously approved drugs) must obtain approval from the FDA, which evaluates many factors, including drug safety, efficacy, raw material suppliers, manufacturing processes, labeling, and quality control.

88.     Generic drug manufacturers operate manufacturing facilities and compete with each other to sell the generic drugs they produce to wholesalers, distributors, and in some cases, directly to retail pharmacy chains, mail-order and specialty pharmacies, hospital chains, and some health plans.

89.     Generic drug manufacturers also sell some of their drugs through auctions to different purchasers in the supply chain, e.g., group purchasing organizations, retail pharmacies, and supermarket chains with pharmacies.

90.     In marketing their generic drugs, manufacturers often do not attempt to differentiate their products because, primarily, a generic drug is a commodity.  Consequently,

24

competition is dictated by price and supply.  As a result, generic drug manufacturers usually all

market the drug under the same name, which is the name of the active ingredient (e.g.,

Acetazolamide).

91.     Drug suppliers can include the manufacturers themselves, or other companies that

have agreements to sell or distribute certain generic drugs manufactured by another company.

The corporate Defendants in this action are all drug manufacturers and suppliers who compete

with one another for the sale of generic drugs which are ultimately sold to consumers in the

United States.

92.     Drugs sold in the United States may be manufactured either domestically or

abroad.  Many manufacturers that produce drugs for the United States market are owned by, or

are, foreign companies.  Generic drugs may be manufactured by the same companies that

manufacture brand-name drugs (even in the same factories) or may come from companies that

manufacture generics exclusively.  Drug manufacturers typically sell their products through

supply agreements negotiated with wholesalers and distributors, group purchasing organizations,

pharmacy benefit managers, and large retailers like pharmacy and supermarket chains.

93.     Generic manufacturers report certain benchmark or list prices for each generic

drug that they offer, including the average wholesale price ("AWP") and wholesale acquisition

cost ("WAC"); these sometimes serve as benchmarks, but given the different characteristics of

different buyers and the nature of individual negotiations, a manufacturer will frequently supply

the same generic drug at several different prices depending on the customer or type of customer.

94.     In addition, generic manufacturers that enter into a Medicaid rebate agreement

must report their average manufacturer prices ("AMP") to the federal Centers for Medicare and

Medicaid Services on a monthly and quarterly basis.  Pursuant to federal law, AMP is defined as

the average price paid to the manufacturer for the drug in the United States by (a) wholesalers for drugs distributed to retail community pharmacies and (b) retail community pharmacies that purchase drugs directly from the manufacturer.

95.     Medicaid reimbursement for certain generic drugs is calculated using a formula that is derived from a manufacturer's AMP for that specific generic drug.  Put another way, a manufacturer's AMP may have a direct impact on how much a state Medicaid program pays for a generic drug dispensed to a Medicaid beneficiary.

96.     The corporate Defendants in this case are among the largest generic drug manufacturers in the industry.  Each has a broad portfolio of generic drugs which it sells to distributors, retailers, and group purchasing organizations, many of whom have a nationwide presence.  The competitors for particular generic products fluctuate often as manufacturers lose exclusivity or decide to enter or exit an existing drug market.

97.     At all times relevant to this Complaint, every corporate Defendant's portfolio remained broad and was marketed to customers in virtually every state across the United States. The Defendants' customers supply generic drugs to a wide swath of consumer populations, including but not limited to Medicaid recipients; private and public sector employees with commercial payor, employer-funded, or self-funded health plans; patients in non-profit, for-profit, or public hospitals or long-term care facilities; and prisons.

98.     Taken together, customers purchase a wide range of generic drugs, in enormous volumes, in every state.  Defendants' business plans and strategies for their broad portfolios focus on the nationwide supply and demand chain that funnels their products through various purchasers, including state governments, municipalities, and private sector employers, in order to

reach consumer populations in every state.  This supply and demand chain is described in more detail below.

### b.      Wholesalers/Distributors

99.      Wholesalers and distributors purchase generic drugs from manufacturers and distribute them to a variety of customers, including pharmacies (retail and mail-order), hospitals, long-term care, and other medical facilities.  Some wholesalers sell to a broad range of customers while others specialize in sales of particular products (e.g., biologic products) or sales to a particular type of customer (e.g., nursing homes).

100.      Wholesalers and distributors have similar business models, but distributors typically provide more services to their customers.  Some of the largest wholesalers and distributors of generic drugs include AmerisourceBergen Corporation ("ABC"), Cardinal Health, Inc. ("Cardinal"), H.D. Smith, LLC ("HD Smith"), McKesson Corporation ("McKesson"), and Morris & Dickson, LLC ("Morris & Dickson").

### c.      Group Purchasing Organizations (GPOs)

101.      Group purchasing organizations ("GPOs") are membership-based entities that negotiate with manufacturers, wholesalers, and distributors on behalf of a large group of purchasers.  GPOs leverage their buying power to obtain better prices and terms for their members and assist buyers in trade relations and contract management with sellers.

102.      GPOs have formed to serve state and local governments, hospital groups, retail pharmacies, and supermarket chains.  Some of the GPOs who sell large volumes of Defendants' generic products for distribution nationwide include Vizient (formerly Novation), Premier, Inc. ("Premier"), Intalere (formerly Amerinet), the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), and Econdisc Contracting Solutions ("Econdisc").

### d.   Pharmacy And Supermarket Chains

103.   Pharmacies are the final step on the pharmaceutical supply chain before drugs reach the consumer.  There are several types of pharmacies, including chain and independent retail pharmacies, pharmacies in supermarkets and other large retail establishments, and mail-order pharmacies.

104.   If a retail pharmacy or supermarket chain purchases generic drugs on a large enough scale, manufacturers may agree to contract with them directly.  Such retailers can obtain attractive terms by avoiding the markups or fees charged by wholesalers, distributors, and GPOs. Retailers large enough to purchase drugs directly from manufacturers include Rite Aid Corporation ("Rite Aid"), CVS Health ("CVS"), The Walgreen Company ("Walgreens"), Wal-Mart Stores, Inc. ("Wal-Mart"), Target Corporation ("Target"), and Publix Super Markets, Inc. ("Publix").

### e.   Customer Incentives

105.   Some of the largest downstream buyers that purchase from generic manufacturers benefit when prices are higher.  For example, in McKesson's 2014 10-K filing, the company reported the following:

> A significant portion of our distribution arrangements with the manufacturers provides us compensation based on a percentage of our purchases. In addition, we have certain distribution arrangements with pharmaceutical manufacturers that include an inflation-based compensation component whereby *we benefit when the manufacturers increase their prices* as we sell our existing inventory at the new higher prices. *For these manufacturers, a reduction in the frequency and magnitude of price increases*, as well as restrictions in the amount of inventory available to us, *could have a material adverse impact on our gross profit margin*.

In that same filing, McKesson also reported that "[t]he business' practice is to pass on to customers published price changes from suppliers."

28

106.   Similarly, in Cardinal's 2014 10-K filing, the company reported that:

> Gross margin in our Pharmaceutical segment is impacted by
> generic and branded pharmaceutical price appreciation and the
> number and value of generic pharmaceutical launches. In past
> years, these items have been substantial drivers of Pharmaceutical
> segment profit.   Prices for generic pharmaceuticals generally
> decline over time. But at times, *some generic products experience
> price appreciation, which positively impacts our margins*.

107.   ABC's Annual Summary 2014 and Annual Report 2014 make similar

observations:

> **Our results of operations continue to be subject to the risks
> and uncertainties of inflation in branded and generic
> pharmaceutical prices and deflation in generic pharmaceutical
> prices.**
>
> Certain distribution service agreements that we have entered into
> with branded and generic pharmaceutical manufacturers continue
> to have an inflation-based compensation component to them.
> Arrangements with a small number of branded manufacturers
> continue to be solely inflation-based. As a result, our gross profit
> from brand-name and generic manufacturers continues to be
> subject to fluctuation based upon the timing and extent of
> manufacturer price increases. *If the frequency or rate of branded
> and generic pharmaceutical price increases slows, our results of
> operations could be adversely affected*. In addition, generic
> pharmaceuticals are also subject to price deflation. *If the frequency
> or rate of generic pharmaceutical price deflation accelerates, our
> results of operations could be adversely affected.*

108.   Other large retail customers have similar contractual provisions in their contracts

with generic manufacturers that allow for potentially greater compensation when prices are

higher.  For example, contracts between Walgreens Boots Alliance Development GmbH, a GPO,

and generic manufacturers contain provisions about Rebates and Administrative fees that are

directly tied to "total contract sales" – a number that increases when prices increase.  In other

words, that GPO (and other large retail customers with similar contractual terms) may make

more money when generic drug prices are higher.

109.     The generic manufacturers are keenly aware that some of their customers benefit from their price increases.  In fact, many of the generic drug manufacturers regularly tout these price increases in their discussions with customers.  Indeed, as D.K., a senior executive at Fougera, stated in an internal e-mail in February 2011:  "Our price increases help our customers as much or more as they help us."

### 4.     The Cozy Nature Of The Industry And Opportunities For Collusion

110.     The generic drug market is structured in a way that allows generic drug manufacturers, including but not limited to the Defendants, to interact and communicate with each other directly and in person, on a frequent basis.

### a.     Trade Association And Customer Conferences

111.     Many customers of the Defendants, including large wholesalers, distributors, and pharmacy or grocery chains, hold multi-day conferences throughout the year in various locations throughout the United States.  Generic drug manufacturers from across the United States are invited to attend.

112.     Additionally, generic drug manufacturers also attend various industry trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance), the Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicines), and the Efficient Collaborative Retail Marketing Company, LLC ("ECRM"), in locations throughout the United States.

113.     At these conferences and trade shows, sales representatives from many generic drug manufacturers, including the Defendants, interact with each other and discuss their respective businesses and customers.  Many of these conferences and trade shows include

30

organized recreational and social events such as golf outings, lunches, cocktail parties, and dinners that provide additional opportunities to meet with competitors.  Defendants use these opportunities to discuss and share competitively sensitive information concerning upcoming bids, specific generic drug markets, pricing strategies, and pricing terms in their contracts with customers.

114.    These trade shows and customer conferences provide generic drug manufacturers, including the Defendants, with ample opportunity to meet, discuss, devise, and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs.

### b.    Industry Dinners And Private Meetings

115.    In addition to these frequent conferences and trade shows, senior executives and sales representatives gather in smaller groups, allowing them to further meet face-to-face with their competitors and discuss competitively sensitive information.

116.    Many generic drug manufacturers, including several of the Defendants, are headquartered near one another in New Jersey or eastern Pennsylvania, giving them additional opportunities to foster connections and meet and collude.  At least forty-one (41) different generic drug manufacturers are concentrated between New York City and Philadelphia, including, among others, Defendants Actavis, Amneal, Aurobindo, G&W, Glenmark, Greenstone, Lannett, Pfizer, Sandoz, Taro, and Wockhardt.

117.    High-level executives of many generic drug manufacturers get together periodically for what some of them refer to as "industry dinners."  For example, in January 2014, at a time when the prices of numerous generic drugs were reportedly soaring, at least thirteen (13) high-ranking executives, including CEOs, Presidents, and Senior Vice Presidents of various

generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.  Executives from

Defendants Actavis, Aurobindo, Lannett, and Perrigo (including individual Defendant Douglas

Boothe), among executives from many other generic manufacturers, were invited to this

particular dinner.

118.    At these industry dinners, one company is usually responsible for paying for all of

the attendees.  For example, in a group email conversation among competitors in December

2013, one of the participants joked: "You guys are still buying for Mark and I, right?"  The

response from another executive:  "Well . . . I didn't think the topic would come up so quickly

but . . . we go in alphabetical order by company and [a generic drug manufacturer not identified

in this Complaint] picked up the last bill. . . .  PS. . . . no backing out now!  Its [sic] amazing how

many in the group like 18 year-old single malt scotch when they aren't buying."

119.    Other groups of competitors gather routinely for golf outings, where they have the

opportunity to spend several days at a time together without interruption.  One such annual event

was organized by a packaging contractor in Kentucky.  From September 17-19, 2014, for

example, high-level executives from Defendants Actavis, Amneal, Lannett, Wockhardt, and

others were invited to a gathering at a Country Club in Bowling Green, Kentucky where they

would play golf all day and socialize at night.

120.    Some generic pharmaceutical sales representatives also get together regularly for

what they refer to as a "Girls Night Out" ("GNO"), or alternatively "Women in the Industry"

meetings or dinners.  During these events, the sales representatives meet with their competitors

and discuss competitively sensitive information.

121.    Many "Women in the Industry" dinners were organized by A.S., a salesperson

from non-Defendant Heritage Pharmaceuticals, Inc. who resides in the State of Minnesota.

Other participants in these meetings were employees of generic drug manufacturers located in Minnesota, or salespeople residing in the area.  However, out of town sales representatives were also aware of these dinners and were included when in the area.  For example, in November 2014, Tracy Sullivan, a sales executive at Defendant Lannett, sent A.S. a text message asking "[w]hen is your next industry women event?  I'm due for a trip out there and I'd love to plan for it if possible...."  A.S. responded:  "There is an XMas [sic] party at Tanya's house on Dec 6th.  Yes that is a Saturday.  We do it about once a quarter and usually it is during the week -- this was an exception."

122.    Sometimes dinners were also planned around visits of out-of-town competitors. As A.S. stated in organizing one such dinner:

> Sorry if the meeting/dinner invite is a little short notice, but [K.N., a National Account Representative at Dr. Reddy's] will [be] in MN on Sept 29th and it would be a great time for everyone to get together!  So much has been happening in the industry too -- we can recap all our findings from NACDS [trade show] over a martini or glass of wine! :)  Plus the food is super Yummy!

Representatives from Defendant Perrigo among others, were also invited to this particular dinner.

123.    Several different GNOs were held in 2015, including:  (1) at the ECRM conference in February (involving Defendants Greenstone, Lannett, and Valeant, among others); and (2) in Baltimore in May (involving Defendants Lupin and G&W, including individual Defendant Erika Vogel-Baylor, among others); and (3) at the NACDS conference in August (involving Defendant Valeant, among others).

33

5.      **The Overarching Conspiracy Between Generic Drug Manufacturers –** *Playing Nice In The Sandbox*

a.      **The General "Fair Share" Understanding**

124.    The overarching conspiracy among generic manufacturers – which ties together all of the agreements on individual drugs identified in this Complaint – is an agreed-upon code that each competitor is entitled to its "fair share" of the market, whether that market is a particular generic drug, or a number of generic drugs.

125.    Coined "fair share," the term is generally understood as an approximation of how much market share each competitor is entitled to, based on the number of competitors in the market, with a potential adjustment based on the timing of entry.  Once a manufacturer has achieved its "fair share," it is generally understood that the competitor will no longer compete for additional business.  The common goal or purpose of this overarching agreement is to keep prices high, avoid price erosion, and serve as the basis for further supra-competitive price increases.

126.    This overarching agreement is widespread across the generic drug industry and is broader than the Defendant manufacturers named in this Complaint.  The Plaintiff States focus here on the role of these named Defendants and their participation in, and agreement with, this overarching conspiracy.  This Complaint describes conspiracies regarding the sale of specific drugs, and how these specific conspiracies are also part of the larger overarching conspiracy.

127.    The exact contours of this "fair share" understanding, which has been in place for many years (and pre-dates any of the specific conduct detailed herein), has evolved over time during the numerous in-person meetings, telephonic communications, and other interactions between generic manufacturers about specific drugs.  These business and social events occur

34

with such great frequency that there is an almost constant ability for Defendants to meet in person and discuss their business plans.  For example, between February 20, 2013 and December 20, 2013 (a 41-week period), there were at least forty-four (44) different tradeshows or customer conferences where the Defendants had the opportunity to meet in person.  These in-person meetings gave the Defendants the opportunity, and the cover to have these conversations, and reach these agreements, without fear of detection.

128.     As described in more detail below, when necessary, this larger understanding was reinforced through phone calls and text messages between the Defendants to discuss "fair share" and the desire to maintain or raise prices with respect to specific drugs.  These types of communications occur with great frequency across the industry, including among Defendants.

129.     Indeed, the Defendants spoke with each other, when needed, hundreds or even thousands of times to ensure adherence to the overarching conspiracy.  Because it would be too voluminous to list the total number of calls among all the Defendants, the following graphic shows, by way of example, the interlocking web of communications and relationships between executives at several of the corporate Defendants and their key competitors.  Each line in the graphic demonstrates that at least one phone call or text message was sent between those executives (identified by their initials) while they were competitors.  For many of these executives, there were hundreds of calls and texts with competitors, but the volume of those communications is not captured by this graphic.



130.    Referred to sometimes as the "rules of engagement" for the generic drug industry, the fair share understanding among Defendants dictates that when two generic manufacturers enter the market at the same time, they generally expect that each competitor is entitled to approximately 50% of the market.  When a third competitor enters, each competitor expects to obtain 33% share; when a fourth competitor enters, each expects 25%; and so on, as additional competitors enter the market.

131.    Similarly, when a generic drug manufacturer is the first to enter a particular drug market on an exclusive basis it is commonly understood that that manufacturer is entitled to a little more than its proportional share of the market.  Conversely, those generic manufacturers that enter later are typically entitled to a little less than their proportional share.

132.    For example, in April 2010, Defendant Perrigo was entering the Imiquimod Cream market where Defendant Fougera had been exclusive.  D.K., a senior Fougera executive, sent an internal e-mail stating that "Perrigo is satisfied with 35-40% share" and explained that

"[i]f the market shares settle out at the current prices we are in a much better position than a higher share at a lower price."  When L.B., another senior executive, questioned why Perrigo would be satisfied with 35-40% of the market, D.K. responded, "any further attempts to gain share would result in driving prices down (D&A up) and no one wins in that scenario."

133.    Similarly, Defendant Taro created a graphic representation of this industry-wide understanding, considering both the number of competitors and their order of entry to estimate what its "fair share" should be in any given market:



134.    Taro used these principles to guide its behavior when communicating with its competitors regarding specific drugs.  One example involved Lidocaine Ointment – a product where Taro was entering the market as a third entrant.  In an internal launch summary from April 2013, Taro described the "Current Market" as "Taro third entrant preceded by Sandoz (~55% share) and Hi-Tech (~45% share)" and stated that Taro had targeted 20-25% share and had achieved 26.3% share.  Further, Taro had matched "WAC and AWP on gram to gram basis . . . with competitors," which it stated was "consistent with a traditional 3 player market."  As was their typical practice, Taro executives spoke with their competitors – CW-3, a Sandoz senior sales executive, and E.B., a senior sales and marketing executive at Hi-Tech – in advance of

37

Taro's entry to ensure that the company met its target market share through agreements to allocate specific customers.

135.    Although these general parameters are well-known, there is no precise method for apportioning "fair share."  This is because market share is ultimately determined by either winning or maintaining the business of various customers, which is inherently variable in any given year and must be revised when there are new entrants.  The shared objective, however, is to attain a state of equilibrium, where no competitors are incentivized to compete for additional market share by eroding price.

136.    This common goal was stated succinctly by Defendant Aprahamian, who advised the Taro Pricing Department in training documents from September and November 2013 that "[g]iving up share to new entrant (as warranted) shows responsibility and will save us in the long run" and "[d]on't rock the boat – [g]reedy hogs go to slaughter."  Similarly, when Defendant Glenmark was entering the market for Fluocinonide .1% Cream in July 2014 and had achieved its "fair share" on the product, one Glenmark sales executive remarked to another:

> We are set for now.  We have hit our share goals and surpassed the sales goals.
>
> Hogs get fat, Pigs get slaughtered

To that, his colleague responded:

> LOL.  I agree.  Oink!

137.    This scheme to minimize competition and allocate "fair share" is typically implemented as follows.  First, Defendants allocate the market for an individual drug based on

the number of competitors and the timing of their entry so that each competitor obtains an acceptable share of the market.  Then, the competitors agree on ways to avoid competing on price and, at times, significantly raise price.  This pattern is frequently followed even in the absence of direct communication between the competitors, demonstrating the universal code of conduct agreed to by Defendants.

138.    This "fair share" understanding has been particularly effective when a new competitor enters the market – a time when, in a free-functioning, competitive market for generic drugs, prices would be expected to go down.  The new competitor will either approach or be approached by the existing competitors.  Indeed, new and existing entrants know that they can call each other, as necessary, to discuss how to implement the "fair share" agreement to an expanded number of competitors.  As a result of these communications, existing competitors will agree to "walk away" from a specific customer or customers by either refusing to bid or submitting a cover bid.  These agreements to allocate specific customers between incumbents and new entrants means that the new competitor's transition into the market is seamless; the new entrant is ceded market share and immediately charges a supra-competitive price.  The competitors then continue this process of dividing up customers until the market reaches a new artificial equilibrium.  Defendants and their co-conspirators refer to this as a "stable" market.

139.    "Fair share" principles also dictate how generic drug manufacturers respond when a competitor experiences supply issues.  If a manufacturer's supply disruption is temporary, its competitors will refrain from using the disruption to win that manufacturer's business from the customers it can no longer supply or taking any other action that might upset the agreed-upon fair share arrangement.  By contrast, if the disruption is for a longer term, the competitors will

divide up customers until each player achieves a revised "fair share" based on the number of players remaining in the market.

140.    For example, in July 2013, a retail pharmacy customer e-mailed Defendant Taro stating that one of Defendant Mylan's products was on back order and asked Taro to bid for the business.  Aprahamian sent an internal e-mail stating: "Not inclined to take on new business . . . Wholesalers have product, let them pull from there temporarily and we can certainly review if shortage persists.  Don't want to overreact to this product.  Not sure how long Mylan is out."

141.    Similarly, in November 2014, Defendant G&W learned that Defendant Sandoz was having temporary supply problems on Fluocinolone Acetonide Cream.  Rather than take Sandoz' customers, G&W decided to offer them one-time buys "at a high price instead of taking the business from them completely because they have the least share and will need to get it back once they are back in stock."  Vogel-Baylor reasoned that G&W wanted "to avoid lowering the price in the market" and that "if we find out that the supply issues will be long term then we will go after taking the business."

142.    When a generic manufacturer participates in this scheme, and prices stay high, this is viewed as "playing nice in the sandbox."  As D.K., a senior Fougera executive, explained in an internal e-mail from July 2011 regarding sales of Imiquimod Cream: "it was an outstanding month as everyone is playing nicely in the sandbox and the price has stayed way above plan."

143.    Similarly, when a generic manufacturer is "playing nice in the sandbox," it is generally referred to as a "responsible" or "rational" competitor.  For instance, in May 2013, R.T., a senior sales and marketing executive at Sandoz, sent an internal e-mail to J.G., the CEO of Sandoz, stating: "My sense is that Sandoz is viewed by customers and competition as a respectful/responsible player in the market, which we should be proud of and has taken years to

develop.  I would be very careful [not] to destroy this through behavior that is too aggressive or desperation."

144.    Sandoz, in turn, uses that same terminology to refer to its competitors that are acting in accordance with "fair share" principles.  For example, in internal company presentations throughout 2014, Sandoz consistently referred to Defendant Actavis as a "responsible competitor" and to Defendant Taro as a "very responsible price competitor."

145.    Adherence to the rules regarding "fair share" is critical to maintaining high prices. Indeed, that is the primary purpose of the agreement.  If even one competitor does not participate (and thus behave in accordance with) the larger understanding, it can lead to unwanted competition and lower prices.  In the relatively few instances where a competitor prioritizes gaining market share over the larger understanding of maintaining "fair share," that competitor is viewed as "irresponsible," and may be spoken to by competitors.

146.    Defendants were always cognizant of these principles which constantly guided their behavior.  For example, in October 2015, McKesson e-mailed Taro with the opportunity to bid on several products.  L.P., a corporate accounts manager at Taro, sent an internal e-mail asking:  "Can we pick up this extra volume at McKesson?  No adjustment to pricing!  Easy win for Taro!"  A.L., a Taro pricing executive, responded, "need to understand what market share it represents before we do anything, also should take a look at who we recently have won out of the smaller customers that this may impact[.]  Lets do all the diligence on this to make sure we don't step into something that would take too long to get off our shoes."

147.    "Fair share," "playing nice in the sandbox," and similar terminology have become part of the industry lexicon, and thus part of the larger understanding among Defendants. Generic drug manufacturers actively and routinely monitor their fair share and that of their

41

competitors, as well as discuss market allocation amongst each other within the context of agreements on specific drugs, as set forth more fully below.

148.   For example, in July 2013, L.J., a senior marketing executive at Sandoz, sent an internal e-mail identifying 47 products where Sandoz did not have its "fair share" of the market. After some back-and-forth internal joking among Sandoz executives about the idea that Sandoz might actually attempt to compete for business in those markets by driving prices down, Defendant Kellum responded by emphasizing the truly industry-wide nature of the agreement:

| | |
|---|---|
| **From:** | Kellum, Armando |
| **Sent:** | Tuesday, July 02, 2013 12:31 AM |
| **To:** | ████████████████████████ |
| **Subject:** | Re: Product Sales and Market Share Performance_v17 (3).xls |

Fair Share for all!!!

149.   Indeed, the concept of "fair share" is so well ingrained in the generic pharmaceutical industry that even customers are aware of, and at times facilitate, collusion among generic manufacturers.  For example, in September 2014, ABC reached out to several large generic manufacturers asking each of them to submit a "Priority Wishlist of items to gain increased volume in the market."  The customer reported that "7 of the global suppliers have created and submitted wishlists and that ABC will be reviewing next week and taking a look at how they can move things around.  He said they are hoping to be able to horse trade without having to do ROFR [right of first refusal]."

150.   Similarly, in January 2014, a large retail customer e-mailed CW-3 at Sandoz regarding Triamcinolone Acetonide Lotion stating, "[t]here's a new player in the market . . . Their pricing is about 15% lower, and they're a smaller player.  Are these skus that Sandoz is

okay with letting go of to provide market share to the other supplier, or will you be holding onto the . . . business?"

151.    Further, in June 2013, G&W declined to bid on Halobetasol Propionate Cream at a customer because G&W did not want lower "pricing to cause us issues in the market place." A.G., a sales executive at G&W, e-mailed Vogel-Baylor asking:  "Are you typically pretty straight forward with customers regarding the reasons when you are not able to bid on a product due to fear of market disruption?"  Vogel-Baylor responded:  "Yes but in conversation.  Let's talk more in person."

152.    Customers at times also facilitate price increases, asking competitors to "rationalize" a market by raising prices.  For example, in November 2013, S.G., a senior sales executive at Sandoz, sent an internal e-mail stating, "[a large wholesale customer] is indicating that Glenmark and [a generic manufacturer not identified in the Complaint] had taken a price increase on [a drug not identified in the Complaint] in June.  [The customer] is asking if Sandoz will be rationalizing the market.  . . . Please advise on next steps.  Our [lower] pricing is disrupting the market."

153.    The "fair share" agreement is not limited to any one market; those principles constantly inform and guide the market actions that generic drug manufacturers decide to take (or not take) both within and across product markets.  For example, in August 2013, Sandoz created a "Projected Behavior – Competition Database" which came "to fruition as a concept" when Sandoz was "looking for additional share in the NT cream market" and was "afraid of any potential 'retaliation' of Taro on other market[s] where Sandoz and Taro compete."  The database allowed Sandoz to analyze whether taking share from a competitor in one product market would cause that competitor to retaliate in another product market where the competitors overlapped.

43

Sandoz measured the "likelihood of retaliation" on whether the competitor had its "fair share" in the other product markets.

154.    Further, in October 2013, CW-1, a senior pricing executive at Sandoz, sent an internal e-mail, including to Defendant Kellum, stating that Sandoz had decided not to bid at a large retail customer on two products on which it overlapped with Mylan.  CW-1 explained his reasoning as follows: "We have been running up against Mylan a lot lately (Nadolol/Benaz/Hctz) and fear blowback if we take any more products at this moment.  Trying to be responsible in the sandbox."  Further, in June 2014, Sandoz again chose not to bid on a product at a Mylan customer out of concern that Mylan would retaliate.  As CW-1 explained:  "I do not want to pursue, I believe this is due to a Mylan increase.  We have a lot of products crossing over with Mylan right now, I do not want to ruffle any feathers."

155.    As these examples make clear, the agreement among generic manufacturers transcends product markets as these companies make decisions not only based on what impact their actions will have in a given product market, but also on how those actions will impact other product markets where the competitors overlap, and any future markets where they might eventually compete.

156.    In fact, as explained in more detail below, certain Defendants had separate long-standing agreements with some of their key competitors in the dermatology sector to limit competition on any products on which the companies overlapped.  For instance, Sandoz had agreements going back many years with Defendants Taro and Perrigo that they would not poach each other's customers and would follow each other's price increases on overlap products.

157.    Defendant G&W had similar understandings with its key competitors Taro and Perrigo.  For instance, in February 2012, Vogel-Baylor exchanged e-mails with her supervisor,

Defendant Orlofski, regarding responding to the annual McKesson One Stop RFP.  Vogel-Baylor stated that she was waiting for McKesson "to confirm the incumbents so depending on who they are, we can decide to bid."  Once she confirmed the incumbents, she conveyed that information to Orlofski who replied:  "Please either don't bid or bid very high the Perrigo and Taro items. OK to bid the Mometasone Ointment aggressively [a Glenmark product.]"  As discussed in more detail below, shortly thereafter, Vogel-Baylor would strike up a relationship with CW-5, a senior executive at Glenmark, and begin communicating and colluding with that company in earnest as well.

158.     Further, in June 2014, Sandoz created a "Dermatology Fair Share Index" that was specifically designed to track Sandoz's market share with respect to dermatology products.  As T.O., a Sandoz marketing executive, described in an internal e-mail:  "Wherever we have lower than fair share, the products are on the list.  In general, we are not targeting Perrigo or Taro." Similarly, in November 2015, Sandoz compiled a spreadsheet containing various product opportunities which contained comments demonstrating its agreements with certain competitors, such as:  "So long as incumbent is not Taro" and "Avoid if Taro," or "Avoid if G&W."

159.     It was also common for these manufacturers to communicate about, and collude on, multiple products at any given time, regardless of whether the competitors were currently in the market for those products.  For example, in April 2013, while speaking with T.P., a sales executive at Perrigo, CW-3, a Sandoz senior sales executive, took the following notes in his Notebook concerning nine (9) different products that Perrigo had recently increased prices on:

45

CW-3 later conveyed that information to Defendant Kellum in an e-mail stating: "As mentioned on the CommOps call earlier today, here are the products Perrigo has recently increased." Notably, this list included several products that Sandoz did not sell at that time, including Halobetasol Propionate Cream. As discussed in more detail below, Sandoz would re-enter that market a few months later, in December 2013, and match competitor pricing.

160.    Similarly, in April 2013, Defendant Orlofski of G&W asked his colleague Defendant Vogel-Baylor to run a report listing "recent price increases on all Perrigo products." Vogel-Baylor responded: "I'm assuming you only want it for Perrigo products that we have in common? Or their entire product line?" Orlofski answered: "Their entire line actually."

161.    Indeed, unlike their branded counterparts, generic drugs are commodities and generic manufacturers are constantly making decisions to enter new markets and leave existing markets. Often these decisions are made, at least in part, on who the competitors are and how strong the relationship is between the two companies. As one example, in July 2013, Sandoz was looking to implement a "Taro Strategy" that involved temporarily delisting ten (10) products on which it overlapped with Taro. This strategy would allow Taro to raise price on these

46

products while Sandoz was out of the market, and then Sandoz could re-enter later at the higher price.  One product included in this strategy was Econazole Nitrate Cream.  As discussed more fully below, Sandoz exited the market in July 2013, Taro and Perrigo raised price in November 2014, and Sandoz re-entered in January 2016 at the higher price.

162.    This interdependence between generic manufacturers is further demonstrated by the countless examples of generic manufacturers sharing sensitive information with competitors as a matter of course.  The Plaintiff States have gathered evidence going back more than a decade of generic manufacturers routinely communicating and sharing information with each other about bids and pricing strategy.  This includes forwarding a bid package received from a customer to a competitor, either on his/her own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that information.

163.    As just one example, in June 2012, Defendant Jim Grauso, then a senior executive at Defendant Aurobindo, forwarded a customer's bid request for multiple products to Defendant Orlofski, his former colleague at G&W.  The request included Prochlorperazine Maleate Suppositories – a product that G&W manufactured, but Aurobindo did not.

164.    Defendants and other generic drug manufacturers also share information among themselves regarding the terms of their contracts with customers, including pricing terms, price protection, and rebates.  Defendants use this information to negotiate prices or terms that are more favorable to them, often to the ultimate detriment of payors and consumers.  For example, in August 2010, CW-6, then a senior sales executive at Fougera, sent the following e-mail regarding "WAC Increase Intel" to his supervisor, Defendant Kaczmarek:

47

From:
Sent:             Wednesday, August 04, 2010 7:05 PM
To:               Walt Kaczmarek
Subject:          WAC Increase Intel

Here is what others have agreed to:

Barr (when they existed) – had it for MCK, days unsure.
Breckenridge – CAH - 30 day credit or buy in.  MCK – 60 days credit or buy in.
Caraco –  Yes, 45 days credit.
Corepharma – did not sign agreement, but would have agreed to 30 days max.
G&W – Yes, 90 days credit on multi-source items. 30 days on exclusives.
Glenmark – Yes,  30 day buy-in.
Lupin – No to both CAH and MCK.
Perrigo – did not agree to any protection.
Teva – No.
West Ward – No.  All open PO's cancelled.
Zydus – Net company with CAH/MCK.  WAC increase not relevant.

165.    Before sending this e-mail, CW-6 had spoken that same day with his contacts at

several of the competitors listed, including Defendant Grauso, then a senior sales executive at

Defendant G&W, T.P., a sales executive at Defendant Perrigo, D.C., a sales executive at

Defendant Glenmark, M.R., a sales executive at West-Ward Pharmaceuticals, and V.M., a sales

executive at Core Pharma LLC.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | M.R. (West-Ward) | 9:55:28 | 0:01:40 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | Grauso, Jim (G&W) | 10:27:49 | 0:00:06 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 10:30:30 | 0:07:40 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 10:40:34 | 0:03:31 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:18:51 | 0:00:16 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:25:37 | 0:00:00 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | Grauso, Jim (G&W) | 11:34:56 | 0:03:29 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:39:05 | 0:26:34 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 12:10:54 | 0:00:05 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | V.M. (Core Pharma) | 12:38:57 | 0:00:24 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | V.M. (Core Pharma) | 12:41:09 | 0:12:30 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | M.R. (West-Ward) | 12:58:48 | 0:04:08 |

166.    Defendants understood that what they were doing was illegal and took steps to

cover up evidence of the overarching conspiracy.  For example, in May 2014, a large customer

received a bid on Betamethasone Dipropionate Lotion and gave Taro an opportunity to bid to

48

retain the business.  A.L., a pricing executive at Taro, sent an internal e-mail stating: "FS ok, will

not protect."  E.G., a Taro sales executive, responded, "explain FS, (Fair Share)?"  Aprahamian

replied:

No emails please. Phone call. ███ let's discuss.

167.    To avoid creating a potentially incriminating paper trail, Defendant Kellum of

Sandoz routinely admonished colleagues for putting information that was too blatant in e-mails,

understanding that it could lead to significant legal exposure for both the company and the

individuals involved.  Similarly, handwritten notes from an internal Sandoz business review

presentation from May 2017 – after the Plaintiff States' investigation was well underway – read:

"Avoid Fair Share terminology on slides – underdeveloped or overdeveloped is better."

168.    It bears noting that the examples referenced in this Section, and in the Sections

that follow, include only illustrative examples of the types of conduct described.  Indeed, to date,

many of the corporate Defendants have made only limited document productions to the Plaintiff

States, including Defendants Actavis, Amneal, Glenmark, Greenstone, Lannett, Lupin,

Mallinckrodt, Mylan, Perrigo, and Wockhardt.

**b.**    **Once Each Competitor Had Its Fair Share, It Was Time To Increase Prices**

169.    As detailed above, the overall understanding among the co-conspirators required a

commitment that each competitor was entitled to its "fair share" of a given product market.

Once the competitors were satisfied that they had their "fair share," they often turned to

increasing prices.  So long as each competitor had its "fair share," no competitor was

incentivized to compete for business when another competitor increased price.  Indeed, it was

generally understood that when a competitor increased price, the other competitors in the same

drug market would either decline to bid for the business or would bid high so as not to take advantage of the price increase.  Often, the competitor would then follow with a comparable price increase of its own.

170.     The concept of "fair share" and price increases went hand in hand.  For example, and as discussed in more detail below, Defendant Sandoz's ongoing understandings with Defendants Taro and Perrigo that they would follow each other's price increases was predicated on the agreement that the follower would not poach the leader's customers after the increase. Indeed, Defendant Aprahamian of Taro often spoke with CW-3 of Sandoz about coordinating price increases between the two companies.  Almost invariably, he would conclude the conversations with phrases like "don't take my fucking customers," "don't take my business," or "don't be stupid."

171.     It is important to note that generic drug manufacturers could not always follow a competitor's price increase quickly.  Various business reasons – including supply disruptions or contractual price protection terms with certain customers that would result in the payment of significant penalties – could cause such delays.  In those instances when a co-conspirator manufacturer delayed following a price increase, the underlying fair share understanding operated as a safety net to ensure that it would not seek to take advantage of a competitor's price increase by stealing market share.

172.     Further, because of this "fair share" understanding, it was not essential for the competitors to communicate with each other in advance of a price increase, although they often did so anyway.  So long as the competitor knew before it was approached by customers that the reason for the solicitation was due to a price increase by the incumbent supplier, the competitor knew not to compete for the business.  Similarly, the competitor knew it would have the

opportunity, which it often took, to follow the increase with a comparable price increase of its own.

### c.  Generic Drug Price Spikes Since 2013

173.   Against this industry backdrop, the prices for many generic drugs skyrocketed in 2013 and 2014.  According to one report, "[t]he prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014."  A separate analysis conducted by Defendant Sandoz showed that during the calendar years 2013 and 2014, there were 1,487 "large price increases" (increases of the Wholesale Acquisition Cost ["WAC"] price greater than 100%), of which 12% (178) were increased by greater than 1,000%.

174.   These increases in 2013 and 2014 were staggering compared to prior years.  The following table (which contains information about WAC pricing changes through October 2014 only) demonstrates the dramatic surge in the number of large drug price increases per year in 2013 and 2014:

|  | Year | Total Number of Increases | Increases Greater than 100% | Increases Greater than 50% |
|---|---|---|---|---|
|  | 2010 | 3820 | 125 | 260 |
|  | 2011 | 4265 | 255 | 409 |
|  | 2012 | 4071 | 223 | 433 |
|  | 2013 | 5694 | 739 | 1072 |
| YTD Oct. | 2014 | 4461 | 637 | 1521 |

175.   Several of the products with the largest WAC increases in 2014 include products that are subjects of this Complaint, including Econazole Nitrate Cream and various formulations of Clobetasol Propionate.  For Econazole, the largest increase was taken by Defendant Perrigo, increasing its WAC by 736% in July 2014.  For Clobetasol, Hi-Tech took the largest increase on the Ointment, increasing its WAC by 2,316% in August 2014.

51

176.     Similarly, a January 2014 survey of 1,000 members of the National Community Pharmacists Association found that more than 75% of the pharmacists surveyed reported higher prices on more than 25 generic drugs, with the prices spiking by 600% to 2,000% in some cases. Indeed, more than $500 million of Medicaid drug reimbursement during the twelve months ending on June 30, 2014 was for generic drugs whose prices had increased by over 100%.

**C.     The Illegal Schemes**

**1.     Generic Topical Products – An Overview**

177.     Topical products include any drug that is administered by means of contact, most often with an external body surface.  Topical products come in a variety of dosage forms, including creams, gels, lotions, ointments, shampoos, and solutions.  Although topical products are mostly dermatology-related, they can also be used to treat other conditions such as pain and allergies.

178.     Topical products are a niche market segment within the generic pharmaceutical industry.  Historically, there have been fewer generic manufacturers that have focused on selling topical products than "conventional" generic drugs such as oral solids (e.g., pills).  This is because manufacturers of generic topical products typically face higher barriers to entry, including technical hurdles relating to proving bioequivalence – which must be shown through multiple clinical trials.  Further, once a manufacturer obtains FDA approval, topical products often require higher levels of investment in manufacturing to produce the various dosage forms involved.

179.     Since at least 2007, the top three manufacturers, by sales, of generic topical products have consistently been Defendants Taro, Perrigo, and Fougera (now Sandoz).  Indeed, between 2007 and 2014, these three companies controlled approximately two-thirds of the

topical market segment.  Several other manufacturers make up the remaining third, including Actavis, Mylan, Teva, G&W, Glenmark and others, as discussed throughout this Complaint. The following graphic shows the market share breakdown on generic topical products for June 2007 through June 2012:

**Figure 15: Ranks have changed in the Derma generic market with Taro now at #1**

| Value market share | Jun-07 | Jun-08 | Jun-09 | Jun-10 | Jun-11 | Jun-12 |
|---|---|---|---|---|---|---|
| Taro | 19% | 18% | 20% | 17% | 17% | 25% |
| Perrigo | 22% | 22% | 21% | 19% | 24% | 21% |
| Fougera | 26% | 24% | 22% | 23% | 23% | 16% |
| Actavis | 3% | 4% | 4% | 4% | 6% | 9% |
| Mylan | 0% | 0% | 0% | 7% | 5% | 4% |
| Teva | 7% | 6% | 6% | 5% | 5% | 3% |
| Novartis | 2% | 2% | 2% | 2% | 2% | 3% |
| Glenmark | 0% | 0% | 0% | 0% | 2% | 2% |
| G & W | 0% | 0% | 0% | 0% | 0% | 2% |
| Prasco | 0% | 0% | 1% | 1% | 2% | 1% |
| Spear Derm | 1% | 1% | 3% | 3% | 2% | 1% |
| Hi-Tech | 1% | 1% | 1% | 1% | 1% | 1% |
| Pfizer | 1% | 1% | 1% | 1% | 1% | 1% |
| Wockhardt | 4% | 3% | 2% | 2% | 1% | 1% |
| Others | 14% | 13% | 17% | 13% | 9% | 8% |
| **Derma generic mkt ($mn)** | **779** | **837** | **955** | **1,230** | **1,740** | **2,510** |

*Source: IMS Health, Credit Suisse*

180.    Similarly, the following chart from an internal Sandoz presentation details a consistent picture for 2014:

## Sandoz & Competitor (Dermatology) Market Share Trend

| Company | MAT Mar 2014 Sales Market Share | MAT Mar 2014 Sales $ | MAT Mar 2014 Sales Growth | MAT Mar 2014 Units | MAT Mar 2014 Units Growth | MAT Mar 2014 Sales Market Share |
|---|---|---|---|---|---|---|
| **TARO** | 20% | $859,306,940 | 6.33% | 21,495,208 | -9.57% | 18% |
| **PERRIGO** | 18% | $789,858,446 | 45.85% | 31,560,652 | -3.72% | 26% |
| **SANDOZ** | 16% | $688,861,246 | 28.65% | 17,921,060 | -1.86% | 15% |
| **MYLAN** | 8% | $327,728,600 | 85.33% | 1,498,117 | 40.52% | 1% |
| **ACTAVIS** | 5% | $236,726,320 | -8.72% | 7,638,311 | -11.25% | 6% |
| **ALL OTHER** | 34% | $1,465,532,194 | 62.93% | 41,092,544 | 30.61% | 23% |

Source: IMS SMART MVP Solutions, NSP Mar 2014, MAT Dollars and Units, Generic and Dermatology

181.    The limited number of manufacturers of generic topical products has created an environment that is ripe for collusion.  Many topical products have only two or three competitors – which increases the likelihood that any market allocation or price fixing agreement will succeed.  In addition, sales and pricing executives at many of the prominent generic topical manufacturers are very familiar with their counterparts at competitor companies because of the extensive product overlap between them.  This personal familiarity among sales executives has led to greater opportunities to collude – which those executives have taken advantage of by consistently communicating and agreeing with each other to limit competition, allocate customers, and significantly raise prices on dozens of generic topical products.

### 2.    The Early Days – Collusion From 2009 To Early 2012

#### a.    Key Relationships Among Generic Topical Manufacturers

182.    The key manufacturers of generic topical products during this early time period – Fougera (and later Sandoz), Perrigo, Taro, and Actavis – had ongoing understandings going back many years not to poach each other's customers and to follow each other's price increases.  These competitors met with each other regularly at trade shows and customer conferences – in addition to speaking frequently by phone – and specifically discussed and agreed on allocating customers and coordinating price increases on the products they had in common.  The following Section focuses on these relationships and provides illustrative examples of how these ongoing understandings manifested themselves with respect to specific products.

##### 1)    Fougera/Perrigo/Taro

183.    CW-6 was a senior sales executive at Fougera between October 2004 and August 2012 and a central player in the collusion taking place among generic topical manufacturers at

that time.  Prior to working at Fougera, CW-6 was a lead buyer in the generics group at Cardinal Health where he developed extensive contacts in the industry.

184.    Upon moving to Fougera, CW-6 was instructed by his supervisor, Defendant Walter Kaczmarek, a senior Fougera executive, to reach out to his contacts at competitor companies to discuss market allocation, price increases, and other commercially sensitive topics. If CW-6 did not have a contact at a competitor, Defendant Kaczmarek directed him to pass messages to that competitor through his contacts that did.  This practice – facilitating anticompetitive conduct through a third competitor – was pervasive throughout the industry.

185.    During his tenure at Fougera, CW-6 frequently attended trade shows and customer conferences.  At these events, he would regularly discuss competitively sensitive topics with his competitors.  CW-6 was also a prolific communicator by phone and exchanged thousands of calls and text messages with his competitors.  After speaking with a competitor, CW-6 would often report the competitive intelligence back to his supervisor, Defendant Kaczmarek, and Fougera would use that information to make competitive decisions, including which customers to give up to a competitor or what pricing actions to take and when.

186.    CW-6 had a particularly collusive relationship with T.P., a sales executive at Perrigo, dating back to at least 2010.  CW-6 and T.P. were not social friends.  If the two were communicating, it was to coordinate behavior on products where Fougera and Perrigo overlapped.  CW-6 and T.P. regularly met at trade shows and customer conferences and discussed competitively sensitive topics.  The goal of these conversations was always to keep prices as high as possible.  CW-6 and T.P. also spoke often by phone.  For example, between February 2010 and August 7, 2012, CW-6 and T.P. exchanged at least three hundred and two (302) phone calls.

187.    CW-6 also had a collusive relationship with H.M., a sales executive at Taro, dating back to at least 2011.  CW-6 spoke with H.M. in person at trade shows and customer conferences, as well as by phone.  During these conversations, the competitors coordinated customer allocation and price increases on products where Fougera and Taro overlapped.  Between January 2011 and August 2012, CW-6 and H.M. exchanged at least eighty-six (86) phone calls.

188.    There were several products where all three companies – Fougera, Perrigo, and Taro – sold a particular drug.  In these instances, CW-6 would facilitate the communications, passing messages from one competitor to the other to ensure the anticompetitive agreement was understood by all three competitors.  This was necessary because T.P. and H.M. did not have an independent relationship and depended on CW-6 to serve as a conduit to effectuate their collusion on overlapping products.

189.    During this early time period, T.P. and H.M. were acting at all times at the direction of, or with approval from, their superiors, including Defendant Wesolowski of Perrigo and Defendant Blashinsky of Taro.

### 2)    Actavis And Taro/Perrigo

190.    Defendant Michael Perfetto, then a senior sales and marketing executive at Actavis, had a collusive relationship with Defendant Mitchell Blashinsky, then a senior marketing executive at Taro.  Between January 2011 and May 2012, when Blashinsky moved to Defendant Glenmark, the competitors exchanged at least one hundred and twenty (120) phone calls.

191.    Similarly, M.D., a sales executive at Actavis, had a collusive relationship with T.P. of Perrigo going back many years.  The two discussed market allocation and coordinated

price increases on products where Actavis and Perrigo overlapped.  Between August 2011 and December 2013, the two competitors exchanged at least eighty-three (83) phone calls.

192.    During this early time period, M.D. was acting at all times at the direction of, or with approval from, his superiors at Actavis, including Defendant Perfetto.

### 3)    Sandoz/Taro

193.    CW-4 worked as a senior sales executive at Sandoz for many years, including during this early time period (between 2009 and early 2012).  At Sandoz, CW-4 was evaluated based on her ability to acquire competitive intelligence.  Competitive intelligence included information concerning product launches, customer alignment, price increases, and supply disruptions.

194.    CW-4 obtained competitive intelligence from customers as well as competitors with whom she had relationships.  CW-4 viewed providing this information as a way to demonstrate value to the company.  CW-4 reported competitive intelligence to superiors, including Defendant Kellum and CW-1, both senior pricing executives at Sandoz.  When CW-4 felt pressure from superiors to deliver useful information, she tended to engage in more anticompetitive conduct.

195.    CW-4 had a longstanding relationship with D.S., a sales executive at Taro.  CW-4 first met D.S. when he was a buyer at a large grocery chain.  The two developed a friendly relationship, in addition to a professional one.

196.    In 2009, shortly after D.S. joined Taro, he and CW-4 met in person at an industry event and had a high-level discussion about Taro's and Sandoz's philosophies with respect to market share and pricing.  The two competitors agreed that both of their employers believed in price increases and maintaining higher pricing.  D.S. explained that companies that compete on

price to get more market share were bad for the market because they brought prices down.  CW-4 agreed and the two discussed the importance of maintaining a fair share balance, not being greedy about market share, and following price increases on overlapping products.

197.    After this conversation, CW-4 and D.S. were confident that they had a consistent understanding, and that neither Sandoz nor Taro would compete aggressively against the other. This conversation paved the way for them to work cooperatively in orchestrating Sandoz's and Taro's movements on several drugs in the coming years.

198.    In addition to communicating frequently in-person, CW-4 and D.S. also spoke often by phone.  Between January 2011 (which is as far back as the Plaintiff States have phone records) and October 2013 (when D.S. left Taro), the two exchanged at least seventy-three (73) phone calls.

199.    During this early time period, CW-4 and D.S. were acting at all times at the direction of, or with approval from, their superiors including Defendant Kellum of Sandoz and Defendant Blashinsky of Taro.

200.    The following Sections will discuss specific examples of how the long-standing competitor relationships detailed above manifested themselves regarding particular products between 2009 and early 2012.

### i.    Carbamazepine ER Tablets

201.    Carbamazepine ER, also known by the brand name Tegretol XR, is a drug prescribed for the prevention and control of seizures, for the relief of nerve pain, and for the treatment of certain mental and mood disorders such as bipolar disorder and schizophrenia.

202.    Shortly after their high-level conversation in 2009 about Taro's and Sandoz's respective views on competition and market-share, D.S. of Taro and CW-4 had the opportunity

to put their understanding into practice as Taro and Sandoz both prepared to enter the market for Carbamazepine ER.

203.    Taro received FDA approval in late March 2009 to enter the Carbamazepine ER market as the first-to-file generic.  A few months later, in June 2009, Sandoz received approval to launch as the authorized generic (the "AG").  As the AG, Sandoz would not be required to wait until the end of Taro's 180-day exclusivity period to enter the market.

204.    Not only was Carbamazepine ER a high-volume, lucrative branded product for Sandoz's parent company, Novartis, but Novartis had also given Sandoz late notice that it would be entering as the AG.  As a result, Sandoz's sales and marketing executives felt a great deal of pressure to secure market share within a short time frame.

205.    As the Taro launch grew close, R.T., a senior marketing executive at Sandoz, pressured CW-4 to obtain information from Taro about its impending launch.  Confident that their recent conversation meant that D.S. would readily provide such information, CW-4 reached out to him.

206.    During one in a series of phone calls between the two, D.S. informed CW-4 that Taro had sent offers to Wal-Mart, Walgreens, and SUPERVALU.  Consistent with "fair share" principles and the fact that Taro would be the first to enter the market, D.S. told CW-4 that Taro's goal was to secure 50%-60% market share and that it would be pursuing other smaller customers as well.  CW-4 understood from that conversation that Sandoz should not compete for the customers that D.S. had identified, and that by identifying those specific customers Sandoz would, in turn, know which customers it should target.  As requested, CW-4 reported this information directly to R.T. at Sandoz.

207.    Based on those conversations, Taro and Sandoz were able to enter the market with little competition, initially leaving generic pricing nearly as high as pricing for the branded drug.

208.    After the initial launch, CW-4 and D.S. continued to discuss and share competitively sensitive information about Carbamazepine ER.  For example, when Taro was delayed in launching the 100mg formulation, Novartis put pressure on R.T. and others at Sandoz to get information about Taro's launch.  R.T., in turn, asked CW-4 to obtain the information.

209.    After exchanging several text messages in January 2010, D.S. informed CW-4 that Taro would not be launching the 100mg formulation because Taro was having trouble filling orders on the other strengths and needed the raw material for those other strengths (which were more profitable for Taro).

210.    Through even 2011, Sandoz refused to challenge for Taro's customers with respect to Carbamazepine ER.  For example, on January 5, 2011, CVS provided Sandoz with a list of product opportunities for Sandoz to bid on, including Carbamazepine ER.  CW-2, then a senior sales executive at Sandoz, was hesitant, and asked his colleagues if there was any appetite to compete for the business.  The purpose for pursuing CVS, he opined, would be "merely to pick off share where we may want some while providing CVS with a lower cost."  He added: "Not sure that we want to do that…."

211.    M.M., a Sandoz marketing executive, responded that pursuing CVS was tempting given that Taro's market share was higher than Sandoz's, but supply issues created short-term obstacles.  Further, the executive concluded that challenging for the business at CVS would "disrupt" the market and erode pricing.  As a result, Sandoz declined to bid on the Carbamazepine XR business at CVS.

60

## ii.    Imiquimod Cream

212.    Imiquimod Cream, also known by the brand names Aldara and Zyclara, is a topical medication used to treat actinic keratosis, or precancerous growths on the skin. Imiquimod Cream was a high-priced, large volume drug that provided a significant source of revenue for its manufacturers.  In 2012, the annual market for Imiquimod Cream in the United States exceeded $200 million.

213.    On February 25, 2010, Fougera received FDA approval to market Imiquimod Cream.  At that time, Fougera was the only generic manufacturer in the market and it used that as an opportunity to set a high price for the product.

### a)    *Perrigo Entry (April 2010)*

214.    Less than two months later, on April 13, 2010, Perrigo announced that it would be the AG for Imiquimod Cream.  That same day, D.K., a senior Fougera executive, sent the following e-mail to Defendant Kaczmarek, also a senior Fougera executive:

| From: | ███████ |
|---|---|
| Sent: | Tuesday, April 13, 2010 12:18 PM |
| To: | Walt Kaczmarek |
| Subject: | Re: New imiquimod pricing model |

I think its clear we need to keep:

1) Walgreens
2) CAH
3) McKesson

Let Perrigo have:

1) CVS
2) ABC
3) W or RA

215.    Later that same day, Kaczmarek called CW-6, a senior sales executive at Fougera, and they spoke for nearly four (4) minutes.  CW-6 hung up and immediately called

T.P., a sales executive at Perrigo, and they spoke for nearly nine (9) minutes. When CW-6 hung up with T.P., he promptly called Kaczmarek back. That call lasted less than one (1) minute.

216.    It is rare that the entry of a generic competitor would cause prices to actually increase – but it did so in this case. Three days later, on Friday April 16, 2010, in advance of Perrigo's entry into the market, Fougera increased its WAC pricing for Imiquimod Cream. That same day, CW-6 called T.P. The call lasted more than two (2) minutes. Immediately after hanging up, CW-6 called his supervisor, Defendant Kaczmarek, and they ultimately spoke for more than six (6) minutes. Immediately after hanging up with Kaczmarek, CW-6 called T.P. back. The call lasted one (1) minute.

217.    The next business day, Monday April 19, 2010, Perrigo sent an internal e-mail stating that "due to Fougera's price change on Friday, we are changing our AWP & WAC for Imiquimod." As a result of the increase, Perrigo's WAC pricing would end up even slightly higher than Fougera's.

218.    That same day, Defendant John Wesolowski, a senior executive at Perrigo, called T.P. and they spoke for nearly six (6) minutes. This set off another rush of communications between T.P. of Perrigo and CW-6 of Fougera, with each of them concurrently reporting the results of those communications to their superiors, Defendants Wesolowski and Kaczmarek. These calls, which all occurred within the span of less than an hour, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:04:44 | 0:05:51 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:16:56 | 0:00:26 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:34:36 | 0:03:48 |
| 4/19/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:39:16 | 0:07:13 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:48:29 | 0:03:42 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:52:43 | 0:03:16 |
| 4/19/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:54:33 | 0:08:49 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:56:29 | 0:06:39 |

219.     The following week, between April 24 and April 27, 2010, the NACDS held its annual meeting in Palm Beach, Florida.  Several executives from Fougera and Perrigo were in attendance, including Defendant Kaczmarek, D.K., and CW-6 from Fougera and Defendant Wesolowski and S.K., senior executives from Perrigo.

220.     Fougera and Perrigo executives were speaking about Perrigo's launch throughout the conference.  On April 26, 2010, T.P. and CW-6 spoke by phone for seven (7) minutes.  Immediately after that call, CW-6 hung up and called Defendant Kaczmarek, speaking for four (4) minutes.

221.     Similarly, on April 27, 2010, D.K. e-mailed Kaczmarek while they were still at the NACDS meeting, stating that he needed "to find [S.K.] from Perrigo.  Interested in what he has to say.  I looked a[t] the roster and it reads like he is John [Wesolowski's] boss now and not BD."

222.     On April 28, 2010, Perrigo officially entered the Imiquimod Cream market and published WAC pricing that was slightly higher than Fougera's.  That same day, D.K. e-mailed Fougera executives with an update regarding his conversations at the NACDS meeting.  With respect to Imiquimod Cream, D.K. stated, "[c]ertainly the number one topic for us.  Importantly Perrigo is in full launch mode."  D.K explained that Fougera gave up McKesson and ABC to Perrigo because "[w]e know we have to give up share in order to maintain price integrity."  D.K. also noted that he was pleased that Perrigo has "respected our position at Walgreens which is the cornerstone to our strategy."  CW-3, a sales executive at Fougera, expressed confusion that Fougera had lost ABC's business.  Kaczmarek explained that "it was a market share play."  CW-3 replied: "I understand.  It's for the greater good."

223.    On April 30, 2010, a senior Fougera executive, L.B., demanded an urgent explanation from D.K. as to why Fougera was willing to give up both McKesson and ABC. D.K. reminded L.B. that it was inevitable that Perrigo would take some of the market.  D.K. also explained: "Had we chosen to fight Perrigo at McKesson to hold onto their business we would have set a new low in the market and Perrigo would then move on to another major account and achieve their share at a NEW lower price."  D.K. stated that Perrigo's share would likely settle in the range of 30-40% "which is a positive as is the fact that Perrigo respected our position at Walgreens [which is] our number one priority."

224.    Consistent with fair share principles and the prior discussions between the competitors, by April 30, 2010 Fougera had given up more than ten (10) of its Imiquimod customers to Perrigo.

225.    On May 16, 2010, Fougera was preparing an internal presentation regarding Imiquimod Cream, which included a statement that "Perrigo is satisfied with 35-40% market share."  While reviewing the presentation, L.B. challenged D.K. about the statement, asking "[w]hy should they [be satisfied]?  Sorry for being so direct but isn't that a bit of wishful thinking of ours?"  D.K. assured L.B. that "[o]ur assumptions on Perrigo share are driven from competitive intelligence at the field level.  To answer your question as to why they would stop, any further attempts to gain share would result in driving prices down (D&A up) and no one wins in that scenario."

226.    The next day, on May 17, 2010, CW-6 and T.P. exchanged at least six calls, including one lasting more than six (6) minutes, likely to confirm (again) the agreement in place between the two competitors.

64

227.     Several months later, on September 8, 2010, CW-6 circulated a press release to the Fougera sales team announcing that Perrigo had received its own ANDA approval to market generic Imiquimod Cream.  Previously, Perrigo had been selling the AG through a license with a branded manufacturer.  That same day, CW-6 called T.P.  That call lasted less than a minute. T.P. called CW-6 back almost immediately, and they spoke for more than two (2) minutes.

228.     On September 27, 2010, CW-6 gave a presentation to Fougera's parent company titled "Business Plan and Status Update" during which he noted that Fougera had given up Imiquimod share to Perrigo and that, with regard to the larger fair share understanding, Fougera is "continuing playing nice in the sand box with Perrigo and Taro."  Later that year, in November 2010, CW-6 also noted in his monthly recap that "everyone [was] playing nice" in the Imiquimod market.

229.     Fougera also continued to monitor the status of other competitors' plans to enter the Imiquimod market.  For example, on February 7, 2011, a Glenmark employee called CW-6, and they spoke for four (4) minutes.  Later that day, CW-6 sent the following e-mail to Defendant Kaczmarek and D.K. regarding Imiquimod Cream:

| From: | ███████████ |
| Sent: | Monday, February 07, 2011 6:38 PM |
| To: | Walt Kaczmarek; ████████ |
| Subject: | Imiquimod |

Rumor has it that Glenmark is a minimum of 18 months away.

████████████

National Accounts Executive

Pleased that Fougera would not be facing any imminent competition from Glenmark, D.K. replied:

| From: | ▮▮▮▮▮▮ |
|---|---|
| Sent: | Monday, February 07, 2011 6:38 PM |
| To: | ▮▮▮▮▮▮▮▮▮▮ Walt Kaczmarek |
| Subject: | RE: Imiquimod |

If true, I will kiss you

▮▮▮▮▮▮
Sr. Vice President, General Manager
Nycomed US Inc

### b)   *Sandoz Entry (February 2011)*

230.    Although Fougera was fortunate that Glenmark had no near-term plans to enter the Imiquimod Cream market, another competitor – Sandoz – did receive FDA approval on February 28, 2011 to launch the product.  That same day, CW-6 of Fougera and T.P. of Perrigo exchanged at least five (5) calls, including two calls lasting two (2) minutes each.

231.    On March 1, 2011, one of Fougera's customers, NC Mutual, also e-mailed CW-3, a sales executive at Fougera, to tell him that Sandoz was launching Imiquimod.  The NC Mutual employee further noted: "Here's to hoping they play smart on pricing . . .."  CW-3 promptly forwarded the e-mail to Defendant Kaczmarek.  That same day, CW-6 called T.P. and they spoke for more than three (3) minutes.

232.    When Sandoz entered the market, it did so seamlessly – initially taking comparable share from the existing competitors Fougera and Perrigo.

233.    For example, in late February and early March, Sandoz made offers to ABC, a Perrigo customer, and Rite Aid, a Fougera customer.  In total, the customers accounted for approximately 13% of the Imiquimod Cream market (ABC at 8% and Rite Aid at 5%).

234.    On March 3, 2011, Fougera declined to bid to retain the Rite Aid business and gave up its primary position to Sandoz.  The next day, on March 4, 2011, Defendant Kellum of Sandoz followed up with S.G., a sales executive at Sandoz, stating, "[c]an you try to get an answer from ABC on this?  Our remaining strategy for this product is dependent on their decision."  Later that day, Perrigo followed suit and declined to bid to retain the ABC business. That same day, CW-6 called T.P. and they spoke for four (4) minutes.  A few minutes later, Defendant Kaczmarek called CW-6 and they spoke for nearly five (5) minutes.

235.    Around this same time, Taro was also starting to make plans to enter the market. Between March 6 and March 10, 2011, representatives from Fougera, Perrigo, Sandoz, and Taro were all in attendance together at the ECRM Retail Pharmacy Generic Pharmaceutical Conference in Champions Gate, Florida.  These representatives included CW-6 from Fougera, T.P. from Perrigo, CW-4 and Defendant Kellum from Sandoz, and H.M. and D.S., sales executives from Taro.

236.    On March 7, 2011, while at the ECRM conference, CW-4 of Sandoz and D.S. of Taro spoke on the phone for four (4) minutes.  Later that day, Defendant Kellum – CW-4's boss – sent an internal e-mail from ECRM stating that he had "heard" Taro may be entering the Imiquimod Cream market.

237.    Also, while at the ECRM conference, CW-6 of Fougera and T.P. of Perrigo spoke once by phone on March 9, 2011.  The call lasted one (1) minute.

238.    By March 9, 2011, Sandoz had acquired approximately 13% of the Imiquimod Cream market and Defendant Kellum recommended that they "stop after 'da group' unless we are sure it's a small Fougera account."  "Da group" referred to a consortium composed of HEB, Ahold, Schnucks, and Giant Eagle.  These were all Perrigo customers, and Sandoz intended to

obtain their Imiquimod business "'quietly' as not to cause a panic at Perrigo that we are trying to go after all their business (which obviously is not the case)." Those customers were the only additional customers whose business Sandoz was seeking. To that end, Kellum conveyed to S.G., a sales executive at Sandoz, that "if we are successful, can you ask that [the consortium] let the incumbent know that we have reached our share goal with this and not pursuing more share." Ultimately, on March 17, 2011, Perrigo conceded the consortium business to Sandoz.

239.   On March 10, 2011, Kellum provided additional color for his recommendation that Sandoz only go after smaller Fougera customers moving forward:

| From: | CN=Armando Kellum/OU=GX/O=Novartis |
| --- | --- |
| Sent: | Thursday, March 10, 2011 7:30 AM |
| To: | CN=███████OU=GX/O=Novartis@PH |
| Subject: | Re: Imiquimod Update - *ABC orders released today* |
| Attach: | EmbeddedImage0001.gif, EmbeddedImage0002.gif |

Thanks ████ both Perrigo and Fougera have been reasonable (as have we) and that is why the market is still good. At some point it will be noisy and annoying if we keep picking and picking.

AK

#### c)   *Taro Entry (July 2011)*

240.   A month or so later, on April 15, 2011, Taro received FDA approval to market Imiquimod Cream. Taro immediately began coordinating its entry with competitors. On April 17, 2011, D.S. of Taro and CW-4 of Sandoz exchanged two calls, with one call lasting twelve (12) minutes. Within an hour of ending the second call, CW-4 called her supervisor, Defendant Kellum, and they spoke for five (5) minutes. The next day, on April 19, 2011, D.S. called CW-4 again. The call lasted one (1) minute.

241.   On these calls, D.S. conveyed to CW-4 that Taro had gotten FDA approval for Imiquimod Cream but advised that Taro would not formally launch until June. D.S. also told

68

CW-4 that Taro had already received a pre-commitment from Econdisc, a large GPO customer, and now would only go after smaller customers. CW-4 understood that D.S. shared this information with her so that she knew Taro would not attack Sandoz at large customers and, if it did compete for smaller customers, it was only to obtain its fair share of the market. CW-4 also understood that Sandoz should not compete for the Econdisc business.

242.    The next day, on April 20, 2011, CW-4 shared this competitive intelligence with R.T., a senior sales and marketing executive at Sandoz:

| From: | CN=■■■■■■■/OU=GX/O=Novartis |
|---|---|
| Sent: | Wednesday, April 20, 2011 12:19 PM |
| To: | CN=■■■■■■■■■/OU=GX/O=Novartis |
| Subject: | Re: Teva also received FDA approval for generic Aldara |
| Attach: | EmbeddedImage0001.gif; EmbeddedImage0002.gif; EmbeddedImage0003.gif; EmbeddedImage0004.gif |

■■■- Taro got the Imiquimod award at Econdisc so they will probably go after some smaller ones...hopefully stay away from ours. 1

■■■■■
Director, National Accounts
Sandoz Inc.

243.    Perrigo and Fougera were also simultaneously coordinating how they would react to Taro's entry. For example, on April 18, 2011, Defendant Kaczmarek informed the Fougera sales executives that Taro had received FDA approval to market Imiquimod Cream and asked, "Hearing anything out there yet?" This set off a flurry of communications that same day between CW-6 of Fougera and T.P. of Perrigo, who were both concurrently reporting to, and taking direction from, their supervisors, Defendants Kaczmarek and Wesolowski. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/18/2011 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:17:23 | 0:00:27 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:43:08 | 0:04:09 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:56:57 | 0:02:44 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 17:00:05 | 0:00:08 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 17:08:22 | 0:03:25 |
| 4/18/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 21:41:15 | 0:06:03 |

244.     Three days later, on April 21, 2011, CW-6 decided to reach out to Taro directly and called H.M., a sales executive at Taro.  The two men spoke for eight (8) minutes.  Upon hanging up, CW-6 called Kaczmarek.  The call lasted one (1) minute.  First thing the next morning, CW-6 sent a text message to T.P. of Perrigo.

245.     By early July 2011, Taro was finally starting to enter the Imiquimod Cream market.  On July 5, 2011, T.P. of Perrigo reached out to CW-6 of Fougera.  The call lasted only two (2) minutes, but it set off another rush of communications among the three competitors – Perrigo, Fougera, and Taro – to make sure they were on the same page regarding Taro's entry.  These calls, which all occurred within the span of approximately fifteen (15) minutes, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/5/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 9:12:00 | 0:02:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:13:00 | 0:01:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 9:18:00 | 0:06:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:23:00 | 0:02:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:25:00 | 0:02:00 |

246.     At the same time, D.S. of Taro was coordinating with CW-4 of Sandoz.  On July 7, 2011, D.S. of Taro called CW-4 of Sandoz.  The call lasted two (2) minutes.  CW-4 returned the call and they spoke for sixteen (16) minutes.  A few hours later, CW-4 called D.S. and they spoke for another four (4) minutes.

247.     On July 14, 2011, CW-6 of Fougera called H.M. at Taro again and they spoke for nine (9) minutes.  As soon as CW-6 hung up he called his boss, Defendant Kaczmarek, and the two spoke for five (5) minutes.  Later that day, Kaczmarek e-mailed the Fougera sales team stating, "[w]e have market intelligence that suggests Taro has quietly launched imiquimod this week."

248.    On July 26, 2011, a customer, MedCo, informed Perrigo that it had received a competitive offer for Imiquimod Cream and asked if Perrigo could match the price.  MedCo declined to disclose who made the offer.  This sparked another flurry of phone communications starting first thing the next morning between Perrigo, Taro and Fougera, as detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/27/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 5:52:47 | 0:00:25 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:19:00 | 0:05:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:39:00 | 0:01:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:40:00 | 0:05:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:55:00 | 0:01:00 |
| 7/27/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 7:00:17 | 0:00:25 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 7:27:00 | 0:08:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 7:40:00 | 0:04:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:06:05 | 0:04:17 |

249.    The next day, on July 28, 2011, Perrigo declined to bid to retain the MedCo business.  That same day, CW-6 of Fougera called T.P. of Perrigo.  The call lasted one (1) minute.  T.P. returned the call and they spoke for six (6) minutes.

250.    On August 8, 2011, D.S. of Taro called CW-4 of Sandoz again.  They ultimately spoke for seventeen (17) minutes.  On that call, D.S. informed CW-4 that Taro had officially been awarded the Econdisc business and the secondary position at Cardinal and that Taro could not support any more customers.  CW-4 understood this to mean that the market would remain strong with no price erosion and Sandoz would not have to relinquish any additional customers to Taro.  Later that evening, on August 8, 2011, CW-4 passed this competitive intelligence along internally at Sandoz:



From: ▮▮▮▮▮▮
Sent: 08/08/2011 05:40 PM EDT
To: ▮▮▮▮▮▮▮▮
Cc: ▮▮▮▮▮▮▮▮
Subject: Imiquimod

Just to let you know, Taro launched about 2 weeks ago. They have Econdisc and then secondary position on Cardinal...that's all they can take on.

Regards.



251.    On August 19, 2011, Hannaford – a retail pharmacy customer – advised CW-6

that it had received a competitive offer for Imiquimod Cream, but similarly would not identify

which competitor made the offer.  Thereafter, CW-6 spoke several times with T.P. of Perrigo and

H.M. of Taro, in an effort to discover which competitor made the offer.  These calls are detailed

in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:07:00 | 0:01:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:07:00 | 0:02:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:09:00 | 0:01:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 6:10:00 | 0:06:00 |

252.    During those calls, CW-6 was able to confirm that Taro had in fact made the

offer.  Later that day, CW-6 sent the following e-mail to Defendant Kaczmarek:

From: ▮▮▮▮▮▮
Sent: Friday, August 19, 2011 3:00 PM
To: Walt Kaczmarek
Subject: Hannaford Imiquimod - Taro hit

Walt,

Hannaford has an offer on imiquimod.  The buyer would not tell me which company or price point.  Hannaford has moves 1100 units annually. I have confirmed it was Taro.

253.   An hour-and-a-half later, CW-6 followed up with Kaczmarek asking:

| From: | ████████████ |
|-------|--------------|
| Sent: | Friday, August 19, 2011 4:28 PM |
| To: | Walt Kaczmarek |
| Subject: | Hannaford Imiquimod |
| Attachments: | Hannaford Imiquimod vs. Taro.xlsx |

Do you want to let Hannaford go to Taro?  I think we should let them walk.

████████████
National Accounts Executive

Kaczmarek ultimately agreed, and Fougera gave up the customer to Taro.

254.   The goal of these communications between the various competitors on Imiquimod Cream – Fougera, Perrigo, Sandoz, and Taro – was always to avoid competition and minimize the price erosion that would typically come with the entry of new competitors.  The results were highly successful.

255.   The next day, on August 20, 2011, D.K., a senior executive at Fougera, sent an e-mail to other senior Fougera executives regarding Imiquimod Cream stating, "[w]e are VERY pleased with where the price is today . . ..  With three additional generic players in addition to us in the market today its amazing the price is holding as high as it is."

256.   Throughout September 2011, H.M. of Taro, CW-6 of Fougera, and T.P. of Perrigo spoke several times by phone during which they discussed, among other things, Taro's new capacity to take on additional market share for Imiquimod Cream and how that should be accommodated in the market.  As always, CW-6 and T.P. kept their supervisors, Defendants Kaczmarek and Wesolowski, informed of the content of those conversations.  Some of these calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/21/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 6:22:00 | 0:01:00 |
| 9/21/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:24:00 | 0:04:00 |
| 9/21/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:49:00 | 0:02:00 |
| 9/23/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:46:00 | 0:03:00 |
| 9/23/2011 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 11:31:14 | 0:12:10 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:23:00 | 0:04:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:29:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:39:00 | 0:03:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 12:46:00 | 0:04:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:49:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:12:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:19:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:26:00 | 0:03:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 4:05:00 | 0:08:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 5:48:00 | 0:03:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:50:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:16:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:16:00 | 0:04:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:46:35 | 0:05:01 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:05:00 | 0:03:00 |
| 9/27/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 8:42:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:24:00 | 0:01:00 |

257.    After this series of calls, on September 30, 2011, Defendant Kaczmarek e-mailed other Fougera sales executives, including D.K., to advise them that Taro had made an offer for Imiquimod Cream at Wal-Mart, a Fougera customer.  Kaczmarek explained that "[i]n the past 2 weeks we have been getting competitive intelligence to suggest that Taro has rectified their manufacturing issues with imiquimod and have been in search of additional market share – they currently have about 5% share so their quest for share is not completely without merit." Kaczmarek reluctantly recommended that Fougera give up Wal-Mart's business and "hope the market settles back down."  Kaczmarek noted that, if Fougera defended Wal-Mart's business, Taro would likely just go after other customers at lower and lower prices "until they get their 'fair share.'"  On the other hand, if Fougera gave up Wal-Mart, Taro would hopefully "do the right thing and leave our remaining share alone and try to pick up an additional from Perrigo." D.K. agreed with Kaczmarek's recommendation and Fougera ultimately ceded the business to Taro in order to keep the market stable.

### iii.   Triamcinolone Acetonide Cream and Ointment

258.    Triamcinolone Acetonide, also known by the brand names Aristocort, Aristocort HP, Kenalog, and Triderm, is a corticosteroid that is used to treat a variety of skin conditions, including eczema, dermatitis, allergies, and rashes.  Triamcinolone Acetonide is available as both a cream and an ointment.

259.    As of July 2010, Fougera and Perrigo were the only generic manufacturers in the market for both Triamcinolone Acetonide Cream and Ointment.  They took advantage of their already ongoing collusive relationship to raise prices on both products.

260.    On July 1, 2010 and again on July 20, 2010, Fougera raised WAC prices for various sizes and formulations of both the cream and the ointment.  CW-3, a sales executive at Fougera, later described these price increases as a "strategic decision."  On July 21 and July 30, 2010, Perrigo increased its own WAC prices on the same products to comparable levels.

261.    In the days leading up to, and surrounding these increases, CW-6 of Fougera and T.P. of Perrigo exchanged at least eight (8) calls.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 6/30/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:29:36 | 0:00:59 |
| 7/1/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:32:00 | 0:00:04 |
| 7/21/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:43:00 | 0:00:07 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:19:10 | 0:00:59 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:22:47 | 0:04:38 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:27:29 | 0:00:04 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:28:03 | 0:03:23 |
| 7/29/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:37:26 | 0:00:33 |

262.    After the price increases, both companies adhered to their understanding not to poach the other's customers or improperly take advantage of the price increase by seeking additional market share.

263.    For example, on July 30, 2010, a Perrigo customer, ABC, provided Fougera an opportunity to bid on its Triamcinolone Acetonide business because of Perrigo's price increase. CW-3 of Fougera e-mailed Defendant Kaczmarek, his supervisor, stating, "[h]ere we go again. Perrigo has taken price increases on the Triams.  I will inquire about their new market sell pricing after I confirm with Joyce we can supply.  Seems like we go through this exercise with the Triams & NT's quite often."

264.    That same day, Defendant Kaczmarek called CW-6.  The call lasted two (2) minutes.  CW-6 then called T.P. of Perrigo and they spoke for three (3) minutes.  CW-6 hung up with T.P., called Kaczmarek back, and they spoke for five (5) minutes.  Immediately upon hanging up, Kaczmarek responded to CW-3's e-mail, with a copy to CW-6.  Confident that the agreement with Perrigo was strong, Kaczmarek stated, "[w]e will NOT bid this.  Don't even bother asking Joyce."  At the same time, T.P. called his supervisor, Defendant Wesolowski, and they spoke for five (5) minutes.

### iv.    Adapalene Cream

265.    Adapalene Cream, also known by the brand name Differin, is a retinoid used to treat severe acne.

266.    On July 6, 2010, Fougera received FDA approval as the first-to-file generic for Adapalene Cream.  Two weeks later, on July 20, 2010, Fougera entered the market and published WAC pricing.

267.    Fougera quickly realized, however, that it would not be alone in the market for long, and that Perrigo would soon emerge as a competitor.  On August 9, 2010, Defendant Kaczmarek e-mailed D.K., a senior executive at Fougera, regarding "Adapalene AG Intel" stating:  "Walgreens and Cardinal [are] reporting contact from Perrigo as AG – expected market

entrance in approximately 2 weeks."  Similarly, a few weeks later, on August 30, 2010, D.K.

informed other Fougera executives: "I am at NACDS Summer Mtg in San Diego.  I learned

today that Perrigo will launch Adapalene Cream within a matter of weeks."  Several Perrigo

representatives attended NACDS, including T.P., Defendant Wesolowski, and S.K., a senior

Perrigo executive.

268.    On September 27, 2010, CW-6 of Fougera called T.P. of Perrigo.  The call lasted

less than one (1) minute.  Minutes later, T.P. called CW-6 back and they spoke for three (3)

minutes.

269.    Two days later, on September 29, 2010, Kaczmarek informed D.K. that Perrigo

would be shipping Adapalene Cream in two (2) weeks and sending out offers to customers

starting that day.  D.K. passed that information along to other senior Fougera executives.

270.    On October 1, 2010, M.A., a marketing executive at Fougera, e-mailed D.K. to

inform him that there had been no publicly reported changes in the Adapalene market.  D.K.

responded: "Keep an eye out.  Perrigo is rumored to be coming in two weeks."

271.    Between October 5 and October 7, 2010, CW-6 of Fougera and T.P. of Perrigo

exchanged several calls.  Shortly after hanging up with T.P., CW-6 called his supervisor

Kaczmarek to report on his conversations.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/5/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 15:52:49 | 0:00:04 |
| 10/5/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 15:53:18 | 0:03:26 |
| 10/5/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:07:16 | 0:00:05 |
| 10/7/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:44:57 | 0:00:40 |
| 10/7/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:53:16 | 0:00:57 |
| 10/7/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 16:56:59 | 0:10:40 |

272.    On October 8, 2010, D.K. e-mailed Kaczmarek with a subject line "Adapalene"

stating: "Any word from Perrigo?"  That same day, Kaczmarek called CW-6 and they spoke for

two (2) minutes.  After that call, CW-6 again exchanged several calls with T.P. of Perrigo.  After

hanging up with CW-6, T.P. immediately called his supervisor, Defendant Wesolowski. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/8/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 10:53:45 | 0:03:30 |
| 10/8/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 15:59:25 | 0:00:38 |
| 10/8/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:01:31 | 0:04:47 |
| 10/8/2010 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:07:04 | 0:00:49 |

273.    CW-6 of Fougera and T.P. of Perrigo continued to exchange calls in the days leading up to Perrigo's launch of Adapalene Cream. As before, CW-6 and T.P. continued to keep their supervisors, Kaczmarek and Wesolowski, informed of their conversations. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:53:56 | 0:01:00 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:55:16 | 0:00:08 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:55:46 | 0:05:04 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:01:36 | 0:00:03 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:33:46 | 0:00:36 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 11:46:18 | 0:15:02 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 15:58:59 | 0:01:40 |
| 10/19/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 16:37:08 | 0:00:58 |
| 10/19/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:49:32 | 0:12:42 |
| 10/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 17:10:46 | 0:04:14 |
| 10/21/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 13:03:06 | 0:02:35 |
| 10/21/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 13:05:59 | 0:00:00 |

274.    On October 25, 2010, Perrigo entered the Adapalene Cream market and published WAC pricing that matched Fougera's WAC pricing exactly. That same day, CW-6 and T.P. spoke again for nearly four (4) minutes.

275.    From the outset, and consistent with fair share principles, Fougera understood and agreed that it needed to give up 40% of its share of the market to Perrigo. CW-6 of Fougera and T.P. of Perrigo also discussed which customers Fougera would give up. For example, the day after Perrigo's entry, on October 26, 2010, CW-6 and T.P. spoke at least four times. Shortly

after the last of those calls, CW-6 sent the following e-mail to Kaczmarek regarding "Adapalene cream – ones to dismiss" stating:

```
From:
Sent:               Tuesday, October 26, 2010 8:42 PM
To:                 Walt Kaczmarek
Subject:            Adapalene cream - ones to dismiss

I suggest we look to give up the following accounts:

Publix
Rite Aid
Super Value
Kroger
Cardinal
NC Mutual
CVS ($70)
```

276.     Fougera wasted no time in acting on CW-6's recommendations and ceding significant share to the new entrant, Perrigo.  Perrigo, in turn, focused specifically on the list of customers provided by CW-6.  For example, on October 25, 2010, Publix informed Fougera that it had received a competitive offer for Adapalene Cream and offered Fougera the opportunity to retain the business.  The next day, on October 26, 2010, S.H., a Fougera sales executive, declined to bid stating, "[w]e have to let this go.  We have to give up share, and you were the first offer we had seen."

277.     Also on October 25, 2010, NC Mutual informed Fougera that it had received a competitive offer for Adapalene Cream.  On October 28, 2010, CW-3 forwarded the request to Kaczmarek asking: "Are we definitely letting NC Mutual go?"  Kaczmarek responded in the affirmative.  Later that day, CW-3 responded to NC Mutual stating: "Unfortunately we have to give up some market share and cannot match the new pricing."

278.     On October 26, 2010, Rite Aid advised Fougera that it had received a competitive

bid for Adapalene Cream.  Consistent with the plan, on November 2, 2010, Fougera ceded the

account to Perrigo, telling the customer: "We are going to have to let this go" and reasoning that

"we have to give up share somewhere."

279.     On October 29, 2010, Kroger informed CW-3 that it had received a competitive

offer from Perrigo for Adapalene Cream.  CW-3 forwarded the e-mail to Kaczmarek asking:

"We are definitely not matching?  Kroger purchased 1,464 units YTD and average usage should

be around 450 per month.  Publix or Supervalu may be a better option in my opinion."

Defendant Kaczmarek responded: "It is a better option and we are giving up all of them.  We

may keep SUPERVALU because they do not like Perrigo.  Remember, we have to give up

40%."  CW-3 would later acknowledge in his October 2010 monthly recap that the decision not

to match Perrigo's offer was a "strategic decision" meant "to relinquish some market share" to

the new entrant, Perrigo.

280.     Further, by the end of October 2010, Fougera had also given up Cardinal's

Adapalene Cream business to Perrigo.

281.     The agreement operated successfully for both Fougera and Perrigo.  Fougera was

impressed that Perrigo had behaved responsibly by keeping prices high and focusing on the

agreed-upon customers as it entered the market for Adapalene Cream.  As D.K. noted in an

internal e-mail, "[t]o this point, Perrigo is using similar methodology as they did with Imiquimod

which should insure that pricing stays at an appropriate level."  He stated further, "[c]ongrats to

all that we were able to maximize the situation."

###### v.     Betamethasone Dipropionate Lotion

282.     Betamethasone Dipropionate Lotion ("Betamethasone Dipropionate" or "Beta Dip"), also known by the brand name Diprolene, is a topical steroid used to treat inflammation caused by allergic reactions, eczema, and psoriasis.

283.     In 2010, Fougera, Perrigo, and Teva were the only three competitors in the market for Betamethasone Dipropionate.

284.     On December 16, 2010, CW-6 of Fougera e-mailed Defendant Kaczmarek to inform him that Teva was exiting the market, leaving Fougera and Perrigo as the only competitors.  With a strong collusive understanding firmly in place between Fougera and Perrigo at that point, Kaczmarek was thrilled with the news and immediately suggested that Fougera take advantage of Teva's departure by increasing pricing on the product:

> **From:** Walt Kaczmarek
> **Sent:** Thursday, December 16, 2010 9:51 AM
> **To:**
> **Cc:**
> **Subject:** FW: Beta Dip Lotion (not augmented)
>
> Let's add this one to the beta party!  Current WAC is $6.50, that will need to go up significantly.  Thinking $40 or so.
>
> Walt Kaczmarek
> Vice President, National Accounts

285.     Also on December 16, 2010, Perrigo held an internal meeting to discuss increasing pricing on Betamethasone Dipropionate.  Notes from that meeting stated: "Will Fougera lead the charge and we can follow?"  That same day, T.P. of Perrigo and CW-6 of Fougera exchanged several calls.  After hanging up with T.P., CW-6 called Kaczmarek to update him on their discussions.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 12/16/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 8:58:29 | 0:00:25 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:12:49 | 0:05:32 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:18:34 | 0:01:03 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:20:00 | 0:03:51 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:24:02 | 0:05:03 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 10:00:24 | 0:01:08 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:34:32 | 0:01:04 |

286.     After this series of phone calls, Perrigo also decided to raise prices – and did so

even before Fougera.  On January 4, 2011, Perrigo increased its WAC pricing for Betamethasone

Dipropionate by 504% to $37.50.  That same day, T.P. called CW-6 and they spoke for seven (7)

minutes.  Just minutes after hanging up, CW-6 again called Defendant Kaczmarek.  The call

lasted one (1) minute.

287.     Three days later, on January 7, 2011, the Fougera sales team held a conference

call during which they discussed the upcoming increase on Betamethasone Dipropionate, among

other products.  That same day, T.P. called CW-6 and they spoke for four (4) minutes.  Over the

course of the day, the two competitors would exchange several more calls and CW-6 would

continue to keep Kaczmarek apprised of his discussions.  This call pattern is detailed in the chart

below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/7/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 5:02:00 | 0:04:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:48:35 | 0:00:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:21:00 | 0:01:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:22:00 | 0:01:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 11:17:00 | 0:02:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 13:45:31 | 0:00:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 14:56:11 | 0:00:14 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 15:00:53 | 0:20:39 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 16:00:36 | 0:04:27 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:05:31 | 0:01:57 |
| 1/7/2011 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:17:40 | 0:01:15 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 17:09:52 | 0:00:00 |

288.     On January 12, 2011, Fougera followed Perrigo and increased its WAC pricing on Betamethasone Dipropionate to $39.99 – slightly higher than Perrigo's WAC pricing.  The next day, on January 13, 2011, CW-6 called T.P. again and they spoke for twelve (12) minutes.

### vi.   Clotrimazole Betamethasone Dipropionate Cream and Lotion

289.     Clotrimazole Betamethasone Dipropionate ("CBD"), also known by the brand name Lotrisone, is a combination of clotrimazole (a synthetic antifungal agent) and betamethasone dipropionate (a synthetic corticosteroid).  CBD comes in both a cream ("CBD Cream") and a lotion ("CBD Lotion").  These products are used to treat a variety of inflamed fungal skin infections such as ringworm, athlete's foot, and jock itch.  In 2013, annual sales of CBD Cream and Lotion in the United States exceeded $150 million.

### a)   *March And April 2011 - Actavis Raises Prices And Fougera And Taro Follow*

290.     In early 2011, the competitors in the generic market for CBD Cream were Fougera, Taro, and Actavis and the competitors in the generic market for CBD Lotion were Fougera and Taro.

291.     On March 9, 2011, J.R., a senior Actavis pricing executive, circulated internally a proposed price increase plan for four products, including CBD Cream, to take effect on March 28, 2011.  Actavis planned to raise WAC prices for CBD Cream by 227% and to increase contract prices to customers by as much as 1100%.  Notably, Actavis had not yet conveyed the proposed increases to its customers.  In fact, in that March 9, 2011 e-mail, J.R. specifically told his colleagues "no letters should go out prior to the 25th."

292.     Even though Actavis had not yet told its customers of these substantial price increases, its competitors, Fougera and Taro, were already aware.  For example, on March 9,

2011 – the same day that J.R. circulated the price increase proposal internally at Actavis – D.H., a Fougera sales executive, sent a National Accounts Monthly Recap report for February 2011 to Defendant Kaczmarek.  In that recap, D.H. reported that for CBD "Actavis is supposed to raise prices." Further, D.H. reported: "Taro [is] raising prices on all Beta products."  The reference to "all Beta products" is a reference to all of Taro's betamethasone products, including CBD Cream and CBD Lotion.  Importantly, Taro had not yet raised its prices on those products.

293.    Fougera was already aware of its competitors' price increases for CBD products because, in the preceding month, representatives of Actavis, Fougera, and Taro were in contact with one another to ensure that each competitor would follow the other's price increases.

294.    For example, from February 1, 2011 to March 9, 2011, Defendant Perfetto, then a senior Actavis sales and marketing executive, spoke with Defendant Blashinsky, then a senior Taro marketing executive, eight (8) times for a total of approximately fifty-two (52) minutes. During that same time, H.M., a Taro sales executive, spoke with CW-6 of Fougera three (3) times for a total of approximately fifteen (15) minutes.

295.    On March 25, 2011, Actavis informed its customers of the price increases for CBD Cream.  By happenstance, just days before the announcement, Actavis learned that its API costs for CBD Cream would increase.  Actavis immediately recognized that it could use this news to mislead its customers and provide cover for its illegal price-fixing conspiracy.

296.    Before the announcements went out, Defendant Perfetto e-mailed the Actavis sales executives, telling them to "[b]e strong" and to stick to the story that the price increase is "due to significant price increase[s] in API cost and overall cost."  One sales executive even went so far as to tell Econdisc that the increase was necessary because Actavis's "API costs were skyrocketing." In reality, Actavis knew the API "increases on a per tube basis amount[ed] to

only pennies, literally" and were "not a real issue" for the pricing of prescription medications such as CBD Cream.

297.   In furtherance of their conspiracy to raise prices, Actavis, Taro, and Fougera remained in contact during the days leading up to Actavis's formal price increase announcement on March 25, 2011, including calls between the following individuals:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/17/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:03:40 | 0:01:44 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:50:22 | 0:00:00 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:51:24 | 0:00:34 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:27:28 | 0:02:38 |
| 3/22/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 15:26:45 | 0:02:00 |
| 3/23/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:31:15 | 0:00:24 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 12:44:00 | 0:09:00 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 13:07:00 | 0:15:00 |
| 3/24/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:49:00 | 0:15:00 |

298.   On March 30, 2011 – just three business days after Actavis sent out its price increase notices for CBD Cream – Fougera sent out notices to its customers stating that it was raising prices for CBD Cream.  Those increases, which took effect April 1, 2011, increased Fougera's WAC prices for CBD Cream by 54% and increased contract prices across the board, in some cases by over 1200%.  The day after Fougera announced those price increases, CW-6 of Fougera and H.M. of Taro spoke three separate times for a total of eighteen (18) minutes.

299.   Within days, on April 4, 2011, Taro implemented its own substantial price increases across the board for both CBD Cream and CBD Lotion.  For some customers, Taro raised prices for CBD Cream by approximately 1350% and raised prices for CBD Lotion by approximately 960%.  The next day, H.M. called CW-6 and they spoke for eighteen (18) minutes.

300.   On April 14, 2011, Fougera followed Taro with a price increase on CBD Lotion – raising its WAC by 71% and increasing its contract prices across the board, in some cases by over 900%. At the time, Fougera's gross profit margin on CBD Lotion was already 67%, yet,

85

with this price increase, their gross profit percentage would soar to 96%.  Fougera estimated that these increases accounted for an extra $1.8 million in profit for the rest of 2011 alone.

301.    In furtherance of the conspiracy, Fougera refrained multiple times from taking customers that approached it for bids.  For example, after Taro's increase, Wal-Mart, a Taro customer for CBD Cream and Lotion, asked Fougera to bid for that business.  Kaczmarek cautioned "we definitely do not want to upset this apple cart."  In an effort to conceal the reason for not bidding, Kaczmarek instructed his colleagues that the "[m]essage back to Wal-Mart is we can't supply – I think they will believe that one!"  Likewise, when Rite-Aid approached Fougera, Fougera did not even consider making a competitive offer.  Instead, a Fougera employee asked internally:  Kaczmarek determined that Fougera should opt for the latter.

302.    Shortly after pulling off one massive coordinated price increase, Taro wasted no time planning the next.  In an e-mail to Kaczmarek on May 6, 2011, D.K., a senior Fougera executive, detailed how Taro had already approached Fougera about raising CBD prices again:

---

**Message**

| | |
|---|---|
| From: | ███████ [/O=NYCUS MAIL/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=███████ ] |
| Sent: | 5/6/2011 1:34:20 PM |
| To: | Walt Kaczmarek [/O=NYCUS MAIL/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=WKaczmarek] |
| Subject: | RE: BD/BV creams/lotion |

Geez. BTW, ████ told me Mitch from Taro called him to ask, "if we increase prices on CBD will Fougera follow"?  I told ████ that Taro are idiots.

████████
Sr. Vice President, General Manager
Nycomed US Inc
P.O. Box 2006
60 Baylis Road
Melville, NY 11747

b)   *Taro Increases Prices On CBD Cream In April 2012 While Actavis And Fougera Play Nice In The Sandbox*

303.     By March 5, 2012, Taro reignited its desire to raise prices on CBD Cream.  Over the next several weeks, representatives of Taro spoke several times with their contacts at Actavis and Fougera.  During these calls, Taro conveyed to its competitors its intentions to increase prices and secured their commitments not to poach Taro's customers.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/7/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:29:00 | 0:07:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:18:00 | 0:01:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:27:00 | 0:02:00 |
| 3/8/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:19:00 | 0:03:00 |
| 3/9/2012 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 4:05:00 | 0:08:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 7:37:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 9:42:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 9:49:00 | 0:02:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 15:34:00 | 0:01:00 |
| 3/16/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 4:51:00 | 0:10:00 |
| 3/17/2012 | Voice | D.S. (Taro) | Outgoing | K.K. (Fougera) | 11:08:00 | 0:02:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 11:11:00 | 0:05:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 11:29:00 | 0:01:00 |
| 3/22/2012 | Voice | CW-3 (Fougera) | Outgoing | Aprahamian, Ara (Actavis) | 7:32:00 | 0:13:00 |
| 3/29/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 8:49:00 | 0:05:00 |
| 3/29/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 10:58:00 | 0:05:00 |

304.     The day after the final calls detailed above, on March 30, 2012, Taro increased its WAC prices for CBD Cream by approximately 7% and its contract prices by 15% for most of its existing customers.

305.     In May 2012, McKesson twice asked Taro to reduce its price based on comparable sales by competitors.  Both times Taro declined, comfortable that its competitors would not poach its business.  Taro's confidence was well placed.

306.     On May 23, 2012, McKesson contacted L.P., an Actavis sales executive, asking if Actavis's recent RFP bid still stood because "something has occurred as it relates to a product

[Actavis] bid on the RFP." At 5:02 p.m., L.P. forwarded McKesson's request to Defendant Perfetto and Defendant Aprahamian, then a senior pricing executive at Actavis. Perfetto said he was "sure it's reflective of the Taro price increase" and that Actavis "need[s] to be prudent." Aprahamian replied, "[l]ove being prudent . . . Yes, we will be wise." The following day, Perfetto exchanged three calls with Defendant Blashinsky of Taro, including one call lasting fourteen (14) minutes. Following his calls with Blashinsky, Perfetto instructed Aprahamian to call him. Aprahamian called Perfetto the next morning on May 25, 2012. After that call, an Actavis employee suggested that Actavis should stick by their RFP price and take the business because it was "in line with or rather on the high end of our market prices." Aprahamian, however, responded simply and directly: "[n]o bid."

**c)** ***Fougera And Taro Raise CBD Lotion Prices In Late 2012/Early 2013***

307.    In the fall of 2012, a fourth competitor (Prasco) was entering the CBD Cream market. However, Taro and Sandoz (which acquired Fougera in July 2012) were still the only competitors in the CBD Lotion market. Facing new competition on CBD Cream, Sandoz and Taro sought to maximize profits by raising the price of CBD Lotion.

308.    Starting in late August 2012, Sandoz began planning a 100% price increase on CBD Lotion to take place in October, which – assuming "continued rational behavior by Taro" – would bring in an estimated additional $3.9 million to Sandoz annually. In the weeks leading up to its planned increase, Sandoz made repeated overtures to Taro to secure that "rational" behavior, including the following calls:

88

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 10:15:00 | 0:01:00 |
| 9/20/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:13:00 | 0:17:00 |
| 9/21/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 8:18:00 | 0:03:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 9:54:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:11:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:04:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:27:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:53:00 | 0:01:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:25:00 | 0:02:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:49:00 | 0:21:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 10:11:00 | 0:02:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 10:12:00 | 0:03:00 |
| 10/8/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 10:32:00 | 0:09:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:00:00 | 0:01:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/12/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:01:00 |

309.     On October 18, 2012, Sandoz increased prices for CBD Lotion, doubling its WAC price (from $61.90 to $123.80) as well as its contract prices.  As expected, Taro did not attempt to poach Sandoz's customers.  For example, when MMCAP e-mailed Taro on October 26, 2012 to request a bid from Taro for a dual award in light of Sandoz's increase, Taro did not even respond to the customer's request.

310.     Taro also made plans to follow the Sandoz price increase.  On January 4, 2013, J.J., a senior Taro sales executive, instructed Taro sales executives, including H.M. and D.S., to gather competitive intelligence on CBD Lotion in anticipation of Taro's planned price increase.  That same day, H.M. spoke with CW-3 of Sandoz for five (5) minutes.  The pair spoke again on January 7, 2013 for thirteen (13) more minutes.  Three days later, on January 10, 2013, D.S. spoke with CW-4 of Sandoz for twenty-three (23) minutes.

311.     On February 12, 2013, Taro instituted its price increase on CBD Lotion, raising WAC by approximately 80% and contract prices by approximately 60%.

312. After Taro's increase was issued, news of it spread throughout Sandoz. One Sandoz employee remarked "[f]antastic news!! Big hugs to Taro." Just as Taro did not poach Sandoz's customers when Sandoz raised CBD Lotion prices, Sandoz was careful not to poach Taro's customers. In fact, CW-1, a Sandoz senior pricing executive, specifically instructed Sandoz employees to "[b]e on the lookout for requests" for CBD Lotion bids, because "we do not want to send offers."

### vii.   Fluocinonide Solution

313. Fluocinonide Solution, also known by the brand name Lidex, is a corticosteroid used to treat a variety of skin conditions, such as eczema, dermatitis, allergies, and rash. Fluocinonide Solution comes in 20ml and 60ml bottles.

### a)   *Fougera Raises Prices In May 2011 And Taro Follows*

314. In early 2011, the competitors in the Fluocinonide Solution market were Teva, Taro, and Fougera. All three competitors produced Fluocinonide Solution in 60ml bottles, while only Taro produced them in 20ml bottles.

315. In the beginning of April 2011, Fougera's Fluocinonide Solution products had been on long-term backorder due to quality control issues with the tips of the bottles leaking. As a result, the market was split between Teva (76% market share) and Taro (19% market share) until Fougera returned to production. Fougera was working to re-launch its Fluocinonide Solution products by mid-May 2011.

316. On April 21, 2011, Defendant Kaczmarek learned by e-mail that Teva was "obsoleting" Fluocinonide Solution; that is, Teva was stopping production and leaving the market. This meant the only competitors in the market would now be Fougera and Taro.

90

317.     Even though it was still on backorder due to supply problems, Fougera viewed Teva's exit as an opportunity to increase prices.  In internal calculations of the expected benefit from the pricing action, Fougera assumed that "Taro follows [Fougera's] lead on pricing actions" and that they would split the market 50/50.  Fougera estimated that this would provide it with a yearly gain of $4.6 million.

318.     On May 10, 2011, Fougera raised its WAC pricing for Fluocinonide Solution by 100% from – $12.50 to $25.00 – with the change effective the following day.  That evening, Fougera also sent out contract price-change notifications to customers where it had existing contracts for Fluocinonide Solution. With those increases, the average net sales price jumped 800% from $2.50 to $20.

319.     On May 13, 2011 – three days after Fougera sent out its price changes – CW-6 and H.M. of Taro exchanged two calls, with one call lasting five (5) minutes.

320.     One week later, on May 20, 2011, Taro followed Fougera's lead by substantially increasing its pricing for Fluocinonide Solution.  Taro increased the WAC price for the 20ml and 60ml formulations by 200% and 400%, respectively.  Taro also increased average net sales prices by 260% and by over 500% for the 20ml and 60ml formulations, respectively.

321.     Following their respective price increases, the market share between Taro and Fougera stabilized to rough parity.  By September 2011, Fougera had approximately 50% market share and Taro had approximately 48% market share.

**b)**     ***Fougera Raises Prices In February 2012 And Taro Follows***

322.     On January 25, 2012, CW-6 and H.M. exchanged several calls.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:36:00 | 0:01:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:37:00 | 0:01:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:38:00 | 0:04:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:19:00 | 0:02:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 9:32:00 | 0:02:00 |

323.    First thing the next morning, on January 26, 2012, Defendant Kaczmarek sent an e-mail to his Fougera colleagues stating, "[w]e have an opportunity to adjust market pricing on fluocinonide solution.  Tomorrow we need to discuss preparing the sensitivity analysis and pre-work for review by the Pricing Committee."  The proposed price increase involved nearly tripling Fougera's WAC price and increasing associated contract prices in a little over two weeks' time.

324.    This price increase opportunity was viewed as so pressing by Kaczmarek that he asked A.R., a Fougera business analyst, to put together a pricing analysis that evening while flying on a plane because she had a scheduled day off the next day.

325.    First thing the next morning, on January 27, 2012, Kaczmarek called CW-6 and they spoke for twenty-two (22) minutes.  CW-6 hung up and immediately called H.M. of Taro.  The call lasted one (1) minute.  A few minutes later, CW-6 called H.M. again and they spoke for twenty-one (21) minutes.  Later that day, CW-6 called Kaczmarek twice.  The calls lasted four (4) minutes and three (3) minutes, respectively.

326.    Later that evening, on January 27, 2012, Kaczmarek submitted the proposed price increase to the Fougera Pricing Committee.  Now, the price increase had grown even larger.  The plan was to raise Fougera's WAC price from $25 to $80.99 and increase its average net sales price from $18.08 to $58.57.  This increase was estimated to bring in an additional $10.1 million in gross profit for the rest of 2012.  Members of the Fougera Pricing Committee enthusiastically embraced the massive price hike, with one member responding: "Let's go!!"

327.    On February 13, 2012, CW-6 called H.M. and they spoke for five (5) minutes. The next day, on February 14, 2012, Fougera formally raised its WAC and contract prices for Fluocinonide Solution as planned.

328.    The increases more than tripled Fougera's WAC price as well as direct and indirect contract prices for its customers.  The increase was so dramatic, that third party data vendor Medi-Span – which tracks WAC prices – reached out to Fougera to confirm that the new WAC amount was not an error.

329.    On February 15, 2012, the day after the increases, CW-6 called H.M. again and they spoke for six (6) minutes.  Later that day, Defendant Blashinsky, a senior Taro marketing executive, circulated an e-mail informing others within Taro that prices in the Fluocinonide Solution "market have gone up dramatically and we will follow shortly."

330.    In furtherance of their price increase conspiracy, and consistent with the overarching conspiracy, Taro was careful not to use Fougera's price increase to poach customers and upset market share.  Indeed, Taro refused to poach even very small customers.  For example, Meijer requested that Taro submit a bid for Fluocinonide Solution.  Internally, Taro noted "we could assume this without upsetting the balance" of market share.  Nonetheless, Taro declined to provide Meijer with a bid and instead falsely claimed that Taro did not have inventory to supply them.

331.    Similarly, HD Smith asked Taro to bid for its Fluocinonide Solution business after Fougera increased.  The representative at HD Smith even stated that she "would take her chances 'IF' [Taro] decided to have a price increase."  S.B., a Taro sales executive, relayed this news to J.J., a senior Taro sales executive, who then chastised him for even considering the offer:



332.    While Taro planned and implemented corresponding price increases,

representatives of Taro and Fougera remained in contact, including but not limited to exchanging

the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/15/2012 | Voice | D.S. (Taro) | Outgoing | CW-6 (Fougera) | 7:39:00 | 0:02:00 |
| 2/16/2012 | Voice | D.S. (Taro) | Incoming | CW-6 (Fougera) | 6:00:00 | 0:03:00 |
| 2/16/2012 | Voice | D.S. (Taro) | Outgoing | CW-6 (Fougera) | 6:03:00 | 0:02:00 |
| 2/29/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:13:00 | 0:07:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:18:00 | 0:01:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:27:00 | 0:02:00 |
| 3/8/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:19:00 | 0:03:00 |

333.    The day after the final calls detailed above, on March 9, 2012, Taro implemented

its price increase, which essentially doubled its WAC and contract prices for both the 60ml and

20ml formulations of Fluocinonide Solution.

### viii.   Erythromycin Base/Ethyl Alcohol Solution

334.    Erythromycin Base/Ethyl Alcohol Solution ("Erythromycin Solution") is a topical

medication used to treat acne.

335.    In the summer of 2011, Defendants Fougera and Wockhardt were the only two

competitors in the market for Erythromycin Solution.  However, both manufacturers would

experience intermittent supply issues that would require their exit from the market for periods of

time.  Because of these supply problems, extensive coordination was necessary between competitors in order to maintain a stable market.

336.    Between May 17 and May 19, 2011, Defendant Perrigo discussed internally whether to re-enter the Erythromycin Solution market.  The next day, May 20, 2011, T.P. of Perrigo called CW-6 of Fougera and they spoke for seven (7) minutes.  Immediately after that call, T.P. called his supervisor, Defendant Wesolowski, and they spoke for three (3) minutes.  The following Monday, on May 23, 2011, Wesolowski gave the green light to move forward with Perrigo's plans to re-launch the product within six months.

337.    On August 5, 2011, CW-3 of Fougera e-mailed his supervisor, Defendant Kaczmarek, stating, "[a]s an FYI, I heard from a customer that Wockhardt . . . will be out of Erythromycin Solution sometime at the end of August for a very very lengthy period (well into 2012)."

338.    Thereafter, on August 9, 2011, CW-6 of Fougera called M.C., a Wockhardt sales executive, three times, including one call lasting ten (10) minutes.  Notably, these were the first phone calls ever between the two competitors according to available phone records.  Indeed, CW-6 and M.C. were not friends and did not socialize together.  If they did speak, it was to coordinate anticompetitive conduct relating to products on which Fougera and Wockhardt overlapped.

339.    Over the next week, CW-6 exchanged several calls with M.C. of Wockhardt and T.P. of Perrigo, the prospective new entrant.  Because T.P. and M.C. did not have an independent relationship, CW-6 acted as the go-between – relaying information between the two.  After speaking with his competitors, CW-6 called his supervisor, Defendant Kaczmarek, to report back what he had learned.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:35:00 | 0:01:00 |
| 8/15/2011 | Voice | M.C. (Wockhardt) | Outgoing | CW-6 (Fougera) | 7:31:00 | 0:02:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 7:39:00 | 0:06:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 7:50:00 | 0:01:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:11:37 | 0:11:55 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:53:00 | 0:09:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:58:18 | 0:10:00 |
| 8/17/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:48:00 | 0:05:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:07:00 | 0:01:00 |

340.    On August 19, 2011, after the final call listed above, Fougera held an internal meeting to discuss Erythromycin Solution and the intelligence that CW-6 had gained from phone calls with competitors.

341.    On November 15, 2011, Defendant Wesolowski of Perrigo sent an internal e-mail to the Perrigo sales team, including to T.P., stating that Perrigo planned to launch Erythromycin Solution the following month in December 2011.  Wesolowski stated, "[w]e need pricing, but don't share too much information with your customers."  Beginning that day, and over the next few days, T.P. exchanged several calls with CW-6 of Fougera.  At the same time, CW-6 was speaking with M.C. of Wockhardt.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 11/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:57:00 | 0:07:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 11:23:00 | 0:06:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 11:29:00 | 0:02:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 11:37:00 | 0:01:00 |
| 11/17/2011 | Voice | M.C. (Wockhardt) | Outgoing | CW-6 (Fougera) | 11:38:00 | 0:01:00 |

342.    The next day, on November 18, 2011, K.K., another Wockhardt sales executive, called CW-3 of Fougera.  The call lasted two (2) minutes.  Later, CW-3 sent the following e-mail to his supervisor, Kaczmarek:

From: ▮
Sent: Friday, November 18, 2011 10:59 AM
To: Walt Kaczmarek
Subject: Erythromycin Topical Solution

Walt,

FYI. I heard from a customer that Perrigo is planning to launch Erythromycin Topical Solution in the next few weeks.

Thanks, ▮

343.     It was CW-3's customary practice to state that he learned information from a customer when he actually learned it from a competitor because he wanted to keep that information out of writing.  In response to CW-3's e-mail, Kaczmarek stated simply: "Heard that as well."

344.     On November 30, 2011, M.C. of Wockhardt called CW-6 and they spoke for four (4) minutes.  Later that same day, CW-6 sent the following e-mail to Kaczmarek regarding Erythromycin Solution:

```
-----Original Message-----
From: ▮
Sent: Wednesday, November 30, 2011 12:37 PM
To: Walt Kaczmarek
Subject: Erythromycin TS Intel

FYI....Wockhardt will be out of erythro TS 60 ml for 18 - 24 months starting in January. That leaves only us and
Perrigo. Perrigo has not launched yet but is shooting for end of year.
```

345.     Kaczmarek forwarded the e-mail along internally to A.R., a Fougera operations manager.  A.R. reminded Kaczmarek that Fougera was also having supply issues and had temporarily exited the market.

346.     A few weeks later, on December 19, 2011, Perrigo entered the Erythromycin Solution market and set WAC pricing that was significantly higher – indeed, approximately 200% higher – than the market WAC pricing at that time.

347.     CW-6 of Fougera exchanged several calls with T.P. of Perrigo in the weeks leading up to, and surrounding, Perrigo's launch, including on the date of the launch itself.  On

97

these calls, the competitors discussed pricing and the allocation of market share to the new

entrant, Perrigo.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 12/12/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 4:40:00 | 0:04:00 |
| 12/12/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:05:00 | 0:01:00 |
| 12/12/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 5:13:00 | 0:01:00 |
| 12/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:10:00 | 0:05:00 |
| 12/20/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:38:00 | 0:03:00 |
| 12/21/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:35:00 | 0:01:00 |

348.    Several months later, between April 24 and April 27, 2012, the NACDS held its

annual meeting in Palm Beach, Florida.  Representatives from Fougera, Perrigo, and Wockhardt

attended, including CW-6 and CW-3 of Fougera, Defendant Wesolowski of Perrigo, and M.C. of

Wockhardt.

349.    At that time, Fougera was readying to re-enter the Erythromycin Solution market.

Shortly after the NACDS annual meeting, on April 30, 2012, Kaczmarek e-mailed his sales team

stating, "[w]e are getting ready to re-launch this product.  Have you heard of any issues in the

market?"  CW-3 responded with the following e-mail:

From:          ████████████
Sent:          Monday, April 30, 2012 12:26 PM
To:            Walt Kaczmarek; ████████████████████
Subject:       RE: erythromycin sol

Heard that Wockhart will be discontinuing sometime soon due to API issues (re-qualify new API supplier with the FDA) and will be out of the market for quite a while.

350.    Fougera's re-launch caused a flurry of communications among the three

competitors on May 1 and May 2, 2013.  Following his consistent practice, CW-6 reported these

conversations back to his boss, Defendant Kaczmarek.  These calls are detailed in the chart

below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/1/2012 | Voice | K.K. (Wockhardt) | Outgoing | CW-3 (Fougera) | 6:56:00 | 0:02:00 |
| 5/1/2012 | Voice | CW-6 (Fougera) | Incoming | CW-3 (Fougera) | 10:04:00 | 0:03:00 |
| 5/1/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:07:00 | 0:02:00 |
| 5/1/2012 | Voice | K.K. (Wockhardt) | Outgoing | CW-3 (Fougera) | 13:12:00 | 0:01:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | CW-3 (Fougera) | 15:20:00 | 0:04:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | CW-3 (Fougera) | 15:24:00 | 0:01:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 15:25:00 | 0:01:00 |

351.   The next day, on May 3, 2012, Fougera re-entered the market and matched Perrigo's increased WAC pricing.  That morning, Kaczmarek sent the following e-mail to his sales team:

-----Original Message-----
From: Walt Kaczmarek
Sent: Thursday, May 03, 2012 7:47 AM
To: National_Accounts
Cc: ▓▓▓▓▓▓▓▓▓▓
Subject: FW: Usage Decision Notification for Backorder Material

Gents:

We are back in business on erythro topical.  Launch quantities listed below. Let's get some market share.  Smart, targeted approach please.

Walt Kaczmarek
Senior Vice President, Commercial Operations
Fougera Pharmaceuticals Inc.

352.   That same day, CW-3 of Sandoz spoke with K.K. of Wockhardt for five (5) minutes and called A.F., a sales executive at Perrigo.  Further, CW-6 called his contact at Perrigo, T.P., and the two competitors spoke for fifteen (15) minutes.  Immediately after hanging up with T.P., CW-6 again called his supervisor, Kaczmarek, and they spoke for five (5) minutes.

353.   The following Monday, on May 7, 2012, Defendant Wesolowski of Perrigo sent the following e-mail regarding Erythromycin Solution to other Perrigo executives:

From: John Wesolowski
To: ██████████████████████████████████████
Sent: 5/7/2012 9:07:29 AM
Subject: FW: Daily Sales
Attachments: 2012-05-04 Daily Sales.xlsx

Fougera is coming back into the market on Ery sol.  We will need to give up some market (25-35%) which will effect overall units and forecast.  They are not in yet but the market is indicating they are very close.  I think they are aware of our price increase so hopefully very little effect on overall ASP.

Thanks,

████

354.    On that same day, Kaczmarek circulated a proposed customer pricing grid for Erythromycin Solution to the Fougera sales team.  Kaczmarek advised: "We are not sending offer letters out to everyone.  This is a targeted approach."  As he explained, blanketing the market with offers is "a sure fire way to make sure we lower the market pricing."

355.    Over the next several days, CW-3 and CW-6 exchanged calls with their respective contacts at Perrigo, A.F. and T.P.  As was his practice, after hanging up with T.P., CW-6 immediately reported back to Kaczmarek what he had learned.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 7:06:00 | 0:01:00 |
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 7:08:00 | 0:01:00 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 7:10:41 | 0:01:52 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Incoming | CW-3 (Fougera) | 7:12:36 | 0:00:00 |
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 8:05:00 | 0:01:00 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 8:52:56 | 0:10:52 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 9:29:30 | 0:01:34 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:09:00 | 0:05:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 5:13:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 8:24:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:26:00 | 0:11:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:38:00 | 0:02:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:10:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 12:39:00 | 0:02:00 |
| 5/14/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 13:09:00 | 0:02:00 |

356.    On May 14, 2012, the date of the last calls detailed above, Kaczmarek sent the following internal e-mail to his sales team, lying about the source of his information to avoid putting evidence of illegal conduct into writing:

| | |
|---|---|
| **From:** | Walt Kaczmarek |
| **Sent:** | Monday, May 14, 2012 11:11 AM |
| **To:** | National_Accounts; ████████████ |
| **Subject:** | updated erythro sol strategy |
| **Attachments:** | erythro sol pricing grid_5.14.12.xlsx |

All:

As you may be aware, we have been receiving customer intel to suggest that Perrigo took the entire market upon the exit of Wockhardt.  As such, new price points attached as well as phase 1 accounts (highlighted in green).

357.    Less than two months later, on June 7, 2012, Fougera recalled Erythromycin Solution and again placed the product on back order.  By that time, Fougera had approached and secured approximately 12% market share on the product, including several customers on its target list such as Rite Aid, Cardinal, Optisource, and SUPERVALU.

358.    By August 2012, Fougera had resolved those supply issues.  Around this same time, Defendant Sandoz had completed its acquisition of Fougera.  As Fougera (now Sandoz) prepared to re-enter the Erythromycin Solution market, the company set an internal market share goal of 20% on the product.

359.    After the Fougera acquisition was completed, CW-6 left the company for another position.  At some point before he left Fougera, CW-6 introduced CW-3 – who would be remaining at Sandoz after the acquisition – to T.P. at Perrigo.  This was the beginning of a collusive relationship that would last several years and will be discussed in detail in subsequent Sections of this Complaint.

360.    The first ever phone calls between CW-3 and T.P., according to the available phone records, were on August 8, 2012.  They spoke two times that day.  The competitors spoke

101

again on August 21, 2012, as Sandoz was preparing to re-enter the market for Erythromycin

Solution.

361.    On September 5, 2012, S.G., a Sandoz sales executive, e-mailed CW-3 and

Defendant Kellum to advise them that Sandoz had an opportunity to bid on Erythromycin

Solution at Walgreens.  Kellum responded, "[l]et's leave this alone for now."  On September 6,

2012, CW-3 called T.P. of Perrigo and they spoke for eleven (11) minutes.

362.    The next day, on September 7, 2012, CW-3 sent an internal e-mail including to

CW-1, a Sandoz senior pricing executive, recommending that Sandoz target the same customers

that Fougera had targeted when it re-launched Erythromycin Solution in May 2012.  Not wanting

to have a discussion in writing, CW-1 responded to CW-3 directly, stating, "[g]ive me a buzz on

this."

363.    On September 13, 2012, CW-3 called T.P. of Perrigo and they spoke for three (3)

minutes.  CW-3 hung up and called R.T., a senior sales and marketing executive at Sandoz.  The

call lasted one (1) minute.  Later that day, CW-3 called K.K. of Wockhardt.  The call lasted one

(1) minute.

364.    The following Monday, on September 17, 2012, CW-1 instructed CW-3 to put

together offers for Cardinal and Wal-Mart and advised that they would be the only customers

Sandoz would be bidding on at this time.  That same day, K.K. of Wockhardt called CW-3 and

they spoke for four (4) minutes.

365.    Between September 20 and September 21, 2012, CW-3 and T.P. of Perrigo

exchanged six (6) calls, including two calls lasting eight (8) minutes and seven (7) minutes,

respectively.  By October 2012, Perrigo had conceded the Erythromycin Solution business at

Cardinal and Wal-Mart to Sandoz.

### ix. Nystatin Ointment

366.    Nystatin Ointment, also known by the brand name Mycostatin, is a topical antifungal medication used to treat fungal skin infections.

367.    In early 2011, Fougera and Perrigo were the only players in the market for generic Nystatin Ointment.

368.    On February 7, 2011, J.E., a Fougera sales executive, circulated internally a list of products and their potential for price increases.  While Nystatin Ointment was one of the products deemed worthy of consideration, the initial conclusion was that its "WAC is too low to raise CP [contract price]."

369.    Undaunted, key Fougera employees turned to rival Perrigo for a creative solution to the problem of low prices and low profits on Nystatin Ointment.  Between February 7 and February 28, 2011, CW-6 of Fougera and T.P. of Perrigo were in frequent communication with each other, exchanging twenty-seven (27) calls and three (3) text messages, with eleven (11) of the calls taking place on February 28, 2011.  During these calls, the competitors hatched a plan for Fougera to leave the market temporarily, allowing Perrigo to significantly raise prices, at which point Fougera would return to the market at that new, higher pricing.

370.    By March 1, 2011, word of the plan formulated during those phone calls had begun to spread into the market, reaching J.E. at Fougera by way of a customer.  Perplexed, J.E. e-mailed Defendant Kaczmarek, asking: "Are we doing something market-wide with the Nystatins? [CW-6] sent several e-mails to customers telling them we are removing the products from contract at end of March or April (in most cases)."

371.    Defendant Kaczmarek responded in the affirmative: "The current thought is that due to manufacturing issues with nt's and nystatins, low market share and low to negative GP's,

we discontinue with the possibility of re-launching at later date."  In fact, other Fougera

personnel were already preparing a draft letter announcing the discontinuation of the product.

372.    Fougera subsequently discontinued Nystatin Ointment effective March 15, 2011.

373.    By late March 2011, numerous large customers including Meijer, Morris &

Dickson, Rite Aid, Giant Eagle, and NC Mutual, had switched their Nystatin Ointment business

to the only remaining alternative in the market – Perrigo.

374.    With essentially the entire market transferred to Perrigo, and customers left with

no alternative suppliers, the stage was set for the next phase of the plan.  On June 1, 2011,

Perrigo instituted a large WAC price increase on Nystatin Ointment.  Indeed, the price of a 15gm

tube increased by 493%, and the price of a 30gm tube increased by 269%.

375.    That same day, CW-6 of Fougera called T.P. of Perrigo.  The two competitors

spoke for six (6) minutes.  Nine days later, on June 10, 2011, CW-6 and T.P.'s discussions

intensified with the two competitors exchanging seven calls that day.

376.    As those phone calls were taking place – and less than three months after it had

discontinued the product – Fougera was taking the first steps towards re-launch by starting to

market the remaining inventory of Nystatin Ointment that it had on hand when it discontinued

the product.

377.    On June 12, 2011, senior Fougera executive D.K. requested an update on

discontinued items that the company might want to bring permanently back into its product line.

J.S., a Fougera marketing executive, sent back a list the next morning, calling special attention to

Nystatin Ointment: "The Nystatin was just a regular disco until we saw the increases that the

competitors took." Recognizing the lucrative opportunity presented by following Perrigo's price

hike, D.K. replied, "we should then sit down and lay out a time line to bring them back with new forecasts at new price points."

378.    But Fougera was not the only company that was motivated by the size of the price increase that Perrigo had managed to implement.  Late in the evening on June 14, 2011, Defendant Perfetto, then a senior sales and marketing executive at Actavis, sent an e-mail to Defendant Aprahamian and other Actavis colleagues with the subject line: "Perrigo – Nystatin: increases prices on ointment as other suppliers leave market." The text that followed was simple and clear: "Let's rock on this…."

379.    The next day, Actavis marketing executive J.M. responded with some projections on the financial implications of Actavis entering the Nystatin market.  The recent sharp WAC increase by Perrigo made the prospect of entry surprisingly irresistible.  J.M. wrote: "This is a very rough projection – just want to know what kind of $ we are talking about – WOW!!! Stay put, I almost fell off my chair!"  J.M. estimated that if Actavis secured a 30% share of the current two-player market, the company would realize more than $3.8 million in sales.  Aprahamian agreed that the time was right to capitalize on the Perrigo price hike, saying: "This is a great opportunity for us to get in while there are issues, carve out our share, and lock up long term profitable business... [sic] Timing is key here."

380.    Meanwhile, Fougera continued selling off its previously stockpiled inventory of Nystatin Ointment and made plans to fully re-enter the market at the new higher WAC prices. On June 27, 2011, D.K. of Fougera e-mailed Kaczmarek asking: "Can you do a pre and post using the new pricing and current volumes to spitball what Nystatin cream and ointment would mean if we came back and got a 30 share at new prices?"

381.    Actavis made its move in early November 2011.  On November 4, 2011, just days
before the launch, Actavis executive D.M. opined in an e-mail to Aprahamian, Perfetto and other
colleagues that conditions were favorable for a very successful launch, including the 187%
increase in the price of Nystatin Ointment over the past year, and the fact that Fougera had not
re-entered the market as yet.  Aprahamian inquired how much share Actavis could handle.  In
response, D.M., mindful of the fair share rules of the game, replied: "We have budgeted 20%
share on the Cream and 30% on the Ointment. In reality, we can handle more than that
(especially on the ointment); provided, of course, it doesn't upset the market. (But I'm sure I
don't need to tell YOU that!)".

382.    On November 7, 2011, Actavis re-entered the market with WAC prices that
exactly matched Perrigo's.

383.    On the day of the Actavis launch, the phone lines among the three competitors
were alive with activity.  In the morning, T.P. at Perrigo placed two calls to CW-6 at Fougera to
discuss the Actavis development.  After the second call, T.P. called M.D., an Actavis sales
executive, setting off a chain of three more calls back and forth between them totaling more than
twenty-three (23) minutes collectively.  During these calls, the competitors discussed which
customers Actavis should target to obtain its market share goals without eroding the high prices
currently in the market.

384.    In the coming weeks, having coordinated its entry with market leader Perrigo,
Actavis began collecting its share of accounts, winning business at Omnicare, Publix, and Rite
Aid, among others.

385.    Meanwhile, unable to gear up its production for an immediate re-launch, Fougera
set its sights on a June 2012 re-launch date for Nystatin Ointment.

106

386.    On June 15, 2012, a Fougera marketing executive provided Kaczmarek with WAC pricing data for Perrigo and Actavis and asked what Fougera's re-launch WAC prices would be.  The competitors' prices were identical to the penny with each charging $14.00 for a 15gm tube, and $21.00 for a 30gm tube.  Later that day, Kaczmarek announced to his colleagues that Fougera would also fall in line, saying: "Let's match the competitive market: 15gm $14.00, 30gm $21.00."

387.    On June 21, 2012, Kaczmarek instructed CW-6 to gather intelligence on price points and "who has who" for Nystatin Ointment.  CW-6 initially e-mailed Cardinal asking for contract pricing, emphasizing that Fougera did not "want to screw the market…."  Knowing that the most accurate source of competitor intelligence was the competitors themselves, however, CW-6 reached out directly to T.P. at Perrigo, initiating a call that lasted two (2) minutes that morning.

388.    The competitors moved forward to claim the market shares to which they had agreed each was entitled, all the while taking great care not to erode the lucrative market pricing.  On June 22, 2012, for example, Aprahamian at Actavis rejected a colleague's suggestion to offer a competitive price on Nystatin Ointment to one customer by saying, "don't want to reduce the Nystatin and disrupt the market."  On the same day, CW-6 sent the following message to another customer: "We are going to be re-launching nystatin ointment at the end of the month. Who are you with? Can you tell me roughly where you are currently on price and your usage so we enter responsibly?"

389.    On June 25, 2012, CW-6 asked Kaczmarek for Fougera's market share goal for Nystatin Ointment.  Kaczmarek's reply acknowledged the importance of playing by the rules of the competitors' agreement: "Don't want to be a pig – 20-25%."

107

390.    That same day, CW-6 called T.P. at Perrigo, and they spoke for ten (10) minutes. Immediately after hanging up with T.P., CW-6 called Kaczmarek, and they spoke for three (3) minutes.

391.    With all decisions made and cleared with its competitors, Fougera re-entered the Nystatin Ointment market on June 29, 2012 at WAC prices identical to its competitors. Consistent with the fair share understanding in place between the three competitors, Fougera proceeded to claim its share of accounts over the coming weeks, including business at HEB, Giant Eagle, and Cardinal Health.

### 4)    G&W And Its Relationships

392.    Although G&W is not a large company and does not manufacture as many topical products as some of the larger generic manufacturers discussed above, G&W has actively conspired with its competitors in the topical space for many years.  During this early time period, G&W had anticompetitive relationships with Fougera and Glenmark and used those relationships to allocate markets and fix prices on a number of products on which those companies overlapped.  These relationships, as well as some illustrative examples of how these relationships manifested themselves regarding specific products, are discussed in detail below.

### i.    G&W/Fougera

393.    Defendant Jim Grauso, then a senior sales and marketing executive at G&W, had a relationship with CW-6 of Fougera.  Although Grauso and CW-6 were social friends, they also had an ongoing understanding, on behalf of the companies they represented, not to poach each other's customers and to follow each other's price increases.  The two competitors conspired with regard to several products on which G&W and Fougera overlapped, some examples of which are discussed below.

394.    Grauso was a prolific communicator who frequently engaged in anticompetitive conduct with his contacts at competitor companies.  Indeed, when CW-6 of Fougera needed to communicate with a competitor at which he did not have a contact, but Grauso did – Defendant Kaczmarek, CW-6's supervisor at Fougera, would direct him to call Grauso and ask him to convey the message to that competitor on behalf of Fougera.

395.    One example of this involved Grauso's relationship with Defendant Perfetto, then a senior sales and marketing executive at Defendant Actavis.  Between January 1, 2010 and December 28, 2011, the two competitors exchanged at least eighty-nine (89) phone calls.  Because CW-6 did not have a contact at Actavis, he used Grauso's relationship with Perfetto to collude on products that Fougera and Actavis overlapped on.

396.    During this early time period, Grauso was acting at all times at the direction of, or with approval from, his superior Defendant Orlofski of G&W.

397.    Grauso left G&W in December 2011 to take a position as a senior executive at Defendant Aurobindo.  With Grauso's departure, CW-6 no longer had a contact at G&W and it became necessary for him to use Grauso to convey messages to Grauso's former colleagues – Defendants Kurt Orlofski and Erika Vogel-Baylor.  Orlofski was the President of G&W and Vogel-Baylor assumed Grauso's role as Vice President of Sales and Marketing after his departure.

398.    This worked well for the first few months of 2012.  However, soon Orlofski believed it prudent to cut out the middleman and communicate directly with CW-6.  David Berthold, the Vice President of Sales at Defendant Lupin, introduced Orlofski to CW-6 and they set up a dinner meeting at an industry conference, which was also attended by Vogel-Baylor.

109

399.     At dinner, the competitors engaged in a high-level discussion to ensure that both companies continued to "play nice in the sandbox" and minimize competition with each other even though Grauso had left.  No specific products were discussed at the meeting.  The focus was to ensure that the competitors stayed the course and continued to coordinate customer allocation and price increases on products that G&W and Fougera overlapped on.

400.     After the dinner, Vogel-Baylor began to communicate directly with CW-6.  Indeed, between May 2012 and May 2013, when CW-6 left the industry, the two exchanged at least one hundred and thirty-three (133) phone calls and text messages.  During this time period, Vogel-Baylor was acting at all times at the direction of, or with approval from, her superior Defendant Orlofski.

401.     The following Sections will discuss specific examples of how the long-standing competitor relationships detailed above manifested themselves regarding particular products between 2010 and early 2012.

### a)     Metronidazole Cream and Lotion

402.     Metronidazole 0.75% is a topical antibiotic commonly used to treat the skin lesions that result from rosacea.  Among other formulations, it is manufactured as a cream ("Metro Cream," also known by the brand name "Metrocream") and as a lotion ("Metro Lotion," also known by the brand name "MetroLotion").  In 2013, the combined annual market for Metro Cream and Lotion in the United States exceeded $70 million.

403.     In 2011, Actavis, Fougera, G&W, and Harris Pharmaceutical ("Harris") each marketed a generic version of Metro Cream, and Actavis and Fougera shared the market for generic Metro Lotion.

404.     In early July 2011, Actavis initiated its plan to raise the prices of both products by reaching out to its rival G&W.  On July 6, 2011, Defendant Mike Perfetto, then a senior sales and marketing executive at Actavis, called Defendant Grauso at G&W twice.  The calls lasted four (4) minutes and twenty-one (21) minutes.

405.     The next day, on July 7, 2011, the conversation continued, with Perfetto initiating a six (6) minute call to Grauso.

406.     Confident that at least G&W was on board with the planned increase, Actavis raised the price of Metro Cream and Lotion effective July 22, 2011.  The new WAC price for Metro Cream was $153.33 for a 45gm tube, an increase of 278%.  The WAC price for Metro Lotion increased by 189% to $208.03 for a 59ml bottle.

407.     That same day, M.A., a Fougera marketing executive, e-mailed several colleagues, including Defendant Kaczmarek, with the precise details of the Actavis increase. Kaczmarek began at once assessing how Fougera would follow, mindful of the fair share rules and the agreement among the competitors.  He inquired of M.A. about G&W's current share of the market, saying: "I show G&W Labs with 40% MS on the cream?"

408.     The next morning, on Saturday July 23, 2011, Fougera utilized one of its most reliable sources of information – the relationship between Fougera's CW-6 and Grauso at G&W. CW-6 called Grauso and the two competitors spoke for four (4) minutes.  A few minutes later, CW-6 called Grauso again and they spoke for fourteen (14) minutes.

409.     Just after 9:00 a.m. on Monday, July 25, 2011, Kaczmarek cautioned his team at Fougera to consult with management before quoting a price to any customer on Metro Cream or Metro Lotion, saying: "Please put metro cream and lotion on mandatory review prior to releasing an order.  Market just moved and we will as well."

410.    By 10:31 a.m. that morning, Kaczmarek had already decided on the exact amount by which Fougera should increase its price on these products to stay in lockstep with Actavis. He told his colleagues: "We have another market opportunity to raise pricing on the below metro sku's due to [sic]. This will again require swift action.  Below are suggested price points based on 99% of Actavis new WAC points."  By early afternoon, a price increase announcement letter had already been drafted and circulated for comment, incorporating Kaczmarek's "99% of Actavis" formula.

411.    Meanwhile, CW-6 and Grauso continued their discussions that same morning. CW-6 initiated calls to Grauso at 9:55 a.m. and 12:21 p.m.

412.    Less than twenty (20) minutes after the second call with Grauso ended, CW-6 called his boss, Defendant Kaczmarek, to report the information he had obtained. A total of eight calls were exchanged between CW-6 and Kaczmarek on the afternoon and early evening of July 25, 2011.

413.    During those calls – only 3 days after the Actavis increase and before G&W had even been able to follow – Kaczmarek informed the Fougera team that "…we should pull trigger on metro WAC increase for tomorrow."

414.    In the early afternoon of Monday, July 25, 2011, a large customer reached out to CW-6 at Fougera seeking a new source of supply for Metro Lotion and another product.  CW-6 asked whether the request was the result of supply issues or "market wide price increases."  The buyer, tongue-in-cheek, asked which answer would yield the better price.  CW-6, following Kaczmarek's earlier instructions replied: "Unfortunately, neither – we cannot take on the volume."

415.    That same day, Fougera informed its customers that it was increasing its pricing for both Metro Cream and Metro Lotion effective July 26, 2011, closely tracking Actavis's new prices.  The new WAC price for Metro Cream was $151.80 for a 45gm tube.  The new WAC price for Metro Lotion was $205.95 for a 59ml bottle.

416.    Customers quickly began to complain to Fougera about the sharp price increase, prompting one Fougera customer service representative to ask Kaczmarek for help in framing a response to a disgruntled customer that e-mailed protesting that the roughly 150% price hike was "very high."

417.    Undaunted by the obvious dissatisfaction of its customers, Fougera's singular focus was on ensuring that the competitors all followed the price increases.  In response to yet another customer inquiry about the price spike, Kaczmarek virtually disregarded the news of the customer's displeasure, saying instead: "Hope to hell G&W does the cream with us."

418.    Kaczmarek did not have to worry for long, however, as G&W's plans to follow the Actavis and Fougera price increases on Metro Cream were already in full swing.  On July 26, 2011 – the day of the Fougera increase – Grauso of G&W called CW-6 of Fougera.  The call lasted one (1) minute.  CW-6 hung up and immediately called Kaczmarek.

419.    Meanwhile, less than ten minutes after ending his call with CW-6, Grauso brought Actavis into the conversation, initiating a two (2)-minute call to Defendant Perfetto.  Defendant Orlofski of G&W similarly followed up with a text message to Perfetto at Actavis roughly a half hour after that.  Grauso called CW-6 at Fougera again a few hours later, and the resulting call lasted seven (7) minutes.  Within five minutes of the end of that call, Grauso had placed yet another call to Perfetto at Actavis, this one lasting five (5) minutes.

113

420.    By that evening, Grauso had spoken to Perfetto by phone for thirty-five (35) more minutes, and had sent him a text message, while CW-6 of Fougera had conferred twice more with his boss, Kaczmarek.

421.    Over the next two days, July 27 and July 28, 2011, Grauso spoke to Perfetto at Actavis four more times and to CW-6 at Fougera six (6) more times.

422.    With its competitors fully apprised, G&W raised the price of Metro Cream on July 28, 2011, following close on the heels of the Actavis and Fougera increases.

423.    As the news of yet another Metro Cream price increase hit the market, customers again scrambled to find more reasonably priced sources of supply.  One large customer reached out to Fougera and Actavis on the same day as the G&W increase seeking quotes.  Fougera sales executive K.K. contacted Kaczmarek about the request, surmising both that the customer was currently supplied by G&W and that G&W must be implementing a price increase.

424.    Despite over a week of receiving nearly constant updates from G&W through CW-6, Kaczmarek remained coy about his knowledge of G&W's increase, saying: "Yes I believe they are."  Then, to ensure that K.K. did not try to compete for the business, he added: "Don't bid this.  We have majority share."

425.    Finally, just four days later on August 1, 2011, the remaining competitor, Harris, fell in line with an increase of its own on Metro Cream.  The new Harris WAC price was $135.00, an increase of 437%.

426.    On August 2, 2011, a customer informed G&W that its increase would bump G&W from its primary position on Metro Cream, but only by a small margin considering the market-wide increases.  Defendant Vogel-Baylor promised the customer a slight price

adjustment in order to maintain the primary position but asked who the other competitor was. The customer responded that it was Harris.

427.    The following day, the customer followed up with Vogel-Baylor to let her know that Harris would not be fighting G&W for the primary position.  The customer added that the Harris representative was upset about the outcome – not because it failed to win the primary position, but rather "…[s]he seemed more upset with the lack of communication with G&W…."

### b)    Calcipotriene Solution

428.    Calcipotriene Solution ("Calcipotriene"), also known by the brand name Dovonex Scalp, is a form of vitamin D that impacts the growth of skin cells.  This topical medication is prescribed for the treatment of chronic plaque psoriasis of the scalp.

429.    In early 2010, the market for generic Calcipotriene was shared by Defendants Fougera, Hi-Tech, and Impax Pharmaceuticals, Inc. ("Impax").  Even with three competitors in the market, pricing remained high and the product was "hugely profitable" for the sellers.

430.    On July 23, 2010, however, Hi-Tech received a warning letter from the FDA detailing numerous violations found during a recent manufacturing facility inspection.  Even though G&W was not in the Calcipotriene market at the time, Defendant Grauso knew his contact at Fougera would be interested in the information.  On July 28, 2010, he forwarded a copy of the FDA letter to CW-6 at Fougera.  Pleased with the news, CW-6 replied: "Christmas in July…."

431.    By the end of July 2010, Hi-Tech had discontinued the product, leaving its approximate 35% market share open for competitors to claim.

432.    One year later, on June 6 and 7, 2011, CW-6 and Grauso exchanged several phone calls, with one call lasting eight (8) minutes.  During those calls, Grauso informed CW-6 that

115

G&W would soon be launching its own generic Calcipotriene.  Shortly after speaking with Grauso, CW-6 e-mailed Defendant Kaczmarek and other colleagues at Fougera sharing the news that he had just learned from his competitor – G&W was launching that week.

433.   G&W did, indeed, launch Calcipotriene that week – on June 10, 2011.  As G&W was entering the market, CW-6 and Defendant Grauso continued to speak, including exchanging two calls on June 23, 2011 and one call on June 24, 2011 lasting sixteen (16) minutes.

434.   A few months later, between November 10 and November 17, 2011, CW-6 and Grauso exchanged at least seven separate phone calls.  The topic of conversation during these calls was a G&W price increase that was about to become effective for Calcipotriene.

435.   At the end of this series of phone communications between Grauso and CW-6, G&W instituted a 54% price increase on Calcipotriene, effective November 18, 2011.  Grauso sent an internal e-mail advising the team to "[p]lease follow-up with your accounts on Monday to let them know there was a change in the market on this item.  Currently, it is only us & [Fougera]."

436.   Shortly after the G&W price increase became effective, on November 21, 2011, CW-6 of Fougera called his supervisor, Defendant Kaczmarek.  Immediately upon hanging up, CW-6 called Grauso and they spoke for five (5) minutes.  Within minutes after that call ended, CW-6 called Kaczmarek again to report the results of his call with the competitor.  Almost simultaneously, Grauso was also reporting the substance of his conversation with CW-6 to his G&W colleagues, by placing calls to Defendants Orlofski and Vogel-Baylor.

437.   Fougera acted quickly.  Just two days later, it followed G&W's price increase. Fougera's new WAC price on Calcipotriene went into effect on November 23, 2011.

**c)  Fluocinolone Acetonide Cream
and Ointment**

438.    Fluocinolone Acetonide ("Fluocinolone") is a steroid that reduces inflammation. In its topical formulations (cream – 0.025%, 0.01% and ointment – 0.025%), it is prescribed for the treatment of skin conditions such as eczema and psoriasis.

439.    In early 2011, Fougera had 100% share of the market for these products and was making plans to implement a price increase.

440.    At an October 3, 2011 meeting of the Fougera Pricing Committee, members discussed their confidence that they were nearly ready to execute the planned increase. Moreover, they discussed the possibility that Fougera could use the impending entry of a competitor into the Fluocinolone market to ensure the success of the price hike, saying: "There is a competitor coming out next year and we would like to reset the market and maximize opportunity."

441.    The market intelligence that the Fougera Pricing Committee had when it convened was the result of at least a week's worth of preparatory conversations that CW-6 had in late September 2011 with the entering competitor – G&W.  Between September 20, 2011 and September 27, 2011, CW-6 and Defendant Grauso at G&W exchanged five phone calls, speaking for a total of forty-six (46) minutes.

442.    The conversations between CW-6 and Grauso continued at a vigorous pace over the coming weeks as Fougera moved towards its price increase, and G&W planned for its launch.  The two exchanged sixteen calls during October and November 2011:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 11:10:00 | 0:06:00 |
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 12:10:00 | 0:01:00 |
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 13:08:00 | 0:14:00 |
| 10/10/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:22:00 | 0:01:00 |
| 10/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 14:53:00 | 0:01:00 |
| 10/11/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:39:00 | 0:02:00 |
| 10/31/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 4:01:00 | 0:06:00 |
| 11/2/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 9:49:00 | 0:10:00 |
| 11/9/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 12:22:00 | 0:01:00 |
| 11/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 4:29:00 | 0:02:00 |
| 11/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 5:56:00 | 0:07:00 |
| 11/11/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 9:55:00 | 0:04:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 14:37:00 | 0:02:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:54:00 | 0:11:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 15:04:00 | 0:04:00 |
| 11/21/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 8:37:00 | 0:05:00 |

443.     On the morning of December 14, 2011, Fougera learned that G&W had launched Fluocinolone the preceding day and, importantly, that it had done so at nearly the same pricing as Fougera's current (pre-increase) price.

444.     D.K., a senior executive at Fougera, was quite displeased with the development considering Fougera's impending price increase, saying: "This is VERY bad news."  J.B., also a senior executive at Fougera, concurred: "Ouch…. let's discuss prior to the review this pm."

445.     Less than a half hour later, Defendant Kaczmarek called CW-6.  The call lasted two (2) minutes.  Immediately after hanging up, CW-6 placed a call to Grauso.  They spoke for six (6) minutes.  Later that day, the competitors exchanged two more calls lasting nine (9) minutes and eighteen (18) minutes, respectively.

446.     Having received some peace of mind from the conversations between CW-6 and Grauso, D.K. of Fougera sent an internal e-mail recommending that Fougera move forward with the planned price increase on Fluocinolone, adding "hope G&W follows."

447.     To solidify the plan, CW-6 and Grauso placed three more calls to each other that afternoon.  Less than an hour after his final call with CW-6, Grauso initiated the first of three

118

calls to his superior, Defendant Orlofski, to update him on the Fluocinolone discussions with Fougera. CW-6 also called to update his supervisor, Kaczmarek.

448. Six more calls followed between CW-6 and Grauso in the days that followed between December 15, 2011 and December 21, 2011.

449. At the conclusion of that series of calls, on December 22, 2011, Fougera increased WAC pricing on Fluocinolone Cream and Ointment by 200%.

450. Fougera knew from its discussions with G&W that G&W would follow the price increase. On the morning of December 28, 2011, D.K. of Fougera instructed a co-worker to find out whether G&W had followed Fougera's price increase yet. The co-worker reported that the competitor had not.

451. Shortly before noon that day, CW-6 and Defendant Grauso had a twenty (20) minute phone conversation. Immediately after that call ended, Grauso called his colleague at G&W, Defendant Vogel-Baylor.

452. Less than a week later, on January 3, 2012, G&W followed through with its assurances to Fougera, increasing WAC prices on Fluocinolone Cream and Ointment to within pennies of Fougera's prices. D.K. was delighted by the news and agreed with a colleague's suggestion that Fougera would "have to give [G&W] some accounts when they actually get out there to do so."

453. Fougera was satisfied with G&W's compliance and promptly gave up its Wal-Mart business to G&W, quoting intentionally high prices on this drug to allow the rival to "gain some share." Specifically, Kaczmarek recommended giving G&W 30-35% share of the market, adding "hopefully G&W is being smart about targeted market share."

454.     In early February 2012, the two companies continued to collaborate on allocating the market between themselves to give the new entrant its fair share.  CW-6 called Orlofski on the morning of February 1, 2012, because his regular contact at G&W – Grauso – had left the company for employment at Aurobindo a few weeks earlier.  Less than one hour later, Orlofski called CW-6 back.  On February 8, 2012, Orlofski called Kaczmarek.  Kaczmarek called Orlofski back on February 9, 2012, and the competitors exchanged two more calls the following day, including one call lasting over twenty-five (25) minutes.

455.     At the conclusion of these communications, on February 14, 2012, Fougera ceded another large customer to G&W, telling Cardinal that it would "give up the primary source position to G&W."

### d)     Betamethasone Valerate Lotion

456.     Betamethasone Valerate ("Beta Val"), also known by brand names such as Betamethacot, Beta-Val and Betacort Scalp Lotion, among others, is a medium strength topical corticosteroid prescribed for the treatment of skin conditions such as eczema and dermatitis, as well as allergies and rashes.  It is manufactured in various formulations, including cream, lotion, and ointment.

457.     In mid-2011, two companies shared the market for Beta Val Lotion – Fougera with 79% of the market, and Teva with 21% market share.

458.     In early November 2011, however, Defendant Grauso at G&W contacted CW-6 with some important news about G&W's plans to enter the Beta Val Lotion market.  Grauso called CW-6 late in the afternoon of November 9, 2011.  They also spoke three times the next morning.  Later that day, CW-6 informed his Fougera colleagues that G&W would be launching "in the next month" and that he believed Teva had discontinued the product.  He opined that,

120

under those circumstances, Beta Val Lotion "[m]ay be ripe for a 100% PI."  Defendant

Kaczmarek responded: "Thanks – will look into [it]."

459.   Fougera promptly began preparing for an even larger price increase than CW-6

had recommended.  On December 13, 2011, CW-3, a Fougera sales executive, created a

spreadsheet detailing Fougera's upcoming price increases, including a 200% increase in WAC

pricing for Beta Val Lotion from $20.00 to $60.00 per 60ml bottle.  The average net sales price

for the product would go from $10.11 to $30.33.

460.   With the Fougera price increase details now firm, CW-6 began coordinating the

price increase directly with G&W, initiating what became a series of twelve phone calls with

Defendant Grauso at G&W from December 14 through December 21, 2011, in the days leading

up to Fougera's price increase for Beta Val Lotion.

461.   Fougera's new $60.00 WAC price went into effect on December 22, 2011.

462.   CW-6 and Grauso remained in close contact in the days that followed the Fougera

price increase, as G&W also finalized plans for its Beta Val Lotion launch, including a twenty

(20) minute call on December 28, 2011, Grauso's last day as a G&W employee.  During these

calls, the competitors discussed G&W's market share goals and identified customers for G&W to

target as it launched.

463.   On January 9, 2012, Defendant Vogel-Baylor of G&W (who had just taken over

for Grauso) distributed to her colleagues a "[t]arget 1 list" for the G&W launch of Beta Val

Lotion, saying "[o]ur market share goal is 44%."  That same day, she sent an e-mail to Wal-Mart

announcing the G&W launch.  On January 11, 2012, she followed up with a quote, offering to

supply the product for $10.40, far below Fougera's newly increased average net sales price.

464. Vogel-Baylor directed her colleagues at G&W to generate a nearly identical offer letter for another customer – Rite Aid – on January 10, 2012, offering a price of $10.20.

465. Something had clearly been lost in translation after Grauso's departure, and CW-6 of Fougera set out to figure out what had happened. Late in the afternoon on January 11, 2012, CW-6 placed an urgent call to Grauso, who had recently started at Defendant Aurobindo. Grauso called him back quickly and the two spoke for five (5) minutes. Immediately upon ending that call, Grauso called his former colleague at G&W, Vogel-Baylor, to convey Fougera's concerns about G&W's drastically underpriced offers. As soon as that call ended, Grauso called CW-6 of Fougera to confirm that he had addressed the problem.

466. At 10:02 p.m. that same day, Vogel-Baylor e-mailed Defendant Orlofski with the news she had just received about Fougera:

Fougera raised their WAC & AWP on December 21st as follows:

- WAC - from $20.00 to $60.00
- AWP - from $24.00 to $72.00

I am trying to find out if the prices went up to. I will let you know but for now I would recommend increasing the WAC & AWP to:

- WAC from $30.00 to $60.15
- AWP from $36.00 to $72.25

467. At 7:55 a.m. the following morning, Vogel-Baylor asked that the G&W team re-submit the Rite Aid proposal with a new price of $20.00, bringing it more in line with Fougera's new price. That same day, G&W also issued a revised price proposal to Wal-Mart, quoting the new price of $20.00.

468. Vogel-Baylor explained the sudden about-face to a colleague by saying that she had revised the G&W launch pricing for this product "based on the recent increase." The

modified schedule included $30.00 for large chains, $32-$75 for small chains, and $38.53 for wholesalers, closely paralleling the new Fougera prices.

469.    One week later, on January 19, 2012, Vogel-Baylor announced to Orlofski that G&W had already reached its target market share for Beta Val Lotion: "Target 1 is now complete and we have 45% market share."  By following Fougera's price increase, that 45% share equated to $1.6 million in total annual gross sales for G&W.

470.    In a February 17, 2012 e-mail exchange with a distributor, Orlofski explained G&W's rationale for not seeking additional market share on this product: "We have achieved approx. 45% market share on Beta Val lotion through the awarding of the business at CVS, WalMart, Rite Aid and Cardinal Source.  We do not plan any additional activity at this time as it would lead to further price decline vis. Fougera."

### e)    Metronidazole .75% Gel

471.    Metronidazole Topical .75% Gel ("Metro Gel .75%," also known by the brand name Metrogel) is a topical antibiotic prescribed for the treatment of skin lesions in patients suffering from rosacea.

472.    As of June 2011, there were three competitors in the market for Metro Gel .75% – Fougera, Sandoz, and Taro.

473.    In the summer of 2011, Sandoz was seeking opportunities to increase prices on its products.  In pursuit of that goal, on July 6, 2011, J.P., a product manager at Sandoz, sent an internal e-mail asking for information on any recent price increases instituted by rivals Taro and Fougera on a list of products on which the companies overlapped.  The list included Metro Gel .75%.  J.P. urged that obtaining such information would "help with our efforts to drive additional profits with in-lines and potential AGx opportunities."

123

474.     That same day, July 6, 2011, CW-4, a senior sales executive at Sandoz,

exchanged three calls with D.S. at Taro, including one call lasting sixteen (16) minutes.  During

these calls, D.S. informed CW-4, among other things, that Taro would be raising prices on Metro

Gel .75%.  Based on their prior conversations and understanding, CW-4 knew that Sandoz was

expected to follow the price increase.

475.     Later that day, CW-4 responded to J.P.'s e-mail stating "[t]hese are comments

around Taro products."  She then listed out the competitive intelligence she had just gathered

from D.S.  Regarding Metro Gel .75%, she included the notation "increase expected."

476.     Over the coming months, Sandoz kept watch on the market, waiting to follow

Taro's expected price increase on Metro Gel .75%.

477.     In the interim, on July 20, 2011, a fourth competitor, G&W, entered the Metro

Gel .75% market.  Despite only recently entering the market, G&W quickly got to work

coordinating a price increase on Metro Gel .75%.  For the increase to succeed, G&W would need

to ensure that the other competitors in the market would follow – and follow they did.

478.     From January 29 to February 1, 2012, the ECRM held its Retail Pharmacy

Generic Pharmaceuticals Conference in Atlanta, Georgia.  Representatives from all four (4)

competitors in the Metro Gel .75% market – Fougera, Sandoz, Taro, and G&W – were in

attendance.  These representatives included CW-6 and Defendant Kaczmarek of Fougera, CW-4

of Sandoz, D.S. of Taro, and Defendants Vogel-Baylor and Orlofski of G&W.  Defendant

Grauso, then at Aurobindo, was also in attendance.

479.     On February 2, 2012, the day after the conference concluded, G&W generated a

price increase analysis for Metro Gel .75%, which included a 245% increase to the WAC price

from $39.99 to $137.99.  That same day, Vogel-Baylor used her former colleague Defendant

124

Grauso (then at Aurobindo) to convey information to CW-6 at Fougera regarding the Metro Gel .75% price increase.

480.    For example, on February 2, 2012, Vogel-Baylor called Grauso and they spoke for eight (8) minutes.  Grauso hung up and immediately called CW-6 of Fougera.  The two men spoke for four (4) minutes.  Immediately upon hanging up, Grauso called Vogel-Baylor back and they spoke for eleven (11) minutes.  Grauso then called CW-6 again and spoke to him for five (5) minutes.  Grauso hung up, received a call from Defendant Orlofski at G&W, and the two men spoke for thirteen (13) minutes.  These calls, which all occurred within the span of less than an hour, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 9:29:00 | 0:08:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 9:36:00 | 0:04:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 9:40:00 | 0:11:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 10:14:00 | 0:05:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Orlofski, Kurt (G&W) | 10:19:00 | 0:13:00 |

481.    Later that evening, CW-6 e-mailed his boss at Fougera, Defendant Kaczmarek, asking him to give him a call.  CW-6 and Kaczmarek spoke by phone three times the following day.

482.    On February 7, 2012, Vogel-Baylor e-mailed Orlofski her latest price increase analysis for Metro Gel .75%.  The next day, on February 8, 2012, Orlofski called Kaczmarek at Fougera.  The two competitors exchanged two more calls over the next few days and finally connected on February 10, 2012 for a twenty-five (25) minute call.

483.    The communications intensified on February 14, 2012 as G&W made final preparations for its price increase announcement.  As they had done previously, Vogel-Baylor and CW-6 used Grauso as the conduit to coordinate their plans on Metro Gel .75%.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 8:42:00 | 0:25:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | CW-6 (Fougera) | 11:34:00 | 0:02:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 11:56:00 | 0:13:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Orlofski, Kurt (G&W) | 12:09:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:10:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 12:19:00 | 0:04:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 12:22:00 | 0:04:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Grauso, Jim (Aurobindo) | 12:26:30 | 0:00:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | Grauso, Jim (Aurobindo) | 13:25:08 | 0:00:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Grauso, Jim (Aurobindo) | 13:25:59 | 0:00:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:40:00 | 0:05:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 13:44:00 | 0:06:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:49:00 | 0:04:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | CW-6 (Fougera) | 13:55:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 14:39:00 | 0:08:00 |

484.    Similarly, the next day, on February 15, 2012, Vogel-Baylor called Grauso and they spoke for eleven (11) minutes.  Less than ten minutes later, Grauso called Vogel-Baylor back and they spoke for forty-one (41) minutes.  Grauso hung up the phone and immediately called CW-6 at Fougera.  That call lasted one (1) minute.  The next day, Vogel-Baylor instructed her team to generate price increase letters for Metro Gel .75%, and to issue them by 1:00 p.m. on February 17, 2012.

485.    Even before G&W notified its customers of the increase, other competitors in the market knew that G&W would be increasing price and planned to do the same.  For example, on February 15, 2012, two days before G&W sent its notice letters to its customers, Defendant Blashinsky, then a senior marketing executive at Taro, informed his colleagues that prices had "gone up dramatically" for Metro Gel .75% and one other product.  "[W]e will follow shortly," he added.  B.S., a senior executive at Taro, responded: "If you think it makes sense to be a fast follower we can raise metronidazole and fluo solution now."

486.    On February 17, 2012, Orlofski e-mailed Blashinsky of Taro asking if he was going to the annual GPhA industry conference the following week.  Orlofski stated, "[i]f so, perhaps we can catch up.  Let me know!"  Blashinsky responded, "[u]nfortunately, I won't be

there but [B.S.] will."  The next day, Orlofski e-mailed B.S., a senior Taro executive, asking

"[a]re you planning on attending GPhA?  If so, would you have a few minutes to meet perhaps

on Wednesday?"  B.S. replied, "I will be attending, and we can certainly make some time."

487.    On February 17, 2012, G&W sent out letters notifying its customers of the Metro

Gel .75% price increase.  That same day, Grauso called Vogel-Baylor and they spoke for sixteen

(16) minutes.  Following the now normal pattern, Grauso hung up and called CW-6 at Fougera.

The two men spoke for five (5) minutes.  Immediately upon hanging up, Grauso called Vogel-

Baylor again.  That call lasted two (2) minutes.

488.    On February 18, 2012, a GPO customer e-mailed Defendant Vogel-Baylor after

receiving the Metro Gel .75% notice asking, "Sandoz or Fougera have not adjusted their WACs

on this item . . . did they?  Perhaps we should have a 60 day notice to see what really happens on

the Gel."  Vogel-Baylor responded, "[t]hey have not increased yet . . . we just initiated the price

increase yesterday.  We can do 15 days.  I think we will know by then."  Of course, Vogel-

Baylor already knew that her competitors would follow G&W's price increase, but she could not

tell the customer that.  Ultimately, the customer negotiated a 45-day notice period and noted,

"okay but will be watching the market closely!"

489.    On February 20, 2012, Blashinsky reiterated to his colleagues that "[m]ajor

changes" were taking place in the Metro Gel .75% market, and that Taro "will be following

quickly."

490.    From February 22 to February 24, 2012, the GPhA held its annual meeting in

Orlando, Florida.  Senior executives from all four competitors in the Metro Gel .75% market –

Fougera, Sandoz, Taro, and G&W – were in attendance.  These representatives included

Kaczmarek and D.K., a senior executive at Fougera, R.T. of Sandoz, B.S. of Taro, and Orlofski

of G&W.  During the conference, the competitors were actively discussing and agreeing on the details of the Metro Gel .75% price increase.

491.    On February 22, 2012, the first day of the GPhA meeting, Defendant Orlofski e-mailed B.S. again, stating "I hope you still have some time to meet at GPhA.  I am available Wed afternoon evening and most of Thursday."  B.S. replied, "[j]ust landed how about 4pm."

492.    Immediately after meeting with Orlofski on February 22, B.S. e-mailed Defendant Blashinsky regarding Metro Gel .75% stating: "G&W Fougera and Sandoz all raised.  Please check it."  Blashinsky responded, "[s]o did we."  B.S. replied, "[i]s it done or is it on the list?" to which Blashinsky answered, "[l]etters are going this week."  B.S. further inquired, "Did you already chg WAC and AWP?" and Blashinsky replied, "[n]ope.  That's the beauty of waiting."  Of course, Fougera and Sandoz had not increased their Metro Gel .75% pricing yet – but B.S. of Taro understood that they would based on his conversation with Orlofski.

493.    Similarly, that same evening, on February 22, 2012, Defendant Kaczmarek of Fougera (who was also at the GPhA conference) sent an e-mail to the Fougera Pricing Committee stating: "G&W took a WAC price increase on metronidazole gel .75% yesterday to $137.99.  I suggest that we move our WAC to $136.68 as soon as possible to prevent spec buying.  Current status: 4 player market – Taro 43% share; Fougera 32% (we are coming back from supply issues mid 2011); Sandoz 14%; and G&W 9 %.  Expect other competitors to follow suit on WAC."

494.    On March 5, 2012, CW-3, then a sales executive at Fougera, e-mailed Kaczmarek predicting that "the new pricing will go over like an atomic bomb" with one customer that had already received a pre-increase price quote from Fougera. Kaczmarek was unsympathetic, responding that he was willing to lose the customer in the interest of maintaining the agreed-

upon higher prices.  He added that with respect to Fougera's price at another Metro Gel .75% customer, "we need to move that with market as well."

495.    On March 9, 2012, Rite Aid e-mailed Sandoz asking for a bid on Metro Gel .75%. CW-4 of Sandoz forwarded the invitation to Defendant Kellum with the simple comment "HMMMMMM."  Kellum wasted no time in telling his colleagues that Sandoz should stay clear of the Rite Aid bid, as Sandoz intended to follow the price increase that he believed spawned the opportunity, saying: "Bingo – no new bids for now please."

496.    One week later, when Rite Aid pressed again for a Sandoz bid, CW-4 contacted Kellum to verify that the decision was to decline.  Kellum not only confirmed that fact, but also suggested a pretext: "Correct – let's blame supply."  Consistent with this instruction, CW-4 responded to Rite Aid: "Finally heard … we are unable to supply.  Sorry for the delay but Demand Planning was trying to make it work."

497.    Within the next several weeks, all three competitors followed G&W's increase on Metro Gel .75% as agreed and essentially matched G&W's WAC pricing.  Fougera increased on March 16, 2012, Taro increased on March 23, 2012, and Sandoz increased on April 6, 2012.

498.    On March 22, 2012, the day before Taro increased its price, Orlofski at G&W received two phone calls from a Taro employee[2] lasting twelve (12) minutes and two (2) minutes, respectively.

499.    Customers began to react immediately to the dramatic price hikes by seeking price quotes from the competitors.  The competitors, however, refused to break ranks. On April 3, 2012, for example, Fougera received a request from a Taro customer to bid on Metro Gel

---

[2]  Taro employees do not have their own individual extensions and calls from their office lines appear in the phone records as coming from the Taro main company number.

.75% in light of the Taro increase. CW-6 relayed the information to Kaczmarek, saying: "I suggest we pass." Kaczmarek responded simply: "Agree, pass."

500.     The following day, on April 4, 2012, CW-6 sent Kaczmarek an updated market share breakdown for the Metro Gel .75% market.  CW-6 expressed satisfaction that the market had arrived at an appropriate equilibrium in accordance with fair share principles, saying: "Sandoz finally moved their marketshare up.  Meijer and Cardinal have asked me for a bid.  I have declined."

### ii.     G&W/Glenmark

501.     In addition to colluding with CW-6 at Fougera, Defendant Vogel-Baylor at G&W also had a collusive relationship during these early days with CW-5, a senior executive at Defendant Glenmark.  Although G&W and Glenmark did not overlap on a large number of products, Vogel-Baylor and CW-5 capitalized on their relationship to collude and enter into anticompetitive agreements on those products that they did have in common.

502.     Vogel-Baylor and CW-5 first met at a Rite Aid event in Las Vegas, Nevada in March 2012.  In the months that followed, the two stayed in constant communication through e-mails, text messages, and phone calls, while also meeting in person at various trade shows and customer conferences.  For example, Defendant Vogel-Baylor and CW-5 exchanged hundreds of text messages and phone calls in April 2012 alone.  Indeed, between April 2012 and the end of that year, Vogel-Baylor and CW-5 exchanged at least 2,037 phone calls and text messages.

503.     This Section will discuss a coordinated price increase on one product, Ciclopirox Cream.  A later Section of this Complaint will address additional collusion between the two competitors in March 2013 regarding Ciclopirox Cream as well as various formulations of a different product, Mometasone Furoate.

### a)     Ciclopirox Cream – April 2012

504.     Ciclopirox Olamine Cream, also known by the brand name Loprox, is an antifungal medicine that prevents fungus from growing on your skin.  Ciclopirox Cream is used to treat skin infections such as athlete's foot and ringworm.

505.     In the summer of 2011, the market for Ciclopirox Cream was evenly split between four competitors – Perrigo with 26%; Paddock Laboratories, LLC ("Paddock")[3] with 30%; Fougera with 21%; and Glenmark with 21%.  Defendant G&W was not in the market at this time.

506.     On September 21, 2011, however, Defendant Vogel-Baylor learned from a customer that Fougera had temporarily discontinued Ciclopirox Cream.  Vogel-Baylor forwarded that information to her supervisor, Defendant Grauso, who then called CW-6 at Fougera twice to confirm the information.  The two competitors also spoke again the next morning.

507.     G&W saw Fougera's exit as an opportunity to enter the market for Ciclopirox Cream.  After confirming Fougera's plans to exit, G&W began making plans to enter the market.

508.     On October 28, 2011, Vogel-Baylor e-mailed Grauso regarding a meeting she had with Rite Aid concerning G&W's upcoming launches.  Regarding Ciclopirox Cream, Vogel-Baylor noted that Rite Aid's current incumbent was Glenmark and stated that "[p]ricing has been stagnant since November 2010."

509.     Throughout January 2012, G&W began formalizing its strategy for the Ciclopirox Cream launch and reached out to various customers to obtain incumbent information, usage, and pricing intelligence.

---

[3]  Perrigo acquired Paddock in July 2011.

510.    On February 3, 2012, Vogel-Baylor e-mailed Defendant Orlofski, a senior G&W executive, notifying him that Ciclopirox Cream was now available in small quantities and that several additional batches would be ready for shipment in the next few weeks.  She further stated that she needed to sit down with him to discuss which customers G&W wanted to approach.

511.    On February 20, 2012, Orlofksi e-mailed Vogel-Baylor with a list of the tasks that she was accountable for.  One of those responsibilities was to secure approximately 20% market share of Ciclopirox Cream per the company's launch plan.

512.    The next day, on February 21, 2012, Orlofski exchanged eight (8) text messages with S.K., a high-level executive at Perrigo.  Two days later, on February 23, 2012, the two competitors exchanged an additional ten (10) text messages.

513.    As of March 2012, Glenmark had 60% share of the Ciclopirox Cream market, Perrigo had 25%, and Fougera had the remaining share even as it was phasing out of the market.

514.    By March 19, 2012, G&W had secured the Ciclopirox Cream business at Walgreens.  Walgreens was a Glenmark customer that accounted for slightly less than G&W's goal of 20% of the market for Ciclopirox Cream.

515.    On March 23, 2012, Vogel-Baylor asked C.M., a sales executive at G&W, to reach out to Publix to see if the customer would be interested in a bid for Ciclopirox Cream. C.M. responded: "If they have Glenmark, it will be a little difficult as I know [the customer] has a good relationship with J.J. [a sales executive at Glenmark]."  Vogel-Baylor responded: "He does have Glenmark.  We are only offering this to Walgreens and Publix.  That is it."  C.M. replied: "Ok.  That helps!  He will leak that to Glenmark if we need him to."  Vogel-Baylor answered immediately stating: "NO!!!  Let's hold off on this for now.  Glenmark cannot know that we went after Walgreens.  They have not been told yet!!"

132

516.    On March 27, 2012, C.M. advised Vogel-Baylor that G&W should put together a proposal for Publix and that the customer planned to award G&W the business before the upcoming RFP.  That same day, while they were both at a Rite Aid event in Las Vegas, Nevada, Vogel-Baylor met CW-5, a senior executive at Glenmark, for the first time.

517.    Two days later, on March 29, 2012, Vogel-Baylor e-mailed CW-5 stating, "[i]t was really nice to finally meet you at the Rite Aid event on Tuesday night" and asked the Glenmark executive to send his full contact information.  The next day, CW-5 responded to Vogel-Baylor's e-mail, providing his contact information and adding, "see you in Florida at NACDS next month."  After exchanging a few more e-mails, the two then also exchanged several text messages.

518.    On April 2, 2012, CW-5 e-mailed Vogel-Baylor stating that he had forgotten his cell phone at home and was "working on a few things today, lets touch base tomorrow with a plan to get together."

519.    Throughout the month of April 2012, Vogel-Baylor and CW-5 exchanged hundreds of text messages and phone calls.  During these communications, and others over the next several months, G&W and Glenmark colluded to significantly raise, almost simultaneously, their contract pricing on Ciclopirox Cream.

520.    For example, on April 11 and April 12, 2012, Vogel-Baylor and CW-5 exchanged more than fifty (50) text messages and phone calls.  In the early morning of April 12, 2012, Vogel-Baylor e-mailed her supervisor, Defendant Orlofski, recommending that G&W increase contract pricing for Walgreens and Publix.  She suggested a direct price increase for Publix between 57% and 82% and between 233% and 408% for Walgreens, depending on the dosage size.

521.    On April 18, 2012, Vogel-Baylor e-mailed C.M. at G&W with specific pricing to submit for the upcoming Publix RFP.  Regarding Ciclopirox Cream, Vogel-Baylor advised that because G&W was doing a price increase on the product, she was including increased pricing on the bid.  Vogel-Baylor further stated that C.M. should discuss this with her before submitting the bid.  That same day, Vogel-Baylor exchanged at least twenty (20) text messages and phone calls with CW-5 of Glenmark.

522.    That same day, Glenmark also began sending out notices to its customers that it would be increasing its prices for Ciclopirox Cream.

523.    From April 24 to April 27, 2012, the NACDS held its annual meeting in Palm Beach, Florida.  Representatives from Glenmark, G&W, and Perrigo all attended, including S.K. of Perrigo, Defendants Orlofksi and Vogel-Baylor of G&W, and CW-5 of Glenmark.

524.    S.K. of Perrigo and Orlofski of G&W communicated several times by phone in advance of the conference, as well as on the day the conference began.  Between April 19 and 24, 2012, Orlofski and S.K. exchanged at least fifteen (15) text messages.  Orlofski also called S.K. once on April 24, 2012.  The call lasted less than one (1) minute.  Vogel-Baylor and CW-5 of Glenmark continued to communicate constantly throughout this time period.  On April 24, 2012 alone, Vogel-Baylor exchanged eighty-eight (88) text messages with CW-5.

525.    That same day, April 24, 2012, Cardinal e-mailed G&W requesting a bid on Ciclopirox Cream.  C.M., a sales executive at G&W, forwarded the request to Vogel-Baylor stating: "Clearly, the reason Cardinal wants us to bid on Ciclopirox is due to the price increases." G&W declined to bid on the opportunity.

526.    The next day, on April 25, 2012, Vogel-Baylor e-mailed C.M. asking him to "[p]lease tell [Publix] that we have been notified by our customers that there has been a price

134

increase in the market on Ciclopirox Cream. Please tell him that we will be increasing his pricing slightly on the bid, however, it is not as high as we have heard the market has gone."

527.    Two days later, on April 27, 2012, Vogel-Baylor requested that G&W prepare a price increase letter for Walgreens raising the prices for Ciclopirox Cream between 233% and 408% depending on the formulation.

528.    On May 21, 2012, Kroger, a Glenmark customer, e-mailed Vogel-Baylor asking if G&W would like to bid on Ciclopirox Cream.  Vogel-Baylor declined to bid on the opportunity claiming that G&W could not handle the volume.

529.    On May 24, 2012, Vogel-Baylor e-mailed C.M. asking if he had heard whether Publix would accept the price increase on Ciclopirox Cream.  C.M. responded that Perrigo had submitted low pricing on the RFP.

530.    By this time, Vogel-Baylor had been introduced to CW-6 at Fougera and was communicating with him directly (instead of through Defendant Grauso, as she had done previously).  Vogel-Baylor knew that CW-6 had a relationship with T.P. at Perrigo, so she reached out to him that same day to have CW-6 act as a conduit between her and T.P. at Perrigo. Immediately upon hanging up with Vogel-Baylor, CW-6 called T.P. of Perrigo.  After speaking with T.P., CW-6 hung up and immediately called Vogel-Baylor back.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/24/2012 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Fougera) | 17:35:03 | 0:01:01 |
| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:39:00 | 0:05:00 |
| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 17:43:00 | 0:02:00 |
| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:45:00 | 0:01:00 |
| 5/24/2012 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Fougera) | 17:46:02 | 0:00:44 |

531.     Later that day, Vogel-Baylor replied to her colleague C.M. stating, "[w]e will not be matching those prices so [Publix] will have to move to Perrigo."  Vogel-Baylor forwarded Perrigo's pricing to her supervisor, Defendant Orlofski.

532.     On June 4, 2012, G&W sent its price increase notice to Walgreens.  In an internal pricing spreadsheet, Perrigo listed its direct pricing at one of its customers on the 15gm, 30gm, and 90gm package sizes as $7.14, $11.22, and $19.39, respectively.  Notably, this pricing was even higher than the increased pricing G&W sent to Walgreens on June 4, 2012.

533.     On June 6, 2012, Defendant Vogel-Baylor and CW-5 of Glenmark exchanged eight phone calls.  All of the calls lasted less than one (1) minute.

534.     On June 11, 2012, C.M. of G&W e-mailed Vogel-Baylor stating that he had spoken with Walgreens and the customer had told him "we missed our mark with pricing and went too high based on where he knows the market to be on this item."  C.M. stated, "[h]e did not say it and I did not ask if we did not go back to these prices would they move it."  Vogel-Baylor responded: "Thanks for letting me know.  I will talk to Kurt [Orlofski] about this."  That same day, Vogel-Baylor and CW-5 of Glenmark exchanged more than eighty (80) text messages.

535.     Vogel-Baylor forwarded her exchange with C.M. to Defendant Orlofski.  The next day, on June 13, 2012, Vogel-Baylor exchanged eighteen (18) text messages with CW-5 of Glenmark.  Also on June 13, 2012, Orlofski sent a text message to S.R. of Walgreens.  G&W ultimately retained the Walgreens business.

536.     Between June 15, 2012 and June 26, 2012, Vogel-Baylor and CW-5 continued to exchange multiple text messages each day.  During that time period, the two competitors exchanged five-hundred and forty-five (545) text messages.

537.     On June 29, 2012, C.M. e-mailed Vogel-Baylor to advise her that MMCAP was requesting a bid on Ciclopirox Cream.  Vogel-Baylor asked: "Who is the incumbent?"  C.M. replied: "Glenmark.  They took a price increase without informing MMCAP.  MMCAP has tried contacting Glenmark without any response."  Vogel Baylor responded: "We will skip.  Thanks." Vogel-Baylor later changed her mind and recommended to C.M. that he bid on the MMCAP business.  As she explained: "It's high pricing so I don't think we will get it but I thought it was better for you to submit something than not make an effort."

### 5)     Additional Collusive Relationships

538.     The key relationships discussed above are examples and are not meant to be an exhaustive list of all the collusive relationships that the Defendants had with each other during this time period.  Indeed, even if a company was not a prominent manufacturer of topical products, if there were product overlaps and a relationship, there was an opportunity to collude.

539.     The relationship between CW-6 of Fougera and E.B., a senior sales executive at Hi-Tech, is a good example.  During his tenure at Fougera, CW-6 had only eight (8) calls with E.B., according to available phone records.  However, Fougera overlapped with Hi-Tech on the product – Lidocaine Ointment – and CW-6 used his connection with E.B. to significantly raise price on that product prior to Hi-Tech's entry in early 2012.  This collusion is detailed in the following Section.

### i.     Lidocaine Ointment

540.     Lidocaine Ointment ("Lidocaine" or "Lido"), also known by brand names such as Xylocaine Topical Solution, among others, is an anesthetic used to temporarily numb and relieve pain from minor burns, skin abrasions, insect bites, and other painful conditions affecting mucous membranes.

541.    In late 2011, Hi-Tech began making plans to launch Lidocaine Ointment.  At that time, Fougera was the sole generic manufacturer in the market.

542.    On November 21, 2011, A.R., a Fougera sales executive, forwarded an invitation to CW-6, among others, for a conference call on November 28, 2011 to discuss "Lido & Lone Pricing Strategy."  "Lone" referred to Fluocinolone Acetonide – a product on which Fougera and G&W overlapped and where CW-6 was colluding with Defendant Grauso of G&W at the same time.  That anticompetitive conduct is discussed above in an earlier Section of this Complaint.

543.    The next day, on November 22, 2011, E.B. of Hi-Tech called CW-6 and they spoke for seven (7) minutes.  Immediately after hanging up, CW-6 called his supervisor, Defendant Kaczmarek, and they spoke for four (4) minutes.  The November 2011 call between CW-6 and E.B. was the first time that the two competitors had ever spoken by phone – according to the available phone records.  During these calls, the two competitors discussed Hi-Tech's entry into the market and Fougera's plan to raise its prices before Hi-Tech entered.

544.    Fougera held its internal strategy meeting on November 28, 2011.  A few days later, on December 2, and then again on December 5, 2011, CW-6 called E.B.  The calls lasted one (1) minute each.

545.    Later that month, on December 22, 2011, and consistent with the competitors' discussions, Fougera increased WAC pricing for Lidocaine Ointment by 200%.

546.    Starting in February 2012, as Hi-Tech began preparing in earnest to enter the market, E.B. and CW-6 began speaking more frequently.  On February 23, 2012, E.B. of Hi-Tech called CW-6 and they spoke for seven (7) minutes.  Immediately upon hanging up, CW-6 called his supervisor, Defendant Kaczmarek, to report the conversation.  That call lasted one (1) minute.  An hour later, Kaczmarek called CW-6 back and they spoke for six (6) minutes.

138

Further, on March 7, 2013, E.B. called CW-6 and they spoke for five (5) minutes.  CW-6 called

E.B. back a few minutes later.  The call lasted one (1) minute.  During these calls, the

competitors discussed which customers Hi-Tech should target as it entered the Lidocaine market,

as well as pricing.

547.    One week later, on March 13, 2012, Hi-Tech entered the Lidocaine Ointment

market and matched Fougera's increased WAC pricing.

548.    After Hi-Tech entered, and consistent with fair share principles, Fougera gave up

several of its Lidocaine Ointment customers to the new entrant.  For example, on March 22,

2012, ABC e-mailed Fougera to advise that it had received an offer for Lidocaine Ointment and

asked whether Fougera wanted to bid to retain the business.  CW-3, then a sales executive at

Fougera, asked Kaczmarek how to respond and he directed that CW-3 "give it up" to the new

player.

549.    Similarly, on March 27, 2012, CW-6 advised Kaczmarek that Hi-Tech had made

an offer to another customer, Ahold, for Lidocaine Ointment.  CW-6 suggested that Fougera "let

it go as we have to give up some market share," to which Kaczmarek replied: "Let it go."

550.    On May 17, 2012, Wal-Mart e-mailed K.K., another Fougera sales executive, to

advise that Fougera was not the lowest bidder on its RFP for Lidocaine Ointment and asked

whether Fougera wanted to bid to retain the business.  K.K. forwarded Wal-Mart's request to

Kaczmarek, asking how he should respond.

551.    First thing the next morning, Kaczmarek called CW-6 and they spoke for ten (10)

minutes.  A few hours later, Kaczmarek called CW-6 again and they spoke for three (3) minutes.

Immediately upon hanging up, CW-6 called E.B. of Hi-Tech.  The call lasted one (1) minute.  A

half hour later, CW-6 called E.B. again.  The call lasted one (1) minute.  That same morning,

Kaczmarek responded to K.K.'s e-mail stating, "[w]e have given up accounts. . . . one thing we know, they have CVS . . .."

552.    Later that day, Kaczmarek e-mailed the sales team regarding Lidocaine Ointment and stated that Fougera had already given up CVS, ABC, and Rite Aid, which accounted for 34% market share, and advised that Fougera was "[n]ot giving up too much more . . .."  S.H., a Fougera sales executive, then reminded Kaczmarek that Fougera had also given up HD Smith and Anda to Hi-Tech.  Therefore, Kaczmarek recommended that Fougera "[d]efend Wal-Mart. That's enough share to give up."   The next day, on May 19, 2012, CW-6 called E.B., speaking for four (4) minutes – likely letting him know that Fougera was now done conceding customers to the new entrant.

### 3.    Focus On Price Increases Intensifies – Collusion From Late 2012 - 2016

#### a.    Shifts In The Market Foster Collusion

553.    In late 2012 and early 2013, there were several changes in and among various manufacturers of topical products – at both the corporate and personnel levels – that facilitated and fostered a heightened focus on collusion among many of these competitors.

554.    For example, in July 2012 Sandoz finalized its purchase of Fougera, a specialty dermatology company, making Sandoz a much more prominent manufacturer of topical products.  Indeed, Sandoz publicly touted that the purchase positioned it "as the new #1 in generic dermatology medicines both globally and in the U.S."

555.    As a result of the acquisition, most Fougera executives, including Defendant Kaczmarek and CW-6, eventually lost their jobs.  Indeed, out of the five Fougera sales executives in place prior to the acquisition, CW-3 was the only one to retain a long-term position with Sandoz.

556.    Because of Sandoz's size and the fact that it manufactured and sold a large number of generic drugs, many competitors reached out to CW-3 when they learned he had transitioned to Sandoz because they viewed this as a strategic opportunity to collude on more overlapping products.  In turn, and as discussed in further detail below, CW-3 would use these contacts to his own advantage by engaging in anticompetitive conduct in order to prove his worth to Sandoz management.

557.    Further, in the months following the Fougera acquisition, three key Actavis executives – Defendants Boothe, Perfetto, and Aprahamian – left Actavis to assume senior-level positions with competitors.  In December 2012, Boothe became the Executive Vice President and General Manager of Perrigo.  One month later, in January 2013, Perfetto became the Chief Commercial Officer of Taro.  And, in March 2013, Aprahamian followed his colleague Perfetto to Taro and assumed the role of Vice President of Sales and Marketing.

558.    As discussed below, these former colleagues – now competitors – would use their longstanding relationships and new high-level corporate positions to collude with their key competitors on many overlapping products.

### 1)    Post-Fougera Acquisition, Sandoz Sales Executives Feel Pressure To Demonstrate Their Value

559.    As a result of the Fougera acquisition, Sandoz had more dermatology products than anyone else.  Although Teva and Mylan were comparable in size to Sandoz, they had fewer topical products.  The other key players in the topical space, Perrigo and Taro, were smaller companies.

560.    Sandoz moved at a much faster pace than Fougera and sold many more products. At the time, the company was also launching several high-value products and bringing even more new products to market.  CW-3 was thrown into the position and spent a lot of time

learning about new (to him) oral solid products.  The mindset at Sandoz was not to celebrate work accomplishments, but to move quickly from one launch to the next.  As a result, CW-3 experienced a significant amount of culture shock and felt stressed and overwhelmed with his new circumstances.

561.    In addition to his regular job duties and responsibilities, CW-3 was also required to participate in an informal working group created by Sandoz management to evaluate the profitability of the Fougera product line.  Shortly after the acquisition, it quickly became apparent that Fougera sales were lagging below Sandoz's initial financial projections.  As the lone holdover from Fougera, CW-3 felt a great deal of pressure from Sandoz management to come up with a plan to make the Fougera product line more profitable.  CW-3 was responsible for identifying areas to help Sandoz meet its numbers, including recommending where to increase prices or where to increase market share.

562.    Other Sandoz sales executives were also feeling anxieties resulting from the Fougera acquisition.  For example, CW-4, a longtime Sandoz senior sales executive, was required to re-interview for her position and felt an immense amount of pressure to perform.  Although she ultimately retained her job, CW-4 continued to feel nervous about having to learn a whole new line of topical products and to prove her value to Sandoz management.

### 2)    Key Relationships Emerge And Existing Relationships Strengthen

563.    The pressures that the Sandoz sales executives were experiencing translated into the emergence of new collusive relationships, and the strengthening of existing relationships, among many of the competitors for topical products.  For example, just as his predecessor CW-6 had done, CW-3 would forge ongoing understandings over the next several years with his key competitors – Taro and Perrigo – with regard to overlapping products.  Similarly, Defendant

142

Perfetto would capitalize on his relationship with his former colleague Defendant Boothe to collude with respect to products on which Taro and Perrigo overlapped.  Lastly, CW-4 would find solace in her existing relationship with D.S. of Taro who provided confirmation that the companies' understanding would continue unchanged despite the Fougera acquisition.  Each of these relationships is explored in greater detail below.

### i.    Sandoz/Taro

#### a)    CW-3's Relationships With Defendant Aprahamian And H.M. Of Taro

564.    Around the time of the Fougera acquisition, CW-3 was approached by Defendant Aprahamian, then a senior pricing executive at Actavis.  CW-3 and Aprahamian had known each other since 2006 – when CW-3 worked at Cardinal and Aprahamian worked at ABC.  The two men had lost touch over the years as they changed jobs, but they still saw each other throughout the years at trade shows and customer conferences.

565.    Once CW-3 became a Sandoz employee, he and Aprahamian started communicating regularly again.  For example, although they had exchanged only two (2) calls in 2011 according to available phone records, CW-3 and Aprahamian exchanged at least two hundred and thirty-five (235) phone calls between April 2012 and August 2016 (when CW-3 left Sandoz to take a sales position with a competitor).  CW-3 and Aprahamian almost always communicated by phone and rarely met in person.

566.    CW-3 and Aprahamian engaged in anticompetitive conduct with regard to several products that Sandoz and Actavis overlapped on while Aprahamian was still at Actavis.  Three examples – Desonide Lotion, Ciclopirox Shampoo, and Betamethasone Valerate Ointment – are discussed in detail below.  However, once Aprahamian moved to Taro in March 2013, the extent

of the product overlap between the two competitors increased significantly, and so did their collusion.

567.    Aprahamian's move to Taro was a promotion.  As Vice President of Sales and Marketing, Aprahamian had the power to set prices.  Similarly, when Aprahamian told CW-3 that Taro would give up a customer, CW-3 was confident, given Aprahamian's senior role, that he could rely on that representation.

568.    Over the years, Sandoz and Taro, primarily through CW-3 and Aprahamian, developed an ongoing understanding not to poach each other's customers and to follow each other's price increases.  Indeed, every time that Taro increased prices on a product for which Sandoz was a competitor, Aprahamian informed CW-3 about the increases in advance and provided him with specific price points.  CW-3 would write this information down and then pass the information along to his superiors, CW-1 and Defendant Kellum.  The expectation was always that Sandoz would follow the increases – and Sandoz did.

569.    When there were other competitors in the market beyond Taro and Sandoz, CW-3 understood that Aprahamian was also coordinating with those competitors as he was coordinating with him.  Many examples of this are discussed below in subsequent Sections of this Complaint.

570.    Although Sandoz consistently followed Taro's price increases, the company could not always do so right away.  This did not mean that there was not an agreement to follow.  Because price increases could trigger price protection penalties from customers, Sandoz would sometimes push the increases to the next quarter to ensure it hit its financial targets.  In the meantime, Defendant Kellum would order that Sandoz place the product on strict allocation –

144

meaning that Sandoz would allocate product to a customer based on regular usage – so that there was not a run on Sandoz's inventory resulting from a competitor's increase.

571.    Further, when Taro increased prices, Aprahamian typically warned CW-3 not to take Taro's customers.  Aprahamian was very animated and would say things like: "Don't take my f***ing customers," "Don't take my business," or "Don't be stupid."  CW-3 understood these warnings to mean that if a Taro customer asked for an offer in response to a Taro price increase, Sandoz should not compete for the business.

572.    Aprahamian and CW-3 also coordinated on product launches.  For a Taro launch into a Sandoz market, Aprahamian would share with CW-3 the customers Taro was targeting. CW-3 would then pass that information along to CW-1 and Kellum, and then subsequently report their responses back to Aprahamian.

573.    For a Sandoz launch into a Taro market, which was more often the case because Taro was a smaller company and did not launch as many new products, Aprahamian would give CW-3 specific contract price points for customers that Taro agreed to relinquish. Aprahamian provided these price points so that Sandoz did not launch at too low a price.  Typically, when Aprahamian told CW-3 that Taro would give up a customer, it did.

574.    CW-3 also colluded with H.M. of Taro.  Shortly after the Fougera acquisition, CW-6 – who would not be staying at Sandoz – provided CW-3 with H.M.'s contact information. Although CW-3 and H.M. had met each other at a supplier meeting several years earlier, they did not actively start conspiring with one another until after CW-3 moved to Sandoz.  According to available phone records, the two men spoke for the first time by phone in September 2012 and then exchanged at least fifty-one (51) phone calls and text messages through March 2014, when H.M. left Taro.  Notably, CW-3 and H.M. were not social friends.  If they were communicating

by phone, it was to coordinate anticompetitive conduct with regard to products on which Sandoz and Taro overlapped.

575.     While at Taro, H.M. shared price points with CW-3 and Sandoz used that information to inform Sandoz's product launches and to obtain market share without significantly eroding prices.  CW-3 considered H.M.'s information to be reliable.  However, once Aprahamian moved to Taro, he told CW-3 not to bother calling H.M anymore and to simply call him directly because he was responsible for pricing.

576.     During this time period, CW-3 and H.M. were acting at all times at the direction of, or with approval from, their superiors, including CW-1 and Defendant Kellum of Sandoz and Defendants Aprahamian and Perfetto of Taro.  In turn, Aprahamian was acting at the direction of, or with approval from, his superior, Perfetto.

**b)   CW-4's Relationship With D.S. Of Taro**

577.     As detailed above, CW-4 of Sandoz and D.S. of Taro had an ongoing understanding going back to at least 2009 that Taro and Sandoz would behave responsibly in the market and not compete on overlapping products.  However, CW-4 was unsure what impact the Fougera acquisition might have on that understanding and felt uneasy about having to learn a whole new product line.

578.     CW-4 reached out to D.S. to calm her nerves and the two competitors had several conversations – both in person and over the phone – during which they discussed which manufacturers of topical products were responsible and which were not.  D.S. reiterated what he had conveyed to CW-4 previously – that "Taro believes in making money."  CW-4 understood this to mean that Taro wanted to maintain a fair market-share balance and keep prices high.  Both CW-4 and D.S. concurred (again) that this was the smart way of doing business.

579.     After these conversations, CW-4 felt more secure and less anxious about her new circumstances.  CW-4 understood that she and D.S. would continue to be resources for each other and collude on overlapping products as they had in the past.

580.     During this time period, CW-4 and D.S. were acting at all times at the direction of, or with approval from, their superiors, including Defendant Kellum of Sandoz and Defendants Perfetto and Aprahamian of Taro.

581.     Soon after the Fougera acquisition, CW-4 learned from Sandoz management that the company was looking to increase market share and take price increases on certain drugs in the Fougera product line to improve the profitability of the Fougera portfolio.  At this time, there were several products where Fougera had less than its fair share.

582.     Shortly thereafter, CW-4 conveyed this information to D.S. at Taro.  CW-4 wanted to make sure that if Sandoz tried to take a Taro customer, D.S. would not get alarmed and would understand that it was only because Sandoz was looking for its "fair share" on that product.  Similarly, CW-4 wanted to signal to D.S. and Taro that if Sandoz took a price increase, Taro should follow, or vice versa.  D.S. listened to what CW-4 said and did not disagree.

### ii.     CW-3's Relationship With T.P. Of Perrigo

583.     Just as CW-6 had provided H.M.'s contact information to CW-3 shortly after the Fougera acquisition, he also introduced CW-3 to T.P. of Perrigo.  The two competitors spoke for the first time by phone in August 2012 and then exchanged at least eighty-one (81) phone calls through the end of 2014.

584.     CW-3 and T.P. were not social friends.  If they were communicating, it was to coordinate anticompetitive conduct with regard to products on which Sandoz and Perrigo overlapped.  CW-3 and T.P. generally spoke only by phone.  They did not exchange e-mails or

text messages because T.P. did not want to create a written record of their communications. T.P. also did not like receiving voicemails. On one occasion, CW-3 left a voicemail for T.P. on his office phone. T.P. thereafter called CW-3 to admonish him, demanding that CW-3 not call his office phone but instead only call him on his personal cell phone.

585. CW-3 continued the ongoing understanding that his predecessor, CW-6, had in place with T.P. – that the competitors would not poach each other's customers and would follow each other's price increases.

586. Conversations between CW-3 of Sandoz and T.P. of Perrigo about price increases were intended to encourage the other side to follow. Sandoz was typically a price-increase follower. Neither company wanted to disrupt the market or do anything to lower prices. CW-3 and T.P. provided each other with information about price increases with the understanding that the other company would not use the price increase as an opportunity to compete for market share and take the other's customers.

587. Similarly, when Sandoz was launching into a Perrigo market, T.P. would provide CW-3 with a list of customers to target. T.P. also had access to Perrigo's pricing file. The file was searchable by customer and included non-public information such as contract pricing, dead nets, and cost of goods sold. T.P. provided pricing information to CW-3 when he requested it. However, on occasion, T.P. had to first check with his boss, Defendant Wesolowski, before he did so.

588. When T.P. provided CW-3 with information, he typically cautioned that CW-3 should be "smart" with the information; meaning that Sandoz should not use the information against Perrigo. CW-3 could generally rely on the pricing and customer alignment information that T.P. provided to him.

589.    During this time period, T.P. was acting at all times at the direction of, or with approval from, his superiors, including Defendants Boothe and Wesolowski.

### iii.    Defendant Perfetto's Relationship With Defendant Boothe Of Perrigo

590.    Prior to Sandoz's acquisition of Fougera, H.M. of Taro and T.P. of Perrigo used CW-6 as a conduit to collude on overlapping products because the two competitors did not have an independent relationship.  That changed when former Actavis executives, Defendants Perfetto and Boothe, moved to Taro and Perrigo, respectively.  As a result of these moves, the two competitors could now communicate directly to coordinate their anticompetitive conduct with regard to products on which Taro and Perrigo overlapped.

591.    Indeed, between January 2013 and January 2016 (when Boothe left Perrigo), the competitors exchanged at least one hundred and nineteen (119) phone calls.  During this time period, the two former colleagues colluded on numerous overlapping products.  Some examples of these products are discussed in detail below.

### 3)    Sandoz Management Knew Of, And Encouraged, The Collusion With Competitors

592.    Early on after the Fougera acquisition, CW-3 had a conversation with Defendant Kellum informing him that he could provide competitive intelligence on the Fougera product line.  Shortly thereafter, CW-3 began providing Kellum and CW-1 with competitive intelligence he obtained from competitors regarding price increases, product launches, and customer allocation.  Kellum and CW-1, Sandoz senior pricing executives, both knew that CW-3 obtained this information directly from competitors because he told them he did.

593.    CW-3 conveyed competitive intelligence to Kellum and CW-1 through e-mails and phone calls.  When communicating by e-mail, CW-3 would disguise the true source of his

information by stating that he had received it from a customer.  When CW-3 had truly learned the information from a customer, it was always from a customer that he worked with, and he referred to that customer by name in his e-mail.  CW-1 and Kellum understood that when CW-3 referred to hearing from a "customer" without identifying that customer – or if CW-3 provided information relating to customers that he did not have responsibility for – it meant that CW-3 had gotten that information from a competitor.

594.    As detailed above, CW-3's strongest relationships were with Aprahamian of Taro and T.P. of Perrigo, although he engaged in anticompetitive conduct with many others. These other relationships are explored in greater detail in subsequent Sections of this Complaint. Wherever possible, CW-3 leveraged his relationships with competitors to demonstrate his value to Sandoz management.

595.    For example, due to the strength of CW-3's relationship with Aprahamian, Sandoz management created what it referred to as a "Taro Strategy" in July 2013 to collude on products where Taro was a competitor.  The "Taro Strategy" had a two-pronged approach: (1) implement concerted price increases on products where Sandoz and Taro were the only competitors in the market; and (2) exit the market for certain other products to allow Taro to raise prices and then Sandoz could re-enter the market later at the higher price.

596.    Although Defendant Kellum and CW-1 knew what they were doing was illegal, they continued to encourage and approve of the collusion with competitors.  They did, however, seek to avoid documenting their illegal behavior.  Indeed, Kellum routinely admonished Sandoz employees for putting information that was too blatant into e-mails.  At one point, Kellum told CW-1 "we need to keep a lid on this, if this gets out, we could get into real trouble."  Similarly,

as time went on, CW-3 became increasingly anxious about his behavior and said to CW-1 "we could go to jail for what we are doing."  CW-1 agreed with him.

### b.   Taro Emerges As A Leader Among Generic Topical Manufacturers

#### 1)   Increased Focus On Fair Share And Price Increases

597.   As detailed above, in early 2013 Defendants Perfetto and Aprahamian left their positions at Actavis to take executive-level positions at Taro.  The two men wasted no time working together to implement changes at Taro designed to improve the company's bottom line.

598.   First, Perfetto and Aprahamian focused their efforts on ensuring that Taro had its fair share of the market on the products it manufactured.  To that end, the executives took steps to formalize internal processes for seeking and tracking competitive intelligence obtained by sales executives at the field level.  This included compiling intelligence from not only customers, but from competitors as well.

599.   For example, in January 2013, at Perfetto's request, J.J., a senior Taro sales executive, e-mailed the sales team asking them to obtain competitive intelligence relating to a list of priority products where "fair market share is being analyzed."  Taro then used that information to inform which products to bid on, at which customers, and at what price points to meet its fair share targets without eroding the market price.

600.   Second, Perfetto and Aprahamian positioned Taro as a price-increase leader and implemented significant price increases on a substantial portion of Taro's product portfolio in 2013 and 2014.  Although Taro had had success implementing price increases in the past, the increases in these years would be much larger than they had been in past years.

601.   For example, in February 2013, Taro took increases on several products, including Nystatin Triamcinolone – its highest grossing product.  When an executive at Dr.

Reddy's, a generic manufacturer not named as a Defendant in this Complaint, learned of the news, he sent an e-mail stating: "Taro just continues to amaze me.  How are we progressing with identifying the responsible market areas and options.  Is there a next derm?"  To that, a senior sales and marketing executive at Dr. Reddy's responded, "[t]his space continues to be appealing as the number of players are limited and the frequent, significant price increases drive the business."

602.    Similarly, in June 2014, Taro took simultaneous, significant price increases on more than a dozen different products.  The chart below, which was included in a Credit Suisse investor report, details some of the products that Taro increased prices on in the summer of 2014, the percentage of Taro's sales implicated, and the size of the increases.

**Figure 1: Products where Taro has taken price increases recently**

| Product | % of Taro sales | Recent Price increase vs. old price | Date of price increase |
|---|---|---|---|
| Clobetasol Propionate - Ointment | 1.4% | 21.6x | Jun-14 |
| Clobetasol Propionate - Cream | 1.8% | 17.8x | Jun-14 |
| Warfarin | 4.0% | 3.1x | Jun-14 |
| Fluocinonide | 3.7% | 3.1x | Jun-14 |
| Phenytoin Sodium ER | 1.2% | 3.1x | Jun-14 |
| Hydrocortisone Val  - Cream | 2.6% | 1.4x | Jun-14 |
| Ketoconazole | 1.0% | 2.1x | Apr-14 |
| Carbamazepine - ER | 4.9% | 1.1x | Jun-14 |
| Ovide (g. Malathion) | 1.5% | 1.5x | May-14 |
| Hydrocortisone Val  - Ointment | 3.9% | 1.1x | Jun-14 |
| Hydrocortisone Butyrate | 0.4% | 1.6x | Jun-14 |

*Source: Price Rx, Credit Suisse research*

603.    As a result of these June 2014 increases, Credit Suisse increased its target pricing for Taro and its parent company Defendant Sun Pharmaceuticals from $85 to $150 per share.  As justification for the increase, Credit Suisse emphasized that there had been zero rollbacks of Taro price increases in recent years:

**#1**: Have previous price increases sustained for Taro?

Taro has approval for ~140 ANDAs in the US and we have already seen Taro taking price increase in more than 30 of these products. Some of these products we have highlighted in Fig 1. It is important to note (1) there have been multiple instances of price increase in these products and (2) there has been no roll-backs of prices even once so far in the last three years.

Figure 1: Taro has not rolled back price increase so far

| Product | Price increase since Mar-11 | # of instances of price increase | Remarks |
|---|---|---|---|
| Nystatin triam - Cream | 59x | 5 | No roll backs |
| Nystatin triam - Ointment | 45x | 5 | No roll backs |
| Clomipramine | 27x | 1 | No roll backs |
| Clobetasol Propionate - Cream | 21x | 2 | No roll backs |
| Clobetasol Propionate - Ointment | 18x | 2 | No roll backs |
| Fluocinonide - Cream | 17x | 3 | No roll backs |
| Fluocinonide - Liquid Lotion | 8x | 3 | No roll backs |
| Nystatin - Cream | 12x | 2 | No roll backs |
| Desonide Cream | 11x | 2 | No roll backs |
| Hydrocortisone Val - Ointment | 8x | 7 | No roll backs |
| Acetazolamide | 5x | 3 | No roll backs |
| Ketoconazole | 2x | 1 | No roll backs |

Source: Price Rx, Credit Suisse estimates.

604.     These price increases, and others taken by Taro in 2013 and 2014, resulted in the accrual of significant profits to Taro.  Indeed, between 2008 and 2016, Taro's profits increased by an astounding 1300%.  As the graph below demonstrates, Taro's financial growth experienced a sharp uptick in 2013, when Perfetto and Aprahamian began at Taro and positioned the company as a price-increase leader.



605.    Taro's success in implementing these increases – and in obtaining its fair share on the products it manufactured – depended, in large part, on the strength of the ongoing collusive relationships that Perfetto and Aprahamian had with their contacts at competitor companies. Some of these relationships have been detailed above, but there were many more.

606.    For example, between March 2013 and October 2018, Aprahamian exchanged at least six hundred and eighteen (618) phone calls and text messages with his contacts at Defendants Sandoz, Glenmark, Actavis, Mylan, G&W, Wockhardt, Lannett, Amneal, Hi-Tech, and Perrigo.  These communications are detailed in the table below:

154

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| CW-3 (Sandoz) | 190 | 3/19/2013 | 8/18/2016 |
| Grauso, Jim (Glenmark) | 106 | 7/1/2014 | 10/16/2018 |
| M.D. (Actavis) | 50 | 3/19/2013 | 9/2/2016 |
| M.A. (Mylan) | 50 | 4/4/2013 | 2/9/2016 |
| Orlofski, Kurt (G&W) | 45 | 7/24/2013 | 6/10/2016 |
| M.C. (Wockhardt) | 27 | 5/7/2013 | 8/20/2017 |
| A.B. (Lannett) | 23 | 11/15/2013 | 12/14/2017 |
| Falkin, Marc (Actavis) | 21 | 4/17/2014 | 3/8/2016 |
| A.B. (Actavis) | 16 | 8/16/2013 | 4/19/2016 |
| M.B. (Actavis) | 13 | 5/13/2013 | 8/22/2015 |
| S.R. (Amneal) | 12 | 6/6/2014 | 4/29/2016 |
| M.B. (Glenmark) | 11 | 5/7/2013 | 3/26/2014 |
| E.B. (Hi-Tech) | 10 | 6/6/2014 | 7/11/2014 |
| Lannett Pharmaceuticals | 8 | 6/6/2014 | 4/29/2016 |
| Vogel-Baylor, Erika (G&W) | 6 | 3/27/2014 | 9/24/2015 |
| Boothe, Doug (Perrigo) | 6 | 11/15/2016 | 8/23/2017 |
| A.G. (Actavis) | 4 | 4/23/2013 | 4/30/2013 |
| Rogerson, Rick (Actavis) | 4 | 6/17/2013 | 4/16/2014 |
| G&W Labs | 4 | 1/8/2014 | 3/6/2017 |
| R.H. (Greenstone) | 3 | 8/14/2014 | 8/20/2014 |
| T.D. (Actavis) | 3 | 4/12/2013 | 7/10/2013 |
| Grauso, Jim (Aurobindo) | 2 | 1/9/2014 | 1/10/2014 |
| Wesolowski, John (Perrigo) | 2 | 5/9/2014 | 5/9/2014 |
| A.S. (Actavis) | 1 | 1/9/2014 | 1/9/2014 |
| Glenmark Pharmaceuticals | 1 | 10/17/2018 | 10/17/2018 |

607.    Similarly, between January 2013 and February 2018, Perfetto exchanged at least six hundred and ninety (690) phone calls and text messages with his contacts at G&W, Perrigo, Actavis, Glenmark, Aurobindo, Wockhardt, Greenstone, Amneal, and Lannett.  These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Orlofski, Kurt (G&W) | 160 | 1/25/2013 | 9/1/2016 |
| Boothe, Douglas (Perrigo) | 130 | 3/5/2013 | 7/29/2016 |
| T.D. (Actavis) | 79 | 2/19/2013 | 4/14/2017 |
| Dorsey, Mike (Actavis) | 89 | 1/2/2013 | 5/12/2017 |
| Grauso, Jim (Glenmark) | 58 | 2/10/2014 | 2/3/2018 |
| Blashinsky, Mitchell (Glenmark) | 51 | 1/4/2013 | 4/29/2017 |
| M.B. (Actavis) | 31 | 2/25/2013 | 2/5/2017 |
| Grauso, Jim (Aurobindo) | 20 | 1/17/2013 | 1/16/2014 |
| M.C. (Wockhardt) | 24 | 1/9/2013 | 12/7/2017 |
| M.P. (G&W) | 18 | 7/2/2013 | 4/22/2017 |
| Falkin, Marc (Actavis) | 7 | 12/13/2013 | 1/17/2017 |
| T.G. (Ranbaxy) | 5 | 1/17/2014 | 1/30/2014 |
| M.P. (Sandoz) | 4 | 3/7/2017 | 3/8/2017 |
| Hatosy, Robin (Greenstone) | 4 | 11/21/2013 | 2/20/2017 |
| Boyer, Andy (Actavis) | 3 | 3/12/2013 | 4/30/2013 |
| Vogel-Baylor, Erika (G&W) | 2 | 3/21/2014 | 3/21/2014 |
| L.P. (Actavis) | 1 | 3/15/2013 | 3/15/2013 |
| S.R. (Amneal) | 1 | 4/7/2014 | 4/7/2014 |
| K.S. (Lannett) | 1 | 4/24/2015 | 4/24/2015 |
| M.T. (Ranbaxy) | 1 | 6/30/2016 | 6/30/2016 |
| C.V. (Perrigo) | 1 | 1/3/2014 | 1/3/2014 |

608.    Aprahamian and Perfetto capitalized on the foregoing relationships to set Taro

apart as a leader in the topical space.  Some examples of how these relationships manifested

themselves regarding specific products are described in detail below.

> **i.    Setting the Stage For Future Collusion – Defendant Aprahamian And CW-3 Collude On Products Where Sandoz And Actavis Competed**

609.    The collusive relationship between Defendant Aprahamian and CW-3 dated back

to Aprahamian's days at Actavis.  Indeed, two of the first examples of collusion between the two

competitors involved market allocation agreements on Ciclopirox Shampoo and Betamethasone

Valerate Ointment – both products where Sandoz was entering the market and Actavis, acting

through Aprahamian, agreed to cede share to the new entrant.  A third product – Desonide Lotion

– involved Sandoz increasing price while Actavis was out of the market and Actavis re-entering

156

later at the higher price, in coordination with Sandoz.  These agreements set the stage for how

collusion would work between the two competitors when Aprahamian moved to Taro.  These

products are discussed in greater detail below.

### a)   Desonide Lotion

610.    Desonide Lotion, also known by various brand names such as DesOwen and

LoKara, among others, is a topical steroid that treats a variety of skin conditions, including

eczema, dermatitis, allergies, and rash.

611.    Between 2009 and 2011, Defendants Actavis and Fougera were the only two

generic manufacturers of Desonide Lotion.  In those years, the competitors instituted WAC price

increases that were in lock step with one another.  For example, on June 1, 2009, Fougera

increased WAC pricing by roughly 90% and Actavis followed and matched on September 1,

2009.  Similarly, on July 22, 2011, Actavis increased WAC pricing by nearly 200% and Fougera

followed three (3) days later, on July 25, 2011.

612.    Following the increases, and consistent with fair share principles, the competitors

declined opportunities to bid on each other's business so as not to take advantage of the price

increases.  For example, when CW-3, then a Fougera sales executive, asked CW-6, his colleague

at Fougera, whether Walgreens had accepted the 2011 price increase, CW-6 responded:

| From: | █████████████ |
| Sent: | Tuesday, August 09, 2011 5:15 PM |
| To: | |
| Subject: | RE: Walgreens -  Metro - Desonide Price Increase |

We didn't ask them to accept.  Just gave it to them.  They bid it out, but found no takers as far as we know.

613.    As of August 2012, the market for Desonide Lotion was evenly split between the

two competitors with Sandoz at 56% market share and Actavis at 44%.

157

614.   On August 23, 2012, Defendant Kellum circulated a list of Fougera products that he recommended taking price increases on, including Desonide Lotion.

615.   Between August 25 and August 28, 2012, the NACDS held its Pharmacy and Technology Conference in Denver, Colorado.  Representatives from Defendants Actavis and Sandoz attended the conference, including CW-3 and Kellum of Sandoz and Defendant Aprahamian, then a senior pricing executive at Actavis.

616.   At the conference, Aprahamian approached CW-3 and told him that Actavis was having supply issues on Desonide Lotion and would be exiting the market for a period of time.  CW-3 then passed this information along to Kellum because he knew Kellum was interested in raising the price on Desonide Lotion and would view Actavis's temporary exit from the market as a positive development.

617.   J.P., a product manager at Sandoz, was tasked with putting together information for the potential price increases, including on Desonide Lotion.  On September 12, 2012, J.P. e-mailed CW-1, a senior pricing executive at Sandoz, and Kellum asking for input on the rationale for the price increases.  Regarding Desonide Lotion, Kellum responded: "We believe they will follow based on past experience."

618.   One month later, in October 2012, Kellum asked CW-3 to reach out to Aprahamian to get more specific information regarding Actavis's supply issues on Desonide Lotion.  On October 17 and 18, 2012, CW-3 exchanged several calls with Aprahamian.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/17/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 9:15:00 | 0:02:00 |
| 10/17/2012 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 14:18:00 | 0:03:00 |
| 10/17/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 16:43:00 | 0:06:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:08:00 | 0:01:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:09:00 | 0:06:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 10:30:00 | 0:01:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 14:02:00 | 0:02:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 14:07:00 | 0:06:00 |

619.    Later that evening on October 18, 2012, CW-3 sent the following e-mail to

Kellum and other Sandoz colleagues reporting what he had learned from Aprahamian:



From:
Sent: Thursday, October 18, 2012 05:31 PM
To:                          Kellum, Armando;
Subject: Desonide Lotion

All-

After positive initial lab results Desonide Lotion is expected to release in mid-December.  We should be able to retain
current market share as Actavis is experiencing an issue due to changing their API supplier.  The customer I spoke with
did not have a potential release date at this time.

Thanks,

620.    As would become his customary practice, CW-3 referred to his source vaguely as

a "customer" because he wanted to avoid putting anything incriminating in writing.  Further,

CW-3 knew that Kellum understood that his true source for the information was not a customer,

but rather his contact at Actavis, Aprahamian.

621.    After confirming their own ability to supply, Sandoz decided to move forward

with a price increase on Desonide Lotion.  In November 2012, Sandoz generated a price increase

analysis for the product.  In that analysis, Sandoz assumed "no unit volume decline and

continued rational[sic] behavior by Actavis."

622.    On December 5, 2012, Sandoz raised its WAC prices for Desonide Lotion by

75%.  On the day before and the day of the price increase, CW-3 called Aprahamian twice,

letting him know the details of the increase.  The calls lasted seven (7) minutes and two (2)

minutes, respectively.  Several months later, on May 10, 2013, Sandoz again increased WAC

pricing for Desonide Lotion – this time by 11%.

623.    On August 22, 2013, Actavis finally re-entered the Desonide Lotion market and

matched Sandoz's increased pricing.  That same day, CW-3 received a text message from A.G., a

sales executive at Actavis.

624.    On August 26, 2013, CW-3 notified the rest of the Fougera sales team that

Actavis had re-entered the market.  In response, CW-1 sarcastically recommended reducing all

Desonide prices by 75%.

625.    Instead of cutting prices Kellum recommended that Sandoz "relinquish some

share so as to preserve the new higher prices."  Kellum noted that "Actavis is generally rationale

[sic] so hopefully they act respectfully."

626.    Sandoz proceeded to concede several of its Desonide Lotion customers to Actavis

in order to allow Actavis to regain its market share without eroding the high market pricing.  For

example, in a December 2013 Business Review, Sandoz noted that it had "[r]elinquished

McKesson, Econdisc, and Walmart w/out lowering mkt pricing."  Several months later, in a

Fougera Business Review, Sandoz further stated that the Desonide Lotion "[m]arket appears

stable," and that Sandoz planned to "[d]efend current awards with goal to retain 60% + market at

highest possible price."

**b)      Ciclopirox Shampoo**

627.    Ciclopirox Shampoo, also known by the brand name Loprox, is used to treat

seborrheic dermatitis, an inflammatory skin condition of the scalp.  As of the summer of 2012,

the three competitors in the market were Perrigo, Actavis, and Taro.

628.     After the Sandoz acquisition of Fougera was finalized in July 2012, Sandoz

engaged in a review of the Fougera product line to determine whether there were any Fougera

products for which Sandoz should considering re-entering the market.  One such product was

Ciclopirox Shampoo.

629.     To that end, on September 4, 2012, J.P., a product manager at Sandoz, e-mailed

the sales team, including CW-3, asking for market pricing on Ciclopirox Shampoo, among other

products.  The next day, on September 5, 2012, S.G. a Sandoz sales executive, also followed up

with CW-3 and asked him to provide J.P. with the requested information.

630.     The following morning, on September 6, 2012, CW-3 reached out to his contacts

at both Taro and Perrigo to discuss Ciclopirox Shampoo.  He then reported the results of those

conversations to both J.P. and S.G. at Sandoz, either that same day or the next day.  These calls

are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 10:15:00 | 0:01:00 |
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 10:32:00 | 0:11:00 |
| 9/6/2012 | Voice | H.M. (Taro) | Outgoing | CW-3 (Sandoz) | 10:57:15 | 0:02:49 |
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | S.G. (Sandoz) | 11:27:00 | 0:01:00 |
| 9/7/2012 | Voice | CW-3 (Sandoz) | Outgoing | J.P. (Sandoz) | 8:58:00 | 0:01:00 |
| 9/7/2012 | Voice | CW-3 (Sandoz) | Outgoing | S.G. (Sandoz) | 8:59:00 | 0:02:00 |

631.     On November 26, 2012, J.R., a marketing executive at Sandoz, e-mailed CW-3

and others at Sandoz regarding the Ciclopirox Shampoo re-launch.  J.R. stated that Sandoz

planned to re-launch the (former Fougera) product on December 3, 2012 and planned to target

12% market share due to limited supply.  J.R. asked CW-3 about current pricing and told him

that they should discuss which customers to target to achieve Sandoz's market share goal.

632.     The next day, on November 27, 2012, J.R. sent another e-mail about the re-launch

reiterating that Sandoz was targeting 12% share and stating that "since Perrigo and Watson

[Actavis] have a majority of the market, we plan on targeting their accounts.  [CW-3] and I are in

161

the process of determining which accounts to target and we'll ask for usage if one of your accounts will be targeted.  [CW-1, a Sandoz senior pricing executive] will be sending out offers for both products by Thursday."

633.    Thereafter, CW-3 set out to coordinate Sandoz's entry with Aprahamian of Actavis.  The next day, November 28, 2012, CW-3 called Aprahamian and they spoke for nine (9) minutes.  First thing the following morning, on November 29, 2012, CW-3 called Aprahamian again and they spoke for ten (10) minutes.  A few hours later, Aprahamian called CW-3 back and they spoke for three (3) minutes.

634.    That same day, J.R. e-mailed CW-3, copying CW-1, asking for pricing information on Ciclopirox Shampoo.  Not wanting to put anything in writing, CW-3 responded: "Call me . . . maybe?"  First thing the next morning, CW-3 exchanged two calls with CW-1, with one lasting five (5) minutes and the other lasting twelve (12) minutes, during which CW-3 conveyed the requested pricing information he had received from competitors.

635.    Later that evening, R.T., a senior sales and marketing executive at Sandoz, sent an internal e-mail asking if Sandoz had sent out offers for Ciclopirox Shampoo.  The next day, on November 30, 2012, J.R. responded that offers had been sent to Wal-Mart and HD Smith – both Actavis customers – and that Sandoz was considering approaching McKesson – a Perrigo customer.

636.    That same morning, CW-3 called T.P. of Perrigo twice, to alert him to the fact that Sandoz would be approaching McKesson.  The calls lasted two (2) minutes and one (1) minute, respectively.  Later that day, CW-1 confirmed that Sandoz had sent an offer to McKesson for Ciclopirox Shampoo.

637.    On December 3, 2012, Sandoz officially re-launched Ciclopirox Shampoo.

638.    On December 4 and December 5, 2012, CW-3 called Aprahamian twice.  The calls lasted seven (7) minutes and two (2) minutes, respectively.  Also, to close the loop, on December 5, 2012, M.D., an Actavis sales executive, called T.P. of Perrigo and the two competitors spoke for seventeen (17) minutes.

639.    Within three days of its entry, by December 6, 2012, Sandoz had already secured the Ciclopirox Shampoo business at HD Smith (from Actavis) and McKesson (from Perrigo).

### c)    Betamethasone Valerate Ointment

640.    Betamethasone Valerate Ointment ("Betamethasone Valerate") is a corticosteroid used to treat a variety of skin conditions, including eczema, dermatitis, allergies, and rash.

641.    In early January 2013, Sandoz began making plans to re-enter the market for Betamethasone Valerate and targeted February 15, 2013 as its re-launch date.  At that time, Actavis was the only other generic competitor in the market.

642.    On January 21, 2013, Sandoz held a Commercial Operations call during which the Betamethasone Valerate re-launch was discussed.  During that call, CW-3 noted that Sandoz was seeking 40% of the market – which was typical (and consistent with fair share principles) for a second entrant in a two-player market – and was looking for price points and customer information.

643.    On February 4, 2013, CW-3 called Defendant Aprahamian, who at that time was still at Actavis.  The call lasted one (1) minute.  The next day, February 5, 2013, CW-3 spoke with Aprahamian two more times – with one call lasting twenty-three (23) minutes.  Immediately after each call with Aprahamian, CW-3 called Kellum or CW-1 to report back what he had learned.  These calls are detailed in the chart below:

163

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 10:14:00 | 0:23:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 10:38:00 | 0:01:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 10:39:00 | 0:01:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 11:24:00 | 0:03:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:27:00 | 0:01:00 |

644.    During these calls, Aprahamian provided CW-3 with Actavis's non-public pricing

for Betamethasone Valerate at its largest customers, as well as the percentage of the market that

each customer represented.  The purpose of providing this specific information was so that

Sandoz would be able to price as high as possible while still obtaining business from specific,

agreed-upon customers that represented an agreed-upon market share.  CW-3 took the following

contemporaneous notes in his Notebook, placing check marks next to Rite Aid and Walgreens,

two of the customers that he and Aprahamian agreed that Sandoz would target.  These notes are

pictured below:



645.    Later in the evening on February 5, 2013, J.R., a senior Sandoz marketing

executive, sent an internal e-mail, including to CW-3, stating: "Team – let's first focus on

WAGS, RA, Cardinal and McK.  Please obtain usage, interest level and we'll then compare to our 40% goal before approaching others."

646.    Two days later, on February 7, 2013, C.P., a pricing analyst at Sandoz, sent an internal e-mail, including to CW-3, stating that Sandoz planned to send an offer to Walgreens shortly and would send offers to additional targets once they received feedback from Walgreens. CW-3 responded:  "Let's talk in a few minutes.  On a call now."

647.    On February 13, 2013, CW-3 called Aprahamian and they spoke for nearly sixteen (16) minutes.  That same day, on February 13, 2013, Rick Rogerson, a senior pricing executive at Actavis, discussed ceding the Walgreens account to Sandoz, stating in an internal e-mail:  "If Sandoz is looking for share (We have 100% as of IMS Q#-12 data) I would let this go." In response, Aprahamian confirmed that Actavis would be ceding the Walgreens business, stating "[w]e need to be responsible and give them ownership in this product."

648.    Two days later, on February 15, 2013, Sandoz re-entered the market and published WAC pricing that matched Actavis's WAC pricing.  That same day, on February 15, 2013, Sandoz was awarded the Betamethasone Valerate business at Walgreens.

649.    On February 19, 2013, Sandoz bid on the Betamethasone Valerate business at Rite Aid.  That same day, CW-3 called Defendant Aprahamian to let him know.  The call lasted less than one (1) minute.  On February 28, 2013, Rite Aid awarded the business to Sandoz.

650.    On March 15, 2013, Sandoz bid on the Betamethasone Valerate business at Cardinal.  A few weeks later, on March 27, 2013, Cardinal awarded the business to Sandoz. These three accounts – Walgreens, Rite Aid, and Cardinal – accounted for approximately 32% of the Betamethasone Valerate market.

651.    On April 1, 2013, Sandoz held a Commercial Operations call during which they discussed, among other items, the status of the Betamethasone Valerate re-launch.  CW-3's notes from that call reflect that Sandoz had been able to secure three customers, but was "shooting for" one additional customer, OptiSource, to reach its original 40% market share goal:



The next day, April 2, 2013, CW-3 called and spoke with Aprahamian twice, with one call lasting six (6) minutes.

652.    On April 4, 2013, Sandoz submitted an offer to Optisource for its Betamethasone Valerate business.  Four days later, on April 8, 2013, Optisource awarded Sandoz the business.

       **ii.**    **Aprahamian Moves To Taro And Immediately Begins Colluding With CW-3 On Products On Which Sandoz And Taro Overlap**

653.    In March 2013, Defendant Aprahamian followed his former colleague, Defendant Perfetto, to Taro and assumed a senior sales and marketing position.  The product overlap between Sandoz and Taro was much greater than it was between Sandoz and Actavis, thereby allowing the collusion between CW-3 and Aprahamian to become systematic and routine.

654.    Indeed, immediately upon moving to Taro, and even before, Aprahamian and CW-3 began colluding on several products on which Sandoz and Taro overlapped – Nystatin Triamcinolone Cream and Ointment, Fluocinonide Ointment, and Lidocaine Ointment.  The collusion on these products is discussed in detail below.

### a)   Nystatin Triamcinolone Cream and Ointment

655.     Nystatin Triamcinolone ("NT") Cream and Ointment is used for the treatment of cutaneous candidiasis, such as yeast infections and thrush.

656.     By early 2011, Sandoz had discontinued NT Cream and Ointment leaving Taro as the exclusive generic manufacturer of the products.

657.     Capitalizing on this exclusivity, Taro took several significant price increases on NT Cream and Ointment in 2011 and 2012, which resulted in a total WAC increase of more than 700% on certain formulations.

658.     Not surprisingly, during this time period, NT Cream and Ointment were Taro's highest grossing products and represented approximately 14.1% of the company's consolidated net sales for the year ending March 31, 2013.

659.     Enticed by the high pricing, Sandoz began making plans to re-enter the NT Cream and Ointment markets in late 2012 and began coordinating regularly with Taro.  On November 12, 2012 – before Defendant Aprahamian had joined Taro – CW-3 of Sandoz called H.M., a Taro sales executive, three times with one call lasting four (4) minutes, to alert him to the fact that Sandoz might be entering the market.  That same day, CW-3 e-mailed M.A., a Sandoz marketing executive, regarding NT Ointment asking, "[c]an you please tell me which sizes we intend on launching on 12/21/12."  M.A. responded that Sandoz planned to launch all three package sizes.

660.     Two days later, on November 14, 2012, B.S., a senior Taro executive, sent an internal e-mail to other senior executives at Taro and Sun recommending price increases on several products where Taro was exclusive, including NT Cream and Ointment.  B.S. explained that "[a]s you have been made aware, we anticipate an N/T ointment competitive launch from

167

Sandoz/Fougera in mid to late December. If you approve an increase in prices of N/T cream and ointment it's important for us to move quickly ahead of the anticipated Sandoz launch."

661. Sandoz's launch dates for NT Cream and Ointment would get pushed back, but CW-3 continued to keep H.M informed. On January 4 and 7, 2013, CW-3 called H.M. of Taro. The calls lasted five (5) minutes and thirteen (13) minutes, respectively. One week later, on January 14, 2013, Taro held a Sales and Marketing conference call. During that call, Defendant Perfetto, then a Taro senior executive, informed the team that it was a "Priority to send out Price Increases," that Taro was "Anticipating April/May Competition" on NT Cream, and that the company should "Set Plan of Action to Solidify 50% MarketShare."

662. Two days later, on January 16, 2013, Perfetto e-mailed J.J., a senior Taro sales executive, advising that it was "time to lock up . . . at least 40 to 50 % of our key accounts prior to Sandoz talking about the item," and asked J.J. to put together a list of Taro's top 10 customers. J.J. then forwarded the request along internally stating, "[w]e'll have to consider a wholesaler and chain to give up share on (CVS would be nice)."

663. On February 12, 2013, Taro increased WAC pricing on NT Cream by 25%.

664. On February 28, 2013, CW-3 e-mailed M.A. of Sandoz asking for an updated target launch date for NT Ointment. M.A. responded: "Oct 2013." That same day, CW-3 called H.M. of Taro to keep him updated on Sandoz's plans, and they spoke for eleven (11) minutes. Two days later, on March 2, 2013, the two competitors exchanged three (3) text messages.

665. The following Monday, March 4, 2013, Taro held a Sales and Marketing conference call. During that call, Perfetto informed the team that Sandoz was "launching NT cream in May and oint in Oct."

666.    On March 13, 2013, D.P., a senior sales executive at Sandoz, sent an internal e-mail to the sales team, including to CW-3, requesting "Competitive Intel" regarding pricing for certain products that Sandoz was planning to re-launch, including NT Cream and Ointment.

667.    One week later, on March 18, 2013, Aprahamian started at Taro.  Over the next several days, Aprahamian and CW-3 exchanged several calls.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:16:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:01:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 3/21/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:12:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:18:00 |

668.    On March 19, 2013, D.P. sent CW-3 a "Gentle Reminder" stating "Please remember to seek Taro pricing on NT cream."  CW-3 understood from this e-mail that D.P. was asking him to call his contact at Taro to obtain pricing.  CW-3 responded: "Not a problem.  Had a conversation today regarding all the products and Fluocinonide OT as well.  Hope to have market intel tomorrow."

669.    True to his word, on March 22, 2013, after the series of phone calls referenced above, CW-3 stated: "Please see the attached file containing market intelligence provided by customers."  Although CW-3 said his information came from "customers," the true source was Aprahamian at Taro.  CW-3 also shared the file with Defendant Kellum and CW-1, a Sandoz senior pricing executive.  Kellum and CW-1 understood at the time that CW-3 obtained this information directly from Taro.

670.    The file attached to CW-3's e-mail, which is pictured below, contained Taro's non-public contract pricing at several customers for several products, including specific price

169

points for NT Cream and Ointment at Cardinal and Rite Aid.  Notably, CW-3 did not have

responsibility for either of those customers – which was a clear signal to his superiors that CW-3

had received the information from a competitor rather than a customer.

| Product | Size | NDC | Comments | CAH | Rite Aid | Walgreens | Winn Dixie | Comments |
|---|---|---|---|---|---|---|---|---|
| Betamethasone Dipropionate Ointment(Augmented) 0.05% | 15 gram tube | 00168-0268-15 | Prasco entered 8/6/2012 | | | | $ 30.00 | Actavis pricing |
| Betamethasone Dipropionate Ointment(Augmented) 0.05% | 50 gram tube | 00168-0268-50 | Prasco entered 8/6/2012 | | | | $ 45.00 | Actavis pricing |
| Desoximetasone Cream 0.25% | 15 gram tube | 00168-0180-15 | Taro Price Increase 2-12-13 | $ 17.00 | | $ 6.00 | | Taro pricing |
| Desoximetasone Cream 0.25% | 60 gram tube | 00168-0180–60 | Taro Price Increase 2-12-13 | $ 36.00 | | $ 24.00 | | Taro pricing |
| Desoximetasone Cream 0.25% | 100 gram tube | 00168-0180-99 | Taro Price Increase 2-12-13 | $ 96.50 | | $ 43.00 | | Taro pricing |
| Nystatin Cream 100,000 U/g | 15 gram | 00168-0054-15 | | $ 8.00 | $ 5.25 | | | Taro pricing |
| Nystatin Cream 100,000 U/g | 30 gram | 00168-0054-30 | | $ 12.00 | $ 7.75 | | | Taro pricing |
| Nystatin-Triamcinolone Cream | 15 gram | 00168-0081-15 | Taro Price Increase 2-12-13 | $ 55.00 | $ 50.00 | | | Taro pricing |
| Nystatin-Triamcinolone Cream | 30 gram | 00168-0081-30 | Taro Price Increase 2-12-13 | $ 79.00 | $ 71.00 | | | Taro pricing |
| Nystatin-Triamcinolone Cream | 60 gram | 00168-0081-60 | Taro Price Increase 2-12-13 | $113.00 | $101.00 | | | Taro pricing |
| Nystatin-Triamcinolone Ointment | 15 gram | 00168-0089-15 | Taro Price Increase 2-12-13 | $ 55.00 | $ 50.00 | | | Taro pricing |
| Nystatin-Triamcinolone Ointment | 30 gram | 00168-0089-30 | Taro Price Increase 2-12-13 | $ 79.00 | $ 71.00 | | | Taro pricing |
| Nystatin-Triamcinolone Ointment | 60 gram | 00168-0089-60 | Taro Price Increase 2-12-13 | $113.00 | $101.00 | | | Taro pricing |

The pricing information had been provided directly by Aprahamian for the express purpose of

allowing Sandoz to price as high as possible when entering the market.

671.    On the morning of April 15, 2013, Aprahamian called CW-3 and they spoke for

eighteen (18) minutes.  A few minutes after hanging up, CW-3 called Aprahamian back.  The

call lasted one (1) minute.  During these calls, CW-3 told Aprahamian that Sandoz would be

entering the market for NT Cream shortly.  Later that day, Taro held a Sales and Marketing

conference call.  The minutes from the conference call stated: "Sandoz entering N/T cream

market, NO ACTION TO BE TAKEN by Taro."

672.    On that same day, April 15, 2013, Sandoz held its own Commercial Operations

call during which they discussed NT Cream.  During that call, Sandoz identified ABC,

Walgreens, Rite Aid, Wal-Mart, and Omnicare as potential targets for the re-launch.  CW-3's

contemporaneous notes from that call are pictured below:



673.    Later that same day, on April 15, 2013, CW-3 called Aprahamian to further discuss the NT Cream launch.  The two competitors spoke for nine (9) minutes.  CW-3's contemporaneous notes from that call are pictured below:



674.    On the call, Aprahamian provided CW-3 with Taro's non-public pricing at ABC, Walgreens, Rite Aid, and Omnicare.  Aprahamian also told CW-3 that Taro would not defend these customers.  CW-3 noted that by drawing arrows pointing at those customer names in his Notebook.

675.    After hanging up with Aprahamian, CW-3 immediately called Defendant Kellum to report his conversation with the competitor.  The call lasted one (1) minute.  First thing the next morning, on April 16, 2013, CW-3 called Kellum again and they spoke for five (5) minutes.

676.    From April 20 to April 23, 2013, NACDS held its annual meeting in Palm Beach, Florida.  Representatives from Taro, including Defendants Aprahamian and Perfetto, and Sandoz, including D.P. and R.T., a senior sales and marketing executive, attended.

677.    The following day, on April 24, 2013, Aprahamian called CW-3 twice.  The calls lasted one (1) minute and five (5) minutes, respectively.  On April 25, 2013, CW-3 called Aprahamian.  The call lasted one (1) minute.  That same day, Sandoz re-entered the NT Cream market and matched Taro's increased WAC pricing.

678.    On the day of Sandoz's re-entry, Rite Aid e-mailed Taro stating that it had received a competitive bid on NT Cream and asked whether Taro planned to bid to retain the business.  H.M. of Taro forwarded the request to his colleagues J.J., Perfetto, and Aprahamian stating: "I know the drill, just let me officially know that we are walking, thank you."  Aprahamian responded: "We will evaluate and get back to you."

679.    The next day, on April 26, 2013, Aprahamian called CW-3 and they spoke for eight (8) minutes.  Consistent with Taro's agreement to cede that customer to Sandoz, Aprahamian e-mailed H.M. on April 27, 2013 asking him to call him Monday morning and stating, "[w]e will not be re-bidding and want to make sure we are aligned."

680.    Also on April 26, 2013, Omnicare e-mailed Taro indicating that it had received an offer for NT Cream and gave Taro the opportunity to match the pricing.  D.S. forwarded the request to Aprahamian who responded, "[w]e will not be able to match as they have noted.  Call me to discuss how you want this communicated . . .."

681.    That same day, Defendant Perfetto sent an internal e-mail to J.K. and M.K., two senior Taro executives, and others including Aprahamian, reporting that over the last two days, Sandoz had approached several of Taro's customers, including ABC, Rite Aid and Omnicare.  Perfetto concluded: "Ara will track share we have given up."

682.    On May 8, 2013, Perfetto sent an internal e-mail to Taro executives advising that Walgreens was moving its NT Cream business to Sandoz and stating that "[w]e are done giving

172

share to Sandoz on NT."  That same day, Aprahamian called CW-3 and they spoke for eight (8)

minutes.  CW-3 called Aprahamian back later that day and they spoke for another nine (9)

minutes.

683.     On May 28, 2013, NC Mutual e-mailed Taro stating that it had received an offer

from Sandoz and asked whether Taro planned to lower its price to retain the business.  E.G., a

Taro sales executive, suggested that Taro defend the account, but Aprahamian disagreed, stating:

"Unfortunately we can't touch this.  Need to keep balance and can't have this tip the cart, just too

much exposure."  Two days later, on May 30, 2013, Aprahamian called CW-3.  The call lasted

one (1) minute.

684.     On June 4, 2013, Taro circulated an internal spreadsheet tracking its customer

gains and losses for May 2013 for various products.  With respect to Nystatin Triamcinolone

Cream, Taro noted that it lost the business at Omnicare because it was "giving up share per Ara"

and the Walgreens business was "moved for strategic reasons."

685.     Despite Sandoz's entry, prices for NT Cream remained extremely high.  Around

this same time, K.S., a policy executive at Taro, actually sent an internal e-mail to J.J., Perfetto,

and Aprahamian asking whether there had "been any appreciable increase in demand in single

ingredient nystatin and triamcinolone" because "we have all heard stories of patients combining

the two products on their own to save money."  J.J. replied that Kaiser had begun "dispensing a

tube of each with instructions to mix" in order to provide some financial relief to its patients.

686.     Following Sandoz's re-launch into the NT Cream market, Sandoz executives

began discussing a larger "Taro Strategy" which involved "price delisting of 10 Taro products

for which Sandoz has 0% MS [market share]."  The rationale was simple – allow Taro to grow

these markets by increasing prices and then Sandoz could re-enter later at the higher prices, in

173

coordination with Taro.  Sandoz referred to NT Cream as "precedence" for the success of this

suggested approach and further noted that it would "help Taro to offset losses of NT Cream" –

meaning that it would help Taro increase its profitability on other products in repayment for

Taro's willingness to give up its market share to Sandoz on its most lucrative product.

687.    Indeed, the following chart from a Credit Suisse Investor report graphically

illustrates the success of such an approach – depicting the price increases taken by Taro on NT

Cream while Sandoz was out of the market and Sandoz's re-entry at the higher price:



688.    In November 2013, Sandoz began readying to re-enter the NT Ointment market.

Sandoz executives, including Defendant Kellum, wanted to mirror the NT Ointment launch after

the NT Cream launch by targeting the same customers as it had for NT Cream.  Kellum

specifically discussed this approach with CW-1.

689.    On November 13 and 15, 2013, Aprahamian and CW-3 exchanged several calls

during which they discussed NT Ointment.  CW-3 then reported what he discussed on those calls

to CW-1.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 8:00:00 | 0:01:00 |
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 8:15:00 | 0:02:00 |
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 8:32:00 | 0:08:00 |
| 11/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 6:33:00 | 0:08:00 |
| 11/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 6:41:00 | 0:11:00 |
| 11/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 6:55:00 | 0:01:00 |

690.   During his calls with Aprahamian, CW-3 took the following contemporaneous notes in his Notebook regarding NT Cream and Ointment:



691.   On these calls, CW-3 and Aprahamian discussed Sandoz's plan to target the same customers that it had targeted on NT Cream – ABC, Walgreens, Rite Aid, and Omnicare.  CW-3 drew an arrow from the customers listed under NT Cream to the NT Ointment pricing to demonstrate this.  As he had done before, Aprahamian agreed that Taro would not defend those customers and provided CW-3 with Taro's pricing at those accounts.

692.   On November 22, 2013, Aprahamian called CW-3 and they spoke for seven (7) minutes.  That same day, Sandoz re-entered the NT Ointment market and matched Taro's increased WAC pricing.  Per the competitors' agreement, Sandoz submitted offers to "the same customers we have contracted with for the NT Cream."

693.   The next day, on November 23, 2013, P.G., a senior Sandoz executive, e-mailed Kellum and D.P. regarding the NT Ointment re-launch.  P.G. asked who the other competitors

175

were in the market and how much share Sandoz planned to target.  D.P. responded: "Two-player market; Taro was alone in the market prior to Sandoz re-launch.  40% share is reasonable to start.  We'll eventually seek >50%.  Can discuss better off-line."

694.    By December 2013, Sandoz had – as agreed – targeted and secured the NT Ointment business at ABC, Walgreens, Rite Aid, and Omnicare.

### b)    Fluocinonide Ointment

695.    Fluocinonide Ointment, also known by the brand name Lidex, is a topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, psoriasis, and vitiligo.  It is one of the most widely prescribed dermatological drugs in the United States.

696.    In early 2013, the Fluocinonide Ointment market was evenly split between Teva with 50% share and Taro with 42% share.

697.    On February 12, 2013, Taro increased pricing on several products, including Fluocinonide Ointment.  The increase included a 15% increase to WAC.

698.    On February 21, 2013, M.A., a Sandoz marketing executive, e-mailed Defendant Kellum and other Sandoz executives to advise that Taro had increased pricing on several products for which Sandoz was re-entering the market, including Fluocinonide Ointment.  That same morning, CW-3 of Sandoz called H.M. of Taro and they spoke for (9) minutes. Immediately after hanging up with H.M., CW-3 called his supervisor, Defendant Kellum, and they spoke for four (4) minutes.

699.    One week later, on February 28, 2013, McKesson e-mailed Taro stating that it had received an unsolicited bid on Fluocinonide Ointment and asked whether Taro wanted to bid to retain the business.  Later that day, CW-3 called H.M. again and the two competitors spoke for

eleven (11) minutes.  First thing the next morning, on March 1, 2013, CW-3 called his boss

Kellum, and they spoke for five (5) minutes.

700.    On March 2, 2013, CW-3 and H.M. exchanged three (3) text messages.  That

same day, E.G., a Taro sales executive, forwarded the customer request along internally and

attached a spreadsheet indicating that McKesson was Taro's largest customer and including the

notation: "Sandoz has approval and is looking for share."

701.    Two days later, on March 4, 2013, M.L., a Taro pricing executive, forwarded the

McKesson request to Defendant Perfetto and other Taro executives suggesting that Taro reduce

its pricing by 20% and retract the price increase to retain the business.  Perfetto responded that he

was okay with this approach, but posed a question: "do we [have] all three wholesalers . . . or just

mckesson . . . or do we have two of the three . . . that may play into [S]andoz approach."

702.    On March 5, 2013, M.L. confirmed that Taro supplied all three wholesalers and

Perfetto responded by asking J.J., a senior Taro sales executive, "are we primary at ABC and/or

Cardinal . . . if so we will need to give one up . . . to Sandoz . . .  Otherwise this product could go

down rapidly . . .."  After confirming that Taro was primary on all three, J.J. replied, "I would

agree with Mike P[erfetto] that if Fougera is in / back we may have to give up a wholesaler.  But

McKesson wouldn't be my first choice."

703.    Looking for a creative way to communicate with Sandoz that Taro would rather it

approach ABC or Cardinal instead of McKesson, Perfetto reached out to his former colleague at

Actavis, Defendant Aprahamian, who he knew had a relationship with CW-3 at Sandoz.[4]

Perfetto asked Aprahamian to speak with CW-3 about Fluocinonide Ointment.  The two

---

[4] Aprahamian was in the process of leaving Actavis at this point, but would not formally begin
working at Taro until two weeks later – on March 18, 2013.

exchanged calls, and Aprahamian reported back to Perfetto what they discussed.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/4/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Aprahamian, Ara (Actavis) | 15:18:00 | 0:14:00 |
| 3/5/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Aprahamian, Ara (Actavis) | 8:01:00 | 0:02:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:05:00 | 0:02:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:07:00 | 0:11:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 14:52:00 | 0:04:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 10:50:00 | 0:04:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 13:24:00 | 0:03:00 |

704.    At the same time, CW-3 was reporting back to CW-1, a Sandoz senior pricing executive, what he had discussed with Aprahamian.  Shortly after that discussion, CW-1 e-mailed Kellum and F.R., a Sandoz pricing executive, regarding Fluocinonide Ointment stating that he had "[j]ust received intel telling me that Taro will defend Mckesson.  Also told that we should have no resistance going to either ABC or Cardinal."  Kellum responded, "Let's do ABC and see where that lands us."  Less than an hour later, Kellum called CW-3 and they spoke for twenty-three (23) minutes.  Later that day, CW-3 called Aprahamian.  The call lasted less than one (1) minute.

705.    Having identified ABC as its target, CW-1 then asked CW-3 to contact Taro and obtain price points for the customer.  Following this directive, CW-3 exchanged several calls with Aprahamian who, in turn, spoke with Perfetto and then relayed the information back to CW-3.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 12:20:06 | 0:00:30 |
| 3/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 12:27:00 | 0:04:00 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | Perfetto, Mike (Taro) | 12:47:00 | 0:01:00 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 12:49:00 | 0:09:00 |
| 3/11/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 14:16:00 | 0:03:00 |
| 3/11/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 14:18:00 | 0:01:00 |
| 3/11/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 14:25:00 | 0:05:00 |

706.     After speaking with Aprahamian for the last time on March 11, 2013, CW-3

called CW-1 and left him the following voicemail:

> Mike, it's Chris.   Hey – I'm going to leave you this message on
> Fluocinonide – I think it's the Ointment.   Old pricing for Taro at ABC.
> These are net prices – old and new nets. . . . 15gm - $9.50, new price $12;
> 30 gm – old price 13.25, new price 16.75; 60gm $20, new price $25.
> Alright?  Thanks, bye.

707.     In accordance with the agreement between the two competitors, Sandoz bid on

Fluocinonide Ointment at ABC and Taro promptly conceded the business.

### c)     Lidocaine Ointment

708.     Lidocaine Ointment ("Lidocaine" or "Lido"), also known by brand names such as

Xylocaine Topical Solution, among others, is an anesthetic used to temporarily numb and relieve

pain from minor burns, skin abrasions, insect bites, and other painful conditions affecting

mucous membranes.

709.     As detailed above in an earlier Section, in late 2011 Fougera raised its price on

Lidocaine Ointment in advance of Hi-Tech's entry into the market in March 2012, and the two

companies conspired to allocate customers to Hi-Tech in the months that followed.

710.     One year later, in March 2013, Taro began preparing to re-launch into the

Lidocaine Ointment market.   At that time, Sandoz (which by that point had acquired Fougera)

had approximately 56% market share and Hi-Tech had 42%.

711.     On March 18, 2013, the same day that Defendant Aprahamian started at Taro,

Defendant Perfetto sent an internal e-mail, welcoming Aprahamian to the team and listing

potential topics for a Monday call.   One of those topics was "Lidocaine . . . get who has Sandoz."

179

712.     Over the next several days, Aprahamian and CW-3 of Sandoz exchanged several calls, including a call on March 19, 2013 lasting sixteen (16) minutes and a call on March 21, 2013 lasting twelve (12) minutes.

713.     Later in the day on March 21, 2013, after Aprahamian's conversations with CW-3, J.J., a senior Taro sales executive, sent an internal e-mail listing Lidocaine Ointment usage numbers by competitor at various customers and stating: "Below is the intel I have so far . . . Originally we were going to target only Sandoz because the market share information indicated a 72% / 28% split.  According to Ara [Aprahamian] that may have shifted.  Please continue to gather usage and pricing information where you can and send to Kate, Ara, and me.  We are looking for some mid-size Hi Tech targets also."  The next day, on March 22, 2013, Aprahamian called CW-3 again.  CW-3 returned the call and the two competitors spoke for seventeen (17) minutes.

714.     During these calls in March 2013, Aprahamian informed CW-3 that Taro would be re-entering the Lidocaine Ointment market.  CW-3, in turn, provided Aprahamian with non-public price points that Sandoz was charging to its customers for the product.

715.     Armed with this competitively sensitive information, on or about March 23, 2013, Taro re-launched Lidocaine Ointment and matched Sandoz and Hi-Tech WAC pricing.   Over the next two weeks, Aprahamian and CW-3 exchanged numerous calls during which they discussed, among other things, the allocation of customers to the new entrant, Taro.  These calls are listed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/25/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 9:14:00 | 0:05:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 6:49:00 | 0:06:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:51:00 | 0:01:00 |
| 3/29/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 9:51:00 | 0:05:00 |
| 3/29/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:06:00 | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 6:12:00 | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:56:00 | 0:06:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 10:15:00 | 0:02:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 10:16:00 | 0:06:00 |

716.    Although Aprahamian wanted CW-3 to tell him which customers to target, CW-3 had a difficult time obtaining that guidance from Defendant Kellum.  Aprahamian told CW-3 that Taro would be taking two customers from Sandoz – CW-3 understood that to mean that Taro planned to take one wholesaler and one retailer.

717.    On April 5, 2013, J.R., a senior Sandoz marketing executive, sent an internal e-mail asking, "[a]ny idea what share and price we think Taro will go for Lidocaine ointment?"  CW-3 responded: "More than likely 25 – 30.  I believe we relinquished Cardinal to them so they will probably want one more from us."  J.R. replied by asking Defendant Kellum, "any idea on pricing?"  Kellum answered by providing his understanding of the conversations between CW-3 and Taro: "My expectation would be that we would relinquish ~2 customers and hopefully pricing would not be too affected."  Later that day, J.R. sent another e-mail to others at Sandoz stating: "We gave up Cardinal and plan on losing Wal-Mart."

718.    On April 8, 2013, Taro held a Sales and Marketing conference call.  According to the meeting minutes, Perfetto reported the following: "Perfect execution of Lidocaine (Picked up Cardinal and Wal-Mart) – FSS- Golden State- Publix, CVS" and "Sandoz-Giving us share."  The next day, on April 9, 2013, CW-3 called Aprahamian and they spoke for seven (7) minutes.

719.    On April 15, 2013, Aprahamian and CW-3 exchanged three calls, including one lasting eighteen (18) minutes and another lasting nine (9) minutes.  Later that day, Aprahamian

sent an internal e-mail attaching a "Lidocaine 30gm Launch Summary."  The Summary detailed that, consistent with fair share principles, Taro's "Target Share" was "20% - 25%" and they had achieved "26.3%" share.  For pricing, Taro matched "WAC & AWP on gram to gram basis . . . with competitors.  Pricing negotiated consistent with traditional 3 player market."

720.    The next day, on April 16, 2013, CW-3 called Aprahamian.  Aprahamian returned the call and the two competitors spoke for eleven (11) minutes.  At the same time, J.J. of Taro called E.B., a senior Hi-Tech sales and marketing executive, and they spoke for eight (8) minutes.  Throughout the rest of April, CW-3 and Aprahamian would exchange at least ten more phone calls.

721.    In June 2013, Taro circulated a spreadsheet detailing its gains and losses for May 2013 for various products.  With respect to Lidocaine Ointment, Taro noted that it did not bid at Omnicare because "we have our share."

722.    By January 2014, Sandoz held a "U.S. Strategy Workshop" which included a presentation on "[s]trategies to strengthen business: Fougera Gx."  The presentation contained a slide titled, "[o]verview of key competitors," which included Taro, and identified the Lidocaine Ointment launch as a key launch for Taro.  Sandoz described Taro's "[m]arket approach and strategy" as a "[v]ery responsible price competitor."

723.    Throughout 2014, Sandoz was careful not to disrupt the market balance it had achieved with Taro and Hi-Tech with regard to Lidocaine Ointment.  For example, in March 2014 Sandoz created a list of products to target at Wal-Mart in 2014.  With regard to Lidocaine Ointment, CW-3 responded that Sandoz had "[r]elinquished [Wal-Mart] to Taro when they launched last June; careful with this product with all customers; priced high in the market and all players have been VERY rational."

182

iii.     **Defendants Aprahamian And Perfetto
Orchestrate And Lead Price Increases On
A Number Of Key Products In May 2013**

724.    In addition to coordinating with Sandoz to allocate the market on several products

on which the two competitors overlapped as detailed above, Defendants Aprahamian and

Perfetto also began planning significant price increases on a number of products starting in early

2013.

725.    Aprahamian and Perfetto focused their efforts on increasing prices on those

products where they had strong relationships and ongoing understandings with individuals at the

competitor companies.  The two men capitalized on these relationships to coordinate price

increases and avoid competing with each other in the markets for those overlap drugs.

726.    One early example occurred in May 2013, when Taro increased its pricing on

twelve (12) different products (the "May 2013 Increases").  As result of these price increases,

Taro anticipated approximately $110 million in additional revenue.  These products, their

corresponding WAC increases, and Taro's competitors for each product are detailed in the chart

below:

| PRODUCT DESCRIPTION | LARGEST % WAC INCREASE | COMPETITORS |
|---|---|---|
| Alclometasone Dipropionate 0.05% Topical Cream | 223% | Sandoz, Glenmark |
| Ammonium Lactate 12% Topical Cream | 97% | Perrigo, Actavis |
| Ammonium Lactate 12% Topical Lotion | 88% | Perrigo, Actavis |
| Betamethasone Dipropionate (Augmented) 0.05% Topical Lotion | 29% | Sandoz |
| Betamethasone Dipropionate 0.05% Topical Cream | 10% | Sandoz, Actavis |
| Betamethasone Valerate 0.1% Topical Cream | 44% | Sandoz, Actavis |
| Carbamazepine 400mg Extended-Release Tablet | 43% | Sandoz |
| Carbamazepine 100mg/5ml Suspension | 18% | Wockhardt |
| Clomipramine Hydrochloride 75mg Capsule | 3441% | Sandoz, Mylan |
| Desonide 0.05% Topical Cream | 703% | Perrigo, Actavis (entered in Aug. 2013) |
| Desonide 0.05% Topical Ointment | 501% | Perrigo, Sandoz (entered in Jan. 2014) |
| Terconazole 3 Day 0.8% Vaginal Cream | 55% | Sandoz, Actavis |

a)     **Aprahamian And Perfetto Communicate And
Coordinate With Their Competitors In Advance
Of The May 2013 Increases**

727.    In advance of the May 2013 Increases, Aprahamian and Perfetto spoke with their

competitors on those products – Sandoz, Perrigo, Actavis, Mylan, and Glenmark -- to discuss the

increases and limit competition between them.  Indeed, Taro began communicating with

competitors, and formulating its list of products for the increases, as early as April 2, 2013.

728.    For example, on April 2, 2013, Aprahamian spoke with CW-3 of Sandoz for six

(6) minutes.  During that call, the two competitors discussed the price increases that Taro was

planning for May 2013 and CW-3 took the following contemporaneous notes in his Notebook:



729.    Immediately upon hanging up with Aprahamian, CW-3 called another competitor,

T.P. of Perrigo, and they spoke for five (5) minutes.  During that call, CW-3 discussed the May

2013 Increases with T.P. and T.P. told CW-3 that he already knew about them.  When CW-3

hung up with T.P., he immediately called Aprahamian back.  The call lasted one (1) minute.  A

few minutes after hanging up with Aprahamian, CW-3 called his superior Defendant Kellum.

Later that morning, Aprahamian called CW-3 and they spoke for another six (6) minutes.

730.    Two days later, on April 4, 2013, Aprahamian called M.A. of Mylan and the two

competitors spoke for fifteen (15) minutes.  Immediately upon hanging up, Aprahamian called

CW-3 of Sandoz and they spoke for six (6) minutes.  Mylan and Sandoz were competitors with

184

Taro on the product Clomipramine HCL Capsules ("Clomipramine"), one of the May 2013 Increase products.

731.    The following Monday, April 8, 2013, Mylan circulated a list of products that it wanted to focus on to increase its market share.  For Clomipramine, Mylan noted:

| Clomipramine | Remove – Just picked up CVS Taro price increase item |
|---|---|

The fact that Clomipramine was a "Taro price increase item" had come directly from M.A.'s conversation with Defendant Aprahamian, because Taro had not yet publicly announced its price increase on this product and would not do so for several more weeks.[5]

732.    At the same time, Taro was communicating with Defendant Blashinsky of Glenmark.  On both April 2, 2013 and April 9, 2013, a Taro employee – likely Defendant Perfetto – called Blashinsky from his office phone.  The calls lasted twenty-eight (28) minutes and twenty-three (23) minutes, respectively.  Also on April 9, 2013, Aprahamian exchanged two calls with CW-3 of Sandoz, including one call lasting seven (7) minutes.  Sandoz and Glenmark were competitors with Taro on the product Alclometasone Dipropionate Cream ("Alclometasone Cream"), one of Taro's May 2013 Increase products.

733.    Further, on April 15, 2013 and April 16, 2013, CW-3 exchanged several calls with Aprahamian and Blashinsky.  These calls are detailed in the chart below:

---

[5]  The collusive relationship and interactions between Taro, Sandoz, and Mylan with regard to the drug Clomipramine are addressed in greater detail in the Plaintiff States' Amended Complaint dated November 1, 2019, MDL No. 2724, 2:19-cv-02407-CMR, Dkt. No. 106 (the Plaintiff States' "Teva Complaint").  Although the Plaintiff States do not seek relief relating to Clomipramine in this Complaint, the collusive interactions are part of the larger pattern of conduct involving Taro, Sandoz, and Mylan, and are discussed herein to provide context for the larger price increase strategy that Taro was employing at this time, and to provide further support for the allegations herein.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 5:26:00 | 0:18:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 5:49:00 | 0:01:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:58:00 | 0:09:00 |
| 4/16/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 6:29:00 | 0:01:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:32:00 | 0:12:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 10:38:00 | 0:01:00 |
| 4/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:04:00 | 0:11:00 |

734.     During these calls, the three competitors discussed, among other things, Taro's planned price increase on Alclometasone Cream.  During at least one of those calls, CW-3 recorded the following contemporaneous notes in his Notebook:



735.     At the same time, Perfetto and Aprahamian were communicating frequently with their contacts at Perrigo and Actavis.  Further, Perrigo and Actavis were also speaking directly with each other during this time period.  Perrigo and Actavis had at least two May 2013 Increase products in common that overlapped with Taro, Ammonium Lactate Cream and Lotion.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/5/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:36:00 | 0:30:00 |
| 4/9/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | M.D. (Actavis) | 14:50:00 | 0:19:00 |
| 4/11/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 12:35:34 | 0:00:29 |
| 4/12/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 13:02:12 | 0:00:56 |
| 4/12/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 13:12:00 | 0:25:00 |
| 4/15/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:59:00 | 0:01:00 |
| 4/15/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 11:00:00 | 0:08:00 |

736.     While the competitors were communicating with each other, they kept their colleagues apprised of their communications with competitors.  For example, after several of

186

CW-3's calls with competitors, he immediately called Defendant Kellum or CW-1 to inform them of what he had learned.  A few of these examples are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:50:00 | 0:01:00 |
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:51:00 | 0:07:00 |
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 5:58:00 | 0:02:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:58:00 | 0:09:00 |
| 4/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:07:00 | 0:01:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:32:00 | 0:12:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 6:46:00 | 0:05:00 |

737.    By April 17, 2013, Aprahamian and Perfetto had finalized their list of products for the May 2013 Increases.  That same day, S.G., a sales executive at Sandoz, sent an internal e-mail, including to CW-3 and CW-4, regarding potential supply issues on Carbamazepine ER Tablets – a drug on Taro's list.  S.G. stated, "[c]an you please find out if Taro is experiencing any supply challenges?  We are not aware but a customer mentioned this.  We want to flesh it out."

738.    After receiving the e-mail, CW-4 and D.S. of Taro spoke twice, with the calls lasting twelve (12) minutes and two (2) minutes, respectively.  On those calls, D.S. explained that Taro did not have any long-term supply issues.  After hanging up with D.S. for the second time, CW-4 responded to S.G.'s e-mail stating: "Nothing significant.  They will be on BO for a few days."

739.    At the same time, CW-3 forwarded S.G.'s request regarding Carbamazepine ER directly to Defendant Kellum in a separate e-mail stating, "I believe we talked about this one a couple of weeks ago" – likely referring to the impending Taro price increase.  To that, Kellum responded simply, "yes."

740.     In the days leading up to the May 2013 Increases, the competitors continued to

communicate with each other in order to coordinate the price increases.  Some of these

communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:28:00 | 0:13:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 10:41:00 | 0:01:00 |
| 4/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:13:00 | 0:01:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:30:00 | 0:09:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 5:12:00 | 0:01:00 |
| 4/20/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 7:24:00 | 0:01:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 10:44:00 | 0:02:00 |
| 4/20/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 11:48:00 | 0:02:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 11:49:00 | 0:02:00 |
| 4/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 5:43:00 | 0:04:00 |
| 4/22/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 7:00:00 | 0:01:00 |
| 4/22/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 13:42:00 | 0:08:00 |
| 4/23/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 11:51:00 | 0:02:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:42:00 | 0:01:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 7:52:00 | 0:02:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:34:00 | 0:05:00 |
| 4/25/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:43:00 | 0:01:00 |
| 4/26/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:30:00 | 0:08:00 |

741.     Also, between April 20 and April 23, 2013, the NACDS held its annual meeting

at the Sands Convention Center in Palm Beach, Florida.  Representatives from Taro, Sandoz,

Perrigo, Actavis, Mylan, and Glenmark were all in attendance.  The attendees included

Defendants Aprahamian and Perfetto of Taro, A.B., a senior-most executive at Actavis, and

Defendant Blashinsky of Glenmark.

742.     One week later, on April 29 and April 30, 2013, Taro sent notices to its customers

informing them of the May 2013 Increases.  The next day, on May 1, 2013, Taro published

increased WAC pricing for the affected products.

743.     During this time, Aprahamian and Perfetto continued to communicate with their

competitors.  For example, on April 30, 2013, Aprahamian and CW-3 exchanged two calls

lasting fourteen (14) minutes and two (2) minutes, respectively.  During those calls, Aprahamian

and CW-3 discussed the May 2013 Increases and the seven Sandoz products that Taro had

188

increased prices on.  CW-3's notes from those phone calls are detailed below.  The notes also include references to the other competitors on these products.  For example, CW-3 listed "Alclo Cream – T & G," which stood for Taro and Glenmark:



After each call with Aprahamian, CW-3 hung up and immediately called Defendant Kellum to inform him of what he had learned from Aprahamian.

744.    At the same time, Aprahamian and Perfetto were also communicating with other competitors about the May 2013 Increases.  Some of these calls, which surround the calls with CW-3, are detailed in the chart below.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 6:30:00 | 0:01:00 |
| 4/30/2013 | Voice | Perfetto, Mike (Taro) | Incoming | A.B. (Actavis) | 7:14:00 | 0:10:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.D. (Actavis) | 10:24:23 | 0:00:06 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:50:00 | 0:14:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 12:44:00 | 0:15:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:37:00 | 0:02:00 |
| 5/1/2013 | Voice | D.S. (Taro) | Outgoing | Blashinsky, Mitchell (Glenmark) | 9:32:00 | 0:01:00 |
| 5/1/2013 | Voice | D.S. (Taro) | Incoming | Blashinsky, Mitchell (Glenmark) | 9:43:00 | 0:21:00 |
| 5/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.D. (Actavis) | 10:35:00 | 0:11:00 |

        **b)**    **Taro's Competitors Uniformly Declined To Bid On Taro Customers And Followed The May 2013 Increases**

745.    Consistent with their ongoing understandings, Taro's competitors uniformly declined opportunities to bid on Taro's customers after the May 2013 Increases.  Taro's competitors understood that to do so would violate the "rules of the road" and would disrupt the market-share balance that they had worked so hard to achieve.  Indeed, rather than compete, these competitors began working on implementing price increases of their own.

746.    For example, on April 30, 2013, Publix e-mailed Sandoz stating that Taro had increased pricing on a number of Sandoz overlap products and asked whether Sandoz wanted to bid on them.  The products included Betamethasone Dipropionate Lotion, Clomipramine, and Carbamazepine ER.  Defendant Kellum e-mailed CW-4 stating, "I'm not inclined to do anything here as these may be opportunities for us.  We can blame supply if these are in fact opps for us."  CW-4 replied: "Agreed!  Especially the opportunities for us part!"  By "opportunities," Kellum and CW-4 both meant that this was a chance for Sandoz to raise its prices on these products as well.

747.    That same day, April 30, 2013, Publix e-mailed Actavis to notify it that Taro had raised pricing on Terconazole Cream and asked whether Actavis wanted to bid for the business.  Two days later, and after several calls between Defendants Aprahamian and Perfetto and their former Actavis colleagues, M.B., a sales executive at Actavis, also refused to bid, stating: "Thank you for thinking of us on Terconazole.  I'd love to add it to contract but we're not able to take on your business right now."

748.    Similarly, on May 7, 2013, CVS asked Sandoz if they would be interested in bidding on several of the May 2013 Increase products.  C.P., a pricing analyst at Sandoz,

responded internally stating, "[w]e can supply the Beta Dip Cream, Beta Val Cream,

Terconazole V Cream immediately and the Carbamazepine XR will require a 4 month lead

time." To that, Kellum responded: "Guys – we do not want to pursue these products with CVS

right now. We'll need to figure out good explanation etc. . . ."

749.    At the same time, Taro was confident based on its conversations with competitors

that its increases would stick. For example, when Kaiser gave Taro push back on the May 2013

Increases, including asking for "justification for the price adjustment on Clomipramine and

Desonide," Aprahamian saw no need for explanation and in an internal e-mail responded

simply, "[t]hey can accept the increase or move the product." Ultimately, Aprahamian's

approach yielded results and Taro retained the business at the higher pricing.

750.    Similarly, on May 8, 2013, Cardinal e-mailed D.S. of Taro stating that regarding

Desonide, "[t]here is a player that is not following you – you can see that you are losing sales.

Do you want to re-evaluate?" D.S. forwarded the e-mail internally and Aprahamian responded,

"its been exactly one week since the adjustments, can't image 'lost sales' are visible in such a

short time. We need to stay the course." Perfetto added, "Ditto."

751.    Further, by the time the May 2013 Increases were publicly announced, Taro's

competitors were already well on their way to implementing comparable price increases of their

own. For example, by May 1, 2013, the day that Taro published its increased WAC pricing,

Actavis had already conducted its own price increase analysis for Terconazole Cream and had

revised its contract pricing to follow the Taro increase.

752.    Similarly, one day later on May 2, 2013, Kellum e-mailed the Sandoz Pricing

Committee recommending that Sandoz increase prices on six of the seven Sandoz products on

Taro's May 2013 Increase list. The power point presentation that Kellum submitted to the

Committee contained no detailed price increase analysis and noted simply that Sandoz should

increase because Taro had raised prices on those products:

| Product | Strength(s) | Competitors | | Comment |
|---|---|---|---|---|
| | | Active | Market Share* | Taro raised price on May 1, 2013. |
| Alcometasone Cream | 15g, 45g, 60g | Glenmark<br>Taro<br>Sandoz | 82%<br>14%<br>4% | |
| Betameth Cream/Lotion | 0.05%<br>0.1% | Taro<br>Actavis<br>Sandoz | 35%<br>35%<br>30% | Taro raised price on May 1, 2013. |
| Carbamazepine XR Tabs | 200mg, 400mg | Taro<br>Sandoz | 55%<br>45% | Taro raised price on May 1, 2013. |
| Clomipramine Caps | 25 mg, 50mg, 75mg | Sandoz<br>Mylan<br>Sandoz | 65%<br>33%<br>2% | Taro raised price on May 1, 2013. |

753.    Over the next several months, and consistent with their ongoing understandings,

Taro's competitors – Sandoz, Perrigo, Actavis, Mylan, and Glenmark – followed Taro's May

2013 Increases with increases of their own.  Several of these competitor price increases, and their

corresponding dates, are detailed in the chart below:[6]

| Drug | Competitors | Lead/Followed | Date |
|---|---|---|---|
| Alclometasone Diproproprionate Cream | Sandoz<br>Glenmark | Followed<br>Followed | 5/10/13<br>5/16/13 |
| Ammonium Lactate Cream | Actavis<br>Perrigo | Followed<br>Followed | 6/25/13<br>7/30/13 |
| Ammonium Lactate Lotion | Actavis<br>Perrigo | Followed<br>Followed | 6/25/13<br>7/30/13 |
| Betamethasone Diprorionate Lotion | Sandoz | Followed | 7/26/13 |
| Betamethasone Diprorionate Cream | Sandoz | Followed | 7/26/13 |
| Betamethasone Valerate Cream | Sandoz | Followed | 7/26/13 |
| Carbamazepine Extended Release Tablets | Sandoz | Followed | 5/10/13 |
| Clomipramine Hydrochloride Capsules | Mylan<br>Sandoz | Followed<br>Followed | 5/16/13<br>7/22/13 |
| Desonide Cream | Perrigo<br>Actavis | Followed<br>Re-entered and Matched | 5/21/13<br>8/15/13 |
| Desonide Ointment | Perrigo<br>Sandoz | Followed<br>Re-entered and Matched | 5/21/13<br>1/17/14 |
| Terconazole Cream | Actavis | Followed | 6/5/2013 |

---

[6]  This list is likely not exhaustive and is based on the information available to the Plaintiff States

to date.

192

754.    Consistent with past practice, the competitors also often spoke before they followed with a price increase.  By way of example, and as detailed in the chart above, Sandoz followed Taro's price increases on Alclometasone Cream and Carbamazepine ER with its own price increases on May 10, 2013, and Glenmark followed Taro's and Sandoz's price increases on Alclometasone Cream shortly thereafter, on May 16, 2013.  The following chart details the competitor calls surrounding those increases:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/6/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 7:33:00 | 0:01:00 |
| 5/6/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 8:32:00 | 0:01:00 |
| 5/7/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:01:00 | 0:07:00 |
| 5/8/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 2:44:00 | 0:02:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 5:09:00 | 0:08:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:30:00 | 0:09:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 4:42:00 | 0:02:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 4:45:00 | 0:01:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 4:51:00 | 0:07:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 5:29:00 | 0:01:00 |
| 5/13/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 13:10:00 | 0:01:00 |
| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:01:00 |
| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Perfetto, Mike (Taro) | 4:00:00 | 0:18:00 |
| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 5:23:00 | 0:01:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 11:56:00 | 0:01:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | CW-3 (Sandoz) | 12:27:00 | 0:05:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | CW-3 (Sandoz) | 12:49:00 | 0:05:00 |

755.    Similarly, Sandoz followed the Taro price increases on Betamethasone Dipropionate Cream and Lotion and Betamethasone Valerate Cream on July 28, 2013.  In the days leading up to the Sandoz price increase, Aprahamian exchanged several calls with CW-3, including a call on July 23, 2013 that lasted three (3) minutes.  During that call, CW-3 conveyed to Aprahamian that Sandoz would be increasing prices on several Taro products, including the Betamethasone products.  CW-3's contemporaneous notes from that call are detailed below:

756.    Lastly, Perrigo followed the Taro price increases on Desonide Cream and Ointment on May 21, 2013 and Actavis re-entered the Desonide Cream market and matched the competitors' pricing on August 15, 2013.  The chart below details at least some of the communications between the three competitors in the days surrounding these market events:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:38:00 | 0:02:00 |
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | T.D. (Actavis) | 4:41:00 | 0:11:00 |
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:56:00 | 0:17:00 |
| 5/22/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:22:00 | 0:02:00 |
| 5/22/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 12:32:20 | 0:00:19 |
| 5/22/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 12:46:00 | 0:14:00 |
| 5/23/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 11:01:47 | 0:24:02 |
| 8/7/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:47:00 | 0:02:00 |
| 8/7/2013 | Voice | Perfetto, Mike (Taro) | Incoming | Boothe, Douglas (Perrigo) | 10:33:00 | 0:13:00 |
| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Incoming | Falkin, Marc (Actavis) | 14:52:00 | 0:11:00 |
| 8/8/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 6:32:00 | 0:06:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:24:00 | 0:03:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 9:25:00 | 0:03:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:28:00 | 0:05:00 |
| 8/9/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 10:39:00 | 0:03:00 |
| 8/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.B. (Actavis) | 7:13:00 | 0:09:00 |

757.    Consistent with their ongoing understandings, Taro exercised restraint, just as its competitors had done, and did not poach customers from its competitors after they followed with price increases of their own.  For example, on May 23, 2013, Econdisc reached out to Taro asking for a bid on Alclometasone Cream.  Aprahamian asked D.S., a Taro sales executive, why Econdisc was looking for a bid and D.S. replied: "Glenmark recently adjusted prices at Econdisc.

So Econdisc is seeing if we want to pick up some market share. We can supply . . . However, I did tell [Econdisc] our supply is tight. So if we do not bid, I have an out." Aprahamian responded: "No, we can not take on." Consistent with Aprahamian's directive, Taro subsequently declined to bid on the business.

758.    The competitors continued to communicate about the May 2013 Increase products even after the competitors had followed the increases. These open lines of communication were important to ensure that the competitors did not run afoul of the delicate market share balance they had achieved with each other.

759.    For example, in September 2013, D.S. of Taro called CW-4 of Sandoz to tell her that Taro's Carbamazepine ER product was being held up at the border. As a result, Sandoz would likely be receiving requests from Taro customers for the product. By conveying this to CW-4, D.S. was sending the message that Taro would lose customers if Sandoz sold too much and Taro would have no choice but to compete to get its market share back. This would disrupt the market and cause prices to deteriorate across the board.

760.    After speaking with D.S., CW-4 sent an internal e-mail, including to Defendant Kellum, stating: "We need to keep a tight reign on our Carbamazepine ER as it seems Taro's production is held up at the border waiting for FDA to approve. Wholesalers are out of their product by next week so we will start seeing activity within 5 days or so." Kellum responded in agreement: "Let's put on strict allocation – please. I'd like to review options for our inventory."

### iv.    Building Upon Early Successes – Taro's Continued Collusion Over The Ensuing Years

761.    Over the next several years – indeed into at least early January 2016 – Defendants Aprahamian and Perfetto continued to use their contacts at competitor companies to collude on overlapping products and improve Taro's bottom line. During these years, Aprahamian and

195

Perfetto expanded their efforts to allocate markets and fix prices on additional products – including several non-topical products – and to collude with additional competitors. Although the Taro executives continued to collude with their key competitors – Sandoz, Perrigo, Actavis, Mylan, and Glenmark – they also coordinated with their contacts at other companies including Rising, Lannett, Wockhardt, Amneal, and G&W. By 2016, a large majority of the company's business was implicated by the executives' anticompetitive conduct.

762.    The following Section discusses this collusion in further detail as it relates to specific products.

a)    **Alclometasone Dipropionate Ointment**

763.    Alclometasone Dipropionate Ointment ("Alclometasone Ointment"), also known by the brand name Aclovate, is a topical steroid used to treat inflammation and itching caused by skin conditions such as allergic reactions, eczema, and psoriasis.

764.    As discussed above in an earlier Section, Taro, Sandoz, and Glenmark colluded to significantly raise the price of Alclometasone Cream in May 2013. Simultaneously, those same three competitors were also coordinating on Alclometasone Ointment.

765.    In May 2013, Sandoz was the exclusive generic manufacturer of Alclometasone Ointment. The other competitors – Taro and Glenmark – had exited the market due to supply issues. However, around this time, Sandoz began experiencing supply issues of its own on Alclometasone Ointment. As a result, Taro and Glenmark – in consultation with Sandoz – used this as an opportunity to raise the price of the product and re-enter at that higher price.

766.    As detailed above, the competitors were discussing their plans for Alclometasone Cream and Ointment as early as April 2013. For example, on April 15 and April 16, 2013, CW-3 of Sandoz exchanged several calls with Defendants Aprahamian of Taro and Blashinsky of

Glenmark.  On these calls, Blashinsky relayed that Glenmark expected to re-enter the

Alclometasone Ointment market in the "next couple days" and was seeking "25-30" percent

share.  CW-3 took contemporaneous notes during these conversations, and his complete notes

from those calls are pictured below:



767.    Three days later, on April 19, 2013, CW-3 of Sandoz e-mailed M.A., a Sandoz

marketing executive, stating "[a] customer informed me that Glenmark will be launching Alclo

OT soon.  Can you send a quick report with the last 12mos of sales by cust.  Reviewing how

much share each customer represents to us."  However, the true source of CW-3's information

was Glenmark, not a customer.  CW-3 wanted a breakdown of sales by customer so that he could

understand how best to divide up customers as Glenmark entered the market.

768.    On May 23, 2013, Sandoz sent an internal e-mail advising that it could no longer

supply the 45gm formulation of Alclometasone Ointment.  At that time, both the 15gm and

60gm formulations were also on temporary back order.  That same day, on May 23, 2013, CW-3 called Blashinsky and they spoke for four (4) minutes.

769.    On May 29, 2013, D.S., a Taro sales executive, forwarded Aprahamian an e-mail he received from Cardinal regarding Sandoz's supply issues on Alclometasone Ointment.  The next day, Aprahamian responded, "fire it up and get back in (alclometasone ointment). . . .  [I] do think there is an opportunity to adjust pricing on our way in.  Also, [w]e want to enter the market with wholesalers only and have accounts pull through them (controlled distribution) . . . We can discuss.  Let me know what you need from me to expedite."

770.    Over the next several days, Taro had several calls with Glenmark during which the two competitors coordinated their plans to increase pricing in advance of their re-entry into the Alclometasone Ointment market.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/31/2013 | Voice | Blashinsky, Mitchell | Incoming | D.S. (Taro) | 9:47:00 | 0:03:00 |
| 5/31/2013 | Voice | Blashinsky, Mitchell | Outgoing | D.S. (Taro) | 11:00:00 | 0:19:00 |
| 6/3/2013 | Voice | Blashinsky, Mitchell | Outgoing | Taro Pharmaceuticals | 13:03:00 | 0:06:00 |
| 6/3/2013 | Voice | Blashinsky, Mitchell | Outgoing | Taro Pharmaceuticals | 13:09:00 | 0:14:00 |

771.    On June 6, 2013, after exchanging e-mails with Taro's supply chain regarding Alclometasone Ointment, Aprahamian sent an internal e-mail stating, "[i]'ll coordinate market adjustment on the ointment and get pricing to wholesalers."  The next day, on June 7, 2013, Aprahamian called CW-3 of Sandoz and they spoke for eleven (11) minutes.

772.    On June 10, 2013, Glenmark re-entered the Alclometasone Ointment market with WAC pricing that was significantly higher than Sandoz's WAC pricing.  The next day, on June 11, 2013, Taro issued notices to the three big wholesalers – ABC, Cardinal, and McKesson – announcing it was re-entering the Alclometasone Ointment market at new WAC pricing that

matched Glenmark.  Taro increased its WAC pricing between 201% and 239%, depending on the formulation.

773.    That same day, on June 11, 2013, M.A. of Sandoz sent an internal e-mail indicating that Taro had increased pricing on Alclometasone Ointment.  J.R., a senior Sandoz marketing executive, responded approvingly: "Thanks, [M.A.].  Taro has been nice and aggressive."

774.    The next day, on June 12, 2013, Aprahamian e-mailed Perfetto and J.K., a Taro executive, regarding Alclometasone Ointment stating that Taro had launched the product and "[w]e did adjust the pricing to reflect current market conditions.  We have received interest from the wholesalers and do anticipate filling a void in the market.  This will be a controlled distribution into the wholesale channel initially to maximize the asset."

775.    That same day, S.B., a Taro sales executive, e-mailed Aprahamian stating, "[w]e had discussed possibly HD Smith, are we going to wait on the response from the big 3?  or move forward?"  Aprahamian responded: "I'm fine IF they have a need."  S.B. replied: "I'll get the usage, wanted to get the OK before I brought up the product."  Aprahamian – not wanting to take more share than Taro was entitled to – responded, "make sure they have supply issues . . .."

### b)    Fluocinonide Solution

776.    Fluocinonide Solution ("Fluocinonide Solution), also known by the brand name Lidex, is a corticosteroid used to treat a variety of skin conditions, such as eczema, dermatitis, allergies, and rash.  Fluocinonide Solution comes in 20ml and 60ml bottles.

777.    As detailed above in an earlier Section, Fougera (now Sandoz) and Taro colluded to increase prices on Fluocinonide Solution twice – once in May 2011 and again in February and March 2012.

778.     On June 17, 2013, Actavis filed a "CBE 30" application with the FDA, which would allow it to use an old ANDA to sell Fluocinonide Solution after having been out of the market for many years.  Actavis targeted the third week of July 2013 for its official launch date and identified a market share goal of 20% to 25%.

779.     Beginning on June 17, 2013, and over the next several days, several Actavis employees exchanged calls with Defendants Aprahamian and Perfetto of Taro.  At the same time, Aprahamian was communicating with his contact at Sandoz, CW-3.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 6/17/2013 | Voice | Rogerson, Rick (Actavis) | Outgoing | Aprahamian, Ara (Taro) | 14:20:37 | 0:00:35 |
| 6/18/2013 | Voice | Perfetto, Mike (Taro) | | T.D. (Actavis) | 13:35:00 | 0:08:00 |
| 6/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 10:27:00 | 0:01:00 |
| 6/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | Rogerson, Rick (Actavis) | 10:47:00 | 0:12:00 |
| 6/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:08:00 | 0:15:00 |
| 6/19/2013 | Voice | Rogerson, Rick (Actavis) | Incoming | Aprahamian, Ara (Taro) | 14:48:04 | 0:11:54 |
| 6/27/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 4:25:00 | 0:13:00 |
| 6/27/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:39:00 | 0:07:00 |
| 6/27/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:15:00 | 0:03:00 |
| 6/28/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | S.C. (Actavis) | 9:47:00 | 0:06:00 |
| 7/2/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.D. (Actavis) | 12:22:00 | 0:39:00 |

780.     Aprahamian was acting as a conduit– conveying information between Actavis and Sandoz – because the two competitors did not have an independent relationship.  For example, as detailed above, in between his communications with Actavis on June 19, 2013, Aprahamian spoke with CW-3 of Sandoz for fifteen (15) minutes.  During that call, CW-3 took the following contemporaneous notes in his Notebook regarding Actavis's entry on Fluocinonide Solution:

781.    On July 5, 2013, Actavis submitted a challenge for Taro's Fluocinonide Solution business at ABC.  On July 9, 2013, ABC alerted Taro of the offer and extended Taro a right of first refusal.  Even though ABC did not disclose the challenger, Taro already knew it was Actavis.

782.    After receiving the price challenge, H.M., a Taro sales executive, acknowledged that "we will need to give up some market share" and asked Aprahamian if ABC was a customer that they wanted to give up.  The following day on July 10, 2013, Aprahamian called three different Actavis sales executives, M.B., T.D. and S.C.  Two of the calls lasted two (2) minutes and the third lasted one (1) minute.

783.    The next day, on July 11, 2013, Aprahamian informed his colleague at Taro, H.M., that "we will not be retaining this business."  The following day, Aprahamian alerted ABC that Taro would not lower its price and, thereafter, ABC awarded the Fluocinonide Solution business to Actavis.

784.    Having secured ABC from Taro, Actavis then focused on securing a larger customer from Sandoz so that Actavis could meet its target share.  In early July, Actavis solicited Walgreens, a large Sandoz customer.

785.    When Actavis formally launched on July 22, 2013, it still had not received a decision back from Walgreens.  The formal launch announcement prompted several companies, including CVS, McKesson, Morris & Dickson, Cigna, and Hannaford, to seek bids from Actavis. Actavis, however, did not provide bids to any of these larger purchasers. The few bids that Actavis sent out in response to solicitations were to smaller potential customers that it determined "wouldn't upset the apple cart" in terms of market share.

786.     Ultimately, Sandoz refused to bid to retain the Walgreens business, and conceded the customer to Actavis.  With this account, Actavis had met its share target and had secured 24% of the Fluocinonide Solution market.

787.     During this time period, Taro and Sandoz were also careful not to poach each other's customers. In early July 2013, Taro was backordered for Fluocinonide Solution.  On July 15, 2013, MMCAP, a Taro customer, reached out to CW-3 asking Sandoz to bid on Fluocinonide Solution.  Only three day later, CW-3 responded to MMCAP and declined to bid claiming supply constraints.  Sandoz's excuse for not bidding was a pretext.  In the intervening time, CW-3 exchanged three (3) text messages with H.M. of Taro and spoke with Aprahamian twice – with one call lasting sixteen (16) minutes and the second lasting eight (8) minutes.

### c)     Taro's August 2013 Price Increases

788.     Following shortly on the heels of the May 2013 Increases, Taro colluded with its competitors – Teva, Sandoz, and Perrigo – to significantly raise prices on three products – Etodolac Tablets, Etodolac ER Tablets (collectively, "Etodolac"), and Hydrocortisone Valerate Cream – in August 2013 (the "August 2013 Increases").  These drugs and their competitors, as well as the dates and sizes of the increases, are detailed in the chart below:

| Drug | Competitors | Lead/Followed | Date | Largest % Increase |
|---|---|---|---|---|
|  | Sandoz | Lead | 7/26/13 |  |
|  | Teva | Followed | 8/9/13 |  |
| Etodolac Tablet | Taro | Followed | 8/9/13 | 433% |
|  | Teva | Lead/Followed | 8/9/13 |  |
| Etodolac Extended Release Tablet | Taro | Lead/Followed | 8/9/13 | 183% |
|  | Perrigo | Lead | 8/1/13 |  |
| Hydrocortisone Valerate Cream | Taro | Followed | 8/9/13 | 351% |

789.     In the weeks leading up to the price increases on Etodolac, Defendant Aprahamian was in frequent communication with his contacts at Teva (Nisha Patel) and Sandoz

(CW-3) to coordinate.[7]   Similarly, and at the same time, Defendant Perfetto was colluding with his contact at Perrigo – Defendant Boothe – regarding Hydrocortisone Valerate Cream.

790.    For example, on July 30, 2013, Perrigo notified its customers that it was increasing prices on a number of different products, including Hydrocortisone Valerate Cream. Notably, at the same time that Perrigo was colluding with Taro on Hydrocortisone Valerate, it was also colluding with other competitors regarding different products on its price increase list – including Promethazine HCL Suppositories (Actavis and G&W) and Ciclopirox Solution (G&W and Sandoz).  These products are discussed in detail in later Sections of this Complaint.

791.    Two days later, on August 1, 2013, Aprahamian instructed a colleague at Taro to begin implementing price increases on Hydrocortisone Valerate and Etodolac.  Aprahamian stated, "[w]e need to get these out next week."  Not wanting to provide the details in writing, Aprahamian concluded: "Will come over and discuss with you."

792.    In the days leading up to the Taro increases, Aprahamian exchanged several calls with Nisha Patel and CW-3 regarding Etodolac, while Perfetto was coordinating with Boothe about Hydrocortisone Valerate.  At least some of those calls are detailed in the chart below:

---

[7]  The collusive relationship and interactions between Taro, Sandoz, and Teva with regard to the drugs Etodolac and Etodolac ER are addressed in greater detail in the Plaintiff States' Teva Complaint, MDL No. 2724, 2:19-cv-02407-CMR, Dkt. No. 106.  Although the Plaintiff States do not seek relief relating to Etodolac herein, the collusive interactions are part of the larger pattern of conduct involving Taro, Sandoz, and Teva, and are discussed herein to provide context for the larger price increase strategy that Taro was employing at this time, and to provide further support for the allegations herein.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/7/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:47:00 | 0:02:00 |
| 8/7/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 7:45:00 | 0:03:00 |
| 8/7/2013 | Voice | Perfetto, Mike (Taro) | Incoming | Boothe, Douglas (Perrigo) | 10:33:00 | 0:13:00 |
| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:19:00 | 0:02:00 |
| 8/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | Patel, Nisha (Teva) | 3:59:00 | 0:01:00 |
| 8/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | Patel, Nisha (Teva) | 4:03:00 | 0:13:00 |
| 8/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 4:37:00 | 0:08:00 |
| 8/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 4:47:00 | 0:01:00 |
| 8/8/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 6:32:00 | 0:06:00 |
| 8/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:42:00 | 0:04:00 |

793.    After this series of communications, on August 9, 2013, Taro followed the

increases on Hydrocortisone Valerate and Etodolac and published WAC pricing that matched its

competitors.

794.    After the August 2013 Increases, several customers voiced concerns over the size

of the increases on Hydrocortisone Valerate Cream.  For example, after receiving Perrigo's

notification on July 30, 2013, one customer e-mailed P.H., a sales executive at Perrigo, asking,

"[w]hy the huge WAC price increase on Hydrocortisone Val?  Is it the Hydro raw material?"

Knowing that there was no real justification for the increase, P.H. responded simply, "I don't

have an answer at this point."

795.    Similarly, on July 31, 2013, T.P., a sales executive at Perrigo, received some

pushback from Walgreens about the Hydrocortisone Valerate price increases.  T.P. passed that

information along to his supervisor, Defendant Wesolowski, a senior Perrigo executive, stating:

"I got yelled at pretty good by WAG yesterday, it is one thing to see it on paper (when we

discussed the new prices over the phone), then when they put the price in the system and see

what the damage is, that hit home hard at WAG yesterday and I got a call from Chris.  . . .

seriously, I estimate that I have raised prices to the tune of 75M at WAG in the last 4 months, we

are at a point where it is getting tougher and tougher . . . WAG is 125M, that is more than ½ the

current DN sales!  That is truly incredible."

### d) Triamcinolone Acetonide Paste

796.    Triamcinolone Acetonide Paste ("Triam Paste"), also known by the brand name Oralone, provides temporary relief from pain symptoms caused by mouth lesions.  In 2013, the annual market size for this drug was approximately $14 million.

797.    As of October 2013, Rising and Taro were the two competitors in the market for Triam Paste and each maintained approximately 50% market share.

798.    In October 2013, Rising was considering implementing a price increase on Triam Paste.  Prior to increasing the price, CW-2, then a senior sales and marketing executive at Rising, reached out to D.S., a Taro sales executive, to discuss the increase.  These calls are detailed in the chart below.  CW-2 felt internal pressure to make money on the product and wanted assurance from D.S. that Taro would follow before Rising raised prices.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/27/2013 | Voice | CW-2 (Rising) | Outgoing | D.S. (Taro) | 13:32:00 | 0:02:00 |
| 9/30/2013 | Voice | CW-2 (Rising) | Incoming | D.S. (Taro) | 5:41:00 | 0:04:00 |
| 10/11/2013 | Voice | CW-2 (Rising) | Outgoing | D.S. (Taro) | 12:09:00 | 0:02:00 |
| 10/14/2013 | Voice | CW-2 (Rising) | Outgoing | D.S. (Taro) | 9:31:00 | 0:04:00 |

799.    Two days after the final call detailed above, on October 16, 2013, Rising increased its WAC pricing for Triam Paste by 25%.  Two weeks later, on November 1, 2013, Taro published increased WAC pricing that matched Rising's pricing exactly.

800.    Prior to implementing the increase, Defendant Aprahamian of Taro described in an internal e-mail that Taro was "adjusting" its prices "based upon current market conditions" and noted that the risk of losing business was "low."  Indeed, the risk was "low" because CW-2 and D.S. had discussed the increase in advance and Taro had confidence that Rising would respect its market position and not poach its customers.

**e)** **Acetazolamide Tablets**

801.    Acetazolamide Tablets ("Acetazolamide"), also known by the brand name Diamox, is an oral solid medication used to treat glaucoma, epilepsy, altitude sickness, periodic paralysis, and heart failure.  Acetazolamide Tablets are available in 250mg and 125mg dosages.  The 250mg dosage is the predominant form.

802.    Since at least 2010, Taro and Lannett have been the only major suppliers of Acetazolamide Tablets.  Taro and Lannett both supply the 250mg dosage and Taro is the only major supplier of the 125mg dosage.

803.    Since 2010, Taro and Lannett have coordinated three lockstep price increases on Acetazolamide:  in December 2010, April 2012, and late fall 2013.  The graph below shows both the lockstep nature of the price increases and their growth in size:



804.    Since at least 2010, each time Taro increased the WAC price of its 250mg dosage of Acetazolamide, it also increased the WAC of its 125mg dosage.

805.    At the start of 2010, Taro and Lannett's WAC prices for the 250mg dosage of Acetazolamide were $34.21 and $32.70, respectively.  These prices remained unchanged until December 2010 when Taro and Lannett raised their prices to almost identical levels within two days of each other.  On December 6, 2010, Taro increased its WAC price for the 250mg dosage by 15% to $40.48.  Two days later, on December 8, 2010, Lannett increased its WAC by 24.26% to $40.75.

806.    The day that Taro increased its prices, December 6, 2010, J.F., a member of Lannett's Board of Directors and an executive at a generics wholesaler, e-mailed K.S., a senior sales and marketing executive at Lannett, about the "good news" that "[T]aro just raised diamox [Acetazolamide]".  K.S. responded early the next morning stating, "[w]e [Lannett] will raise our prices this week."

807.    By April 2012, Taro and Lannett were ready to impose a larger price increase.  On April 3, 2012 at 7:37 in the morning, Defendant Blashinsky, then a senior Taro marketing executive, called K.S. at Lannett.  The call lasted one (1) minute.  That same day, Taro increased its WAC price for the 250mg dosage by 44.5% to $61.43.  Lannett followed and matched Taro's increase two (2) days later on April 5, 2012.  M.B. and K.S. would not speak again until May 9, 2012.

808.    The day of the Taro increase, a Cardinal representative called D.S., a sales executive at Taro, and told him that the customer would be putting Acetazolamide Tablets, as well as other Taro products, out to bid unless the company agreed not to increase prices on those products.  D.S. summarized the call in an e-mail to Blashinsky and asked him how to respond.  Blashinsky replied that Acetazolamide was one of several "safe products" and that the pricing on the product should "remain as is."  What Defendant Blashinsky meant was that Taro had an

understanding with Lannett that Lannett would follow Taro's price increase and it would not poach any of Taro's customers.  On April 10, 2012, Taro submitted reduced pricing to Cardinal for several of the products, but the price of Acetazolamide remained unchanged.

809.    Also on April 3, 2012, Tracy Sullivan., a Lannett sales executive, e-mailed her supervisor, K.S., about bidding on a Target RFP and listed several products including Acetazolamide for which Taro was the current supplier.  Consistent with the ongoing agreement with Taro, K.S. directed Sullivan not to bid on the Acetazolamide business.  The next day, April 4, 2013, Lannett submitted a response to the Target RFP that did not include Acetazolamide.

810.    In March 2013, Taro hired Defendant Aprahamian as a senior sales and marketing executive.  Aprahamian and A.B., a senior-most executive officer at Lannett, had a social relationship that preceded Aprahamian's tenure at Taro.  The two men met up for meals, contemplated joining a horse racing investment group, and did other favors for each other.

811.    Shortly after Aprahamian began working at Taro, in the late fall of 2013, that relationship became collusive and Taro and Lannett coordinated to again raise the price of Acetazolamide – this time by raising it more than 220%.

812.    In the months leading up to the increases, representatives of Taro and Lannett had the opportunity to discuss and coordinate the late fall 2013 price increases in person at trade association meetings and other social occasions.

813.    For example, from August 10 to August 13, 2013, the NACDS held its Total Store Expo in Las Vegas, Nevada.  Representatives from Taro, including Defendant Aprahamian and D.S., and representatives from Lannett, including Sullivan, K.S., A.B., and M.B., a Lannett business and development manager, attended the conference.  Further, representatives from Sun

Pharmaceuticals, Taro's parent company, also attended, including G.S., a senior executive, and S.K., a sales executive.

814.   After the conference, on August 16, 2013, M.B. of Lannett and J.F., a Lannett Board member, had dinner with G.S. and S.K. of Sun.  M.B. of Lannett followed up by e-mail a few days later thanking G.S. for dinner and also "learning from you and [S.K.] about your thoughts on the industry."  M.B. further noted that "[o]nce you settle in I would like to talk to you about some of the opportunities we discussed at dinner with the Acetazolamide."

815.   Representatives from Taro and Lannett also attended the GPhA Fall Technical Conference in Bethesda, Maryland from October 28 through October 30, 2013.

816.   Approximately two weeks later, on November 15, 2013, A.B. of Lannett called Aprahamian twice.  Both calls lasted two (2) minutes.  A.B. called Aprahamian again the next day, on November 16, 2013.  The call lasted one (1) minute.  According to available phone records, the calls on November 15, 2013 were the first calls between the two competitors since August 22, 2012, as well as the first time that they had spoken by phone since Aprahamian joined Taro.

817.   Shortly after these calls, on November 26, 2013, Lannett raised its WAC price on Acetazolamide by 275.5% to $230.65.

818.   Following the increase, Lannett customers reached out to Taro asking the competitor to bid on Acetazolamide.  Consistent with its ongoing understanding with Lannett, Taro turned the business away.

819.   For example, Wal-Mart, a Lannett customer, e-mailed D.S. of Taro on November 26, 2013, asking if Taro was interested in bidding on its Acetazolamide business.  In response, Aprahamian sent an internal e-mail to D.S., and others at Taro, instructing them "[w]e will not be

209

taking on this or any new [Acetazolamide] business."  Aprahamian further advised that they should "lock down [Acetazolamide] inventory as discussed this morning."

820.    Later that same day, another Lannett customer, Meijer, reached out to S.B., a Taro sales executive, asking for a bid on Acetazolamide.  S.B. responded, "[w]e will not be able to supply at this time, receiving multiple requests for this product today.  If the inventory situation changes, I will let you know."  But that explanation was a lie; Taro was not having supply issues at that time.

821.    Following Lannett's increase, Taro's customers, including Cardinal, McKesson, and Morris & Dickson, tried to increase their Acetazolamide orders with Taro at the lower pricing, anticipating that Taro might try to raise its prices as well.  Aprahamian told Taro's supply chain personnel to monitor these increased orders and cut them to historical levels.  He explained that "we will be putting out an adjustment price next week and [I]'m sure some [customers] are already on to us…."

822.    On December 4, 2013, Econdisc, a GPO customer, asked Sullivan of Lannett why the company had increased its pricing on Acetazolamide, noting "it is getting really tough around here on increases."  Sullivan drafted a response that blamed the increases on general market conditions and higher costs of production and forwarded the draft to R.F., a Lannett marketing manager, asking "[c]an I say this?"  R.F. responded:

| | |
|---|---|
| From: | ████ |
| Sent: | Wed, 4 Dec 2013 12:56:52 -0500 (EST) |
| To: | Tracy Sullivan[tsullivan@lannett.com] |
| Subject: | RE: Digoxin |

I wouldn't get into the market part. Even though it is true, we are saying we raised the price because we could.

████

Marketing Manager

( 215-333-9000 x2115

7 267- 350-0069

████

823.    Later that day, Sullivan replied to Econdisc stating that Lannett raised the price on Acetazolamide because "testing requirements to bring Acetazolamide to the market have increased, which has impacted our cost and capacity to manufacture it."

824.    At the same time customers were reacting to Lannett's increase, Taro was in the midst of implementing its own price increase.  On December 1, 2013, Aprahamian e-mailed pricing information for the Acetazolamide increase to the Taro sales team and asked them to coordinate getting Taro's price increase letters out.  Taro sent the letters to its customers on December 11 and December 12, 2013.

825.    On December 13, 2013, Taro raised its WAC price on the Acetazolamide 250mg dosage by 226.5% to match Lannett's pricing at $230.65.

826.    The next day, on December 14, 2013, Aprahamian called A.B. of Lannett.  The call lasted two (2) minutes.  Aprahamian and A.B. would not speak again until April 8, 2014, according to available phone records.

827.    Taro held firm to its increase even when a large distributor, McKesson, asked for a price reduction.  In support of a price reduction, McKesson noted that one of Taro's competitors could sell Acetazolamide for 18.42% below McKesson's current contract price.

211

Aprahamian responded that "Taro will not be adjusting its price and does feel that our prices are market competitive and will allow McKesson to effectively compete" and suggested that the McKesson representative "revisit current market dynamics."  McKesson subsequently closed the issue.

828.   Similarly, on December 16, 2013, Taro's customer MMCAP e-mailed asking why Taro had increased pricing on Acetazolamide.  L.R., a business analyst at Taro, forwarded the request to M.L., a Taro pricing executive, asking for advice on how to respond.  M.L. instructed L.R. to tell MMCAP the increase was "[d]ue to market conditions."

829.   That same day, on December 16, 2013, in a Sales and Marketing conference call, Aprahamian noted to the invitees, including M.L., that the Acetazolamide pricing adjustments "will fill the leaky bucket."

830.   Taro's and Lannett's revenue from Acetazolamide grew substantially with the coordinated price increases.  In 2012, total sales for Acetazolamide were $16,480,000.  Revenue from sales in 2013 rose to $21,270,000 and, in 2014 after the late fall 2013 price increases, total sales of Acetazolamide reached $60,680,000.

831.   Throughout the period of the price increases referenced above, Lannett and Taro maintained a virtually even split of the 250mg market, with each having around 50% of the market.  Overall, combining the markets for the 125mg dosage and 250mg dosage, Taro had approximately 56% of the total market and Lannett had 43%.

### f.   Desonide Ointment

832.   Desonide Ointment is a topical steroid that treats a variety of skin conditions, including eczema, dermatitis, allergies, and rash.

833.    As discussed in detail above in an earlier Section, Taro and Perrigo coordinated to significantly raise prices on Desonide Ointment in May 2013.  At the same time, Taro and Perrigo were also speaking with Sandoz about Desonide Ointment, knowing that Sandoz had plans to re-enter the market.

834.    Indeed, as early as March 2013, Sandoz began discussing its potential re-entry into the market for Desonide Ointment both internally and with its competitors.

835.    For example, on March 28, 2013, M.A., a Sandoz marketing executive, sent an internal e-mail, including to CW-3, stating "[w]e are trying to evaluate Desonide Ointment, currently a TU [temporarily unavailable] item.  The market is split between Taro and Perrigo.  Could you please provide current contract pricing?"  CW-3 immediately forwarded the e-mail to Defendant Kellum.

836.    The next morning, on March 29, 2013, CW-3 called Kellum and they spoke for seven (7) minutes.  CW-3 then spent the next twenty-five minutes communicating alternately with Defendant Aprahamian and with his superiors at Sandoz.  After each call with Aprahamian, CW-3 would immediately hang up and call either Kellum or CW-1.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 9:41:00 | 0:07:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 9:51:00 | 0:05:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 9:56:00 | 0:10:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 10:06:00 | 0:06:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 10:12:00 | 0:01:00 |

837.    The next business day, on April 1, 2013, CW-3 called T.P. of Perrigo – the other competitor for Desonide Ointment – and they spoke for seventeen (17) minutes.  During that call, T.P. provided CW-3 with a list of products, including Desonide Ointment, for which Perrigo had recently increased prices.  Notably, however, Perrigo had not yet increased pricing on

213

several of those products, including Desonide Ointment.  CW-3's contemporaneous notes from

that call are detailed below:



838.     Later that day, CW-3 typed up the information into an e-mail and forwarded it

along internally, including to Kellum:



| From: | ▮▮▮▮▮ |
|---|---|
| Sent: | Monday, April 01, 2013 3:47 PM |
| To: | Kellum, Armando ▮▮▮▮▮ |
| Cc: | ▮▮▮▮▮ |
| Subject: | Perrigo Increase Products |

All-

As mentioned on the CommOps call earlier today, here are the products Perrigo has recently increased.

1.  Clindamycin Phosphate Foam, 1%
2.  Desonide Cream, 0.05%
3.  Desonide Ointment, 0.05%
4.  Halobetasol Propionate Cream, 0.05%
5.  Halobetasol Propionate Ointment, 0.05%
6.  Hydrocortisone
7.  Hydrocortisone Valerate Cream USP, 0.2%
8.  Ketoconazole Foam, 2%
9.  Permethrin Cream, 5%

Thanks,▮▮▮

839.    The next day, April 2, 2013, CW-3 called Aprahamian and they spoke for six (6) minutes.  CW-3 hung up and immediately called T.P. of Perrigo.  The call lasted five (5) minutes.  On these calls, and as discussed in detail in an earlier Section, the competitors spoke about the products that Taro planned to increase prices on in May 2013, including Desonide Ointment.  CW-3's contemporaneous notes from these calls reflect as much:



840.    Several months later, after both Taro and Perrigo had implemented their price increases on Desonide Ointment, Sandoz was readying to re-enter the market.  On December 18, 2013, M.A., a marketing executive at Sandoz, sent the following internal e-mail summarizing the facts surrounding the re-launch:

**From:** ▇▇▇▇
**Sent:** Wednesday, December 18, 2013 10:48 AM
**To:** ▇▇▇▇▇▇▇▇
**Cc:** Kellum, Armando; ▇▇▇▇▇▇▇
**Subject:** RE: Product re-entry

Hi ▇▇▇

Desonide Ointment Summary:

- Fougera went out of the market April 2012, IMS market for 2012 $9.7M
- Current market is $35.6M, 266% growth (price increase May 2013)
- 2 players, Perrigo 55% and Taro 45%
- Size Breakdown - 15g 60%, 60g 40%
- Channel – 90% Retail, 1% Mail Order, 2% LTC, 3% Clinics/Hospitals, 4% Other
- Approvals – Fougera, Perrigo, Taro, and Galderma
- Share Goal - 10% ramping to 20%, 2014 Sales Forecast $1.5M
- COGs – 15g - $1.36, 60g -$4.65 (2014 COGS 15g $1.71,  60g $5.91)
- Expiry Dating 15g - 24 mos, 60g -36 mos

841.    That same day, CW-3 of Sandoz called T.P. of Perrigo and they spoke for five (5) minutes.  CW-3 hung up and called CW-1 twice.  First thing the next morning, on December 19, 2013, CW-3 called T.P. again.  The call lasted one (1) minute.  CW-3 hung up and immediately

called CW-1 and they spoke for four (4) minutes.  Later that day, CW-3 spoke with Defendant

Aprahamian at Taro.  The call lasted fifteen (15) minutes.

   842.   On January 6, 2014, Sandoz held a Commercial Operations call during which they

discussed, among other things, the Desonide Ointment re-launch.  In particular, they discussed

the market share breakdown between Taro and Perrigo, Sandoz's target market share, and the

anticipated re-launch date of January 17, 2014.  CW-3's contemporaneous notes from the call are

below:



   843.   Two days later, on January 8, 2014, CW-3 called T.P. of Perrigo.  The call lasted

one (1) minute.  The next day, on January 9, 2014, CW-3 called T.P. again and they spoke for

nearly sixteen (16) minutes.  During that call, T.P. provided CW-3 with Perrigo's non-public

pricing for Desonide Ointment at various customers.  T.P. also warned CW-3 not to go after

Walgreens.  CW-3's contemporaneous notes from that call are below:



   844.   Immediately upon hanging up with T.P., CW-3 called Aprahamian and they spoke

for nine (9) minutes.  That same day, Defendant Perfetto of Taro and Defendant Boothe of

Perrigo also exchanged two calls lasting six (6) minutes and twenty-nine (29) minutes,

respectively.

216

845.     On January 16, 2014 – the day before Sandoz's anticipated re-launch – CW-3

called T.P. of Perrigo and they spoke for ten (10) minutes.  CW-3 hung up and immediately

called CW-1.  The call lasted eight (8) minutes.  A few days later, on January 22, 2014,

Aprahamian called CW-3.  The call lasted one (1) minute.  On January 24, 2014, CW-3 called

Aprahamian back and they spoke for twenty-two (22) minutes.

846.     On these calls, T.P. of Perrigo and Aprahamian of Taro provided CW-3 with non-

public pricing for Desonide Ointment at various customers.  The competitors also discussed

which customers they would agree to cede to Sandoz.  CW-3 contemporaneously listed this

information in his Notebook and placed check marks next to the customers that Perrigo and Taro

agreed to give up to Sandoz.  These notes are below:



847.     In accordance with their agreement, on January 28 and January 29, 2014, Sandoz

submitted bids for Desonide Ointment to Taro's customers Econdisc, McKesson, and Omnicare,

and to Perrigo's customer, Rite Aid.  In each instance, the competitors declined to reduce their

pricing to retain the business.  As a result, the customers awarded their Desonide Ointment

business to the new entrant, Sandoz.

217

848.    On February 13, 2014, Sandoz was presented with the opportunity to supply Cardinal with Desonide Ointment.  Not wanting to disturb the delicate market balance it had negotiated with its competitors, CW-1 responded, "Cardinal is currently with Taro, and we recently signed Omnicare, econdisc and Mckesson (verbal at this point).  I do not want to go after more Taro accounts at this time.  I would blame supply."

### g)    Taro's June 2014 Price Increases

849.    Building on its successes in 2013, Taro set its sights even higher in 2014, implementing a number of significant price increases, including several of the largest WAC increases across the industry that year.  As they had done in the past, Defendants Aprahamian and Perfetto focused their efforts on increasing prices on those products where they had strong relationships and ongoing understandings with individuals at competitor companies.

850.    For example, in April 2014 Taro capitalized on its relationships with Teva and Sandoz to significantly raise prices on Ketoconazole Cream and Tablets.  Defendant Aprahamian coordinated with Nisha Patel of Teva and CW-3 of Sandoz, while CW-1 of Sandoz also communicated directly with Patel.  The collusion on Ketoconazole is discussed in detail in the Plaintiff States' Teva Complaint and is referred to herein for illustrative purposes only.

851.    Shortly thereafter, in June 2014, Taro increased pricing on several different products (the "June 2014 Increases").  Some of these products had also been the subject of coordinated increases in 2013 – including Carbamazepine ER Tablets (with Sandoz) and Hydrocortisone Valerate Cream (with Perrigo).  As a result of these increases, Taro expected approximately $289 million in additional revenues – more than 2 ½ times what Taro had expected from the May 2013 Increases.  Several of these products, their corresponding WAC increases, and Taro's competitors are detailed in the chart below:

218

| PRODUCT DESCRIPTION | LARGEST % WAC INCREASE | COMPETITORS |
|---|---|---|
| Carbamazepine Tablet | 2337% | Teva, Torrent, Apotex |
| Carbamazepine Chewable Tablet | 392% | Teva, Torrent |
| Carbamazepine Extended Release Tablet | 23% | Sandoz |
| Clobetasol Proprionate Cream | 2138% | Sandoz, Hi-Tech, Actavis (entered in Mar 2015) |
| Clobetasol Proprionate Emollient Cream | 1011% | Sandoz, Hi-Tech |
| Clobetasol Proprionate Gel | 2008% | Sandoz, Hi-Tech, Perrigo |
| Clobetasol Proprionate Ointment | 2316% | Sandoz, Hi-Tech |
| Clobetasol Proprionate Solution | 953% | Sandoz, Hi-Tech, Wockhardt |
| Clobetasol Proprionate Lotion | 65% | Actavis, Perrigo |
| Clotrimazole Topical Solution | 208% | Teva |
| Fluocinonide Cream .05% | 754% | Teva |
| Fluocinonide Emollient Cream | 430% | Teva |
| Fluocinonide Gel | 491% | Teva, Sandoz |
| Fluocinonide Ointment | 483% | Teva |
| Hydrocortisone Valerate Cream | 44% | Perrigo |
| Phenytoin Sodium Extended Release Capsule | 210% | Amneal, Mylan, Sun |
| Warfarin Sodium Tablet | 220% | Teva, Zydus, Upsher-Smith |

852.    As it had done in the past, Taro communicated with several of its competitors in advance of the June 2014 Increases and, consistent with their ongoing understandings, the competitors agreed to follow with comparable price increases of their own.

853.    For example, on May 14, 2014, Taro had finalized its list of products to include in the June 2014 Increases and Defendant Aprahamian forwarded the list to K.S., a senior executive at Taro, for his review and approval.  That same day, Aprahamian exchanged eight (8) text messages and one five (5) minute phone call with Patel of Teva.  Taro overlapped with Teva on seven (7) of the June 2014 Increase products – including Fluocinonide, Carbamazepine, Clotrimazole, and Warfarin. [8]

854.    After speaking with Aprahamian, Patel directed a colleague to create a list of future Teva price increase candidates, based on a set of instructions and data she had given to her

---

[8]  The collusive relationship and interactions between Taro and Teva with regard to the drugs Fluocinonide, Carbamazepine, Clotrimazole, and Warfarin are addressed in greater detail in the Plaintiff States' Teva Complaint, MDL No. 2724, 2:19-cv-02407-CMR, Dkt. No. 106.  Although the Plaintiff States do not seek relief relating to those drugs in this Complaint, the collusive interactions are part of the larger pattern of conduct and are discussed herein to provide context for the larger price increase strategy that Taro was employing at this time, and to provide further support for the allegations herein.

Teva colleague.  On May 28, 2014, that colleague sent her a list titled "2014 Future Price

Increase Candidate Analysis."  The list included several drugs from Taro's June 2014 Price

Increase list – with the notation "Follow/Urgent" listed as the reason for the increase.  Notably,

however, Taro had not yet increased prices on those drugs or notified its customers that it would

be doing so.  The relevant portions of that spreadsheet are set forth below:

| Item Description | Product Family | BUCKET |
|---|---|---|
| CARBAMAZEPINE TABLETS 200MG 100 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 1000 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 15GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 30GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 60GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 15GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 30GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 60GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE GEL 0.05% 60GM | FLUOCINONIDE TOPICAL GEL | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 15GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 30GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 60GM | FLUOCINONIDE OINTMENT | Follow/Urgent |

855.    Similarly, on Friday May 15, 2014, the day after Taro finalized its June 2014

Increase list, Aprahamian called CW-3 of Sandoz and the two competitors spoke for fifteen (15)

minutes.  Taro overlapped with Sandoz on seven of the June 2014 Increase products – including

Carbamazepine ER Tablets and various formulations of Clobetasol Propionate.   The following

Monday, on May 19, 2014, CW-3 sent an internal e-mail, including to Defendant Kellum and

CW-1, advising them of the Taro increases:

From: ███████████
**Sent:** Monday, May 19, 2014 9:30 AM
**To:** Kellum, Armando; ████████████████████████
**Cc:** ███████████████
**Subject:** Taro Price Increases

All-

As an FYI, per customer intel received on Friday, Taro has increased pricing on all Clobetasol's, Fluocinonides and Carbamazepine.  Attached you will find a spreadsheet listing the NDC's for Clobetasol and Fluocinonide.

Thanks ███████

███████
Director, National Accounts
Sandoz Inc.
506 Carnegie Center, Suite 400
Princeton, NJ 08540
USA

Notably, the source of the information was not "a customer," but his competitor, Defendant

Aprahamian.  Further, Taro had not yet increased pricing on these products and would not do so

for another several weeks.  Later that day, CW-3 called Aprahamian.  The call lasted one (1)

minute.

856.    Further, on May 27, 2014, Aprahamian exchanged three calls with M.C., a sales

executive at Wockhardt, including one call lasting nine (9) minutes.  Taro overlapped with

Wockhardt on one June 2014 Increase product – Clobetasol Solution.  That same day, ABC

reached out to C.U., a sales executive at Taro, asking for a bid on Clobetasol Solution because

Wockhardt was having issues with the FDA.  Having spoken with M.C. earlier in the day and

knowing that the competitors had discussed coordinating a price increase on the product,

Aprahamian responded, "nothing is confirmed yet.  Don't want to send any communication out

just yet.  We will certainly keep our eyes on it."

857.    On June 2, 2014, Taro sent letters to its customers notifying them of the June

2014 Increases.  The next day, on June 3, 2014, Taro published new WAC pricing for the

affected products.  In the days leading up to these actions by Taro, and in the days that followed,

Aprahamian and Perfetto reached out to their competitors -- Sandoz, Perrigo, Actavis, Teva, Hi-

Tech, Wockhardt, Mylan, and Amneal -- to discuss the increases and limit competition between them.  These communications are detailed in the chart below:

| | |
|---|---|
| **Teva:** Aprahamian speaks to Patel on 5/14, 6/3, 6/4 | **Sandoz:** Aprahamian speaks to CW-3 on 5/15, 5/19, 5/27, 5/28, 6/3, 6/4, 6/6 (2 calls) |
| **Hi-Tech:** Aprahamian speaks to E.B.  on 6/6 (2 calls), 6/9 (2 calls) | **Actavis:** Aprahamian speaks to Falkin on 6/4 (2 calls) and M.D. on 6/4; Perfetto speaks to M.D. on 6/6 |

| PRODUCT DESCRIPTION | COMPETITORS |
|---|---|
| Carbamazepine Tablet | Teva, Torrent, Apotex |
| Carbamazepine Chewable Tablet | Teva, Torrent |
| Carbamazepine Extended Release Tablet | Sandoz |
| Clobetasol Proprionate Cream | Sandoz, Hi-Tech, Actavis (entered in Mar 2015) |
| Clobetasol Proprionate Emollient Cream | Sandoz, Hi-Tech |
| Clobetasol Proprionate Gel | Sandoz, Hi-Tech, Perrigo |
| Clobetasol Proprionate Ointment | Sandoz, Hi-Tech |
| Clobetasol Proprionate Solution | Sandoz, Hi-Tech, Wockhardt |
| Clobetasol Proprionate Lotion | Actavis, Perrigo |
| Clotrimazole Topical Solution | Teva |
| Fluocinonide Cream .05% | Teva |
| Fluocinonide Emollient Cream | Teva |
| Fluocinonide Gel | Teva, Sandoz |
| Fluocinonide Ointment | Teva |
| Hydrocortisone Valerate Cream | Perrigo |
| Phenytoin Sodium Extended Release Capsule | Amneal, Mylan, Sun |
| Warfarin Sodium Tablet | Teva, Zydus, Upsher-Smith |

| | | | |
|---|---|---|---|
| **Perrigo:** Perfetto speaks to Boothe on 6/3 (4 calls) | **Wockhardt:** Aprahamian speaks to M.C. on 5/27 (3 calls) | **Amneal:** Aprahamian speaks to S.R. on 6/6 (2 calls) | **Mylan:** Aprahamian speaks to M.A. on 6/4, 6/6, and 6/9 |

858.    After receiving notification of the increases, several customers complained to Taro about the size of the increases.  However, confident in their strategy – and the strength of the ongoing understandings they had with their competitors – Aprahamian advised his colleagues that Taro should stay the course and stick with the plan.

859.    For example, on June 24, 2014, McKesson e-mailed Taro stating, "[i]f you take the price increase, we will need to re-evaluate your awards as there are lower priced alternatives. You stand to lose your awards on all the price increase products.  Please confirm that you are moving forward with the price increase."  E.G., a Taro sales executive, forwarded McKesson's e-

222

mail to Aprahamian who responded, "[w]e are fine, we have done this before.  We always have

risk.  Will call Jason."  E.G. replied, "[w]hat do you want me to do?" and Aprahamian stated,

"[c]all her and explain national increase.  Our PI stands."

860.     Similarly, on June 27, 2014, ABC sent out a request for bids on multiple products,

including several that Taro had increased prices on, and cited the reason as "Change In Market

Dynamics."  C.U., a sales executive at Taro, forwarded the ABC request along internally, stating

that he had left a message with the ABC representative to discuss the request.  A.L., a Taro

pricing executive, responded: "No no, don't need to call yet, these are our products.  They are

looking to see if they can get better pricing as a result of recent adjustment.  Talk to Ara first, this

might be where we just stay put and wait."  To that, Aprahamian replied: "Correct . . . these are

our products. . .. They have our price, just a matter if anyone else will take our business."

861.     Sandoz also received the ABC request on June 27, 2014.  Defendant Kellum

forwarded it along internally, including to CW-1, stating simply: "Price in teases."  Although

CW-1 already knew that Taro had increased prices, he responded to Kellum's e-mail asking,

"[w]ho increase[d] [C]lobetasol?"  Kellum replied, "Taro" and CW-1 quickly answered, "I was

kidding.  I say we go after CVS."  Kellum responded sarcastically: "LOL  Great thinking!"  Of

course, and consistent with past practice and the ongoing understanding between the two

competitors, Kellum and CW-1 did not want bid at CVS.  Further, on July 1, 2014, Kellum e-

mailed the larger Sandoz team about the ABC request stating, "[i]t seems obvious these are price

increase related.  I do not want to bud[sic] under these circumstances.  We need to understand

the situation and see if we can maximize the opportunity rather than punishing the incumbent."

862.     Not surprisingly given Taro's understandings with its competitors, on July 11,

2014, ABC e-mailed C.U. to advise him that Taro had retained all of its business at ABC because

"[n]o one bid on your products."  C.U. forwarded the e-mail along to Aprahamian, stating

excitedly, "FYI!"  Aprahamian then forwarded the e-mail to Perfetto stating: "Read trail below . .

.."

863.     Consistent with past practice, and their ongoing understandings, the competitors

uniformly followed the July 2014 Increases and matched Taro's increased WAC pricing.  These

competitor price increases, and their corresponding dates, are detailed in the chart below:

| Drug | Competitor | Lead/Follower | Date Action |
|------|-----------|---------------|-------------|
| | Apotex | Followed | 7/11/14 |
| | Teva | Followed | 8/28/14 |
| Carbamazepine Tablet | Torrent | Followed | 9/12/14 |
| | Teva | Followed | 8/28/14 |
| Carbamazepine Chewable Tablet | Torrent | Followed | 9/12/14 |
| Carbamazepine Extended Release Tablet | Sandoz | Followed | 8/26/14 |
| | Sandoz | Followed | 7/18/14 |
| Clobetasol Proprionate Cream | Hi-Tech | Followed | 8/9/14 |
| | Sandoz | Followed | 7/18/14 |
| Clobetasol Proprionate Emollient Cream | Hi-Tech | Followed | 8/9/14 |
| | Sandoz | Followed | 7/18/14 |
| Clobetasol Proprionate Gel | Hi-Tech | Followed | 8/9/14 |
| | Sandoz | Followed | 7/18/14 |
| Clobetasol Proprionate Ointment | Hi-Tech | Followed | 8/9/14 |
| | Sandoz | Followed | 7/18/14 |
| | Hi-Tech | Followed | 8/9/14 |
| Clobetasol Proprionate Solution | Wockhardt | Followed | 9/2/14 |
| Clotrimazole Solution | Teva | Followed | 8/28/14 |
| Fluocinonide Cream .05% | Teva | Followed | 7/1/14 |
| Fluocinonide Emollient Cream | Teva | Followed | 7/1/14 |
| | Teva | Followed | 7/1/14 |
| Fluocinonide Gel | Sandoz | Followed | 10/10/14 |
| Fluocinonide Ointment | Teva | Followed | 7/1/14 |
| Hydrocortisone Valerate Cream | Perrigo | Followed | 7/24/14 |
| | Sun | Followed | 7/14/14 |
| | Mylan | Followed | 7/16/14 |
| Phenytoin Sodium Extended Release Tablets | Amneal | Followed | 9/1/14 |
| | Zydus | Followed | 6/13/14 |
| Warfarin Sodium Tablet | Teva | Followed | 8/28/14 |

864.     The products on which Taro and Teva conspired are discussed in detail in the

Plaintiff States' Teva Complaint.  The following Sections explore in further detail the non-Teva

overlap products that are the subject of this Complaint – Carbamazepine ER Tablets, Clobetasol

Propionate, Hydrocortisone Valerate Cream, and Phenytoin Sodium ER Tablets.

### a. Carbamazepine ER Tablets and Clobetasol Propionate

865.    Carbamazepine ER, also known by the brand name Tegretol XR, is a drug

prescribed for the prevention and control of seizures, for the relief of nerve pain, and for the

treatment of certain mental and mood disorders such as bipolar disorder and schizophrenia.  In

2012, the annual market for Carbamazepine ER Tablets in the United States exceeded $100

million.

866.    At all relevant times, Taro and Sandoz have been the only competitors in the

market for Carbamazepine ER.

867.    As detailed above in earlier Sections, Taro and Sandoz have a long history of

collusion on Carbamazepine ER – dating back to 2009 when Taro entered the market as the first-

to-file generic and Sandoz entered as the AG.  At that time, CW-4 of Sandoz coordinated with

D.S. of Taro to allocate the market as both companies entered the market.  Similarly, in May

2013, CW-3 of Sandoz colluded with Defendant Aprahamian of Taro to increase prices on

Carbamazepine ER – along with a list of other products that Taro and Sandoz overlapped on.

868.    Given that history, not surprisingly, when Taro added Carbamazepine ER to its

June 2014 Price Increase list, it described the increase as "Low" risk.

869.    Clobetasol Propionate ("Clobetasol"), also known by the brand name Temovate,

is a corticosteroid that comes in various formulations and is used to treat skin conditions such as

eczema, contact dermatitis, seborrheic dermatitis, and psoriasis.

870.    As of June 2014, Sandoz and Hi-Tech were Taro's primary competitors on the various formulations of Clobetasol, including the Cream, Emollient Cream, Gel, Ointment, and Solution.  In addition, Wockhardt marketed the Solution.

871.    As detailed above, Taro spoke with each of these competitors in the days leading up to the increases on Carbamazepine ER and Clobetasol.  The sequence and timing of these calls is listed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/15/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:42:00 | 0:15:00 |
| 5/19/2014 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:23:00 | 0:01:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.C. (Wockhardt) | 9:35:00 | 0:01:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.C. (Wockhardt) | 9:36:00 | 0:01:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.C. (Wockhardt) | 9:39:00 | 0:09:00 |
| 5/27/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:17:00 | 0:01:00 |
| 5/28/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 8:37:00 | 0:10:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 9:16:00 | 0:01:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Incoming | Boothe, Douglas (Perrigo) | 14:03:00 | 0:01:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 14:04:00 | 0:05:00 |
| 6/3/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 14:06:00 | 0:01:00 |
| 6/3/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 15:23:00 | 0:01:00 |
| 6/4/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:04:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 6:54:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 12:34:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 12:52:00 | 0:01:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:14:00 | 0:08:00 |
| 6/9/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 6:26:00 | 0:10:00 |
| 6/9/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | E.B. (Hi-Tech) | 6:35:00 | 0:01:00 |

872.    After Taro's price increases for Carbamazepine ER and Clobetasol were announced, and consistent with their ongoing understandings, Taro's competitors declined opportunities to bid on customers so as not to take advantage of Taro's price increases, except in those circumstances where they sought additional market share to meet their fair share targets.

873.    For example, on June 4, 2014, Wal-Mart e-mailed Sandoz asking whether it would like to submit a bid for Carbamazepine ER because Wal-Mart had received a price increase from Taro.  Wal-Mart followed up on the request again on June 10, 2014.  L.B., a sales executive at Sandoz, e-mailed the request to Defendant Kellum asking, "Armando . . . any update here?  [Walmart] is asking again. . .. I understand our situation in that we want to max on share

226

and price, but we hardly get these opportunities at Wal-Mart. . . ."  Not wanting to bid, and instead planning to take a price increase as well, Kellum suggested a pretext: "Let's say we are currently not in a position to supply."

874.    Also on June 4, 2014, Cardinal e-mailed Sandoz asking it to bid on its Clobetasol business as a result of the Taro price increase.  Kellum responded similarly: "we DO NOT want to pursue this.  We have a very large opportunity of our own as a result of this price increase which we hope to implement next month.  I suggest we reference supply constraint and pass."

875.    Further, on June 23, 2014, McKesson presented Sandoz with an opportunity to take on additional business for several products, including both Clobetasol and Carbamazepine ER. K.K., a senior sales executive at Sandoz, responded to the customer: "Any opportunity to increase business is always welcome!  I do know that there are some constraints on some of these products.  We need to run the requests through supply chain to see if we can squeeze additional volume."  Less than five minutes later, Kellum responded to K.K. (without copying the customer) stating: "I do not want to pursue these.  Let's run thru the process but these are the products that Taro took very large price increases on and we have [an] opportunity ourselves." K.K. replied: "Understood Armando:  This is why I brought up the 'supply constraint' theme . . .to have our out option."  The next day, K.K. responded to McKesson, raising the familiar refrain: "The team reviewed this opportunity.  Unfortunately, as feared, we are still supply constrained at this time and cannot supply the incremental volumes requested."

876.    Throughout June 2014, Aprahamian exchanged several calls with his contacts at Taro's principal competitors on Carbamazepine ER and Clobetasol – Sandoz and Hi-Tech – to discuss the increases and coordinate their actions.

877.    For example, on June 6, 2014, Aprahamian called E.B., a senior sales and marketing executive at Hi-Tech twice.  Both calls lasted one (1) minute.  These were the first calls ever between the two competitors according to the available phone records.  Then, on June 9, 2014, Aprahamian and E.B. exchanged two more calls, including one call lasting ten (10) minutes.  The next day, on June 10, 2014, E.B. met in-person with B.K., a senior executive at Akorn, and S.G., a sales executive, "to discuss our options" regarding Clobetasol.

878.    On June 20, 2014, Aprahamian engaged in a series of communications with both CW-3 of Sandoz and E.B. of Hi-Tech.  Each time that CW-3 hung up with Aprahamian, he immediately called his supervisor, Defendant Kellum, to report the conversations.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:40:00 | 0:02:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 11:42:00 | 0:01:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:43:00 | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:56:00 | 0:04:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | E.B. (Hi-Tech) | 12:07:00 | 0:12:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:40:00 | 0:10:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:50:00 | 0:01:00 |

879.    During these calls, Aprahamian provided CW-3 with Taro's new non-public prices, by class of trade, for Carbamazepine ER, the various formulations of Clobetasol, and Fluocinonide (a product at issue in the Plaintiff States' Teva Complaint).  In all, Aprahamian identified more than seventy (70) different price points for these products.  CW-3 took contemporaneous notes of these conversations in his Notebook.  A snapshot of these notes is pictured below:

228

6/20

Fluocinonide OT  - Chain/Whs  Dist  6PO

15gm  +21  $ 50  #38

30gm  #43  x 59  # 76

60gm  #86  x 118  #152

Carbomazepine ER .200  - #92  #103  #115

400  - #184  #206  #230

Fluocinonide Gel

15 - #18  #25  #32

30 - #36  #50  #60

60 - #72  #100  #128

Clobet OT

15  - #47  #66  #85

30 - #79  #108  #140

45 - #119  #162  #210

60 - #160  #216  #280

Clobet CR

15 - #39  #54  #69

30 - # 78  #107  $140

45 - #116  #160  #208

60 - #139  #190  #250

Clobet SOl

25 - #32  #43  #56

50 - #63  #86  #112

880.    When CW-3 conveyed the price points to Defendant Kellum and CW-1, Kellum

was shocked by the size of the increases and asked CW-3 to go back and confirm with

Aprahamian that the information was correct.  Indeed, Taro had increased WAC pricing on

certain formulations of Clobetasol by more than 1000%.  When CW-3 called Aprahamian to

confirm, he placed a ✓ next to each price point that he confirmed.  When CW-3 later conveyed

this information to Kellum, he wrote a second ✓ next to each of the price points.  Armed with

this information, Kellum then directed CW-3 to tell Aprahamian that Sandoz would follow and

remarked: "We are swinging for the fences on clobetasol."

881.    Similarly, after E.B.'s conversations with Aprahamian, on June 24, 2014, Hi-Tech

held an internal "Clobetasol Price Increase Discussion," which E.B. attended.  The agenda for

the call was "to discuss the logistics of increasing the WAC on Clobetasol and the contractual

implications of the price increase.  The goal is to increase the price while incurring minimal

penalties from our wholesaler agreements."

882.     Over the next several days, Hi-Tech held several internal meetings during which they discussed the Clobetasol price increase – including on July 1, July 2, and July 8.  E.B. attended all three meetings.  On July 8, the day of the third meeting, E.B. called Aprahamian. The call lasted one (1) minute.  Less than a half hour later, Aprahamian called CW-3 of Sandoz. The call lasted one (1) minute.

883.     Three days later, on July 11, 2014, Hi-Tech sent letters to its customers notifying them that it was increasing WAC pricing on the various formulations of Clobetasol effective August 9, 2014.  The new pricing matched Taro's pricing exactly.  That same day, Aprahamian exchanged two calls with CW-3 – lasting three (3) minutes and five (5) minutes – and two calls with E.B – each lasting one (1) minute.  Notably, these were the last calls that Aprahamian and E.B. exchanged, according to the available phone records.

884.     Shortly after Hi-Tech increased its price on Clobetasol, the other competitors followed suit.  On July 18, 2014, Sandoz increased its WAC pricing on Clobetasol to match both Taro and Hi-Tech.  On August 26, 2014, it raised its WAC pricing on Carbamazepine ER to match Taro.  Further, on September 2, 2014, Wockhardt increased its WAC pricing on Clobetasol Solution to match Taro, Hi-Tech, and Sandoz.  As had been the pattern, Aprahamian spoke with both CW-3 of Sandoz and M.C. of Wockhardt in advance of these price increases. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/8/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.C. (Wockhardt) | 7:46:00 | 0:13:00 |
| 8/13/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 14:10:00 | 0:07:00 |
| 8/14/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 5:48:00 | 0:08:00 |
| 8/14/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.C. (Wockhardt) | 12:03:00 | 0:01:00 |
| 8/14/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.C. (Wockhardt) | 12:04:00 | 0:08:00 |
| 8/21/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 6:09:00 | 0:02:00 |

885.     Notably, after the calls highlighted above, Aprahamian and M.C. of Wockhardt would not speak again by phone until June 9, 2015, according to the available phone records.

231

### b.  Hydrocortisone Valerate Cream

886.    Hydrocortisone Valerate Cream is a topical corticosteroid used to treat a variety of skin conditions including eczema, dermatitis, allergies, and rash.

887.    The two competitors on Hydrocortisone Valerate Cream were Taro and Perrigo. As detailed above in an earlier Section, Defendant Boothe of Perrigo colluded with Defendant Perfetto of Taro to raise the price of Hydrocortisone Valerate Cream in August 2013, including raising WAC pricing by 351% on certain formulations.  Building on this success, the competitors colluded to raise the price again in June 2014.

888.    As detailed above, on June 3, 2014, Taro published increased WAC pricing for the June 2014 Increase products, including Hydrocortisone Valerate.  That same day, M.C., a sales executive at Perrigo, sent an internal e-mail advising of the Taro price increases. Defendant Wesolowski, a senior executive at Perrigo, responded stating: "Keep on the look out. Listen mode only."  That same day, Defendants Boothe and Perfetto exchanged four phone calls, including one call lasting five (5) minutes.  Two days later, on June 5, 2014, Boothe followed up with Perfetto again.  The call lasted two (2) minutes.

889.    On July 14, 2014, A.F., a sales executive at Perrigo, sent an internal e-mail asking for a list of products that were due for a price increase.  The next day, on July 15, 2014, D.B., a Perrigo pricing executive responded "I am just doing analysis right now.  They have not been approved.  Here are the products we are reviewing."  Hydrocortisone Valerate was on the list.

890.    Over the next several days, Defendants Boothe and Perfetto exchanged several calls during which they discussed the price increase on Hydrocortisone Valerate, as well as other products.  These calls are detailed in the chart below:

232

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/18/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 12:10:00 | 0:01:00 |
| 7/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:51:00 | 0:01:00 |
| 7/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:02:00 |
| 7/21/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 14:20:00 | 0:26:00 |
| 7/24/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 10:40:00 | 0:02:00 |
| 7/24/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 15:03:00 | 0:07:00 |

891.    After the lengthy twenty-six (26) minute call between Boothe and Perfetto on July 21, 2014, Perrigo notified its customers on July 22, 2014 that it would be increasing its WAC pricing on a list of products, including Hydrocortisone Valerate, effective July 24, 2014. Notably, Perrigo was also colluding with competitors regarding other products on its list – Econazole Nitrate Cream (Taro and Teligent) and Hydrocortisone Acetate Suppositories (G&W). These products are discussed in detail below in subsequent Sections.

### c.  Phenytoin Sodium ER Capsules

892.    Phenytoin Sodium Extended Release Capsules ("Phenytoin Sodium"), also known by the brand name Dilantin, is an antiepileptic drug that is used to prevent and treat seizures.

893.    Throughout the spring and summer of 2014, there were four competitors in the Phenytoin Sodium market:  Taro, Mylan, Amneal, and Taro's parent company, Sun.

894.    In early April 2014, Taro began formulating its list of products for the June 2014 Increases.  On April 3, 2014, Aprahamian exchanged an e-mail with A.S., a pricing executive at Taro, concerning Phenytoin Sodium pricing and, by April 7, 2014, Taro had added the product to its price increase list.

895.    Three days later, on April 10, 2014, Aprahamian and M.A., a Mylan sales executive, exchanged two calls lasting two (2) minutes and ten (10) minutes, respectively. Notably, the competitors would not speak again by phone until June 4, 2014, one day after Taro increased its pricing on Phenytoin Sodium.

233

896.    On April 16, 2014, Walgreens – an Amneal customer – e-mailed Taro asking for a bid on Phenytoin Sodium.  After an internal discussion regarding market shares, Aprahamian responded on April 20, 2014 stating: "I'll advise.  Do nothing until I decide what we are doing here . . .."  Similarly, on April 24, 2014, Walgreens also e-mailed Mylan, another competitor in the market, asking for a bid on the product.

897.    Between April 26 and 29, 2014, NACDS held its annual meeting in Scottsdale, Arizona.  Key representatives from Taro, Mylan, Amneal, and Sun all attended the conference. The attendees included Defendants Aprahamian and Perfetto of Taro, Jim Nesta, a senior pricing and sales executive at Mylan, S.R., a pricing executive at Amneal, and G.S., a senior executive at Sun.

898.    While attending the NACDS annual meeting, the competitors had numerous opportunities at various programming and social events to discuss Phenytoin Sodium, along with other products on which they competed.  Indeed, between April 27 and April 29, Nesta of Mylan and S.R. of Amneal exchanged at least twenty-two (22) phone calls and text messages.  Further, on April 29, 2014, while still at the NACDS meeting, Aprahamian sent an e-mail to S.I., an administrative clerk at Taro, asking, "can you send me current pricing that is loaded for all on [Phenytoin Sodium]."

899.    One month later, on May 29, 2014, the Pricing and Contracts ("P&C") team at Mylan generated a Daily Report listing the Mylan opportunity at Walgreens on Phenytoin Sodium.  In the report, Mylan noted that it could supply in July 2014 and identified the product as "Potential Amneal price increase."  Notably, no generic manufacturer of Phenytoin Sodium had increased pricing yet, including Amneal.

900.    In the days leading up to the generation of the P&C Report, Nesta and M.A., a sales executive at Mylan, both communicated multiple times with S.R. of Amneal.  These communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/27/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 18:44:13 | 0:02:56 |
| 5/28/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 12:14:56 | 0:00:04 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 15:55:15 | 0:00:14 |
| 5/29/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:08:45 | 0:00:06 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:09:19 | 0:00:04 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:20:50 | 0:00:15 |
| 5/29/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:36:27 | 0:01:23 |
| 5/29/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 16:53:02 | 0:05:37 |
| 5/29/2014 | Text | S.R. (Amneal) | Incoming | M.A. (Mylan) | 17:05:22 | 0:00:00 |

901.    Ultimately, Mylan declined to bid on the Walgreens business, refusing to take the business away from its competitor, Amneal.

902.    As detailed above, on June 2, 2014 Taro notified its customers that it would be increasing its prices on the June 2014 Increase products, including Phenytoin Sodium.  That same day, S.R. of Amneal called both M.A. and Nesta several times.  Over the next several days, all three competitors would exchange a number of calls.  These are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 16:46:53 | 0:00:02 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 16:47:32 | 0:00:04 |
| 6/2/2014 | Voice | S.R. (Amneal) | Incoming | Nesta, Jim (Mylan) | 17:02:54 | 0:00:06 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 17:03:18 | 0:00:03 |
| 6/2/2014 | Voice | S.R. (Amneal) | Outgoing | Nesta, Jim (Mylan) | 17:04:14 | 0:00:19 |
| 6/2/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:51:53 | 0:00:46 |
| 6/4/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 13:17:00 | 0:01:00 |
| 6/4/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 13:21:17 | 0:07:38 |
| 6/4/2014 | Voice | S.R. (Amneal) | Incoming | M.A. (Mylan) | 13:51:18 | 0:00:26 |
| 6/5/2014 | Voice | S.R. (Amneal) | Outgoing | M.A. (Mylan) | 13:47:00 | 0:00:02 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Incoming | S.R. (Amneal) | 13:47:37 | 0:00:17 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 15:49:34 | 0:00:05 |
| 6/5/2014 | Text | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 15:50:12 | 0:00:00 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:36:15 | 0:00:00 |
| 6/5/2014 | Voice | Nesta, Jim (Mylan) | Outgoing | S.R. (Amneal) | 17:36:41 | 0:03:34 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 6:56:00 | 0:02:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | S.R. (Amneal) | 6:57:00 | 0:07:00 |
| 6/6/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 12:41:00 | 0:09:00 |
| 6/9/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 9:02:00 | 0:04:00 |

903.    On July 2, 2014, S.K., a sales executive at Sun, sent an internal e-mail advising

G.S., a senior executive at Sun, and others, that Amneal had raised pricing on Phenytoin Sodium.

However, Amneal would not publish its increased WAC pricing until several months later – on

September 1, 2014.

904.    In the days leading up to July 2, Taro, Mylan, and Amneal continued to

communicate.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 6/25/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 12:11:00 | 0:01:00 |
| 6/25/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 13:04:00 | 0:09:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:29:00 | 0:01:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:35:00 | 0:01:00 |
| 6/26/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 12:19:00 | 0:11:00 |
| 6/27/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 10:52:00 | 0:02:00 |
| 6/27/2014 | Voice | M.A. (Mylan) | Incoming | S.R. (Amneal) | 11:17:00 | 0:06:00 |
| 7/1/2014 | Voice | M.A. (Mylan) | Outgoing | S.R. (Amneal) | 6:15:00 | 0:09:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 11:11:00 | 0:04:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | S.R. (Amneal) | 11:15:00 | 0:06:00 |
| 7/2/2014 | Voice | M.A. (Mylan) | Outgoing | Aprahamian, Ara (Taro) | 11:18:00 | 0:02:00 |
| 7/2/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 11:20:00 | 0:04:00 |

905.    On July 10, 2014, Wal-Mart e-mailed Mylan requesting a bid on Phenytoin Sodium because its incumbent supplier had increased its pricing.  That same day, M.A. of Mylan called Defendant Aprahamian.  The call lasted seven (7) minutes.  First thing the next morning, on July 11, 2014, Aprahamian called S.R. of Amneal.  S.R. returned the call a few minutes later and they spoke for three (3) minutes.  Later that day, C.W., a pricing executive at Mylan, sent an internal e-mail regarding the Wal-Mart opportunity stating: "This is a future price increase item. Taro increased in June, Amneal increase is rumored but not confirmed. . . . Walgreens and CVS approached us for a bid last month and we did not pursue.  . . . **P&C is suggested __NOT__ to give Walmart an offer but need management's weigh in.**" (emphasis in original).

906.    On July 14, 2014, Sun followed its competitors and increased pricing on Phenytoin Sodium.  Similarly, Mylan followed suit on July 16, 2014, increasing its WAC pricing by 210% to match market pricing.

907.    On July 31, 2014, Wal-Mart was still looking for a supplier for Phenytoin Sodium and reached out to Taro asking for a bid.  E.G., a Taro sales executive, forwarded the request along internally, asking "[c]an we supply?"  Although it was confirmed that Taro could, in fact, supply the customer, A.L., a Taro pricing executive, advised that E.G. respond to the Wal-Mart request as follows:  "While we would be happy to give them a one time buy to get them to full stock level we are not currently in position to pick up additional share."  To that, Aprahamian replied to A.L. separately stating – "good, don't get baited."

908.    One month later, on September 1, 2014, Amneal followed and matched its competitors' WAC pricing.

### h)   Econazole Nitrate Cream

909.    Econazole Nitrate Cream ("Econazole"), also known by the brand name Spectazole, is a topical antifungal cream prescribed for the treatment of infections of the skin caused by fungus, such as athlete's foot and ringworm.

910.    In the summer of 2014, there were three competitors in the market for Econazole: Perrigo, Taro, and Teligent.

911.    In June 2014, Perrigo began planning a price increase.  On June 17, 2014, Defendant Boothe of Perrigo called a Taro employee – likely Defendant Perfetto – and they spoke for forty-five (45) minutes.

912.    One week later, on June 25, 2014, S.B., a sales executive at Taro, sent an internal e-mail stating that "[w]e discussed possibly taking on one smaller customer for Econazole Cream," and suggested bidding at Associated Pharmacies.  On July 8, 2014, Taro put together an offer for that customer.  With regard to Taro's pricing for the bid, Defendant Aprahamian stated: "Go higher . . . Hearing net price in market has gone up . . . Glad to handle if you are tied up." Notably, the price of Econazole had not yet gone up – and would not do so for another several weeks.

913.    On July 18 and July 19, 2014, Defendant Boothe of Perrigo and Defendant Perfetto of Taro exchanged three short calls.  The next business day, on July 21, 2014, the two competitors spoke for twenty-six (26) minutes.  On July 22, 2014, T.P. of Perrigo spoke with S.M., a sales executive at Teligent, for more than five (5) minutes.  Three days later, on July 24, 2014, Boothe called Perfetto again.  The call lasted two (2) minutes.  Perfetto returned the call and the two competitors spoke for seven (7) minutes.

914.    That same day, on July 24, 2014, Perrigo instituted a dramatic price increase for Econazole.  Customers saw increases ranging from 637% to 735%.

915.    That morning, Aprahamian notified his colleagues at Taro of the development. He instructed them not to capitalize on any opportunities that might come Taro's way as a result of Perrigo's price increase, saying: "We will not take on additional share... Supply chain, sorry, but we need to lock down and closely monitor."  Aprahamian further instructed his team to increase Taro's Econazole price to GPOs to $0.02 under its WAC price with just five (5) days' notice for all such customers.  "(I don't care what contract says)," he added, "If they push back, we can terminate product... Not negotiable."

916.    The next day, on July 25, 2014, E.G., a Taro sales executive, placed two calls to S.M. at Teligent.  E.G. called S.M. again on August 12, 2014 and they spoke for nearly five (5) minutes.  The next day, on August 13, 2014, Defendant Perfetto spoke with Defendant Boothe for eleven (11) minutes.

917.    The coordination among the competitors bore fruit quickly.  Just two weeks later, on September 1, 2014, Teligent increased its WAC prices for Econazole to match Perrigo. Taro's price increases followed two months later, on November 18, 2014.  After the Taro increase, a customer forwarded the Taro notification to K.M., a sales executive at Perrigo, stating "[i]t should make you all feel good that you now are the leaders and the others are the followers."

918.    By May 2015, Sandoz was making plans to re-enter the Econazole market, attracted by the fact that the other players had instituted price increases. CW-3 advocated a re-launch strategy that considered fair share principles as well as Sandoz's ongoing understanding with Perrigo.  He advised his colleagues: "[Teligent] will more than likely protect their market share so the logical target would be Perrigo at 57% market share."

919.    On October 1, 2015, W.W., a Sandoz launch executive, e-mailed CW-3 seeking intel on current prices for various customer accounts in anticipation of the upcoming Econazole re-launch.  Less than an hour later, CW-3 called T.P. at Perrigo and they spoke for twenty-seven (27) minutes.

920.    Later that day, CW-3 responded to his colleague's e-mail with details of Perrigo's pricing at Morris & Dickson.  Not wanting to put additional details about his conversation with T.P. in writing, CW-3 copied CW-1, a senior pricing executive at Sandoz, stating:

> █████…please call me to discuss additional specific market dynamics surrounding this molecule.
> Thanks, ██████

921.    On November 30, 2015, Sandoz bid on the Econazole business at Morris & Dickson.  Perrigo, however, refused to cede the business to Sandoz because it had already given up one customer to the new entrant and was not inclined to hand over another.

922.    Intent on working out a deal with the market share leader, CW-3 and T.P. of Perrigo exchanged four calls on December 16, 2015.  The next day, on December 17, 2015, Sandoz contacted Morris & Dickson and convinced the customer to consider a revised offer from Sandoz.  This time, Perrigo ceded the customer to Sandoz.

923.    When Sandoz's re-launch of Econazole finally came to fruition in late 2015, it matched its competitors' increased WAC prices.

### i)    Fluocinonide .1% Cream

924.    Fluocinonide .1% Cream, also known by the brand name Vanos, is a strong corticosteroid used to treat a variety of skin conditions, including allergic reactions, psoriasis, eczema, and dermatitis.

925.    On January 14, 2014, Perrigo launched Fluocinonide .1% as the first-to-file generic, giving it 180 days of exclusivity against all other generic competitors, except for the authorized generic (the "AG").  Two weeks later, on January 31, 2014, Oceanside Pharmaceuticals (a subsidiary of Valeant Pharmaceuticals, the brand manufacturer, and hereinafter referred to as "Valeant") launched the AG of Fluocinonide .1% and published WAC pricing that matched Perrigo.

926.    When Valeant entered the market, the company submitted a bid to Publix for Fluocinonide .1%.  After consultation with T.P., a sales executive at Perrigo, and Defendant Wesolowski, a senior Perrigo executive, the company decided to "play fair" and gave up the business to Valeant.

927.    As the end of Perrigo's exclusivity approached, Taro and Glenmark both began making plans to enter the Fluocinonide .1% market.  Although Sandoz also had plans to enter, manufacturing issues would delay its launch until later in 2015.

928.    On June 3, 2014, Defendant Perfetto of Taro exchanged four (4) calls with Defendant Boothe of Perrigo, including one call lasting five (5) minutes.

929.    On June 9, 2014, A.L., a Taro pricing executive, sent an internal e-mail stating that Taro was nearing the Fluocinonide .1% launch and "we need to start gathering information." A.L. further stated that "given the number of preexisting competitors, we will need precise targeting and execution to make sure we can hit the budgeted goals."  A.L. also explained, "it is nearly as pivotal for us to understand who is the incumbent as what is the price range."  Attached to the e-mail was a fact sheet about the launch that identified Taro's target market share goal as 15%.  Thereafter, Aprahamian responded to A.L. directly to express his approval of the direction the pricing executive had given to the sales team, stating simply: "Solid."

930.    At the same time, Glenmark was planning its launch and targeting approximately 25% share of the Fluocinonide .1% market.

931.    Over the next several days, Perfetto of Taro exchanged several calls with Boothe of Perrigo and Defendant Grauso, a senior executive at Glenmark.  These calls among the three competitors are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/12/2014 | Voice | Grauso, Jim (Glenmark) | Incoming | Perfetto, Mike (Taro) | 3:58:00 | 0:09:00 |
| 6/17/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Taro Pharmaceuticals | 12:13:00 | 0:45:00 |
| 6/18/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 6:33:00 | 0:02:00 |
| 6/19/2014 | Voice | Grauso, Jim (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 12:31:00 | 0:27:00 |
| 6/19/2014 | Voice | Grauso, Jim (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 13:00:00 | 0:01:00 |
| 6/19/2014 | Voice | Grauso, Jim (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 13:16:00 | 0:02:00 |

932.    On June 25, 2014, Taro submitted an offer to Publix, a Valeant customer, for Fluocinonide .1%.  On June 30, 2014, Publix e-mailed Valeant asking whether the company wanted to bid to retain the business.  S.S., a sales executive at Valeant, forwarded the request along internally stating that he had spoken with his contact at Publix who told him that Taro "floated some offers out to a handful of customers (some of our customers and Perrigo's), to secure some early share.  [Publix] stated they [Taro] want to get their fair share but not be 'pigs' about it. . . . I recommend we walk away."  After discussing the issue internally, M.S., a marketing executive at Valeant, responded with his agreement to act in accordance with the larger fair share understanding among the Defendants: "Yes, we are all in agreement.  We'll give up Publix to Taro."  Thereafter, on July 7, 2014, Publix awarded the business to Taro.

933.    In the days leading up to Taro's and Glenmark's Fluocinonide .1% launch, Aprahamian of Taro and Grauso of Glenmark exchanged several calls, including two calls on July 14, 2014 – the day that both competitors launched the product.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/1/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Grauso, Jim (Glenmark) | 13:33:00 | 0:18:00 |
| 7/8/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Grauso, Jim (Glenmark) | 6:11:00 | 0:07:00 |
| 7/8/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Grauso, Jim (Glenmark) | 6:21:00 | 0:01:00 |
| 7/9/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Grauso, Jim (Glenmark) | 11:55:00 | 0:06:00 |
| 7/14/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Grauso, Jim (Glenmark) | 13:26:00 | 0:01:00 |
| 7/14/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Grauso, Jim (Glenmark) | 13:31:00 | 0:02:00 |

934.    On July 14, 2014, Taro and Glenmark published WAC pricing that essentially matched each other.  Prior to their entry, the generic market was evenly split between Perrigo (with 56%) and Valeant (with 44%).

935.    Through the end of July 2014, the competitors continued to talk with each other. Aprahamian and Perfetto of Taro exchanged several calls with Grauso of Glenmark and Perfetto exchanged several calls with Boothe of Perrigo.  These calls are detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/18/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Grauso, Jim (Glenmark) | 7:35:00 | 0:03:00 |
| 7/18/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 12:10:00 | 0:01:00 |
| 7/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:51:00 | 0:01:00 |
| 7/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:02:00 |
| 7/21/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 14:19:00 | 0:26:00 |
| 7/22/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Grauso, Jim (Glenmark) | 12:51:00 | 0:05:00 |
| 7/24/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 10:40:00 | 0:02:00 |
| 7/24/2014 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 15:02:00 | 0:07:00 |

936.    During this time, and in accordance with fair share principles, Perrigo and Valeant both ceded several accounts to the new entrants, Taro and Glenmark.

937.    For example, on July 14, 2014, Meijer, a Perrigo customer, e-mailed Glenmark to advise that it was interested in receiving an offer for Fluocinonide .1%.  J.J., a sales executive at Glenmark, forwarded the e-mail to his colleague Jim Brown, a senior sales executive at Glenmark, who responded: "Let's wrap up a big guy first.  I don't want to give Perrigo any reason to not walk away from someone."

938.    Over the next several days, Glenmark secured awards for Fluocinonide .1% at Econdisc, a Valeant customer, and Rite Aid and ABC, both Perrigo customers.  With respect to

243

ABC, when J.C., a Glenmark sales executive, received the customer's acceptance she forwarded it along internally, stating, "[a]warded to Glenmark! Signed offer to follow later this morning. Perrigo walked."

939.    After securing these accounts, J.J. of Glenmark followed up with his colleague Brown regarding Meijer, asking "I assume we can file all these smaller opportunities away for now since we have hit our share target?"  Brown replied to J.J.'s e-mail stating:

> We are set for now.  We have hit our share goals and surpassed the sales goals.
>
> Hogs get fat, Pigs get slaughtered

To that, J.J. responded:

> LOL.  I agree.  Oink!

940.    Notably, after Glenmark bid on Fluocinonide .1% at Econdisc, but before it was awarded the business, the customer e-mailed S.B., a Taro sales executive, asking "[i]s Taro going to send an offer?  We are reviewing another so did not want to exclude you."  After forwarding the request along internally, S.B. replied to the customer on July 18, 2014 stating that Taro would not bid for the business.  That same day, Aprahamian of Taro spoke with Grauso of Glenmark for three (3) minutes and Perfetto of Taro exchanged a one (1) minute call with Boothe of Perrigo.

941.    In addition to securing Publix from Valeant in July, Taro also secured business at Walgreens, Optisource, and McKesson from Perrigo that same month.  When Optisource awarded Taro the business, the customer noted "[l]ooks like Perrigo is playing nice after all and

244

is going to give us up to you.  Attached is your acceptance."  Further, in October and November 2014, Perrigo also gave up its business at Meijer and Omnicare to its competitors.

942.    Approximately one year later, in September 2015, Sandoz had resolved its manufacturing issues and was readying to enter the Fluocinonide .1% market.  At that time, Valeant was the market share leader with 43.93% followed by Glenmark (23.79%), Perrigo (18.33%), and Taro (13.94%).

943.    On September 18, 2015, W.W., a launch executive at Sandoz, e-mailed Sandoz sales executives CW-3 and W.G., requesting pricing, usage, and incumbent information for Fluocinonide .1% at three customers that Sandoz was considering targeting – H.D. Smith, Morris & Dickson, and Premier.  W.W. stated that "[s]ince this is a very crowded market Price CI [competitive intelligence] will be very helpful!  We will extend offers after."

944.    On September 24, 2015, CW-1, a Sandoz senior pricing executive, followed up regarding W.W.'s request, asking "[a]ny info on price points?"  CW-3 responded to CW-1 only stating, "[w]orking on it."  That same day, CW-3 called Aprahamian.  The call lasted one (1) minute.  An hour and half later, CW-3 called T.P. of Perrigo and they spoke for twenty-three (23) minutes.  On this call, T.P. provided CW-3 with contract pricing for Fluocinonide .1% for various customers, including Walgreens, HEB, Target, McKesson, and Econdisc.  None of these customers were CW-3's customers.  Later that day, CW-3 e-mailed the information he had obtained from his competitor to CW-1, W.W., and others at Sandoz.

945.    A few days later, on September 28, 2015, Sandoz provided CW-3 with an offer for Fluocinonide .1% to submit to his customer, Morris & Dickson.  CW-3 responded stating "[t]hese price points look high based on the CI provided last week," and then re-forwarded his e-mail from September 24, 2015.

946.    The next day, on September 29, 2015, CW-3 called Aprahamian and they spoke for eleven (11) minutes.  After that call, CW-3 sent the following e-mail to CW-1 and others at Sandoz:

| From: | |
|---|---|
| Sent: | Tuesday, September 29, 2015 12:59 PM |
| To: | |
| Cc: | |
| Subject: | RE: Morris & Dickson Fluocinonide Cream |

Taro Pricing (small share).  Please prove a more competitive offer for Morris & Dickson

30gm – Less than $100
60gm – Less than $130
120 – Less than $200

947.    Thereafter, Sandoz revised its offer to Morris & Dickson and the customer awarded Sandoz the business.  On October 12, 2015, Sandoz also secured the Fluocinonide 1% business at Wal-Mart, a Taro customer.

### j)    Metronidazole 1% Gel

948.    Metronidazole 1% Gel ("Metro Gel 1%"), also known by the brand name Metrogel 1%, is a topical treatment for inflammatory rosacea lesions.  Metrol Gel 1% is used by patients diagnosed with rosacea, a condition affecting 16 million Americans.  In 2013, the annual market for Metro Gel 1% in the United States exceeded $120 million.

949.    Prior to the summer of 2014, Sandoz was the exclusive generic manufacturer of Metro Gel 1%.  In June 2014, Taro began making plans to enter the market and, on July 1, 2014, Taro launched the product and matched Sandoz's WAC pricing.

950.    In the days leading up to the launch, CW-3 of Sandoz and Defendant Aprahamian of Taro exchanged several calls during which they discussed the launch and Sandoz's allocation of customers to the new entrant, Taro.  Further, during these calls, Aprahamian told CW-3 that Taro was targeting 35% market share and identified the customers that it planned to target.

246

Immediately upon hanging up with Aprahamian, CW-3 reported this information back to his superiors, CW-1 and Defendant Kellum.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/17/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:44:00 | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:03:00 | 0:01:00 |
| 6/18/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:18:00 | 0:01:00 |
| 6/19/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 9:55:00 | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:40:00 | 0:02:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:42:00 | 0:01:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:43:00 | 0:01:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:56:00 | 0:04:00 |
| 6/20/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:40:00 | 0:10:00 |
| 6/20/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:50:00 | 0:01:00 |
| 6/25/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:02:00 | 0:13:00 |
| 6/25/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 13:15:00 | 0:01:00 |
| 6/25/2014 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 13:18:00 | 0:01:00 |

951.    On June 18, 2014, Aprahamian sent an internal e-mail to A.L., a pricing executive at Taro, stating "you know the strategy - ~35 ish on Metro . . . Need offer by Wednesday at the latest to WBAD."  WBAD is a GPO that purchases generic drugs on behalf of its members, including ABC and Walgreens.  On June 25, 2014, Taro submitted an offer to Walgreens.  A few days later, on June 30, 2014, Taro submitted a separate offer to ABC.

952.    On the same day that ABC received the offer from Taro, the customer notified Sandoz that it had received a competitive bid from Taro and asked whether Sandoz would lower its price to retain the business.  S.G., a sales executive at Sandoz, forwarded the request along internally, including to CW-1 and Defendant Kellum.  CW-1 responded to S.G. stating: "It's my recommendation that we relinquish the ABC share. . . .  I'm sure we will see other challenges and will have to monitor closely.  The sooner we give up share the sooner the market will settle.  Based on my experience of Taro entering markets that we are already in, I guestimate[sic] that they are probably looking for 30%."  Kellum agreed: "I think we let ABC go."

953.    The next day, July 1, 2014, A.H., a sales executive at Sandoz, sent an internal e-mail stating that he had spoken with WBAD and learned that Taro was "looking for 30% share:

ABC + WAG + some smaller." Kellum responded, "[t]o maximize product it probably makes sense to relinquish these 2 and hold on to all other large accounts. We should be able to mNage[sic] with minimal erosion. Taro traditionally is rationale[sic] player." CW-1 replied: "OK, We will relinquish Metro 1% at ABC and continue to monitor the market closely."

954.    Walgreens accepted Taro's bid on July 2, 2014 and ABC accepted Taro's bid on July 7, 2014. WBAD (including ABC and Walgreens) represented approximately 20% of Sandoz's volume and sales for Metro Gel 1%.

955.    On July 8, 2014, Taro also submitted a bid to Wal-Mart for Metro Gel 1%. That same day, Aprahamian called CW-3 of Sandoz twice. Both calls lasted one (1) minute. Two days later, on July 10, 2014, Aprahamian e-mailed E.G., a Taro sales executive, asking her to follow up with Wal-Mart regarding the offer. The next day, on July 11, 2014, CW-3 and Aprahamian exchanged four (4) calls. After the last call, CW-3 hung up and immediately called Kellum. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/11/2014 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:31:00 | 0:01:00 |
| 7/11/2014 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:49:00 | 0:01:00 |
| 7/11/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:05:00 | 0:03:00 |
| 7/11/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:52:00 | 0:05:00 |
| 7/11/2014 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:57:00 | 0:01:00 |

956.    The following Monday, on July 14, 2014, Wal-Mart notified Sandoz that it had received a competitive bid on Metro Gel 1% that was 10% lower than Sandoz's pricing and asked whether it would bid to retain the business.

957.    On July 18, 2014, W.G., a pricing executive at Sandoz, forwarded the request internally, including to CW-1 and Kellum, stating "[t]hey plan to capture ~35% share. . . . I recommend that we relinquish this share to Taro. If we retain, the challenges will come elsewhere potentially with more aggressive pricing." CW-1 responded by recommending that

Sandoz relinquish Wal-Mart and stating, "I think we need to relinquish and relinquish soon to calm the market.  The WMT reduction needed was only 10%, so I believe Taro is trying to be responsible with their pricing.  Just wanted a last check with you before I walk."  Kellum then replied, "I agree."

958.    Notably, after sending this e-mail, someone at Sandoz changed the language in the earlier e-mail string from "they plan to capture ~35% share" to "*we assume* they will be targeting ~30% share."  Sandoz made this change to avoid documenting the fact that the competitively sensitive information came directly from its competitor, Taro.

959.    Although Sandoz gave up the business, Wal-Mart was unexpectedly reluctant to stop ordering Metro Gel 1% from Sandoz. On August 7, 2014, L.B., a sales executive at Sandoz, sent an internal e-mail advising that Wal-Mart was still ordering and stating, "[a] lot of times, the buyers do not want to change, and, for only a 10% reduction in price, it is not worth changing.  I will monitor, and let everyone know if we officially lose it."  B.G. of Sandoz replied, "I would not push to keep the Walmart business.  Hopefully Walmart communicated to Taro that we relinquished.  As expected, Taro is targeting other customers and will continue to do so until they pick up fair share."

960.    On August 4, 2014, McKesson also notified Sandoz that it had received an unsolicited bid for the Rite Aid portion of its Metro Gel 1% business and gave Sandoz the opportunity to bid to retain the business.  Kellum responded that "[w]e need to review and respond.  The big question here is do we relinquish given that Taro is seeking share."  After some internal discussion, Sandoz decided to cede the Rite Aid portion of the business to Taro. As P.C., a pricing executive at Sandoz, explained in an internal e-mail on August 8, 2014: "We are going to relinquish this award.  This is the last one that we will relinquish for this product."

961.    On August 11, 2014, McKesson awarded the Rite Aid portion of its Metro Gel 1% business to Taro.  Two days later, on August 13, 2014, Aprahamian called CW-3 and they spoke again for seven (7) minutes.

**k)    Clotrimazole 1% Cream**

962.    Clotrimazole Cream, also known by the brand name Lotrimin AF Cream, is an antifungal medication used to treat vaginal yeast infections, oral thrush, diaper rash, pityriasis versicolor, and various types of ringworm including athlete's foot and jock itch.

963.    In early January 2015, Sandoz was readying to re-launch into the Clotrimazole Cream market.  At that time, there were three (3) other competitors in the market – Taro, Glenmark, and Major Pharmaceuticals.  Sandoz had some supply constraints and was only targeting between 15% and 20% market share as the fourth entrant.

964.    On the evening of January 7, 2015, A.G., a senior Sandoz launch executive, sent an internal e-mail to the Sandoz launch team, stating that the Pricing Department was preparing pre-launch offers for Clotrimazole Cream to be sent the following week.

965.    First thing the next morning, on January 8, 2015, CW-3 of Sandoz called Defendant Aprahamian of Taro.  Aprahamian called him back shortly thereafter.  Both calls lasted one (1) minute.  That same day, E.D., a Sandoz launch executive, told his colleague CW-1, a Sandoz senior pricing executive, that CW-3 was getting an additional price point for the Clotrimazole Cream launch.  The next day, on January 9, 2015, Aprahamian called CW-3.  CW-3 called him back and they spoke for four (4) minutes.

966.    First thing the next business day, Monday January 12, 2015, E.D. followed up with an e-mail to CW-3 stating, "[j]ust wanted to follow-up on our conversation from last week

re: Clotrimazole.  Were you able to get a price point?"  CW-3 responded: "Will have the price points for you today."

967.    That same day, CW-3 called Aprahamian.  Aprahamian returned the call and they spoke for seven (7) minutes.  On that call, Aprahamian provided CW-3 with Taro's non-public pricing for two different categories of customer – wholesalers and retailers.  CW-3 told Aprahamian that Sandoz had limited supply of Clotrimazole Cream and that it planned to target Wal-Mart and Walgreens only.  CW-3's contemporaneous notes from the call are detailed below:



968.    Immediately after his call with Aprahamian, CW-3 called CW-1.  The call lasted one (1) minute.  Also, later that day CW-3 sent the following e-mail to E.D. at Sandoz, with a copy to CW-1, conveying the competitively sensitive information he had learned from Aprahamian:

```
From:                    ███████████
Sent:                    Monday, January 12, 2015 3:00 PM
To:
Cc:                      ███████████
Subject:                 RE: Clotrimazole 1% Cream


Not a real compelling market.  Please call me to discuss proposed targets.

Wholesalers
15 - $2.75
30 - $4.50
45 - $5.50

Retail
15 - $2.50
30 - $4.50
45 - $5.50
```

The prices matched exactly the prices that CW-3 had written down in his Notebook.

969.    The next day, on January 13, 2015, CW-3 spoke with CW-1 for sixteen (16) minutes.  Later that afternoon, Aprahamian called CW-3.  CW-3 returned the call and they spoke for eight (8) minutes.

970.    On January 29, 2015, Sandoz bid on Clotrimazole Cream at Wal-Mart, a Taro customer.  Wal-Mart e-mailed Aprahamian to inform him of the bid and asked if Taro wanted to bid to retain the business.  Aprahamian responded, "[w]e will review and let you know by Monday if that is OK . . .."  That same day, Aprahamian called CW-3 and they spoke for nine (9) minutes.

971.    The following Monday, February 2, 2015, Aprahamian e-mailed Wal-Mart and declined the opportunity explaining that "[w]e have reviewed your price on the Clotrimazole and unfortunately we are unable to adjust at this time.  Certainly appreciate you giving us a crack at this.  Please let us know what you decide so we can plan accordingly."  Aprahamian then forwarded his response along internally stating: "Heads up, we will be losing this at Walmart due to new entrant."

972.     On February 9, 2015, Wal-Mart e-mailed Sandoz to notify the company that it had won the Clotrimazole Cream business.

973.     In March 2015, and consistent with its plans, Sandoz also bid on Clotrimazole Cream at Walgreens, a Glenmark customer.   On March 27, 2015, Walgreens awarded the business to Sandoz.

### l)     Ketoconazole Cream and Fluocinonide Gel

974.     In March 2015, G&W entered into an agreement with Teva to purchase its manufacturing facility in Sellersville, Pennsylvania.  As a part of that transaction, G&W acquired the rights to manufacture over twenty-five (25) of Teva's products, including Ketoconazole Cream and Fluocinonide Gel.

975.     Taro had a history of colluding with Teva and Sandoz on both Ketoconazole Cream and Fluocinonide Gel.  In 2014, Defendant Aprahamian of Taro coordinated with Nisha Patel, a Teva pricing and sales executive, and CW-3 of Sandoz, to significantly raise prices on both products.  This collusion is discussed in detail in the Plaintiff States' Teva Complaint and is referred to herein for context only.

976.     After G&W acquired these products from Teva, Taro immediately began communicating and colluding with G&W.  The following Sections will discuss this collusion on Ketoconazole Cream and Fluocinonide Gel in further detail.

### a.     Ketoconazole Cream

977.     Ketoconazole Cream, also known by the brand name Nizoral, is an antifungal medication used to treat infections such as seborrhea, athlete's foot, and ringworm.

978.    At the beginning of 2015, there were three competitors in the market for Ketoconazole Cream: Taro, Teva, and Sandoz.  As detailed above, in March 2015, G&W purchased the rights to manufacture Ketoconazole Cream from Teva.

979.    With G&W poised to enter the market, Defendant Orlofski of G&W placed a call to Defendant Aprahamian at Taro on June 10, 2015 to discuss the details.  They spoke for nine (9) minutes.  The following Monday, on June 15, 2015, G&W entered the market for Ketoconazole Cream.

980.    G&W's target market share for the launch was forty percent (40%), a share to which it felt entitled in light of its predecessor Teva's roughly 60% share in the months leading up to the sale of the Sellersville facility.  G&W took great care to aim for that target with precision, in compliance with its agreement with the other players in the market.  Late in the day on June 15, 2015 – the day of G&W's launch – Defendant Vogel-Baylor of G&W e-mailed a colleague to ask how close to the target forty percent (40%) G&W would be if it won both Walgreens and CVS.  Vogel-Baylor added: "I need to obtain 40% MS for this launch.  I need to get the full WAG business, however, I am okay with taking a piece of the CVS business.  If the below exceeds 40% by 5% or greater, can you please give me the annual volume that I should target CVS at so that I hit my 40%?  Thank you!!!!"  The response was good news: "Good morning!!! Well, believe it or not, total CVS + WAG business is 40% mkt share exactly."

981.    Even though Teva, Taro, and Sandoz had conspired to significantly raise prices on Ketoconazole Cream only about a year earlier, G&W entered the market with a dramatic price increase – roughly four times that of the competitors already in the market.  Its WAC for the 15gm tube was $105.06, while market WAC was $24.72.  Its WAC for the 30gm tube was

$166.76; market WAC was $41.69.  Its WAC for the 60gm tube was $221.55; market WAC was

$63.30.

982.    Anxious to confirm that his competitors would act accordingly, Orlofski placed

another call to Defendant Aprahamian of Taro on June 17, 2015.  This time the call lasted twenty

(20) minutes.

983.    Two days later, on June 19, 2015, Aprahamian called CW-3 at Sandoz and they

spoke for seventeen (17) minutes.  During that call, the two competitors discussed the details of

G&W's entry and Taro's plans to follow the sharp price increase.  CW-3 took the following

contemporaneous notes in his Notebook documenting their conversation:



984.    Following his call with Aprahamian on June 19, 2015, CW-3 texted his superior,

Defendant Kellum, to set up a time to talk to him about his discussion with Aprahamian.

985.    G&W's bold price move upon entering the market was not well-received by

customers.  On June 18, 2015, Red Oak reached out to Taro for a price proposal, saying "Teva is

getting out of this product and another supplier is launching it.  I think we could keep this all

with you if you were interested."  Taro, however, held staunchly to its deal with its competitors.

C.U., a Taro sales executive, forwarded Red Oak's message to Aprahamian with the comment:

255

"For your enjoyment!!! . . . I will write back and let him know that we cannot take on any additional units."

986.    The next day, on June 19, 2015, Red Oak also tried to interest Sandoz in its business, saying: "Teva is getting out of this product and another supplier is launching it."

987.    Sandoz was careful to confer with the competition before responding.  On June 22, 2015, CW-3 of Sandoz placed two calls to Aprahamian at Taro, lasting seven (7) minutes and nine (9) minutes, respectively.  On June 26, 2015, CW-3 initiated another call to Aprahamian, and the two spoke for three (3) more minutes.

988.    Four business days later, on July 1, 2015, CW-1, a Sandoz senior pricing executive, gave approval to submit a bid to Red Oak for one of two drugs under consideration. With respect to the second drug – Ketoconazole Cream – however, the answer was different. CW-1 instructed: "the Keto cream we are currently reviewing the market.  No offers."

989.    Two weeks after the G&W launch, Walgreens was pressing G&W for some relief from its steep price increase.  On July 1, 2015, Vogel-Baylor updated Defendant Orlofski on the situation.  She reported that her Walgreens contact "said that she didn't bid the product out to any other manufacturer yet, however, if she did and she was able to get her current price or lower that she would automatically have that price locked in for 6 months before any price increase." Vogel-Baylor played hardball with Walgreens, however, knowing that the competitors would dutifully follow G&W's price move.  She told Orlofski: "I told Courtney that our new WAC/AWP is publicly posted so if a manufacturer is going to follow the price increase then they most likely will bid the increased price when they bid on her business so they wouldn't necessarily have the price locked in for 6 months."

990.     Orlofski e-mailed Vogel-Baylor the following day, July 2, 2015, emphasizing that securing the Walgreens business was "Priority 1," adding: "Please keep watching the price databases to see when/if Taro and Sandoz raise the WAC price."

991.     On July 6, 2015, Vogel-Baylor notified Orlofski and A.G., a senior G&W executive, that she had "checked MediSpan to see if there have been any changes in Sandoz's and Taro's WACs. Both are still the same as they were prior to our launch. They were last updated in April 2014. I will continue to monitor and keep you posted."

992.     Orlofski acted quickly, calling Aprahamian the next day, plus four more times over the next three weeks as shown below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/7/2015 | Voice | Aprahamian, Ara (Taro) | Incoming | Orlofski, Kurt (G&W) | 12:03:00 | 0:03:00 |
| 7/9/2015 | Voice | Aprahamian, Ara (Taro) | Outgoing | Orlofski, Kurt (G&W) | 12:44:00 | 0:01:00 |
| 7/10/2015 | Voice | Aprahamian, Ara (Taro) | Outgoing | Orlofski, Kurt (G&W) | 12:58:00 | 0:06:00 |
| 7/22/2015 | Voice | Aprahamian, Ara (Taro) | Incoming | Orlofski, Kurt (G&W) | 12:02:00 | 0:29:00 |
| 7/28/2015 | Voice | Aprahamian, Ara (Taro) | Outgoing | Orlofski, Kurt (G&W) | 12:17:00 | 0:01:00 |
| 7/28/2015 | Voice | Aprahamian, Ara (Taro) | Incoming | Orlofski, Kurt (G&W) | 14:45:00 | 0:15:00 |
| 7/30/2015 | Voice | Aprahamian, Ara (Taro) | Incoming | Orlofski, Kurt (G&W) | 8:09:00 | 0:02:00 |

993.     On July 31, 2015, the day after the final call in the series of calls detailed above, Taro followed G&W's price increase on the 15gm and 30gm tubes of Ketoconazole Cream, instituting 325% and 300% WAC increases respectively.

994.     On August 3, 2015, Orlofski initiated an eight (8) minute call to Aprahamian. Taro raised WAC on the 60gm tube by 250% that same day.

995.     Orlofski was delighted when he heard that Taro had followed G&W's lead, calling it "good news indeed." He instructed Vogel-Baylor: "Please also keep checking the price database to see if Sandoz raises the price."

996.     Sandoz did not delay in making its own plans to follow its competitors' price increases. On August 17, 2015, the agenda of a Sandoz internal strategy meeting included the

257

item: "Ketoconazole (prune, take price increase)."  Before it could follow the price increases, however, it made sure not to poach any of its competitors' customers or take steps that would disrupt the market.

997.    For example, on September 10, 2015, T.O., a Sandoz marketing executive, instructed a colleague that Sandoz should not submit a bid on Ketoconazole Cream in response to ABC's invitation to do so, revealing that the company's price increase was imminent.  T.O. stated: "[I] prefer not to go for ketoconazole … they are bidding it because of the price rise in the market that we are about to take… I feel like we will be asking for a fight with the incumbent. Thx."

998.    In January 2016, a Sandoz internal report listed drugs they planned to increase prices on, with Ketoconazole Cream described as "the main one."

999.    In March 2016, Sandoz finally followed the competitors' moves, increasing its price for Ketoconazole Cream by 300%.  CW-3 of Sandoz and Aprahamian of Taro continued to coordinate even then, with a twenty-three (23) minute call on March 7, 2016, followed by a ten (10) minute call the next day, March 8, 2016.

### b.    Fluocinonide Gel

1000.   Fluocinonide Gel is a topical medication prescribed for the treatment of atopic dermatitis, psoriasis, and other inflammatory skin conditions.

1001.   For most of 2015, Taro was the only player in the market, with Teva and Sandoz having discontinued Fluocinonide Gel from their product lines in late 2014.

1002.   In the fall of 2015, however, G&W was making plans to join Taro in the market by launching the product that November, after purchasing the product from Teva.  G&W built

into its plans an assumption that Taro would cede approximately twenty-five (25%) percent market share to G&W upon its launch.

1003.   By mid-November, G&W had bumped its product launch date back to December because of a product testing problem at an outside lab.  No longer content with *assuming* that Taro would give it a quarter of the market when the launch came to fruition, G&W executives reached out to the competitor to confirm.  On November 17, 2015, Defendant Orlofski of G&W called Defendant Aprahamian at Taro, and the two competitors spoke for seventeen (17) minutes.  Later that same day, Defendant Perfetto of Taro placed a brief call to Orlofski.  M.P., a G&W business development executive, also continued the dialogue with a call to Perfetto on November 18, 2015.

1004.   On November 20, 2015, Defendant Vogel-Baylor of G&W worked on confirming that Taro was, indeed, the only competitor with whom G&W had to confer, asking a colleague to pull information for Fluocinonide Gel: "I need to see who the players are and how much share each player currently has."  Orlofski placed another quick call to Perfetto on November 21, 2015.

1005.   Two days later, on November 23, 2015 at 11:25 a.m., Orlofski called Perfetto yet again.  They spoke for seven (7) minutes.  Less than two hours later, Vogel-Baylor sent Kroger an e-mail with news of the G&W launch of Fluocinonide Gel and a request for information about the purchaser's usage numbers for the product.  On November 24, 2015, Kroger responded that G&W would need to offer all three sizes of the product – 15gm, 30gm, and 60gm – before it would consider moving the business.  G&W, however, would not be prepared to launch the two smaller sizes until May 2016.

1006.   The Kroger response sent the competitors back to square one in figuring out how to allocate the Fluocinonide Gel market between them.  G&W set to work quickly exploring

other options.  On November 25, 2015, Orlofski called Perfetto and the two competitors spoke for seven (7) minutes.

1007.   On December 3, 2015, Vogel-Baylor reached out to Walgreens asking whether the customer would entertain a bid for Fluocinonide Gel.  Vogel-Baylor explained to Walgreens that it was "most likely [her] only target to start."

1008.   A few days later on December 8, 2015, Aprahamian and Orlofski had a twenty-three (23) minute phone conversation.  Later that day, Vogel-Baylor moved forward, e-mailing her Walgreens contact to ask where G&W should send its Fluocinonide Gel proposal soliciting Walgreens' business.

1009.   While Vogel-Baylor awaited Walgreens' response, other G&W executives continued their conversations with their counterparts at Taro.  On December 13, 2015, Perfetto called M.P. of G&W and they spoke for twenty-nine (29) minutes.  The following day, December 14, 2015, Aprahamian called Orlofski and they spoke for nine (9) minutes.

1010.   Having gotten the requested information from Walgreens late in the evening on December 14, 2015, and having vetted the plan with its competitor, G&W sent its pricing proposal on Fluocinonide Gel to Walgreens the following day.

1011.   Walgreens contacted Taro two days later, on December 17, 2015, to inform the incumbent of G&W's proposal and to find out whether Taro intended to defend.  Taro sales executive C.U. asked Aprahamian: "Thoughts on our POA?"  Aprahamian responded simply "we will be market responsible."  C.U. wrote back, emphasizing that he was well aware of Taro's cooperative arrangement with its competitors, saying: "Thought so, just wasn't sure if we would be responsible elsewhere?"

1012.   To keep the lines of communication open, Orlofski called Perfetto first thing the following morning.

1013.   C.U. refrained from responding to Walgreens' question about Taro's intentions in writing, instead cautiously e-mailing his Walgreens contact on December 21, 2015: "Can you call my office when you get a chance."

1014.   Having somehow overlooked C.U.'s request for a phone call, on January 4, 2016 the Walgreens representative again pressed for an answer on what Taro's approach would be on Fluocinonide Gel, asking: "Has anything been sent over on this request?"  C.U. responded: "I sent you this email and left you a few vmails to discuss this.  At this time Taro will not be submitting a competitive offer."

1015.   The following day, January 5, 2016, a Taro pricing executive, M.L., confirmed that Taro had voluntarily ceded its Walgreens business to the competitor, telling his colleague: "We gave up the Fluo Gel at WAG's.  Seems that G&W bought Teva plant and we had to give up share."

1016.   That same day, a Taro pricing executive, A.L., advised C.U. that he should have someone on the pricing team send e-mails to customers when Taro declines to bid – like the one he sent to Walgreens for Fluocinonide Gel.  As A.L. explained, "we should send it so you don't look like the bad guy, you can always be the one, 'I tried all I can but they are asswhole[sic] in house they don't understand the business . . ..'"

1017.   On January 6, 2016, the day after Taro declined to bid at Walgreens, Vogel-Baylor called C.U. at Taro and they spoke for twenty-five (25) minutes.  Notably, this was the only phone call ever between these two competitors according to the available phone records.

1018.   Several months later, on April 26, 2016, C.U. forwarded along internally a monthly tracking spreadsheet entitled: "CU 2016 Gains and Losses March."  In the spreadsheet, C.U. noted with respect to Fluocinonide Gel at Walgreens: "Taro was market responsible and G&W came into market.  Taro walked away from ROFR in January.  Removal date is 3-31-16."

### c.    Sandoz And Its Other Relationships

1019.   As discussed in detail above, CW-3 colluded extensively with Aprahamian and H.M. of Taro on products that Sandoz and Taro overlapped on and had an ongoing understanding going back many years not to poach each other's customers and to follow each other's price increases.  However, CW-3 was a prolific communicator who regularly colluded with many other competitors.

1020.   For example, between June 2011 and August 2016, when he left Sandoz, CW-3 exchanged at least one thousand one hundred (1,100) phone calls and text messages with his contacts at Defendants Taro, Mallinckrodt, Perrigo, Aurobindo, Actavis, Glenmark, G&W, Wockhardt, Mylan, Lannett, Lupin, Greenstone, and non-Defendants Rising.  These communications are detailed in the chart below:

262

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Aprahamian, Ara (Taro) | 187 | 3/15/2013 | 8/18/2016 |
| Kaczmarek, Walt (Mallinckrodt) | 146 | 11/14/2012 | 7/13/2016 |
| K.K. (Mallinckrodt) | 158 | 12/3/2012 | 6/20/2016 |
| T.P. (Perrigo) | 95 | 8/8/2012 | 2/4/2016 |
| CW-6 (Aurobindo) | 90 | 8/16/2012 | 5/10/2013 |
| CW-2 (Rising) | 80 | 8/2/2013 | 5/11/2016 |
| H.M. (Taro) | 53 | 9/6/2012 | 3/11/2014 |
| Aprahamian, Ara (Actavis) | 52 | 8/17/2011 | 3/11/2013 |
| Blashinsky, Mitchell (Glenmark) | 49 | 8/28/2012 | 10/9/2013 |
| S.G. (Rising) | 37 | 6/4/2015 | 6/15/2016 |
| K.K. (G&W) | 30 | 2/6/2014 | 3/30/2015 |
| A.F. (Perrigo) | 27 | 6/30/2011 | 7/19/2013 |
| K.K. (Wockhardt) | 25 | 7/29/2011 | 5/23/2013 |
| B.G. (Lannett) | 22 | 3/18/2016 | 8/19/2016 |
| T.G. (Aurobindo) | 20 | 3/11/2014 | 10/19/2015 |
| L.W. (Mylan) | 14 | 9/21/2012 | 7/23/2013 |
| Berthold, David (Lupin) | 3 | 2/7/2012 | 10/18/2012 |
| Grauso, Jim (Aurobindo) | 3 | 6/28/2012 | 7/16/2012 |
| Perfetto, Mike (Taro) | 2 | 8/11/2016 | 8/11/2016 |
| K.S. (Lannett) | 2 | 5/10/2012 | 5/15/2012 |
| D.C. (Glenmark) | 1 | 8/22/2013 | 8/22/2013 |
| A.G. (Actavis) | 1 | 8/22/2013 | 8/22/2013 |
| Nailor, Jill (Greenstone) | 1 | 5/29/2013 | 5/29/2013 |
| Taro Pharmaceuticals | 1 | 8/11/2016 | 8/11/2016 |
| Sullivan, Tracy (Lannett) | 1 | 5/8/2012 | 5/8/2012 |

1021.   As detailed above, when CW-3 was coordinating with competitors, he was acting at all times at the direction of, or with approval from, his superiors, including CW-1 and Defendant Kellum.

1022.   Several of CW-3's relationships – including with Perrigo, Glenmark, Aurobindo, Rising, and Mallinckrodt – as well as other relationships between various Sandoz executives and certain competitors, are explored in greater detail in the following Sections.

### 1)    Collusion Between Sandoz And Perrigo

1023.   As detailed above, Sandoz and Perrigo had an ongoing understanding over many years not to poach each other's customers and to follow each other's price increases.  This

understanding was implemented primarily through communications between CW-3 of Sandoz and T.P. of Perrigo.  CW-3 continued the relationship with T.P. after his predecessor, CW-6, left Fougera in August 2012.  CW-3 and T.P. of Perrigo were not social friends.  If they were communicating with each other, it was to coordinate anticompetitive conduct with regard to drugs on which Sandoz and Perrigo overlapped.

1024.   During this time period, T.P. was acting at all times at the direction of, or with approval from, his superiors, including Defendants Boothe and Wesolowski.

1025.   Several examples of CW-3's coordination with T.P. on specific products are discussed in detail in the following Sections.

### i.   Bromocriptine Mesylate Tablets

1026.   Bromocriptine Mesylate Tablets ("Bromocriptine"), also known by the brand name Parlodel, is used in the treatment of Parkinson's disease, hyperprolactinemia (abnormally high levels of prolactin in the blood), and acromegaly (a syndrome where the pituitary gland produces excess growth hormones).

1027.   As of December 2012, the three competitors in the market for Bromocriptine were Sandoz (with 65% share), Perrigo (with 30%), and Mylan (with 5%).

1028.   On March 1, 2013, Walgreens reached out to Sandoz asking for a one-time buy for Bromocriptine because Mylan was having supply issues and would be out of the market for two months.  On March 4, 2013, S.G. responded to Walgreens stating that Sandoz could not fill the customer's request.

1029.   Viewing Mylan's supply issues as an opportunity, S.G. forwarded his exchange with Walgreens to Defendant Kellum asking, "[c]an we take a price increase?"  Kellum responded within the hour stating, "Yes."  That same day, March 4, 2013, CW-4, a Sandoz

264

senior sales executive, spoke with Jim Nesta, a senior sales executive at Mylan, for nearly four (4) minutes.  The two competitors spoke again on March 11, 2013 for nearly ten (10) minutes.

1030.   On March 22, 2013, Kellum e-mailed the Pricing Committee recommending that Sandoz increase prices on Bromocriptine, among other products.  In particular, Kellum sought a 206% increase to Sandoz's WAC pricing for Bromocriptine and noted the reason for the increase was due to "Mylan exiting [the] market."

1031.   By March 31, 2013, all members of the Sandoz Pricing Committee (which included Defendant Kellum and CW-1, among others) had approved the increase.   The very next day, on April 1, 2013, CW-3, a Sandoz senior sales executive, called T.P. of Perrigo – the other competitor on Bromocriptine – and they spoke for seventeen (17) minutes.  The next morning, on April 2, 2013, CW-3 called T.P. again and they spoke for five (5) minutes.  On this call, CW-3 conveyed to his competitor a list of products that Sandoz planned to increase pricing on in April 2013, including Bromocriptine, as well as the amount of those increases.  CW-3's contemporaneous notes from that call are detailed below:



1032.   After hanging up with T.P., CW-3 called Defendant Kellum.  The call lasted one (1) minute.  A few hours later, CW-3 called CW-1, a senior pricing executive at Sandoz, and they spoke for eleven (11) minutes.

1033.   The next day, on April 3, 2013, Sandoz held an internal meeting attended by sales and pricing personnel, including CW-3, CW-4, CW-1, and Kellum, to discuss the upcoming Sandoz price increases, including Bromocriptine.

1034.   Two days later, on April 5, 2013, Sandoz implemented the Bromocriptine increase and raised WAC pricing on the product by 205%.

1035.   Throughout the first three weeks of May 2013, CW-4 spoke with Nesta of Mylan regularly.  These communications included at least the calls detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 7:51:16 | 0:03:20 |
| 5/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 8:40:23 | 0:04:07 |
| 5/20/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 10:42:42 | 0:00:04 |

1036.   By late May 2013, Mylan had resolved its supply issues on Bromocriptine and was readying to increase its own price.  To that end, on May 22, 2013, Mylan held an internal meeting to discuss Bromocriptine.

1037.   That same day, on May 22, 2013, ABC e-mailed Sandoz to request a bid on Bromocriptine, citing supply issues with its incumbent manufacturer.  S.G., a Sandoz sales executive, who had a better idea of Mylan's plans, forwarded the request to Defendant Kellum stating "I believe this is Mylan price increase."

1038.   Sandoz quickly set out to confirm the reason for ABC's request.  First thing the next morning, on May 23, 2013, Kellum called L.W., a sales executive at Mylan.  The call lasted two (2) minutes.  Notably, this was the only call ever between the two competitors according to the available phone records.  That same morning, CW-3 spoke twice with T.P. of Perrigo and CW-4 exchanged two calls with Nesta of Mylan.  These calls are detailed in the chart below:

266

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 8:04:00 | 0:05:00 |
| 5/23/2013 | Voice | L.W. (Mylan) | Incoming | Kellum, Armando (Sandoz) | 8:33:00 | 0:01:55 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 10:49:23 | 0:00:37 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 12:40:43 | 0:01:25 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:48:00 | 0:03:00 |

1039.   After speaking with their competitors, CW-3 and T.P. reported back to their superiors, CW-1 and Kellum of Sandoz and Defendant Wesolowski of Perrigo.  This call pattern is illustrated in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 8:04:00 | 0:05:00 |
| 5/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 9:13:00 | 0:07:00 |
| 5/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 9:20:00 | 0:01:00 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 10:26:00 | 0:01:00 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:48:00 | 0:03:00 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 14:51:00 | 0:01:00 |
| 5/23/2013 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:14:00 | 0:16:00 |

During these calls, Sandoz learned that ABC was in fact Perrigo's customer, and that Perrigo might be leaving the market for Bromocriptine due to supply problems.

1040.   After this series of calls, Kellum called S.G. of Sandoz and they spoke for twenty-one (21) minutes.  While on the phone with Kellum, S.G. sent the following internal e-mail, with a copy to Kellum, regarding the reason for ABC's bid request on Bromocriptine:



From:
Sent:        Thursday, May 23, 2013 1:58 PM
To:
Cc:          Kellum, Armando
Subject:     BID REQUEST: BROMOCRIPTINE MESYLATE

Perrigo is out.  This is ABC's primary.  Can we please evaluate.

Best Regards,

SG

Not wanting to upset the market balance between the competitors, Sandoz ultimately decided to submit an offer to ABC for a one-time buy.  However, the customer declined the offer because Sandoz's pricing was too high.

1041.   Just one week later, on May 31, 2013, Mylan re-entered the market and published WAC pricing for Bromocriptine that matched Sandoz's increased pricing.  In the days leading up to, and on the day of, Mylan's price increase, the competitors again exchanged several calls. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/28/2013 | Voice | L.W. (Mylan) | Outgoing | CW-3 (Sandoz) | 7:58:00 | 0:07:00 |
| 5/29/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 9:46:30 | 0:12:51 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 11:46:43 | 0:08:32 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:45:59 | 0:00:06 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 13:54:01 | 0:00:04 |
| 5/31/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 13:54:45 | 0:03:01 |
| 5/28/2013 | Voice | L.W. (Mylan) | Outgoing | CW-3 (Sandoz) | 14:23:00 | 0:03:00 |
| 5/28/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 15:29:00 | 0:04:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 16:21:00 | 0:02:00 |

1042.   As of June 2013, Sandoz decided not to pursue additional market share on Bromocriptine because it had reached its "fair share" and achieved a "good price."

1043.   Perrigo did not quickly follow the price increases taken by Sandoz and Mylan, in part due to their intermittent supply issues.  As a result, Sandoz received several complaints from its customers that Perrigo was selling the product at a cheaper price.

1044.   For example, on July 22, 2013, McKesson e-mailed Sandoz requesting a price reduction for Bromocriptine because a competitor was selling the product at "77.77% below [McKesson's] current contract price."  The next day, on July 23, 2013, CW-3 called L.W. of Mylan and they spoke for eight (8) minutes.  Within minutes of hanging up, CW-3 called CW-1. The call lasted two (2) minutes.  Two days later, Sandoz responded to McKesson and declined to lower its pricing stating, "[w]e feel your current price is competitive relative to the market."

268

1045.   On July 29, 2013, McKesson asked that Sandoz reconsider its decision because otherwise it would need to request a bid from Perrigo.  That same day, T.P. of Perrigo called CW-3 twice.  Both calls lasted one (1) minute.  The next morning, CW-3 called T.P. and they spoke for thirteen (13) minutes.  During these calls, the competitors discussed the fact that Perrigo had not followed the Sandoz and Mylan price increases on Bromocriptine.  However, T.P. assured CW-3 that Perrigo would not take Sandoz's business at McKesson.  CW-3's contemporaneous notes from his conversation with T.P. are pictured below:



1046.   After hanging up with T.P., CW-3 called CW-1 and they spoke for four (4) minutes.  On this call, CW-3 conveyed to CW-1 what T.P. had told him about Bromocriptine.  According to CW-3, it was not a question of whether Perrigo would follow, but when they would follow.  Armed with this assurance from Perrigo, Sandoz responded to McKesson's request by declining to lower its pricing and reiterating "we feel your price is competitive relative to the market."

1047.   Similarly, on August 23, 2013, Omnicare, a Sandoz customer, e-mailed Perrigo stating that they noticed Perrigo's price for Bromocriptine was significantly lower than the other competitors and asked "[a]re you anticipating a price increase on this soon or having supply issues?"  P.H., a sales executive at Perrigo, forwarded the e-mail to T.P. asking, "[d]o you know if we may [be] increasing the price?  Our supply looks good."  To that, T.P. responded, "yes I recommended we do, I think [John Wesolowski] is going to."  Although Perrigo considered bidding on the business, it ultimately declined the opportunity.  On September 5, 2013, P.H. e-

mailed Omnicare stating, "I will touch base with you in Oct as we are having a price adj on the item that is TBD."

1048.   Sandoz and Mylan generated a substantial amount of money from Bromocriptine sales in 2013.  For example, on February 4, 2014, Sandoz released a business review report that detailed how the 2013 price increases for certain drugs delivered upwards of $197 million of revenue for Sandoz after price protection.  Among the drugs mentioned, Bromocriptine realized incremental net sales of $3.2 million after price protection.

1049.   Perrigo ultimately followed its competitors and implemented a price increase on Bromocriptine in October 2014.

1050.   On October 2, 2014, T.P. of Perrigo called CW-3 and they spoke for seven (7) minutes.  Immediately upon hanging up with CW-3, T.P. called his supervisor, Wesolowski. Less than one (1) week later, on October 7, 2014, Perrigo sent letters to its customers notifying them of the Bromocriptine increase.  The next day, on October 8, 2014, CW-3 sent an internal e-mail to Kellum and CW-1, among others, noting that Perrigo "has finally followed [Sandoz's] Bromocriptine Price increase from April '13."  That same day, CW-3 called T.P. and they spoke for four (4) minutes.

### ii.    Adapalene Cream

1051.   Adapalene Cream, also known by the brand name Differin, is a retinoid used to treat severe acne.

1052.   As detailed above in an earlier Section, Fougera and Perrigo colluded to allocate market share to Perrigo upon its entry into the Adapalene Cream market as the authorized generic in October 2010.

1053.   Two years later, in November 2012, Sandoz (which had acquired Fougera) left the Adapalene Cream market temporarily due to supply issues.  This left Perrigo as the sole manufacturer of the product.

1054.   By early January 2013, Sandoz was making plans for its re-entry into the market. On January 14, 2013, CW-3 provided M.A., a Sandoz marketing executive, a list of potential targets for Adapalene Cream stating that "the highlighted accounts are just an estimate as we need to target a reasonable amount of market share."  CW-3 further explained that "[i]n order to recover these accounts we would have to reduce the pricing however the price points are dependent on where Perrigo is currently priced."  The list of potential targets was organized by historical volume of units purchased and Walgreens was the first name on that list.  Wal-Mart was not listed as a target.

1055.   On June 24, 2013, approximately one month before Sandoz's re-launch, CW-3 and T.P. of Perrigo had a ten (10) minute phone call during which T.P. shared Perrigo's non-public dead net pricing for Adapalene Cream for two customers – Walgreens and Optisource. During that conversation, CW-3 recorded those prices in his Notebook as follows:



1056.   On July 15, 2013, Sandoz held a Commercial Operations call during which they discussed, among other things, the Adapalene Cream re-launch scheduled for July 26, 2013. That same day, T.P. and CW-3 exchanged two more calls, both lasting one (1) minute.  After

exchanging a third call that lasted one (1) minute on July 16, 2013, the two competitors

connected on July 17, 2013 and spoke for nineteen (19) minutes.  During this call, T.P. provided

CW-3 with Perrigo's non-public pricing for Adapalene Cream for a list of customers.  T.P. also

told CW-3 that Perrigo was not willing to give up Walgreens to Sandoz.  CW-3's

contemporaneous notes from this call are detailed below:



The purpose of conveying this information was so that Sandoz, when it re-entered the market,

could target and obtain specific agreed-upon customers with the highest prices possible, to

minimize price erosion.

    1057.  Also, between July 16, 2013 and July 18, 2013, CW-3 and A.F., a sales executive

at Perrigo, exchanged at least nineteen (19) text messages.

    1058.  On July 26, 2013, the day of Sandoz's re-launch of Adapalene Cream, CW-3

called CW-1 and they spoke for eight (8) minutes.  On this call, CW-3 provided CW-1 with the

customer pricing for Adapalene Cream that T.P. had provided to him.  Within minutes of

hanging up with CW-3, CW-1 sent an internal e-mail, including to Defendant Kellum, regarding

Adapalene Cream.  In that e-mail, CW-1 recommended that Sandoz approach "ABC, Walmart, and Mckesson for starters.  Intel tells me that they want to retain WGS [Walgreens]."  CW-1 also provided the following pricing information for those customers:

> Here are is some current pricing deadnets
>
> ABC = $150
> Mckesson = $150
> Wal-Mart = $137

1059.   Notably, the price points matched exactly with the price points T.P. had provided to CW-3.  In his e-mail, CW-1 also stated that Sandoz would need to bid 30% lower than ABC's current price in order to win the business upon re-launch.

1060.   That same day, on July 26, 2013, Sandoz prepared and sent offers for Adapalene Cream to the three customers CW-1 identified – ABC, McKesson, and Wal-Mart – as well as Rite Aid and Morris & Dickson.  Consistent with the prior conversations between CW-3 and T.P. of Perrigo, Sandoz did not submit a bid to Walgreens.

1061.   Later that day, on July 26, 2013, Morris & Dickson accepted Sandoz's bid for Adapalene Cream.

1062.   Also, that same day, Wal-Mart declined the opportunity – but for reasons other than price – stating: "This product was not awarded to the current supplier until December of last year.  I am not able to move it."

1063.   The following Monday (the next business day), on July 29, 2013, T.P. of Perrigo called CW-3 twice.  Both calls lasted one (1) minute.  The next day, on July 30, 2013, CW-3 called T.P. back and they spoke for thirteen (13) minutes.  CW-3 hung up and immediately

called CW-1 to report about his conversation with the competitor.  The call lasted four (4)

minutes.  That same day, Rite Aid accepted Sandoz's bid for Adapalene Cream.

1064.   The next day, on July 31, 2013, Sandoz sent an offer for Adapalene Cream to

Econdisc.  The next morning, on August 1, 2013, Econdisc notified Perrigo of the offer and gave

the incumbent an opportunity to bid to retain the business.  Within the hour, T.P. called CW-3.

The call lasted one (1) minute.  Ten minutes later, T.P. called CW-3 again and they spoke for

five (5) minutes.  Later that day, in an effort to avoid putting evidence of his collusive

conversations in writing, CW-3 sent the following e-mail to CW-1:

| From: | ██████████ |
| Sent: | Thursday, August 01, 2013 6:33 PM |
| To: | ██████████ |
| Subject: | Call me about Adapalene |

That same day, CW-3 and CW-1 spoke for five (5) minutes.

1065.   On August 2, 2013, ABC accepted Sandoz's bid for Adapalene Cream.

1066.   On August 6, 2013, T.P. and CW-3 exchanged two calls lasting four (4) minutes

and twelve (12) minutes, respectively.  Later that day, T.P. and his colleagues at Perrigo,

including his supervisor, Defendant Wesolowski, had a conference call to discuss Adapalene

Cream.  That same afternoon, Perrigo notified Econdisc that it was declining to bid to retain the

customer's business.  Later that day, Econdisc accepted Sandoz's bid for Adapalene Cream.

1067.   The next day, on August 7, 2013, McKesson accepted Sandoz's offer for

Adapalene Cream.

1068.   T.P. of Perrigo and CW-3 continued to talk throughout August 2013 to coordinate

Sandoz's smooth entry into the market.  For example, between August 12 and August 15, 2013,

the two competitors exchanged at least eight calls, including two calls on August 15, 2013

lasting eight (8) minutes and fourteen (14) minutes, respectively.  Later that day, M.A., a Sandoz marketing executive, e-mailed CW-1 regarding Adapalene Cream stating that Sandoz's market share was now 25.5% and asking whether Walgreens could be "revisited."  As detailed above, Sandoz had stayed away from Walgreens because Perrigo said they would not give up the business.

1069.   Respecting the agreement that the two competitors had arranged, Sandoz stayed away from Walgreens and instead submitted another offer to Wal-Mart on August 27, 2013.  Wal-Mart, again, summarily refused the offer stating that it "can't entertain the bid at this time," because Perrigo had been its supplier for less than one year.  The next day, on August 28, 2013, CW-3 called T.P. and they spoke for fourteen (14) minutes.  T.P. hung up and spoke with his supervisor, Wesolowski, for seven (7) minutes.

1070.   As of December 2013, and without the Wal-Mart business, Sandoz had only obtained approximately 30% share of the Adapalene Cream market.  This was well below its expected share in a two-player market and less than the 47% market share that Sandoz had maintained prior to leaving the market in November 2012 due to supply issues.

1071.   This underperformance caught the attention of high-level executives at Sandoz.  On January 8, 2014, R.A., a Sandoz finance executive, convened a meeting to discuss the Adapalene Cream re-launch and the issue of securing more market share on the product.  By that time, it had been decided internally by the sales team that Sandoz would pursue Walgreens – representing approximately 19% share – to meet its fair share targets on Adapalene Cream.

1072.   That same day, on January 8, 2014, CW-3 called T.P. of Perrigo.  The call lasted one (1) minute.  First thing the next morning, CW-3 called T.P. again and they spoke for sixteen (16) minutes.  T.P. and CW-3 would exchange two more calls the following week, on January 13

and January 16, 2013, lasting one (1) minute and ten (10) minutes, respectively.  Immediately upon hanging up from the ten (10) minute call, CW-3 called CW-1 and they spoke for eight (8) minutes.

1073.   On January 28, 2014, Sandoz held a follow-up meeting to discuss the Adapalene Cream re-launch and Walgreens as Sandoz's next target.  Two days later, on January 30, 2014, Sandoz met with Walgreens to discuss new product opportunities, including Adapalene Cream. The next day, on January 31, 2014, CW-3 called T.P. and they spoke for eight (8) minutes. Upon hanging up with T.P., CW-3 called CW-1.  The call lasted one (1) minute.

1074.   After this series of communications between CW-3 of Sandoz and T.P. of Perrigo, Sandoz submitted a bid to Walgreens for Adapalene on February 14, 2014.  Perrigo promptly conceded the customer and Walgreens awarded the business to Sandoz on March 5, 2014.  This award brought Sandoz's share back to 47% -- the same percentage it had before exiting the market in 2010.

### iii.   Calcipotriene Betamethasone Dipropionate Ointment

1075.   Calcipotriene Betamethasone Dipropionate Ointment ("CBD Ointment" or "Cal Beta"), also known by the brand name Taclonex Ointment, is a vitamin D analogue and corticosteroid combination product indicated for the topical treatment of psoriasis vulgaris in adults 18 years of age and older.  CBD Ointment is available in 60gm and 100gm dosages.

1076.   In early 2014, both Sandoz and Perrigo were preparing to launch CBD Ointment. Sandoz was preparing to launch as the first-to-file generic and Perrigo was preparing to launch as the authorized generic (the "AG").  Under the agreement that Perrigo had reached with the brand manufacturer, Perrigo could not launch until Sandoz, the first filer, entered the market. Typically, a first filer interested in gaining a competitive advantage would want to keep its

launch date a secret from the company launching the AG so that the first filer could catch the AG by surprise and maintain market exclusivity for a longer period of time.  But that was not the case with regard to CBD Ointment.

1077.   T.P., a sales executive at Perrigo, and CW-3, a senior sales executive at Sandoz, exchanged two calls in late February 2014.  On those calls, T.P. told CW-3 that Perrigo would be launching the AG of CBD Ointment and asked CW-3 when Sandoz planned to launch its generic version.

1078.   When first approached by T.P. about CBD Ointment, CW-3 was not aware that Sandoz was planning to launch it.  After being approached by T.P., CW-3 reached out to others at Sandoz to find out what Sandoz's plans were.  On March 4, 2014, A.S., a senior Sandoz launch executive, confirmed to CW-3 that Sandoz would be launching CBD Ointment.  Within minutes of receiving A.S.'s confirmation the night of March 4, 2014, CW-3 e-mailed Defendant Kellum, stating: "Please call me when you have a moment."

1079.   The next day, on March 5, 2014, Sandoz held an internal "Cal-Beta Launch Meeting" teleconference to discuss its plans.  Kellum, A.S., CW-1, a Sandoz senior pricing executive, and other members of the sales and launch teams attended the call.  Additional meetings were held on March 10 and March 13, 2014 to coordinate the CBD Ointment launch.

1080.   Also on March 13, 2014, CW-3 called T.P. two (2) times, with one of the calls lasting twelve (12) minutes.  That same day, Perrigo scheduled its own teleconference for the following day to discuss its CBD Ointment launch.  T.P., his supervisor Defendant Wesolowski, a senior executive at Perrigo, and over twenty (20) other Perrigo sales and launch team members attended the call.  On the call, the Perrigo sales executives were directed to go after only six (6)

select customer accounts, and no others.  These accounts were referred to as "wave 1 customers to receive an offer."

1081.   Promptly following the call, J.B., a Perrigo marketing executive, circulated a document that was discussed on the call.  The document was internally prepared at Perrigo and indicated that Sandoz may launch on March 31, 2014 and that Perrigo's "target share" was 50% of the market.  Perrigo's information was accurate.  Sandoz ultimately launched the 100gm size on March 31, 2014 and the 60gm size on April 1, 2014.  In harmony with Perrigo's target share goal of 50%, internal Sandoz e-mail correspondence circulated prior to launch stated that Sandoz also had a target market share of 50% for CBD Ointment.

1082.   While Perrigo planned to approach a small, select group of potential customers, Sandoz was deciding which large customers to go after.  Sandoz initially planned to target Walgreens and ABC for CBD Ointment.  However, Sandoz remained involved in ongoing business disputes with Walgreens and ABC in the middle of March 2014.  Sandoz was concerned that Walgreens and ABC would not award Sandoz their CBD Ointment business if the disputes were not resolved prior to launch.

1083.   On the night of Friday, March 14, 2014, A.S. e-mailed P.G., the President of Sandoz US, stating that resolving the ABC and Walgreens disputes would be a "pivotal success factor" for the CBD Ointment launch.  P.G. responded by directing A.S. to look for CBD Ointment business "somewhere else" and to "stay close and drive orders home asap, no excuses."

1084.   A.S. forwarded his e-mail correspondence with P.G. to Defendant Kellum and others at Sandoz on the afternoon of March 16, 2014.  Consistent with P.G.'s direction, A.S., Kellum, CW-3 and CW-1 immediately began to strategize how Sandoz could reach its market

278

share target of 50% without Walgreens and ABC.  A.S. determined that in order to reach that goal, Sandoz would need to have CVS as a customer.  At an in-person meeting in Sandoz's Princeton offices, Kellum told CW-3 and CW-1 that he also wanted McKesson and Rite Aid as customers.

1085.   On the next day, March 17, 2014, CW-3 called T.P. at Perrigo to resume their discussions about customer allocation and to exchange pricing information.  Between March 17 and March 20, 2014, CW-3 and T.P. exchanged more than ten phone calls, with one call lasting eleven (11) minutes and another call lasting seventeen (17) minutes.  Further, T.P. reported the substance of these calls to his supervisor, Wesolowski, seeking direction from him on how to respond to CW-3.  T.P. often spoke with Wesolowski between calls with CW-3, sometimes even calling him immediately after hanging up with CW-3.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/17/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:38:00 | 0:01:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 8:56:00 | 0:11:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 9:08:00 | 0:12:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 12:42:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 12:49:00 | 0:01:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 13:13:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 13:22:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 13:48:00 | 0:08:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:56:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 14:00:00 | 0:03:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 15:30:00 | 0:04:00 |
| 3/19/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 16:20:00 | 0:17:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolwoski, John (Perrigo) | 8:37:00 | 0:01:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolwoski, John (Perrigo) | 8:40:00 | 0:03:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolwoski, John (Perrigo) | 12:37:00 | 0:08:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:18:00 | 0:07:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolwoski, John (Perrigo) | 14:24:00 | 0:01:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 15:08:00 | 0:03:00 |

1086.   Although most of T.P. and CW-3's calls were just between the two of them, occasionally other colleagues would join them.  For example, CW-3 made a call early in the

week of March 17, 2014 to T.P. from A.S.'s office in Princeton, and Defendant Kellum and CW-1 also joined the call.

1087.   As noted above, over the course of these calls, T.P. and CW-3 discussed market pricing and customer allocation.  In a call early in the week of March 17, 2014, T.P. shared Perrigo's proposed WAC pricing and AWP pricing for different types of customers.  During that call, CW-3 took the following contemporaneous notes in his Notebook:



1088.   When Perrigo launched CBD Ointment about two weeks later, its WAC and AWP matched those price points.  The two rows of WAC prices in the Notebook represent the different pricing for the 60gm and 100gm sizes.  Sandoz's WAC prices at launch were close but slightly higher than Perrigo's, at $657.45 for the 60gm size and $968.40 for the 100gm size.

1089.   T.P. also shared with CW-3 what Perrigo's non-public, "dead net" pricing would be for its customers.  Perrigo ranked its customers into five "tiers."  Customers in the same tier were typically sold a drug at the same "dead net" price.  T.P. communicated the CBD Ointment pricing tiers to CW-3 by giving examples of the types of customers in a tier, such as large wholesalers like ABC and Cardinal or regional wholesalers like HD Smith or Optisource, and what the corresponding "dead net" pricing would be for that type of customer.  CW-3's contemporaneous notes regarding Perrigo's dead net pricing for CBD Ointment are below:



1090.   The pricing tiers T.P. gave to CW-3 matched the pricing tiers Perrigo planned to

use.  The following rows are from an internally prepared spreadsheet that shows Perrigo's main

pricing tiers for the two different sizes of CBD Ointment:

| PERRIGO PHARMACEUTICALS COMPANY | | | | | | | | | | | W T2 | W T3 | W T4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALLPRICE REPORT | | | | | | | | | | | | | |
| PRODUCT | SIZE | NDC # | PRICING REFERENCE S# | WAC PRICE | MEDI REBATE | FREIGHT | COGS | AWP | CONTROL LEVEL | RX OTC | Tier 2 Pricing | Tier 3 Pricing | Tier 4 Pricing |
| CALCIPOTRIENE-BETAMETHASONE DIPROPIONATE OINTMENT 0.005-0.064% | 60 G | 45802-0989-96 | S0529RC | 631.15 | 0.00 | 0.06 | 5.26 | 788.94 | | RX | 426.31 | 448.75 | 498.61 |
| CALCIPOTRIENE-BETAMETHASONE DIPROPIONATE OINTMENT 0.005-0.064% | 100 G | 45802-0989-01 | S0530RC | 929.66 | 0.00 | 0.09 | 6.52 | 1162.08 | | RX | 627.94 | 660.99 | 734.43 |

1091.   Moreover, Perrigo's offers to customers were in step with the "dead net" pricing

noted above.   For example, Perrigo made offers to Wal-Mart and Meijer, both so-called "tier 2"

customers, that resulted in Wal-Mart and Meijer having "dead net" pricing of $426.31 and

$627.94 for the 60g and 100g sizes respectively and offers to Optisource and Morris Dickson,

both so-called "tier 3" customers, that resulted in Morris Dickson and Optisource having "dead

net" pricing of $448.75 and 660.99 for the 60g and 100g sizes respectively.

1092.   As noted earlier, T.P. and CW-3 did not just use these calls to share pricing

information in anticipation of their launches.  They also used them to allocate the customers that

would be in the market.  When CW-3 and T.P. spoke on calls early in the week of March 17, 2014, each shared his respective company's position on how customers should be divided between them to achieve "fair share."  CW-3 told T.P. that Sandoz wanted McKesson, Rite Aid, Econdisc, CVS, Cardinal, Omnicare and Kaiser.  CW-3 documented this in his Notebook:



1093.   T.P. responded that Perrigo wanted Anda, Walgreens, ABC, Wal-Mart, Rite Aid and McKesson.  CW-3 documented this in his Notebook:

The purpose of reaching agreement on the list of customers was to avoid competing with one another as both companies entered the market simultaneously.

1094.   As the lists above show, with the exception of Rite Aid and McKesson, Sandoz and Perrigo were aligned on how significant customers should be allocated.  In March 2014, Rite Aid was purchasing generic drugs through McKesson's "OneStop Generics" program, so Perrigo and Sandoz viewed these customers as a package or, put another way, whoever got McKesson also got Rite Aid as a customer.  Both of the competitors wanted that business.

1095.   As the negotiations continued, Sandoz recognized that the list of customers it wanted for CBD Ointment was more than its fair share of the market.  However, in keeping with its general strategic preference for selling to a smaller number of large customers, Sandoz did not want to give up McKesson, Rite Aid, CVS, or Cardinal.  To resolve the issue, Defendant Kellum, CW-3 and CW-1 brainstormed a list of other customers that, when combined, would have about the same market share as Rite Aid and McKesson and that Sandoz was willing to give up to

Perrigo.  Ultimately, the list of customers that Sandoz created included Optisource, Publix,

Morris & Dickson (MD), PBA Health (PBA), Meijer, and Kaiser.

1096.   Thereafter, CW-3 called T.P. and proposed that Sandoz give up these customers

to Perrigo in exchange for McKesson and Rite Aid.  CW-3 documented this in his Notebook:

*[handwritten note: -propose OPAI, Publix, MD, PBA, Meijer raise-]*

Perrigo agreed.

1097.   Following the plan, Perrigo submitted offers to the customers listed above and

was awarded the business at Optisource, Publix, Morris & Dickson, Meijer, and Kaiser.  In

addition, and as planned, Perrigo bid on and won Anda, Walgreens, ABC and Wal-Mart, while

Sandoz bid on and won McKesson, Rite Aid, CVS, Cardinal, and Omnicare.

1098.   While Defendant Wesolowski encouraged the Perrigo sales team to go after their

assigned customers, he was also careful to make sure they adhered to the agreement reached with

Sandoz.  For example, on March 21, 2014, Omnicare reached out to Perrigo asking for a bid on

CBD Ointment.  Omnicare was a customer allocated to Sandoz.  P.H., a Perrigo sales executive,

forwarded the request to Wesolowski who responded, "[t]his customer will not be approached."

Consistent with Wesolowski's direction, P.H. told Omnicare that Perrigo was "holding off on

offers for now," even though Perrigo was actively sending offers to other potential customers at

that time.

1099.   On March 31, 2014, CW-3 called T.P.  The call lasted two (2) minutes.  That

same day, Sandoz officially launched the 100gm package size of CBD Ointment and Perrigo

launched both the 100gm and 60gm package sizes.  The next day, on April 1, 2014, Sandoz

launched the 60gm size.  Early in the morning of April 1, 2014, M.A., a Sandoz marketing

executive, e-mailed Kellum and A.S. to advise that she received an alert that Perrigo had increased prices on CBD Ointment.  She noted that she was "sure you are already aware of Perrigo's pricing."

1100.   On April 7, 2014, D.A., a Sandoz launch executive, noted in an internal e-mail that Sandoz "hit its target share goal on Cal/Beta."  At the end of April 2014, Sandoz and Perrigo had a virtually even split of the market for that product.

### iv.   Tacrolimus Ointment

1101.   Tacrolimus Ointment ("Tacrolimus"), also known by the brand name Protopic, is a secondary treatment option for moderate to severe eczema.  Tacrolimus is available in 30gm, 60gm and 100gm dosages.  Recent annual sales of Tacrolimus Ointment in the United States exceeded $100 million.

1102.   In August 2014, Sandoz and Perrigo were both preparing to launch Tacrolimus. Sandoz was the first-to-file generic and Perrigo was the authorized generic (the "AG").

1103.   On August 13, 2014 at 3:57 p.m., E.D., a Sandoz launch executive, sent an internal e-mail asking if anyone knew whether there would be an AG for Tacrolimus or if any other competitors planned to enter the market.  At 5:11 p.m. that same day, CW-3, a Sandoz senior sales executive, called T.P., a Perrigo sales executive, and they spoke for fifteen (15) minutes.  Notably, prior to this call, CW-3 and T.P. had not spoken since June 18, 2014.  Within a half hour of hanging up with T.P., CW-3 sent the following e-mail responding to E.D.'s questions:



1104.   On September 8, 2014, Sandoz held a Commercial Operations meeting during which they discussed the Tacrolimus launch.  That same day, CW-3 called T.P. four times, with one call lasting eleven (11) minutes and another six (6) minutes.  On those calls, CW-3 and T.P. discussed the Tacrolimus launch and decided to model it after the CBD Ointment launch.  As discussed above in the previous Section, in the spring of 2014 CW-3 and T.P. had colluded on CBD Ointment when Sandoz was entering as the first-to-file generic and Perrigo as the AG.  By using CBD Ointment as a model, the competitors would not have to spend significant time negotiating the allocation of customers for Tacrolimus.

1105.   That same day, on September 8, 2014, CW-3 sent the following e-mail to Sandoz launch executives, E.D. and A.S., with a copy to CW-1, a Sandoz senior pricing executive:



1106.   Two days later, on September 10, 2014, CW-3 called T.P. and they spoke for fifteen (15) minutes.  During that call, the competitors again talked about the Tacrolimus launch. Specifically, they discussed the allocation of certain customers to Sandoz and Perrigo so that

each competitor could reach 50% market share.  Further, T.P. provided CW-3 with Perrigo's

WAC and AWP pricing for the three dosage sizes, and the dead net pricing that Perrigo was

contemplating for various classes of customers.  CW-3's contemporaneous notes from that call

are pictured below:



1107.   In his notes, CW-3 recorded that the competitors would "Model after Cal Beta"

and listed the customers that they agreed to allocate to each other.  Sandoz planned to target the

customers listed in the box in the bottom right hand corner of the note, and Perrigo planned to

target the customers listed above it.

1108.   On November 10, 2014, A.F., a Perrigo sales executive, e-mailed Defendant

Wesolowski, a senior Perrigo executive, to advise that a customer told her Sandoz was launching

286

Tacrolimus that day.  In turn, Wesolowski e-mailed T.P. and others at Perrigo asking them if the launch could be confirmed.  That same day, T.P. and CW-3 spoke two times, with one call lasting two (2) minutes and the second lasting three (3) minutes.  During those calls, CW-3 told T.P. that Sandoz had not yet formally launched the product or started shipping to customers.  Later that afternoon, T.P. reported back to Wesolowski:

> My customer says they are not shipping

In order to avoid any written evidence of his illegal activity, T.P. referred to his source as a "customer" even though it was actually his competitor, CW-3.

1109.   On November 19, 2014, Sandoz launched Tacrolimus and Perrigo launched on the following day, November 20, 2014.  Consistent with the competitors' plans, Sandoz was awarded CVS, Cardinal, Omnicare, and Econdisc, among other customers.  As planned, Perrigo won Walgreens, Walmart, ABC (secondary), Anda, Optisource, and Publix.

1110.   On November 20, 2014, Defendant Boothe, a senior Perrigo executive, sent around a congratulatory e-mail to the Perrigo team that worked on the Tacrolimus launch.  He specifically congratulated C.V., a Perrigo business development executive, and Defendant Wesolowski for "reeling in this product!"  A few days later, in response to a request from the Tacrolimus brand manufacturer on how sales were going, C.V. replied, "[v]ery good so far.  We appear to have right around 50% of the market."

### v.    Methazolamide Tablets

1111.   Methazolamide, also known by the brand name Neptazane, is used to treat ocular conditions where lowering intraocular pressure would be beneficial, including several types of glaucoma.  Methazolamide Tablets are available in 25mg and 50mg dosages.

1112.   By the fall of 2013, there were two manufacturers marketing Methazolamide –
Defendant Sandoz and Fera Pharmaceuticals, Inc. ("Fera").  Both competitors had posted nearly
identical WAC pricing for the 25mg and 50mg dosage sizes, respectively.

1113.   In early 2014, Sandoz began experiencing issues with its API supplier and was
forced to temporarily withdraw from the market.  At that time, Sandoz expected that its supply
problems would be resolved in June 2014 and it would re-enter then.

1114.   At the same time that Sandoz was experiencing supply problems, Perrigo acquired
Fera's right to distribute Methazolamide.  As a result of Perrigo's acquisition, Fera left the
Methazolamide market.

1115.   On March 6, 2014, Perrigo formally launched Methazolamide.  Perrigo knew
prior to its launch that Sandoz, its only competitor, was out of the market and was not expected
to re-enter until the summer of 2014.  Perrigo leveraged its temporary position as the only
manufacturer with the ability to supply by implementing a large price increase.  Perrigo's WAC
pricing when it entered was 136% higher than Sandoz's.  An internal Perrigo document
circulated approximately one month prior to the launch indicated that Perrigo's target share for
Methazolamide was "50% of [the] generic market [for Methazolamide] with short-term upside."

1116.   On June 17, 2014, Perrigo learned from a customer that Sandoz was back in the
Methazolamide market.  That same day, T.P. of Perrigo called CW-3, a Sandoz senior sales
executive.  The call lasted one (1) minute.  After that call, T.P. called his supervisor, Defendant
Wesolowski, and they spoke for three (3) minutes.  The next day, on June 18, 2014, T.P. and
CW-3 exchanged two more calls, with one call lasting three (3) minutes.  On Monday, June 23,
2014, T.P. e-mailed Wesolowski the following:

Sandoz, I believe is back with the 25mg, not the 50mg

288

1117.   Indeed, Sandoz had re-entered the market for the 25mg with a WAC price of $129.84 – which was significantly lower than Perrigo's WAC price of $306.47.  Defendant Wesolowski was upset that Sandoz did not reach out to Perrigo before re-entering the market. Had it done so, Sandoz would have known to raise its price, and to what level.  Wesolowski forwarded T.P.'s e-mail above to Defendant Boothe, a senior Perrigo executive, and others at Perrigo with the following cover note:

> Guys,
>
> Confirmed at three accounts that Sandoz is back at the old price on the 25mg. No timetable set on the 50mg yet but "soon".  Bummer that they didn't do their homework.
>
> JW

1118.   In the meantime, Perrigo would make sure that Sandoz did its "homework" before re-entering on the 50mg, and that it would correct its prior mistake on the 25mg.

1119.   On October 21, 2014, CW-3 and T.P. spoke for fifteen (15) minutes.  During that call, T.P. provided CW-3 with Perrigo's increased WAC pricing for the 25mg and 50mg package sizes of Methazolamide to ensure that Sandoz would match those prices when it re-entered the market.  CW-3's contemporaneous notes from that call are pictured below:



1120.   Shortly after the call, in early November 2014, Sandoz began ramping up for its re-entry into the Methazolamide market.  On November 3, 2014, Sandoz held a Commercial

Operations meeting during which Sandoz discussed its plans for the Methazolamide re-launch, including implementing significant price increases to align with Perrigo's pricing.

1121.   The next day, on November 4, 2014, CW-1, a senior Sandoz pricing executive, sent an internal e-mail asking his colleague P.C. to evaluate the "WAC price increase impact" if Sandoz raised its WAC pricing to match Perrigo.  The next day, CW-3 called T.P at Perrigo and the two competitors spoke for twelve (12) minutes.  Also on that day, CW-1 directed the Sandoz pricing team to remove Methazolamide from any existing contracts.  CW-1 explained that "[w]e will be reintroducing [Methazolamide] at a revised price therefore we need to remove the current contract pricing."

1122.   The two competitors continued to coordinate over the next several weeks as Sandoz made final preparations to re-enter the market and raise prices.  On November 10, 2014, CW-3 called T.P. twice with one call lasting two (2) minutes and the other call lasting three (3) minutes.

1123.   On December 4, 2014, CW-3 e-mailed Defendant Kellum, CW-1, and others at Sandoz regarding Methazolamide, providing them with specific, non-public pricing information he had learned from his competitor:

GPO price points in the market are as follows (dead nets) - $250 & $500.

Internal Perrigo documents confirm that its so-called "dead net" pricing for group purchasing organizations (GPOs) at that time was approximately $250 for the 25mg and $500 for the 50mg. This pricing information was not publicly available.

1124.   On December 5, 2014, Sandoz re-launched its 50mg dosage with a WAC price of $612.97, which matched Perrigo's WAC price.  At the same time, Sandoz increased the WAC price on its 25mg dosage by 136% to match Perrigo's pricing.

290

### 2)    Collusion Between Sandoz And Glenmark

1125.   In August 2012, not long after Sandoz acquired Fougera, Defendant Mitchell

Blashinsky, who had just recently joined Defendant Glenmark as its Vice President of Sales and

Marketing, approached CW-3 of Sandoz at the NACDS conference in Denver, Colorado.  During

their conversation over breakfast at the Marriot Hotel, Blashinsky told CW-3, among other

things, "we can make a lot of money" and "we can work together on pricing."

1126.   Over the next two years, the two competitors did "work together" on both market

allocation and pricing – speaking at least fifty (50) times.  Their communications were all

collusive in nature.  The two competitors were not friends and had no other reason to speak

except to coordinate anticompetitive conduct.  During that time period, Sandoz and Glenmark

conspired to fix prices and allocate markets on at least two products: (1) Fluticasone Propionate

Lotion (60ml) and (2) Desoximetasone Ointment.

### i.    Fluticasone Propionate Lotion (60ml)

1127.   Fluticasone Propionate Lotion ("Fluticasone"), also known by the brand name

"Cutivate," is a topical corticosteroid used to treat swelling and itching that result from various

chronic skin disorders, including atopic dermatitis.

1128.   Glenmark was the first generic manufacturer to enter the market for Fluticasone

on March 26, 2012.  As the first generic manufacturer to file an approved ANDA, Glenmark

enjoyed a 180-day period of exclusivity during which time no other competitors could sell the

product.  Even before Glenmark launched, Sandoz (then Fougera) was planning to enter the

market for Fluticasone after Glenmark's exclusivity period ended in September 2012 and

understood that Perrigo was also planning to enter at the same time.  Over the course of several

months, Fougera – in particular CW-6, at the direction of Defendant Kaczmarek – coordinated

291

with Glenmark frequently about Fluticasone, including market share targets and pricing, to prepare for its eventual Fluticasone launch.

1129.   After the Sandoz acquisition of Fougera in July 2012, as the end of Glenmark's 180-day exclusivity period approached, Sandoz continued to stay in communication with Glenmark and Perrigo about Fluticasone.  As part of its launch strategy, Sandoz planned to obtain 33% of the market.  Perrigo, however, only anticipated taking about one-quarter of the market.

1130.   By mid-August 2012, Sandoz learned that its launch of Fluticasone would be delayed until the end of November 2012 because of certain production problems.  As a result of this delay, Defendant Kellum was concerned that Perrigo would be able to launch earlier than Sandoz and wanted to learn more about Perrigo's launch strategy.  On August 21, 2012, Kellum sent an e-mail to his sales team asking about "Perrigo's intentions."  Within minutes of receiving the e-mail, CW-3 reached out to T.P., his contact at Perrigo, by phone.

1131.   CW-3 also sent a message to Perrigo through a customer.  That same day, the customer sent an e-mail to a Perrigo sales executive, stating: "Rumor has it… you guys are launching [Fluticasone Lotion.]  You guys want to play?"  The Perrigo sales executive informed the customer that Perrigo's Fluticasone launch had now been "moved out" to the first quarter of 2013.  The customer then forwarded that e-mail directly to CW-3 at Sandoz, who reported the information directly to Defendant Kellum and others at Sandoz the next day.

1132.   Around this same time, Sandoz also began preparing to have conversations with "customers" about its Fluticasone launch while at the NACDS Conference in Denver in late August 2012.  It was at that same conference where CW-3 first spoke to Defendant Blashinsky at Glenmark about working "together" and making "a lot of money."  In an internal e-mail to the

Sandoz sales team on August 25, 2012, in advance of the NACDS Conference, R.T., a senior Sandoz sales and marketing executive, instructed his team on the current strategy which aligned with the larger "fair share" understanding: "If [the] market is just Glenmark and Sandoz we would like to get at least 40% market share.  If Perrigo also enters, we would like to get at least 30% market share."

1133.   As its launch date for Fluticasone approached, Sandoz began to think more critically about which customers to target and began to communicate directly with Glenmark on the subject.  On November 26, 2012, Sandoz scheduled an internal meeting to discuss which customers it should approach as part of its Fluticasone launch.  That same day, CW-3 of Sandoz spoke to Defendant Blashinsky of Glenmark twice, with one call lasting five (5) minutes.  After the second call with Blashinsky, CW-3 e-mailed his Sandoz colleagues a list of six (6) customers he thought Sandoz should target.  That list would later grow to eight (8) customers.  CW-3 also made it known to his Sandoz colleagues that Glenmark was planning a potential price increase on Fluticasone at some point in the future.

1134.   The next day, November 27, 2012, a senior Sandoz marketing executive asked CW-3 to get Fluticasone "price points" for the customers Sandoz had agreed to target.  CW-3 responded that he was "working on gathering this information."  As promised, the next morning (November 28) CW-3 called Defendant Blashinsky of Glenmark.  The two spoke four (4) times that day, including one call lasting eight (8) minutes.  Later that same day, CW-3 was again asked if he had been able to "gather any intel in preparation for sending out offers [on Fluticasone.]"  CW-3 responded: "I believe I have all the fluticasone information and will provide it soon."

293

1135.   The next morning, CW-3 sent an updated list of nine (9) customers that Sandoz should target for Fluticasone – based on his conversations with Defendant Blashinsky – but he did not include the pricing information that had been requested.  The senior Sandoz marketing executive responded immediately: "Pricing?"  CW-3 countered by referring to one of the biggest pop songs of 2012, suggesting that his boss should call him instead of asking for the information in writing:

| | |
|---|---|
| **From:** | █████████ |
| **Sent:** | Thursday, November 29, 2012 1:37 PM |
| **To:** | █████████ |
| **Cc:** | █████████ |
| **Subject:** | RE: Fougera Launches - Fluticasone Propionate and Ciclopirox Shampoo |

Call me....maybe?

1136.   As Sandoz continued to prepare for its imminent launch, it also began to evaluate the usage expected from the nine customers that it had agreed with Glenmark to target.  Sandoz found that those nine customers would not allow the company to reach its desired market share goals.  As a result, on November 30, 2012 a senior Sandoz marketing executive suggested that Sandoz approach two large wholesaler customers, instead of one as originally agreed.  CW-3 responded immediately, saying "I'm still gathering intel on Fluticasone."  CW-3 then stated that "[t]wo retail[ers] and two wholesale[rs] on Fluticasone would be too much.  Glenmark will more than likely retain one of the two wholesalers approached."  A few hours later, CW-3 called Defendant Blashinsky and left a message.  Defendant Blashinsky promptly returned the call and the competitors spoke for three (3) minutes.  Later that day, CW-3 also called and spoke to his contact at Perrigo, T.P., twice.

1137.   Sandoz officially entered the market for Fluticasone on December 3, 2012, matching Glenmark's WAC pricing exactly.  That same day, CW-3 of Sandoz called Defendant

Blashinsky of Glenmark and they had a two (2) minute call.  Also that day, Blashinsky directed the sales team to relinquish the Publix and Optisource accounts to Sandoz, two of the nine customers that Glenmark had agreed to give up to the new entrant.

1138.   Sandoz continued to coordinate with Glenmark to make sure that it was targeting the appropriate customers and minimizing price erosion as it entered the Fluticasone market.  For example, on December 13, 2012, a large wholesaler that Sandoz had agreed not to target approached Sandoz looking for an offer.  That same day, CW-3 spoke to Defendant Blashinsky twice.  When Sandoz refused to respond to the customer, the customer followed up again on December 21, 2012.  Again, following the same pattern, CW-3 spoke to Defendant Blashinsky twice that day, including one call lasting four (4) minutes.

1139.   Although Sandoz made sure to coordinate extensively with Glenmark, it had initial difficulty meeting its market share goal, in part because some of the customers already had a significant amount of inventory on hand.  On January 9, 2013, CW-3 had a conversation with Defendant Blashinsky where the two competitors walked through a list of customers, identifying those that Sandoz should target and those which it should not.  CW-3 took detailed contemporaneous notes of the conversation.  Later in the day, after reviewing the list, CW-3 of Sandoz began to suspect that Glenmark may have oversold to certain customers in advance of Sandoz's entry, stating in an e-mail that he had "a feeling Glenmark is playing games with us."

1140.   By January 11, 2013, CW-1 of Sandoz sent around a summary of "where we are with Fluticasone," stating that "our market share is now 21.8%, and we have been able to keep the price up which has allowed us to exceed our 2013 [target].  If this were a product with traditional customer share distribution I would estimate we would probably be a little over 30% share.  Currently the brand continues to have 43% of the market."  In response, R.T. of Sandoz

indicated that he was "ok with our progress so far," but that 21.8% market share was "not optimal" and that Sandoz should continue to press for its original market share goal.

1141.   During an internal Commercial Operations meeting on January 21, 2013, Sandoz decided to approach another customer, CVS, in order to obtain additional market share.  But before doing so Sandoz wanted to confirm that it was acceptable with Glenmark.  In his contemporaneous notes of the meeting, CW-3 recorded in his Notebook that he was supposed to "call MB [Mitchell Blashinsky of Glenmark]" and let him know that Sandoz was "going to CVS":



1142.   Sandoz subsequently learned why Glenmark was reluctant to give up more market share to Sandoz.  There was a discrepancy between the two competitors about how much market share Sandoz had already obtained.  On January 29, 2013, a senior Sandoz marketing executive reported that "Glenmark believes our share is greater than what we've received in terms of customer utilization and as a result, they continue to defend their business."  Two days later, on January 31, 2013, CW-3 and Defendant Blashinsky spoke two more times, for five (5) minutes each.

1143.   Over the next several months Sandoz and Glenmark continued to coordinate about Fluticasone, including about a Glenmark price increase on that drug.  For example, on April 16, 2013, as Glenmark was preparing for a large-scale price increase on several different drugs (in coordination with several different competitors), CW-3 of Sandoz had two separate calls with Defendant Blashinsky of Glenmark, including one call lasting thirteen (13) minutes.

They talked about several things, including Glenmark's potential entry and market share targets on a different drug, Alclometasone, as well as a price increase on Fluticasone, as recorded by CW-3 in his contemporaneous notes of the call:



1144.   Defendant Blashinsky called CW-3 again on May 6, 2013, in advance of the Glenmark price increase.  He also called CW-3 on May 17, 2013 – the day after the Glenmark price increase on Fluticasone became effective.  In all, the two competitors spoke three times on May 17, 2013, including two separate five (5) minute calls.

1145.   Throughout this time period, Sandoz also kept in close communication with Perrigo about the details of Perrigo's anticipated entry into the Fluticasone market.  For example, in early April 2013 CW-3 of Sandoz spoke to T.P. of Perrigo multiple times, including calls lasting seventeen (17) and five (5) minutes, respectively.  CW-3 subsequently reported to his colleagues at Sandoz that Perrigo would be delayed in entering the Fluticasone market "until July at the earliest and fall at the latest."  On April 9, 2013, a colleague at Sandoz followed up asking CW-3 for additional information about whether Perrigo planned to enter "with both the 60 and 120 ml bottles?"  The next day, CW-3 communicated directly with Perrigo to obtain the answer, calling and speaking with T.P. two (2) times.

1146.   On May 21, 2013, as Perrigo was beginning to plan its entry into the market, a Perrigo executive asked T.P. to obtain "market pricing" for Fluticasone Lotion.  Two days later, on May 23, 2013, T.P. called CW-3 at Sandoz.  They ended up speaking twice that day, for five (5) and three (3) minutes, respectively.  Immediately after their second call, CW-3 called

Defendant Blashinsky at Glenmark – the other competitor on Fluticasone – and the two spoke for four (4) minutes.

1147.   Similarly, on May 28, 2013 a senior Sandoz executive requested additional "market intelligence" about Perrigo's entry timing on Fluticasone.  That same day, CW-3 called T.P. at Perrigo and they spoke for four (4) minutes.  The next day, T.P. called CW-3 back and they spoke again for two (2) minutes.

1148.   By July 2013, Perrigo finally began preparing in earnest to enter the Fluticasone market.  As of that time Sandoz had been able to obtain 30% market share, reaching its initial target goal for a 3-player market with Glenmark and Perrigo.  Sandoz understood that, because Glenmark still had a significant majority of the market share, Perrigo would target Glenmark customers as it entered.

1149.   In the days and weeks leading up to Perrigo's launch, Perrigo was in frequent communication with Sandoz, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/2/2013 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 11:13:00 | 0:01:00 |
| 7/10/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 16:14:00 | 0:01:00 |
| 7/15/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 12:06:00 | 0:01:00 |
| 7/16/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 9:22:00 | 0:01:00 |
| 7/17/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 11:22:00 | 0:19:00 |
| 7/29/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 10:27:00 | 0:01:00 |
| 7/29/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:11:00 | 0:01:00 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 10:09:00 | 0:13:00 |
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:32:00 | 0:01:00 |
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:42:00 | 0:05:00 |

1150.   Perrigo held an internal meeting to discuss its Fluticasone launch on July 16, 2013.  As can be seen in the table above, on the day of the meeting T.P. of Perrigo called CW-3 at Sandoz and left a message.  He called CW-3 again the next day, and they were able to speak for nineteen (19) minutes.  During these conversations, T.P. informed CW-3 that, consistent with

the "fair share" understanding, Perrigo was targeting specific Glenmark customers and looking for approximately 25% market share.  CW-3 took contemporaneous notes of his conversation with T.P., as set forth below:



1151.   On July 30, 2013, Perrigo received FDA approval to begin selling Fluticasone. That same day, T.P. of Perrigo spoke to CW-3 of Sandoz for thirteen (13) minutes.  Perrigo then formally launched the product on August 1, 2013, with the same exact WAC pricing as Glenmark and Sandoz.  T.P. and CW-3 also spoke twice that day.

1152.   As Perrigo entered the market it planned only a "limited launch," targeting only $1 million per year in sales.  In accordance with the fair share understanding and the previous communications between the competitors, Perrigo targeted – and Glenmark conceded – multiple customers immediately.

### ii.    Desoximetasone Ointment

1153.   Desoximetasone Ointment ("Desoximetasone"), also known by the brand name "Topicort," is a corticosteroid used to treat a variety of skin conditions, including eczema and dermatitis.   Desoximetasone reduces the swelling, redness and itching associated with those conditions.

1154.   As of the summer of 2012, Defendant Taro was the only manufacturer of Desoximetasone Ointment.

299

**a)** *Sandoz Entry (September 2012)*

1155.   Starting in August 2012, Sandoz began making plans to enter the Desoximetasone market.  Because it would be a 2-player market upon Sandoz's entry, and because Sandoz was the second manufacturer to enter the market, Sandoz initially decided – consistent with the "fair share" understanding outlined above – to target 40% market share.

1156.   On the evening of August 21, 2012, Sandoz held an internal meeting to discuss its "share goal" and "customer strategy" regarding Desoximetasone.  Shortly after the meeting, a Sandoz executive sent an initial list of eight (8) customers that Sandoz should consider approaching.  The executive indicated that Sandoz's success would depend "on how Taro reacts to our entry" and that more research was necessary regarding one of the larger customers, because approaching such a "big" customer could cause "disruption."

1157.   First thing the next morning, Sandoz began to coordinate with Taro.  K.K., a national account executive at Sandoz, called D.S., a senior sales executive at Taro, and the two spoke for nine (9) minutes.

1158.   On August 30, 2012, Sandoz held another internal meeting to discuss its Desoximetasone launch.  That same day, K.K. of Sandoz spoke again to D.S. of Taro, this time for two (2) minutes.  The day after this internal Sandoz meeting and the phone conversation with Taro, on August 31, 2012, CW-1 of Sandoz sent Defendant Kellum a "pricing grid" for Desoximetasone, which included specific pricing "intel" and a more refined list of customers that would provide Sandoz with its target market share.

1159.   As the Sandoz launch date approached, CW-3 of Sandoz also began speaking to H.M., an account executive at Taro, to coordinate Sandoz's entry into the market.  The two competitors were not friends, and nearly all their conversations were collusive in nature.

According to phone records, the first ever call between the two competitors was on September 6, 2012.  They spoke again on September 21, 2012, as Sandoz was finalizing its launch plan. During these calls, H.M. provided CW-3 with Taro price points for various customers so that Sandoz could bid as high as possible and avoid price erosion, while still obtaining new customers as it entered the market.  CW-3 passed that pricing information and list of customer targets on to CW-1 and Defendant Kellum at Sandoz.  That same day, H.M. also sent an e-mail to J.M., a sales executive at Taro, relaying a "rumor" that Sandoz would be entering the Desoximetasone market "looking for a 40% share," and suggesting six accounts as possible targets.

1160.   Sandoz received FDA approval and formally launched Desoximetasone on September 28, 2012, matching Taro's WAC pricing exactly.  That same day, CW-3 of Sandoz also called H.M. at Taro and left a message; H.M. returned the call almost immediately, leaving CW-3 a voicemail.

1161.   Based on the conversations with Taro, Sandoz decided to take a "staggered approach" in targeting customers, so as "not to cause too much panic" with its competitor.  In an internal Sandoz e-mail on October 1, CW-1 indicated that Sandoz's initial "target market share" for this product had now been adjusted slightly lower based on "some additional intelligence."

1162.   Shortly after receiving approval, on October 1, 2012, Sandoz began approaching a limited set of customers, per its agreement with Taro.  That same day, CW-4 of Sandoz reached out to D.S. at Taro – someone CW-4 had colluded with in the past – and spoke two times, including one call lasting twenty-one (21) minutes.

1163.   Consistent with the understanding in place between the two competitors, Taro immediately started conceding customers to Sandoz.  For example, on October 11, 2012, a high-ranking Taro executive sent an internal e-mail discussing Sandoz's launch of Desoximetasone.

301

In the e-mail, the executive indicated that Taro had been aware of Sandoz's launch "for some time" and that Taro had just conceded two large customers to Sandoz, with the expectation of relinquishing "about 1/3 of our total share" going forward.  That same day, H.M. of Taro called CW-3 of Sandoz, likely to let him know that the customers had been conceded and confirm the plan moving forward.  They spoke twice that day, including one call lasting more than six (6) minutes.

1164.   Sandoz was able to obtain most of its targeted market share quickly, without any market disruption.  By October 12, 2012, for example, R.T., a senior sales and marketing executive at Sandoz, provided a summary of the Desoximetasone launch, stating: "Knock on wood, things are going well on this so far with pricing being very good . . . and have picked up about 20% market share so far with Walmart, Rite Aid, and finalizing McKesson."

1165.   At that point, Sandoz decided it needed to obtain at least one more customer to meet its fair share goals.  Internally, Sandoz discussed sending a message to Taro that "this is our last big customer if we get it."  On October 23, 2012, CW-1, CW-3 and Defendant Kellum scheduled a conference call to discuss which customers to approach to "fill the additional share we need."  That same day, CW-3 called H.M. at Taro and the two competitors spoke several times, including two separate fifteen (15) minute calls.

1166.   As a result of these conversations, Taro agreed to relinquish additional customers to Sandoz.  By February 2013, Sandoz had captured its original goal of 40% of the Desoximetasone market, without any significant disruption.

### b)   *Glenmark Entry (September 2013)*

1167.   Glenmark received FDA approval to sell Desoximetasone on September 20, 2013. In the days and weeks leading up to the Glenmark launch, Glenmark, Taro and Sandoz were

speaking frequently to coordinate Glenmark's entry, including at least the following calls and

text messages:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/15/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Aprahaman, Ara (Taro) | 13:33:00 | 0:08:00 |
| 8/20/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Aprahaman, Ara (Taro) | 9:40:00 | 0:02:00 |
| 8/20/2013 | Voice | S.G. (Sandoz) | Outgoing | D.I. (Glenmark) | 13:45:00 | 0:01:00 |
| 8/20/2013 | Voice | S.G. (Sandoz) | Outgoing | D.I. (Glenmark) | 13:56:00 | 0:02:00 |
| 8/21/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahaman, Ara (Taro) | 11:37:00 | 0:07:00 |
| 8/22/2013 | Text | CW-3 (Sandoz) | Incoming | D.C. (Glenmark) | 13:29:19 | 0:00:00 |
| 8/22/2013 | Text | CW-3 (Sandoz) | Incoming | D.C. (Glenmark) | 13:29:19 | 0:00:00 |
| 8/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahaman, Ara (Taro) | 15:54:00 | 0:03:00 |
| 8/27/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 17:48:00 | 0:03:00 |
| 8/28/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Perfetto, Mike (Taro) | 13:29:00 | 0:01:00 |
| 8/28/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahaman, Ara (Taro) | 11:36:00 | 0:15:00 |
| 9/4/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:08:00 | 0:01:00 |
| 9/4/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:26:00 | 0:01:00 |
| 9/5/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahaman, Ara (Taro) | 15:29:00 | 0:03:00 |
| 9/6/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 11:05:00 | 0:01:00 |
| 9/6/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 11:07:00 | 0:10:00 |
| 9/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 11:24:00 | 0:01:00 |
| 9/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 12:35:00 | 0:01:00 |

At the same time, Defendant Perfetto of Taro was also communicating with T.C., a senior-most

executive at Glenmark, through e-mail.

    1168.   Glenmark's approval came on Friday, September 20, 2013.  The following

Monday, there was a flurry of additional communications between the three competitors to

coordinate Glenmark's entry.

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 9/23/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 9:15:00 | 0:02:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahaman, Ara (Taro) | 11:40:00 | 0:01:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 11:41:00 | 0:01:00 |
| 9/23/2013 | Voice | Aprahaman, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:24:00 | 0:01:00 |
| 9/23/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Perfetto, Mike (Taro) | 13:50:00 | 0:04:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahaman, Ara (Taro) | 13:55:00 | 0:01:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 14:22:00 | 0:03:00 |

The day after that, September 24, CW-3 of Sandoz spoke to Defendant Aprahamian at Taro

again for fifteen (15) minutes.  CW-3 then sent an e-mail to his superiors, including CW-1 and

Defendant Kellum, alerting them to the situation: "FYI. Glenmark just received approval [on

Desoximetasone Ointment]."

303

1169.   On September 26th, there was another torrent of phone calls between Glenmark, Taro and Sandoz:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 8:45:00 | 0:04:00 |
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 11:35:00 | 0:06:00 |
| 9/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:22:00 | 0:15:00 |
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:32:00 | 0:02:00 |
| 9/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:44:00 | 0:01:00 |

During these calls, the competitors reached an understanding about which customers Glenmark would target and what prices it would offer in order to avoid price erosion.  That same day, September 26, 2013, CW-5, a senior-most executive at Glenmark, described Glenmark's launch strategy as a "[t]argeted launch so as not to disrupt the market."

1170.   Because Taro still had a majority of the market share, it understood pursuant to the "fair share" understanding that it would be the primary target of Glenmark and would have to relinquish market share to Glenmark as it entered.  Internally, Taro executives commented that it "wouldn't make sense to lower pricing even with a 3rd competitor coming into the market."

1171.   Taro began to concede customers to Glenmark immediately.  By October 17, 2013, CW-5 reported internally that Glenmark had already been able to obtain 30% market share for Desoximetasone.

1172.   Because of the discussions between the competitors in advance, and because prices remained high, Taro was not upset about conceding this business to Glenmark.  Taro executives continued to stress that "lowering the price at this point could erode the market" and "we can afford to give up a small percent and leave the price as is."

1173.   In early November 2013, Taro was approached by a customer to bid on Desoximetasone as part of an RFP.  In deciding whether to provide a bid, Taro executives noted that the company had already "walked from some customers" so that Glenmark could obtain

304

market share.  Nonetheless, Taro still decided not to bid, stating "we are not looking to be awarded this product to increase market share. We already have a nice big slice."

### 3)        Collusion Between Sandoz And Aurobindo

1174.    As a result of Sandoz's acquisition of Fougera, CW-6 left his job at Fougera in August 2012 and took a position as a sales executive at Aurobindo.  CW-6 followed his former friend and colleague, Defendant Grauso, who moved to Aurobindo in December 2011 to assume a senior executive role.

1175.    As detailed above, CW-6 had a long-standing, collusive relationship with Grauso dating back to when he worked at Fougera and Grauso worked at G&W.  Further, the two had continued that relationship even after Grauso left G&W – with Grauso serving as a conduit to communicate messages between his former G&W colleagues, Defendants Orlofski and Vogel-Baylor, and CW-6 at Fougera.

1176.    Because many of CW-6's key contacts worked at generic competitors that focused primarily on topical products, his move to Aurobindo – a company focused on oral solids – was a difficult transition.  Without many of those prior relationships to rely on, CW-6 was concerned that he might not be able to prove his value at Aurobindo.  Indeed, CW-3 at Sandoz was one of the few people that CW-6 knew who worked for a company that also manufactured a significant number of oral solids.

1177.    For that reason, when Aurobindo sold a product that overlapped with Sandoz, CW-6 used his relationship with CW-3 to collude on that product.  Importantly, although CW-6 and CW-3 were former colleagues, they were not social friends.  When CW-6 called CW-3 during this time period, they were engaging in anticompetitive conduct.  Between August 2012,

when CW-6 began at Aurobindo, and May 2013, when CW-6 left the industry, he exchanged at least one hundred and nine (109) phone calls with CW-3.

1178.   During this time period, CW-6 was acting at all times at the direction of, or with approval from, his superiors, including Defendant Grauso.

1179.   The following Section will focus on the anticompetitive conduct engaged in by CW-3 and CW-6 with regard to several products on which Sandoz and Aurobindo overlapped during this time period.

### i.     Oxacillin Sodium and Nafcillin Sodium Injectable Vials

1180.   Oxacillin Sodium ("Oxacillin") and Nafcillin Sodium ("Nafcillin") are separately marketed antibiotics used to treat infections caused by penicillin-resistant staphylococci, among other bacteria.

1181.   In 2012, Sagent Pharmaceuticals and Sandoz were the primary generic suppliers of Oxacillin and Nafcillin.  However, in December 2012, Aurobindo began making plans to enter the Nafcillin and Oxacillin markets as a third entrant.

1182.   In advance of Aurobindo's entry into those markets, on December 26, 2012 for Nafcillin and January 22, 2013 for Oxacillin, CW-6 and CW-3 spoke several times to discuss pricing and the allocation of market share to the new entrant, Aurobindo.  All the while, CW-6 kept his supervisor, Defendant Grauso, informed of his conversations with CW-3.

1183.   For example, on December 12, 2012, CW-6 called Grauso and they spoke for five (5) minutes.  That set off a flurry of phone calls between CW-6 and CW-3, with nearly constant reporting back by CW-6 to his supervisor, Defendant Grauso, as the two competitors orchestrated how to avoid competition upon Aurobindo's entry.    These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:21:00 | 0:05:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 8:25:00 | 0:01:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 8:26:00 | 0:03:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:28:00 | 0:02:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 11:41:00 | 0:04:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 11:50:00 | 0:04:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:43:00 | 0:05:00 |

1184.   Two weeks later, on December 26, 2012, Aurobindo received FDA approval to market Nafcillin and published WAC pricing that essentially matched Sandoz's WAC pricing. On the date that Aurobindo received approval, and in the days surrounding the launch, CW-6 spoke several more times with CW-3 during which they discussed the launch.  As he had done before, CW-6 reported back to Grauso what they had discussed.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 9:29:00 | 0:03:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 9:46:00 | 0:01:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 12:26:00 | 0:08:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:43:00 | 0:01:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:49:00 | 0:02:00 |
| 12/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 16:49:00 | 0:02:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Aurobindo Pharma | 3:19:00 | 0:13:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:39:00 | 0:11:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 5:24:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:51:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 7:32:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 8:01:00 | 0:04:00 |

1185.   The calls between the competitors continued into January 2013.  On January 3, 2013, CW-6 spoke with Grauso three times for a total of twenty-five (25) minutes.  Twenty minutes later, CW-3 called CW-6.  The call lasted two (2) minutes.  The next morning, CW-6 spoke with Grauso for four (4) minutes.  That same morning, CW-6 called CW-3 of Sandoz twice, with one call lasting three (3) minutes.

1186.   Two days later, on January 6, 2013, Sandoz put together a Monthly Business review regarding its key products, including Nafcillin and Oxacillin.  Regarding Oxacillin,

Sandoz noted that Aurobindo was "rumored" to be entering the market. Sandoz stated that its "recommended next steps in the market" were to "[s]hed customers to [Aurobindo] and or Sagent that consistently request lower pricing," and "[e]mploy similar defense strategy as Nafcillin: relinquish 25-30% share and maintain current price for as long as possible."

1187. Over the next several days, between January 7, 2013 and January 11, 2013, CW-6 and CW-3 spoke several more times by phone. After those calls, CW-6 promptly called Grauso to keep him apprised of his discussions. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 4:44:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 4:47:00 | 0:06:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:53:00 | 0:01:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:53:00 | 0:01:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:00:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 5:11:00 | 0:14:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 6:39:00 | 0:07:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 7:26:00 | 0:01:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:37:00 | 0:06:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:59:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:27:00 | 0:11:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:34:00 | 0:02:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 5:36:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:32:00 | 0:08:00 |

1188. Two weeks later, on January 22, 2013, Aurobindo entered the Oxacillin market and again published WAC pricing that essentially matched Sandoz's WAC pricing. That same day, CW-6 spoke with Grauso for ten (10) minutes. Ten minutes after hanging up, CW-6 called CW-3 of Sandoz. The call lasted one (1) minute. Over the next two days, CW-6 and CW-3 shared five (5) more phone calls.

1189. In an e-mail dated January 30, 2013, Sandoz noted that it had "[r]elinquished" its Oxacillin contract at Walgreens to the new entrant, Aurobindo. That same day, CW-3 and CW-6 spoke by phone for four (4) minutes.

## ii.   Cefpodoxime Proxetil Oral Suspension and Tablets

1190.   Cefpodoxime Proxetil ("Cefpodoxime"), also known by the brand name Vantin, is an antibiotic used to treat a wide variety of bacterial infections.  It is sold in both oral suspension and tablet form.

1191.   On January 3, 2013, CW-3 of Sandoz called CW-6 of Aurobindo.  The call lasted two (2) minutes.  The next day, on January 4, 2013, CW-6 called CW-3 twice, with one call lasting three (3) minutes.  A few minutes after hanging up, CW-3 called Defendant Kellum and they spoke for nine (9) minutes.  After that call, Kellum sent the following e-mail to R.T., a senior sales and marketing executive at Sandoz:

> **From:** Kellum, Armando
> **Sent:** Friday, January 04, 2013 5:09 PM
> **To:** ███████████████████
> **Subject:** Cefpodoxime
>
> Just heard that Aurobindo is likely to launch Cefpodoxime (trying to find out if this is tabs or suspension or both) in the near future.
>
> I had planned on taking price increase in January.  We are currently exclusive on both.
>
> fyi

R.T. responded, "[p]ls take the increase" to which Kellum replied, "[w]ill do."

1192.   The following business day, on January 7, 2013, CW-6 of Aurobindo and CW-3 of Sandoz exchanged three calls, including one lasting six (6) minutes.  During these calls, CW-6 confirmed that Aurobindo planned to launch both formulations of Cefpodoxime that week.[9] CW-3 told CW-6 that Sandoz planned to increase pricing on both formulations by 20%.  CW-6 advised that Aurobindo was looking for 40% share and would start by targeting Cardinal and CVS.  In turn, CW-3 gave his competitor specific non-public contract price points that Sandoz

---

[9]  On these calls, the two competitors also discussed Aurobindo's launch of Cefdinir Capsules and Cefdinir Oral Suspension, among other products.  Those two drugs are at issue in the Plaintiff States' Teva Complaint and are not addressed herein.

was charging to those customers.  CW-6 then stated: "Follow the plan and we'll be reasonable."

CW-3's contemporaneous notes from this call are pictured below:



1193.   Shortly after speaking with each other, CW-6 called Defendant Grauso and CW-3 called Defendant Kellum to report back what they had discussed.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 4:44:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 4:47:00 | 0:06:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:53:00 | 0:01:00 |
| 1/7/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 4:53:00 | 0:07:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:00:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 5:11:00 | 0:14:00 |

1194.   On January 9, 2013 and January 11, 2013, the day that Sandoz increased WAC pricing on Cefpodoxime, CW-3 and CW-6 exchanged three more calls.  After speaking with each other, CW-3 called Kellum and CW-6 called Grauso to report back what they had discussed.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 6:39:00 | 0:07:00 |
| 1/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 6:47:00 | 0:01:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 7:26:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:59:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:27:00 | 0:11:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:38:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:34:00 | 0:02:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 5:36:00 | 0:01:00 |

1195.   Due to an issue at its manufacturing facility, Aurobindo's launch of Cefpodoxime was delayed and the company was unable to launch in January 2013 as planned.

1196.   Between February 24 and February 27, 2013, ECRM held its annual Retail Pharmacy Generic Pharmaceuticals Conference in Dallas, Texas.  Representatives from Aurobindo and Sandoz were in attendance, including CW-6 and Defendant Grauso of Aurobindo and Defendant Kellum, CW-3, and CW-2 of Sandoz.

1197.   On February 26, 2013, CW-2, a Sandoz senior sales executive – while still at the ECRM conference – sent the following e-mail to his Sandoz colleagues:

| From: | ▮ |
|---|---|
| Sent: | Tuesday, February 26, 2013 7:46 PM |
| To: | Kellum, Armando |
| Cc: | ▮ |
| Subject: | Cefpodoxime |
| | |
| Follow Up Flag: | Follow up |
| Flag Status: | Completed |

Armando, ▮

I heard at ECRM that Aurobindo will be coming back with Cefpodoxime in about a month.

1198.   On April 17, 2013, CW-6 of Aurobindo called CW-3 of Sandoz.  The call lasted two (2) minutes.  Less than an hour later, CW-3 called CW-6 back and they spoke for six (6) minutes.  The next day, on April 18, 2013, CW-6 called CW-3 and they spoke for ten (10) minutes.  That same day, Aurobindo launched both formulations of Cefpodoxime and matched Sandoz's increased WAC pricing.

1199.   On April 30, 2013, CW-3 and CW-6 exchanged three phone calls, including one call lasting three (3) minutes.  On these calls, the competitors again discussed Aurobindo's launch of Cefpodoxime Tablets, including that Aurobindo was looking for 40-50% market share. The competitors also discussed specific customers that Aurobindo was targeting.  CW-3's contemporaneous notes from these calls are pictured below:

1200.   In accordance with the plan, on May 22, 2013, Aurobindo made an offer to CVS for Cefpodoxime Tablets and the customer accepted that offer the very next day on May 23, 2013.

1201.   Similarly, on August 29, 2013, Aurobindo made an offer to ABC for Cefpodoxime Tablets.  The next day, on August 30, 2013, ABC e-mailed Sandoz to advise that it had received a competitive offer and asked whether Sandoz wanted to bid to retain the business. On September 4, 2013, S.G., a Sandoz sales executive, responded to ABC and declined the opportunity stating, "we will be relinquishing Cefpodoxime/Proxet Tabs."  Later that same day, ABC awarded the business to Aurobindo.

1202.   Aurobindo would also win awards for Cefpodoxime Tablets at McKesson and several other smaller customers, without substantially eroding the high pricing in the market.

1203.   On September 9, 2013, P.S., an Aurobindo sales and marketing executive, pushed Defendant Grauso to submit a bid for Wal-Mart's Cefpodoxime business.  Grauso balked at the request stating, "I thought we had our share on Cefpodoxime."  P.S. responded, "I thought you wanted to get additional share considering the only other market player is Sandoz.  We currently hold only 22% share."  Given the market share breakdown, Grauso gave his approval to submit a bid to Wal-Mart.  Thereafter, on September 30, 2013, the customer accepted the bid and awarded Aurobindo its indirect business.

1204.   Later, in December 2013, when Sandoz was looking to identify additional products to supply to Wal-Mart, Kellum noted with respect to Cefpodoxime: "If we did/do not have this business, I do not recommend challenging Aurobindo as we have dominant share and high price."

### iii.   Pioglitazone HCL Metformin HCL Tablets

1205.   Pioglitazone HCL Metformin HCL ("Pioglitazone Metformin"), also known by the brand name Actoplus Met, is used to control high blood sugar in patients with type 2 diabetes mellitus.

1206.   Prior to February 2013, Mylan and Teva were the only competitors in the market for Pioglitazone Metformin.  As a result of settling patent litigation with the brand manufacturer, Mylan was entitled to 180 days exclusivity as the first-to-file generic and Teva earned the right to market the authorized generic.  During that period, Mylan and Teva split the market equally with Teva controlling 48% share and Mylan controlling 52%.

1207.   Mylan and Teva's 180-day exclusivity period expired on February 13, 2013 and Aurobindo and Torrent Pharmaceuticals entered the market on that date.  Although Sandoz also planned to enter at that time, the company ran into regulatory obstacles that delayed its launch until April 16, 2013.

1208.   In advance of Aurobindo's entry, CW-6 and Grauso were in frequent communication with their contacts at Mylan and Teva to discuss, among other things, Aurobindo's entry into the Pioglitazone Metformin market.  On these calls, the competitors spoke about pricing and the allocation of market share to the new entrant.

1209.   For example, in the week leading up to Aurobindo's entry on February 13, 2013, CW-6 exchanged at least nine calls with Jim Nesta, a senior sales executive at Mylan.  At the same time, Grauso was communicating with his contacts at Teva, exchanging at least twenty-one calls with sales executives Kevin Green and T.S.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/6/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 9:23:00 | 0:06:00 |
| 2/6/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 14:25:00 | 0:02:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 4:33:00 | 0:22:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 12:12:00 | 0:07:00 |
| 2/7/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 15:20:00 | 0:03:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 4:04:00 | 0:05:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 5:41:00 | 0:21:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 9:56:00 | 0:08:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 10:34:00 | 0:01:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 10:40:00 | 0:01:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 10:41:00 | 0:02:00 |
| 2/8/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 11:21:00 | 0:11:00 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 13:55:05 | 0:00:19 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 14:04:28 | 0:02:17 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 15:38:09 | 0:00:04 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 15:41:26 | 0:00:03 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 15:58:28 | 0:00:27 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 16:09:54 | 0:03:40 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 16:19:22 | 0:00:04 |
| 2/11/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-6 (Aurobindo) | 13:01:14 | 0:00:29 |
| 2/11/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-6 (Aurobindo) | 14:06:26 | 0:00:52 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Green, Kevin (Teva) | 5:52:00 | 0:12:00 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | T.S. (Teva) | 6:26:00 | 0:39:00 |
| 2/12/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 13:35:00 | 0:45:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | Green, Kevin (Teva) | 9:53:00 | 0:09:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 11:11:00 | 0:01:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Incoming | T.S. (Teva) | 12:19:00 | 0:02:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 12:42:00 | 0:01:00 |
| 2/13/2013 | Voice | Grauso, Jim (Aurobindo) | Outgoing | T.S. (Teva) | 13:58:00 | 0:01:00 |

1210.   Illustrating the substance of these calls, on February 12, 2013, T.S., a Teva sales executive, spoke to Defendant Grauso at Aurobindo for forty-five (45) minutes.  Shortly after that call, T.S. sent an internal e-mail stating, "I heard that Aurobindo picked up Cardinal on the Pio/Met."  Cardinal was a Mylan customer.

1211.   At the same time, Mylan and Teva were communicating with each other. In the week leading up to Aurobindo's entry on February 13, 2013, Green of Teva exchanged at least seventeen (17) calls with Nesta of Mylan.  These calls are detailed in the chart below:



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:19:51 | 0:00:13 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:29:54 | 0:00:05 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 10:01:05 | 0:00:07 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 11:17:07 | 0:00:06 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:53:33 | 0:08:47 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:16:25 | 0:00:10 |
| 2/7/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 17:19:23 | 0:00:10 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 8:26:12 | 0:00:05 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:08:59 | 0:29:51 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 15:44:04 | 0:11:18 |
| 2/8/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 16:14:42 | 0:06:03 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 9:31:39 | 0:00:04 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 9:45:09 | 0:12:58 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 11:09:47 | 0:00:04 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 11:18:15 | 0:08:38 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Incoming | Green, Kevin (Teva) | 12:44:01 | 0:03:25 |
| 2/13/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | Green, Kevin (Teva) | 19:17:42 | 0:04:15 |

1212.   Similarly, Green of Teva exchanged several calls with his contacts at Sandoz, Defendant Kellum and CW-2.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 2/7/2013 | Voice | Green, Kevin (Teva) | Outgoing | CW-2 (Sandoz) | 4:24:00 | 0:05:00 |
| 2/7/2013 | Voice | Green, Kevin (Teva) | Outgoing | Kellum, Armando (Sandoz) | 11:04:00 | 0:01:00 |
| 2/7/2013 | Voice | CW-2 (Sandoz) | Outgoing | Green, Kevin (Teva) | 12:29:00 | 0:02:00 |
| 2/10/2013 | Voice | Green, Kevin (Teva) | Incoming | Kellum, Armando (Sandoz) | 9:09:00 | 0:06:00 |
| 2/12/2013 | Voice | Kellum, Armando (Sandoz) | Outgoing | Green, Kevin (Teva) | 7:15:00 | 0:08:00 |

1213.   On February 7, 2013, the same day that Green talked to both Kellum and CW-2, both of those Sandoz employees participated in a conference call in which they discussed "status and next steps" on Pioglitazone Metformin.

1214.   Finally, the new entrants, Sandoz and Aurobindo, were also communicating directly with each other regarding Pioglitazone Metformin.  For example, CW-3 of Sandoz and CW-6 of Aurobindo exchanged at least six calls between February 13 and February 19, 2013.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/13/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:51:00 | 0:01:00 |
| 2/15/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 4:36:00 | 0:01:00 |
| 2/15/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 7:33:00 | 0:16:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:03:00 | 0:01:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 4:06:00 | 0:04:00 |
| 2/19/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:52:00 | 0:01:00 |

During their calls on February 19, 2013, CW-6 and CW-3 discussed specific customers and price

points for Pioglitazone Metformin, and the fact that Aurobindo had already picked up Cardinal

as a customer.  CW-3's contemporaneous notes are pictured below:



1215.  By mid-April, Aurobindo had secured approximately 20% of the Pioglitazone

Metformin market, including Cardinal, a portion of the CVS business, Costco, and several other

smaller customers.

1216.  Between February 24 and February 27, 2013, ECRM held its annual Retail

Pharmacy Generic Pharmaceuticals Conference in Dallas, Texas.  Representatives from

Aurobindo and Sandoz attended, including CW-6 and Defendant Grauso from Aurobindo and

CW-3 and Defendant Kellum from Sandoz.

1217.  On February 28, 2013, Kellum sent an internal e-mail to other Sandoz executives

regarding the "most salient things I heard at ECRM."  With regard to Pioglitazone Metformin,

Kellum stated the following:

317

<u>Pioglitazone/Metformin</u> is much better than we probably forecast - Torrent and Aurobindo entered but were more responsible than we would assume.  Pricing still ok – we'll do homework before launching.

1218.   A month and a half later, on April 16, 2013, Sandoz finally received FDA approval to market Pioglitazone Metformin.  The next day, CW-1, a Sandoz senior pricing executive, e-mailed the sales team stating: "Per the conversations I had with each of you concerning this launch please send along customer alignment and pricing info.  We are looking to send out offers as soon as possible."  Six minutes later, CW-1 e-mailed CW-3 individually, asking him to "find ou[t] who Walmart is with."

1219.   That same day, CW-3 exchanged two calls with CW-6 of Aurobindo lasting two (2) minutes and six (6) minutes.  The next day, on April 18, 2013, the two competitors spoke again for ten (10) minutes.  During that call, CW-6 provided CW-3 with Aurobindo's dead net prices at several customers, including Cardinal and CVS.  CW-3's contemporaneous notes from that call are pictured below:

1220.   At the same time, Sandoz was speaking with Teva.  On April 18 and April 19, 2013, CW-2, a Sandoz senior sales executive, spoke three times with Green of Teva, including two calls lasting four (4) minutes and one call lasting eight (8) minutes.

1221.   Later in the evening on April 19, 2013, CW-1 e-mailed Kellum and others at Sandoz regarding Pioglitazone Metformin stating, "I'm thinking ABC is our best first shot at this point.  Teva currently has ABC, RAD, WMT, and Mck, so they can do without one of those." Others at Sandoz agreed, and Sandoz submitted an offer to ABC on April 22, 2013.

1222.   The next day, on April 23, 2013, ABC e-mailed Teva to inform it that Sandoz had made an offer for Pioglitazone Metformin and asked whether Teva intended to bid to retain the business.  ABC further stated that "[a]s an FYI, Sandoz is only looking for 10% share and will be done if they get ABC's business."  Green, the Teva sales executive who had spoken to CW-2 the day before, forwarded ABC's e-mail to several other Teva executives, writing: "What do you guys think?  I have not sent pricing yet, but I did confirm they [Sandoz] are only looking for 10%."  K.G., a senior Teva marketing executive, responded, "I think we should concede."

1223.   Three days later, on April 26, 2013, Teva declined to bid to retain the business and noted in Delphi, it's internal tracking database, that "Teva conceded business to Sandoz who has entered the market looking for 10% share" and stated the reason for the concession was "Strategic New Market Entrant."  That same day, ABC awarded the business to Sandoz.

1224.   Also, that same day, on April 26, 2013, Sandoz officially entered the market and published WAC pricing that matched its competitors.

### 4)   Collusion Between Sandoz And Rising

1225.   CW-3 and CW-2 worked together as senior sales executives at Sandoz until August 2013 when CW-2 left Sandoz to become a senior sales and marketing executive at

Rising.  While at Sandoz, the two were close friends.  CW-2 was responsible for Walmart and helped transition the account to CW-3 when he moved to Rising.

1226.   Beginning in 2013, and beyond, these former colleagues turned competitors used their relationship to collude with regard to products on which Rising and Sandoz overlapped. One such example – Griseofulvin Microsize Tablets – is discussed in detail below.

### i.     Griseofulvin Microsize Tablets

1227.   Griseofulvin Microsize Tablets ("Griseofulvin"), also known by the brand name Grifulvin V, is a medication used to treat fungal infections of the skin, hair, or nails that do not respond to creams or lotions.  The market size for this drug ranged between $13 million and $16 million dollars annually.

1228.   Throughout 2013, Rising had a virtual monopoly on the Griseofulvin market, with Valeant Pharmaceuticals maintaining only a small percentage of the share.

1229.   On August 7, 2013, Sandoz received FDA approval to market Griseofulvin. Sandoz planned to talk to customers at the NACDS Annual Total Store Expo that weekend and then launch the following week.

1230.   However, on August 14, 2013, Sandoz learned that the Griseofulvin launch would be delayed due to production problems.  Despite the delay, Sandoz estimated that it could still realize $2.5 million in sales in 2013 "if existing competitor [i.e. Rising] behaves rationally."

1231.   On September 19, 2013, CW-2, then a senior sales and marketing executive at Rising, called CW-3 of Sandoz twice.  Both calls lasted one (1) minute.  CW-3 returned the calls later that day and they spoke for twenty-one (21) minutes.  During these calls, CW-2 and CW-3 discussed Sandoz's manufacturing issues on Griseofulvin and its continued delay in launching the product.

1232.   However, just one week later, on September 25, 2013, Sandoz learned that its production problems had been resolved.  The following Monday, on September 30, 2013, CW-3 informed CW-2 of this unexpected news in the following text message exchange:

| Start Time: Time | From | Body |
|---|---|---|
| 9/30/2013 14:17(UTC+0) | CW-3 | Hi ▮▮▮ Is ▮▮▮. Looks like Griseo may be this week. |
| 9/30/2013 14:17(UTC+0) | CW-3 | Can't talk right now...I'll call you later. |
| 9/30/2013 14:17(UTC+0) | CW-2 | Ok. Call as soon as possible. |
| 9/30/2013 14:17(UTC+0) | CW-2 | What happened to 'no anytime soon' :-( |
| 9/30/2013 14:17(UTC+0) | CW-3 | On a call |
| 9/30/2013 14:17(UTC+0) | CW-3 | Was on QA hold and is going to release sooner than expected. Sorry |

1233.   That same day, CW-2 called CW-3 twice.  The calls lasted one (1) minute and eight (8) minutes.  That evening, Sandoz held an internal meeting to discuss launch strategy for Griseofulvin, including which customers to approach in order to achieve Sandoz's market share goal.

1234.   Over the next several days, CW-2 of Rising exchanged several calls with CW-3 and L.J., a Sandoz sales executive, during which they discussed pricing for Griseofulvin and the allocation of market share to the new entrant, Sandoz.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/1/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 6:32:00 | 0:01:00 |
| 10/1/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 12:15:00 | 0:10:00 |
| 10/2/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 12:35:00 | 0:02:00 |
| 10/2/2013 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 13:30:00 | 0:22:00 |
| 10/2/2013 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 13:59:00 | 0:03:00 |
| 10/2/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 14:46:00 | 0:09:00 |

1235.   After this series of communications between the two competitors, on October 2, 2013, Kellum sent an internal e-mail identifying four (4) customers that Sandoz planned to target to obtain approximately 40% share of the Griseofulvin market – CVS (20%), McKesson (8%),

321

Rite Aid (6%), and ABC (8%).  That evening, Sandoz prepared and sent its initial round of offers to CVS and McKesson.

1236.   The next day, on October 3, 2013, CW-2 of Rising exchanged three calls with L.J., the Sandoz sales executive responsible for the McKesson account, and one (1) call with CW-3 that lasted twenty-one (21) minutes.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/3/2013 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 6:23:00 | 0:01:00 |
| 10/3/2013 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 6:24:00 | 0:02:00 |
| 10/3/2013 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 6:25:00 | 0:05:00 |
| 10/3/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 11:34:00 | 0:21:00 |

1237.   On October 4, 2013, McKesson e-mailed CW-2 asking if Rising wanted to submit a bid for Griseofulvin.  Rising responded to the request by submitting a high bid so that Sandoz would win the business.  On October 7, 2013, McKesson advised Rising that its bid was not competitive and awarded the business to Sandoz.

1238.   On October 8, 2013, CVS e-mailed Sandoz and declined its Griseofulvin offer, stating: "This is a 2 player product; we need a better proposal on this one if you are interested in earning our business now."  Later that evening, CVS e-mailed CW-2 asking whether Rising planned to bid on the business.

1239.   First thing the next morning, on October 9, 2013, CW-2 of Rising and CW-3 of Sandoz exchanged three calls, including one call lasting nine (9) minutes.  After these calls, Sandoz reduced its pricing and sent a revised offer to CVS.  At the same time, Rising prepared and submitted a high bid to CVS with the intention that Sandoz would win the business.

1240.   However, CVS threw a wrench in the competitors' plans when it refused to accept Rising's high bid that same day stating: "No good.  This is a 2 player product.  Please Call me."  Knowing he had agreed to give up the customer to Sandoz, CW-2 asked his colleague to reduce

322

the CVS offer only slightly – by $10 – and "advise it is best and final."  Thereafter, on October 10, 2013, CVS declined the Rising bid and awarded the business to Sandoz.

1241.   On October 15, 2013, Sandoz submitted an offer to Rite Aid for its Griseofulvin business.

1242.   Between October 16 and October 21, 2013, CW-2 of Rising and CW-3 of Sandoz spoke several additional times to coordinate Sandoz's entry.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/16/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 14:37:00 | 0:01:00 |
| 10/17/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 5:12:00 | 0:14:00 |
| 10/17/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 5:27:00 | 0:01:00 |
| 10/18/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 7:06:00 | 0:02:00 |
| 10/18/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 7:45:00 | 0:02:00 |
| 10/18/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 9:42:00 | 0:07:00 |
| 10/18/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 13:24:00 | 0:06:00 |
| 10/21/2013 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 7:24:00 | 0:01:00 |
| 10/21/2013 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 8:12:00 | 0:05:00 |

1243.   On these calls, the two competitors discussed Griseofulvin and the accounts that Sandoz had targeted or planned to target.  CW-2 also advised CW-3 that Rising would not give up Rite Aid to Sandoz.  On October 21, 2013, CW-3 took the following contemporaneous notes in his Notebook:

1244.   First thing the next morning, on October 22, 2013, CW-2 of Rising called CW-3 of Sandoz twice.  Both calls lasted one (1) minute.  CW-3 returned the call later that morning and they spoke for eight (8) minutes.

1245.   The next day, on October 23, 2013, Rite Aid advised Sandoz that it declined to accept Sandoz's offer for Griseofulvin – as expected, Rising had lowered its pricing to retain the customer.  That same day, Sandoz began making plans to approach Wal-Mart and Cardinal as their next targets.

1246.   On October 28, 2013, CW-3 e-mailed Wal-Mart to see if the customer was interested in an indirect bid for Griseofulvin.  Wal-Mart replied that it was.  The next morning, on October 29, 2013, CW-3 of Sandoz called CW-2 of Rising and they spoke for twenty-two (22) minutes.  During that call, CW-3 informed CW-2 that Sandoz would approach Wal-Mart, and CW-2 agreed that Rising would relinquish that customer.  Later that day, Sandoz prepared an offer and sent it to Wal-Mart.

1247.   On November 4, 2013, CW-3 of Sandoz called CW-2 of Rising and they spoke for twenty-eight (28) minutes.  The next day, on November 5, 2013, Wal-Mart accepted Sandoz's offer for Griseofulvin and awarded it the business.

1248.   On November 20, 2013, CW-2 of Rising and L.J. of Sandoz spoke for three (3) minutes.  Later that day, Sandoz submitted an offer to Cardinal for its Griseofulvin business.

1249.   On November 22, 2013, CW-3 of Sandoz called CW-2 of Rising and they spoke for seventeen (17) minutes.  Later that day, Rising executives held a Commercial Operations meeting at which CW-2 conveyed that Sandoz needed Rising to relinquish one more account – Cardinal – so that it could meet its share goal.  CW-2 advised that Sandoz would be done after Cardinal and would not seek any additional share.

1250.   Thereafter, Rising conceded Cardinal, and Cardinal awarded its Griseofulvin business to Sandoz.

1251.   The following Monday, on November 25, 2013, Rising held a sales and marketing meeting during which they discussed Griseofulvin, among other products.  CW-2 forwarded the minutes from that meeting to several Rising executives and S.S., a senior Rising executive responded, "Looks like relinquishing Griseo 500 at Cardinal is a new development. . . . What's the impact?"  CW-2 responded with the following e-mail to S.S.:



To that, S.S. replied, apologizing that he had not put two-and-two together, and stated "My bad 😊."

1252.   One year later, on October 15, 2014, Rising increased WAC pricing on Griseofulvin.  In advance of the increase, CW-2 of Rising exchanged several calls with L.J. of Sandoz, during which they discussed the price increase.  These calls are detailed in the chart below.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/1/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 14:16:00 | 0:04:00 |
| 10/2/2014 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 13:01:00 | 0:02:00 |
| 10/2/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 15:23:00 | 0:11:00 |
| 10/8/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 14:47:00 | 0:01:00 |
| 10/8/2014 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 14:57:00 | 0:07:00 |
| 10/13/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 14:33:00 | 0:08:00 |

Further, CW-2 also met in-person with L.J. and the two men discussed the increase over drinks.

1253.   Even after the Rising price increase, CW-2 of Rising continued to communicate with his former Sandoz colleagues about the increase.  For example, on November 12, 2014, CW-3 and CW-2 exchanged the following text messages:

| From | Body | Status | Timestamp: Time |
|------|------|--------|-----------------|
| CW-3 | ▆ Hi there!  Sorry I missed your call. Will give you a ring tomorrow. | Read | 11/12/2014 1:49:51 AM(UTC+0) |
| CW-3 | Hope all is well! | Read | 11/12/2014 1:49:59 AM(UTC+0) |
| CW-2 | No worries!  Talk to you tomorrow. | Sent | 11/12/2014 2:37:52 AM(UTC+0) |

1254.   The next day, on November 13, 2014, CW-2 also exchanged several lengthy calls with CW-3 and L.J. of Sandoz.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/13/2014 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 3:05:00 | 0:14:00 |
| 11/13/2014 | Voice | CW-2 (Rising) | Outgoing | CW-3 (Sandoz) | 3:19:00 | 0:01:00 |
| 11/13/2014 | Voice | CW-2 (Rising) | Incoming | CW-3 (Sandoz) | 3:19:00 | 0:20:00 |
| 11/13/2014 | Voice | CW-2 (Rising) | Outgoing | L.J. (Sandoz) | 10:51:00 | 0:02:00 |
| 11/13/2014 | Voice | CW-2 (Rising) | Incoming | L.J. (Sandoz) | 13:59:00 | 0:09:00 |

1255.   After speaking with CW-2 of Rising, CW-3 sent an e-mail to CW-1, a Sandoz senior pricing executive, stating only "[c]all me please."  CW-1 responded that he was "[i]n a training" and CW-3 replied:



| From: | ▆▆▆▆▆▆ |
|-------|--------|
| Sent: | Thursday, November 13, 2014 4:18 PM |
| To: | ▆▆▆▆▆▆ |
| Subject: | RE: Call me please |

OK.  I heard from a customer that Rising took an increase on Griseo last month.  Do we intend to follow soon?

As was his customary practice, CW-3 stated that he had learned the information from a "customer," when he had actually obtained the information directly from his competitor, CW-2. Later that day, CW-1 and CW-3 spoke for twelve (12) minutes.

1256.   Sandoz did not follow the Rising price increase immediately because, after conducting several analyses, it determined that the price protection penalties it would have incurred were too high to justify the increase.

1257.   However, by July 2015 those concerns were alleviated.  On July 27, 2015, P.C., a Sandoz pricing executive, sent an internal e-mail detailing that Sandoz planned to increase prices the following week on a list of products, including Griseofulvin.  P.C. noted that for Griseofulvin, Sandoz was assuming "0% volume loss."  In other words, Sandoz knew that Rising would not seek to take any of its customers after the price increase.

1258.   Two days later, on July 29, 2015, CW-3 of Sandoz called S.G., then a senior sales executive at Rising, and the two competitors spoke for nine (9) minutes.  One week later, on August 7, 2015, Sandoz followed Rising's price increase and published WAC pricing that matched its competitor.

### 5)      Collusion Between Sandoz And Mallinckrodt

1259.   During his time at Fougera, CW-3 worked for Defendant Kaczmarek and with K.K., another Fougera sales executive.  Not long after the Sandoz acquisition of Fougera in July 2012, Kaczmarek and K.K. moved to Defendant Mallinckrodt.  Kaczmarek became a senior executive and K.K. took a senior sales executive position.

1260.   Beginning in late 2012, these former colleagues turned competitors would use their long-standing relationships to collude with regard to products on which Sandoz and

Mallinckrodt overlapped.  Two such examples – Methylphenidate HCL Tablets and Methylphenidate HCL ER Tablets – are discussed in detail below.

**i.     Methylphenidate HCL Tablets and Methylphenidate HCL ER Tablets**

1261.   Methylphenidate HCL, also known by the brand name Ritalin, is used to treat attention deficit disorder and attention deficit hyperactivity disorder, as well as some sleep disorders.  There are two formulations of Methylphenidate HCL – Immediate Release ("Methylphenidate IR") and Extended Release ("Methylphenidate ER").

1262.   As of November 2012, there were three competitors in the Methylphenidate IR market – Mallinckrodt with 43% share, Watson (Actavis) with 37%, and Sandoz with 16%.  For Methylphenidate ER, there were only two competitors – Mallinckrodt with 54% share and Sandoz with 16%.

1263.   On February 13, 2013, L.J., a Sandoz sales executive, sent an internal e-mail stating that he had heard that Mallinckrodt was experiencing supply issues on Methylphenidate. Further, L.J. requested the following:

> **We need to get customer intel on the following important questions:**
>
> 1) When will Mallinckrodt be back in the market for Methylphenidate SR and IR? Previously we heard June 2013.
> 2) What caused Mallinckrodt to leave the market?
> 3) Specifically on Methylphenidate IR, where Watson is also present, will Watson be able to take some of Mallinckrodt's share?

1264.   A few minutes later, D.P., a senior Sandoz sales executive, forwarded L.J.'s e-mail to his sales team, including to CW-3, asking "please query your contacts / customers for Intel on Mal[l]inckrodt and Watson."

1265.   That same day, on February 13, 2013, CW-3 called K.K., a senior Mallinckrodt sales executive, and they spoke for sixteen (16) minutes.  Immediately upon hanging up, CW-3

called Defendant Aprahamian, then a sales executive at Actavis, and they spoke for sixteen (16) minutes. A few hours later, CW-3 called D.P. of Sandoz to report back what he had learned. That call lasted ten (10) minutes.

1266.   Later that day, CW-3 also sent the following e-mail conveying the information he had obtained from his competitors:



From:
Sent:            Wednesday, February 13, 2013 6:41 PM
To:

Cc:                                              Kellum, Armando
Subject:         RE: Methylphenidate SR and IR Update

According to my customers, Mallinckrodt has temporarily discontinued 5 out of the 6 six sku's of the IR; the 5mg 100 is available however product is being allocated. They are targeting an availability date of late June or early July. On the SR they are still shipping the 10mg however the 20mg may have periodic supply disruptions. Mallinckrodt has discontinued these products due to API quota limitations imposed by the FDA / DEA; they are petitioning the DEA for an increased quota. Also, it appears as though they are using their current API for other products (i.e. recently launched Concerta). Lastly, Watson does not have any supply issues on the IR and could increase market share.

Hope this helps.

Thanks,

1267.   As was his customary practice, CW-3 stated that the sources of his information were his "customers," to keep out of writing the fact that he obtained the information directly from his competitors – Mallinckrodt and Actavis (Watson). But CW-3's superiors were aware that the information was coming directly from Mallinckrodt and Actavis, not a customer.

1268.   Having confirmed Mallinckrodt's supply issues – and the fact that the market share leader would be out of the market for a period of time – Sandoz immediately set to work on implementing a price increase on Methylphenidate.

1269.   Indeed, less than one week later, on February 19, 2013, Sandoz prepared a price increase analysis for Methylphenidate to send to the Pricing Committee for approval. In the analysis, Sandoz noted that Mallinckrodt had a "significant supply issue" and recommended increasing price by 340% on Methylphenidate IR and 125% on Methylphenidate ER. Sandoz

estimated that these increases would result in the accrual of an additional $12.9 to $36.0 million in profits.

1270.   On March 1, 2013, CW-3 of Sandoz exchanged at least nine (9) text messages with Defendant Kaczmarek, then a senior executive at Mallinckrodt.  Through those text messages, the competitors discussed Sandoz's price increase on Methylphenidate and specific customer accounts.  During these conversations, CW-3 took the following contemporaneous notes in his Notebook:



1271.   Further, in the days leading up to the Sandoz price increase on Methylphenidate, CW-3 exchanged at least twenty-three (23) calls and text messages with Kaczmarek and K.K. These communications are listed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/4/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 12:08:02 | 0:00:00 |
| 3/4/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 12:08:35 | 0:03:14 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 12:50:02 | 0:00:00 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 15:25:08 | 0:00:00 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 15:25:40 | 0:00:00 |
| 3/5/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 16:50:58 | 0:00:00 |
| 3/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 17:27:43 | 0:01:02 |
| 3/6/2013 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (Mallinckrodt) | 6:53:00 | 0:01:00 |
| 3/6/2013 | Voice | K.K. (Mallinckrodt) | Outgoing | CW-3 (Sandoz) | 8:06:00 | 0:01:00 |
| 3/6/2013 | Voice | K.K. (Mallinckrodt) | Incoming | CW-3 (Sandoz) | 8:20:00 | 0:03:00 |
| 3/6/2013 | Voice | K.K. (Mallinckrodt) | Incoming | CW-3 (Sandoz) | 8:23:00 | 0:02:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 17:46:13 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:08:09 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:08:43 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 18:10:26 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:11:07 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:11:55 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 18:12:13 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:15:13 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:17:06 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:18:30 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Incoming | Kaczmarek, Walt (Mallinckrodt) | 18:20:17 | 0:00:00 |
| 3/8/2013 | Text | CW-3 (Sandoz) | Outgoing | Kaczmarek, Walt (Mallinckrodt) | 18:21:08 | 0:00:00 |

During this same time period, CW-3 was also in frequent contact with Defendant Aprahamian at Actavis, as detailed in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:05:00 | 0:02:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:07:00 | 0:11:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 10:50:00 | 0:04:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 15:49:40 | 0:00:23 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:20:06 | 0:00:30 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:27:00 | 0:04:00 |

1272.   After this series of communications with both Mallinckrodt and Actavis, on March 8, 2013, Sandoz followed through with its plans and increased WAC pricing on Methylphenidate IR between 293% and 449%, depending on the formulation, and on Methylphenidate ER by 125%.

1273.   Three days later, on March 11, 2013, Aprahamian of Actavis called Defendant Perfetto, at that point a senior executive at Taro, and they spoke for fifty-four (54) minutes.  The

331

two competitors would exchange two more calls that day lasting one (1) minute and three (3) minutes.  Immediately upon hanging up with Perfetto, Aprahamian called CW-3 of Sandoz.  The call lasted one (1) minute.  A few minutes later, Aprahamian called CW-3 again and they spoke for five (5) minutes.

1274.   The next day, on March 12, 2013, Perfetto e-mailed J.K., a senior Taro executive, and G.S., a senior executive at Taro's parent company, Sun, regarding Methylphenidate stating:

> From: Michael Perfetto/US/TARO@TARO
> To: ███████████████████████████████
> Date: 03/12/2013 05:24 PM
> Subject: Methly IR
>
> I'm hearing Sandoz they took the product up 200 % +...
>
> Watson, Sandoz and Malicront....(is out to make concerta)
>
> Mutual has an approval.
>
> U may want to tell ████

Perfetto's reference to "Mutual" was to one of Taro's sister companies, which was also a subsidiary of Sun.  When G.S. of Sun expressed some confusion over what product Perfetto was referring to, he sent the following e-mail to clarify:

> On Mar 12, 2013, at 5:35 PM, "Michael Perfetto" wrote:
>
> This is the Adderall IR.....
>
> Malicront is using quota to make concerta.
> Sandoz is short on supply
> Waston

 G.S. responded that Methylphenidate was a "top priority product" for Sun and the company was working as quickly as possible to bring it to market.

1275.   Between March 13 and April 2, 2013, CW-3 of Sandoz and Defendant Kaczmarek exchanged at least twenty-nine (29) text messages.  During that same time period, CW-3 was also communicating frequently with his contact at Actavis, Aprahamian, who was

also in the process of transitioning to a position at Taro (his first day at Taro was March 18, 2013, but he continued to speak frequently with Actavis colleagues after his departure).  Those calls are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 11:42:00 | 0:01:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 8:07:00 | 0:16:00 |
| 3/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 11:28:00 | 0:01:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 14:44:00 | 0:01:00 |
| 3/21/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:33:00 | 0:01:00 |
| 3/21/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:34:00 | 0:12:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 8:31:00 | 0:01:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Incoming | CW-3 (Sandoz) | 12:36:00 | 0:18:00 |
| 3/25/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Incoming | CW-3 (Sandoz) | 9:14:00 | 0:05:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 6:49:00 | 0:06:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Actavis/Taro) | Outgoing | CW-3 (Sandoz) | 13:51:00 | 0:01:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 9:51:00 | 0:05:00 |
| 3/29/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 10:06:00 | 0:06:00 |
| 4/2/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:12:00 | 0:06:00 |
| 4/2/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis/Taro) | 6:26:00 | 0:01:00 |

During his calls with Aprahamian on April 2, 2013, CW-3 took the following contemporaneous notes in his Notebook regarding Methylphenidate:



Notably, as of April 2, 2013, Actavis had not yet published increased WAC pricing for Methylphenidate IR and would not do so for another several weeks.

1276.   Between April 20 and April 23, 2013, the NACDS held its annual meeting in Palm Beach, Florida.  Representatives from Sandoz, Mallinckrodt, Actavis, Sun, and Taro were all in attendance.  These included senior executives -- D.P. of Sandoz, Defendant Kaczmarek of Mallinckrodt, G.S. of Sun, and Defendant Perfetto and J.K. of Taro.

1277.   The day after the NACDS annual meeting had concluded, on April 24, 2013, Actavis published increased WAC pricing for Methylphenidate IR that matched Sandoz's WAC

pricing.  Two days later, on April 26, 2013, Sun entered the Methylphenidate IR market and

matched its competitors' WAC pricing.  And, one week later, on May 1, 2013, Mallinckrodt re-

entered the market and matched competitor WAC pricing on both formulations.  That same day,

Kaczmarek sent a text message to CW-3 of Sandoz.

### 6)    Sandoz's Collusion With Greenstone

1278.   Defendants Sandoz (including its predecessor, Fougera) and Greenstone

coordinated market activity on several overlapping drugs starting at least as early as 2010.

Defendant Kellum of Sandoz, for example, had collusive relationships with at least two different

executives at Greenstone: (1) Jill Nailor, a senior sales executive, and (2) Robin Hatosy, a sales

executive.   Similarly, CW-1 of Sandoz colluded with Hatosy of Greenstone, and CW-6 of

Fougera colluded with Nailor of Greenstone, when necessary, to implement the illegal

agreements.

1279.   In order to coordinate their market activity and maintain their anticompetitive

agreements, executives at Sandoz/Fougera and Greenstone exchanged over three hundred and

sixty (360) phone calls and text messages between January 2011 and October 2014.  Many of

those calls and text messages can be tied directly to anticompetitive conduct and are discussed

below.

1280.   During that same time period, Sandoz/Fougera and Greenstone conspired to fix

prices and allocate markets on at least the following products:  (1) Clindamycin Phosphate Gel;

(2) Clindamycin Phosphate Lotion; (3) Clindamycin Phosphate Solution; (4) Clindamycin

Phosphate Cream; (5) Latanoprost Drops; and (6) Eplerenone Tablets.

### i.     Greenstone Equals Pfizer

1281.   In the Sections below, and throughout this Complaint, all references to Defendant Greenstone apply equally to Defendant Pfizer.  Indeed, the two companies operate in many important respects as a single functioning entity, without regard to corporate formalities.  Pfizer is the sole owner and shareholder of Greenstone, but treats Greenstone as its generics division or an internal business unit rather than as a separate and independent entity, controlling and directing Greenstone's business activities including Greenstone's marketing and sale of generic drugs.  Both companies share the same office space at Pfizer's Peapack, New Jersey campus. They also share common officers, managerial and supervisory personnel, and other employees.

1282.   Pfizer performs many of the important business functions of Greenstone that an independent corporate entity would typically perform on its own, including but not limited to: (1) financial and sales analysis, (2) business technology, (3) customer service, (4) legal, (5) intellectual property, (6) supply chain, (7) human resources and (8) employee benefits. Importantly, Greenstone – which as of 2017 was the 15th largest generic manufacturer in the country with annual gross sales of over one billion dollars – does not have its own Finance Department, Accounting Department, Legal Department, Customer Services Department, Human Resources Department, Operations Department or Information Technology Department – all critical functions for a legitimate business operation.  All of those functions are performed by Pfizer.

1283.   Most – if not all – of Greenstone's "employees" are actually employed by Pfizer. The two primary individuals identified throughout this Complaint as having conspired with competitors on behalf of Greenstone – Jill Nailor and Robin Hatosy – are Pfizer employees. They are paid directly by Pfizer, and Pfizer is listed as their employer in W-2 Wage and Tax

335

Statements submitted to the United States government. In their communications internally and with customers and competitors, both Nailor and Hatosy regularly used e-mail addresses that ended with Pfizer's e-mail domain: "@pfizer.com." This is the case for most if not all of Greenstone's "employees." Nailor and Hatosy also both received shares of Pfizer stock as compensation for their work, in addition to their Pfizer-paid salaries. They were reimbursed and/or compensated by Pfizer through its accounts payable system for membership in industry trade associations; they used Pfizer cell phones and/or iPads; and they used Pfizer teleconference and webex services to conduct their work.

1284.   Jill Nailor received regular performance evaluations directly from Pfizer, called "Pfizer Senior Leader Excellence Profile[s]," and participated in a program called "Pfizer Cornerstones of Management."

1285.   During all times relevant to this Complaint, Greenstone has not had its own President, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, Chief Commercial Officer or any Vice Presidents. The highest-ranking position at Greenstone has been the General Manager, a position held by a Pfizer employee that reports directly to higher-level executives at Pfizer.

1286.   During all times relevant to this Complaint, Pfizer has operated with multiple business units, one of which was always responsible for overseeing the marketing and sale of "established" products, including the generic drugs sold by Greenstone. The name of this business unit has changed over time. As of 2014, it was called the Global Established Pharmaceuticals Division ("GEP"). Today, it is referred to as "Pfizer Essential Health" ("PEH"). Within Pfizer, Greenstone has operated as part of GEP and/or PEH, and Greenstone "employees" (often referred to as the "Greenstone team" were all included in Pfizer's organizational charts –

demonstrating that Greenstone was acting as an internal division within Pfizer rather than as a separate company.  For example, as of 2017, Jill Nailor and other Greenstone executives were prominently identified as PEH employees in certain Pfizer organizational charts.  A part of one of those charts is shown below:



1287.   Similarly, as of 2014 these same individuals were considered part of GEP.  In an April 2014 presentation to Greenstone customers at the NACDS Annual Conference in Scottsdale, Arizona, Jill Nailor gave what she referred to as a "Greenstone/Pfizer overview" where she discussed the new streamlined organization of Pfizer and Greenstone.  Specifically, Nailor told customers that the General Manager of Greenstone – Jim Cannon – was now only three levels away from the CEO of Pfizer within the overall Pfizer corporate structure.  She showed customers the organizational structure of Pfizer, which included both Jim Cannon (General Manager of Greenstone) and herself as reports within the Pfizer corporate hierarchy:



1288.   Even Greenstone's own separate organizational charts, to the extent they exist, include all Pfizer employees, the Pfizer trademarked logo and brand name, and refer to the "Extended Pfizer Team" of individuals who perform many important business functions for the company.  For example:



1289.   Greenstone also promotes itself publicly as a marketing or distribution wing of Pfizer, specifically adopting the Pfizer logo in its marketing materials.  For example, on the top of the front page of its own website, Greenstone displays the following image:



On that same page, Greenstone touts that the authorized generic drugs it sells "are manufactured to the same standards and at the same facilities as Pfizer brand-name drugs" and that they "carry the legacy of the brand-name products' years of clinical research, data and patient and physician experience."  Greenstone has consistently advertised its connection with Pfizer in order to strategically capitalize on Pfizer's brand recognition and respect, for purposes of increasing its own sales.

1290.   In carrying out its business, Greenstone's internal training and marketing documents regularly carry Pfizer's trademarked logo and brand name.  This includes internal "Greenstone" presentations relating solely to generic drugs and issues specific to the generic pharmaceutical industry.

1291.   Because Greenstone operates as part of Pfizer, Pfizer is directly involved in the generics business and extensively evaluates generic competitors, price erosion in the generic industry, and other strategic issues on behalf of Greenstone.  Greenstone and Pfizer management regularly coordinate on strategy, and communicate about concepts such as "fair share," "responsible pricing" and following other competitors' price increases in particular generic drug markets.  For example, in a PEH presentation in January 2017 relating to Greenstone, a dual Pfizer/Greenstone employee explained the strategy behind the "fair share" concept, and indicated that Greenstone should "PUSH" those drugs where Greenstone had less than fair share, and simply maintain market share in those markets that were "STABLE."

1292.   Pfizer employees also work directly with the FDA on Greenstone's behalf to obtain approval for the drugs that Greenstone sells.

1293.   Greenstone also relies on Pfizer for cost and pricing strategy.  For new products in particular, Pfizer's Global Supply unit ("PGS") makes the budget, defines the costs of goods sold, and then conveys that information to Greenstone without significant feedback.  PGS is also heavily involved in deciding which new molecules will be produced and/or sold by Greenstone.

1294.   Pfizer performs all financial analyses, sales reports, revenue projections, and other finance functions for Greenstone.  Since at least January 2013, these tasks have been performed by Pfizer's Director of Business Finance, G.C.  In his LinkedIn profile, G.C. lists his employer as

340

Pfizer, and includes within his responsibilities that he is the "Finance Lead" for Greenstone – a "business unit" of Pfizer that sells generic pharmaceuticals in the U.S. and Puerto Rico.

1295.   Greenstone does not have its own separate IT infrastructure, and Pfizer provides access to its bid-tracking software and other business tools so that Greenstone can keep track of its operations, including but not limited to:  budget, supply, pricing, molecules sold, competition, market share, and financial performance generally.

1296.   In every important respect, including financially, Pfizer directly controls the decision-making of Greenstone.  Greenstone does not even have the authority to implement its own price increases without first obtaining the approval of Pfizer.  This includes the price increases discussed below.  Not only does Pfizer have to approve Greenstone's price increases, but it also directs Greenstone's strategy regarding the increases, and Greenstone always acts at the direction of Pfizer.  For example, in a "Business Review" presentation to the President of PEH in May 2017, Greenstone indicated that, for price increases specifically, it must "[f]ollow Pfizer guidelines."

1297.   For these reasons, although technically Greenstone is a separately incorporated entity, it is separate in name only.  Any actions attributed to Defendant Greenstone throughout this Complaint, including specifically those of Jill Nailor or Robin Hatosy, are actions taken, directed and/or controlled by Defendant Pfizer.

### ii.   Clindamycin Phosphate

1298.   Clindamycin Phosphate ("Clindamycin"), also known by the brand names Cleocin T, Clinda Max, and Clinda-Derm, among others, is a topical antibiotic used on the skin to stop the growth of certain bacteria that cause acne.  Clindamycin comes in several different formulations, including a cream, gel, lotion, and solution.

1299.   At all times relevant to the Complaint, Fougera (and later Sandoz, after its acquisition of Fougera) and Greenstone were the primary players in the markets for the four different formulations of Clindamycin Phosphate.  In each of those markets, the two competitors adhered to the "fair share" understanding across all four product markets and coordinated several significant price increases.  In only one of those markets – Clindamycin Solution – did any significant competition ever enter the market.  As discussed more fully below, Taro and Perrigo entered the market for Clindamycin Solution in late 2013, coordinating to avoid competition and minimize price erosion consistent with the "fair share" understanding.

**a)**   ***The First Coordinated Price Increase (60ml Solution – Fougera And Greenstone)***

1300.    In 2010, Defendants Fougera and Greenstone were the only suppliers in the market for Clindamycin 60ml solution.  Fougera – a separate entity that was subsequently acquired by Sandoz in 2012 – temporarily discontinued the product in September 2010, leaving Greenstone as the sole supplier in the market.

1301.   By late 2010, however, Greenstone also began to experience production problems, although it did continue to supply certain select customers.  Fougera immediately started preparing to re-enter the market and significantly raise price – in direct coordination with Greenstone.

1302.   On November 1, 2010, Fougera learned that it had Clindamycin 60ml solution in stock and that the product was available for shipping.  That day, Defendant Kaczmarek stated internally that "[w]e need to effect a WAC price increase and 're-introduce' this into the market. Stand by for details."  In response, a Fougera sales executive indicated that Greenstone "is out there, but with a limited customer base.  We just need to get that price point figured out."   That same executive initially suggested that Fougera double its WAC price, from $7.50 to $15.

342

1303.   Fougera did get the price point "figured out," with the help of Greenstone.  The next day – November 2, 2010 – Fougera scheduled an internal "Clinda[mycin] Solution Strategy Conference Call."  "Required attendees" for the call included Kaczmarek, CW-3 and CW-6, among others.  Before that conference call, CW-6 of Fougera called Jill Nailor of Greenstone – someone he generally did not speak with on the phone for social reasons – and the two spoke for nearly six (6) minutes.

1304.   At some point that day, Fougera changed plans and decided to re-enter the market with a much more dramatic WAC price increase than originally suggested the day before, going from $7.50 to $31.50 – or a 320% increase.  Customer contract prices increased even higher. Within two days after the price increase, for example, during a conversation with a Fougera national account representative, a customer complained that it had only just recently taken Clindamycin off contract with Fougera but "[n]ow you want to add it back at a 700% increase?????"  That same day, November 4, 2010, CW-6 and Nailor of Greenstone exchanged twenty-one (21) text messages.

1305.   Based on their communications, Fougera knew that Greenstone would follow its price increase – but it could not tell its customers that.  For example, in January 2011, a large wholesaler customer, ABC, approached Fougera asking if it knew whether Greenstone would be following Fougera's price increase on Clindamycin Solution.  In an internal Fougera e-mail exchange, CW-3 asked CW-6 (who, as stated above, had spoken with Nailor at Greenstone on the day of the Fougera price increase) if there was "[a]ny new news about Greenstone raising prices?  ABC is still inquiring.  Not sure what to tell them."  CW-6 responded that he did not have any new information, other than that a Greenstone price increase "is coming."  When CW-3 pressed for more detail about how quickly it would be coming, CW-6 responded: "Don't know.

I have left a message."  Indeed, CW-6 had called Nailor at Greenstone and left a 43-second voicemail immediately before sending that e-mail to CW-3.

1306.   Over the ensuing months, Fougera was contacted by several customers requesting price reductions due to the fact that Greenstone had not yet followed.  Fougera continued to coordinate regularly with Greenstone and did not reduce its price, but grew frustrated when its competitor did not promptly follow as expected – internally stating that Greenstone was "so dumb regarding their pricing," and that they "just don't get it," and that they were "[m]orons."

1307.   Greenstone did ultimately follow Fougera's price increase with an increase of its own on Clindamycin Solution in July 2011, but it did not fully match Fougera's public WAC pricing.  Nonetheless, Fougera refused to bid on any of Greenstone's accounts as it did not want to punish Greenstone for actually raising its prices.

1308.   During this time period, the anticompetitive understanding and coordination between Fougera and Greenstone applied to the other formulations of Clindamycin as well.  For example, in May 2012 Greenstone notified customers that it would be raising the price of Clindamycin Gel.  Shortly after that, Fougera was approached by a customer asking for a bid on Clindamycin Gel.  In conveying the request to Defendant Kaczmarek, a Fougera senior executive explained that "[m]arket shares [for Clindamycin Gel] are fairly evenly split and have been fairly steady, so I would think we want to stay away."  Kaczmarek agreed:

| | |
|---|---|
| **From:** | Walt Kaczmarek |
| **Sent:** | Tuesday, June 19, 2012 5:49 PM |
| **To:** | ███████████ |
| **Subject:** | RE: HEB Request for Proposal - CLINDAMYCIN GEL 1% |

Run away.

Walt Kaczmarek
Senior Vice President, Commercial Operations
Fougera Pharmaceuticals Inc.

344

1309.   The next day, CW-6 exchanged five (5) text messages with Nailor of Greenstone, likely to convey Fougera's decision not to challenge Greenstone's market share at that customer.

1310.   Similarly, on June 27, 2012, CW-3 at Fougera learned that ABC had put Clindamycin Gel, Lotion and Cream out to bid "due to Greenstone's price increase."  According to CW-3, "Greenstone's price is [now] close to ours."  That same day, CW-6 of Fougera placed a call to Nailor at Greenstone and left a 31-second voicemail.

**b)**   ***The Second Coordinated Increase (October 2012 – All Formulations – Sandoz And Greenstone)***

1311.   In late July 2012, Defendant Sandoz formally acquired Fougera.  As discussed more fully below, even before the acquisition Sandoz had been conspiring separately with Greenstone to fix prices on Latanoprost Drops, and thus had its own separate relationships with Greenstone.

1312.   After the merger, Sandoz began to scrutinize the Fougera business line and search for ways to maximize revenue for Fougera products in order to meet its pre-merger expectations. Starting in or about August 2012, Defendants Kellum (of Sandoz) and Kaczmarek (of Fougera, still with the company during the transition) – now co-workers – were tasked with discussing and identifying a list of price increase candidates from the Fougera drug portfolio.

1313.   By August 1, 2012, Greenstone had identified Clindamycin Solution as a "Price Increase Candidate."  On August 7, 2012, Defendant Kellum called Hatosy and the competitors exchanged six (6) text messages.  The next day, August 8, 2012, Kellum and Hatosy spoke for ten (10) minutes.

1314.   Later that month, on August 22, 2012, Kellum identified Clindamycin, in all of its various formulations, as a price increase candidate.  In describing his reasoning, Kellum indicated that the only competitor for all four formulations was Greenstone, "who's shown some

345

signs of intelligence on the tab / ophthalmic [sic.] side." Kellum was referring to his recent

successful collusion with Greenstone on Latanoprost drops (discussed below) which had resulted

in a significant price increase. In response, Kaczmarek recalled his own experience of

Greenstone's failure to follow Fougera's Clindamycin Solution price increase as quickly as he

wanted, stating "as FYI Greenstone has been complete and utter idiots in our space."

      1315.   Kellum's confidence in Greenstone was based on his own relationship with

Hatosy of Greenstone, and his prior conversations with her. Kellum pushed forward with the

planned price increases for Clindamycin, noting in a late-August 2012 presentation that

"Greenstone [was] traditionally not [a] rational competitor but did follow [Sandoz's] increase on

Latan[o]prost Opthalmic Drops recently."

      1316.   As Sandoz was planning for the Clindamycin price increase in August 2012,

Kellum was coordinating with Hatosy. For example, on August 29, 2012, a colleague at Sandoz

sent Kellum a draft "Fougera Price Increases presentation", which included detailed information

about the proposed Clindamycin price increase. After speaking with Hatosy of Greenstone that

same day for more than three (3) minutes, Kellum responded to his colleague saying, "I'm in

favor of recommending [a] price increase on all Clindamycin NDCs (not just V-cream)."

      1317.   Similarly, in September 2012 when Kellum was asked for his "rationale" for the

price increases on Clindamycin, he told colleagues that he expected Greenstone would "act

rationally as they did recently with Latanoprost" and follow the Sandoz price increase. Although

others at Sandoz expressed some concern that Greenstone might not follow, Defendant Kellum

remained confident in his agreement with Hatosy and Greenstone.

      1318.   On October 19, 2012, Defendant Sandoz implemented price increases on all four

formulations of Clindamycin in the amounts set forth below:

346

| Formulation | Old WAC | New WAC | Percentage Increase |
|---|---|---|---|
| CLINDAMYCIN PHOSPHATE 1% SOLUTION (60 ML) | $31.50 | $65.29 | 107% |
| CLINDAMYCIN PHOSPHATE 1% GEL (30 GRAM) | $20.00 | $57.49 | 187.00% |
| CLINDAMYCIN PHOSPHATE 1% GEL (60 GRAM) | $36.00 | $103.54 | 188% |
| CLINDAMYCIN PHOSPHATE 1% LOTION (60 ML) | $31.95 | $79.98 | 150% |
| CLINDAMYCIN PHOSPHATE 2% VAG CREAM (40 GRAM) | $42.34 | $75.04 | 77% |

1319.    In the days leading up to the price increases, Kellum continued his coordination –

by phone and text message – with Hatosy of Greenstone:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/17/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 13:10:55 | 0:00:00 |
| 10/17/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 19:03:16 | 0:00:00 |
| 10/18/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 9:38:07 | 0:00:00 |
| 10/18/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 13:37:57 | 0:00:00 |
| 10/18/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 14:14:42 | 0:00:33 |
| 10/18/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 16:46:17 | 0:00:00 |
| 10/18/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 17:58:49 | 0:00:00 |
| 10/18/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 17:59:38 | 0:00:00 |
| 10/18/2012 | Text | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 18:24:33 | 0:00:00 |
| 10/19/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 8:23:59 | 0:03:56 |

As detailed in the table above, Kellum reached out repeatedly by phone and text message to

Hatosy at Greenstone in the days leading up to Sandoz's announcement of the price increases.

This culminated in a nearly four (4) minute call between the two competitors on October 19,

2012 – the day the Sandoz price increases became effective.

1320.    During these communications, the competitors confirmed their understanding that

Greenstone would follow the Sandoz price increases.  With the agreement in hand and

understood between the two competitors, Kellum and Hatosy would not need to speak again by

phone or text message for nearly a year-and-a-half, until March 18, 2014 – as Sandoz was

preparing for another large increase on Clindamycin (discussed below).

1321.    Greenstone followed the price increases quickly this time, notifying its customers

of a price increase on all of Clindamycin formulations on November 27, 2012 – although the

WAC price increases did not become effective and publicly visible until December 27, 2012.  In

347

the interim period before Greenstone publicly followed the Sandoz price increases, Sandoz made sure to not disrupt the market.

1322.   When Greenstone's customers approached Sandoz looking for a lower price, Sandoz refused to bid.  Defendant Kellum, in particular, "highly recommend[ed]" that Sandoz avoid bidding as a result of the Greenstone price increases.

1323.   During that same time period, Sandoz's own customers also approached the company, seeing lower public prices from Greenstone and requesting that Sandoz reduce its pricing because they were not yet aware that Greenstone had followed.  Knowing that Greenstone would follow, however, Sandoz refused.  For example, in early December 2012 Sandoz was approached by its customer McKesson asking Sandoz to reduce its pricing for Clindamycin because Greenstone was offering significantly lower pricing in the market.  A Sandoz pricing employee initially responded to the customer by refusing to lower the price, saying "[w]e feel McKesson's price is competitive relative to the market" and "[o]ur intelligence indicates that pricing is higher in the market than what is referenced in" your e-mail.  When the customer challenged those responses and asked for additional details about what intelligence Sandoz was referring to, the pricing employee forwarded the e-mail string to Defendant Kellum and CW-1, asking for advice on how to avoid referring to the illegal understanding between the two companies:

**From**: ▮▮▮▮▮▮▮
**Sent**: Thursday, December 20, 2012 01:43 AM
**To**: Kellum, Armando; ▮▮▮▮▮▮▮
**Subject**: FW: Request New SSF - CLINDAMYCIN PHOSPHATE - E FOUGERA & CO INC - MCL 14531

Can I tell him that it looks like the competition took a price increase?  Trying to figure out a way to vaguely tell him.

Kellum responded by instructing the employee to call McKesson and "explain what we believe to be the case."  Knowing that a Greenstone increase would be coming, Kellum concluded: "Remind me to check Analysource to see if Greenstone raised WAC [yet]."

1324.   The Greenstone Clindamycin WAC price increases became effective and publicly visible on December 27, 2012.  Greenstone followed Sandoz's WAC price increases to the penny on every formulation, with Greenstone's prices on Clindamycin Solution increasing by 416%.

1325.   The coordinated price increases were a success.  In a May 2013 Sandoz Planning Meeting, Sandoz noted with respect to Clindamycin: "Q4 price increase held, Greenstone followed."  By May 2014, those price increases had resulted in an additional $61,000,000 in net sales to Sandoz.

**c)** ***New Entrants On Clindamycin Solution –***
***Perrigo And Taro – Do Not Significantly***
***Erode Pricing***

1326.   The late-2012 Sandoz and Greenstone price increases got the attention of two competitors – Taro and Perrigo – that had previously obtained approval to market Clindamycin Solution but had not recently been active in the market.

1327.   For example, in a January 2013 internal e-mail Perrigo employees noted that they had "seen some big WAC/AWP price increases" on Clindamycin Solution.  They noted that Perrigo already possessed approved ANDAs for the product that were "not being commercialized," and "were wondering if the market prices have increased enough to allow us to come back to this market."  Perrigo did indeed begin making plans to return to the market; and was in frequent communication with its competitors at every important step throughout the process.

1328.   Taro similarly had approval to sell Clindamycin Solution; but had not been marketing the product.  As early as April 2013, however, Taro began taking steps to bring the product back to market, which included reaching out to competitors.  For example, on April 17, 2013, Taro circulated an internal e-mail about a "Product Launch" for Clindamycin Solution, requesting specific information about material availability in order to estimate an available launch date.  That same day, Defendant Aprahamian called his contact at Sandoz, CW-3, and the two spoke for four (4) minutes.

1329.   Similarly, Defendant Aprahamian scheduled a meeting with colleagues at Taro on June 6, 2013 to discuss Taro's entry into the market for Clindamycin Solution.  They day before that meeting, he sent an e-mail internally saying, "we are hoping to get into the market relatively soon and need to understand current MS [market share] dynamics to roll out our strategy. . . . Looks like only [Sandoz] and Greenstone [are in the market] with some nice pricing actions in late last year…"  The day after his internal meeting – June 7, 2013 – Aprahamian called CW-3 at Sandoz and the two competitors spoke for nearly eleven (11) minutes.

1330.   Starting in July 2013, Sandoz started having temporary supply problems for Clindamycin Solution, due to a change in the adhesive label which required additional testing. The disruption was temporary, and Sandoz expected to be back in the market by the end of the year.  However, this left Greenstone as the only viable competitor while Taro and Perrigo were planning to enter the market.

1331.   Because it well understood under "fair share" principles that Greenstone would have to concede market share and "play nice in the sandbox" as these new competitors entered the market (and as Sandoz subsequently re-entered the market), it was important for Taro,

Perrigo and Sandoz to coordinate with each other in order to avoid competition and minimize

price erosion as they re-entered the market.

1332.   Perrigo started preparing in earnest to enter the market for Clindamycin Solution

in August 2013.  Over the next several weeks, executives at Perrigo, Taro and Sandoz were in

almost constant communication, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:32:00 | 0:01:00 |
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:42:00 | 0:05:00 |
| 8/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 17:54:00 | 0:05:00 |
| 8/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 17:07:00 | 0:01:00 |
| 8/6/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:22:00 | 0:04:00 |
| 8/6/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:27:00 | 0:12:00 |
| 8/7/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:45:00 | 0:03:00 |
| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:33:00 | 0:13:00 |
| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 18:19:00 | 0:02:00 |
| 8/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:47:00 | 0:01:00 |
| 8/8/2013 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 10:32:00 | 0:06:00 |
| 8/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 16:42:00 | 0:04:00 |
| 8/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 8:37:00 | 0:08:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 6:42:00 | 0:03:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 11:04:00 | 0:01:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:39:00 | 0:02:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 16:04:00 | 0:01:00 |
| 8/12/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 16:22:00 | 0:01:00 |
| 8/14/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:01:00 | 0:01:00 |
| 8/15/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 12:53:00 | 0:08:00 |
| 8/15/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:09:00 | 0:14:00 |
| 8/21/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 13:51:00 | 0:08:00 |
| 8/21/2013 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 19:41:00 | 0:05:00 |
| 8/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:54:00 | 0:03:00 |

1333.   On August 28, 2013, at 1:30 p.m. ET, the Perrigo sales team held an internal

launch meeting regarding Clindamycin Solution.  In advance of that meeting, a Perrigo executive

circulated pricing and market share information to the team, including a pricing grid with

proposed Perrigo pricing for different "tiers" of customers.  One of the attached documents listed

Perrigo's "Target Share" at "15-20%."  This led to several more phone calls between Perrigo,

Taro and Sandoz that same day, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 8/28/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 7:36:00 | 0:15:00 |
| 8/28/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 10:37:35 | 0:13:22 |
| 8/28/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Taro Pharmaceuticals | 14:36:00 | 0:13:00 |

As can be seen from the table above, Defendant Aprahamian of Taro and T.P. of Perrigo both spoke to CW-3 of Sandoz in the morning before the 1:30 p.m. ET Perrigo launch meeting. Shortly after the meeting, at 2:36 p.m., Defendant Boothe of Perrigo called the Taro main line and spoke to someone at Taro – likely Defendant Perfetto – for approximately thirteen (13) minutes.

1334.   Perrigo formally launched and entered the market for Clindamycin Solution on Monday, September 9, 2013 – a week earlier than expected.  The week before the launch, as Perrigo was deciding which customers to approach, executives at the company were again in frequent contact with competitors Taro and Sandoz.  On Wednesday, September 4, 2013, a Perrigo executive sent an e-mail to the Perrigo sales team about Clindamycin Solution, stating: "12 days 'til launch!  Do we have any customers yet?"  The next day, T.P. of Perrigo called his contact at Sandoz, CW-3, and the two spoke for approximately ten (10) minutes.  The day after that – Friday September 6, 2013 – Defendant Boothe of Perrigo spoke to Defendant Perfetto of Taro for nearly two (2) minutes.

1335.   Perrigo was quickly able to obtain ABC and Walmart as customers, allowing the company to even exceed its initial market share targets.

1336.   Shortly after Perrigo entered the market, on September 12, 2013, Defendant Aprahamian of Taro sent an internal e-mail announcing that "Perrigo just entered the market making this a 3-player market: Greenstone, Sandoz, and now Perrigo.  We are hoping to have product towards end of next month.  Will keep you posted with updates."

1337.   Over the next several weeks, executives at Taro communicated frequently with their counterparts at Perrigo and Sandoz to determine which customers to target, and how to avoid competing with each other.  At least some of those communications are set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/17/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 15:10:07 | 0:16:39 |
| 9/17/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 19:08:00 | 0:02:00 |
| 9/18/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 11:52:11 | 0:11:14 |
| 9/19/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:41:00 | 0:17:00 |
| 9/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 15:23:00 | 0:01:00 |
| 9/23/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:24:00 | 0:01:00 |
| 9/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:42:00 | 0:15:00 |
| 9/26/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:37:17 | 0:06:44 |
| 9/26/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 15:22:00 | 0:15:00 |
| 9/27/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 16:00:00 | 0:05:00 |
| 10/1/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 17:56:00 | 0:01:00 |
| 10/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 12:41:00 | 0:10:00 |
| 10/3/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 16:13:00 | 0:05:00 |
| 10/3/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 18:16:00 | 0:01:00 |
| 10/4/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:32:20 | 0:00:12 |
| 10/4/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 14:32:52 | 0:04:51 |
| 10/4/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 15:37:00 | 0:02:00 |

1338.   As can be seen in the table above, Aprahamian called CW-3 at Sandoz on October 1, 2013, most likely leaving a voicemail.  CW-3 called Aprahamian back the next day, and the two spoke for ten (10) minutes.  During that call, Aprahamian and CW-3 talked about specific pricing in the market and which customers Taro should approach as it entered the market.  That same day – October 2, 2013 – Defendant Aprahamian created a spreadsheet titled "ClindamycinSolution_Pricing_10.2.13.xlsx," which documented some of the information he had received during that call.  In that document Aprahamian created an initial pricing model for Taro's upcoming launch of Clindamycin Solution, based on his conversations with CW-3.  The spreadsheet included not only public WAC pricing for Sandoz, Greenstone and Perrigo, but also – in a separate tab of the spreadsheet titled "Com Pricing" – non-public price points for three potential customers:  Rite Aid, Publix, and ABC:

|   | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Company | Size | Price | Manufacturer | Comments |  |  |
| 2 | Publix | 30ml | 18.5 | Greenstone |  |  |  |
| 3 | Publix | 60ml | 37.25 | Greenstone |  |  |  |
| 4 | ABC | 30 ml | $15 invoice | Perigo | just switched from Greenstone |  |  |
| 5 | ABC | 60ml | $30 invoice | Perigo | just switched from Greenstone |  |  |
| 6 | Rite Aid | 30ml | $19 | Greenstone | 11, 195 units year |  |  |
| 7 | Rite Aid | 60ml | $38 | Greenstone | 54,907 year |  |  |
| 8 |  |  |  |  |  |  |  |

1339.   On October 8, 2013, Taro was busy preparing for the launch.  Aprahamian sent an e-mail to the Taro sales team indicating that Taro was planning to launch Clindamycin Solution "in the next week" and asking those sales executives to reach out to customers and "get a sense of the market."  Aprahamian said he was "[s]pecifically looking for price points, usage, who they are with, and their willingness to entertain an offer."  Consistent with the "fair share" understanding, Aprahamian indicated that "Greenstone is our sole target with an 89% share"; meaning that Taro would only target Greenstone customers – not Perrigo – due to Greenstone's very high market share.  Another Taro employee was concurrently creating a "Clindamycin 1% Solution Fact Sheet" with information about the product, recent price trends in the market, competitors, and Taro's "Target Market share goal" of 20%.  That same day, Aprahamian called CW-3 at Sandoz and left a message.  CW-3 returned the call immediately and the two spoke for approximately three (3) minutes.

1340.   Taro also scheduled an internal meeting regarding the Clindamycin launch for October 11, 2013.  The day before and the day of that meeting, Aprahamian was again busy communicating with CW-3 of Sandoz.  On October 10, 2013, Aprahamian called CW-3 twice – first on CW-3's office line, leaving a message, and then immediately after on his cell phone, leaving another message.  The next day – the day of the Taro internal launch meeting – the two

competitors spoke three times, with calls lasting three (3), one (1), and five (5) minutes, respectively.

1341.   As Defendant Aprahamian kept speaking to CW-3 at Sandoz, who was in turn speaking with T.P. at Perrigo, he continued compiling competitively sensitive, non-public price points for various customers.  For example, by October 25, 2013, the "Com Pricing" tab of Aprahamian's Clindamycin Solution pricing spreadsheet had grown:

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Company | Size | Price | Manufacturer | Comments | | |
| 2 | Publix | 30ml | $       18.50 | Greenstone | | | |
| 3 | Publix | 60ml | $       37.25 | Greenstone | | | |
| 4 | ABC | 30 ml | $15 invoice | Perigo | just switched from Greenstone | | |
| 5 | ABC | 60ml | $30 invoice | Perigo | just switched from Greenstone | | |
| 6 | Rite Aid | 30ml | $       19.00 | Greenstone | 11, 195 units year | | |
| 7 | Rite Aid | 60ml | $       38.00 | Greenstone | 54,907 year | | |
| 8 | Henry Sc | 30ml | $       19.50 | Greenstone | | | |
| 9 | Henry Sc | 60ml | $       39.75 | Greenstone | | | |
| 10 | HD Smith | 30 ml | $       21.00 | Greenstone | 2160 year | | |
| 11 | HD Smith | 60ml | $       54.00 | Sandoz | 2800 year | | |
| 12 | Kroger | 30ml | | Greenstone | 3600 yr | | |
| 13 | Kroger | 60ml | mid $30's | Greenstone | 58000 YR | | |
| 14 | Cardinal | 30ml | $       22.00 | Greenstone | 1500 / month | | |
| 15 | Cardinal | 60ml | $       44.00 | Greenstone | 6500 / month | | |
| 16 | Humana | 60ml | $       14.75 | ? | low volumen | | |
| 17 | | | | | | | |

Having this competitively sensitive, non-public information allowed Taro to price as high as possible while still obtaining new business – accomplishing one of the fundamental goals of the "fair share" understanding by minimizing price erosion as it entered the market.

1342.   Taro entered the market for Clindamycin Solution on October 28, 2013, matching Sandoz, Greenstone and Perrigo's WAC pricing exactly.  When launching, Taro quickly targeted and obtained Rite Aid – not ABC or Walmart – to avoid competing with Perrigo for market share.  This gave Taro approximately 13% market share immediately, almost reaching its target goal with just one customer.

1343.   When Sandoz subsequently re-entered the market for Clindamycin Solution in early 2014, it also did so in coordination with its competitors.  For example, on Monday, February 10, 2014, members of the Sandoz sales team had a conversation about the company's upcoming re-launch of Clindamycin Solution.  As a result of that discussion, it was decided that "the team was going to call around to get alignment before sending out offers."

1344.   That same day, Defendant Kellum sent an internal e-mail to the Sandoz sales team reminding them of the important understanding already in place with Greenstone across all of the Clindamycin formulations, not just the Solution:

| | |
|---|---|
| **From:** | Kellum, Armando |
| **Sent:** | Monday, February 10, 2014 6:35 PM |
| **To:** | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| **Subject:** | RE: ABC Clindamycin Solution - Monthly Usage/Alignment? |

Team,

Because of the other Clinda's I think we should avoid Greenstone as much as possible despite their large share.

We enjoy a very good and stable situation on the other Clinda products.

Thanks!

Armando Kellum
Vice President, Contracting and Business Analytics.
Sandoz Inc.

1345.   Two days later, on February 12, 2014, CW-3 of Sandoz called Defendant Aprahamian of Taro and the two spoke for seventeen (17) minutes.  They spoke again on February 13 for one (1) minute.  That same day – February 13, 2014 – CW-1 of Sandoz sent an internal e-mail again stressing the broader relationship with Greenstone and the desire not to disrupt that relationship:  "This re-launch is slightly complicated because we share a lot of cross over with GS [Greenstone] on other Clinda sku's, so need to be careful."

1346.   Over the next several weeks until Sandoz re-launched, the four competitors for

Clindamycin Solution – Sandoz, Taro, Perrigo and Greenstone – coordinated through numerous

phone calls, in order to minimize any disruption that might be caused by Sandoz's re-entry:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/14/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 13:04:00 | 0:17:00 |
| 2/19/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 15:42:00 | 0:02:00 |
| 2/20/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 4:56:11 | 0:00:34 |
| 2/20/2014 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 9:21:00 | 0:03:00 |
| 2/20/2014 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 9:24:00 | 0:11:00 |
| 2/24/2014 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 12:38:00 | 0:01:00 |
| 2/26/2014 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:02:00 |
| 3/1/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 18:06:00 | 0:01:00 |
| 3/5/2014 | Voice | Boothe, Douglas (Perrigo) | Incoming | Perfetto, Mike (Taro) | 6:48:00 | 0:12:00 |
| 3/11/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Wesolowski, John (Perrigo) | 8:18:40 | 0:00:16 |
| 3/11/2014 | Text | Nailor, Jill (Greenstone) | Outgoing | Wesolowski, John (Perrigo) | 8:23:15 | 0:00:00 |
| 3/11/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Wesolowski, John (Perrigo) | 9:02:21 | 0:00:09 |
| 3/11/2014 | Voice | Nailor, Jill (Greenstone) | Incoming | Wesolowski, John (Perrigo) | 11:51:57 | 0:00:00 |
| 3/11/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Wesolowski, John (Perrigo) | 11:53:16 | 0:02:38 |
| 3/13/2014 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 4:05:00 | 0:01:00 |
| 3/13/2014 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 9:42:00 | 0:12:00 |
| 3/18/2014 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 11:43:38 | 0:00:31 |
| 3/18/2014 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 12:22:44 | 0:07:39 |

1347.   Sandoz set its target market share at 25%, choosing to target 20% from

Greenstone and 5% from Perrigo.  In a May 2014 internal Sandoz presentation, Sandoz laid out

its plan for re-entry, specifically referring to one of its competitors as "Pfizer" rather than

"Greenstone":



1348.   Ultimately, these coordinated efforts to minimize price erosion were very

successful.  Even after both Taro and Perrigo's entry, and Sandoz's re-entry, prices for

Clindamycin Solution remained significantly higher than they had been prior to the first coordinated price increase.  In a "Business Review" presentation to Pfizer in 2017, Greenstone summarized the lock-step price increases in the market for Clindamycin Solution, while also showing relatively minimal price erosion even after two additional competitors had entered the market:



d)   *The Third Coordinated Price Increase
    (2014 – All Formulations Except Solution
    – Sandoz And Greenstone)*

1349.   Starting in April 2014, Sandoz decided to raise prices on the three formulations of Clindamycin where Greenstone was still its only competitor.  This led to a quick flurry of phone calls between Greenstone and Sandoz in early April 2014 to confirm the understanding, as shown below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/2/2014 | Voice | Nailor, Jill (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 13:49:38 | 0:06:59 |
| 4/2/2014 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 14:52:52 | 0:03:05 |
| 4/4/2014 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 10:50:27 | 0:00:25 |
| 4/4/2014 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 11:36:07 | 0:03:04 |

The phone call between Nailor and Defendant Kellum listed above was the first phone call ever between the two, according to phone records.  As a result of these calls, Sandoz understood that Greenstone would follow its price increases.  During these calls, the competitors also discussed a separate price increase on Eplerenone Tablets, discussed more fully below.

1350.   Sandoz moved quickly, raising its WAC prices on Clindamycin Gel, Clindamycin Lotion, and Clindamycin Cream by approximately 20%, effective April 18, 2014.  Shortly after the Sandoz increase, on April 23, 2014, Nailor of Greenstone and Kellum spoke again for nearly fifteen (15) minutes.

1351.   By now, Greenstone understood the need to follow the Sandoz price increases quickly – and did so.  It followed the Sandoz WAC increases to the penny less than a month-and-a-half later, with an effective date of June 2, 2014.  Shortly before Greenstone followed the Sandoz Clindamycin increases – on May 22, 2014 – Hatosy of Greenstone called Kellum of Sandoz twice, leaving him a forty-seven (47) second voicemail.  They did not speak again for nearly three (3) months.  Similarly, three days before the increases became effective, on May 29, 2014, Nailor of Greenstone called Kellum of Sandoz, leaving him a twenty-six (26) second voicemail.  As part of that same price increase, Greenstone also raised its pricing on Eplerenone Tablets.

1352.   Sandoz honored the "fair share" understanding with Greenstone and the agreement to raise prices on Clindamycin.  For example, when approached by a customer, Omnicare, on May 28, 2014 to provide a bid for Clindamycin Gel, the first reaction from a Sandoz marketing manager was that Defendant Kellum "may not want to pursue to avoid price

disruption." Omnicare approached Sandoz again in August, asking if Sandoz had enough supply to meet the customer's needs. The e-mail from Omnicare followed a flurry of phone calls between Kellum and Hatosy of Greenstone only a few days prior, on August 14, 2014 (their first calls since May 2014). After receiving the e-mail from Omnicare, CW-3 of Sandoz informed the customer that Sandoz would not do anything that would disrupt the market.

### iii.   Latanoprost Drops

1353.   Latanoprost, also known by the brand name Xalatan (manufactured by Defendant Pfizer), is an ophthalmic solution, in the form of eye drops, used to treat high blood pressure inside the eye due to glaucoma (open angle type) or other eye diseases including but not limited to ocular hypertension. In 2013, the annual market for Latanoprost Drops in the United States exceeded $100 million.

1354.   As of March 2012, there were three generic manufacturers in the market for Latanoprost Drops: Sandoz, Greenstone, and Valeant (sometimes referred to as Bausch & Lomb ("B&L")). Greenstone had the largest market share with 42%, followed by Valeant with 30% and Sandoz with 19%. In April 2012, all three manufacturers raised their prices in direct coordination with one another.

1355.   In early April 2012, Greenstone informed its customers that it would be taking a price increase on Latanoprost Drops. In the days and weeks leading up to the Greenstone price increase notice, Robin Hatosy of Greenstone was coordinating with both Defendant Kellum of Sandoz and B.P., a sales executive at Valeant, by phone and text message:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/1/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | B.P. (Valeant) | 12:35:30 | 0:00:00 |
| 3/1/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:38:54 | 0:00:29 |
| 3/1/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:39:39 | 0:00:46 |
| 3/5/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 9:30:16 | 0:05:18 |
| 3/16/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 21:26:02 | 0:00:00 |
| 3/16/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 21:27:11 | 0:00:00 |
| 3/17/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 16:21:54 | 0:00:00 |
| 3/17/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 20:13:55 | 0:00:00 |
| 3/17/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 21:08:36 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 11:07:59 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:03:57 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:07:02 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:11:17 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:15:28 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:49:42 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:51:14 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:52:14 | 0:00:00 |

Hatosy consistently acted as the conduit, sharing information between Sandoz and Valeant in order to secure an agreement from both to raise prices.

1356.   On the day that Greenstone sent out the price increase notices, April 3, 2012, both CVS and Walgreens approached Sandoz looking for a lower price on Latanoprost Drops.  That same day, Hatosy and Kellum exchanged five (5) text messages while Kellum replied internally to his colleagues at Sandoz, stating: "I strongly suspect this [approach from customers] is price increase related.  We will evaluate quickly and make [a] recommendation."  Later that evening, Kellum instructed his sales team not to make any "new offers" for Latanoprost and to put the product on "strict allocation."  Kellum also instructed S.G., one of his sales executives, to lie to Walgreens about why Sandoz was unable to bid, instructing S.G. to "blame supply" even though Sandoz had plenty of supply.

1357.   Sandoz immediately began preparing an increase of its own.  On April 4, 2012, Kellum called Hatosy but was unable to connect.  He called her again on April 5, 2012, and the two competitors spoke for nearly two (2) minutes.

1358.   On April 6, 2012, Kellum requested a customer list from a colleague so that he could begin calculating the financial impact of a Sandoz price increase.  He also added the item "Latanaprost[sic] (price increase)" to the agenda for that day's "Pricing and Product Management Meeting."  After some quick calculations, Kellum determined that a Sandoz increase on Latanoprost Drops could increase the company's revenues by up to $14,900,000 per year.

1359.   In a presentation he created that same day to support the Latanoprost price increase, Kellum was intentionally opaque about why Sandoz should take the increase, stating that "Sandoz learned from several customers that both Greenstone (Pfizer gx division) and B&L [Valeant] have taken significant price increase[s]."  But that was a lie.  Kellum had first learned of the Greenstone price increase directly from Hatosy, not a customer.  In addition, the Valeant price increase had not even happened yet.  In fact, it would not be effective until April 24, 2012, three weeks in the future; Kellum's inside information instead came directly from his prior conversations with his competitor, Greenstone.

1360.   While he was in the midst of planning the Sandoz price increase on April 6, 2012, Kellum also exchanged two (2) more text messages and had a nearly seven (7) minute call with Hatosy of Greenstone.  Hatosy, in turn, then called B.P. at Valeant and the two spoke for nearly five (5) minutes.  Later that evening, Kellum told colleagues: "I have a very good understanding of the market price points ~ $7 net per dropper."

1361.   Things moved quickly from there.  On April 9, 2012, Defendant Kellum sent around an agenda for the Pricing Committee meeting the next day.  The agenda included "Latanprost[sic] Opthalmic Price increase approval."  He also called Hatosy of Greenstone but was unable to reach her.  Kellum quickly obtained approval for the Latanoprost price increase;

customers were notified of the increase on April 11, 2012, and it became effective on April 13, 2012.  As a result of this quick action, Sandoz's price increase became effective even before Greenstone's.

1362.   On April 12, 2012, a large retail pharmacy customer, Rite-Aid, sent Greenstone a request for a bid on Latanoprost.  Knowing that this was likely an indication that Sandoz had followed Greenstone's price increase, Hatosy (then using a different surname) forwarded the e-mail directly to Kellum with an approving message:

| | |
|---|---|
| **From:** | Strzeminski, Robin <Robin.Strzeminski@pfizer.com> |
| **Sent:** | Thursday, April 12, 2012 7:55 PM |
| **To:** | Kellum, Armando |
| **Subject:** | Fwd: Open Bid - Latanoprost |

Nice!

Robin Strzeminski | National Account Director|Greenstone LLC Mobile ▮▮▮▮▮ | Fax ▮▮▮▮▮ Email |
robin.strzeminski@pfizer.com<mailto:robin.strzeminski@pfizer.com>

1363.   That same day, a different customer, Optisource, approached Sandoz – angry that it was not notified in advance of Sandoz's Latanoprost price increase.  A Sandoz sales executive told the customer that Sandoz was simply "following our competitions increase," but Optisource challenged that idea, saying that Valeant – which was also on a secondary contract with that customer – had not raised its price.  Questioning Defendant Kellum's intel about the price increases, a senior sales and pricing executive at Sandoz forwarded the e-mail string directly to Defendant Kellum on Friday, April 13, 2012, asking: "B&L [Valeant] did not raise?"  Kellum immediately responded: "Not my understanding."  Kellum's understanding, of course – based on his conversations with Hatosy – was that Valeant would be raising, or already had raised, its price.

363

1364.   The following Monday, April 16, 2012, Kellum called Hatosy.  She called him back the next day, but they were unable to connect.    On April 18 and 19, 2012, Hatosy and B.P. of Valeant then communicated several times by phone and text message, including one call lasting nearly fourteen (14) minutes.

1365.   On April 24, 2012, Valeant raised its WAC pricing on Latanoprost to a point even higher than Sandoz's.  That same day, B.P. of Valeant called Hatosy of Greenstone, likely to report the news.

1366.   Three price increases in the span of roughly three weeks caused a lot of customer activity and confusion – which in turn required additional coordination among the three manufacturers to make sure prices stayed high and the market remained stable.  For the most part, Sandoz tried to avoid taking any of its competitors' customers after the price increases, but it did want to pick up one customer to get closer to its "fair share" of the market.

1367.   For example, on Friday May 4, 2012 – shortly after the Greenstone and Valeant price increases became effective – Cardinal approached Sandoz with an opportunity to bid and take the business with a lower price.  Kellum called Hatosy that day, but they were unable to connect.  He called her again on Monday, and they spoke for more than six (6) minutes.  They spoke about Sandoz's desire to obtain another customer, and which customer it should target. Monday morning, before speaking to Hatosy, Kellum responded to the internal Sandoz e-mail saying, "[m]y preference is really to take the ABC business [instead of Cardinal].  We had that business before and I think we are sending a very poor market signal by taking the Greenstone business immediately after an increase."  The next day, after speaking to Hatosy, Kellum followed up the e-mail, confirming that Sandoz should pass on Cardinal, stating "I really think we'll be able to get ABC" and "I'm worried the message this will send."  Consistent with the

agreement reached with Greenstone, Sandoz retained its secondary position with Cardinal, instead of bidding for the primary position, and decided to wait until ABC put its Latanoprost business out to bid and let Greenstone concede that customer instead.

1368.   Around this same time, CW-1 started at Sandoz.  He had previously worked with Hatosy at a prior employer and thus had a pre-existing relationship with the Greenstone sales executive.  When some confusion arose later in May 2012 around the Cardinal business, Hatosy communicated with both CW-1 and Defendant Kellum from Sandoz, as well as B.P. of Valeant, in order to enforce the agreement already in place among the three manufacturers.

1369.   For example, on the morning of May 31, 2012, B.P. of Valeant and Hatosy of Greenstone exchanged one text message and had several phone calls of varying lengths.  In the midst of those communications with B.P., Hatosy was simultaneously communicating with CW-1 of Sandoz using iPhone chat, resulting in the following message exchange:

| From | Body | Status | Timestamp: Time |
|------|------|--------|-----------------|
| +███████ Robin | Did u guys pick up cardinal on latanaprost? | Read | 5/31/2012 8:18:08 AM |
| +███████ | No , did you lose it? | Sent | 5/31/2012 8:23:11 AM |
| +███████ Robin | You guys bid?? I'm confused... Its b&l. And supposedly you ranked the price unless cardinal is lying. | Read | 5/31/2012 8:28:48 AM |
| +███████ Robin | Tanked the price? I need to call Armando. | Read | 5/31/2012 8:28:48 AM |

As Hatosy explained to CW-1, Valeant (B&L) had the Cardinal business, not Greenstone, but Cardinal was telling Valeant that Sandoz had a lower price in the market.  Hatosy expressed the need to call "Armando" [Kellum] because CW-1 had only recently started at Sandoz and thus did not completely understand the scope of the prior collusive communications between Hatosy and Defendant Kellum about the Latanoprost price increases.

1370.   Immediately following this exchange, Hatosy did call Defendant Kellum, setting off a flurry of calls between the three competitors that day, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 8:31:29 | 0:00:02 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 8:31:50 | 0:01:57 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 8:34:24 | 0:03:15 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 8:39:30 | 0:00:59 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | B.P. (Valeant) | 8:43:46 | 0:00:00 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | B.P. (Valeant) | 8:44:31 | 0:00:26 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 8:45:15 | 0:02:26 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 9:17:22 | 0:02:29 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 10:38:48 | 0:01:01 |

1371.   Over the next several weeks, Hatosy went to great lengths to make sure Sandoz and Valeant lived up to their agreement to keep prices high across the board for Latanoprost.  For example, between June 26 and 28, 2012, Hatosy and B.P. of Valeant exchanged twelve (12) text messages.

1372.   After that series of communications, on June 29, 2012, Hatosy reached out again to CW-1 via iPhone chat:

| From | Body | Status | Timestamp: Time |
|------|------|--------|-----------------|
| ███████ Robin | Remind Armando to remove lantanoprost from cardinals secondary contract or raise the price. PLEASE!! it's visible everywhere. | Read | 6/29/2012 4:24:32 PM |
| ███████ | We are working on it | Sent | 6/30/2012 8:46:10 PM |
| ███████ Robin | Lol!! Speedy Gonzales please!!! If I get another message someone is getting shot. | Read | 6/30/2012 8:46:56 PM |
| ███████ | Sorry vacation going on this week. Ak out and I am in Miami | Sent | 6/30/2012 8:48:21 PM |
| ███████ Robin | Lol!! Enjoy!!! Tell him to get his shit together!! | Read | 6/30/2012 8:51:12 PM |

At the exact same time that Hatosy was exchanging these iPhone chat messages with CW-1 at Sandoz, she was also exchanging separate text messages with B.P. of Valeant.

1373.   Those efforts were successful.  On July 3, 2012, CW-1 followed up with Hatosy via iPhone chat message confirming that Sandoz's pricing for Latanoprost was not low at Cardinal – or any other customer for that matter:

| From | Body | Status | Timestamp: Time |
|------|------|--------|-----------------|
| ▮▮▮▮▮ | FYI we do not have old low pricing out there | Sent | 7/3/2012 4:24:54 PM |
| ▮▮▮▮▮ | We have a secondary but it's not old or low | Sent | 7/3/2012 4:26:20 PM |
| ▮▮▮▮▮ Robin | Secondary cardinal pricing? Are u sure?? | Read | 7/3/2012 4:26:40 PM |
| ▮▮▮▮▮ Robin | I hope it's higher than primary would be??? | Read | 7/3/2012 4:26:40 PM |
| ▮▮▮▮▮ Robin | Like over $11 | Read | 7/3/2012 4:26:40 PM |
| ▮▮▮▮▮ | Correct | Sent | 7/3/2012 4:28:21 PM |
| ▮▮▮▮▮ Robin | Ok!! What about Kinray Parmed? In line?? | Read | 7/3/2012 4:30:56 PM |
| ▮▮▮▮▮ | Yes | Sent | 7/3/2012 4:37:50 PM |
| ▮▮▮▮▮ Robin | Otherwise I get my voodoo doll out! | Read | 7/3/2012 5:17:52 PM |
| ▮▮▮▮▮ | And I don't want that | Sent | 7/3/2012 5:19:48 PM |
| ▮▮▮▮▮ Robin | Right!!! You don't! :)) | Read | 7/3/2012 5:20:00 PM |

Again, shortly after receiving this information from CW-1 about Sandoz's pricing, Hatosy sent a text message to B.P. at Valeant. They exchanged several other text messages that same day.

1374.   Greenstone similarly lived up to its agreement to concede the ABC business to Sandoz, allowing Sandoz to get closer to its "fair share" of the Latanoprost market. On June 22, 2012, ABC requested a bid from Sandoz on Latanoprost, as expected, due to the Greenstone price increase. Consistent with the agreement, Greenstone quickly conceded the customer to Sandoz, allowing Sandoz to obtain the business "without compromising pricing in [the] market."

1375.   As discussed above, this successful effort at price fixing convinced Kellum to recommend further efforts at price fixing with Greenstone on various formulations of Clindamycin beginning in August 2012, continuing through 2014. That history also paved the way for yet another successful price fixing agreement between Sandoz and Greenstone on Eplerenone Tablets, discussed below.

### iv.    Eplerenone Tablets

1376.   Eplerenone, also known by the brand name Inspra, is an oral medication used alone or in combination with other medicines to treat high blood pressure by blocking a chemical (aldosterone) in your body which in turn lowers the amount of sodium and water the body retains.

367

1377.   As of spring 2014, Sandoz and Greenstone were the only generic manufacturers of Eplerenone Tablets.

1378.   As discussed above, while Greenstone was coordinating with Sandoz in April 2014 to follow Sandoz's price increases on various formulations of Clindamycin, it was also coordinating to lead a price increase on Eplerenone Tablets.

1379.   Originally, Greenstone planned its Eplerenone price increase to become effective on May 1, 2014, but sometime in mid-April that increase was delayed.  Shortly after the decision was made to delay the Eplerenone price increase, on April 22, 2014, Naylor of Greenstone called Defendant Kellum and left a message.  They traded voicemails until they were able to speak the next day for nearly fifteen (15) minutes.

1380.   Greenstone planned its increases of Clindamycin and Eplerenone together, as it was coordinating with Sandoz – and both increases ultimately became effective on June 2, 2014. Shortly before the increases became effective, on May 29, 2014, Naylor of Greenstone called Defendant Kellum of Sandoz, leaving him a twenty-six (26) second voicemail.

1381.   Sandoz's intent was always to follow Greenstone's Eplerenone price increase, rather than compete for market share.  Sandoz began preparing to follow Greenstone's Eplerenone price increase in early July 2014.  However, because of price protection terms with several of Sandoz's customers, the company decided to delay the roll-out of its Eplerenone price increase (and several others) until it made more financial sense and Sandoz would be able to limit any contractual penalties that would arise as a result of the increase.

1382.   Ultimately, Sandoz followed Greenstone's price increase on Eplerenone on October 10, 2014.  Sandoz increased its pricing by as much as 270% to certain customers. During the time period after Greenstone's price increase and before Sandoz could follow, the

two competitors continued to coordinate by phone, including a number of calls between

Defendant Kellum and Hatosy of Greenstone in August 2014.  Shortly after the Sandoz price

increase became effective, on October 15, 2014, Defendant Kellum and Nailor of Greenstone

also communicated briefly.

### d.    G&W And Its Other Relationships

1383.   Earlier Sections of this Complaint discuss in detail G&W's collusion with several

competitors between 2010 and July 2012, when Sandoz acquired Fougera – including collusion

with Fougera, Perrigo, and Glenmark.  Another Section focuses on collusion between Taro and

G&W in late 2015 and early 2016 on several products that G&W purchased from Teva.

1384.   However, G&W's illegal behavior goes well-beyond those examples.  Indeed,

during the time period relevant to this Complaint, the vast majority of G&W's business was

implicated by its anticompetitive conduct.  Much of this collusion was spearheaded by

Defendants Orlofski and Vogel-Baylor.  Both were prolific communicators that used their many

relationships with competitors to collude on overlap products.

1385.   For example, between January 2011 and December 2016, when he left G&W,

Orlofski exchanged at least one thousand eight hundred and sixty-three (1,863) phone calls and

text messages with his contacts at Defendants Lupin, Aurobindo, Amneal, Wockhardt, Taro,

Glenmark, Perrigo, Fougera, Actavis, and Sandoz. These communications are detailed in the

chart below:

369

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Berthold, David (Lupin) | 589 | 4/4/2011 | 10/13/2016 |
| Grauso, Jim (Aurobindo) | 406 | 12/28/2011 | 1/20/2014 |
| S.R.(1) (Amneal) | 265 | 8/29/2011 | 4/8/2016 |
| M.C. (Wockhardt) | 238 | 4/19/2011 | 12/27/2016 |
| Perfetto, Mike (Taro) | 136 | 1/25/2013 | 9/1/2016 |
| Grauso, Jim (Glenmark) | 66 | 2/12/2014 | 10/27/2016 |
| S.K. (Perrigo) | 56 | 1/20/2011 | 4/24/2012 |
| Aprahamian, Ara (Taro) | 45 | 7/24/2013 | 6/10/2016 |
| Boothe, Douglas (Perrigo) | 19 | 1/25/2013 | 1/8/2015 |
| K.K. (Wockhardt) | 11 | 8/29/2011 | 8/30/2011 |
| Taro Pharmaceuticals | 11 | 3/22/2012 | 8/5/2014 |
| Kaczmarek, Walt (Fougera) | 4 | 2/8/2012 | 2/10/2012 |
| Boyer, Andy (Actavis) | 4 | 9/7/2012 | 7/22/2013 |
| D.P. (Sandoz) | 3 | 8/13/2013 | 8/13/2013 |
| Wesolowski, John (Perrigo) | 3 | 9/16/2014 | 9/16/2014 |
| CW-6 (Aurobindo) | 3 | 10/31/2012 | 5/25/2013 |
| CW-6 (Fougera) | 2 | 2/1/2012 | 2/1/2012 |
| B.S. (Taro) | 1 | 4/24/2012 | 11/15/2012 |
| C.V. (Perrigo) | 1 | 6/1/2016 | 6/1/2016 |

1386.   Similarly, between July 2011 and February 2017, Vogel-Baylor exchanged at least nine thousand two hundred and seventy-four (9,274) phone calls and text messages with her contacts at Defendants Aurobindo, Glenmark, Greenstone, Wockhardt, Actavis, Lupin, Amneal, Perrigo, Fougera, Valeant, Taro, and Mylan.  These communications are detailed in the chart below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Grauso, Jim (Aurobindo) | 2120 | 12/29/2011 | 1/30/2014 |
| CW-5 (Glenmark) | 2061 | 3/30/2012 | 2/21/2014 |
| Hatosy, Robin (Greenstone) | 1294 | 3/28/2012 | 4/22/2016 |
| M.M. (Wockhardt) | 1158 | 7/31/2011 | 10/22/2013 |
| K.K. (Wockhardt) | 868 | 7/29/2011 | 1/31/2014 |
| Grauso, Jim (Glenmark) | 692 | 2/4/2014 | 7/18/2016 |
| Rogerson, Rick (Actavis) | 438 | 8/8/2012 | 2/8/2017 |
| Berthold, David (Lupin) | 159 | 8/28/2011 | 4/16/2013 |
| CW-6 (Aurobindo) | 121 | 8/26/2012 | 5/3/2013 |
| J.P. (Amneal) | 113 | 3/26/2014 | 12/6/2016 |
| T.P. (Perrigo) | 94 | 7/8/2013 | 4/29/2016 |
| Brown, Jim (Glenmark) | 56 | 5/7/2013 | 10/2/2015 |
| S.R.(1) (Amneal) | 24 | 5/15/2012 | 5/16/2013 |
| S.K. (Wockhardt) | 16 | 9/14/2011 | 9/24/2012 |
| M.C. (Wockhardt) | 13 | 8/28/2011 | 6/13/2012 |
| CW-6 (Fougera) | 12 | 5/18/2012 | 8/7/2012 |
| B.P. (Valeant) | 9 | 11/20/2013 | 11/25/2015 |
| Aprahamian, Ara (Taro) | 6 | 3/27/2014 | 9/24/2015 |
| Aurobindo Pharma | 6 | 1/17/2012 | 6/15/2012 |
| J.K. (Aurobindo) | 6 | 6/4/2013 | 7/17/2013 |
| Glenmark Pharmaceuticals | 2 | 3/14/2014 | 9/9/2015 |
| D.I. (Glenmark) | 2 | 3/3/2014 | 3/7/2014 |
| Perfetto, Mike (Taro) | 2 | 3/21/2014 | 3/21/2014 |
| C.U. (Taro) | 1 | 1/6/2016 | 1/6/2016 |
| M.A. (Mylan) | 1 | 5/20/2014 | 5/20/2014 |

1387.   At all relevant times herein, Defendant Vogel-Baylor was acting at the direction of her supervisor, Defendant Orlofski.  Orlofski was very much aware of her collusion with competitors and encouraged her to do it.  The Complaint is replete with examples of Vogel-Baylor communicating with a competitor and then immediately calling Orlofski to report back what she had learned.  Indeed, Vogel-Baylor was evaluated, at least in part, based on the strength of her competitive relationships.

1388.   Vogel-Baylor also directed her subordinates to collude with competitors.  For example, in February 2014, G&W hired K.K., previously a sales executive at Defendant Wockhardt.  Immediately upon his arrival, K.K. began colluding in earnest with his contact at

Sandoz, CW-3.  Up to that point, no G&W employee had a relationship with anyone at Sandoz.

Although there had been a relationship with CW-6 of Fougera prior to the Sandoz acquisition,

his departure from the company left a gap.  K.K.'s relationship with CW-3 filled this void.

1389.   Although it was a smaller company, G&W celebrated the fact that it was selling

topical products, where it was able to form anticompetitive agreements with most of its primary

competitors.  For example, in May 2013, Vogel-Baylor was asked to put together a report for

management regarding G&W's sales goals for the coming year.  After listing out a number of

G&W's price increases from 2012 – all of which were the subject of collusion and are discussed

at various points throughout this Complaint – Vogel-Baylor concluded:  "We remain very upbeat

to be playing in the topical and suppository market where there continues to be limited to no

competition."

1390.   The following Sections focus on G&W's relationships with Defendants Perrigo,

Actavis, Glenmark, and Lupin, and discuss specific examples of how those anticompetitive

relationships manifested themselves with respect to particular products.

### 1)   Collusion Between G&W And Perrigo

1391.   As detailed above, after Sandoz's acquisition of Fougera in July 2012, CW-6 left

Fougera and took a sales position at Defendant Aurobindo.  Although Vogel-Baylor could no

longer use CW-6 to collude with regard to products on which G&W and Fougera overlapped, she

knew that CW-6 had a contact at another one of G&W's key competitors – T.P. at Defendant

Perrigo.  Over the next year, Vogel-Baylor and T.P. would use CW-6 as a conduit to pass

information between them and reach anticompetitive agreements with regard to a number of

products on which G&W and Perrigo overlapped.

1392.   This collusive relationship was critical because G&W overlapped with Perrigo on more products than any other competitor during this time period.

1393.   In May 2013, CW-6 suffered an illness and left the industry.  With CW-6 no longer available to serve as middleman, Defendant Vogel-Baylor had no choice but to collude directly with T.P. of Perrigo.  In July 2013, she placed her first calls ever to T.P. according to the available phone records.  Over the ensuing years, Vogel-Baylor and T.P. colluded on several products that are discussed in detail below.

### i.   Halobetasol Propionate Cream and Ointment

1394.   Halobetasol Propionate, also known by the brand name Ultravate, is a strong corticosteroid used to treat a variety of skin conditions, including eczema, dermatitis, psoriasis, and rash.  Halobetasol comes in both cream and ointment form.

1395.   As of June 2012, the market was split between Perrigo with 60% share and G&W with 40%.

### a)   *The First Coordinated Price Increase – September 2012*

1396.   On September 25, 2012, both G&W and Perrigo announced price increases for Halobetasol Cream and Ointment. G&W's price increases took effect on September 28, 2012 and Perrigo's price increases took effect one month later on October 28, 2012.

1397.   In the days leading up to the price increases, both Defendant Vogel-Baylor of G&W and T.P. of Perrigo had numerous discussions with CW-6 of Aurobindo concerning Halobetasol.  Although Aurobindo did not manufacture either form of Halobetasol, Vogel-Baylor and T.P. used CW-6 as a conduit to convey information between them about the price increases.  As discussed in detail above, CW-6 had formerly worked at Fougera and had developed relationships with Vogel-Baylor and T.P. of Perrigo during his tenure there.

373

1398.   For instance, on September 19, 2012, less than one week before the price increases, Vogel-Baylor exchanged three (3) text messages with CW-6. Then, CW-6 called Vogel-Baylor, hung up, and immediately called T.P.  After speaking with T.P., CW-6 hung up and immediately called Vogel-Baylor back, relaying the information he had learned from T.P. Indeed, within a twenty-minute period, CW-6 had exchanged at least eight calls with Vogel-Baylor and T.P.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:16:11 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 10:17:50 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:18:49 | 0:00:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:44:00 | 0:01:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:45:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:48:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:52:00 | 0:03:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:57:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 14:03:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:04:00 | 0:02:00 |

1399.   After speaking with CW-6 for the final time on September 19, 2012, Vogel-Baylor immediately called her boss, Defendant Orlofski and spoke to him for thirteen (13) minutes.  Similarly, T.P. also reported back to his boss, Defendant Wesolowski, a senior executive at Perrigo, exchanging two calls with him totaling roughly six (6) minutes.

1400.   Further, two days later, on September 21, 2012, and then again on September 27, 2012, the day before the G&W price increase went into effect, the same call pattern occurred. These calls are detailed in the chart below:

374

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duratio |
|------|----------|-------------|-----------|--------------|------|---------|
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 6:30:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:53:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:56:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:58:00 | 0:01:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 7:04:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:06:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:53:00 | 0:15:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:02:00 | 0:04:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 4:06:00 | 0:01:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 4:11:00 | 0:03:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:16:00 | 0:03:00 |

1401.   In early November 2012, a customer reached out to G&W asking it to submit a bid for Halobetasol Cream and Ointment because the customer believed its prices were inconsistent with the market.

1402.   After receiving the request, Vogel-Baylor had several calls with CW-6 who, again, served as a conduit between Vogel-Baylor and T.P. to discuss Halobetasol.  These calls are detailed in the chart below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duratio |
|------|----------|-------------|-----------|--------------|------|---------|
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:03:00 | 0:03:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:05:00 | 0:05:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:09:00 | 0:04:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:13:00 | 0:01:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:38:00 | 0:02:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 6:41:00 | 0:01:00 |
| 11/6/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:42:00 | 0:03:00 |

1403.   After this call exchange, Vogel-Baylor sent the following directive to C.M., a sales executive at G&W, instructing him to submit a cover bid to the customer in order to create a false appearance of competition between G&W and Perrigo:

From:
ERIKA VOGEL <evogel@gwlabs.com>
To:
▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅
Date:
Tue, 06 Nov 2012 18:15:44 +0000

We cannot take this from Perrigo so I will give you pricing so that it looks like you are making an attempt to bid:

15gm - $18.06
50gm - $44.99

Thanks,
Erika

### b) *The Second Coordinated Price Increase – March/April 2013*

1404.   The competitors colluded to raise the price of Halobetasol again in 2013.  This time, there were multiple channels of communication between the competitors.  For example, on March 26, 2013, Defendant Boothe of Perrigo called Defendant Orlofski of G&W directly and they spoke for seven (7) minutes.  That same day, T.P. of Perrigo once again called CW-6.  The call lasted two (2) minutes.  Right after that call, CW-6 called Vogel-Baylor.  That call lasted one (1) minute.

1405.   The next day, on March 27, 2013, Perrigo increased its WAC pricing for both the Halobetsol Cream and Ointment by over 250%.

1406.   Roughly two (2) weeks later, on April 11, 2013, G&W also increased its contract and WAC pricing for the two formulations.  G&W's contract price was now double what it had been just the year before.

1407.   G&W told one of its customers, Morris & Dickson, that G&W increased prices in "response to a competitor recently raising their price."  Indeed, in the days leading up to the G&W price increase, Vogel-Baylor and T.P. had again engaged in a game of telephone with CW-6 to coordinate their pricing actions.  After speaking with T.P. for four (4) minutes on April 8, 2013, CW-6 immediately called Vogel-Baylor. The call lasted one (1) minute.  CW-6 then

called Vogel-Baylor a short while later and they spoke for four (4) minutes. Immediately after

that call, Vogel-Baylor called her boss, Defendant Orlofski.  The call lasted a little over one (1)

minute.

<b>c)</b>   <i>Sandoz Launches Halobetasol Cream</i>

1408.   In December 2013, Sandoz began preparing to re-launch Halobetasol Cream.  At

that time, G&W had 63% of the market and Perrigo had 36%.  Sandoz was targeting 20% market

share.  Because G&W was the market share leader, Sandoz wanted to "[t]ake most of the share

from G+W and one smaller account from Perrigo."

1409.   On December 11, 2013, A.S., a senior Sandoz launch executive, instructed

Sandoz employees to reach out to Rite-Aid and Walgreens to learn who their suppliers were for

Halobetasol Cream and what their pricing was.  Upon learning that both customers were with

G&W – the market share leader – Sandoz decided to target those customers.

1410.   On December 12, 2013, Walgreens reached out to G&W to advise that Sandoz

had expressed interest in its Halobetasol Cream business.  When Vogel-Baylor shared this

information with Orlofski, he remarked that G&W "should give up something to them given our

market share."  Although Sandoz submitted a bid for Halobetasol on December 16, 2013,

Walgreens declined to move the business because the price was slightly higher than G&W's

price.

1411.   On December 17, 2013, another one of G&W's customers, Ahold, informed

G&W that it had received a bid from Sandoz and was now seeking a lower price from G&W.

Vogel-Baylor e-mailed Orlofski stating, "[w]hile I am thinking about giving it up because it was

a new award anyway, this won't be enough for them to stop.  Thoughts?" Orlofski responded by

asking Vogel-Baylor to call him, noting "[i]t would be good to catch up on a few things."  Later

377

that day, Rite Aid also e-mailed Vogel-Baylor stating that Sandoz had submitted a bid for Halobetasol Cream and requested that G&W lower its price to retain the business.

1412.   Vogel-Baylor tried calling Orlofski three times on December 17, 2013.  After the third call, Vogel-Baylor called T.P. of Perrigo and they spoke for more than seven (7) minutes.[10] Vogel-Baylor hung up with T.P. and called Orlofski again.  Orlofski returned her call later that day and they spoke for five (5) minutes.

1413.   After speaking with Orlofski, Vogel-Baylor e-mailed Rite-Aid stating, "we are going to let this go to Sandoz since we only have the 50gm with you.  We would like them to stop going after our customers so hopefully it will stop here."  Rite-Aid accepted Sandoz's offer the next day

1414.   At the same time that Sandoz was going after G&W's Halobetasol customers, it was also approaching some Perrigo customers as well, albeit in coordination with Perrigo.  On December 17, 2013, CW-1, a senior Sandoz pricing executive, e-mailed CW-3, a senior Sandoz sales executive, asking him to inquire whether Wal-Mart, a Perrigo customer, was interested in receiving a bid from Sandoz for Halobetasol Cream.  CW-3 happened to be meeting with Wal-Mart at that time at its offices in Bentonville, Arkansas.

1415.   Wal-Mart told CW-3 that it was interested in receiving an offer.  Thereafter, CW-3 called T.P. of Perrigo.  During that call, T.P. provided CW-3 with Perrigo's price points for Halobetasol Cream at Wal-Mart and Omnicare and agreed to give up Wal-Mart to Sandoz.  CW-3 took the following contemporaneous notes in his Notebook during that call:

---

[10]  As detailed above, by this time, CW-6 had left the industry and Vogel-Baylor had begun colluding with T.P. of Perrigo directly with regard to products on which G&W and Perrigo overlapped.

1416.   Also on December 17, 2013, CW-3 responded to an e-mail exchange with CW-1 and Defendant Kellum regarding Halobetasol Cream, stating: "We shoul[d] also target GW as Perrigo will not relinquish significant share.  [CW-1] . . . will call you later.  On a flight now."

1417.   Two days later, on December 19, 2013, CW-3 called T.P. again.  The call lasted one (1) minute.  After hanging up, CW-3 called CW-1, and they spoke for four (4) minutes.  That same day, Sandoz sent offers to Wal-Mart and Omnicare.  The next day, on December 20, 2014, K.K., a senior Sandoz launch executive, followed up with CW-3 regarding the Wal-Mart offer.  CW-3 responded, "[n]o response from WMT.  Offer sent yesterday.  We discussed this one off line and looks like a viable opportunity pending response from Perrigo."

1418.   That same day, Defendant Boothe of Perrigo called Defendant Orlofski of G&W.  The call lasted two (2) minutes.  Orlofski returned the call a half hour later and they spoke for eleven (11) minutes.  Later that day, Orlofski called Vogel-Baylor and they spoke for more than seventeen (17) minutes.

1419.   On January 8, 2014, CW-3 called T.P. of Perrigo.  The call lasted one (1) minute.  Later that day, Wal-Mart accepted Sandoz's bid for Halobetasol Cream.  CW-3 forwarded the acceptance to his supervisor, CW-1, who asked, "[w]ho was [W]almart with?"  CW-3 replied in two separate e-mails sent simultaneously: "Perrigo" and "Call me. Important."

1420.   The next day, on January 9, 2014, CW-1 and CW-3 agreed that "G&W should be our target next."  That same day, CW-3 called T.P. and they spoke for more than fifteen (15) minutes.

1421.   In early February 2014, K.K. joined G&W as a Director of Sales & Marketing. [11] Once at G&W, K.K. wasted no time using his competitor contacts at Sandoz – CW-3 and CW-4 – to coordinate regarding Halobetasol.

1422.   On February 18, 2014, K.K. of G&W e-mailed Defendant Vogel-Baylor stating that Sandoz had bid on Halobetasol at Walgreens again and the customer was providing G&W with an opportunity to bid to retain the business.  Less, than an hour later, Vogel-Baylor called T.P. at Perrigo and K.K. called CW-3 at Sandoz to coordinate a response.  The calls lasted one (1) minute and two (2) minutes, respectively.  Immediately after hanging up, K.K. sent Vogel-Baylor the following e-mail:

**RE: Wags ROFR**

From:
████████████████████████████████

To:
ERIKA VOGEL-BAYLOR <evogel@gwlabs.com>

Date:
Tue, 18 Feb 2014 16:53:39 +0000

I reached out to my friend at Sandoz waiting to hear back. Do you know if they are launching?

████████████
Director, Sales & Marketing
Office (732) 866-4402
Fax (732) 866-4407
Cell ████████████

1423.   After receiving the e-mail, Vogel-Baylor called K.K.  He returned the call and they spoke for sixteen (16) minutes.  Immediately after hanging up with K.K., Vogel-Baylor sent a text message to T.P. of Perrigo.  Later that day, K.K. sent the following e-mail to Vogel-Baylor:

---

[11]  The K.K. referenced in this Complaint that joined G&W in February 2014 is a different individual than the K.K. of Sandoz identified previously in this Section.

-----Original Message-----
From: █████
Sent: Tuesday, February 18, 2014 4:57 PM
To: ERIKA VOGEL-BAYLOR
Subject: RE: Wags ROFR

No call back yet did ████ call you back?

█████████
Director, Sales & Marketing
Office (732) 866-4402
Fax (732) 866-4407
Cell █████████

1424.   Two days later, on February 20, 2014, K.K. had still not heard back from CW-3 and so he reached out to his other contact at Sandoz, CW-4, and the competitors spoke for four (4) minutes.  Immediately after hanging up, K.K. called Vogel-Baylor and they spoke for four (4) minutes.  Later that morning, Vogel-Baylor and K.K. exchanged two (2) more calls lasting thirteen (13) minutes and three (3) minutes, respectively.  Upon hanging up with Vogel-Baylor, K.K. sent an internal e-mail, including to Vogel-Baylor, stating:

> On Feb 20, 2014, at 11:10 AM, "█████████@GWLabs.com> wrote:
>
> Gals please keep your ears to the ground as Sandoz is looking for more market share on the above.
>
> Market intel
> They are looking for 30% MS on. On our share report it only shows us and perrigo and I think they picked up Riteaid. They already sent bid to Walgreens.
>
> Thanks
>
>
> █████████
> Director, Sales & Marketing
> Office (732) 866-4402
> Fax (732) 866-4407
> Cell █████████

1425.   Vogel-Baylor later responded:  "FYI – we gave them rite aid in December."

1426.   A few minutes after receiving K.K.'s e-mail, Vogel-Baylor sent a text message to T.P. of Perrigo.  A half hour later, she called T.P. and they spoke for more than seven (7)

minutes.  At around the same time, CW-3 of Sandoz called K.K. and they spoke for (8) minutes. Immediately after hanging up with CW-3, K.K. called Vogel-Baylor to report back what he had learned.  That call lasted nineteen (19) minutes.

1427.   Later that afternoon, Vogel-Baylor called her supervisor, Defendant Orlofski, to apprise him of the situation and they spoke for twenty-one (21) minutes.  Upon hanging up, Vogel-Baylor called K.K. and they spoke for nearly twelve (12) minutes.  Immediately after talking to K.K., Vogel-Baylor called T.P. of Perrigo one more time that day.  The call lasted less than one (1) minute.

1428.   That evening, after his conversation with G&W, CW-3 also sent the following e-mail to CW-1:

| From: | ████████████ |
|---|---|
| Sent: | Thursday, February 20, 2014 10:07 PM |
| To: | ████████████ |
| Subject: | Call me Re. Halobetasol CR |

Within a half hour of receiving the e-mail, CW-1 called CW-3 and they spoke for twenty (20) minutes.

1429.   The next morning, on February 21, 2014, CW-3 and CW-1 spoke again for fourteen (14) minutes.  CW-3 hung up and immediately called K.K. of G&W.  The call lasted one (1) minute.  Immediately after that call, K.K. called Vogel-Baylor.  The call lasted one (1) minute.  That same day, K.K. sent the following response to Walgreens:

**RE: Halobetasol cream**

**From:**

███████████████████████████████████████████

**To:**
███████████ @walgreens.com>

**Cc:**
ERIKA VOGEL-BAYLOR <evogel@gwlabs.com>

**Date:**
Fri, 21 Feb 2014 20:59:56 +0000

████ Please give me a call I left you a voicemail regarding Halobetasol Cream. We are going to cede the business. You can beat me up when you see me down in Florida.
Thanks

███████████
Director, Sales & Marketing
Office (732) 866-4402
Fax (732) 866-4407
Cell (████████████

Walgreens had accounted for over one third of G&W's total market share for Halobetasol Cream.

### d)   *Taro Launches Halobetasol Cream and Ointment*

1430.   In mid-March 2014, Taro was making plans to re-launch Halobetasol Cream and Ointment.  Although its launch was ultimately delayed until May 2014 due to issues relating to the FDA, Defendant Aprahamian called Vogel-Baylor on March 27, 2014 and they spoke for fourteen (14) minutes.  Notably, this was the first phone call ever between these two competitors, according to the available phone records.  Four days later, on March 31, 2014, Vogel-Baylor called Aprahamian and they spoke for over five (5) minutes.

1431.   On May 13, 2014, Taro re-entered the Halobetasol Cream and Ointment markets and published WAC pricing that matched its competitors.  In the days leading up to the re-launch, all four competitors were speaking frequently by phone.  At least some of those calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/7/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:28:00 | 0:04:00 |
| 5/7/2014 | Voice | Aprahamian, Ara (Taro) | Incoming | Vogel-Baylor, Erika (G&W) | 7:57:00 | 0:14:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (G&W) | 8:23:00 | 0:05:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 8:28:00 | 0:02:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (G&W) | 8:30:00 | 0:01:00 |
| 5/8/2014 | Voice | CW-3 (Sandoz) | Outgoing | K.K. (G&W) | 8:31:00 | 0:01:00 |
| 5/8/2014 | Voice | K.K. (G&W) | Outgoing | CW-3 (Sandoz) | 8:39:00 | 0:01:00 |
| 5/9/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Wesolowski, John (Perrigo) | 7:18:00 | 0:01:00 |
| 5/9/2014 | Voice | Aprahamian, Ara (Taro) | Outgoing | Wesolowski, John (Perrigo) | 7:24:00 | 0:02:00 |

1432.   After the phone calls detailed above, Aprahamian would not speak to Vogel-Baylor again until September 2015.  Similarly, the two calls between Aprahamian and Defendant Wesolowski of Perrigo are the only calls ever exchanged between the two competitors, according to the available phone records.

1433.   On May 11, 2014, Defendant Aprahamian circulated a Fact Sheet including details regarding the Halobetasol re-launch.  Taro stated that "[u]nits have been decreasing slightly over the past three years while sales are up over 300% due to price adjustments.  Sandoz recently came into the cream market only."  The Fact Sheet detailed the following market share breakdown and set Taro's target market shall goal at 15%:

**Generic / Brand competition by units:** (Q1 2014)

**Cream**

| G&W | 38.49% |
|---|---|
| Perrigo | 56.54% |
| Sandoz | 4.95% |

**Ointment**

| G&W | 47.53% |
|---|---|
| Perrigo | 51.93% |
| Ranbaxy(Brand) | .53% |

**Target Market share goal: ~15%**

1434.   On June 10, 2014, Aprahamian instructed a colleague to put together offers for Halobetasol at Publix (a G&W and Perrigo customer) and HD Smith (a Perrigo customer).  Aprahamian cautioned "do NOT bid the 50gm cream at HD that is with Sandoz."  That same

day, Defendant Perfetto of Taro exchanged three (3) text messages with Defendant Orlofski of G&W.

1435.   On June 11, 2014, Vogel-Baylor called T.P. of Perrigo.  The call lasted one (1) minute.  The next day, on June 12, 2014, HD Smith informed Taro that Perrigo had proactively revised its pricing shortly after Taro submitted the bid and asked Taro to lower its bid to win the business.

1436.   On June 17, 2014, Defendant Boothe of Perrigo called a Taro employee on his office line.[12]  The call lasted forty-five (45) minutes.  Later that day, A.L., a Taro pricing executive, sent an internal e-mail stating, "[i]f Perrigo is looking to keep HD that badly we should move on to another customer."  The next day, June 18, 2014, Perfetto called Boothe.  That call lasted two (2) minutes.

1437.   Around that same time, G&W employees were having a similar exchange over e-mail.  On June 17, 2014, K.K. sent an internal e-mail to Orlofski stating: "Taro is launching Halobetasol Cream and Ointment.  So far we have been challenged at Publix and Morris Dickson. . . . I believe we should yield to Taro on this.  We are researching to see how much market share they want and I will update once I have intel.  Let me know what you want to do.  We need to get back to them by Thursday [June 19, 2014]."

1438.   On June 18, 2014, Orlofski sent a text message to Perfetto and also called him.  The call lasted two (2) minutes.  The next morning, on June 19, 2014, Orlofski replied to K.K.'s e-mail stating: "I agree with you on this.  Let's let these accounts move to Taro.  Hopefully they will not go after any other accounts from G&W.  Please let me know if you hear of any other

---

[12]  As detailed above, Taro employees do not have their own individual extensions and calls from their office lines appear in the phone records as the Taro main company number.  Given the history of conduct between the two, this Taro employee was likely Defendant Perfetto.

competitive offers from Taro to our customers."  K.K. then sent an internal e-mail directing that G&W should cede the Publix and Morris & Dickson accounts to Taro.  As K.K. explained to his colleagues, it was "purely a business decision that at the end of the day is better for all of us."

1439.   On June 20, 2014, Orlofski exchanged two text messages and two calls with Perfetto, including one call lasting nearly thirty-eight (38) minutes.

1440.   At the same time, G&W was also careful not to take any steps that would throw off its market share balance with Perrigo.  For example, on June 18, 2014, HEB, a Perrigo customer, asked G&W to bid on their Halobetasol business.  K.K. responded, "[w]e are going to have to hold off on [that] right now.  Don't want to upset market.  Tell him we are just at capacity with this product right now."

## ii.    Prochlorperazine Maleate Suppositories

1441.   Prochlorperazine Maleate Suppositories ("Prochlorperazine"), also known by the brand names Compro and Compazine, are used to treat nausea and vomiting.

1442.   Since at least 2011, G&W and Perrigo have been the only generic suppliers of Prochlorperazine.  Throughout 2011 and 2012, G&W and Perrigo priced Prochlorperazine similarly and maintained a virtually even split of the market.

1443.   In mid-January 2013, Perrigo hired Defendant Boothe as an executive.  On January 25, 2013, Defendant Orlofski called Boothe for the first time ever, according to the available phone records.

1444.   A little over one month later, on Friday, March 1, 2013, Boothe and Orlofski met for lunch at an Italian restaurant, Al Dente Ristorante, in Piscataway, New Jersey.

1445.   The next business day, on Monday, March 4, 2013, Orlofski met with Vogel-Baylor in his office at 1:00 p.m.  Later that same day, Vogel-Baylor sent an internal e-mail to

386

M.S., a sales analyst at G&W, asking her to run sales reports on Prochlorperazine in anticipation of a price increase.  M.S. provided the requested information to Vogel-Baylor on March 5, 2013.

1446.   On March 7, 2013, Vogel-Baylor e-mailed Orlofski a price increase analysis for Prochlorperazine.  Vogel-Baylor recommended increasing WAC pricing by 200% from $35.66 to $106.98.

1447.   On March 19, 2013, G&W implemented the 200% increase.  That same day, Defendant Orlofski called Defendant Boothe.  The two competitors would exchange two more phone calls later that day, including one call lasting six (6) minutes.  These were the first calls exchanged between Orlofksi and Boothe since their lunch on March 1, 2013, according to the available phone records.  Orlofski and Boothe would exchange one text message and one more phone call in March 2013 and would not communicate by phone again until August 30, 2013, according to the available phone records.

1448.   On April 11, 2013, Perrigo announced it would also be increasing its WAC price for Prochlorperazine by 200% from $34.85 to $104.55.  However, Perrigo waited to notify its customers of the specific changes to its contract pricing until after attending the NACDS 2013 annual meeting.

1449.   The NACDS 2013 annual meeting was held at the Sands Expo Convention Center in Palm Beach, Florida between April 20 and April 23, 2013.  Defendants Boothe, Orlofksi, and Vogel-Baylor attended the conference and had many opportunities to meet in person to discuss the Prochlorperazine increases at various programming and social events.

1450.   For example, on Sunday, April 21, 2013, Boothe and Orlofski had dinner together with W.S., a representative of Defendant Pfizer.  That same evening, Boothe and Orlofski also attended a wine tasting hosted by Upsher-Smith.  Also on Sunday, Vogel-Baylor told a potential

GPO customer that G&W would need to understand who its incumbent supplier was for Prochlorperazine, among other drugs, before participating in a bid for new business.

1451.   Over the next several days, Perrigo sent out price increase notices to its customers for Prochlorperazine specifying its new contract pricing.

1452.   On May 7, 2013, Associated Pharmacies, a Perrigo customer, e-mailed C.M., a sales executive at G&W, asking for a bid on Prochlorperazine.  C.M. declined to bid on the new business, responding:



1453.   Although G&W turned away this business, a few months later it would take the customer back in retaliation against Perrigo for taking its Target business through McKesson's One Stop program.  After trading these accounts, the competitors fell back in line with the agreement.  By the fall of 2013, the Prochlorperazine Suppositories market was again virtually evenly split between Perrigo and G&W.

### iii.   Ciclopirox Solution

1454.   Ciclopirox Solution, also known by the brand names Penlac and Ciclodan, is an antifungal medication used to treat fungal infections of the fingernails and toenails.

1455.   As of January 2013, Perrigo and G&W were the two dominant suppliers of Ciclopirox Solution, with 46% and 41% share of the market, respectively.  Sandoz had 7% share

and the remaining 5% of the market was split among Hi-Tech, Harris Pharmaceutical,[13] and Versapharm.

1456.   Between April 20 and April 23, 2013, representatives from Perrigo, G&W, and Sandoz attended the NACDS 2013 Annual Meeting in Palm Beach, Florida ("NACDS 2013"). During the conference, the attendees had many opportunities to interact with each other at various programming and social events.

1457.   Defendant Vogel-Baylor was among the attendees at NACDS 2013.  Immediately upon returning from the conference, on April 24, 2013, Vogel-Baylor prepared a price increase analysis for Ciclopirox Solution and e-mailed it to Defendant Orlofski and R.G., a senior G&W executive.  Vogel-Baylor proposed increasing WAC pricing by 132% – from $16.00 to $37.15. According to the analysis, the increase would result in over $7.6 million in additional sales revenue to G&W annually.  R.G. was excited at the prospect of this large price increase, replying to the e-mail:

> If this works, we'll be transforming a dog into a star (no offense, █████)!

1458.   The following Monday, April 29, 2013, Vogel-Baylor coordinated on the price increase with competitors Perrigo and Sandoz.  Vogel-Baylor used CW-6 (then at Aurobindo) as a messenger to communicate with both T.P. of Perrigo and CW-3 of Sandoz.  As discussed above, Vogel-Baylor often used CW-6 as a conduit to convey competitively sensitive information to competitors – even on products that Aurobindo did not sell.

1459.   As detailed further in the chart below, Vogel-Baylor had an early morning phone call with CW-6 on April 29, 2013 that lasted four (4) minutes.  After that call ended, CW-6

---

[13]  Harris obtains its supply from G&W.

immediately called T.P. and then CW-3.  The phone calls between CW-6 and Vogel-Baylor,

T.P., and CW-3 continued throughout the day, and included at least the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 9:09:00 | 0:04:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 9:13:00 | 0:01:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 9:14:00 | 0:03:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 9:17:00 | 0:02:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 9:29:00 | 0:03:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 9:56:00 | 0:03:00 |
| 4/29/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 9:58:00 | 0:02:00 |
| 4/29/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:10:19 | 0:00:36 |
| 4/29/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 13:19:58 | 1:08:00 |

1460.   After the flurry of calls on April 29, 2013, Vogel-Baylor e-mailed J.G., an

operations manager at G&W, advising him that she would know the next day whether G&W was

going to be able to increase price on Ciclopirox Solution.

1461.   The phone calls between the competitors continued throughout the next day and

on May 1, 2013, and included at least the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/30/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:36:00 | 0:01:00 |
| 4/30/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:38:00 | 0:03:00 |
| 4/30/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:45:00 | 0:02:00 |
| 5/1/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:13:36 | 0:00:03 |
| 5/1/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:20:00 | 0:02:00 |
| 5/1/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:22:00 | 0:01:00 |

1462.   On April 30, 2013, while speaking with CW-6, CW-3 made the following

contemporaneous note in his Notebook detailing the amount of the proposed G&W price

increase:



1463.   Also on April 30, 2013 CW-3 called his superior at Sandoz, Defendant Kellum,

five times.

1464.   After her calls with CW-6 on May 1, 2013, Vogel-Baylor confirmed to J.G. that G&W would increase the price of Ciclopirox Solution and directed her sales team to start drafting price increase letters to customers.

1465.   On Tuesday, May 7, 2013, Vogel-Baylor and G&W sales representatives began informing customers about the price increases.  Several customers noted that although the product was available from other manufacturers for a lower price, the customer would wait to see what the market did before making G&W a secondary supplier.  One customer remarked that product pricing had gotten too low and hoped that more manufacturers would increase pricing. Another customer thanked C.M., a G&W sales executive, for calling him about the price increase before sending the letter and C.M. responded:

> I have gotten to be damn good at increasing prices.  Practice makes perfect.  LOL

When the customer told C.M. he should "feel free to stop practicing," C.M. responded:

> Well, 4 increases this year makes me a professional.  LOL!!!

1466.   On May 8, 2013, Vogel-Baylor e-mailed her "BFF" L.S., an account manager at the customer Ahold, to tell her that G&W was implementing a price increase on Ciclopirox Solution.  Ahold was not G&W's customer for the product.  Vogel-Baylor wrote that L.S. should "keep [her] eyes out" as a price increase on this product from Ahold's supplier "may be coming."

1467.   By the end of the day on May 9, 2013, G&W's customer Rite Aid had sought a bid from Sandoz for Ciclopirox Solution as a result of the G&W price increase.

1468.   CW-4, a Sandoz senior sales executive, received Rite Aid's bid request and forwarded it to Defendant Kellum with the message "?".  Kellum responded that the bid request was due to a price increase.  C.P., a pricing analyst at Sandoz, asked whether Sandoz should bid

391

for the business or "just leave it alone." Kellum replied, "[l]eave alone." Accordingly, Sandoz did not submit a bid for this business.

1469.   While G&W was in the midst of its price increase on Ciclopirox Solution, CW-6 left the industry and was no longer available to serve as a conduit between the competitors. Going forward, Vogel-Baylor would need to collude with T.P. directly and use him as a conduit to collude with CW-3 of Sandoz.

1470.   On July 30, 2013, T.P. had a thirteen (13) minute call with CW-3 of Sandoz and exchanged five (5) phone calls with Vogel-Baylor. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | Vogel-Baylor, Erika (G&W) | 3:38:00 | 0:03:00 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:19:00 | 0:01:00 |
| 7/30/2013 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 7:09:00 | 0:13:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 8:58:06 | 0:02:33 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | Vogel-Baylor, Erika (G&W) | 9:29:00 | 0:10:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 14:29:07 | 0:09:05 |

1471.   That same day, Perrigo prepared price increase letters for Ciclopirox Solution. Two days later, on August 1, 2013, Perrigo raised its WAC pricing by 60% -- from $15.00 to $24.00.

1472.   On August 5, 2013, Perrigo's customer Kroger reached out to Vogel-Baylor and asked if G&W would like to bid on Ciclopirox Solution. Vogel-Baylor declined the opportunity, explaining to the customer that it is currently a "4 player market" and G&W "has 45%."

1473.   Later in August, Versapharm, a small player with under 1% of the Ciclopirox Solution market, submitted a bid to Cardinal, a G&W customer. Cardinal reached out to Vogel-Baylor to ask G&W to lower its price. Vogel-Baylor wanted to keep the business but also thought, consistent with fair share principles, that she may need to give it up to VersaPharm because of its low share. Vogel-Baylor asked Orlofski, her supervisor, for his direction on this. Orlofski decided G&W should retain the business, but should use the customer to convey a

392

message to its competitor VersaPharm explaining the fair share understanding and the rules of

engagement between generic manufacturers:

> Erika,
>
> I really think we should hold the business. Perhaps Cardinal can pass along that Perrigo is the market share leader and Versapharm should go after one of their accounts. We will not let anything go.
>
> Kurt

1474.   Consistent with Orlofski's recommendation, Vogel-Baylor lowered Cardinal's

price on Ciclopirox Solution and sent Cardinal the following e-mail:

> Hi ███,
>
> We are matching the price that you need on the Ciclopirox Solution.  Please find attached your new price.  Perrigo is the market leader here so the bidder can get share from them! ☺.
>
> Please advise on the effective date for the new price.
>
> Thank you very much for giving us the opportunity to keep this item.
>
> Thanks,
> Erika

### iv.   Hydrocortisone Acetate Suppositories (Anucort HC)

1475.   Hydrocortisone Acetate Suppositories ("Hydrocortisone Acetate"), also known by

the G&W brand name Anucort-HC, are used to treat itching or swelling caused by hemorrhoids

as well as ulcerative colitis, proctitis, and other inflammatory conditions of the intestines,

rectum, or anus.  Hydrocortisone Acetate is a corticosteroid.

1476.   During the time period relevant to this Complaint, Hydrocortisone Acetate was

G&W's top-selling product.  As of January 2016, the 25mg formulation of Hydrocortisone

Acetate accounted for nearly half of all of G&W's moving annual sales, totaling more than

$119.7 million.  Similarly, Hydrocortisone Acetate was Perrigo's second-best selling product.

During that same time period, Perrigo's moving annual sales for the 25mg and 30mg

formulations accounted for approximately $78.3 million of Perrigo's total sales.

393

1477.   In 2013, the Hydrocortisone Acetate market was split between G&W with 41%

market share, Perrigo with 32%, and County Line Pharmaceuticals ("County Line") with 25%.

However, by late June 2013, County Line made the decision to exit the market for

Hydrocortisone Acetate.

1478.   County Line's exit created an opportunity for Perrigo and G&W to collude to

significantly raise the price of Hydrocortisone Acetate in July 2013, and then again one year later

in July 2014.

1479.   On June 25, 2013, Defendant Vogel-Baylor of G&W e-mailed Wal-Mart, a

County Line customer, stating that she had heard that County Line was discontinuing

Hydrocortisone Acetate and asked whether Wal-Mart was interested in a new supplier.

1480.   Similarly, on June 26, 2013, ABC, also a County Line customer, e-mailed G&W

requesting a bid on Hydrocortisone Acetate due to a "Supplier Discontinuation."  Vogel-Baylor

forwarded the request to her supervisor, Defendant Orlofski, explaining: "Anucort is listed on the

ABC bid for the County Line discontinuation.  I still haven't heard back from WalMart yet but

this bid is due back this Friday.  I am leaving for Vegas in the morning for the McKesson Trade

Show through Saturday.  I could always ask for an extension on this until next week if we think

we need more time to see what is going on with the rest of the market.  What are your thoughts?"

1481.   Between June 27 and June 30, 2013, representatives from Perrigo and G&W,

including Vogel-Baylor, attended the annual trade show, McKesson ideaShare, at the Venetian

hotel in Las Vegas, Nevada.

1482.   While at the trade show, on June 27, 2013, Vogel-Baylor received a call from

S.S., a former sales executive at Perrigo.  The call lasted approximately one (1) minute.  A few

hours later, Vogel-Baylor called Orlofski and they spoke for nearly fifteen (15) minutes.  Shortly

394

thereafter, Vogel-Baylor sent an internal e-mail to her team notifying them that G&W would be implementing a price increase for Hydrocortisone Acetate and requesting that they draft customer notifications to that effect.  The price increase included a 200% increase to WAC and would result in an estimated $27.9 million in increased sales for G&W.

1483.   J.G., an operations manager at G&W, responded to Vogel-Baylor's e-mail stating, "I hear the Donald Trump theme song… Money, Money, Money…." to which Vogel-Baylor responded: "MONEY!!!!"

1484.   The next day, on June 28, 2013, Vogel-Baylor contacted Orlofski three more times from the trade show, including exchanging two (2) text messages and one call lasting more than nineteen (19) minutes.

1485.   On July 8, 2013, T.P. of Perrigo and Vogel-Baylor exchanged two (2) calls and then connected for a call lasting more than seven (7) minutes, during which they coordinated their price increases on Hydrocortisone Acetate.  After that call, both T.P. of Perrigo and Vogel-Baylor reported the substance of their conversations back to their supervisors.  Immediately upon hanging up with T.P., Vogel-Baylor called Defendant Orlofski and they spoke for more than six (6) minutes.  Similarly, T.P. called Defendant Wesolowski three (3) times after speaking with Vogel-Baylor, including two calls lasting one (1) minute and a third lasting six (6) minutes.

1486.   The G&W price increases on Hydrocortisone Acetate went into effect on July 9, 2013.  That same day, Perrigo issued a product announcement notifying its customers that it was also increasing its pricing on Hydrocortisone Acetate effective July 11, 2013.  Perrigo increased its WAC by 473% on the 25mg formulation to essentially match G&W's WAC.  That same day, July 11, 2013, T.P. of Perrigo called Vogel-Baylor.  The call lasted one (1) minute.

1487.   Also on July 11, 2013, ABC e-mailed Vogel-Baylor asking G&W to lower its dead net pricing for Hydrocortisone Acetate to match Perrigo's slightly lower dead net pricing. Vogel-Baylor forwarded the request to Orlofski who responded:  "Just say no!!!"  Vogel-Baylor replied, "I will but it's painful!"  Later that day, Vogel-Baylor responded to ABC and declined to lower its pricing.

1488.   On July 19, 2013, Harvard Drug Group e-mailed Vogel-Baylor asking why G&W was increasing its price on Hydrocortisone Acetate.  Vogel-Baylor replied: "The only two players that are left are us and Perrigo.  Perrigo only carries the 12 count, while we have the 12's, 24's, and 100 counts on this item.  We initiated the price increase two weeks ago and we received word from our customers that Perrigo has followed."

1489.   Several months later, on April 9, 2014, K.K., a G&W sales executive, e-mailed Vogel-Baylor regarding bidding on several products at Kaiser, including Hydrocortisone Acetate.  Vogel-Baylor responded that G&W could not disrupt the market and pursue the customer, reasoning that Kaiser "moved Anucort to Perrigo last summer. . . .  We can do a onetime buy but we can't take the business back."

1490.   On June 11, 2014, Vogel-Baylor e-mailed Orlofski recommending that G&W increase McKesson's contract pricing for Hydrocortisone Acetate.  That same day, Vogel-Baylor called T.P. of Perrigo.  The call lasted less than one (1) minute.  Two days later, on June 13, 2014, Vogel-Baylor tried to reach T.P. again by phone.  The call lasted less than one (1) minute.

1491.   Less than a week later, on June 26, 2014, Perrigo generated its own internal price increase analysis for Hydrocortisone Acetate.  The analysis assumed zero percent unit loss as a result of the planned increase.

1492.   On July 22, 2014, Perrigo notified its customers that it was increasing pricing on a list of products, including Hydrocortisone Acetate.  This included a 235% increase to WAC for its 25mg formulation, effective on July 24, 2014.

1493.   At the time the increase was announced, representatives from Perrigo and G&W, including Vogel-Baylor, attended the annual trade show, McKesson ideaShare, at the Gaylord Palms Hotel in Orlando, FL.

1494.   Over the next several days, G&W heard from multiple customers that Perrigo had increased pricing on Hydrocortisone Acetate.

1495.   In accordance with their ongoing understanding to follow each other's price increases, and consistent with past practice on this product and others, G&W went to work implementing a comparable price increase of its own.

1496.   On July 29 and July 30, 2014, Vogel-Baylor and Orlofski exchanged e-mails finalizing the details of the price increase for Hydrocortisone Acetate.  The increase included an increase to WAC for the 25mg, 12 count bottle that essentially matched Perrigo pricing.

1497.   Also on July 30, 2014, Vogel-Baylor learned of pricing that Perrigo had offered to Schnucks and sent a text message to her superiors: "Perrigo gave Schnucks $101.91.  Seems high for a small chain price.  Not sure if they priced him high because he is our account."

1498.   The next day, on July 31, 2014, A.G., a senior G&W executive, e-mailed Vogel-Baylor stating: "Everyday of this increase is worth $200k to the company.  I'm OK with the letters going out on Tuesday, but let's get the [price increase] letters out to our top 5 major customers tomorrow."  Vogel-Baylor responded, "I can do that.  The call to our customers is going to have to come from me since this is a big one.  I will confirm with you tomorrow once this has been completed."

1499.   The next day, on August 1, 2014, G&W began notifying its customers of the price increase on Hydrocortisone Acetate.  Vogel-Baylor sent an internal e-mail advising the team that, "[a]s always . . . call the customer first, tell them that Perrigo did a price increase last week and we are following it. You can then send them the letter. . . . Has to go out TODAY!"  G&W sent out a second wave of letters to additional customers on August 5, 2014.

1500.   The increase included a 200% increase to WAC for all three package sizes. According to an internal analysis, G&W projected an increase in Hydrocortisone Acetate sales from $41.3 million to $111.3 million as a result of the increase, or a total of $70 million in sales.

1501.   The two competitors continued to coordinate after the price increases.  On August 11, 2014, T.P. of Perrigo called Vogel-Baylor and they spoke for more than sixteen (16) minutes. One week later, on August 18, 2014, Vogel-Baylor called T.P. and they spoke for more than ten (10) minutes.

1502.   Several customers did not react kindly to the increase.  For example, when Vogel-Baylor e-mailed Econdisc to notify the customer of the price increase, Econdisc responded by stating that G&W's conduct was "[d]ownright getting criminal!!"  Similarly, after learning of the increase, Schnucks sent the following e-mail to Vogel-Baylor:

**From:** ████████████████████@Schnucks.com]
**Sent:** Thursday, September 25, 2014 11:46 AM
**To:** ████████ ERIKA VOGEL-BAYLOR
**Subject:** Anucort



INCREASES FOR EVERYONE....
HAHAHAHAHAHAHAHA

500% increase huh? I need a 60 day buy in and I move 800/month. Bastards.

**Director, Pharmacy Procurement & Managed Care**
Schnuck Markets, Inc.
314-994-2226 (O)
████████████)
314-994-4586 (F)

### 2)    Collusion Between G&W And Actavis

1503.   Vogel-Baylor met Rick Rogerson, a senior pricing executive at Defendant Actavis, while attending the NACDS Pharmacy and Technology Conference in Denver, Colorado, from August 25 to August 28, 2012.

1504.   After returning from the NACDS conference, Rogerson sent Vogel-Baylor an e-mail on August 30, 2012, stating: "It was great to actually sit down and talk to you, we've said 'hi' at meetings for a couple years now!  I was completely impressed by you and as I said before I am definitely part of you[r] fan club now!  If there is anything I can ever do to help you out please do not hesitate to call me.  When you have time give me a call today to catch up on our conversation."

399

1505.   Later that same day, on August 30, 2012, Vogel-Baylor called Rogerson and they spoke for seventeen (17) minutes.  Over the ensuing months, the two competitors stayed in regular contact and colluded to raise prices on Promethazine HCL Suppositories twice – once in late 2012 and again in 2013.  The collusion on this product is discussed in detail below.

### i.   Promethazine HCL Suppositories

1506.   Promethazine HCL, also known by the brand name Promethegan, is an antihistamine that is used to treat some allergies, nausea, and vomiting.  In late 2012 and early 2013, the competitors in the market for Promethazine HCL were Actavis, Perrigo, and G&W.

1507.   Starting in late August 2012 – around the same time that Defendant Vogel-Baylor first met Rogerson at Actavis – G&W began planning a price increase for Promethazine HCL.  Prior to implementing that increase, and as it had done on other products, G&W reached out to its competitors to coordinate plans.

1508.   On September 18, 2012, Vogel-Baylor sent an internal e-mail to M.S., a sales analyst at G&W, asking her to prepare a spreadsheet containing Promethazine sales data for the price increase.  That same day, Vogel-Baylor also responded to a request from her boss, Defendant Orlofski, asking who the incumbent manufacturers were for the major wholesalers.  Vogel-Baylor stated that G&W was the incumbent at ABC and Cardinal and Actavis supplied McKesson.  The next day, on September 19, 2012, Orlofski replied:  "OK.  That's right.  Let's get ready then to go on Prometh 12.5 and 25."

1509.   Meanwhile, Vogel-Baylor was actively communicating with Rogerson of Actavis regarding the increases.  Indeed, on September 18, 2012 alone, Vogel-Baylor exchanged thirty-four (34) text messages with Rogerson.

1510.   Similarly, on September 19, 2012, Vogel-Baylor used her contact at Aurobindo, CW-6, as a conduit to communicate with T.P. of Perrigo, the other competitor on Promethazine HCL.  This call pattern is detailed in the chart below.  Notably, these are the same calls that Vogel-Baylor used to convey information regarding the price increase on Halobetasol, another product on which Perrigo and G&W overlapped, which was happening at the same time.  The collusion on Halobetasol is discussed in detail in an earlier Section.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:16:11 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 10:17:50 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:18:49 | 0:00:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:44:00 | 0:01:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:45:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:48:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:52:00 | 0:03:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:57:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 14:03:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:04:00 | 0:02:00 |

1511.   After speaking with CW-6 for the final time on September 19, 2012, Vogel-Baylor immediately called her boss, Defendant Orlofski, and spoke to him for thirteen (13) minutes.

1512.   While Vogel-Baylor was communicating with T.P. of Perrigo through her contact CW-6, T.P. was also communicating directly with M.D., a sales executive at Actavis, and reporting that information back to his superior, Defendant Wesolowski.  This call pattern, including the calls between T.P. and CW-6, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 13:38:00 | 0:11:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Aurobindo) | 13:48:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Aurobindo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 13:58:00 | 0:02:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 13:59:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Aurobindo) | 13:02:00 | 0:02:00 |

1513.   Over the next week, G&W worked to finalize its price increase for Promethazine HCL.  On September 21, 2012, Vogel-Baylor forwarded her initial price increase analysis to Orlofski and scheduled a one-on-one meeting to discuss it on September 24, 2012.  Two days later, on September 26, 2012, Vogel-Baylor e-mailed a revised price increase analysis to Orlofski and, after obtaining his approval, e-mailed that analysis to the team on September 28, 2012.  In her e-mail, Vogel-Baylor informed the team that they were to send out their price increase notices to customers on October 5, 2012.

1514.   Throughout this time period, Vogel-Baylor stayed in constant communication with Rogerson at Actavis.  For example, between September 25, 2012 and October 5, 2012 – the day the price increase notices were sent – Vogel-Baylor exchanged thirty-eight (38) text messages with Rogerson.  Similarly, Vogel-Baylor continued to keep T.P. of Perrigo informed of G&W's plans through her conduit CW-6.  This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 6:30:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:53:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:56:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:58:00 | 0:01:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 7:04:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:06:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:53:00 | 0:15:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:02:00 | 0:04:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 4:06:00 | 0:01:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 4:11:00 | 0:03:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:16:00 | 0:03:00 |
| 10/5/2012 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 5:30:01 | 0:01:41 |
| 10/5/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 5:38:00 | 0:02:00 |
| 10/5/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 5:39:00 | 0:06:00 |

1515.   On October 8, 2012, G&W published increased WAC pricing for Promethazine HCL, which included an 18% increase on the 25mg dosage and a 35% increase on the 12.5mg dosage.

1516.   Perrigo followed suit on December 4, 2012, when it notified customers that it would be increasing contract pricing on Promethazine HCL effective January 5, 2013.  Similarly,

on February 12, 2013 and April 3, 2013, Actavis also followed and increased its WAC pricing to

match G&W on the 12.5mg and 25mg dosages, respectively.  On February 12, 2013, Rogerson

called Vogel-Baylor and they spoke for nearly twenty-two (22) minutes.

1517.   The competitors were not satisfied to stop there, however.  Knowing now that all

three competitors were on board to increase prices, they began contemplating a second increase

on Promethazine HCL – and this time, it would be much larger.

1518.   On March 25, 2013, M.S., a sales analyst at G&W, forwarded Vogel-Baylor

updated sales data for Promethazine HCL.  That same day, Orlofski of G&W sent a text message

to Defendant Boothe, an executive at Perrigo.  The next day, on March 26, 2013, Boothe called

Orlofski back and they spoke for six (6) minutes.  Similarly, Vogel-Baylor continued to

communicate with T.P. of Perrigo through her conduit, CW-6, about Promethazine HCL.  These

calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/26/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:59:51 | 0:00:15 |
| 3/26/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 13:21:57 | 0:06:46 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:28:00 | 0:01:00 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 17:33:00 | 0:02:00 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:36:00 | 0:01:00 |
| 3/27/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 20:04:10 | 0:00:00 |
| 3/27/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 20:05:10 | 0:01:37 |
| 3/28/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 18:19:55 | 0:00:03 |
| 3/28/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 18:41:00 | 0:05:00 |
| 3/28/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 18:46:00 | 0:01:00 |

1519.   On March 28, 2013, the same day as the last calls listed above, Vogel-Baylor

finalized a price increase analysis for Promethazine HCL and, on April 1, 2013, she forwarded

that information to Orlofski.  Vogel-Baylor and Orlofski discussed some revisions to the analysis

and, on April 10, 2013, Vogel-Baylor sent the revised analysis to Orlofski.  G&W planned to

implement the price increase on April 15, 2013, but ultimately sent the notices on April 16, 2013.

403

1520.   Meanwhile, all three competitors continued to coordinate their plans on

Promethazine HCL.  Vogel-Baylor of G&W was speaking with Rogerson at Actavis, while T.P.

at Perrigo was speaking to M.D. at Actavis. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/1/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 15:11:49 | 0:00:26 |
| 4/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:51:41 | 0:00:00 |
| 4/4/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:55:41 | 0:01:30 |
| 4/4/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 17:33:07 | 0:00:00 |
| 4/4/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 19:32:16 | 0:00:00 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:51:47 | 0:08:15 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:51:47 | 0:08:15 |
| 4/11/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 7:35:00 | 0:01:00 |
| 4/12/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 13:12:00 | 0:25:00 |

1521.   At the same time, Vogel-Baylor continued to use CW-6 as a conduit to

communicate with T.P. of Perrigo regarding Promethazine HCL.  This call pattern is detailed in

the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/4/2013 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:37:55 | 0:07:00 |
| 4/5/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:25:00 | 0:01:00 |
| 4/5/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 13:30:28 | 0:00:00 |
| 4/5/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 13:36:07 | 0:00:00 |
| 4/5/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 16:44:00 | 0:01:00 |
| 4/8/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 11:59:40 | 0:00:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:00:00 | 0:04:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:03:00 | 0:01:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-6 (Aurobindo) | 12:18:02 | 0:00:03 |
| 4/8/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:23:18 | 0:00:00 |
| 4/8/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:36:24 | 0:00:03 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:53:00 | 0:04:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:26:00 | 0:02:00 |
| 4/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 11:08:00 | 0:04:00 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 13:50:56 | 0:00:29 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:00:00 | 0:06:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 14:09:00 | 0:01:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 16:52:00 | 0:06:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 16:59:00 | 0:01:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 17:05:00 | 0:02:00 |

1522.   According to the plan, on April 17, 2013 G&W published new WAC pricing for

Promethazine HCL, increasing WAC from $38.99 to $116.97 – an approximately 200% increase.

1523.   Around the time of the increase, G&W received an e-mail from a potential new customer seeking pricing on a list of products, including Promethazine HCL.  M.S. forwarded the request to Vogel-Baylor who responded, "tell him that we are not able to bid on these items at this time, and that they are strategic products for us so we would need to know who he is currently buying from before we would bid."

1524.   A few weeks later, Actavis followed G&W's price increase on Promethazine HCL and, on June 5, 2013, published WAC pricing that matched G&W.  Prior to increasing its price, and as it had now done several times before, Actavis spoke with both G&W and Perrigo.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/29/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 9:09:00 | 0:01:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 12:12:00 | 0:02:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 12:14:00 | 0:05:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 12:19:00 | 0:02:00 |
| 5/31/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 4:04:00 | 0:09:00 |
| 5/31/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 8:38:00 | 0:07:00 |
| 6/3/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 12:00:52 | 0:14:17 |
| 6/4/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 11:10:30 | 0:12:16 |

1525.   On June 26, 2013, Vogel-Baylor e-mailed Orlofski to advise him that G&W had received Cardinal's 2013 RFP.  Vogel-Baylor explained, "[w]e are primary on Promethazine.  If Perrigo does not follow the increase soon, we might have an issue.  We are only going to bid the items we are Primary on.  Our goal is to maintain what we have.  We will not bid on items that we are not the current incumbent on."  The next day, Vogel-Baylor received a short phone call from S.S., a former sales executive at Perrigo.  Several hours later, Vogel-Baylor placed a phone call to Orlofski.

1526.   G&W had no reason to fear because a few weeks later, on July 30, 2013, Perrigo notified its customers that it was increasing price on a list of products, including Promethazine HCL, with an effective date of August 1, 2013.  This included an increase to its WAC pricing

405

that matched G&W and Actavis.  In the days leading up to Perrigo's price increase, the three

competitors again spoke several times by phone.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 7/29/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 0:01:11 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | Vogel-Baylor, Erika (G&W) | 0:03:00 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Outgoing | Vogel-Baylor, Erika (G&W) | 0:01:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 0:02:33 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | T.P. (Perrigo) | 0:00:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 0:09:06 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 0:21:00 |

1527.   Several months later, the collusion continued on Promethazine HCL.  On March

5, 2014, K.K., a G&W sales executive, informed Vogel-Baylor that Walgreens had received an

offer from Actavis for a one time buy on the 25mg dosage at a significantly discounted price of

$42.08.  G&W would later learn that Actavis had made the offer because it had an excess of

short-dated inventory on the 25mg dosage.  This information stunned Vogel-Baylor, who asked

"Jesus…. did he tell you what qty?"

1528.   Despite her initial surprise, Vogel-Baylor confidently reported to Orlofski: "I will

tell you more about this when we speak next, however, I will make sure that this deal does not

happen."  To make good on her promise, Vogel-Baylor placed a call to Rogerson fifteen (15)

minutes later.  The two competitors continued to trade phone calls over the next several days,

including a call on March 6, 2014 that lasted eleven (11) minutes.

1529.   Apparently, Vogel-Baylor's communications with Rogerson did yield a solution

to her problem.  On March 18, 2014, she e-mailed Walgreens to advise the customer that G&W

lowered its price on Promethazine HCL.  Aware that the details of her interactions with

Rogerson would be incriminating if reduced to writing, Vogel-Baylor offered only a vague

statement to the customer: "Will tell you why and story next time we speak."

1530.   Over the next several months, G&W would continue to decline to bid on new opportunities for Promethazine HCL so as not to upset the market share balance it had achieved with its competitors.

1531.   For example, on May 5, 2014, L.C., a sales executive at G&W, summed up G&W's commitment to playing nice in the sandbox when she told a customer, PBA Health, that she wanted to identify opportunities for Promethazine HCL (and other drugs) only if she could do so "without creating too much of a stir."  Similarly, on May 30, 2014, Vogel-Baylor instructed M.S. not to bid on the Promethazine HCL business at another customer, IPC, because "we hold the majority of the share in the market and we do not want to upset things."  Further, on August 8, 2014, Vogel-Baylor told K.K. that prior to bidding on Promethazine HCL at Humana, G&W would need to know who the incumbent was and whether there was a right of first refusal reasoning it was "not worth pissing someone off for that volume."

1532.   Lastly, on August 25, 2014, McKesson – an Actavis customer – e-mailed K.K. asking if G&W would like to bid on Promethazine HCL.  K.K. knew that G&W would not bid, but in an effort to get the story straight, asked Vogel-Baylor if he should provide the pre-textual justification that G&W was at capacity.  Vogel-Baylor approved that messaging in a response on August 28, 2014 stating: "Yes, I would say we have the bulk of the market share and can't take on anymore from a capacity standpoint."

### 3)   Collusion Between G&W And Glenmark

1533.   As detailed above in an earlier Section, Defendant Vogel-Baylor of G&W had a long-standing relationship with CW-5, a senior executive at Defendant Glenmark, and the competitors used that relationship to fix prices on Ciclopirox Cream in April 2012.

1534.   One year later, on May 16, 2013, Glenmark increased pricing on at least eighteen (18) different products, including Ciclopirox Cream and various formulations of Mometasone Furoate that were also manufactured by G&W.[14]   The anticompetitive conduct relating to those products is discussed in further detail below.

### i.   Ciclopirox Cream and Mometasone Furoate

1535.   Ciclopirox Olamine Cream, also known by the brand name Loprox, is an antifungal medicine that prevents fungus from growing on your skin.  Ciclopirox Cream is used to treat skin infections such as athlete's foot and ringworm.

1536.   As of May 2013, the primary competitors for Ciclopirox Cream were Glenmark with 44% market share, Perrigo with 38%, and G&W with 16%.

1537.   Mometasone Furoate ("Mometasone"), also known by the brand name Elocon, is a medium-strength corticosteroid used to treat skin conditions such as eczema, psoriasis, allergies, and rashes.  Mometasone is available in several forms, including cream, ointment, and solution.

1538.   As of May 2013, the same three competitors – Glenmark, Perrigo, and G&W – controlled a majority of the market share on the various formulations of Mometasone.

---

[14]  Notably, while Glenmark was colluding with G&W on these products, CW-5 and his colleagues were also colluding with competitors on other products on its price increase list.  For example, several of the products – Moexipril HCL Tablets, Moexipril HCL/HCTZ Tablets, Nabumetone Tablets, Pravastatin Sodium Tablets, and Ranitidine Tablets – overlapped with Teva and are the subject of the Plaintiff States' Teva Complaint.  In that Complaint, the Plaintiff States allege that Nisha Patel, a Teva sales executive, colluded with CW-5 and J.C., a sales executive at Glenmark, to significantly raise prices on those products.  Similarly, Glenmark's list included Alclometasone Dipropionate Cream – a product that Glenmark overlapped on with Taro that is discussed earlier in this Complaint.  As discussed above, Defendant Blashinsky, a sales executive at Glenmark, colluded with Defendant Aprahamian and D.S., a sales executive at Taro, to raise prices on that product.

1539.   Beginning as early as May 2, 2013, Glenmark began communicating with its competitors, including G&W, to coordinate its May 2013 price increases.  Over the next several weeks, CW-5 and Jim Brown, a senior sales executive at Glenmark, had multiple calls with Vogel-Baylor of G&W during which they discussed and agreed to increase prices on Ciclopirox Cream and the various formulations of Mometasone.  Notably, prior to these calls, Vogel-Baylor had never spoken to Brown before, according to the available phone records.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/2/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-5 (Glenmark) | 18:10:31 | 0:00:33 |
| 5/6/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-5 (Glenmark) | 9:00:46 | 0:00:00 |
| 5/6/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 9:00:48 | 0:00:51 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 13:57:00 | 0:00:00 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 15:27:37 | 0:02:50 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:01:30 | 0:00:00 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:05:56 | 0:03:42 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:27:03 | 0:00:55 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 17:32:13 | 0:00:00 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 17:32:14 | 0:00:00 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 18:26:47 | 0:00:00 |
| 5/14/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 11:18:55 | 0:00:40 |
| 5/15/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:04:27 | 0:00:14 |
| 5/15/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:05:28 | 0:05:07 |
| 5/16/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:12:12 | 0:06:33 |

1540.   Similarly, Vogel-Baylor, as she had done in the past, used her contact, CW-6 – then at Aurobindo – to communicate with T.P. of Perrigo regarding the increases.  As discussed above, CW-6 had formerly worked at Fougera and developed relationships with Vogel-Baylor and T.P. of Perrigo during his tenure there.  At this time, G&W and Aurobindo had no products that overlapped and CW-6 and Vogel-Baylor were not social friends.  These communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:43:12 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:45:35 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:47:58 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:50:22 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:52:45 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:55:08 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:05:32 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:18:21 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:20:44 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:23:08 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:25:31 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:27:54 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:30:19 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:40:42 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:50:48 | 0:00:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:47:00 | 0:01:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:48:00 | 0:02:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:50:00 | 0:01:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 13:02:00 | 0:07:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:09:00 | 0:06:00 |

1541.   As a result of these conversations, Glenmark increased prices on Ciclopirox Cream and Mometasone Cream, Ointment, and Solution on May 16, 2013.  Soon thereafter, G&W would follow with comparable increases of its own on Ciclopirox Cream and the various formulations of Mometasone and Perrigo would follow with an increase on Ciclopirox Cream.

1542.   Over the next several weeks, G&W consistently declined opportunities to reduce pricing on the various formulations of Mometasone so as not to take advantage of the Glenmark price increases.

1543.   For example, on May 15, 2013 – the day before the Glenmark price increases would become effective and publicly visible – C.M., a G&W sales executive, e-mailed Vogel-Baylor to inform her that ANDA was requesting decreased pricing on several products because the prices were higher than their competitors.  The list included Mometasone Solution and listed Glenmark's pre-increase pricing for Cardinal as the comparison price point.  Knowing that Glenmark was increasing pricing on this product, Vogel-Baylor advised C.M. that G&W would not lower its pricing.

410

1544.   Similarly, on May 17, 2013, the day after the Glenmark increases became effective, McKesson sent G&W a request for a bid on Mometasone Ointment because it "recently received a price increase from our incumbent."  Vogel-Baylor asked the customer who its incumbent was, and McKesson responded that it was Glenmark.  Immediately upon receiving this response, Vogel-Baylor called CW-5 of Glenmark.  The call lasted less than one (1) minute. She then hung up and called Brown of Glenmark.  That call lasted less than one (1) minute. Fifteen minutes later, Brown called Vogel-Baylor back and they spoke for twelve (12) minutes. Later that day, Vogel-Baylor responded to McKesson and declined the opportunity, stating "[w]e do not have the capacity to add your volume in our plant.  I really wish we could handle it."

1545.   The next business day, on May 20, 2013, C.M. e-mailed Vogel-Baylor asking, "[w]hat's going on with the Mometasone Ointment?  I have not heard but Walgreens just contacted me looking for pricing and I saw Kurt's message."  Vogel-Baylor responded by sending the following e-mail to C.M. and others on the sales team:

## RE: Mometasone

**From:**
ERIKA VOGEL <"/o=pharma/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients/cn=erika vogelf6c">

**To:**
████████████████@gwlabs.com>

**Cc:**
████████████@gwlabs.com>, ████████████@gwlabs.com>

**Date:**
Tue, 21 May 2013 00:20:12 +0000

Hi ████/All,

Glenmark has done a price increase on Ciclopirox Cream, Mometasone Cream, Mometasone Ointment, and Mometasone Solution.  We are going to follow this increase, probably within a week or two, once we have an idea of how the rest of the market is responding.

Also, this may be a good time to find an opportunity with Ciclopirox Cream so please let me know if you get requests for pricing.

Thanks,
Erika

411

1546.   Later that day, ANDA e-mailed C.M. asking if G&W was interested in bidding on Ciclopirox Cream.  Because G&W had slightly less than its fair share of the Ciclopirox Cream market, C.M. responded: "Perhaps.  Glenmark is raising prices.  What's the usage?"  ANDA provided the usage information and, the next day, on May 22, 2013, C.M. forwarded the request to Vogel-Baylor, along with some additional bid requests it had received from other customers on other products.  With regard to Ciclopirox Cream, C.M. stated: "In all the pricing scenarios that are going on, we have the following opportunities that I wanted to run by you for comments: ANDA- No ROFR on this – Ciclopirox Cream – Incumbent Glenmark."  Vogel-Baylor responded: "Great!  We are definitely going to bid Ciclo Cream at Anda.  I am working on our price increase on my flight home this afternoon so I will have pricing to present to them by tomorrow."

1547.   On May 23, 2013, Vogel-Baylor e-mailed price increase analyses for Ciclopirox Cream and the Mometasone line to her supervisor, Defendant Orlofski.  The next day, May 24, 2013, Vogel-Baylor called CW-5 at Glenmark twice.  The calls lasted less than one (1) minute each.

1548.   On May 29, 2013, Vogel-Baylor exchanged five (5) calls with CW-5 and Brown of Glenmark.  That same day, G&W finalized its price increase notifications for Ciclopirox Cream to send to its customers, including Publix and Wal-Mart.  Vogel-Baylor sent an internal e-mail to the team stating: "By now you should have your Ciclopirox price increase letters for your customers. Please call your customers right away and tell them that Glenmark initiated this increase, and Perrigo has since followed. We are now going to follow the increase as well. Please make sure all of your calls and letters are sent today.  Please confirm back to me once you have completed this."

1549.   Also on May 29, 2013, Target e-mailed C.M. of G&W stating that the customer had received a 250% price increase on another drug, Halobetasol, and asking whether C.M. could provide any insight into why.  C.M. responded, "This is simply a case where one manufacturer raised their price and other suppliers followed.  A lot of creams and ointments are going up.  Look for Ciclopirox Cream and Mometasone to go up in the coming days."

1550.   On May 30 and May 31, 2013, Brown called Vogel-Baylor twice.  The calls lasted four (4) minutes and less than one (1) minute, respectively.

1551.   On June 4, 2013, G&W sent price increase notifications to its customers regarding the various Mometasone formulations.  That same day, Vogel-Baylor called Brown.  The call lasted less than one (1) minute.

1552.   On June 5, 2013, Pharmacy Select e-mailed C.M. regarding the notification and asked him to provide new WAC pricing for the Mometasone line of products.  C.M. forwarded the request to Vogel-Baylor asking, "[a]re there new WAC's on these?"  Vogel-Baylor responded, "No only on the solution.  Glenmark did not raise WACs so we can't."

1553.   G&W and Glenmark continued to coordinate even after their price increases.  For example, on June 5, 2013, Rite Aid, a G&W customer for Mometasone, asked Glenmark whether it wanted to bid for the business because G&W had increased price.  The next day, on June 6, 2013, Brown of Glenmark called Vogel-Baylor and they spoke for six (6) minutes.  On June 7, 2013, Vogel-Baylor called Brown back.  The call lasted less than one (1) minute.  That same day, CW-5 e-mailed his colleagues Brown and Defendant Blashinsky regarding the Rite Aid opportunity stating "[w]e don't want this.  Bid high."  Brown responded: "I was aware this was coming.  I'm on it."

413

1554.   After preparing the bid for Rite Aid, Brown e-mailed CW-5 and Blashinsky on Saturday, June 8, 2013 stating: "I will confirm that it is high enough, but I am sure it is."  The following Monday, on June 10, 2013, Brown called Vogel-Baylor.  Vogel-Baylor returned the call and they spoke for more than six (6) minutes.  Within ten (10) minutes of hanging up, and having confirmed the pricing with his competitor, Brown e-mailed his colleagues with specific price points that Glenmark should use to bid high and not take the Rite Aid business from G&W.

### 4)   Collusion Between G&W And Lupin

1555.   Defendant Orlofski of G&W had a long-standing relationship with David Berthold, a senior sales executive at Defendant Lupin.  Indeed, as detailed above, it was Berthold who introduced Orlofski and Vogel-Baylor to CW-6 of Fougera.  This connection allowed G&W and Fougera to continue their collusive relationship even after CW-6's contact, Defendant Grauso, had left G&W to take a senior position at Aurobindo.

1556.   Notably, G&W and Lupin only overlapped on one product – Ethambutol HCL Tablets – during the time period relevant to this Complaint.  However, that did not stop the competitors from using their relationship to collude on that product.  This collusion is discussed in further detail below.

### i.   Ethambutol HCL Tablets

1557.   Ethambutol HCL Tablets ("Ethambutol"), also known by the brand name Myambutol, is a drug used to treat tuberculosis.  In 2012, G&W marketed the authorized generic of Ethambutol for the manufacturer, STI Pharma ("STI"), and Lupin, VersaPharm, and Teva sold the generic version.

1558.   By late 2012 and early 2013, however, both VersaPharm and Teva were experiencing supply issues on Ethambutol.  Viewing this as an opportunity, Lupin and G&W

colluded to significantly raise price on the product while their competitors were out of the market.

1559.   In November and December 2012, Defendants Orlofski and Vogel-Baylor of G&W exchanged several calls with David Berthold of Lupin to discuss Ethambutol.  At the same time, Berthold was keeping Kevin Green, a sales executive at Teva, apprised of his discussions with G&W.

1560.   For example, on November 15, 2012, Orlofski exchanged at least eight (8) text messages with Berthold.  The next day, on November 16, 2012, Orlofski and Berthold spoke for nearly twelve (12) minutes.  Shortly thereafter, Berthold spoke three separate times with Green, with the calls lasting five (5) minutes, ten (10) minutes, and five (5) minutes, respectively.

1561.   That same day, G&W reached out to several VersaPharm customers, including Econdisc, HealthTrust, and FW Kerr, to inquire whether they were interested in a new supplier for Ethambutol due to VersaPharm's supply issues.

1562.   Over the next month, Berthold would continue to exchange numerous calls and text messages with Vogel-Baylor and Orlofski during which they discussed a coordinated price increase on Ethambutol.  These communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/18/2012 | Text | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 18:48:29 | 0:00:00 |
| 11/18/2012 | Text | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 18:48:33 | 0:00:00 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 12:55:26 | 0:00:03 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:24:13 | 0:07:55 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:31:57 | 0:00:03 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:57:55 | 0:03:11 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:30:34 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:30:36 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:04 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:08 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:15 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:19 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 20:30:46 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 20:30:48 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 14:54:28 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 14:54:33 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:01:44 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:01:45 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:05:03 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:05:08 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:21:48 | 0:00:00 |
| 12/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:22:36 | 0:00:03 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:57:26 | 0:00:00 |

1563.   On December 9, 2012, the day after the final call listed above, J.G., a finance executive at Lupin, e-mailed Berthold at 3:41 p.m. stating: "Here are the most recent documents for the price increase on Ethambutol that we would like to communicate by this Friday or next Monday." Three minutes later, at 3:44 p.m., Berthold called Orlofski. The call lasted less than one (1) minute. The next day, on December 11, 2012, Berthold called Vogel-Baylor and they spoke for nearly six (6) minutes. A short time later, Orlofski sent a text message to Berthold and the two competitors exchanged two (2) more calls that day, including one lasting nearly six (6) minutes.

1564.   On December 17, 2012, K.W., a Lupin sales executive, sent an internal e-mail including to Berthold, attaching the price increase letters for Ethambutol that Lupin planned to send on December 18, 2012. Between December 17, 2012 and December 19, 2012, Berthold

again exchanged several calls and text messages with Orlofski and Vogel-Baylor.  These are

detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 12/17/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:32:53 | 0:00:14 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 21:48:43 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 21:51:13 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 21:54:44 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 21:54:48 | 0:00:00 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 8:19:40 | 0:00:02 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:54:06 | 0:00:25 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 11:56:05 | 0:00:58 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:12:46 | 0:00:02 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 15:13:09 | 0:00:07 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:56:16 | 0:13:10 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 16:56:44 | 0:04:12 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:06:52 | 0:04:52 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:25:24 | 0:00:02 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:30:08 | 0:04:19 |

1565.   On January 2, 2013, Orlofski e-mailed Vogel-Baylor suggesting that they discuss

the Ethambutol price increase during their meeting scheduled for the next day.  That same day,

Vogel-Baylor called Berthold and they spoke for eleven (11) minutes.  Later that evening,

Vogel-Baylor e-mailed Orlofski a price increase analysis for Ethambutol.

1566.   The next day, January 3, 2013, a customer, HEB, e-mailed C.M., a sales executive

at G&W, to advise him that VersaPharm was out of the market.  C.M. responded that he was

aware and stated: "Between us . . . we are going to do a price increase on it."  That same day,

Vogel-Baylor exchanged at least four (4) calls with Berthold, including one lasting more than

four (4) minutes.

1567.   On January 14, 2013, another customer, Morris & Dickson, e-mailed Lupin

asking for a bid on Ethambutol.  The customer explained that both VersaPharm and Teva were

having supply issues.  That same day, Orlofski sent a text message to Berthold.  Berthold also

called Green of Teva and they spoke for nine (9) minutes.

1568.   On January 28, 2013, the manufacturer of G&W's authorized generic, STI, e-mailed Vogel-Baylor to inform her that it would be shipping Ethambutol to G&W the following day stating: "ETA would be Wednesday – but under quarantine."  Vogel-Baylor then forwarded the e-mail to Orlofski as an "FYI only."  Later that day, Vogel-Baylor sent her Ethambutol price increase analysis to the sales team and asked them to draft letters to their customers advising them of the increases.  The next day, on January 29, 2014, Orlofski sent a text message to Berthold and Berthold spoke two times with Green of Teva by phone, with calls lasting three (3) minutes and more than five (5) minutes, respectively.

1569.   On January 31, 2013, Vogel-Baylor called Berthold and they spoke for three (3) minutes.  The next day, on February 1, 2013, Vogel-Baylor called Berthold again.  Berthold returned the call and they spoke for five (5) minutes.  The following Monday, on February 4, 2013, Vogel-Baylor e-mailed Orlofski to inform him that G&W planned to send the Ethambutol price increase letters on February 7, 2013 and would call customers in advance to advise that they would be coming.

1570.   Consistent with the plan, on February 6, 2013, G&W reached out to its customers to advise them of the Ethambutol increases.  As Vogel-Baylor explained in her e-mail to Wal-Mart: "There are only 2 players currently in the market – Lupin and us.  Lupin did a price increase in the beginning of January 2013.  We are increasing our price so that it is market competitive."

1571.   Berthold continued to communicate with Orlofski and Vogel-Baylor over the next several weeks.  For example, on February 19, 2013, Vogel-Baylor and Berthold had a joint dinner with representatives from two customers – ABC and Kroger.

418

1572.   On April 1, 2013, STI began notifying customers that it was terminating its

relationship with G&W regarding Ethambutol.  STI advised that it would be taking over the

marketing and distribution of the product effective April 15, 2013.  Between April 2, 2013 and

April 15, 2013, Berthold exchanged several calls with Orlofski and Vogel-Baylor.  The calls are

detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 10:38:29 | 0:00:03 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 10:38:57 | 0:03:49 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:48:27 | 0:00:07 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 17:09:30 | 0:04:19 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 17:09:30 | 0:04:18 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 20:47:56 | 0:00:04 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:04:58 | 0:03:24 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:24:05 | 0:00:08 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:24:29 | 0:02:27 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:33:02 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:35:51 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:48:32 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:49:08 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:49:40 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:50:02 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:50:42 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:51:24 | 0:00:00 |
| 4/15/2013 | Text | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 21:37:55 | 0:00:00 |
| 4/15/2013 | Text | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 21:38:21 | 0:00:00 |

1573.   Notably, after April 15, 2013, the date of the last two text messages listed above,

Berthold and Vogel-Baylor would *never* communicate by phone again, according to the phone

records available to the Plaintiff States.

### 4.   The Defendants' Profitability Increases Dramatically As A Result Of Collusive Conduct

1574.   As discussed more fully above, between 2009 and early 2016, the Defendants

colluded to allocate markets and raise prices on at least 80 different generic drugs.  The impact of

this anticompetitive conduct on the Defendants' profitability was dramatic.

### a.    Defendant Taro And Defendant Perrigo's Profits Increased Over 1300% From 2008 To Early 2016

1575.   Both Taro and Perrigo's Prescription (Rx) Pharmaceuticals segment saw profits increase over 1300% between 2008 and early 2016.   Taro often led price increases and Perrigo's Prescription (Rx) Pharmaceuticals segment reported revenues and profits for generic dermatology drugs disaggregated from other operations.   Accordingly, the profits of these two companies are instructive in showing the dramatic profits the Defendants made from their collusive conduct.

### 1)    Defendant Taro

1576.   By early 2016, Taro's operating income was 1303%, or more than thirteen (13) times, higher than it was in 2008.   Similarly, in 2016, Taro's net income was 1673%, or more than sixteen (16) times higher than it was in 2008.   Indeed, in 2016, Taro's net sales revenue reached nearly $1 billion, which was $600 million more than it made in 2008.

1577.   The graph below shows Taro's consistent financial growth from 2008 through early 2016 and highlights how the timing dovetails with Taro's price increases on products at issue in this Complaint.



[1] As discussed in earlier Sections of this Complaint, in May 2013 Taro raised its prices on 12 products.
[2] As discussed in earlier Sections of this Complaint, in June 2014 Taro raised its prices on 17 products.

1578.   As depicted above, as Taro increased prices, its profits increased.  Indeed, consistent with the allegations in the Complaint, Taro's profits grew steadily from 2010 through 2011, during the early days of collusion, and then increased exponentially from late 2012 through 2015 when price increases intensified across the industry.

1579.   In SEC filings, Taro repeatedly attributed its increases in sales revenue and gross profits to price adjustments.  For example, in its 2011 annual filing, Taro stated that its revenues and gross profits increased in the United States "primarily due to price increases on select products."  Similarly, in its 2013 annual filing, Taro stated that approximately $27 million of its

increased sales in the first quarter of 2012 "resulted from price increases on seven

dermatological topical products."

### 2)    Defendant Perrigo

1580.   Perrigo's profits also grew significantly as a result of its collusive conduct.  As

noted above, this analysis focuses on the profits of Perrigo's Prescription (Rx) Pharmaceuticals

segment, which covers its U.S. generic drug sales, with a strong focus on extended topicals.

1581.   In its fiscal year 2015, Perrigo's Prescription (Rx) Pharmaceuticals segment's

operating income was 1648%, or over sixteen (16) times, higher than it was in 2008.  The

segment's net sales revenue was just over $1 billion in 2015, which was over $800 million more

than it made in 2008.

1582.   Perrigo's Prescription (Rx) Pharmaceuticals segment was the growth driver for

Perrigo during this time period.  Perrigo's other operations grew much slower by comparison.

While the segment's operating income grew 1648%, Perrigo's operating income for all its

operations when combined grew only 278%.  Similarly, while the segment's net sales revenue

grew 521%, Perrigo's net sales revenue for all its operations when combined was only 153%.

1583.   The graph below shows Perrigo's consistent financial growth from 2008 through

2015 and highlights how the timing dovetails with Perrigo's price increases on products at issue

in this Complaint.



[1] As discussed in earlier Sections of this Complaint, on July 24, 2014 Perrigo increased its prices on Econazole Nitrate Cream, Hydrocortisone Acetate Suppositories, and Hydrocortisone Valerate Cream.
[2] As discussed in earlier Sections of this Complaint, on August 1, 2013 Perrigo increased it prices on Ciclopirox Solution, Hydrocortisone Valerate Cream, and Promethazine HCL Tablets.

1584.   As depicted above, as Perrigo increased prices, the company profited handsomely. Further, and consistent with Taro's financial picture, Perrigo's profits from generic drug sales grew steadily during the early days of collusion, between 2010 and 2011, and then accelerated around 2012 when the industry began to focus more intensely on price increases.

**b.      Other Defendants' Revenues And Profits
Also Multiply From 2008 To Early 2016**

1585.   The other Defendants also profited from their collusive conduct.  For example, G&W and Actavis's revenues multiplied as their focus on price increases intensified.  G&W's sales tripled from 2011 to 2014, increasing by over 30% each year during that period.  In 2014, G&W's revenue from sales, at over $290 million, broke $200 million for the first time ever.

1586.   Similarly, Actavis's global generics business saw its revenues grow between 2008 and 2013 from just over $1.4 billion to approximately $6.35 billion.  Over that same time period, the company's profits from its generics business also grew from $416 million in 2008 to nearly $2 billion in 2013.

1587.   Defendants Fougera and Sandoz also profited from their collusive conduct.  In 2010 and 2011, during the early days of collusion, and prior to its acquisition by Sandoz, Fougera had gross profits of approximately $217 million and $304 million, respectively.  Similarly, in 2010, Sandoz had over $1 billion of operating income and, in 2011, the company reported the highest operating income in its history at that time, just over $1.4 billion.

1588.   After acquiring Fougera, Sandoz's sales in the United States rose steadily each year from 2012, which had sales of over $2.7 billion, through 2016, when sales reached $3.7 billion.  Sandoz's operating income continued to exceed $1 billion each year during this period and, following years of collusive activity, in 2016 Sandoz's operating income exceeded the 2011 record and reached approximately $1.45 billion, the highest in Sandoz's history to date.

1589.   Sandoz executives wrote about the significant positive impact that the Fougera business had on Sandoz's profits.  For example, Sandoz noted in internal documents that "a strong contribution from Fougera" was a driver of US sales growth in 2013, in October 2014 the

Fougera team "delivered a record month for 2014 so far", and in 2015 "[o]ur growth was mainly driven by Fougera, Biopharm and Oncology."

5. **Price Increases Slow Dramatically After Government Investigations Commence**

1590.   As further evidence that the price increases discussed above were not the result of normal market factors, the massive price spikes that were occurring in the industry in 2013 and 2014 slowed dramatically after the State of Connecticut commenced its antitrust investigation in July 2014.  This was not a coincidence.  Generic drug manufacturers in the industry – including the Defendants in this case – understood that they were under scrutiny and did not want to draw further attention to themselves.

1591.   In January 2015, Sandoz conducted an analysis of the price increases in the generic drug industry in 2013 and 2014, with an early look toward 2015.  In its report, Sandoz found that "[g]eneric drug price increases in 2013 and 2014 were very common."  Specifically, the report stated:  "For the years 2013 and 2014, there were 1,487 SKU 'large price increases' (WAC increase greater than 100%)[;] of this 12% (178 SKUs) were increased by more than 1000%."

1592.   The report went on to state that "[t]he number and level of price increases declined noticeably in 4Q 2014."  The following graphic, which was included in the Sandoz report, demonstrates that the number of price increases started to decline dramatically after the second quarter of 2014 – the same time that the Plaintiff States commenced their investigation:



1593.   The massive price spikes in the industry may have declined, but the already-high prices for most of these drugs did not go down.  To date, prices for many of these drugs remain at significantly inflated, anti-competitive levels.

**D.   Consciousness Of Guilt**

1594.   The Defendants understood that their conduct was illegal.  They all made consistent efforts to avoid communicating with each other in writing, or to delete written electronic communications after they were made.  There are numerous examples, discussed throughout this Complaint, where executives at the various Defendants stated that they could not talk by e-mail, but had additional information that they could only convey personally.  This was part of a consistent effort by these individuals to avoid putting incriminating information in writing, to evade detection.

1595.   For example, Defendant Kellum of Sandoz was well aware that what he and others at Sandoz were doing was illegal.  Kellum had received antitrust training and knew that conspiring with competitors to fix or raise prices, or to allocate customers or markets, was a violation of the antitrust laws.  Kellum would routinely admonish Sandoz employees for putting anything incriminating into e-mails, and voiced concern that the conduct they were engaging in – if discovered – could result in significant liability.  As a result of Kellum's admonishments, Sandoz employees (including Kellum himself) routinely lied in e-mails about the sources of their information to camouflage their conduct, claiming that they learned the information from a customer instead of a competitor.

1596.   Similarly, when Defendant Vogel Baylor was asked by a G&W sales executive whether she is straightforward with customers regarding the true reason why G&W declines to bid to maintain market balance, Vogel-Baylor responded, "[y]es but in conversation.  Let's talk more in person."  Further, when Defendant Aprahamian was asked a similar question by a colleague – namely to explain what "fair share" meant – he responded, "No emails please. Phone call.  . . . let's discuss."

1597.   Additionally, Defendants took actions to obstruct the Plaintiff States' ongoing investigation.  Several were speaking frequently at or around the time a subpoena was issued, or when the Plaintiff States were engaging in substantive discussions with their counsel.  For example, on April 16, 2018, David Berthold, the Vice President of Sales at Defendant Lupin, signed for a subpoena issued to him by the Plaintiff States.  That same day, Berthold called Defendant Grauso.  The next day, April 17, 2018, Grauso returned the call and the two competitors spoke for eleven (11) minutes.

1598.   Similarly, on July 17, 2018, the Plaintiff States issued a subpoena to Defendant Grauso through his counsel.  That same day, Grauso spoke to Defendant Aprahamian for more than twelve (12) minutes.  The Plaintiff States then scheduled a conference call with Grauso's counsel for July 25, 2018.  The day before that call – on July 24, 2018 – Defendant Aprahamian spoke to his lawyer, and then shortly thereafter called Grauso.  The next day, shortly after a conversation between the Plaintiff States and counsel for Grauso, Defendants Aprahamian and Grauso spoke again, this time for nearly seven (7) minutes.

1599.   Further, on October 19, 2018, Defendant Orlofski signed for a subpoena issued to him by the Plaintiff States.  That same day, Orlofski called his attorney.  The following Monday, October 22, 2018, the attorney called Orlofski back and they spoke for fifteen (15) minutes.  Less than two hours later, Defendant Orlofski called Defendant Grauso and they spoke for nearly thirty-two (32) minutes.  The next day, October 23, 2018, Orlofski and Grauso spoke again for more than seven (7) minutes.  Before these calls, the two competitors had not spoken since June 2, 2018.

1600.   In another example, K.K., a Director of Sales and Marketing at Defendant G&W, received a subpoena from the Plaintiff States on July 28, 2017.  The next day, July 29, 2017, K.K. called his former supervisor at G&W – Defendant Vogel-Baylor.  K.K. called Vogel-Baylor again on July 30, 2017 and they spoke for ten (10) minutes.  On August 2, 2017, Vogel-Baylor called K.K. and they spoke for thirty-three (33) minutes.  Later that month, on August 23, 2017, the Plaintiff States spoke with K.K.'s attorney regarding the investigative subpoena.  The next day, August 24, 2017, K.K. called Defendant Vogel-Baylor and they spoke for twelve (12) minutes.

## V.      PURCHASES OF GENERIC PHARMACEUTICALS THROUGH MMCAP

1601.   During the relevant period, state, local, municipal, and other state and non-state governmental entities purchased and Defendant manufacturers sold generic pharmaceuticals through a process operationalized by the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP").

1602.   Every state can be and is a member of MMCAP.  Subject to criteria established by MMCAP and the member state, state entities, and non-state governmental entities such as counties, cities, towns, villages, public school districts, public authorities, and public benefit corporations, can use MMCAP's process.

1603.   MMCAP enters into agreements with generic drug manufacturers and service providers that operationalize the process for purchasing, distributing, and paying for generic pharmaceuticals by and for those state and non-state governmental entities.

1604.   MMCAP agreements and member state processes/agreements contain provisions that assign to the state claims the contracting party may possess under federal and state antitrust laws.  Thus, the state stands in the shoes of the contracting party for purposes of alleging federal and state antitrust claims.

1605.   Plaintiff States asserting damage claims relating to purchases made through the MMCAP process here assume the rights of those contracting parties to assert claims arising out of Defendants' activities alleged in this Complaint, including the right to recover damages flowing from Defendants' illegal conduct.

## VI.     TRADE AND COMMERCE

1606.   At all times relevant to this Complaint, the activities of the Defendants in manufacturing, selling, and distributing generic drugs, including but not limited to those

429

identified herein, among others, were in the regular, continuous and substantial flow of interstate trade and commerce and have had and continue to have a substantial effect upon interstate commerce. The Defendants' activities also had and continue to have a substantial effect upon the trade and commerce within each of the Plaintiff States.

## VII.  **MARKET EFFECTS**

1607.   The acts and practices of the Defendants have had the purpose or effect, or the tendency or capacity, of unreasonably restraining competition and injuring competition by preventing competition for the numerous generic drugs identified herein and have directly resulted in an increase in consumer prices for those drugs.

1608.   By unreasonably and illegally restraining competition for the generic drugs identified herein, Defendants have deprived the Plaintiff States and their consumers of the benefits of competition that the federal and state antitrust laws, consumer protection laws and/or unfair competition statutes and related state laws are designed to promote, preserve, and protect.

1609.   As a direct and proximate result of the unlawful conduct alleged above, the Plaintiff States and consumers were not and are not able to purchase or pay reimbursements for purchases of the various generic drugs identified herein at prices determined by a market unhindered by the impact of Defendants' anticompetitive behavior. Instead, they have been and continue to be forced to pay artificially high prices. Consequently, they have suffered substantial injury in their business and property in that, *inter alia*, they have paid more and continue to pay more for the various generic drugs identified herein than they would have paid in an otherwise competitive market.

1610.   As a direct and proximate cause of the unlawful conduct alleged above, the general economies of the Plaintiff States have sustained injury and the Plaintiff States are

430

threatened with continuing injury to their business and property unless the Defendants are

enjoined from continuing their unlawful conduct.

1611.   Plaintiff States do not have an adequate remedy at law.

1612.   All conditions precedent necessary to the filing of this action have been fulfilled,

waived, or excused.

## VIII.   CAUSES OF ACTION

### COUNT ONE (BY ALL PLAINTIFF STATES AGAINST DEFENDANT SANDOZ AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1613.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth

herein.

1614.   Defendant Sandoz entered into agreements with various competitors to allocate

customers and divide markets in accordance with the principles of fair share discussed above, to

fix and raise prices, and to rig bids, for numerous generic drugs.  The details regarding these

anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject

to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Adapalene Cream |
| Alclometasone Dipropionate Cream |
| Alclometasone Dipropionate Ointment |
| Betamethasone Dipropionate Cream |
| Betamethasone Dipropionate Lotion |
| Betamethasone Valerate Cream |
| Betamethasone Valerate Lotion |
| Betamethasone Valerate Ointment |
| Bromocriptine Mesylate Tablets |
| Calcipotriene Betamethasone Dipropionate Ointment |
| Calcipotriene Solution |
| Carbamazepine ER Tablet |
| Cefpodoxime Proxetil Oral Suspension |

| |
|---|
| Cefpodoxime Proxetil Tablets |
| Ciclopirox Shampoo |
| Ciclopirox Solution |
| Clindamycin Phosphate Cream |
| Clindamycin Phosphate Gel |
| Clindamycin Phosphate Lotion |
| Clindamycin Phosphate Solution |
| Clobetasol Propionate Cream |
| Clobetasol Propionate Emollient Cream |
| Clobetasol Propionate Gel |
| Clobetasol Propionate Ointment |
| Clobetasol Propionate Solution |
| Clotrimazole Cream |
| Clotrimazole Betamethasone Dipropionate Cream |
| Clotrimazole Betamethasone Dipropionate Lotion |
| Desonide Lotion |
| Desonide Ointment |
| Desoximetasone Ointment |
| Econazole Nitrate Cream |
| Eplerenone Tablets |
| Erythromycin Base/Ethyl Alcohol Solution |
| Fluocinolone Acetonide Cream |
| Fluocinolone Acetonide Ointment |
| Fluocinonide .1% Cream |
| Fluocinonide Gel |
| Fluocinonide Ointment |
| Fluocinonide Solution |
| Fluticasone Propionate Lotion |
| Griseofulvin Microsize Tablets |
| Halobetasol Propionate Cream |
| Imiquimod Cream |
| Ketoconazole Cream |
| Latanoprost Drops |
| Lidocaine Ointment |
| Methazolamide Tablets |
| Methylphenidate HCL Tablets |
| Methylphenidate HCL ER Tablets |
| Metronidazole Cream |
| Metronidazole .75% Gel |
| Metronidazole 1% Gel |
| Metronidazole Lotion |
| Nafcillin Sodium Injectable Vials |
| Nystatin Ointment |
| Nystatin Triamcinolone Cream |

432

| |
|---|
| Nystatin Triamcinolone Ointment |
| Oxacillin Sodium Injectable Vials |
| Pioglitazone HCL Metformin HCL Tablets |
| Tacrolimus Ointment |
| Terconazole Cream |
| Triamcinolone Acetonide Cream |
| Triamcinolone Acetonide Ointment |

1615.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Sandoz and its competitors, including many of the corporate Defendants herein. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1616.   The conspiracies substantially affected and still affect interstate commerce.

1617.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1618.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Sandoz has enjoyed ill-gotten gains from the sales of these generic drugs.

1619.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the

433

corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

**COUNT TWO (BY ALL PLAINTIFF STATES AGAINST DEFENDANT TARO AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

1620.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1621.   Defendant Taro entered into agreements with various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for numerous generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Acetazolamide Tablets |
| Alclometasone Dipropionate Cream |
| Alclometasone Dipropionate Ointment |
| Ammonium Lactate Cream |
| Ammonium Lactate Lotion |
| Betamethasone Dipropionate Cream |
| Betamethasone Dipropionate Lotion |
| Betamethasone Valerate Cream |
| Carbamazepine ER Tablet |
| Clindamycin Phosphate Solution |
| Clobetasol Propionate Cream |
| Clobetasol Propionate Emollient Cream |
| Clobetasol Propionate Gel |
| Clobetasol Propionate Ointment |
| Clobetasol Propionate Solution |
| Clotrimazole 1% Cream |
| Clotrimazole Betamethasone Dipropionate Cream |
| Clotrimazole Betamethasone Dipropionate Lotion |
| Desonide Cream |
| Desonide Ointment |
| Desoximetasone Ointment |

| |
|---|
| Econazole Nitrate Cream |
| Fluocinonide .1% Cream |
| Fluocinonide Gel |
| Fluocinonide Ointment |
| Fluocinonide Solution |
| Halobetasol Propionate Cream |
| Halobetasol Propionate Ointment |
| Hydrocortisone Valerate Cream |
| Imiquimod Cream |
| Ketoconazole Cream |
| Lidocaine Ointment |
| Metronidazole .75% Gel |
| Metronidazole 1% Gel |
| Nystatin Triamcinolone Cream |
| Nystatin Triamcinolone Ointment |
| Phenytoin Sodium ER Capsules |
| Terconazole Cream |
| Triamcinolone Acetonide Paste |

1622. These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Taro and its competitors, including many of the corporate Defendants herein. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1623. The conspiracies substantially affected and still affect interstate commerce.

1624. The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1. No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1625. As a direct and proximate result of these agreements, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified

435

herein, at supra-competitive prices, and Defendant Taro has enjoyed ill-gotten gains from the sales of these generic drugs.

1626.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

**COUNT THREE (BY ALL PLAINTIFF STATES AGAINST DEFENDANT PERRIGO AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

1627.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1628.   Defendant Perrigo entered into agreements with various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for numerous generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Adapalene Cream |
| Ammonium Lactate Cream |
| Ammonium Lactate Lotion |
| Betamethasone Dipropionate Lotion |
| Bromocriptine Mesylate Tablets |
| Calcipotriene Betamethasone Dipropionate Ointment |
| Ciclopirox Cream |
| Ciclopirox Shampoo |
| Ciclopirox Solution |
| Clindamycin Phosphate Solution |

436

| |
|---|
| Desonide Cream |
| Desonide Ointment |
| Econazole Nitrate Cream |
| Erythromycin Base/Ethyl Alcohol Solution |
| Fluocinonide .1% Cream |
| Fluticasone Propionate Lotion |
| Halobetasol Propionate Cream |
| Halobetasol Propionate Ointment |
| Hydrocortisone Acetate Suppositories |
| Hydrocortisone Valerate Cream |
| Imiquimod Cream |
| Methazolamide Tablets |
| Nystatin Ointment |
| Prochlorperazine Maleate Suppositories |
| Promethazine HCL Suppositories |
| Tacrolimus Ointment |
| Triamcinolone Acetonide Cream |
| Triamcinolone Acetonide Ointment |

1629.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Perrigo and its competitors, including many of the corporate Defendants herein. These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1630.   The conspiracies substantially affected and still affect interstate commerce.

1631.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1632.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified

herein, at supra-competitive prices, and Defendant Perrigo has enjoyed ill-gotten gains from the sales of these generic drugs.

1633.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

### COUNT FOUR (BY ALL PLAINTIFF STATES AGAINST DEFENDANT G&W AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1634.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1635.   Defendant G&W entered into agreements with various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for numerous generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Betamethasone Valerate Lotion |
| Calcipotriene Solution |
| Ciclopirox Cream |
| Ciclopirox Solution |
| Ethambutol HCL Tablets |
| Fluocinolone Acetonide Cream |
| Fluocinolone Acetonide Ointment |
| Fluocinonide Gel |
| Halobetasol Propionate Cream |
| Halobetasol Propionate Ointment |

| Hydrocortisone Acetate Suppositories |
| Ketoconazole Cream |
| Metronidazole Cream |
| Metronidazole .75% Gel |
| Mometasone Furoate Cream |
| Mometasone Furoate Ointment |
| Mometasone Furoate Solution |
| Prochlorperazine Maleate Suppositories |
| Promethazine HCL Suppositories |

1636.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant G&W and its competitors, including many of the corporate Defendants herein.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1637.   The conspiracies substantially affected and still affect interstate commerce.

1638.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1639.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant G&W has enjoyed ill-gotten gains from the sales of these generic drugs.

1640.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the

439

corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

### COUNT FIVE (BY ALL PLAINTIFF STATES AGAINST DEFENDANT ACTAVIS AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1641.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1642.   Defendant Actavis entered into agreements with various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for numerous generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Ammonium Lactate Cream |
| Ammonium Lactate Lotion |
| Betamethasone Valerate Ointment |
| Ciclopirox Shampoo |
| Clotrimazole Betamethasone Dipropionate Cream |
| Desonide Lotion |
| Fluocinonide Solution |
| Methylphenidate HCL Tablets |
| Methylphenidate HCL ER Tablets |
| Metronidazole Cream |
| Metronidazole Lotion |
| Nystatin Ointment |
| Promethazine HCL Suppositories |
| Terconazole Cream |

1643.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Actavis and its competitors, including many of the corporate Defendants herein.

440

These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1644.   The conspiracies substantially affected and still affect interstate commerce.

1645.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1646.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Actavis has enjoyed ill-gotten gains from the sales of these generic drugs.

1647.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT SIX (BY ALL PLAINTIFF STATES AGAINST DEFENDANT GLENMARK AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1648.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1649.   Defendant Glenmark entered into agreements with various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for certain generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Alclometasone Dipropionate Cream |
| Alclometasone Dipropionate Ointment |
| Ciclopirox Cream |
| Desoximetasone Ointment |
| Fluocinonide .1% Cream |
| Fluticasone Propionate Lotion |
| Mometasone Furoate Cream |
| Mometasone Furoate Ointment |
| Mometasone Furoate Solution |

1650.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Glenmark and its competitors, including many of the corporate Defendants herein. These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

1651.   The conspiracies substantially affected and still affect interstate commerce.

1652.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1653.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for certain generic drugs, including those identified

442

herein, at supra-competitive prices, and Defendant Glenmark has enjoyed ill-gotten gains from the sales of these generic drugs.

1654.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT SEVEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANTS PFIZER AND GREENSTONE AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1655.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1656.   Defendants Pfizer and Greenstone entered into agreements with various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for certain generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Clindamycin Phosphate Cream |
| Clindamycin Phosphate Gel |
| Clindamycin Phosphate Lotion |
| Clindamycin Phosphate Solution |
| Eplerenone Tablets |
| Latanoprost Drops |

1657.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendants Pfizer and Greenstone and their competitors, including many of the corporate Defendants herein.  These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

1658.   The conspiracies substantially affected and still affect interstate commerce.

1659.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1660.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for certain generic drugs, including those identified herein, at supra-competitive prices, and Defendants Pfizer and Greenstone have enjoyed ill-gotten gains from the sales of these generic drugs.

1661.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

**COUNT EIGHT (BY ALL PLAINTIFF STATES AGAINST DEFENDANT AUROBINDO AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

1662.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1663.   Defendant Aurobindo entered into agreements with various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for certain generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Nafcillin Sodium Injectable Vials |
| Oxacillin Sodium Injectable Vials |
| Cefpodoxime Proxetil Oral Suspension |
| Cefpodoxime Proxetil Tablets |
| Pioglitazone HCL Metformin HCL Tablets |

1664.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Aurobindo and its competitors, including many of the corporate Defendants herein.  These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

1665.   The conspiracies substantially affected and still affect interstate commerce.

1666.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1667.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Aurobindo has enjoyed ill-gotten gains from the sales of these generic drugs.

1668.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT NINE (BY ALL PLAINTIFF STATES AGAINST DEFENDANT MYLAN AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1669.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1670.   Defendant Mylan entered into agreements with various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for certain generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| Bromocriptine Mesylate Tablets |
| --- |
| Phenytoin Sodium ER Capsules |
| Pioglitazone HCL Metformin HCL Tablets |

446

1671.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Mylan and its competitors, including many of the corporate Defendants herein.  These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

1672.   The conspiracies substantially affected and still affect interstate commerce.

1673.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1674.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Mylan has enjoyed ill-gotten gains from the sales of these generic drugs.

1675.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

**COUNT TEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANT SUN AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

1676.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1677.   Defendant Sun entered into agreements with various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for certain generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Methylphenidate HCL Tablets |
| Methylphenidate HCL ER Tablets |
| Phenytoin Sodium ER Capsules |

1678.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Sun and its competitors, including several of the corporate Defendants herein.  These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

1679.   The conspiracies substantially affected and still affect interstate commerce.

1680.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1681.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Sun has enjoyed ill-gotten gains from the sales of these generic drugs.

1682.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

### COUNT ELEVEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANT MALLINCKRODT AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1683.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1684.   Defendant Mallinckrodt entered into agreements with various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for certain drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| Methylphenidate HCL Tablets |
|---|
| Methylphenidate HCL ER Tablets |

1685.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Mallinckrodt and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

1686.   The conspiracies substantially affected and still affect interstate commerce.

1687.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1688.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Mallinckrodt has enjoyed ill-gotten gains from the sales of these generic drugs.

1689.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

## COUNT TWELVE (BY ALL PLAINTIFF STATES AGAINST DEFENDANT VALEANT AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1690.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1691.   Defendant Valeant entered into agreements with various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for certain generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Latanoprost Drops |
| Fluocinonide .1% Cream |

1692.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Valeant and its competitors, including several of the corporate Defendants herein.  These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

1693.   The conspiracies substantially affected and still affect interstate commerce.

1694.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1695.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because

451

they have had to purchase or reimburse for certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Valeant has enjoyed ill-gotten gains from the sales of these generic drugs.

1696.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

### COUNT THIRTEEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANT WOCKHARDT AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1697.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1698.   Defendant Wockhardt entered into agreements with various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for certain generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Clobetasol Propionate Solution |
| Erythromycin Base/Ethyl Alcohol Solution |

1699.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between

Defendant Wockhardt and its competitors, including several of the corporate Defendants herein. These agreements have eliminated any meaningful form of price competition in the market for certain generic drugs, including those identified herein.

1700.  The conspiracies substantially affected and still affect interstate commerce.

1701.  The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1702.  As a direct and proximate result of these agreements, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for certain generic drugs, including those identified herein, at supra-competitive prices, and Defendant Wockhardt has enjoyed ill-gotten gains from the sales of these generic drugs.

1703.  These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

### COUNT FOURTEEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANT AMNEAL AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1704.  Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1705.   Defendant Amneal entered into agreements with Defendants Taro, Mylan, and Sun to allocate and divide customers within the market for the generic drug Phenytoin Sodium ER Capsules in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for that drug.  The details regarding these anticompetitive agreements are discussed earlier in this Complaint.

1706.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Amneal and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for Phenytoin Sodium ER Capsules.

1707.   The conspiracies substantially affected and still affect interstate commerce.

1708.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1709.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Phenytoin Sodium ER Capsules at supra-competitive prices, and Defendant Amneal has enjoyed ill-gotten gains from the sales of that drug.

1710.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

**COUNT FIFTEEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANT LANNETT
AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL
LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX
PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF
SECTION 1 OF THE SHERMAN ACT**

1711.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1712.   Defendant Lannett entered into agreements with Defendant Taro to allocate and divide customers within the market for the generic drug Acetazolamide Tablets in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for that drug on multiple occasions.  The details regarding these anticompetitive agreements are discussed earlier in this Complaint.

1713.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Lannett and Defendant Taro.  These agreements have eliminated any meaningful form of price competition in the market for Acetazolamide Tablets.

1714.   The conspiracies substantially affected and still affect interstate commerce.

1715.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1716.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Acetazolamide Tablets at supra-competitive prices, and Defendant Lannett has enjoyed ill-gotten gains from the sales of that drug.

455

1717.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

**COUNT SIXTEEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANT LUPIN AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

1718.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1719.   Defendant Lupin entered into an agreement with Defendant G&W to allocate and divide customers within the market for the generic drug Ethambutol HCL Tablets in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for that drug.  The details regarding this anticompetitive agreement are discussed earlier in this Complaint.

1720.   The agreement is facially anticompetitive because it allocates customers for the marketing and sale of generic drugs, artificially raises prices, and limits competition between Defendant Lupin and Defendant G&W.  This agreement has eliminated any meaningful form of price competition in the market for Ethambutol HCL Tablets.

1721.   This conspiracy substantially affected and still affect interstate commerce.

1722.    The agreement constitutes an unreasonable restraint of trade that is *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of the agreement.

1723.    As a direct and proximate result of the agreement, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Ethambutol HCL Tablets at supra-competitive prices, and Defendant Lupin has enjoyed ill-gotten gains from the sales of this drug.

1724.    The agreement was part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

**COUNT SEVENTEEN (BY ALL PLAINTIFF STATES AGAINST DEFENDANT TELIGENT AND ALL OTHER CORPORATE DEFENDANTS UNDER JOINT AND SEVERAL LIABILITY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

1725.    Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1726.    Defendant Teligent into agreements with various competitors to allocate and divide customers within the market for the generic drug Econazole Nitrate Cream in accordance with the principles of fair share discussed above, and to fix and raise prices, and rig bids, for that drug.  The details regarding these anticompetitive agreements are discussed earlier in this Complaint.

1727.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Teligent and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for Econazole Nitrate Cream.

1728.   The conspiracies substantially affected and still affect interstate commerce.

1729.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1730.   As a direct and proximate result of these agreements, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for Econazole Nitrate Cream at supra-competitive prices, and Defendant Teligent has enjoyed ill-gotten gains from the sales of that drug.

1731.   These agreements were part of an overarching conspiracy among all of the corporate Defendants named in this Complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs, including those identified herein.  As participants in the overarching conspiracy, the corporate Defendants are jointly and severally liable for any harm caused as a result of the conspiracy.

**COUNT EIGHTEEN (BY CERTAIN PLAINTIFF STATES[15] AGAINST DEFENDANT ARA APRAHAMIAN) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

1732.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1733.   Beginning at least as early as 2012, Defendant Aprahamian took active steps to facilitate market allocation and price fixing agreements between Defendants Actavis and/or Taro and their competitors involving numerous generic drugs, as discussed herein.

1734.   Defendant Aprahamian participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Actavis and/or Taro to communicate with competitors, or tacitly approving of those communications by other Actavis and/or Taro employees about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendants Actavis and/or Taro and their competitors.

1735.   These communications resulted in agreements between Defendants Actavis and/or Taro and various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for numerous generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Acetazolamide Tablets |
| Alclometasone Dipropionate Cream |
| Alclometasone Dipropionate Ointment |
| Ammonium Lactate Cream |
| Ammonium Lactate Lotion |
| Betamethasone Dipropionate Cream |

---

[15]  All Plaintiff States join in Counts Eighteen through Twenty-Seven against the Individual Defendants except:  District of Columbia, New Hampshire, Tennessee, and Wisconsin.

| |
|---|
| Betamethasone Dipropionate Lotion |
| Betamethasone Valerate Cream |
| Betamethasone Valerate Ointment |
| Carbamazepine ER Tablet |
| Ciclopirox Shampoo |
| Clindamycin Phosphate Solution |
| Clobetasol Propionate Cream |
| Clobetasol Propionate Emollient Cream |
| Clobetasol Propionate Gel |
| Clobetasol Propionate Ointment |
| Clobetasol Propionate Solution |
| Clotrimazole 1% Cream |
| Clotrimazole Betamethasone Dipropionate Cream |
| Clotrimazole Betamethasone Dipropionate Lotion |
| Desonide Cream |
| Desonide Lotion |
| Desonide Ointment |
| Desoximetasone Ointment |
| Econazole Nitrate Cream |
| Fluocinonide .1% Cream |
| Fluocinonide Gel |
| Fluocinonide Ointment |
| Fluocinonide Solution |
| Halobetasol Propionate Cream |
| Halobetasol Propionate Ointment |
| Hydrocortisone Valerate Cream |
| Ketoconazole Cream |
| Lidocaine Ointment |
| Methylphenidate HCL Tablets |
| Methylphenidate HCL ER Tablets |
| Metronidazole 1% Gel |
| Nystatin Triamcinolone Cream |
| Nystatin Triamcinolone Ointment |
| Nystatin Ointment |
| Phenytoin Sodium ER Capsules |
| Terconazole Cream |
| Triamcinolone Acetonide Paste |

1736.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between

Defendant Actavis and/or Taro and their competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1737.   The conspiracies substantially affected and still affect interstate commerce.

1738.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1739.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Aprahamian has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1740.   As a participant in the agreements identified above, Defendant Aprahamian is jointly and severally liable for any harm caused as a result of those conspiracies.

## COUNT NINETEEN (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT MITCHELL BLASHINSKY) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1741.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1742.   Beginning at least as early as 2011, Defendant Blashinsky took active steps to facilitate market allocation and price fixing agreements between Defendants Taro and/or Glenmark and their competitors involving numerous generic drugs, as discussed herein.

1743.   Defendant Blashinsky participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Taro and/or Glenmark to communicate with

461

competitors, or tacitly approving of those communications by other Taro and/or Glenmark employees about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendants Taro and/or Glenmark and their competitors.

1744.   These communications resulted in agreements between Defendants Taro and/or Glenmark and various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for numerous generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Acetazolamide Tablets |
| Alclometasone Dipropionate Cream |
| Alclometasone Dipropionate Ointment |
| Clotrimazole Betamethasone Dipropionate Cream |
| Clotrimazole Betamethasone Dipropionate Lotion |
| Desoximetasone Ointment |
| Fluticasone Propionate Lotion |
| Metronidazole .75% Gel |

1745.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendants Taro and/or Glenmark and their competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1746.   The conspiracies substantially affected and still affect interstate commerce.

1747.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1748.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Blashinsky has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1749.   As a participant in the agreements identified above, Defendant Blashinsky is jointly and severally liable for any harm caused as a result of those conspiracies.

### COUNT TWENTY (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT DOUGLAS BOOTHE) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1750.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1751.   Beginning as early as 2012, Defendant Boothe took active steps to facilitate market allocation and price fixing agreements between Defendant Perrigo and its competitors involving numerous generic drugs, as discussed herein.

1752.   Defendant Boothe participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Perrigo to communicate with competitors, or tacitly approving of those communications by other Perrigo employees about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Perrigo and its competitors.

1753.   These communications resulted in agreements between Defendant Perrigo and various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for numerous generic drugs. The details regarding these anticompetitive agreements are discussed throughout this Complaint.

The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Adapalene Cream |
| Ammonium Lactate Cream |
| Ammonium Lactate Lotion |
| Bromocriptine Mesylate Tablets |
| Calcipotriene Betamethasone Dipropionate Ointment |
| Ciclopirox Cream |
| Ciclopirox Solution |
| Clindamycin Phosphate Solution |
| Desonide Cream |
| Desonide Ointment |
| Econazole Nitrate Cream |
| Fluticasone Propionate Lotion |
| Halobetasol Propionate Cream |
| Halobetasol Propionate Ointment |
| Hydrocortisone Acetate Suppositories |
| Hydrocortisone Valerate Cream |
| Methazolamide Tablets |
| Prochlorperazine Maleate Suppositories |
| Promethazine HCL Suppositories |
| Tacrolimus Ointment |

1754.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Perrigo and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1755.   The conspiracies substantially affected and still affect interstate commerce.

1756.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1757.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because

they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Boothe has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1758.   As a participant in the agreements identified above, Defendant Boothe is jointly and severally liable for any harm caused as a result of those conspiracies.

### COUNT TWENTY-ONE (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT JAMES GRAUSO) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1759.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1760.   Beginning at least as early as 2010, Defendant Grauso took active steps to facilitate market allocation and price fixing agreements between Defendants G&W and/or Aurobindo and their competitors involving numerous generic drugs, as discussed herein.

1761.   Defendant Grauso participated directly or indirectly in these conspiracies by communicating with competitors, directing others at G&W and/or Aurobindo to communicate with competitors, or tacitly approving of those communications by other G&W and/or Aurobindo employees about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendants G&W and/or Aurobindo and their competitors.

1762.   These communications resulted in agreements between Defendants G&W and/or Aurobindo and various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for numerous generic drugs.  The details regarding these anticompetitive agreements are discussed throughout

this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Betamethasone Valerate Lotion |
| Nafcillin Sodium Injectable Vials |
| Oxacillin Sodium Injectable Vials |
| Calcipotriene Solution |
| Cefpodoxime Proxetil Oral Suspension |
| Cefpodoxime Proxetil Tablets |
| Ciclopirox Cream |
| Fluocinolone Acetonide Cream |
| Fluocinolone Acetonide Ointment |
| Fluocinonide .1% Cream |
| Metronidazole Cream |
| Metronidazole .75% Gel |
| Metronidazole Lotion |
| Pioglitazone HCL Metformin HCL Tablets |

1763.  These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendants G&W and/or Aurobindo and their competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1764.  The conspiracies substantially affected and still affect interstate commerce.

1765.  The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1766.  As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified

herein, at supra-competitive prices, and Defendant Grauso has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1767.   As a participant in the agreements identified above, Defendant Grauso is jointly and severally liable for any harm caused as a result of those conspiracies.

## COUNT TWENTY-TWO (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT WALTER KACZMAREK) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1768.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1769.   Beginning at least as early as 2010, Defendant Kaczmarek took active steps to facilitate market allocation and price fixing agreements between Defendants Fougera and/or Mallinckrodt and their competitors involving numerous generic drugs, as discussed herein.

1770.   Defendant Kaczmarek participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Fougera and/or Mallinckrodt to communicate with competitors, or tacitly approving of those communications by other Fougera and/or Mallinckrodt employees about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendants Fougera and/or Mallinckrodt and their competitors.

1771.   These communications resulted in agreements between Defendants Fougera and/or Mallinckrodt and various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for numerous generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Adapalene Cream |
| Betamethasone Dipropionate Lotion |
| Betamethasone Valerate Lotion |
| Calcipotriene Solution |
| Clindamycin Phosphate Solution |
| Clotrimazole Betamethasone Dipropionate Cream |
| Clotrimazole Betamethasone Dipropionate Lotion |
| Erythromycin Base/Ethyl Alcohol Solution |
| Fluocinolone Acetonide Cream |
| Fluocinolone Acetonide Ointment |
| Fluocinonide Solution |
| Fluticasone Propionate Lotion |
| Imiquimod Cream |
| Lidocaine Ointment |
| Metronidazole Cream |
| Metronidazole .75% Gel |
| Metronidazole Lotion |
| Methylphenidate HCL Tablets |
| Methylphenidate HCL ER Tablets |
| Nystatin Ointment |
| Triamcinolone Acetonide Cream |
| Triamcinolone Acetonide Ointment |

1772.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendants Fougera and/or Mallinckrodt and their competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1773.   The conspiracies substantially affected and still affect interstate commerce.

1774.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1775.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because

468

they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Kaczmarek has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1776.   As a participant in the agreements identified above, Defendant Kaczmarek is jointly and severally liable for any harm caused as a result of those conspiracies.

### COUNT TWENTY-THREE (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT ARMANDO KELLUM) – HORIZONTAL CONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1777.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1778.   Beginning at least as early as 2012, Defendant Kellum took active steps to facilitate market allocation and price fixing agreements between Defendant Sandoz and its competitors involving numerous generic drugs, as discussed herein.

1779.   Defendant Kellum participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Sandoz to communicate with competitors, or tacitly approving of those communications by other Sandoz employees about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Sandoz and its competitors.

1780.   These communications resulted in agreements between Defendant Sandoz and various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for numerous generic drugs. The details regarding these anticompetitive agreements are discussed throughout this Complaint. The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

469

| |
|---|
| Adapalene Cream |
| Alclometasone Dipropionate Cream |
| Alclometasone Dipropionate Ointment |
| Betamethasone Dipropionate Cream |
| Betamethasone Dipropionate Lotion |
| Betamethasone Valerate Cream |
| Betamethasone Valerate Ointment |
| Bromocriptine Mesylate Tablets |
| Calcipotriene Betamethasone Dipropionate Ointment |
| Carbamazepine ER Tablet |
| Cefpodoxime Proxetil Oral Suspension |
| Cefpodoxime Proxetil Tablets |
| Clindamycin Phosphate Solution |
| Ciclopirox Shampoo |
| Ciclopirox Solution |
| Clindamycin Phosphate Cream |
| Clindamycin Phosphate Gel |
| Clindamycin Phosphate Lotion |
| Clindamycin Phosphate Solution |
| Clobetasol Propionate Cream |
| Clobetasol Propionate Emollient Cream |
| Clobetasol Propionate Gel |
| Clobetasol Propionate Ointment |
| Clobetasol Propionate Solution |
| Clotrimazole Cream |
| Desonide Lotion |
| Desonide Ointment |
| Desoximetasone Ointment |
| Econazole Nitrate Cream |
| Eplerenone Tablets |
| Fluocinonide .1% Cream |
| Fluocinonide Ointment |
| Fluticasone Propionate Lotion |
| Griseofulvin Microsize Tablets |
| Halobetasol Propionate Cream |
| Imiquimod Cream |
| Ketoconazole Cream |
| Latanoprost Drops |
| Lidocaine Ointment |
| Methazolamide Tablets |
| Methylphenidate HCL Tablets |
| Methylphenidate HCL ER Tablets |

| |
|---|
| Metronidazole .75% Gel |
| Metronidazole 1% Gel |
| Nafcillin Sodium Injectable Vials |
| Nystatin Triamcinolone Cream |
| Nystatin Triamcinolone Ointment |
| Oxacillin Sodium Injectable Vials |
| Pioglitazone HCL Metformin HCL Tablets |
| Tacrolimus Ointment |
| Terconazole Cream |

1781.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Sandoz and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1782.   The conspiracies substantially affected and still affect interstate commerce.

1783.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1784.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Kellum has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1785.   As a participant in the agreements identified above, Defendant Kellum is jointly and severally liable for any harm caused as a result of those conspiracies.

471

**COUNT TWENTY-FOUR (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT KURT ORLOFSKI) – HORIZONTAL ONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

1786.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1787.   Beginning at least as early as 2010, Defendant Orlofski took active steps to facilitate market allocation and price fixing agreements between Defendant G&W and its competitors involving numerous generic drugs, as discussed herein.

1788.   Defendant Orlofski participated directly or indirectly in these conspiracies by communicating with competitors, directing others at G&W to communicate with competitors, or tacitly approving of those communications by other G&W employees about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant G&W and its competitors.

1789.   These communications resulted in agreements between Defendant G&W and various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for numerous generic drugs. The details regarding these anticompetitive agreements are discussed throughout this Complaint. The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Betamethasone Valerate Lotion |
| Calcipotriene Solution |
| Ciclopirox Cream |
| Ciclopirox Solution |
| Ethambutol HCL Tablets |
| Fluocinolone Acetonide Cream |
| Fluocinolone Acetonide Ointment |
| Fluocinonide Gel |
| Halobetasol Propionate Cream |

| |
|---|
| Halobetasol Propionate Ointment |
| Hydrocortisone Acetate Suppositories |
| Ketoconazole Cream |
| Metronidazole Cream |
| Metronidazole .75% Gel |
| Mometasone Furoate Cream |
| Mometasone Furoate Ointment |
| Mometasone Furoate Solution |
| Prochlorperazine Maleate Suppositories |
| Promethazine HCL Suppositories |

1790.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant G&W and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1791.   The conspiracies substantially affected and still affect interstate commerce.

1792.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1793.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Orlofski has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1794.   As a participant in the agreements identified above, Defendant Orlofski is jointly and severally liable for any harm caused as a result of those conspiracies.

**COUNT TWENTY-FIVE (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT MICHAEL PERFETTO) – HORIZONTAL ONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

1795.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1796.   Beginning at least as early as 2011, Defendant Perfetto took active steps to facilitate market allocation and price fixing agreements between Defendants Actavis and/or Taro and their competitors involving numerous generic drugs, as discussed herein.

1797.   Defendant Perfetto participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Actavis and/or Taro to communicate with competitors, or tacitly approving of those communications by other Actavis and/or Taro employees about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendants Actavis and/or Taro and their competitors.

1798.   These communications resulted in agreements between Defendants Actavis and/or Taro and various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for numerous generic drugs.  The details regarding these anticompetitive agreements are discussed throughout this Complaint.  The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Acetazolamide Tablets |
| Alclometasone Dipropionate Cream |
| Alclometasone Dipropionate Ointment |
| Ammonium Lactate Cream |
| Ammonium Lactate Lotion |
| Betamethasone Dipropionate Cream |
| Betamethasone Dipropionate Lotion |
| Betamethasone Valerate Cream |
| Carbamazepine ER Tablet |

| |
|---|
| Clindamycin Phosphate Solution |
| Clobetasol Propionate Cream |
| Clobetasol Propionate Emollient Cream |
| Clobetasol Propionate Gel |
| Clobetasol Propionate Ointment |
| Clobetasol Propionate Solution |
| Clotrimazole 1% Cream |
| Clotrimazole Betamethasone Dipropionate Cream |
| Desonide Cream |
| Desonide Ointment |
| Desoximetasone Ointment |
| Econazole Nitrate Cream |
| Fluocinonide .1% Cream |
| Fluocinonide Gel |
| Fluocinonide Ointment |
| Fluocinonide Solution |
| Halobetasol Propionate Cream |
| Halobetasol Propionate Ointment |
| Hydrocortisone Valerate Cream |
| Ketoconazole Cream |
| Lidocaine Ointment |
| Methylphenidate HCL Tablets |
| Methylphenidate HCL ER Tablets |
| Metronidazole Cream |
| Metronidazole 1% Gel |
| Metronidazole Lotion |
| Nystatin Ointment |
| Nystatin Triamcinolone Cream |
| Nystatin Triamcinolone Ointment |
| Phenytoin Sodium ER Capsules |
| Terconazole Cream |
| Triamcinolone Acetonide Paste |

1799.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendants Actavis and/or Taro and their competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1800.   The conspiracies substantially affected and still affect interstate commerce.

475

1801.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1802.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Perfetto has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1803.   As a participant in the agreements identified above, Defendant Perfetto is jointly and severally liable for any harm caused as a result of those conspiracies.

### COUNT TWENTY-SIX (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT ERIKA VOGEL-BAYLOR) – HORIZONTAL ONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1804.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1805.   Beginning as early as 2011, Defendant Vogel-Baylor took active steps to facilitate market allocation and price fixing agreements between Defendant G&W and its competitors involving numerous generic drugs, as discussed herein.

1806.   Defendant Vogel-Baylor participated directly or indirectly in these conspiracies by communicating with competitors, directing others at G&W to communicate with competitors, or tacitly approving of those communications by other G&W employees about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant G&W and its competitors.

1807.   These communications resulted in agreements between Defendant G&W and various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for numerous generic drugs. The details regarding these anticompetitive agreements are discussed throughout this Complaint. The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Betamethasone Valerate Lotion |
| Calcipotriene Solution |
| Ciclopirox Cream |
| Ciclopirox Solution |
| Ethambutol HCL Tablets |
| Fluocinolone Acetonide Cream |
| Fluocinolone Acetonide Ointment |
| Fluocinonide Gel |
| Halobetasol Propionate Cream |
| Halobetasol Propionate Ointment |
| Hydrocortisone Acetate Suppositories |
| Ketoconazole Cream |
| Metronidazole .75% Gel |
| Mometasone Furoate Cream |
| Mometasone Furoate Ointment |
| Mometasone Furoate Solution |
| Prochlorperazine Maleate Suppositories |
| Promethazine HCL Suppositories |

1808.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant G&W and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1809.   The conspiracies substantially affected and still affect interstate commerce.

1810.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1811.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Vogel-Baylor has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1812.   As a participant in the agreements identified above, Defendant Vogel-Baylor is jointly and severally liable for any harm caused as a result of those conspiracies.

### COUNT TWENTY-SEVEN (BY CERTAIN PLAINTIFF STATES AGAINST DEFENDANT JOHN WESOLOWSKI) – HORIZONTAL ONSPIRACY TO ALLOCATE MARKETS AND FIX PRICES FOR MULTIPLE GENERIC DRUGS IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT

1813.   Plaintiff States repeat and re-allege every preceding allegation as if fully set forth herein.

1814.   Beginning at least as early as 2010, Defendant Wesolowski took active steps to facilitate market allocation and price fixing agreements between Defendant Perrigo and its competitors involving numerous generic drugs, as discussed herein.

1815.   Defendant Wesolowski participated directly or indirectly in these conspiracies by communicating with competitors, directing others at Perrigo to communicate with competitors, or tacitly approving of those communications by other Perrigo employees about market entry, loss of exclusivity, price increases, supply disruptions, and other significant markets events affecting Defendant Perrigo and its competitors.

478

1816.   These communications resulted in agreements between Defendant Perrigo and various competitors to allocate customers and divide markets in accordance with the principles of fair share discussed above, to fix and raise prices, and to rig bids, for numerous generic drugs. The details regarding these anticompetitive agreements are discussed throughout this Complaint. The generic drugs subject to these market allocation and price-fixing agreements include at least the following:

| |
|---|
| Adapalene Cream |
| Ammonium Lactate Cream |
| Ammonium Lactate Lotion |
| Betamethasone Dipropionate Lotion |
| Bromocriptine Mesylate Tablets |
| Calcipotriene Betamethasone Dipropionate Ointment |
| Ciclopirox Cream |
| Ciclopirox Shampoo |
| Ciclopirox Solution |
| Clindamycin Phosphate Solution |
| Desonide Cream |
| Desonide Ointment |
| Econazole Nitrate Cream |
| Erythromycin Base/Ethyl Alcohol Solution |
| Fluocinonide .1% Cream |
| Fluticasone Propionate Lotion |
| Halobetasol Propionate Cream |
| Halobetasol Propionate Ointment |
| Hydrocortisone Acetate Suppositories |
| Hydrocortisone Valerate Cream |
| Imiquimod Cream |
| Methazolamide Tablets |
| Nystatin Ointment |
| Prochlorperazine Maleate Suppositories |
| Promethazine HCL Suppositories |
| Tacrolimus Ointment |
| Triamcinolone Acetonide Cream |
| Triamcinolone Acetonide Ointment |

1817.   These agreements are facially anticompetitive because they allocate customers for the marketing and sale of generic drugs, artificially raise prices, and limit competition between Defendant Perrigo and its competitors.  These agreements have eliminated any meaningful form of price competition in the market for numerous generic drugs, including those identified herein.

1818.   The conspiracies substantially affected and still affect interstate commerce.

1819.   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  No elaborate analysis is required to demonstrate the anticompetitive character of these agreements.

1820.   As a direct and proximate result of this ongoing conspiracy, Plaintiff States, governmental entities, and/or consumers have been injured in their business or property because they have had to purchase or reimburse for numerous generic drugs, including those identified herein, at supra-competitive prices, and Defendant Wesolowski has personally enjoyed ill-gotten gains from the sales of these generic drugs.

1821.   As a participant in the agreements identified above, Defendant Wesolowski is jointly and severally liable for any harm caused as a result of those conspiracies.

## COUNT TWENTY-EIGHT – SUPPLEMENTAL STATE LAW CLAIMS

### Connecticut

1822.   Plaintiff State of Connecticut repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1823.   Defendants' actions as alleged herein violate the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-26 and 35-28, in that they have the purpose and/or effect of unreasonably restraining trade and commerce within the State of Connecticut and elsewhere.

480

1824.   Defendants' actions as alleged herein have damaged, directly and indirectly, the prosperity, welfare, and general economy of the State of Connecticut and the economic well being of a substantial portion of the People of the State of Connecticut and its citizens and businesses at large.  Plaintiff State of Connecticut seeks recovery of such damages as parens patriae on behalf of the State of Connecticut and the People of the State of Connecticut pursuant to Conn. Gen. Stat. § 35-32(c)(2).

1825.   Defendants' acts and practices as alleged herein constitute unfair methods of competition in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b.

1826.   Plaintiff State of Connecticut seeks injunctive relief pursuant to Conn. Gen. Stat. § 35-34, civil penalties pursuant to Conn. Gen. Stat. § 35-38 for each and every violation of the Connecticut Antitrust Act, civil penalties pursuant to Conn. Gen. Stat. § 42-110o of $5,000 for each and every willful violation of the Connecticut Unfair Trade Practices Act, an order pursuant to Conn. Gen. Stat. § 42-110m requiring Defendants to submit to an accounting to determine the amount of improper compensation paid to them as a result of the allegations in the Complaint, disgorgement of all revenues, profits and gains achieved in whole or in part through the unfair methods of competition complained of herein, pursuant to Conn. Gen. Stat. § 42-110m, reasonable attorney's fees pursuant to Conn. Gen. Stat. § 42-110m, and such other and further relief as this Court deems just and equitable.

### Alabama

1827.   Plaintiff State of Alabama repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1828.   The acts and practices by Defendants constitute unconscionable acts in violation of the Alabama Deceptive Trade Practices Act, Code of Alabama, 1975, § 8-19-5(27) for which the State of Alabama is entitled to relief.

### Alaska

1829.   Plaintiff State of Alaska repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1830.   The aforementioned practices by Defendants are in violation of the Alaska Restraint of Trade Act, AS 45.50.562 et seq., and these violations had impacts within the State of Alaska and have substantially affected the people of Alaska.  Specifically, the defendants conspired to allocate market share and to fix and raise prices of generic pharmaceuticals resulting in a restraint of trade or commerce. Plaintiff State of Alaska is entitled to relief for these violations under AS 45.50.576-.580.

1831.   The aforementioned practices by Defendants are in violation of the Alaska Unfair Trade Practices and Consumer Protection Act, AS 45.50.471(b)(11) and (b)(12), and these violations had impacts within the State of Alaska and have substantially affected the people of Alaska. Specifically, the defendants' conduct in allocating market share and in fixing and raising prices, as described in the preceding paragraphs, deceived and damaged Alaskans by causing them to pay increased prices for generic pharmaceuticals.  Further, the defendants deceived and defrauded Alaskans and omitted a material fact, namely their anti-competitive conduct, when selling their product to wholesalers and pharmacies knowing this would increase the cost to consumers. Plaintiff State of Alaska is entitled to relief for these violations under AS 45.50.501, .537, and .551.

**Arizona**

1832.   Plaintiff State of Arizona repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1833.   Defendants' actions as alleged herein violate the Arizona State Uniform Antitrust Act, Ariz. Rev. Stat. § 44-1401, et seq.

1834.   Plaintiff State of Arizona brings this action pursuant to A.R.S. §§ 44-1407 and 1408, and seeks relief, including but not limited to injunctive relief, civil penalties, other equitable relief (including but not limited to disgorgement), fees and costs, and such other relief as this Court deems just and equitable.

1835.   Defendants engaged in deception, deceptive or unfair acts or practices, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of generic drugs in violation of the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521–44-1531, including but not limited to:

a.   Defendants engaged in deceptive and unfair acts and practices by omitting from their customers and from end-users the fact that Defendants were engaged in an overarching conspiracy to improperly allocate the markets for generic drugs amongst competitors and maintain anti-competitively high prices for generic drugs.

b.   Defendants engaged in deceptive and unfair acts and practices by misrepresenting to their customers and other market participants the reasons for their price increases and refusals to submit bids to supply generic drugs, by attributing these actions to supply issues, among other things, instead of to their unlawful

agreements with competitors to maintain their "fair share" of the market or inflate prices.

1836.   The unfair acts and practices alleged in the preceding paragraphs caused or were likely to cause substantial injury to consumers that was not reasonably avoidable by consumers and was not outweighed by countervailing benefits to consumers or to competition.

1837.   Defendants' violations of the Arizona Consumer Fraud Act were willful, in that they knew or should have known that their conduct was of the nature prohibited by A.R.S. §44-1522.

1838.   Plaintiff State of Arizona brings this action pursuant to A.R.S. §§ 44-1528 and 1531, and seeks relief, including but not limited to injunctive relief, restitution, disgorgement and other equitable relief, civil penalties, fees and costs, and such other relief as this Court deems just and equitable.

## Arkansas

1839.   Plaintiff State of Arkansas repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1840.   Defendants' actions alleged herein violate, and Plaintiff State of Arkansas is entitled to relief under, The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 et seq., the Unfair Practices Act, Ark. Code Ann. § 4-75-201 et seq., Monopolies Generally, Ark. Code Ann. § 4-75-301 et seq., and the common law of Arkansas.

1841.   Plaintiff State of Arkansas seeks relief and is entitled to, maximum civil penalties allowed by law, injunctive relief, equitable relief, attorney's fees, costs, investigative expenses, expert witness expenses, and such other relief as this Court deems appropriate.

**Colorado**

1842.   Plaintiff State of Colorado repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1843.   Defendants violated the Colorado Antitrust Act of 1992, § 6-4-101, et seq., Colo. Rev. Stat. when they conspired to rig bids and unreasonably restrain trade and commerce by allocating markets and fixing generic drug prices.

1844.   Defendants violated the Colorado Antitrust Act:

    a.   Each time they sold a generic drug; and

    b.   Each time they rigged a bid.

1845.   Defendants' acts and practices constitute *per se* violations of the Colorado Antitrust Act.

1846.   Plaintiff State of Colorado seeks relief under the Colorado Antitrust Act on behalf of itself and its agencies, pursuant to § 6-4-111(1)-(2), Colo. Rev. Stat.

1847.   Defendants also violated the Colorado Consumer Protection Act, § 6-1-101 et seq., Colo. Rev. Stat.

    a.   In the course of their business, Defendants made false and misleading statements as to the reasons for their price increases and why they could not submit bids for drugs. Defendants also made false and misleading statements about the absence of competition in markets for generic drugs. The Defendants deceptively misrepresented to Plaintiff State of Colorado, its agencies, and its consumers that Defendants' pricing of generic drugs that were sold, distributed, and obtained in Colorado was competitive and fair.

b. In the course of their business, Defendants failed to disclose material facts in the sale of generic drugs, including but not limited to that they were engaged in an overarching conspiracy, and individual drug conspiracies, to allocate markets for, fix prices of, and rig bids of generic drugs to increase and maintain anticompetitive prices.

1848. Defendants' acts and practices constitute deceptive trade practices and violate § 6-1-105(1), including but not limited to § 6-1-105(1)(l), (u), and (kkk).

1849. Defendants violated the Colorado Consumer Protection Act:

a. Each time Defendants provided false or misleading statements about price increases, why they could not submit bids, or the absence of competition in generic drugs; and

b. Each time Defendants failed to disclose material facts in the sale of generic drugs.

1850. Plaintiff State of Colorado seeks relief under the Colorado Consumer Protection Act on behalf of itself, its agencies, and its consumers pursuant to § 6-1-110(1), Colo. Rev. Stat.

1851. Plaintiff State of Colorado is entitled to all legal and equitable relief available under the Colorado Antitrust Act of 1992, § 6-4-101, et seq., Colo. Rev. Stat. and the Colorado Consumer Protection Act, § 6-1-101 et seq., Colo. Rev. Stat., including, but not limited to, equitable relief, civil penalties, restitution, disgorgement, damages, attorneys' fees, costs, expenses, and such other and further relief as this Court deems just and equitable.

## **Delaware**

1852. Plaintiff State of Delaware repeats and re-alleges each and every preceding allegation as if fully set forth herein.

486

1853.   The aforementioned practices by defendants constitute violations of Section 2103 of the Delaware Antitrust Act, 6 Del. C. § 2101, et seq.

1854.   Plaintiff State of Delaware through the Attorney General brings this action pursuant to Sections 2105 and 2107, and seeks civil penalties and equitable relief pursuant to Section 2107 of the Delaware Antitrust Act, 6 Del. C. § 2101, et seq.

## District of Columbia

1855.   Plaintiff District of Columbia, through its Attorney General, repeats and realleges each and every preceding allegation as if fully set forth herein.

1856.   The aforementioned practices by Defendants were in violation of the District of Columbia Antitrust Act, D.C. Code § 28-4502.

1857.   Plaintiff District of Columbia has been and continues to be injured by Defendants' actions. The District is entitled to all available relief for these violations pursuant to D.C. Code §§ 28-4507 and 28-4509, including injunctive relief, damages, restitution, disgorgement, costs, attorney's fees, and any other appropriate injunctive and equitable relief.

## Florida

1858.   The State of Florida repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1859.   This is an action that alleges a violation of the Florida Antitrust Act, Section 542.18, and the Florida Deceptive and Unfair Trade Practices Act, Section 501.201, et seq.  The State of Florida is entitled to relief, including, but not limited to, damages, disgorgement, civil penalties, equitable relief, injunctive relief, attorneys' fees and costs resulting from the Defendants' conduct as stated above, for all purchases of pharmaceuticals by the State of Florida and its government entities and municipalities, Florida businesses, and individual consumers.

1860.  Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") purchases pharmaceuticals directly from Defendants and/or has an assignment of antitrust claims from Cardinal Health, Inc. ("Cardinal").  The State of Florida purchases generic drugs from MMCAP and has a similar assignment from MMCAP for any claims MMCAP may have for violations of the antitrust laws.  As a result of these assignments, any claims for violations of federal and/or state antitrust laws that MMCAP and/or Cardinal may have had have been assigned to the State of Florida when the claims relate to purchases by the State of Florida.

1861.  Defendants knowingly – that is, voluntarily and intentionally – entered into a continuing agreement, understanding, and conspiracy to raise, fix, maintain, and/or stabilize the prices charged for pharmaceuticals during the Relevant Period, continuing through the filing of this Complaint.

1862.  Defendants directly and indirectly sold pharmaceuticals to the State of Florida and its government entities and municipalities, Florida businesses, and individual consumers.

1863.  The State of Florida and its government entities and municipalities, and Florida individual consumers have been injured and will continue to be injured by paying more for pharmaceuticals purchased directly and/or indirectly from the Defendants and their co-conspirators than they would have paid in the absence of the conspiracy.

1864.  As a direct and proximate result of the Defendants' conduct, the State of Florida and its government entities and municipalities, and Florida individual consumers have been harmed and will continue to be harmed by paying supra-competitive prices for pharmaceuticals that they would not had to pay in the absence of the Defendants' conduct as alleged herein.

1865.   The sale of pharmaceuticals in the State of Florida involves trade or commerce within the meaning of the Florida Antitrust Act and the Florida Deceptive and Unfair Trade Practices Act.

1866.   Defendants' combination, conspiracy, acts, and practices, or the effects thereof, are continuing and will continue and are likely to recur unless permanently restrained and enjoined.

1867.   The combination, conspiracy, acts, and practices alleged herein constitute unfair methods of competition in violation of the Florida Deceptive and Unfair Trade Practices Act, 501. 201, et seq, Florida Statutes.

1868.   Further, Defendants' actions offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to Florida governmental entities, to municipalities in the State of Florida, and to consumers in the State of Florida in violation of Section 501.204, Florida Statutes.

## Guam

1869.   Plaintiff Guam, a Territory of the United States, repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1870.   The aforementioned practices by Defendants violate Guam's Antitrust Law, codified as Title 9 Chapter 69 §§ 69.10 through 69.70 of the Guam Code Annotated. In addition, the practices by Defendants violate Guam's Deceptive Acts and Prohibited Practices, codified as Title 5 Chapter 32, Article 2 §§ 32201 through 32203 of the Guam Code Annotated.

1871.   Guam is entitled to equitable relief, civil penalties, and any other relief available under the aforementioned statutes and all other applicable laws.

1872.   Guam also seeks attorney fees and costs incurred in the pursuit of this action.

489

## Hawaii

1873.   Plaintiff State of Hawaii repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1874.   The aforementioned practices by Defendants negatively affected competition by unlawfully restraining trade or commerce, or having the purpose or effect of fixing, controlling or maintaining prices, allocating or dividing customers or markets, fixing or controlling prices or bidding for public or private contracts, or otherwise thwarting genuine competition in generic drug markets, in violation of Chapter 480, Hawaii Revised Statutes.

1875.   Section 480-2, Hawaii Revised Statutes, provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

1876.   The aforementioned practices by Defendants were and are deceptive acts or practices because they involve representations, omissions, and/or practices that were and are material, and likely to mislead entities acting reasonably under the circumstances.

1877.   The aforementioned practices by Defendants:  were and are unfair because they offend public policy as established by statutes, the common law, or otherwise; were and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumer and entities affected by Defendants' practices; and were and are unfair competitive conduct.

1878.   The aforementioned practices are unfair or deceptive acts or practices and unfair methods of competition in violation of section 480-2, Hawaii Revised Statutes.

1879.   Plaintiff State of Hawaii is entitled to:  injunctive relief pursuant to section 480-15, Hawaii Revised Statutes, and other equitable relief (including but not limited to restitution and disgorgement of Defendants' ill-gotten gains); civil penalties pursuant to section 480-3.1,

490

Hawaii Revised Statutes; threefold the actual damages sustained by government agencies; as parens patriae on behalf of natural persons residing in the State for threefold damages for injuries sustained by such natural persons to their property by reason of any violation of chapter 480; and reasonable attorney fees and costs.

### Idaho

1880.   Plaintiff State of Idaho repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1881.   Defendants' actions as alleged herein violate the Idaho Competition Act, Idaho Code § 48-104, in that they have the purpose and/or the effect of unreasonably restraining Idaho commerce, as that term is defined by Idaho Code § 48-103(1).

1882.   For each and every violation alleged herein, Plaintiff State of Idaho, on behalf of itself, its state agencies, and persons residing in Idaho, is entitled to all legal and equitable relief available under the Idaho Competition Act, Idaho Code §§ 48-108, 48-112, including, but not limited to, injunctive relief, actual damages or restitution, civil penalties, disgorgement, expenses, costs, attorneys' fees, and such other and further relief as this Court deems just and equitable.

1883.   Defendants' actions constitute per se violations of Idaho Code § 48-104.  Pursuant to Idaho Code § 48-108(2), Plaintiff State of Idaho, as parens patriae on behalf of persons residing in Idaho, is entitled to treble damages for the per se violations of Idaho Code § 48-104.

### Illinois

1884.   Plaintiff State of Illinois repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1885.   Defendants' actions as alleged herein violate sections 3(1), 3(2) and 3(3) of the Illinois Antitrust Act, 740 ILCS 10/1 et seq.

1886.   Plaintiff State of Illinois, under its antitrust enforcement authority in 740 ILCS 10/7, seeks relief, including but not limited to damages, for Illinois consumers and Illinois state entities that paid for one or more of the drugs identified in this Complaint during the relevant period and thereby paid more than they would have paid but for Defendants' unlawful conduct. Plaintiff State of Illinois also seeks, and is entitled to, injunctive relief, civil penalties, other equitable relief (including but not limited to disgorgement), fees and costs, and any other remedy available for these violations under sections 7(1), 7(2), and 7(4) of the Illinois Antitrust Act.

### Indiana

1887.   Plaintiff State of Indiana repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1888.   The aforementioned practices are a violation of Chapter Two of the Indiana Antitrust Act, Ind. Code § 24-1-2-1, and the Plaintiff State of Indiana seeks recovery pursuant to I.C. § 24-1-2-5.

1889.   The aforementioned practices are a violation of Chapter One of the Indiana Antitrust Act, I.C. § 24-1-1-1, and the Plaintiff State of Indiana seeks recovery pursuant to I.C. § 24-1-1-2.

1890.   The aforementioned practices are unfair and/or deceptive acts by a supplier in the context of a consumer transaction in violation of the Indiana Deceptive Consumer Sales Act, I.C. § 24-5-0.5-3.

1891.   Plaintiff State of Indiana under its authority in I.C. § 24-1-2-5, I.C. § 24-1-1-2, and I.C. § 24-5-0.5-4 seeks relief, including but not limited to damages, for Indiana consumers

492

and Indiana state entities that paid for one or more of the drugs identified in this Complaint during the relevant period and thereby paid more than they would have paid but for Defendants' unlawful conduct.  Plaintiff State of Indiana also seeks, and is entitled to, civil penalties, injunctive relief, other equitable relief (including but not limited to disgorgement), fees and costs and any other remedy available for these violations under the Indiana Antitrust Act and the Indiana Deceptive Consumer Sales Act.

## Iowa

1892.   Plaintiff State of Iowa repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1893.   The alleged practices by Defendants were in violation of the Iowa Competition Law, Iowa Code Chapter 553.

1894.   Iowa seeks an injunction and divestiture of profits resulting from these practices pursuant to Iowa Code § 553.12, and civil penalties pursuant to Iowa Code § 553.13.

1895.   Defendants' acts and practices as alleged herein also constitute deceptive and/or unfair practices in violation of the Iowa Consumer Fraud Act, Iowa Code § 714.16(2)(a).

1896.   Pursuant to Iowa Code § 714.16(7), the State of Iowa seeks disgorgement, restitution, and other equitable relief for these violations.  In addition, pursuant to Iowa Code § 714.16(11), the Attorney General seeks reasonable fees and costs for the investigation and litigation.

## Kansas

1897.   Plaintiff State of Kansas repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1898.   The aforementioned practices by Defendants were and are in violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101 et seq.

1899.   The State of Kansas seeks relief on behalf of itself and its agencies and as parens patriae on behalf of its residents, pursuant to Kan. Stat. Ann. §§ 50-103 and 50-162.

1900.   Kansas governmental entities and residents are entitled to money damages regardless of whether they purchased one or more of the drugs identified in this Complaint directly or indirectly from Defendants, pursuant to Kan. Stat. Ann. § 50-161(b).

1901.   The State of Kansas is entitled to injunctive relief, civil penalties, restitution, treble damages, reasonable expenses and investigative fees, reasonable attorney fees and costs, and any other appropriate relief the court so orders, pursuant to Kan. Stat. Ann. §§ 50-103, 50-160, and 50-161.

## Kentucky

1902.   Plaintiff Commonwealth of Kentucky repeats and re-alleges each and every preceding allegation as if fully set forth herein.  The aforementioned acts or practices by Defendants violate the Consumer Protection Act, Ky. Rev.Stat.Ann.§ 367.110 et seq. ("KCPA")

1903.   Defendants, by distributing, marketing and selling generic pharmaceutical drugs to consumers through wholesalers and distributors, pharmacy and supermarket chains, and other resellers of generic pharmaceutical drugs and otherwise engaging in the conduct described herein with respect to the generic pharmaceutical drugs identified herein, are engaging in trade or commerce that harmed the Commonwealth and consumers within the meaning of Ky.Stat.Ann. §367.170.

1904.   Defendants impaired consumer choice in each generic drug market identified herein in what should have been a freely competitive marketplace for the generic pharmaceutical

drugs identified herein. Defendants have deprived consumers of being able to meaningfully choose from the options a competitive market would have provided.

1905.   The Defendants agreed to, and did in fact, act in restraint of trade or commerce in each generic drug market identified herein, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which the generic pharmaceutical drugs identified herein were sold, distributed or obtained. Such conduct has been and is unfair under the KCPA.

1906.   Defendants have misrepresented the absence of competition in each generic drug market identified herein. By misrepresenting and/or omitting material facts concerning the absence of competition in each generic drug market identified herein, the Defendants misled the Commonwealth that prices for the numerous generic pharmaceutical drugs identified herein were competitive and fair. Defendants' conduct has been misleading and/or had a tendency to deceive.

1907.   The Defendants' misrepresentations and omission of material facts had the following effects:  (1) generic drug price competition was restrained, suppressed and eliminated; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels; (3) the Commonwealth was deprived of free and open markets; and (4) the Commonwealth and consumers paid supra-competitive, artificially inflated prices for the generic pharmaceutical drugs identified herein. The Defendants' misrepresentations and omissions of material facts have caused Commonwealth harm in paying more for generic pharmaceutical drugs identified herein.

1908.   Defendants violated the KCPA:

      a.      Each time Defendants agreed to allocate the market for specific drugs in the generic pharmaceutical drug market as set forth above;

b.      Each time Defendants agreed to fix prices on the specified drugs in the specified drug markets as set forth above;

c.      Each time a Defendant failed to disclose the existence of a market allocation agreement and/or a price-fixing agreement involving any of the numerous generic pharmaceutical drugs identified herein;

d.      Each time a Defendant submitted false or misleading cover bids and/or offers to their customers and wholesalers;

e.      Each time a Defendant provided false or misleading statements to prospective customers related to supply capacity or reasons for bidding or not bidding;

f.      Each time a request for reimbursement was made to the Commonwealth for any of the numerous generic pharmaceutical drugs identified herein; and

g.      Each time the Commonwealth or its consumers paid an artificially inflated price for any of the numerous generic pharmaceutical drugs identified herein the Defendants' distributed, marketed or sold.

1909.   The above described conduct has been and is willful within the meaning of Ky.Stat.Ann. §367.990.

1910.   The Commonwealth states that the public interest is served by seeking a permanent injunction to restrain the acts and practices described herein. The Commonwealth and its citizens will continue to be harmed unless the acts and practices complained of herein are permanently enjoined pursuant to Ky.Stat.Ann. §367.190. Further, the Commonwealth seeks restitution to the Commonwealth and/or disgorgement pursuant to Ky.Stat.Ann.§§ 367.190 -.200.

496

The Commonwealth seeks a civil penalty of up to $2,000 for each such willful violation, or $10,000 for each such violation directed at a person over 60 pursuant to Ky.Stat.Ann.§ 367.990.

### *Unjust Enrichment*

1911.   Defendants have been unjustly enriched as a result of the conduct set forth herein. The Commonwealth and consumers were purchasers, reimbursers and/or end-payors of Defendants' generic pharmaceutical drugs identified herein and have paid, at their expense, amounts far in excess of the competitive prices for such drugs that would have prevailed in a competitive and fair market.

1912.   For those customers that purchase directly or indirectly from Defendants at artificially inflated and supra-competitive prices, Defendants have increased prices above what would have prevailed in a competitive and fair market; thereby, directly benefiting Defendants in the form of increased revenues.

1913.   Defendants knew of, and appreciated and retained the benefits of Commonwealth and consumers' purchases of any of the Defendants' generic pharmaceutical drugs identified herein at amounts far in excess of the competitive price.

1914.   Based on Defendants' conduct set forth therein, it would be inequitable and unjust for Defendants to retain such benefits without payment of value. Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received resulting from the purchase of any of the generic pharmaceutical drugs identified herein by the Commonwealth. The Commonwealth therefore seeks to recover the amounts that unjustly enriched the Defendants.  The Commonwealth is entitled to equitable relief in the form of an injunction and disgorgement, and any other relief the Court deems appropriate.

497

**Louisiana**

1915.   Plaintiff State of Louisiana repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1916.   The practices of Defendants described herein are in violation of the Louisiana Monopolies Act, LSA-R.S. 51:121 et seq., and the Louisiana Unfair Trade Practices Act, LSA-R.S. 51:1401 et. seq.

1917.   Plaintiff State of Louisiana is entitled to injunctive relief and civil penalties under LSA-R.S. 51:1407 as well as disgorgement and any other equitable relief that the court deems proper under LSA-R.S. 51:1408.

**Maine**

1918.      Plaintiff State of Maine repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1919.      The aforementioned practices by Defendants are in violation of the Maine Monopolies and Profiteering Law, 10 M.R.S.A §§ 1101 and 1102, and Plaintiff State of Maine is entitled to all available relief for these violations under 10 M.R.S.A. § 1104, including, without limitation, treble damages for Maine governmental and consumer purchasers, civil penalties, injunctive relief, attorney's fees, investigative and litigation costs, and any other appropriate injunctive and equitable relief.

**Maryland**

1920.   Plaintiff State of Maryland repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1921.  The aforementioned practices by Defendants were and are in violation of the Maryland Antitrust Act, Md. Com. Law Code Ann. §§ 11-201 et seq.  These violations substantially affect the people of Maryland and have impacts within the State of Maryland.

1922.  Plaintiff State of Maryland brings this action against Defendants in the following capacities:

> a.  Pursuant to Md. Com. Law Code Ann. § 11-209(a) in its sovereign capacity for injunctive relief, civil penalties, restitution, disgorgement and all other available equitable remedies;
>
> b.  Pursuant to Md. Com Law Code Ann. § 11-209(b)(5) as parens patriae on behalf of persons residing in Maryland.  These persons are entitled to three times the amount of money damages sustained regardless of whether they have purchased generic pharmaceuticals directly or indirectly from Defendants.  Md. Health Gen. Code Ann. § 21-1114.

1923.  Plaintiff State of Maryland also seeks, pursuant to Md. Com. Law Code Ann. § 11-209(b), reimbursement of reasonable attorney's fees, expert fees and costs.

### **Massachusetts**

1924.  Plaintiff Commonwealth of Massachusetts repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1925.  The aforementioned practices by Defendants, including but not limited to agreements in restraint of trade and/or attempted agreements in restraint of trade, constitute unfair methods of competition and/or unfair or deceptive acts or practices in trade or commerce in violation of the Massachusetts Consumer Protection Act, M.G.L c. 93A, § 2 et seq.

1926.   Defendants knew or should have known that their conduct violated the Massachusetts Consumer Protection Act, M.G.L c. 93A, § 2 et seq.

1927.   Plaintiff Commonwealth of Massachusetts is entitled to relief under M.G.L. c. 93A, § 4, including, without limitation, damages and restitution to Massachusetts consumers and Massachusetts governmental purchasers; civil penalties for each violation committed by the Defendants; injunctive relief and other equitable relief including, without limitation, disgorgement; fees and costs including, without limitation, costs of investigation, litigation, and attorneys' fees; and any other relief available under M.G.L. c. 93A, § 4.

1928.   Plaintiff Commonwealth of Massachusetts notified the Defendants of this intended action at least five days prior to the commencement of this action and gave the Defendants an opportunity to confer in accordance with M.G. L. c. 93A, § 4.

## Michigan

1929.   Plaintiff State of Michigan repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1930.   The State of Michigan brings this action both on behalf of itself, its State Agencies, and as parens patriae on behalf of natural persons, pursuant to Mich. Comp. Laws §14.28, and §14.101, to enforce public rights and to protect residents and its general economy against violations of the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, et seq., the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, et. seq., and the common law of the State of Michigan.

1931.   The aforementioned practices by Defendants were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771, et seq., the Michigan Consumer Protection Act, Mich. Comp. Laws §445.901, et. seq., and the common law of the State of

Michigan.  As a result of Defendant's unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade and Defendants' conspiracy to restrain trade for the purpose of excluding or avoiding competition, all as more fully described above, the Plaintiff State of Michigan, its agencies, and consumers have suffered and been injured in business and property by reason of having to purchase or reimburse at supra-competitive prices as direct and indirect purchasers and will continue to suffer ascertainable loss and damages in an amount to be determined at trial.

1932.   Accordingly, Plaintiff State of Michigan on behalf of itself, its agencies, and as parens patriae on behalf of its consumers affected by Defendants' illegal conduct, is entitled to relief including but not limited to injunctive relief and other equitable relief (including but not limited to disgorgement), civil penalties, damages, costs and attorney fees.

### Minnesota

1933.   Plaintiff State of Minnesota repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1934.   Defendants' acts as alleged herein violate the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49-.66. Plaintiff State of Minnesota seeks relief, including but not limited to:

    a.    damages for itself, its state agencies that paid for the generic pharmaceutical drugs identified herein, and as parens patriae on behalf of its consumers.  Plaintiff State of Minnesota is entitled to damages under Minn. Stat. § 8.31, subd. 3a and treble damages under Minn. Stat. § 325D.57;

    b.    disgorgement under Minn. Stat. § 325D.59 and Minn. Stat. Ch. 8;

    c.    injunctive relief under Minn. Stat. §§ 325D.58 and Minn. Stat. § 8.31, subd. 3;

      d.     costs and reasonable attorneys' fees under Minn. Stat. § 325D.57 and Minn. Stat. § 8.31, subd. 3a; and

      e.     civil penalties under Minn. Stat. § 325D.56 and Minn. Stat. § 8.31, subd.

1935.　The Defendants deceptively misrepresented to Plaintiff State of Minnesota, its state agencies and Minnesota consumers that Defendants' pricing at which the numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in Minnesota was competitive and fair.

1936.　The Defendants' deceptive misrepresentations and failure to disclose material facts had the following effects: (1) generic drug price competition was restrained, suppressed and eliminated throughout Minnesota; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels throughout Minnesota; (3) Plaintiff State of Minnesota, its state agencies and Minnesota consumers were deprived of free and open markets; and (4) Plaintiff State of Minnesota, its state agencies and Minnesota consumers paid supra-competitive, artificially inflated prices for the numerous generic pharmaceutical drugs identified herein.

1937.　The Defendants' deceptive misrepresentations and failure to disclose material facts have caused Plaintiff State of Minnesota, its state agencies, and Minnesota consumers to suffer and to continue to suffer loss of money or property, real or personal, by means of Defendants' use or employment of deceptive commercial practices as set forth above.

1938.　Defendants violated the deceptive trade practices laws of Minnesota:

      a.     Each time a Defendant failed to disclose the existence of a market allocation agreement and/or a price-fixing agreement involving any of the numerous generic pharmaceutical drugs identified herein;

      b.     Each time a Defendant submitted false or misleading cover bids and/or offers to their customers and wholesalers;

  c.  Each time a Defendant provided false or misleading statements to prospective customers related to supply capacity or reasons for bidding or not bidding;

  d.  Each time Plaintiff State of Minnesota, its state agencies and Minnesota consumers paid an artificially inflated price for any of the numerous generic pharmaceutical drugs identified herein; and

  e.  Each time a request for reimbursement was made to Minnesota for any of the numerous generic pharmaceutical drugs identified herein.

1939. The Defendants' conduct is unlawful pursuant to the Uniform Deceptive Trade Practices Act of 1973, Minn. Stat. §§ 325D.43-.48 and Minn. Stat. Ch. 8. The aforesaid methods, acts or practices constitute deceptive acts under this Act, including, but not limited to:

  a.  Representing "that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have" in violation of Minn. Stat. § 325D.44, subd. 1(5);

  b.  Representing "that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" in violation of Minn. Stat. § 325D.44, subd. 1(7); and

  c.  Engaging "in any other conduct which similarly creates a likelihood of confusion or of misunderstanding" in violation of Minn. Stat. § 325D.44, subd. 1(13).

1940. Some or all of these violations by Defendants were willful.

1941. Plaintiff State of Minnesota seeks relief for violations of the Uniform Deceptive Trade Practices Act of 1973, Minn. Stat. §§ 325D.43-.48 including but not limited to:

  a.  damages for itself, its state agencies that paid for the generic pharmaceutical drugs identified herein, and as parens patriae on behalf of its consumers under Minn. Stat. § 325D.45, subd. 3 and Minn. Stat. § 8.31, subd. 3a;

  b.  disgorgement under Minn. Stat. § 325D.45, subd. 3, Minn. Stat. Ch. 8, and Minnesota common law;

     c.     injunctive relief under Minn. Stat. § 325D.45, subd. 1 and Minn. Stat. § 8.31, subd. 3;

     d.     costs and reasonable attorneys' fees under Minn. Stat. § 325D.44 and Minn. Stat. § 8.31, subd. 3a; and

     e.     civil penalties under Minn. Stat. § 8.31, subd. 3.

1942.   By reason of the foregoing, the Defendants have been unjustly enriched as a result of the conduct set forth herein with respect to Plaintiff State of Minnesota, its state agencies that paid for the generic pharmaceutical drugs identified herein, and its consumers.

1943.   Plaintiff State of Minnesota, its state agencies that paid for the generic pharmaceutical drugs identified herein, and its consumers were purchasers, reimbursers and/or end-payors of Defendants' generic pharmaceutical drugs identified herein and have paid amounts far in excess of the competitive prices for such drugs that would have prevailed in a competitive and fair market.

1944.   Defendants knew of and appreciated, retained, or used, the benefits of Plaintiff State of Minnesota, its state agencies that paid for the generic pharmaceutical drugs identified herein, and its consumers' purchases of any of the Defendants' generic pharmaceutical drugs identified herein at amounts far in excess of the competitive price.  Defendants engaged in the conduct described herein to allocate or preserve the market share of the numerous generic pharmaceutical drugs identified herein thereby increasing their sales and profits.

1945.   For those customers that purchase directly or indirectly from Defendants at artificially inflated and supra-competitive prices, Defendants have increased prices above what would have prevailed in a competitive and fair market; thereby, directly benefiting Defendants in the form of increased revenues.

1946.   Based on Defendants' conduct set forth herein, it would be inequitable and unjust for Defendants to retain such benefits without payment of value.

1947.   Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received or used resulting from the purchase of any of the numerous generic pharmaceutical drugs identified herein by Plaintiff State of Minnesota, its state agencies that paid for the generic pharmaceutical drugs identified herein, and its consumers. Plaintiff State of Minnesota, on behalf of itself, its state agencies that paid for the generic pharmaceutical drugs identified herein, and as parens patriae on behalf of its consumers, seeks to recover the amounts that unjustly enriched the Defendants.

1948.   Plaintiff State of Minnesota seeks relief, on behalf of itself, its state agencies that paid for the generic pharmaceutical drugs identified herein, and as parens patriae on behalf of its consumers, and is therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement and any other relief the Court deems appropriate under Minn. Stat. Ch. 8 and Minnesota common law for unjust enrichment.

## Mississippi

1949.   Plaintiff State of Mississippi repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1950.   Defendants' acts violate Miss. Code Ann. § 75- 21-1 *et seq*., and Plaintiff State of Mississippi is entitled to relief under Miss. Code Ann. § 75- 21-1 *et seq*.

1951.    The aforesaid conduct was not only anti-competitive but was also unfair and deceptive to the consumers of the State of Mississippi, therefore Defendants' acts violate the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq*., and Plaintiff State of

Mississippi is entitled to relief under the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq*.

1952.   Pursuant to Miss. Code Ann. § 75-21-1 *et seq*., and the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq*., Plaintiff State of Mississippi seeks and is entitled to relief, including but not limited to injunctive relief, damages, restitution, disgorgement, civil penalties, costs, attorney fees, and any other just and equitable relief which this Court deems appropriate.

## Missouri

1953.   Plaintiff State of Missouri repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1954.   The aforementioned practices by Defendants violate the Missouri Antitrust Law, Missouri Rev. Stat. §§ 416.011 et seq., and Missouri's Merchandising Practices Act, Missouri Rev. Stat. §§ 407.010 et seq., as further interpreted by 15 CSR 60-8.010 et seq. and 15 CSR 60-9.01 et seq., and the State of Missouri is entitled to an injunction, disgorgement, civil penalties and any other relief available under the aforementioned Missouri statutes and regulations.

1955.   The State of Missouri also seeks its costs and attorney fees incurred in the prosecution of this action.

## Montana

1956.   Plaintiff State of Montana repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1957.   Defendants' acts and practices described in this Complaint violate Montana's Unfair Trade Practices and Consumer Protection Act, Mont Code Ann. § 30-14-101 et seq.,

including § 30-14-103, and Unfair Trade Practices Generally, Mont. Code Ann. § 30-14-201 et seq., including § 30-14-205.

1958.   Mont. Code Ann § 30-14-103 prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.  Mont. Code Ann. § 30-14-102(8) defines the terms "trade" and "commerce" as meaning "the advertising, offering for sale, sale, or distribution of any services, any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value, wherever located, and includes any trade or commerce directly or indirectly affecting the people of this state."

1959.   Montana's standard for 'unfairness' as prohibited under Mont. Code Ann. § 30-14-103 is articulated in Rohrer v. Knudson, 203 P.3d 759 (Mont. 2009) as an act or practice which "offends established public policy and which is either immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."

1960.   Mont Code Ann. § 30-14-205 states that it is unlawful for a person or group of persons, directly or indirectly:

> (1)   to enter an agreement for the purpose of fixing the price or regulating the production of an article of commerce;
>
> (2)   for the purpose of creating or carrying out any restriction in trade to:  (a) limit productions; (b) increase or reduce the price of merchandise or commodities; (c) prevent competition in the distribution or sale of merchandise or commodities; (d) fix a standard or figure whereby the price of an article of commerce intended for sale, use, or consumption will be in any way controlled.

1961. Defendants' anticompetitive and unfair and/or deceptive acts and practices in the marketing and sale of pharmaceuticals as described in this Complaint occurred in the conduct of "trade" and "commerce" as defined by Montana law.

1962. Defendants' anticompetitive and unfair and/or deceptive acts and practices in the marketing and sale of pharmaceuticals as described in this Complaint offend established public policy. Those acts and practices are also unethical, oppressive, and unscrupulous and have substantially injured and continue to injure Montanans through supra-competitive prices.

1963. Defendants' price-fixing and market allocating conduct as described in this Complaint violates the plain language of Mont. Code Ann. § 30-14-205(1) and (2).

1964. Defendants' unlawful conduct was willful as defined in Mont. Code Ann. § 30-14-142(4).

1965. Plaintiff State of Montana is entitled to all equitable relief and the maximum civil penalties available under Mont. Code Ann. § 30-14-101 et seq. and § 30-14-201 et seq., including but not limited to Mont. Code Ann. §§ 30-14-111(4), -131, -142(2), and -222. Plaintiff State of Montana also seeks reasonable attorneys' fees and costs.

## Nebraska

1966. Plaintiff State of Nebraska repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1967. Defendants' actions as alleged herein violate the Unlawful Restraint of Trade Act, Neb. Rev. Stat. § 59-801 et seq. and the Consumer Protection Act, Neb. Rev. Stat. § 59-1601 et seq. Specifically, Defendants' actions constitute unreasonable restraints of trade or commerce in violation of Neb. Rev. Stat. § 59-801 and Neb. Rev. Stat. § 59-1603, and Defendants' actions constitute unfair methods of competition in violation of Neb. Rev. Stat. § 59-1602. The sale of

pharmaceuticals to the State of Nebraska and its citizens constitutes trade or commerce as defined in Neb. Rev. Stat. § 59-1601. These violations have had an impact, directly and indirectly, upon the public interest of the State of Nebraska, for the State of Nebraska, its state agencies, and its citizens have been injured and continue to be injured by paying supra-competitive prices for pharmaceuticals purchased directly and/or indirectly from the Defendants.

1968.   Accordingly, Plaintiff State of Nebraska, on behalf of itself, its state agencies, and as parens patriae for all citizens within the state, seeks all relief available under the Unlawful Restraint of Trade Act, the Consumer Protection Act, and Neb. Rev. Stat. § 84-212. Plaintiff State of Nebraska is entitled to relief including, but not limited to: damages, disgorgement, civil penalties, equitable relief, injunctive relief, and its costs and attorney's fees pursuant to Neb. Rev. Stat. §§ 59-803, 59-819, 59-821, 59-1608, 59-1609, 59-1614, and 84-212.

## **Nevada**

1969.   Plaintiff State of Nevada repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1970.   As alleged in Sections IV and VII, *supra*, the Defendants' conduct was and is directed at consumers nationwide, including in Nevada, and was overtly deceptive; not merely anticompetitive.

1971.   As repeatedly alleged *supra*, in the course of carrying out their schemes, Defendants often (i) declined bid opportunities and misrepresented the reason for their failure to bid, or (ii) provided false bids that they knew would not be successful.  In all such cases, the alleged acts and practices by Defendants were, and are, in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, et seq., and specifically the following:

    (a)    NRS 598.0915(15), a person engages in a deceptive trade practice by knowingly making a false representation in a transaction;

    (b)    NRS 598.0923(2), a person engages in a deceptive trade practice by failing to disclose a material fact in connection with the sale or lease of goods or services; and

    (c)    NRS 598.0923(3), a person engages in a deceptive trade practice by violating a state or federal statute or regulation relating to the sale or lease of goods or services.

1972.  As repeatedly alleged *supra*, the Defendants' anticompetitive conduct produced, and continues to produce, harm across the Plaintiff States, including in Nevada.  Accordingly, the aforementioned acts and practices by Defendants were, and are, also in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010, et seq., and specifically the following:

    (a)    NRS 598A.060(a), competitors unlawfully restrain trade by engaging in price fixing;

    (b)    NRS 598A.060(b), competitors unlawfully restrain trade by agreeing to division of markets; and

    (c)    NRS 598A.060(c), competitors unlawfully restrain trade by agreeing to allocate customers.

1973.  Accordingly, Plaintiff State of Nevada seeks all relief available under the Nevada Deceptive Trade Practices Act, the Nevada Unfair Trade Practices Act, and common law. Plaintiff State of Nevada is entitled to relief including but not limited to:  disgorgement,

injunctions, civil penalties, damages, and its costs and attorney's fees pursuant to Nev. Rev. Stat. §§ 598.0963, 598.0973, 598.0999, 598A.160, 598A.170, 598A.200 and 598A.250.

### New Hampshire

1974.   Plaintiff State of New Hampshire repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1975.   The aforementioned collusive actions, practices and conduct by Defendants violate the New Hampshire Antitrust Provisions, N.H. RSA 356:1, et seq., by, among other things, unlawfully restraining trade or commerce, or having the purpose or effect of fixing, controlling or maintaining prices, allocating or dividing customers or markets, fixing or controlling prices or bidding for public or private contracts, or otherwise thwarting genuine competition in generic drug markets. Defendants impaired the competitive process which deprived New Hampshire consumers and customers of free and open market place for generic products and/or of paying a price for the generic pharmaceutical drugs identified herein which would have been competitive and fair absent agreements to allocate customers, fix prices, and stabilize artificially inflated prices.

1976.   The aforementioned actions, practices and conduct by Defendants as suppliers in commercial transactions also violate the New Hampshire Consumer Protection Act, N.H. RSA 358-A:1 et seq. by using unfair or deceptive business acts or practices, or methods of competition, in the conduct of trade or commerce including, among other things, pricing generic health care pharmaceutical goods in a manner that tends to harm competition; making misrepresentations, taking steps to conceal, failing to disclose a material fact, and/or participating in maintaining artificially inflated pricing in connection with the sale or advertisement of such generic products; or otherwise thwarting and harming genuine competition

in generic drug markets as identified herein.  Illegal conduct included, agreement to and, in fact, acting to restrain trade or commerce in each generic drug market identified herein, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which the numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in the State of New Hampshire; as well as, among other things, submitting false or misleading cover bids and/or offers to the customers and wholesalers, and/or providing false or misleading statements to prospective customers relating to supply capacity or reasons for bidding or not bidding, and/or otherwise engaging in a course of conduct to induce contracting and purchasing of generic products by customers at artificially inflated prices.

1977.   Defendants' illegal conduct, collectively and individually, all relates to generic products that are intended and expected by consumers, private entities, and public entities to provide great savings for consumers and purchasing entities in the health care industry, offending public policy and comprising deceptive, unfair, immoral, unethical, oppressive or unscrupulous conduct.  NH RSA 358-A:2.

1978.   These violations artificially inflated prices of generic drugs, substantially affecting and harming the people of New Hampshire (consumers, public entities, and private entities, alike) and having various past and ongoing harmful impacts within the state including affecting New Hampshire commerce and affecting the choice of generic drugs available to and/or prices paid by consumers and entities.  The State of New Hampshire has reason to believe that Defendants directly and/or indirectly through nationwide or regional distributors, wholesalers, and retailers, sold or marketed the generic drugs at issue to the State of New Hampshire, its agencies and municipalities, to New Hampshire businesses, and to individual

consumers, and that such products were received and purchased by such consumers and entities within the state, whether dealing with Defendants directly or indirectly.

1979.   The State of New Hampshire has reason to believe that Defendants received ill-gotten gains or proceeds as a result of their illegal conduct, and it would be inequitable and unjust for Defendants to retain such profits and benefits without payment of value.

1980.   Some or all of the violations by Defendants were willful and flagrant.

1981.   The State of New Hampshire brings this action in its law enforcement capacity as a sovereign or quasi-sovereign and in a parens patriae capacity on behalf of state consumers of generic products, seeking legal and equitable remedies available under the New Hampshire Antitrust Provisions, under the New Hampshire Consumer Protection Act, and under common law such as unjust enrichment.  New Hampshire seeks restoration to state consumers for ascertainable loss incurred in making payments and purchases, whether direct or indirect, in relation to the generic drug products identified herein, through among other things, restitution, disgorgement, and/or injunctive relief.  New Hampshire seeks injunctive relief to prohibit Defendants from engaging in the unlawful business practices identified herein; civil penalties (in double/treble multipliers); and recovery for compensable investigation and litigation costs, expenses and attorney's fees, and other relief as this Court deems just and equitable.  See N.H. RSA 356:4 et seq.; N.H. RSA 358-A:1 et seq.

1982.   Plaintiff State of New Hampshire notified Defendants of this intended action at least ten days prior to the commencement of this action and gave Defendants an opportunity to confer with the attorney general in accordance with NH RSA 358-A:5.

**New Jersey**

1983.   Plaintiff State of New Jersey repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1984.      Defendants' actions as alleged herein violate the New Jersey Antitrust Act, N.J.S.A. 56:9-1 et seq., in that they have the purpose and/or effect of unreasonably restraining trade and commerce within the State of New Jersey and elsewhere.  N.J.S.A. 56:9-3.  Plaintiff State of New Jersey seeks relief including, but not limited to, injunctive relief, disgorgement, civil penalties, and attorneys' fees and investigative costs.  N.J.S.A. 56:9-10.

1985.      Defendants' actions as alleged herein violate the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., in that Defendants' made misleading statements, omitted material facts and engaged in unconscionable commercial practices in connection with the advertising, offering for sale and sale of one or more of the drugs identified in this Complaint.  N.J.S.A. 56:8-2.  Plaintiff State of New Jersey seeks relief including but not limited to, injunctive relief, disgorgement, civil penalties and attorneys' fees and investigative costs.  N.J.S.A. 56:8-8, -11, -13 and -19.

**New Mexico**

1986.   Plaintiff State of New Mexico repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1987.   The State of New Mexico, through its Attorney General, brings this enforcement action as parens patriae in its sovereign and quasi-sovereign capacity and in its proprietary capacity on behalf of the State, including its agencies and entities, to recover damages to the State, its residents, its economy, and all such other relief as may be authorized by statute or common law.

1988.   The aforementioned actions and practices by Defendants were and are a contract, agreement, combination, or conspiracy in an unreasonable restraint of trade or commerce in New Mexico, thus violating the New Mexico Antitrust Act, N.M. Stat. Ann. § 57-1-1 et seq.

1989.   The aforementioned actions and practices by Defendants were unfair or deceptive trade practices as they were false or misleading oral or written statements or other representations made in connection with the sale of goods in the regular course of their trade or commerce, that may, tended to or did deceive or mislead consumers.  These practices included false or misleading statements of fact concerning the price and availability of drugs and failures to state material facts about the costs of drugs, actions that deceived or tended to deceive consumers. Additionally, Defendants' actions constituted unconscionable trade practices, because they resulted in supra-competitive prices for the aforementioned drugs, resulting in a gross disparity between the prices paid by consumers and the value received. These practices and actions violated the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1 et. seq.

1990.   The aforementioned actions and practices by Defendants also constitute unfair competition and unjust enrichment under New Mexico's common law.

1991.   Accordingly, the State of New Mexico is entitled remedies available to it under the New Mexico Antitrust Act, the New Mexico Unfair Practices Act, and New Mexico common law, including injunctive relief, actual, treble, and statutory damages, restitution, disgorgement, civil penalties, costs, attorney's fees, and any other appropriate monetary and injunctive relief. See N.M. Stat. Ann. §§ 57-1-3, -7, -8; N.M. Stat. Ann. § 57-12-8, -10, -11.

## New York

1992.   Plaintiff State of New York repeats and re-alleges each and every preceding allegation as if fully set forth herein.

515

1993.   In addition to violating federal antitrust law, the aforementioned practices by the Defendants violate New York antitrust law, the Donnelly Act, New York Gen. Bus. Law §§ 340-342c, and constitute both "fraudulent" and "illegal" conduct in violation of New York Executive Law § 63(12).

1994.   Plaintiff State of New York seeks relief, including but not limited to damages, for New York consumers and New York state entities that paid for one or more of the drugs identified in this Complaint during the relevant period and thereby paid more than they would have paid but for Defendants' unlawful conduct.  Plaintiff State of New York also seeks, and is entitled to, civil penalties, injunctive relief, other equitable relief (including but not limited to disgorgement), and fees and costs.

## North Carolina

1995.   Plaintiff State of North Carolina repeats and re-alleges each and every preceding allegation as if fully set forth herein.

1996.   Defendants' acts of distributing, marketing and selling generic pharmaceutical drugs to consumers through drug wholesalers and distributors, pharmacy and supermarket chains, and other resellers of generic pharmaceutical drugs and in otherwise engaging in the conduct more fully described herein with respect to the numerous generic pharmaceutical drugs identified herein, the Defendants are engaging in trade or commerce that directly or indirectly harmed North Carolina consumers pursuant to North Carolina's Unfair or Deceptive Practices Act, N.C. Gen. Stat. § 75-1 *et seq.*

1997.   The Defendants agreed to, and did in fact, act in restraint of trade or commerce in each generic drug market identified herein that includes North Carolina, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which the

516

numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in North Carolina, deprived North Carolina consumers from paying a price for the numerous generic pharmaceutical drugs identified herein which would have been competitive and fair absent the agreement to allocate customers and fix prices.

1998.  The aforesaid methods, acts or practices constitute unfair methods of competition and/or unfair acts or practices within their meaning under the North Carolina Unfair or Deceptive Practices Act, and are injurious to North Carolina consumers and the general economy of the State of North Carolina, including, but not limited to:

a.  Violating Section 1 of the Sherman Act, 15 U.S.C § 1, through engaging in a market allocation agreement as set forth in the preceding counts;

b.  Violating Section 1 of the Sherman Act, 15 U.S.C § 1, through engaging in a price-fixing agreement as set forth in the preceding counts;

c.  Engaging in any conduct which causes substantial injury to consumers.

1999.  By deceptively misrepresenting and/or omitting material facts concerning the absence of competition in each generic drug market identified herein to the State of North Carolina and North Carolina consumers, the Defendants misled the State of North Carolina and North Carolina consumers into believing that prices for the numerous generic pharmaceutical drugs identified herein were competitive and fair in violation of the North Carolina Unfair or Deceptive Practices Act.

2000.  The Defendants agreed to, and did in fact, act in restraint of trade or commerce in each generic drug market identified herein that includes North Carolina, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which the

numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in North Carolina.

2001.   The Defendants' impairment of choice and the competitive process had the following effects:  (1) generic drug price competition was restrained, suppressed and eliminated throughout North Carolina; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels throughout North Carolina; (3) the State of North Carolina and North Carolina consumers were deprived of free and open markets; and (4) the State of North Carolina and North Carolina consumers paid supra-competitive, artificially inflated prices for the numerous generic pharmaceutical drugs identified herein.

2002.   The Defendants' impairment of choice and the competitive process have caused the State of North Carolina and North Carolina consumers to suffer and to continue to suffer loss of money or property, real or personal, by means of Defendants' use or employment of unfair methods of competition and/or unfair acts or practices as set forth above.

2003.   The Defendants' deceptive misrepresentations and failure to disclose material facts had the following effects:  (1) generic drug price competition was restrained, suppressed and eliminated throughout North Carolina; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels throughout North Carolina; (3) the State of North Carolina and North Carolina consumers were deprived of free and open markets; and (4) the State of North Carolina and North Carolina consumers paid supra-competitive, artificially inflated prices for the numerous generic pharmaceutical drugs identified herein.

2004.   The Defendants' deceptive misrepresentations and failure to disclose material facts have caused the State of North Carolina and North Carolina consumers to suffer and to

continue to suffer loss of money or property, real or personal, by means of Defendants' use or employment of deceptive commercial practices as set forth above.

2005.   Defendants violated the North Carolina Unfair or Deceptive Practices Act:

    a.    Each time Defendants agreed to participate in the overarching conspiracy within the generic pharmaceutical drug market as set forth in Paragraphs 85 to 106;

    b.    Each time Defendants agreed to allocate the market for specific drugs in the generic pharmaceutical drug market as set forth in Paragraphs 110 to 233;

    c.    Each time Defendants agreed to fix prices on the specified drugs in the specified drug markets as set forth in Paragraphs 234 to 431;

    d.    Each time the State of North Carolina or a North Carolina consumer paid an unfairly or unconscionably inflated price for any of the numerous generic pharmaceutical drugs identified herein;

    e.    Each time a Defendant failed to disclose the existence of a market allocation agreement and/or a price-fixing agreement involving any of the numerous generic pharmaceutical drugs identified herein;

    f.    Each time a Defendant submitted false or misleading cover bids and/or offers to their customers and wholesalers;

    g.    Each time a Defendant provided false or misleading statements to prospective customers related to supply capacity or reasons for bidding or not bidding;

519

h.     Each time a request for reimbursement was made to the State of North Carolina for any of the numerous generic pharmaceutical drugs identified herein; and

i.     Each time the State of North Carolina or a North Carolina consumer paid an artificially inflated price for any of the numerous generic pharmaceutical drugs identified herein.

2006.  Plaintiff State of North Carolina is entitled to relief pursuant to N.C. Gen. Stat. § 75-1 *et seq*., including recovery of its costs and attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1.

## North Dakota

2007.   Plaintiff State of North Dakota repeats and re-alleges each and every preceding allegation as if fully set forth herein.

2008.   The aforementioned practices by Defendants are in violation of North Dakota's Uniform State Antitrust Act North Dakota Century Code (N.D.C.C.) § 51-08.1-01 et seq., and Plaintiff State of North Dakota is entitled to relief for these violations under N.D.C.C. § 51-08.1-01 et seq.

2009.   The aforementioned practices by Defendants constitute unconscionable or deceptive acts or practices in violation of the North Dakota Consumer Fraud Law, N.D.C.C. §51-15-01 et seq., and Plaintiff State of North Dakota is entitled to relief for those violations under N.D.C.C. §51-15-01 et seq.

## Northern Mariana Islands

2010.   Plaintiff Commonwealth of the Northern Mariana Islands repeats and re-alleges each and every preceding allegation as if fully set forth herein.

520

2011.   The aforementioned practices by Defendants constitute "unfair acts or practices" made illegal pursuant to the Commonwealth's Consumer Protection Act, 4 CMC §§ 5101 *et. seq*. Specifically, Defendants' actions constitute unfair acts and practices pursuant to 4 CMC §5105 (m) engaging in any act or practice which is unfair or deceptive to the consumer; and (t) engaging in price fixing which bears no reasonable relationship to the cost of the merchandise.

2012.   In addition, the aforementioned practices by Defendants violate the Commonwealth of the Northern Mariana Islands' Unfair Business Practices statutes, codified as 4 CMC §§ 5201 et. seq. Specifically, Defendants' aforementioned actions are prohibited activities pursuant to 4 CMC § 5202 (a) to create or carry out restrictions in trade or commerce; (c) To prevent competition in the manufacture, making, transportation, sale, or purchase of any merchandise, produce, or commodity; and (f) To make or enter into or carry out any contract, obligation or agreement by which the persons do any of the following:

> (1) Bind themselves not to sell, dispose of or transfer any article or commodity below a common standard figure or fixed value; (2) Agree to keep the price of such article, commodity or transportation at a fixed or graduated figure; (3) Establish or set the price of any article, commodity or transportation between them or themselves and others, so as directly or indirectly to preclude free and unrestricted competition among themselves or any purchaser or consumer in the sale or transportation of a any such article or commodity; and (4) Agree to pool, combine or directly or indirectly unite any interest that they may have connected with the sale or transportation of any such article or commodity that might in any way affect its price.

2013.   The Commonwealth of the Northern Mariana Islands seeks equitable relief, civil penalties, treble damages, costs of suit and any other relief available under the aforementioned statutes and all other applicable laws, including without limitation attorney fees and costs incurred in the pursuit of this action.

## Ohio

2014.   Plaintiff State of Ohio repeats and re-alleges each and every preceding allegation as if fully set forth herein.

2015.   The aforementioned practices by Defendants were, and are, a per se illegal conspiracy against trade in violation of Ohio Revised Code Section 1331.01 et seq, the common law of Ohio, and void pursuant to Ohio Rev. Code § 1331.06.  The State of Ohio, the general economy of Ohio, Ohio entities and individuals in Ohio were harmed as a direct result of Defendants' per se illegal conduct.  Defendants received ill-gotten gains or proceeds as a direct result of their per se illegal conduct.

2016.   Plaintiff State of Ohio seeks and is entitled to an injunction, disgorgement and civil forfeiture pursuant to Ohio Rev. Code § 109.81 and Ohio Rev. Code §§ 1331.01 et seq, including Section 1331.03, which requires a forfeiture of $500 per day that each violation was committed or continued, and any other remedy available at law or equity.

## Oklahoma

2017.   Plaintiff State of Oklahoma repeats and re-alleges each and every allegation as if fully set forth herein.

2018.   The aforementioned practices by the Defendants are in violation of the Oklahoma Antitrust Reform Act, 79 O.S. § 201 et seq., and Plaintiff State of Oklahoma is entitled to relief under 79 O.S. § 205, including but not limited to: injunctive relief, disgorgement, costs, attorney's fees and any other appropriate relief for those violations.

## Oregon

2019.   Plaintiff State of Oregon repeats and re-alleges each and every preceding allegation as if fully set forth herein.

2020.   The aforementioned practices by Defendants were, and are, in violation of the Oregon Antitrust Law, Oregon Revised Statutes ("ORS") 646.705, et seq. These violations had impacts within the State of Oregon and substantially affected the people of Oregon.

2021.   Plaintiff State of Oregon seeks all relief available under the Oregon Antitrust Act for Oregon consumers and the State of Oregon, including injunctive, civil penalties, other equitable relief including but not limited to disgorgement, the State of Oregon's costs incurred in bringing this action, plus reasonable attorney fees, expert witness fees, and costs of investigation, and any other remedy available at law for these violations under ORS 646.760, ORS 646.770, ORS 646.775, and ORS 646.780.

## Pennsylvania

2022.   Plaintiff Commonwealth of Pennsylvania repeats and re-alleges each and every preceding allegation as if fully set forth herein.

### *Pennsylvania Unfair Trade Practices and Consumer Protection Law*

2023.   In distributing, marketing and selling generic pharmaceutical drugs to consumers through drug wholesalers and distributors, pharmacy and supermarket chains, and other resellers of generic pharmaceutical drugs and in otherwise engaging in the conduct more fully described herein with respect to the numerous generic pharmaceutical drugs identified herein, the Defendants are engaging in trade or commerce that directly or indirectly harmed the Commonwealth of Pennsylvania and Pennsylvania consumers within the meaning of 73 P. S. §

201-2(3) of the Pennsylvania Unfair Trade Practices and Consumer Protection Law

("PUTPCPL").

### *Unfair Methods of Competition and Unfair Acts or Practices*

2024.   By reason of the foregoing, the Defendants have impaired the Commonwealth of

Pennsylvania and Pennsylvania consumer choice in each generic drug market identified herein.

2025.   By impairing choice in what should have been a freely competitive marketplace

for the numerous generic pharmaceutical drugs identified herein, the Defendants have deprived

the Commonwealth of Pennsylvania and Pennsylvania consumers from being able to

meaningfully choose from among the options a competitive market would have provided.

2026.   The Defendants agreed to, and did in fact, act in restraint of trade or commerce in

each generic drug market identified herein that includes Pennsylvania, by affecting, fixing,

controlling and/or maintaining at artificial and non-competitive levels, the prices at which the

numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in

Pennsylvania.

2027.   The Defendants impaired the competitive process which deprived the

Commonwealth of Pennsylvania and Pennsylvania consumers from paying a price for the

numerous generic pharmaceutical drugs identified herein which would have been competitive

and fair absent the agreement to allocate customers and fix prices.

2028.   Regardless of the nature or quality of Defendants' aforementioned acts or

practices on the competitive process or competition, Defendants' conduct has been otherwise

unfair or unconscionable because they offend public policy as established by statutes, the

common law, or otherwise, are immoral, unethical, oppressive, unscrupulous, or substantially

injurious to the Commonwealth of Pennsylvania and Pennsylvania consumers.

2029.   Defendants' unscrupulous conduct has resulted in the Commonwealth and its consumers being substantially injured by paying more for or not being able to afford the numerous generic pharmaceutical drugs identified herein.

2030.   The Defendants' impairment of choice and the competitive process had the following effects:  (1) generic drug price competition was restrained, suppressed and eliminated throughout Pennsylvania; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels throughout Pennsylvania; (3) Commonwealth of Pennsylvania and Pennsylvania consumers were deprived of free and open markets; and (4) Commonwealth of Pennsylvania and Pennsylvania consumers paid supra-competitive, artificially inflated prices for the numerous generic pharmaceutical drugs identified herein.

2031.   The Defendants' impairment of choice and the competitive process have caused the Commonwealth of Pennsylvania and Pennsylvania consumers to suffer and to continue to suffer loss of money or property, real or personal, by means of Defendants' use or employment of unfair methods of competition and/or unfair acts or practices as set forth above.

2032.   Defendants violated the PUTPCPL:

    a.     Each time Defendants agreed to participate in the overarching conspiracy within the generic pharmaceutical drug market as set forth herein;

    b.     Each time Defendants agreed to allocate the market for specific drugs in the generic pharmaceutical drug market as set forth herein;

    c.     Each time Defendants agreed to fix prices on the specified drugs in the generic pharmaceutical drug market as set forth herein;

    d.     Each time Defendants agreed to allocate the market on the specified drugs in the specified drug markets as set forth herein;

e.     Each time Defendants agreed to fix prices on the specified drugs in the specified drug markets as set forth herein;

f.     Each time Defendants agreed to decline to bid or otherwise bid high so as to not take market share on the specified drugs in the specified drug markets as set forth herein;

g.     Each time Defendants knowingly breached a legal or equitable duty within the generic pharmaceutical drug market as set forth herein; and

h.     Each time the Commonwealth of Pennsylvania or a Pennsylvania consumer paid an unfairly or unconscionably inflated price for any of the numerous generic pharmaceutical drugs identified herein.

2033.   The Defendants' conduct more fully described herein is unlawful pursuant to 73 P.S. § 201-3.

2034.   The aforesaid methods, acts or practices constitute unfair methods of competition and/or unfair acts or practices within their meaning under Sections 2 and 3 of the PUTPCPL, including, but not limited to:

a.     "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in violation of 73 P.S. § 201-2(4)(xxi).

2035.   The above described conduct created the likelihood of confusion and misunderstanding and exploited unfair advantage of the Commonwealth of Pennsylvania and Pennsylvania consumers seeking to exercise a meaningful choice in a market expected to be free of impairment to the competitive process and thus constitutes constructive fraud or, in the

alternative, constructive fraud in its incipiency through one or more of the following breaches of legal or equitable duties.

      a.    Violating Section 1 of the Sherman Act, 15 U.S.C § 1, through engaging in a market allocation agreement as set forth in the preceding counts;

      b.    Violating Section 1 of the Sherman Act, 15 U.S.C § 1, through engaging in a price-fixing agreement as set forth in the preceding counts;

      c.    Violating Pennsylvania antitrust common law through engaging in a market allocation agreement;

      d.    Violating Pennsylvania antitrust common law through engaging in a price-fixing agreement; and/or

      e.    Engaging in any conduct which causes substantial injury to consumers.

2036.   The above described conduct substantially injured Pennsylvania consumers and the Commonwealth of Pennsylvania.

2037.   The above described conduct has been willful within the meaning of 73 P.S. § 201-8 and is unlawful under the PUTPCPL.

2038.   Pursuant to 71 P.S. § 201-4, the Commonwealth of Pennsylvania believes that the public interest is served by seeking a permanent injunction to restrain the methods, acts and practices described herein, as well as seeking restoration, disgorgement and attorneys' fees and costs pursuant to 73 P.S. §§ 201-4 and 4.1 for the Commonwealth of Pennsylvania and Pennsylvania consumers and civil penalties of not exceeding $3,000 for each such willful violation pursuant to 73 P.S. § 201-8 (b).  The Commonwealth of Pennsylvania believes that the Commonwealth of Pennsylvania and its citizens are suffering and will continue to suffer harm unless the methods, acts and practices complained of herein are permanently enjoined.

### *Deceptive Acts or Practices*

2039.   By reason of the foregoing, the Defendants have deceptively misrepresented the absence of competition in each generic drug market identified herein to the Commonwealth of Pennsylvania and Pennsylvania consumers in violation of the PUTPCPL.

2040.   By deceptively misrepresenting and/or omitting material facts concerning the absence of competition in each generic drug market identified herein to the Commonwealth of Pennsylvania and Pennsylvania consumers, the Defendants misled the Commonwealth of Pennsylvania and Pennsylvania consumers into believing that prices for the numerous generic pharmaceutical drugs identified herein were competitive and fair.

2041.   The Defendants agreed to, and did in fact, act in restraint of trade or commerce in in each generic drug market identified herein that includes Pennsylvania, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which the numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in Pennsylvania.

2042.   The Defendants deceptively misrepresented to the Commonwealth of Pennsylvania and Pennsylvania consumers that Defendants' pricing at which the numerous generic pharmaceutical drugs identified herein were sold, distributed or obtained in Pennsylvania was competitive and fair.

2043.   Regardless of the nature or quality of Defendants' aforementioned acts or practices on the competitive process or competition, Defendants' conduct has had the tendency or capacity to deceive.

528

2044.   Defendants expressed, implied or otherwise falsely claimed conformance with prescribed bidding practices to their customers and wholesalers in relation to the numerous generic pharmaceutical drugs identified herein.

2045.   Defendants expressed, implied or otherwise falsely claimed supply capacity or reasons to prospective customers for bidding or not bidding in relation to the numerous generic pharmaceutical drugs identified herein.

2046.   The Defendants' deceptive misrepresentations and failure to disclose material facts had the following effects:  (1) generic drug price competition was restrained, suppressed and eliminated throughout Pennsylvania; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels throughout Pennsylvania; (3) Commonwealth of Pennsylvania and Pennsylvania consumers were deprived of free and open markets; and (4) Commonwealth of Pennsylvania and Pennsylvania consumers paid supra-competitive, artificially inflated prices for the numerous generic pharmaceutical drugs identified herein.

2047.   The Defendants' deceptive misrepresentations and failure to disclose material facts have caused Commonwealth of Pennsylvania and Pennsylvania consumers to suffer and to continue to suffer loss of money or property, real or personal, by means of Defendants' use or employment of deceptive commercial practices as set forth above.

2048.   Defendants violated the PUTPCPL:

a.      Each time a Defendant failed to disclose the existence of a market allocation agreement and/or a price-fixing agreement involving any of the numerous generic pharmaceutical drugs identified herein;

b.      Each time a Defendant submitted false or misleading cover bids and/or offers to their customers and wholesalers;

    c.       Each time a Defendant provided false or misleading statements to prospective customers related to supply capacity or reasons for bidding or not bidding;

    d.       Each time a request for reimbursement was made to the Commonwealth of Pennsylvania for any of the numerous generic pharmaceutical drugs identified herein; and

    e.       Each time the Commonwealth of Pennsylvania or a Pennsylvania consumer paid an artificially inflated price for any of the numerous generic pharmaceutical drugs identified herein.

2049.   The Defendants' conduct more fully described herein is unlawful pursuant to 73 P. S. § 201-3.

2050.   The aforesaid methods, acts or practices constitute deceptive acts or practices within their meaning under Sections 2 and 3 of the PUTPCPL, including, but not limited to:

    a.       "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status affiliation or connection that he does not have" in violation of 73 P.S. § 201-2(4)(v);

    b.       "Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another" in violation of 73 P.S. § 201-2(4)(vii); and

    c.       "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in violation of 73 P.S. § 201-2(4)(xxi).

2051.   The above described conduct has been willful within the meaning of 73 P.S. § 201-8 and is unlawful under the PUTPCPL.

2052.   Pursuant to 71 P.S. § 201-4, the Commonwealth of Pennsylvania believes that the public interest is served by seeking a permanent injunction to restrain the methods, acts and practices described herein, as well as seeking restoration, disgorgement and attorneys' fees and costs pursuant to 73 P.S. §§ 201-4 and 4.1 for the Commonwealth of Pennsylvania and Pennsylvania consumers and civil penalties of not exceeding $3,000 for each such willful violation pursuant to 73 P.S. § 201-8 (b).  The Commonwealth of Pennsylvania believes that the Commonwealth of Pennsylvania and its citizens are suffering and will continue to suffer harm unless the methods, acts and practices complained of herein are permanently enjoined.

### *Common Law Doctrine against Restraint of Trade*

2053.   By reason of the foregoing, the Defendants have entered into an agreement in restraint of trade to allocate markets and fix prices in each generic drug market identified herein within the Commonwealth of Pennsylvania.

2054.   The agreements to allocate customers and to fix pricing as set forth in the preceding counts constitute an unreasonable restraint of trade in violation of Pennsylvania antitrust common law.

2055.   Unless Defendants' overall anticompetitive scheme is enjoined, the Defendants will continue to illegally restrain trade in the relevant market in concert with another in violation of the Pennsylvania common law doctrine against unreasonable restraint of trade.

2056.   Defendants' conduct in engaging in a contract to unreasonably restrain trade concerning the customers to whom and the prices at which the numerous generic pharmaceutical

531

drugs identified herein were sold, distributed or obtained in Pennsylvania threatens injury to the Commonwealth of Pennsylvania and Pennsylvania consumers.

2057.   Defendants' anticompetitive and unlawful conduct alleged herein has injured, is injuring and will continue to injure competition in the relevant market by denying consumer choice and otherwise thwarting competition in the relevant market.

2058.   The Defendants' contract in restraint of trade had the following effects:  (1) generic drug price competition was restrained, suppressed and eliminated throughout Pennsylvania; (2) generic drug prices were raised, fixed, maintained and stabilized at artificially-high levels throughout Pennsylvania; (3) Commonwealth of Pennsylvania and Pennsylvania consumers were deprived of free and open markets; and (4) Commonwealth of Pennsylvania and Pennsylvania consumers paid supra-competitive, artificially inflated prices for the numerous generic pharmaceutical drugs identified herein.

2059.   The Defendants' illegal conduct has had a substantial effect on the Commonwealth of Pennsylvania and Pennsylvania consumers.

2060.   As a direct and proximate result of the Defendants' unlawful conduct, the Commonwealth of Pennsylvania and Pennsylvania consumers have been injured in their business and property.

2061.   On behalf of the Commonwealth of Pennsylvania and its citizens pursuant to 71 P.S. §732-204 (c), Pennsylvania seeks injunctive relief, disgorgement and any other relief the Court deems proper.

***Common Law Doctrine against Unjust Enrichment***

2062.   By reason of the foregoing, the Defendants have been unjustly enriched as a result of the conduct set forth herein with respect to the Commonwealth of Pennsylvania and Pennsylvania consumers.

2063.   The Commonwealth of Pennsylvania and Pennsylvania consumers were purchasers, reimbursers and/or end-payors of Defendants' numerous generic pharmaceutical drugs identified herein and have paid amounts far in excess of the competitive prices for such drugs that would have prevailed in a competitive and fair market.

2064.   Defendants knew of, and appreciated and retained, or used, the benefits of Commonwealth of Pennsylvania and Pennsylvania consumers' purchases of any of the Defendants' numerous generic pharmaceutical drugs identified herein at amounts far in excess of the competitive price.  Defendants engaged in the conduct described herein to increase the market share of the numerous generic pharmaceutical drugs identified herein thereby increasing their sales and profits.

2065.   For those customers that purchase directly or indirectly from Defendants at artificially inflated and supra-competitive prices, Defendants have increased prices above what would have prevailed in a competitive and fair market; thereby, directly benefiting Defendants in the form of increased revenues.

2066.   Based on Defendants' conduct set forth herein, it would be inequitable and unjust for Defendants to retain such benefits without payment of value.

2067.   Defendants will be unjustly enriched if they are permitted to retain the direct or indirect benefits received or used resulting from the purchase of any of the numerous generic pharmaceutical drugs identified herein by the Commonwealth of Pennsylvania and Pennsylvania

consumers.  The Commonwealth of Pennsylvania, on behalf of itself and Pennsylvania consumers, seeks to recover the amounts that unjustly enriched the Defendants.

2068.   The Commonwealth of Pennsylvania and Pennsylvania consumers are therefore entitled to equitable relief in the form of an injunction, restitution and disgorgement and any other relief the Court deems appropriate.

## Puerto Rico

2069.   Plaintiff Commonwealth of Puerto Rico repeats and re-alleges each and every preceding allegation as if fully set forth herein.

2070.   The aforementioned practices by Defendants were in violation of Puerto Rico Law No. 77 of June 25, 1964, also known as "Puerto Rico`s Antitrust and Restrictions of Commerce Law", 10 P.R. Laws Ann. §§ 257 et seq., and 32 P.R. Laws Ann. § 3341.

2071.   The Commonwealth of Puerto Rico, through its Attorney General, brings this enforcement action as parens patriae in its proprietary capacity on behalf of the Commonwealth, including its agencies and entities, to recover damages to the Commonwealth and all such other relief as may be authorized by statute or common law.

2072.   Accordingly, the Commonwealth of Puerto Rico is entitled remedies available under the Puerto Rico`s Antitrust and Restrictions of Commerce Law and 32 P.R. Laws Ann. § 3341, including injunctive relief, civil penalties and damages for the Commonwealth agencies and entities and any other appropriate monetary and injunctive relief.

## Rhode Island

2073.   Plaintiff State of Rhode Island repeats and re-alleges every preceding allegation as if fully set forth herein.

2074.   The acts alleged herein also constitute antitrust violations pursuant to the Rhode Island Antitrust Act, R.I. Gen. L. §§ 6-36-1, *et. seq.*

2075.   Rhode Island seeks all remedies available under federal law or the Rhode Island Antitrust Act including, without limitation, the following:

a.       Disgorgement pursuant to R.I. Gen. L. § 6-36-11;

b.       Injunctive and other equitable relief pursuant to R.I. Gen. L. § 6-36-10;

c.       Civil penalties pursuant to R.I. Gen. L. 6-36-10(c) which provides that "any person who violates this chapter may be liable for a civil penalty of not more than fifty thousand dollars ($50,000) for each violation.";

d.       Costs and attorney's fees pursuant to R.I. Gen. L. § 6-36-11(a); and

e.       Other remedies as the court may deem appropriate under the facts and circumstances of the case.

### South Carolina

2076.   Plaintiff South Carolina repeats and re-alleges each and every preceding allegation as if fully set forth herein.

2077.   The aforementioned practices by Defendants constitute "unfair methods of competition and unfair or deceptive acts or practices" under §39-5-20 of the South Carolina Code of Laws. The State of South Carolina asserts claims in a statutory parens patriae capacity under S.C. Code § 39-5-50(a) and a common law parens patriae capacity.  Pursuant to S.C. Code § 39-5-50(a), South Carolina seeks injunctive relief to prohibit Defendants from engaging in the conduct described in this complaint.

2078.   Defendants knew or reasonably should have known that their conduct violated S.C. Code § 39-5-20.  Under S.C. Code § 39-5-110(c), Defendants' conduct therefore constitutes

a willful violation of S.C. Code § 39-5-20.  Accordingly, South Carolina seeks an award of civil penalties under S.C. Code § 39-5-110(a) in an amount up to $5,000.00 per violation in South Carolina.

2079.   South Carolina seeks attorneys' fees and costs under S.C. Code § 39-5-50(a).

## Tennessee

2080.   Plaintiff State of Tennessee repeats and re-alleges each and every preceding allegation as if fully set forth herein.

2081.   This is an action that alleges violation of Tennessee's antitrust law, the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 et seq.

2082.   Defendants directly and/or indirectly through nationwide distributors, wholesalers, and retailers, sold or marketed the generic drugs at issue to the State of Tennessee and its agencies, Tennessee businesses, and individual consumers.

2083.   Defendants made arrangements or agreements with a view to lessening, or which tend to lessen, full and free competition in the sale in Tennessee of, or which were designed to advance or control the prices charged for, the generic drugs at issue.

2084.   Defendants' conduct affected Tennessee commerce to a substantial degree and substantially affected the people of Tennessee, by affecting the choice of generic drugs available to, and/or the prices paid by, the State of Tennessee and its agencies, Tennessee businesses, and individual consumers for such generic drugs.

2085.   The aforementioned conduct by Defendants was in violation of Tennessee's antitrust law, the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 et seq.

2086.   As a direct and proximate result of Defendants' illegal conduct, the State of Tennessee and its agencies, Tennessee businesses, and individual consumers have been harmed

536

and will continue to be harmed, by, *inter alia*, paying more for generic drugs purchased directly and/or indirectly from the Defendants and their co-conspirators than they would have paid in the absence of the illegal conduct.

2087.   The State of Tennessee is entitled to relief for purchases of affected generic drugs by the State of Tennessee and its agencies, Tennessee businesses, and individual consumers.

2088.   On behalf of the State and its agencies, Tennessee businesses, and individual consumers, the State of Tennessee seeks all legal and equitable relief available under the Tennessee Trade Practices Act and the common law, including, but not limited to: damages for purchases of the affected generic drugs; equitable relief including disgorgement and injunctive relief; attorneys' fees and costs; and such other and further relief as this Court deems just and equitable.

### Utah

2089.   Plaintiff State of Utah repeats and re-alleges each and every preceding allegation as if fully set forth herein.

2090.   The aforementioned acts by Defendants violate the Utah Antitrust Act, Utah Code §§ 76-10-3101 through 76-10-3118 (the "UAA"), and Utah common law.  Accordingly, Plaintiff State of Utah, by and through the Attorney General of Utah, on behalf of itself, Utah governmental entities, and as *parens patriae* for its natural persons, is entitled to all available relief under the UAA and Utah common law, including, without limitation, damages (including treble damages, where permitted), injunctive relief, including disgorgement, restitution, unjust enrichment, and other equitable monetary relief, civil penalties, and its costs and reasonable attorneys' fees.

537

2091.  The aforementioned acts by Defendants violate the Utah Consumer Sales Practices Act, Utah Code §§ 13-11-1 through 13-11-23 (the "CSPA"). Accordingly, Plaintiff State of Utah, Division of Consumer Protection, is entitled to relief under the CSPA, including, without limitation, injunctive relief, civil penalties, costs, including costs of investigation, and reasonable attorneys' fees.

## Vermont

2092.  Plaintiff State of Vermont repeats and re-alleges each and every preceding allegation as if fully set forth herein.

2093.  Plaintiff State of Vermont brings this action in its law enforcement capacity.

2094.  Defendants' actions alleged herein constitute unfair methods of competition in commerce and unfair and deceptive acts and practices in commerce and thereby violate the Vermont Consumer Protection Act, 9 V.S.A. § 2453.

2095.   Pursuant to 9 V.S.A. §§ 2458 and 2465, the State of Vermont seeks and is entitled to injunctive relief, civil penalties, and other equitable relief (including but not limited to an accounting to determine the amount of money paid to Defendants as a result of the actions described herein, and disgorgement of revenues, profits and gains achieved in whole or part through the unfair methods of competition alleged herein), as well as its costs and fees for these violations.

## Virginia

2096.  Plaintiff Commonwealth of Virginia repeats and re-alleges each and every preceding allegation as if fully set forth herein.

2097.   The aforementioned practices by Defendants are in violation of the Virginia Antitrust Act, Virginia Code Sections 59.1-9.1, et seq.  These violations substantially affect the people of Virginia and have impacts within the Commonwealth of Virginia.

2098.   Plaintiff Commonwealth of Virginia, through the Attorney General, brings this action pursuant to the Virginia Antitrust Act, Virginia Code Section 59.1-9.15.  Pursuant to Sections 59.1-9.15(a) and (d), Plaintiff Commonwealth of Virginia seeks disgorgement, restitution, and other equitable relief, as well as civil penalties for these violations and reasonable fees and costs for the investigation and litigation.

### Washington

2099.   Plaintiff State of Washington repeats and re-alleges each and every preceding allegation as if fully set forth herein.

2100.   The aforementioned practices by Defendants were, and are, in violation of the Washington Consumer Protection Act, Wash. Rev. Code 19.86.020 and .030.  Defendants have also engaged in conduct in violation of RCW 19.86.020 that is not a reasonable business practice and constitutes incipient violations of antitrust law and/or unilateral attempts to fix prices or allocate markets.  These violations have impacts within the State of Washington and substantially affect the people of Washington.

2101.   Plaintiff State of Washington seeks relief, including but not limited to damages, for Washington consumers and Washington state agencies that paid more for the generic drugs at issue than they would have paid but for the Defendants' unlawful conduct.  Plaintiff State of Washington also seeks, and is entitled to, injunctive relief, other equitable relief (including but not limited to disgorgement), civil penalties, and costs and fees under the Consumer Protection Act, Wash Rev. Code 19.86.080 and 19.86.140.

## West Virginia

2102.   Plaintiff State of West Virginia repeats and re-alleges each and every preceding allegation as if fully set forth herein.

2103.   Defendants' acts violate the West Virginia Antitrust Act, see W. Va. Code § 47–18–1 et seq. These violations substantially affected the State of West Virginia and had impacts within the State of West Virginia.

2104.   West Virginia affirmatively expresses that the State is not seeking any relief in this action for the federal share of funding for West Virginia's Medicaid Program.

2105.   Claims for damages for any federal monies expended by the State of West Virginia are hereby expressly disavowed.

2106.   Plaintiff State of West Virginia is entitled to all remedies available at law or in equity (including injunctive relief, disgorgement, restitution, and reimbursement), as well as civil penalties under West Virginia Code § 47–18–1 et seq.

2107.   Plaintiff State of West Virginia also is entitled to recover its costs and attorneys' fees under West Virginia Code § 47–18–9.

## Wisconsin

2108.   Plaintiff State of Wisconsin repeats and re-alleges each and every preceding allegation as if fully set forth herein.

2109.   The aforementioned practices by Defendants are in violation of Wisconsin's Antitrust Act, Wis. Stat. Ch. § 133.03 et seq.  These violations substantially affect the people of Wisconsin and have impacts within the State of Wisconsin.

540

2110.   Plaintiff State of Wisconsin, under its antitrust enforcement authority in Wis. Stat. Ch. 133, is entitled to all remedies available at law or in equity under Wis. Stat. §§ 133.03, 133.14, 133.16, 133.17, and 133.18.

## U.S. Virgin Islands

2111.   Plaintiff the Territory of the U.S. Virgin Islands repeats and re-alleges each and every preceding allegation as if fully set forth herein.

2112.   The aforementioned practices by Defendants violate the Virgin Islands Monopolies and Restraints of Trade Act, 11 V.I.C. § 1503 and the Consumer Fraud and Deceptive Business Practices Act 12A V.I.C. § 304.

2113.   The U.S. Virgin Islands requests that the Court permanently enjoin Defendants, under 11 V.I.C. § 1507(1)  and 12A V.I.C. § 328(a) from engaging in any acts or practices that violate 11 V.I.C. § 1503 and   12A V.I.C. § 304; order Defendants to pay the maximum civil penalty under 11 V.I.C. § 1507 (4), and  12A V.I.C. § 328(b) for each and every violation of  11 V.I.C. § 1503, and 12A V.I.C. § 304, respectively; and  further requests that the Court grants all other  legal and equitable relief that the Court deems appropriate.

## California

2114.   Plaintiff State of California repeats and re-alleges each and every preceding allegation as if fully set forth herein.

2115.   Defendants' conspiracy to allocate market share and to fix and raise the price of generic pharmaceuticals constituted an unreasonable restraint of trade or commerce in violation of the Cartwright Act, California Business & Professions Code sections 16720 et seq.

541

2116.   As a direct and proximate result of Defendants' conspiracy, Plaintiff State of California and its state agencies (collectively, "California") were injured in their business and property in that they paid more for generic pharmaceuticals than they would have paid in the absence of Defendants' unlawful conduct.

2117.   California also bought generic pharmaceuticals from vendors and intermediaries. Pursuant to California Government Code Sections 4552-54, these vendors and intermediaries assigned to Plaintiff State of California all of their antitrust claims based on the purchase and resale of generic pharmaceutics to California.

2118.   As a result of Defendants' violations of section 16720 of the California Business and Professions Code, Plaintiff State of California brings this claim pursuant to section 16750(a) and (b) based on California's purchase of generic pharmaceutics at fixed and/or supra-competitive prices and based on any claims assigned to it.  Plaintiff State of California seeks treble damages, costs of suit, and reasonable attorneys' fees, pursuant to section 16750(a) and (b) of the California Business and Professions Code.  Plaintiff State of California also seeks injunctive relief, including disgorgement, pursuant to California Business and Professions Code section 16754.5.

2119.   Plaintiff State of California also brings this claim in the name of the people of the State of California, as *parens patriae* on behalf of natural persons residing in the state. As a direct and proximate result of the defendants' unlawful conduct described above, natural persons residing in the State of California were injured in their business and property in that they paid more for generic pharmaceuticals than they would have paid in the absence of the defendants' unlawful conduct.  Defendants' unlawful conduct has also resulted in deadweight loss to the economy of the State of California.  Plaintiff State of California seeks treble damages, costs of

542

suit, and reasonable attorneys' fees, pursuant to section 16760(a) of the Business and Professions Code.

2120.   Defendants' actions as alleged herein are in violation of the Unfair Competition Law, California Business & Professions Code sections 17200 et seq.

2121.   The acts alleged herein constitutes a common continuous and continuing course of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, et seq., including but not limited to Defendants' violation of the Sherman and Cartwright Acts.

2122.   The unlawful practices of Defendants, as described herein, caused California and natural persons residing in the state to lose money or property by being forced to pay supra-competitive and artificially-inflated prices for generic pharmaceuticals.

2123.   Plaintiff State of California accordingly seeks equitable relief pursuant to the California Business and Professions Code, sections 17203 and 17204, including but not limited to restitution of any amounts Defendants received as a result of their unlawful acts.  Plaintiff State of California also seeks civil penalties to the maximum extent permitted by law pursuant to California Business and Professions Code, Section 17206.

**PRAYER FOR RELIEF**

Accordingly, the Plaintiff States request that the Court:

A. Adjudge and decree that Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

B. Adjudge and decree that the foregoing activities violated each of the State statutes enumerated in this Complaint;

C. Enjoin and restrain, pursuant to federal and state law, Defendants, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anticompetitive conduct or in any unfair or deceptive acts or practices in violation of state consumer protection law, and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the actions set forth above;

D. Award to Plaintiff States disgorgement of the Defendants' ill-gotten gains and any other equitable relief as the Court finds appropriate to redress Defendants' violations of federal law or state antitrust and consumer protection laws to restore competition;

E. Award to the Plaintiff States damages, including treble damages, to the extent sought pursuant to applicable state laws as enumerated above;

F. Award to each Plaintiff State the maximum civil penalties allowed by law as enumerated above;

G. Award restitution to the Plaintiff States that seek it;

H. Award to each Plaintiff State its costs, including reasonable attorneys' fees; and

I. Order any other relief that this Court deems proper.

544

## JURY DEMAND

The Plaintiff States demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure, on all issues triable as of right by jury.


PLAINTIFF

WILLIAM TONG
ATTORNEY GENERAL


BY:   /s/ Laura J. Martella
      W. Joseph Nielsen
      Federal Bar No. ct20415
      Laura J. Martella
      Federal Bar No. ct27380
      Christine Miller
      Federal Bar No. ct30794
      Assistant Attorneys General
      165 Capitol Ave.
      Hartford, CT  06106
      Tel: (860) 808-5040
      Fax: (860) 808-5033
      Joseph.Nielsen@ct.gov
      Laura.Martella@ct.gov
      Christine.Miller@ct.gov

545

STATE OF ALABAMA
STEVE MARSHALL
ATTORNEY GENERAL

Olivia W. Martin
Assistant Attorney General

Office of the Attorney General
Consumer Interest Division
501 Washington Avenue
Montgomery, AL 36130
Tel.: (334) 242-7393
Fax: (334) 353-8400
Email: Olivia.Martin@AlabamaAG.gov

FOR PLAINTIFF STATE OF ALASKA
TREG R. TAYLOR
ATTORNEY GENERAL

Margaret Paton-Walsh
(Alaska Bar No. 0411074)
Jeff Pickett
(Alaska Bar No. 9906022)
Assistant Attorneys General
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Tel: (907) 269-5100
Fax: (907) 276-3697
margaret.paton-walsh@alaska.gov
jeff.pickett@alaska.gov

547

FOR PLAINTIFF STATE OF ARIZONA
MARK BRNOVICH
ATTORNEY GENERAL OF ARIZONA

DANA R. VOGEL
(Arizona Bar No. 030748)
Antitrust Unit Chief
CHRISTINA M. GREY
(Arizona Bar No. 035822)
Assistant Attorney General
Office of the Attorney General
Civil Litigation Division, Antitrust Unit
2005 North Central Avenue
Phoenix, AZ 85004-1592
Telephone: (602) 542-7748
Fax: (602) 542-9088
Dana.Vogel@azag.gov

FOR THE PLAINTIFF STATE OF ARKANSAS

LESLIE RUTLEDGE
ATTORNEY GENERAL

Johnathan R. Carter – AR Bar # 2007105
Assistant Attorney General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Telephone:  501.682.8063
Fax:  501.682.8118
Email:  Johnathan.Carter@Arkansasag.gov

FOR PLAINTIFF STATE OF CALIFORNIA

ROB BONTA
ATTORNEY GENERAL OF THE
STATE OF CALIFORNIA

Emilio Varanini
Supervising Deputy Attorney General
Healthcare Rights and Access Section
California Office of the Attorney General

David Houska
Deputy Attorney General
Healthcare Rights and Access Section
California Office of the Attorney General

Erica Koscher
Deputy Attorney General
Healthcare Rights and Access Section
California Office of the Attorney General

Sophia TonNu
Deputy Attorney General
Healthcare Rights and Access Section
California Office of the Attorney General

455 Golden Gate Avenue, Ste. 11000
San Francisco, Ca. 94102
Phone #: 415-510-3541
E-mail: Emilio.Varanini@doj.ca.gov

Attorneys for Plaintiff State of California

550

FOR PLAINTIFF STATE OF COLORADO
PHILIP J. WEISER
ATTORNEY GENERAL

Diane R. Hazel
Acting First Assistant Attorney General
Abigail Smith
Assistant Attorney General
Colorado Department of Law
Consumer Protection Section
1300 Broadway, Seventh Floor
Denver, Colorado 80203
Telephone: 720-508-6219
Email: diane.hazel@coag.gov
abigail.smith@coag.gov

STATE OF DELAWARE
KATHLEEN JENNINGS
ATTORNEY GENERAL

Michael A. Undorf
Deputy Attorney General
Delaware Department of Justice
820 N. French St., 5th Floor
Wilmington, DE 19801
Telephone: (302) 683-8816
Email: michael.undorf@delaware.gov

FOR PLAINTIFF DISTRICT OF COLUMBIA

KARL A. RACINE
Attorney General for the District of Columbia

KATHLEEN M. KONOPKA
Deputy Attorney General
Public Advocacy Division
CATHERINE A. JACKSON
Chief, Public Integrity Section
ELIZABETH G. ARTHUR
Assistant Attorney General
Public Integrity Section
441 Fourth Street, N.W., Suite 630 South
Washington, D.C. 20001
(202) 742-6514
elizabeth.arthur@dc.gov

Attorneys for the District of Columbia

FOR PLAINTIFF STATE OF FLORIDA
ASHLEY MOODY
Attorney General

JOHN GUARD
(Florida Bar No. 374600)
Chief Deputy Attorney General
PATRICIA A. CONNERS
(Florida Bar No. 361275)
Chief Associate Deputy Attorney General
LIZABETH A. BRADY
(Florida Bar No. 457991)
Chief, Multistate Enforcement
TIMOTHY FRASER
(Florida Bar No. 957321)
Assistant Attorney General
Office of the Attorney General
State of Florida
PL-01, The Capitol
Tallahassee, FL 32399-1050
Tel: (850) 414-3300
Fax: (850) 488-9134

FOR PLAINTIFF STATE OF GEORGIA
CHRISTOPHER M. CARR
Attorney General of Georgia

Daniel S. Walsh
Senior Assistant Attorney General
Charles K. Thimmesch
Assistant Attorney General
Department of Law
State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
Tel: 404-657-2204 Fax: 404-656-0677
dwalsh@law.ga.gov
cthimmesch@law.ga.gov

555

FOR THE TERRITORY OF GUAM
LEEVIN TAITANO CAMACHO
Attorney General


Marinna N. Julian
Assistant Attorney General
Consumer Protection Division
590 South Marine Corps Drive
Suite 901, ITC Building
Tamuning, Guam 96913 ▪ USA
Telephone:  (671) 475-3324
Facsimile:  (671) 472-2493
mnjulian@oagguam.org

ATTORNEY FOR THE TERRITORY OF
GUAM

556

FOR THE STATE OF HAWAII
CLARE E. CONNORS
ATTORNEY GENERAL OF HAWAII

BRYAN C. YEE
RODNEY I. KIMURA
Deputy Attorneys General
Department of the Attorney General
425 Queen Street
Honolulu, Hawaii  96813
Tel:  808-586-1180
Fax:  808-586-1205
Bryan.c.yee@hawaii.gov
Rodney.i.kimura@hawaii.gov

557

FOR PLAINTIFF STATE OF IDAHO
LAWRENCE G. WASDEN
ATTORNEY GENERAL

Brett T. DeLange
John K. Olson
David Young
Deputy Attorneys General
Consumer Protection Division
Office of the Attorney General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, Idaho  83720-0010
Telephone: (208) 334-4114
Fax: (208) 334-4151
brett.delange@ag.idaho.gov
john.olson@ag.idaho.gov
david.young@ag.idaho.gov

FOR PLAINTIFF STATE OF ILLINOIS
KWAME RAOUL
ATTORNEY GENERAL

Blake L. Harrop
Chief, Antitrust Bureau
Joseph B. Chervin
Assistant Attorney General
Office of the Illinois Attorney General
Antitrust Bureau
100 W. Randolph Street
Chicago, IL 60601
Telephone: (312) 814-1004
Fax: (312) 814-4209
Email: bharrop@atg.state.il.us
       jchervin@atg.state.il.us

*Attorney for the State of Illinois*

Respectfully submitted,

INDIANA ATTORNEY GENERAL
THEODORE E. ROKITA

TAMARA WEAVER
Deputy Attorney General

VANESSA VOIGT GOULD
Deputy Attorney General

BETSY M. DENARDI
Director of Complex Litigation

CORY C. VOIGHT
Director of Complex Litigation

302 West Washington St., 5th Floor
IGCS -5th Floor
Indianapolis, IN 46204

Tel: (317) 234-7122
Fax: (317) 233-4393

ATTORNEYS FOR THE
STATE OF INDIANA

ATTORNEYS FOR THE
STATE OF IOWA

THOMAS J. MILLER
Attorney General of Iowa

Max M. Miller
Assistant Attorney General
Consumer Protection Division
Hoover Office Building-Second Floor
1305 East Walnut Street
Des Moines, IA 50319
Tel: (515) 281-5926
Fax: (515) 281-6771
Max.Miller@ag.iowa.gov


ATTORNEYS FOR THE
STATE OF IOWA

561

FOR PLAINTIFF STATE OF KANSAS
DEREK SCHMIDT
ATTORNEY GENERAL

Lynette R. Bakker
Assistant Attorney General
Office of the Kansas Attorney General
120 S.W. 10th Avenue, 2nd Floor
Topeka, KS 66612-1597
Telephone: (785) 368-8451
Fax: (785) 291-3699
Email: lynette.bakker@ag.ks.gov

DANIEL CAMERON
Attorney General of Kentucky

Jonathan Farmer
Assistant Attorneys General
Office of the Attorney General of Kentucky
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
Tel: 502-696-5300
Fax: 502-573-8317
Jonathan.Farmer@ky.gov

ATTORNEYS FOR THE STATE OF KENTUCKY

563

FOR PLAINTIFF STATE OF LOUISIANA

JEFF LANDRY
ATTORNEY GENERAL


William H. Rogers, Jr. LA Bar #37288
Assistant Attorney General
Public Protection Division
Complex Litigation Section
1885 North 3rd Street
Baton Rouge, Louisiana 70804-9005
225.326.6438 (P)
225.326.6499 (F)

564

AARON M. FREY
Attorney General of Maine

Christina Moylan
Assistant Attorney General
Office of the Attorney General of Maine
6 State House Station
Augusta, ME  04333
Tel:  207-626-8838
Fax: 207-624-7730
christina.moylan@maine.gov

ATTORNEYS FOR THE
STATE OF MAINE

FOR PLAINTIFF STATE OF MARYLAND:

BRIAN E. FROSH
Attorney General

Schonette J. Walker
Assistant Attorney General
Chief, Antitrust Division

Gary Honick
Assistant Attorney General
Deputy Chief, Antitrust Division
200 St. Paul Place, 19th Floor
Baltimore, Maryland  21202
(410) 576-6470
swalker@oag.state.md.us
ghonick@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*

FOR PLAINTIFF COMMONWEALTH
OF MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL

William T. Matlack (MA BBO No. 552109)
Assistant Attorney General
Chief, Antitrust Division
Michael B. MacKenzie (MA BBO No. 683305)
Assistant Attorney General
Deputy Chief, Antitrust Division
Daniel H. Leff (MA BBO No. 689302)
Assistant Attorney General
Antitrust Division
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200
Fax: (617) 722-0184 (fax)
William.Matlack@mass.gov
Michael.Mackenzie@mass.gov
Daniel.Leff@mass.gov

FOR PLAINTIFF
STATE OF MICHIGAN
DANA NESSEL
ATTORNEY GENERAL


Wisam E. Naoum
Assistant Attorney General
Corporate Oversight Division
Michigan Department of Attorney General
G. Mennen Williams Building, 6th Floor
525 W. Ottawa Street
Lansing, Michigan 48933
NaoumW1@michigan.gov
Telephone: (517) 335-7632
Fax: (517) 335-6755

568

FOR PLAINTIFF
STATE OF MINNESOTA

KEITH ELLISON
ATTORNEY GENERAL

JAMES W. CANADAY
Deputy Attorney General

JASON PLEGGENKUHLE
ELIZABETH ODETTE
JOSEPH C. MEYER
Assistant Attorneys General

Office of the Minnesota Attorney General
Suite 1400
445 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 757-1433
Fax: (651) 296-9663
Email: Joseph.Meyer@ag.state.mn.us

569

FOR PLAINTIFF STATE OF MISSISSIPPI

LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By: Crystal Utley Secoy, MSBN 102132
Director & Assistant Attorney General
Consumer Protection Division
Mississippi Attorney General's Office
Post Office Box 220
Jackson, Mississippi  39205
Telephone:  601-359-4213
Email:  crystal.utley@ago.ms.gov

FOR PLAINTIFF STATE OF MISSOURI

ERIC S. SCHMITT
Attorney General

Michael Schwalbert, E.D. MO Bar No. 63229MO
Assistant Attorney General
815 Olive Street, Suite 200
Saint Louis, Missouri 63101
Tel: (314) 340-7888
Fax: (314) 340-7957
Michael.Schwalbert@ago.mo.gov

ATTORNEY FOR PLAINTIFF
STATE OF MISSOURI

STATE OF MONTANA
AUSTIN KNUDSEN
Attorney General


MARK MATTIOLI
Chief, Consumer Protection

MONTANA DEPARTMENT OF JUSTICE
OFFICE OF CONSUMER PROTECTION
555 Fuller Avenue
P.O. Box 200151
Helena, MT 59620-0151
(406) 444-4500
FAX:  (406) 442-1894
mmattioli@mt.gov

FOR PLAINTIFF STATE OF NEBRASKA,
DOUGLAS J. PETERSON,
ATTORNEY GENERAL

Shereece Dendy-Sanders
Assistant Attorney General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE  68509
Tel: 402-471-9305
Fax: 402-471-4725
shereece.dendy-sanders@nebraska.gov

573

FOR PLAINTIFF STATE OF NEVADA

AARON D. FORD
Nevada Attorney General

ERNEST D. FIGUEROA
Consumer Advocate

Lucas J. Tucker
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
8945 West Russell Road., Suite 204
Las Vegas, Nevada 89148
Nevada Bar No. 10252
LTucker@ag.nv.gov

Marie W.L. Martin
Senior Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
100 N. Carson Street
Carson City, NV 89701
Nevada Bar No. 07808
MMartin@ag.nv.gov

FOR THE PLAINTIFF
STATE OF NEW HAMPSHIRE
By its attorney,
John M. Formella
Attorney General of New Hampshire

Gregory M. Albert, NH Bar #20058
Assistant Attorney General
Consumer Protection and Antitrust Bureau
NH Department of Justice
33 Capitol Street
Concord, NH 03301
Gregory.Albert@doj.nh.gov
(603) 271-1196

ANDREW BRUCK
Acting Attorney General of New Jersey

Isabella R. Pitt
Deputy Attorney General
State of New Jersey
Office of the Attorney General
Division of Law
124 Halsey Street – 5th Floor
Newark, New Jersey 07102
Tel: (973) 648-7819
Fax: (973) 648-4887
Isabella.Pitt@law.njoag.gov

ATTORNEY FOR THE
STATE OF NEW JERSEY

FOR PLAINTIFF STATE OF NEW MEXICO
HECTOR BALDERAS
ATTORNEY GENERAL

P. Cholla Khoury
Nicholas M. Sydow
Assistant Attorneys General
P.O. Drawer 1508
Santa Fe, NM  87504-1508
Telephone: (505) 490-4060
Fax: (505) 490-4881
Email: ckhoury@nmag.gov
nsydow@nmag.gov

577

Respectfully submitted,

LETITIA JAMES
Attorney General of the State of New York

CHRISTOPHER D'ANGELO
Chief Deputy Attorney General
Economic Justice Division

ELINOR HOFFMANN
Chief, Antitrust Bureau

ROBERT L. HUBBARD
BEATRIZ MARQUES
Assistant Attorneys General

28 Liberty, 20th Floor
New York, New York 10005
Tel: (212) 416-8267
Fax: (212) 416-6015

ATTORNEYS FOR THE
STATE OF NEW YORK

FOR PLAINTIFF
STATE OF NORTH CAROLINA

Respectfully submitted,

JOSHUA H. STEIN
Attorney General of North Carolina

Kimberley A. D'Arruda
Special Deputy Attorney General
kdarruda@ncdoj.gov

Jessica V. Sutton
Assistant Attorney General
jsutton2@ncdoj.gov

North Carolina Dept. of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC  27603
Telephone: (919) 716-6000
Fax: (919) 716-6050

STATE OF NORTH DAKOTA
Wayne Stenehjem
Attorney General

Parrell D. Grossman, ND ID 04684
Assistant Attorney General
Director, Consumer Protection &
Antitrust Division
Office of Attorney General
Gateway Professional Center
1050 E Interstate Ave, Ste 200
Bismarck, ND  58503--5574
Telephone (701) 328-5570
Facsimile (701) 328-5568
pgrossman@nd.gov

*Attorneys for the State of North Dakota*

580

FOR THE COMMONWEALTH OF THE
NORTHERN MARIANA ISLANDS
EDWARD E. MANIBUSAN
ATTORNEY GENERAL

Lillian A. Tenorio
Deputy Attorney General
Abbi Novotny
Assistant Attorney General
Office of the Attorney General
Commonwealth of the Northern Mariana Islands
2nd Floor Hon. Juan A. Sablan Memorial Building
Caller Box 10007, Capital Hill
Saipan, MP  96950
Tel:  670-234-7529
Fax:  670-665-2349
deputy_AG@cnmioag.org
abbi_novotny@cnmioag.org

Respectfully submitted,

DAVE YOST
Attorney General of Ohio

Jennifer Pratt
Chief, Antitrust Section
Beth A. Finnerty
Assistant Section Chief, Antitrust Section
Edward J. Olszewski
Principal Assistant Attorney General
Office of the Ohio Attorney General
Antitrust Section
30 East Broad Street, 26th Floor
Columbus, OH 43215
Tel: (614) 466-4328
Fax: (614) 995-0269
edward.olszewski@OhioAGO.gov

ATTORNEYS FOR THE
STATE OF OHIO

582

FOR PLAINTIFF STATE OF OKLAHOMA
MIKE HUNTER
ATTORNEY GENERAL

Caleb J. Smith, OBA No. 33613
Assistant Attorney General
Consumer Protection Unit
Oklahoma Office of the Attorney General
313 NE 21st St
Oklahoma City, OK 73105
Tel. (405) 522-1014
Fax (405) 522-0085
Caleb.Smith@oag.ok.gov

STATE OF OREGON

ELLEN F. ROSENBLUM
ATTORNEY GENERAL

TIM D. NORD, OSB 882800
Special Counsel
Civil Enforcement Division
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel: (503) 934-4400
Fax: (503) 373-7067
tim.d.nord@doj.state.or.us

CHERYL F. HIEMSTRA, OSB 133857
Assistant Attorney General
Civil Enforcement Division
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel: (503) 934-4400
Fax: (503) 373-7067
cheryl.hiemstra@doj.state.or.us

COMMONWEALTH OF
PENNSYLVANIA
Office of the Attorney General

JOSH SHAPIRO
ATTORNEY GENERAL

Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section

Joseph S. Betsko
Senior Deputy Attorney General
Antitrust Section

Abigail U. Wood
Stephen M. Scannell
Deputy Attorneys General
Antitrust Section

Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Phone: 717-787-4530
Fax: 717-787-1190
twertz@attorneygeneral.gov
jbetsko@attorneygeneral.gov
awood@attorneygeneral.gov
sscannell@attorneygeneral.gov

ATTORNEYS FOR THE
COMMONWEALTH
OF PENNSYLVANIA

FOR PLAINTIFF COMMONWEALTH OF
PUERTO RICO

DENNISE N. LONGO QUIÑONES
Attorney General


Johan M. Rosa Rodríguez
Attorney
PR Bar No. 16819
P.O. Box 9020192
San Juan, Puerto Rico 00902-0192
Tel: (787) 721-2900, ext. 2600, 2601
Fax: (787) 721-3223
jorosa@justicia.pr.gov

FOR PLAINTIFF STATE OF RHODE ISLAND:

PETER F. NERONHA
Attorney General

STEPHEN N. PROVAZZA
Special Assistant Attorney General

Stephen N. Provazza
SProvazza@riag.ri.gov
Rhode Island Office of the Attorney General
150 South Main St., Providence RI 02903
Tel:  (401) 274-4400

*Attorney for Plaintiff State of Rhode Island*

587

ALAN WILSON
Attorney General for the
State of South Carolina
Federal ID No. 10457
Email: awilson@scag.gov

W. JEFFREY YOUNG
Chief Deputy Attorney General
Federal ID No. 6122
Email: jyoung@scag.gov

ROBERT D. COOK
Solicitor General
Federal ID No. 285
Email: bcook@scag.gov

C. HAVIRD JONES, JR.
Senior Assistant Deputy Attorney General
Federal ID No. 2227
Email: sjones@scag.gov

CLARK KIRKLAND, JR.
Assistant Attorney General
Federal ID No. 12410
Email: ckirklandjr@scag.gov

OFFICE OF THE ATTORNEY GENERAL
1000 Assembly Street
Rembert C. Dennis Building
Post Office Box 11549
Columbia, South Carolina 29211-1549
Phone: 803.734.3970

Attorneys for Alan Wilson, in his official
capacity as Attorney General of the
State of South Carolina.

588

FOR PLAINTIFF STATE OF TENNESSEE

HERBERT H. SLATERY III
Attorney General and Reporter of
Tennessee

DAVID MCDOWELL
Senior Assistant Attorney General
David.McDowell@ag.tn.gov

JIN YOO
Assistant Attorney General
Jin.Yoo@ag.tn.gov

Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
Tel: (615) 741-8722


ATTORNEYS FOR THE
STATE OF TENNESSEE

FOR PLAINTIFF STATE OF UTAH

SEAN D. REYES
UTAH ATTORNEY GENERAL

David Sonnenreich
Deputy Attorney General
Antitrust Section Director

Christy A. Matelis
Assistant Attorney General

Scott Ryther
Assistant Attorney General

Office of the Attorney General of Utah
including as counsel for the Utah Division of
Consumer Protection
160 East 300 South, 5th Floor
P.O. Box 140874
Salt Lake City, UT 84114-0874
Tel: 801-366-0375
Fax: 801-366-0378
cmatelis@agutah.gov

FOR PLAINTIFF STATE OF
VERMONT

THOMAS J. DONOVAN, JR.
ATTORNEY GENERAL


Jill S. Abrams
Assistant Attorney General
Director, Consumer and Antitrust Division
109 State Street
Montpelier, Vermont 05609
Telephone: (802) 828-1106
Email: Jill.Abrams@vermont.gov

Respectfully submitted,

MARK R. HERRING
Attorney General of Virginia

Erin B. Ashwell
Chief Deputy Attorney General

Samuel T. Towell
Deputy Attorney General

Richard S. Schweiker, Jr.
Senior Assistant Attorney General and
Chief, Consumer Protection Section

Sarah Oxenham Allen
Senior Assistant Attorney General

Tyler T. Henry
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, VA  23219
Tel:  804-692-0485
Fax: 804-786-0122
thenry@oag.state.va.us


ATTORNEYS FOR THE
COMMONWEALTH OF VIRGINIA

ROBERT W. FERGUSON
Attorney General of Washington State

JONATHAN A. MARK
Senior Assistant Attorney General
Antitrust Division Chief

Travis Kennedy
Assistant Attorney General
Office of the Attorney General of
Washington State
800 5th Ave, Ste. 2000
Seattle, WA 98104-3188
(206) 464-7744

Attorneys for Plaintiff State of Washington

593

FOR PLAINTIFF STATE OF WEST VIRGINIA
PATRICK MORRISEY
ATTORNEY GENERAL

Ann L. Haight
Deputy Attorney General
Douglas L. Davis
Assistant Attorney General
Office of the West Virginia Attorney General
812 Quarrier Street, 1st Floor
Charleston, WV  25301
Telephone: (304) 558-8986
Fax: (304) 558-0184
Email:  douglas.l.davis@wvago.gov

JOSHUA L. KAUL
Attorney General of Wisconsin

GWENDOLYN J. COOLEY
Assistant Attorney General
State Bar #1053856

Attorneys for the State of Wisconsin

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 261-5810
(608) 294-2907 (Fax)
cooleygj@doj.state.wi.us

U.S. VIRGIN ISLANDS
DENISE N. GEORGE

Carol Thomas-Jacobs
Chief Deputy Attorney General
V.1. Department of Justice
Office of the Attorney General,
GERS Building, 2'" Floor
St. Thomas, USVI 00801
Phone: (340) 774-5666 ext. 1010
Fax:(340) 774-3494
Email: carol.jacobs@doj.vi.gov

596