# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-md-2724 |
| THIS DOCUMENT RELATES TO:<br><br>*The State of Connecticut, et al. v. Sandoz, Inc., et al.* | HON. CYNTHIA M. RUFE<br><br>Civil Action No.<br><br>2:20-cv-03539-CMR |

**CERTAIN DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR JOINT MOTION TO DISMISS
THE PLAINTIFF STATES' OVERARCHING CONSPIRACY CLAIMS
<u>IN THE BELLWETHER COMPLAINT</u>**

## Table of Contents

Page

I.   Introduction ................................................................................................... 1

II.  Background ................................................................................................... 3

    A.    The States Filed a First Consolidated Amended Complaint in 2018 Seeking to Hold All Named Corporate Defendants Jointly and Severally Liable for Participating in "the Overarching Conspiracy" ................................................................................................... 3

    B.    Rather Than Further Amend Their First Complaint, the States Filed Two New Actions Also Alleging an "Overarching Conspiracy" as a Basis for Joint and Several Liability. 5

    C.    The States Describe the Same "Overarching Conspiracy" in the Third Complaint, but Broaden Its Scope ................................................................................................... 7

        1.    The States Allege Dozens of Unrelated Drug-Specific Conspiracies and Provide No Evidence of An Overarching Conspiracy ................................................................................................... 7

        2.    The States Allege an Expanded and Amorphous Time Period ................................... 8

        3.    The Scope of Each Count Reflects the Lack of Definition in the States' Overarching Conspiracy Claims ................................................................................................... 9

III.  Argument ................................................................................................... 10

    A.    The States Fail to State An Overarching Conspiracy Claim ................................... 11

        1.    The States' Allegations Largely Describe Lawful, Parallel Conduct ........................ 12

        2.    The States Fail to Allege Sufficient Direct or Circumstantial  Evidence of an Overarching Agreement ................................................................................................... 14

        3.    There Is No "Connective Tissue" Among the Alleged Discrete and  Disconnected Product-Centered Conspiracies that Gives "Credence"  to the Existence of an Overarching Conspiracy ................................................................................................... 20

    B.    The States' Overarching Conspiracy Claims Should Be Dismissed as Improper Claim-Splitting ................................................................................................... 24

        1.    The States' First, Second, and Third Complaints Each Purport to Allege the Same "Fair Share"-Based "Overarching Conspiracy" ................................................... 26

        2.    The States' Actions Involve Many of the Same Parties ........................................... 28

        3.    The Factual Allegations in the First and Second Complaints  Overlap with Those in the Third Complaint ................................................................................................... 29

4.  At Minimum, the Court Should Dismiss the States' Duplicative Allegations and Overlapping Theories of Recovery .......................................................................... 31

IV.  Conclusion ............................................................................................................ 34

## **TABLE OF AUTHORITIES**

**Page(s)**

<u>Cases</u>

*Agha-Khan v. United States*,
    No. 15-cv-0042, 2015 WL 5734380 (E.D. Cal. Sept. 29, 2015), *aff'd*, 683 F.
    App'x 628 (9th Cir. 2017) ..................................................................................................26

*Alaska Dep't of Revenue, Treasury Div. v. Manku*,
    No. 20-cv-1759, 2021 WL 3027170 (2d Cir. Jul. 19, 2021)................................................3, 20

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
    37 F.3d 996 (3d Cir. 1994)..............................................................................................11, 12

*Alyeska Pipeline Serv. Co. v. United States*,
    688 F.2d 765 (Ct. Cl. 1982) ................................................................................................31

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................................15

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................13, 15, 22

*Brain Life, LLC v. Elekta Inc.*,
    746 F.3d 1045 (Fed. Cir. 2014)..........................................................................................31

*Brown & Brown, Inc. v. Blumenthal*,
    1 A.3d 21 (Conn. 2010) ......................................................................................................32

*DIRECTV, Inc. v. Kitzmiller*,
    No. 03-cv-3296, 2004 WL 834703 (E.D. Pa. Mar. 31, 2004) ................................................27

*Dubuc v. City of Tulsa*,
    No. 98-cv-5140, 1999 WL 668823 (10th Cir. Aug. 27, 1999) ................................................26

*Egli v. Strimel*,
    251 F. Supp. 3d 827 (E.D. Pa. 2017) (Rufe, J.) ......................................................................30

*Fabics v. City of New Brunswick*,
    629 F. App'x 196 (3d Cir. 2015) ........................................................................................29

*Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*,
    95 F.3d 358 (5th Cir. 1996) ................................................................................................32

*Gregory v. Chehi*,
    843 F.2d 111 (3d Cir. 1988)................................................................................................30

iii

*Hudson v. United States*,
    522 U.S. 93 (1997) ........................................................................................................33

*Hutchins v. United Parcel Serv., Inc.*,
    197 F. App'x 152 (3d Cir. 2006) ...................................................................................31

*In re Auto. Parts Antitrust Litig.*,
    No. 12-md-2311, 2016 WL 8200512 (E.D. Mich. Apr. 13, 2016) ...........................20, 21, 22

*In re Auto. Parts Antitrust Litig.*,
    No. 12-md-2311, 2018 WL 1138422 (E.D. Mich. Jan. 16, 2018) ...........................20, 21, 22

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999)...........................................................................11, 12, 15

*In re Chocolate Confectionary Antitrust Litig.*,
    801 F.3d 383 (3d Cir. 2015)...........................................................................13, 18

*In re Flat Glass Antitrust Litig*,
    385 F.3d 350 (3d Cir. 2004)...........................................................................12, 13, 15

*In re Generic Pharm. Pricing Antitrust Litig.*,
    No. 16-md-2724, 2021 WL 1047553 (E.D. Pa. Feb. 9, 2021).................................................1

*In re Generic Pharm. Pricing Antitrust Litig.*,
    338 F. Supp. 3d 404 (E.D. Pa. 2018) ...........................................................................18

*In re Generic Pharm. Pricing Antitrust Litig.*,
    394 F. Supp. 3d 509 (E.D. Pa. 2019) ...........................................................................20

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)...........................................................................3, 14, 22

*In re K-Dur Antitrust Litig.*,
    No. 01-cv-1652, 2016 WL 755623 (D.N.J. Feb. 25, 2016) ...................................................23

*In re Magnesium Oxide Antitrust Litig.*,
    No. 10-cv-5943(DRD), 2011 WL 5008090 (D.N.J. Oct. 20, 2011) .................................20, 22

*In re Packaged Seafood Prods. Antitrust Litig.*,
    No. 15-md-2670, 2017 WL 35571 (S.D. Cal. Jan. 3, 2017)...................................................22

*In re Polyurethane Foam Antitrust Litig.*,
    152 F. Supp. 3d 968 (N.D. Cal. 2015) ...........................................................................22

*In re Processed Egg Prods. Antitrust Litig.*,
    821 F. Supp. 2d 709 (E.D. Pa. 2011) ...........................................................................18

iv

*In re Text Messaging Antitrust Litig.*,
   782 F. 3d 867 (7th Cir. 2015) ..........................................................................................13, 14

*In re Vitamins Antitrust Litig.*,
   320 F. Supp. 2d 1 (D.D.C. 2004) .................................................................................20

*Intel Corp. v. Fortress Inv. Grp. LLC*,
   No. 19-cv-7651, 2020 WL 6390499 (N.D. Cal. Jul. 15, 2020) ............................................24

*Katz v. Gerardi*,
   655 F.3d 1212 (10th Cir. 2011) ....................................................................................25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).......................................................................................................15

*McKenna v. City of Phila.*,
   304 F. App'x 89 (3d Cir. 2008) ...................................................................................31

*Monsanto Co. v. Spray–Rite Serv. Corp.*,
   465 U.S. 752 (1984).......................................................................................................15

*Moore v. N.Y. Cotton Exch.*,
   270 U.S. 593 (1926).......................................................................................................26

*Precision Assocs., Inc. v. Panalpina*,
   No. 08-cv-42(JG)(VVP), 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) .....................17, 22, 23

*Prewitt v. Walgreens Co.*,
   No. 12-cv-6967, 2013 WL 6284166 (E.D. Pa. Dec. 2, 2013)..........................................24, 25

*Protocomm Corp. v. Novell, Inc.*,
   No. 94-cv-7774, 1998 WL 351605 (E.D. Pa. June 30, 1998)................................................29

*RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
   800 F. Supp. 2d 182 (D.D.C. 2011), *aff'd*, 682 F.3d 1043 (D.C. Cir. 2012)...........................31

*Schneider v. United States*,
   301 F. App'x 187 (3d Cir. 2008) ...................................................................................31

*Sensormatic Sec. Corp. v. Sensormatic Elec. Corp.*,
   273 F. App'x 256 (4th Cir. 2008) ...................................................................................32

*Serlin v. Arthur Andersen & Co.*,
   3 F.3d 221 (7th Cir. 2012) .............................................................................................25

*Silva v. Yosemite Cmty. Coll. Dist.*,
   No. 19-cv-0795, 2019 WL 6878237 (E.D. Cal. Dec. 17, 2019)............................................30

*Staley v. Gilead Scis., Inc.*,
  No. 19-cv-2573-EMC, 2020 WL 5507555 (N.D. Cal. July 29, 2020) ............................23, 24

*Stark v. Starr*,
  94 U.S. 477 (1876) ................................................................................................................25

*Strader v. U.S. Bank*,
  No. 19-cv-118, 2020 WL 3447776 (W.D. Pa. June 24, 2020) ................................................31

*United States v. McKee*,
  506 F.3d 225 (3d Cir. 2007) ..................................................................................................24

*United States ex rel. Lisitza v. Par Pharm. Cos., Inc.*,
  62 F. Supp. 3d 743 (N.D. Ill. 2014) ........................................................................................27

*United States v. Haytian Republic*,
  154 U.S. 118 (1894) ..............................................................................................................24

*United States v. Mississippi*,
  380 U.S. 128 (1965) ..............................................................................................................26

*Valspar Corp. v. E.I. du Pont de Nemours & Co.*,
  873 F.3d 185 (3d Cir. 2017) ..............................................................................12, 13, 14, 18

*Vanover v. NCO Financial Servs., Inc.*,
  857 F.3d 833 (11th Cir. 2017) .........................................................................................25, 31

*Walton v. Eaton Corp.*,
  563 F.2d 66 (3d Cir. 1977) ..............................................................................................25, 29, 31

*Williamson v. Columbia Gas & Elec. Corp.*,
  186 F.2d 464 (3d Cir. 1951) ....................................................................................................9

*Xerox Corp. v. SCM Corp.*,
  576 F.2d 1057 (3d Cir. 1978) ...........................................................................................26, 29

*Zisumbo v Ogden Reg'l Med. Ctr.*,
  536 F. App'x 832 (10th Cir. 2013) ........................................................................................32

## Statutes

28 U.S.C. § 1407 ...........................................................................................................................1

Conn. Gen. Stat. § 35-42 .............................................................................................................32

N.Y. Gen. Bus. Law § 341 ...........................................................................................................33

NY Gen. Bus. Law § 342-a ..........................................................................................................33

Wis. Stat. § 133.03(1) .................................................................................................................33

## I.   INTRODUCTION

On June 10, 2020, State Plaintiffs filed what is now the current State "bellwether" complaint, which seeks to hold 26 manufacturer Defendants[1] and 10 individual Defendants (together, "Defendants") jointly and severally liable for supposed anticompetitive conduct with respect to generic drugs because of an alleged "overarching conspiracy" among all Defendants. *See, e.g.*, *Connecticut et al. v. Sandoz, Inc. et al.*, No. 20-cv-3539, ECF No. 1 (June 10, 2020) (the "Third Complaint"), *amended by* ECF No. 62 (Sept. 9, 2020) (the "Amended Third Complaint"), at pp. 431–59.[2]  Because the States fail to state a claim on which joint and several liability may be recovered, and because the Third Complaint violates the rule against claim-splitting, Defendants move to dismiss the overarching conspiracy claim in the Third Complaint.

As this Court has recognized, "the purpose of a bellwether selection is to determine a course that is reasonable and fair and 'will promote the just and efficient conduct of' the cases constituting the MDL."  *In re Generic Pharm. Pricing Antitrust Litig.*, 16-md-2724, 2021 WL 1047553, at *3 (E.D. Pa. Feb. 9, 2021) (quoting 28 U.S.C. § 1407).  This Court should not delay in granting Defendants the requested relief, because if the overarching conspiracy claim in this action proceeds, "rocky shoals" await,[3] for at least two reasons:

---

[1]    Though the States name 26 distinct manufacturer Defendants, they refer to several corporate affiliates in the collective (for example, Amneal Pharmaceuticals, Inc. and Amneal Pharmaceuticals, LLC are referred to collectively as "Amneal," *see* Am. Third. Compl. ¶ 30). Counting each collective as a single Defendant, the States have identified 17 corporate (non-individual) Defendants.  All of the Defendants are alleged to have participated in the asserted overarching conspiracy.

[2]    For ease of reference, Defendants refer herein to the "Amended Third Complaint" as the "Third Complaint."  However, for clarity, *citations* to the Amended Third Complaint are noted as such.

[3]    *Id.* (observing that careful up-front management of the scope of the MDL is critical to avoid "capsizing the progress of the MDL when it is too late to turn back.").

*First*, the States have failed to allege any facts supporting the formation or existence of an overarching conspiracy. The States' current iteration of the "overarching conspiracy" claims is both implausible and ill-defined. It attempts to hold all the Defendants jointly and severally liable for alleged conspiracies pertaining to dozens of unrelated products over the course of more than seven years without adding any "connective tissue" that would render an overarching conspiracy claim viable.

*Second*, the States have now claimed the same "overarching conspiracy" three times, in violation of the Federal Rules' prohibition on claim-splitting. If the States' overarching conspiracy claims are not dismissed, Defendants will be subject to duplicative litigation and the risk of duplicative recovery. The States elected to file a Third Complaint, rather than seeking leave to amend either the First or Second Complaints, because of (a) this Court's scheduling order limiting amendments to existing complaints, and more importantly (b) Connecticut's prohibition against using post-complaint evidence gathered through Connecticut's state-law-based investigative subpoenas to prosecute pending complaints. Having made that choice, the States were required to limit the Third Complaint to new and distinct conduct that did not have a "common nucleus of operative facts" with the First or Second Complaints. They did not. The States' pleading tactics have caused delay, spawned numerous overlapping private complaints, and consumed the Court's resources. Due process, effective case management, and faithful application of binding precedent mandate rejection of the States' attempts to split claims across multiple complaints.

The Third Complaint alleges an overarching conspiracy with no central actor, no central group of products, and no other meaningful ties among the more narrowly alleged product-specific conspiracies. Instead, the States declare in conclusory fashion that the alleged product-specific conspiracies reveal an alleged "industry-wide" conspiracy. They do not. The Third Complaint

fails to articulate the formation of or participation in an overarching conspiracy by any of the named Defendants, much less every one of them.[4]  In fact, the States do not even attempt to explain how such an "overarching" conspiracy is plausible in the face of price decreases for hundreds of generic products over the same period (to say nothing of the difficulty that the States will encounter in establishing the material facts necessary to prove such a claim).  The States spent years investigating these claims—through, among other things, pre-complaint investigative subpoenas—before the filing of their serial complaints, and years since to take discovery.  If they had facts supporting the existence of the alleged overarching conspiracy, they should have been pled in the Third Complaint, but they are not.  This Court should dismiss the overarching conspiracy claims in the States' Third Complaint.

## II.    BACKGROUND

### A.    The States Filed a First Consolidated Amended Complaint in 2018 Seeking to Hold All Named Corporate Defendants Jointly and Severally Liable for Participating in "the Overarching Conspiracy"

On December 14, 2016, a group of States filed a complaint in the District of Connecticut, alleging that six defendant-manufacturers conspired with respect to the pricing of two pharmaceutical products.  *Connecticut et al. v. Aurobindo Pharma USA, Inc. et al.*, No. 16-cv-

---

[4]    Defendants do not concede that the States have alleged any conspiracy, whether relating to a single product or a group of products.  Further, because the States have declined to define any multi-drug conspiracy, apart from the vague alleged overarching conspiracy, the States may not proceed on an open-ended theory of various conspiracies, with a vague intent to define them more carefully at some future moment in the litigation.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 339 (3d Cir. 2010) (plaintiffs must "identify the scope" of broader conspiracies "with precision"); *Alaska Dep't of Revenue, Treasury Div. v. Manku*, No. No. 20-cv-1759, 2021 WL 3027170, at *4 (2d Cir. Jul. 19, 2021) (rejecting all-encompassing conspiracy claim where plaintiffs chose not "to plead, in the alternative, [any] narrower antitrust conspiracy" and explaining that "we evaluate plaintiffs' claims as they are alleged.").

2056 (D. Conn.), ECF No. 1.[5]  In November 2017, those States—joined by others—sought leave to file a consolidated amended complaint to expand the scope of the original complaint. *Connecticut, et al. v. Aurobindo Pharma USA, Inc., et al.*, No. 17-cv-3768, ECF No. 3; June 5, 2018 Order, ECF No. 6 (granting leave to amend); Am. First Compl., ECF Nos. 14, 15 ("Amended First Complaint").[6]  The States' First Complaint centers around 15 specific products manufactured and sold by defendant Heritage Pharmaceuticals, Inc. ("Heritage") and names 19 other companies and individuals as defendants.  The First Complaint alleges individual conspiracies regarding these 15 products and seeks to hold all named corporate defendants "jointly and severally liable" for all conduct alleged in the First Complaint pursuant to an alleged "overarching conspiracy," even where a corporate defendant did not manufacture or sell a particular product.  *See, e.g.*, Am. First Compl. ¶ 597.

The States claim that the overarching, industry-wide conspiracy alleged in the First Complaint was implemented through "interactions at various and frequent industry trade shows, customer conferences and other similar events[.]"  Am. First Compl. ¶ 9.  While Heritage is alleged to be a "consistent participant in [the] conspiracies identified," the First Complaint also alleges that the "conduct is pervasive and industry-wide" and thus "part of a larger, overarching understanding about how generic manufacturers fix prices and allocate markets to suppress competition[.]"  *Id.* ¶ 11.

---

[5]    After the States filed that complaint, the Judicial Panel on Multidistrict Litigation ("JPML") transferred the case to this MDL, and it was later docketed as No. 17-cv-3768 (E.D. Pa.).

[6]    For ease of reference, Defendants refer herein to the "Amended First Complaint" as the "First Complaint."  For clarity, *citations* to the Amended First Complaint are noted as such.

The underlying mechanism of the alleged overarching conspiracy, according to the States, was a shared understanding to establish market allocation based on a competitor's "fair share" of the market.  According to the States, this alleged mechanism existed as to all generic products:

> Defendants here understood and acted upon an underlying code of conduct that is widespread in the generics industry: an expectation that any time a company is entering a particular generic drug market, it can contact its competitors and allocate the market according to a generally agreed-upon standard of "**fair share**" in order to avoid competing and keep prices high.  **While different drugs may involve different sets of companies, this background understanding remains constant and is an important component of the Defendants' ability to reach agreements for specific drugs**.

Am. First Compl. ¶ 14 (emphasis added).

**B.      Rather Than Further Amend Their First Complaint, the States Filed Two New Actions Also Alleging "the Overarching Conspiracy" as a Basis for Joint and Several Liability**

This Court entered an order on November 20, 2018, holding that any "amendment to any currently outstanding complaint must be made on or before December 21, 2018."  PTO No. 61 ¶ I.1, No. 16-md-2724, ECF No. 775.  The Court ordered that, absent leave, "[n]o further amendments [were] permitted after that date."  *Id.*  The States took no timely action, aware that, under Connecticut law, an amended complaint would be limited to evidence obtained via investigative subpoenas issued *before* the First Complaint.  Nearly five months after that amendment deadline, the States instead filed a new complaint in the District of Connecticut, asserting many of the same allegations of the First Complaint verbatim —and incorporating the entire First Complaint by reference.  *See Connecticut et al. v. Teva Pharm. USA, Inc. et al.*, No. 19-cv-710, ECF No. 1 (D. Conn. May 10, 2019) ("Second Complaint"), ¶ 937.[7]

---

[7]      After the States filed their Second Complaint in the District of Connecticut, Defendants requested that the JPML transfer the States' Second Complaint to this MDL, and it was later transferred and docketed as No. 19-cv-02407 (E.D. Pa.).  Several months later, the States amended their Second Complaint.  For ease of reference, Defendants refer herein to the Amended Second

Approximately one year later, in June 2020, the States filed the Third Complaint,[8] in which they again assert the same alleged "overarching conspiracy" purportedly described in the First and Second Complaints, in the same vague terms.  Like its two predecessors, the Third Complaint also includes product-specific conspiracies, framed as examples of the "overarching conspiracy."  In the Third Complaint, at least 15 of these products overlap with conspiracies alleged in the Second Complaint.[9]  The States refer to these repeat allegations as part of the "the larger pattern of conduct."  Am. Third Compl. ¶ 731 n.5, ¶ 789 n.7, ¶ 853 n.8.

Although the Third Complaint also includes new products, the States rely on a common nucleus of factual allegations and legal theories asserted in the States' First and Second Complaints against many—but not all—of the same named Defendants.  A comparison of allegations in the three Complaints is instructive—whole swaths of the Third Complaint, particularly those allegations relating to the alleged overarching conspiracy, have been copied and pasted from the States' First and Second Complaints.  *See* Exhibit A.

---

Complaint as the "Second Complaint."  Citations to the Amended Second Complaint are noted as such.

[8]     After the States filed their Third Complaint in the District of Connecticut, Defendants requested that the JPML transfer the States' Third Complaint to this MDL, and it was later transferred and docketed as No. 20-cv-03539 (E.D. Pa.).

[9]     In two instances, the Third Complaint attempts to expand the scope of drug-specific conspiracies alleged in the Second Complaint: Ketoconazole Cream and Fluocinonide Gel.  *See* Am. Third Compl. ¶ 975.  In the Second Complaint, the States allege single-product conspiracies for both products among Taro, Sandoz, and the owner of the Sellersville, Pennsylvania manufacturing facility before March 2015 (Teva).  Am. Second Compl. ¶¶ 783-94, 829-46.  In the Third Complaint, the States allege single-product conspiracies for both products among Taro, Sandoz, and the owner of the Sellersville facility following Teva's March 2015 sale of the facility to G&W.  Am. Third Compl. ¶¶ 977–1018.  The Third Complaint also discusses 13 other products alleged to have been the subject of conspiracies in the Second Complaint: ¶ 730 n.5 (Clomipramine); ¶ 789 n.7 (Etodolac and Etodolac ER); ¶ 853 n.8 (Carbamazepine, Clotrimazole, and Warfarin); ¶ 1192 n.9 (Cefdinir Capsules and Cefdinir Oral Suspension); ¶ 1534 n.14 (Moexipril HCL, Moexipril HCL/HCTZ Tablets; Nabumetone Tablets, Pravastatin Sodium Tablets, and Ranitidine Tablets).

C.    **The States Describe the Same "Overarching Conspiracy" in the Third Complaint, but Broaden Its Scope**

In the Third Complaint, the States seek recovery for the same overarching conspiracy alleged in prior Complaints, violating the doctrine against claim-splitting. But the States allege the overarching conspiracy in a manner that stretches such a theory beyond plausibility.

1.    **The States Allege Dozens of Unrelated Drug-Specific Conspiracies and Provide No Evidence of An Overarching Conspiracy**

The States have not alleged any facts that tie drug-specific conspiracies together and therefore have not provided any basis on which to craft a theory of a single, industry-wide conspiracy. The States' First Complaint alleged conspiracies concerning 15 products, all involving Heritage. Am. First Compl. ¶¶ 11–13. In the Third Complaint, the States again assert a theory of overarching conspiracy by attempting to tie together independent, product-specific allegations of collusion. This time, however, the States' product-specific allegations span 80 different products, across different markets and time periods, with no common central actor. Even if accepted as true for purposes of a motion to dismiss, these allegations are deficient. And the deficiencies inherent in the Third Complaint's paper-thin allegations will cause further delay and complication in this case, should it proceed to summary judgment or trial.

Although the States attempt to tie together the Third Complaint products under a banner of "dermatological products," nearly two dozen are not, in fact, dermatological products.[10] Moreover, the Third Complaint alleges that only a handful of the named Defendants controlled a

---

[10]    Non-dermatological products include Acetazolamide Tablets, Bromocriptine Mesylate Tablets, Carbamazepine ER Tablets, Cefpodoxime Proxetil Oral Suspension, Cefpodoxime Proxetil Tablets, Eplerenone Tablets, Ethambutol HCL Tablets, Griseofulvin Microsize Tablets, Latanoprost Eye Drops, Methazolamide Tablets, Methylphenidate HCL Tablets, Methylphenidate HCL ER Tablets, Nafcillin Sodium Injectable Vials, Oxacillin Sodium Injectable Vials, Phenytoin Sodium ER Capsules, Pioglitazone HCL Metformin HCL Tablets, Prochlorperazine Maleate Suppositories, and Promethazine HCL Suppositories.

considerable amount of the market share in the so-called "topical" products market.  *See* Am. Third Compl. ¶¶ 179–81 (asserting that "between 2007 and 2014, [just] three companies controlled approximately two-thirds of the topical market[.]").[11]  Several Defendants are not alleged to have participated in any conspiracy involving any dermatological product at all;[12] seven of States' Counts 1 through 17 (the violation of federal law counts asserted against the corporate defendant groups) do not include a single dermatological product.  Nevertheless, the States ask the Court to infer that every one of the Defendants, as they determined how to price and sell every one of the 80 named products, was motivated by the terms of a single conspiracy in the markets for dermatological products.  They ask the Court to take this leap without a single factual allegation as to how and when that conspiracy was formed, how and when each of these Defendants allegedly joined it, or how it was perpetuated.  Am. Third Compl. ¶¶ 124, 126–27.  Notably, although the States reference information gathered from six cooperating witnesses, not a single allegation indicates that those cooperating witnesses identified an overarching agreement or conspiracy.

## 2.    The States Allege an Expanded and Amorphous Time Period

While the events alleged in the First Complaint took place between 2012 and 2015, the Third Complaint alleges product-specific conspiracies taking place "from at least 2009 through early 2016."  Am. Third Compl. ¶ 1.  And as was the case in the First Complaint, the States allege, without any factual basis, that the alleged overarching "understanding" has existed "for many years" and "evolved over time."  Am. Third Compl. ¶ 127.  However, in contrast to the First Complaint, the States also claim that this understanding "pre-dates any of the specific conduct

---

[11]    The States attempt to lend credibility to their conspiracy theory by *emphasizing* the "*limited number*" of generic topical product manufacturers, which the States allege made the hypothetical dermatological market "ripe for collusion."

[12]    These Defendants include:  Amneal, Aurobindo, Lannett, Lupin, Mallinckrodt, Mylan, and Sun.

detailed herein." *Id.* The States provide no clarity regarding when this supposed "understanding" began, how (if at all) it was executed, nor how its terms changed over the years. Rather, the States simply appear to have selected products for which to allege individual conspiracies, and then allege that an overarching "understanding" must have existed during that time for purposes of asserting joint and several liability.

### 3. The Scope of Each Count Reflects the Lack of Definition in the States' Overarching Conspiracy Claims

The States' Counts in the Third Complaint reflect the uncertain scope and substance of the alleged overarching conspiracy claims, leaving each Defendant in the dark as to the extent of its alleged complicity. Each of the States' Counts should reflect a distilled form of the factual and legal bases for the States' cause of action—a roadmap for both summary judgment and trial. The States' Counts do not meet this standard. *Williamson v. Columbia Gas & Elec. Corp.*, 186 F.2d 464, 469 (3d Cir. 1951) ("The purpose of the requirement of separate counts is to clarify the issues and simplify the trial.").

The States' Third Complaint presents Counts 1–27 as *Defendant*-specific claims.[13] In each Count, the States name a single Defendant, identify between 1 and 64 individual products, and assert that the named Defendant "entered into agreements with various competitors to allocate customers and divide markets in accordance with the principles of fair share" for "at least" the products identified. *See, e.g.*, Am. Third Compl. ¶ 1614. That language—alleging conspiracies

---

[13]   The States' Second Complaint also alleges Counts in this manner. Conversely, in the First Complaint, each of the States' Counts 1–18 identified an alleged product-centered conspiracy in which Heritage and at least one other Defendant played a role. In the First Complaint, for every Count against manufacturer Defendants, the States then added that the alleged drug-specific conspiracy "was part of an overarching conspiracy among all of the manufacturer Defendants named in this complaint to unreasonably restrain trade in the generic pharmaceutical industry, and to artificially fix, raise, stabilize, and control the prices for generic drugs[.]" *See, e.g.*, Am. First Compl. ¶ 476.

as to "at least" the named products—underscores the fact that the Third Complaint is a textbook example of claim-splitting.  The States further allege—without citing a single supporting fact— that the alleged "agreements" "were part of an overarching conspiracy among all of the manufacturer Defendants named in this Complaint," asserting that the identified Defendant is, accordingly, jointly and severally liable for every other instance of product-specific collusion, whether identified in the Complaint or not.  *See, e.g.*, *id.* ¶ 1619.  The States fail to specify, however, the products, time period, co-conspirators, or context for any of the asserted "agreements" in each Count.

The organization of the Counts renders the trial court's task effectively impossible:  to sustain a verdict on a single count, the States would have to prove dozens of unrelated product-specific agreements against a single Defendant (perhaps more) *and* successfully prove every single Defendant's involvement in a sprawling, seven-year "overarching" conspiracy involving ("at least") 80 different products.

## III.   ARGUMENT

The overarching conspiracy claim in the Third Complaint must be dismissed for two reasons.  First, the overarching conspiracy allegations of the Third Complaint—which rest on layers of implausible inferences to stretch allegations of product-specific conspiracies into a massive industry-wide conspiracy for which no direct facts are alleged—fail to satisfy the States' pleading burden under *Bell Atlantic v. Twombly* and its progeny.  Second, the States' overarching conspiracy claim—indeed, the Third Complaint as a whole—violates the rule against claim-splitting.  The States may not maintain three separate actions that seek to hold overlapping groups of Defendants jointly and severally liable for the same alleged conspiracy by arbitrarily dividing

that conspiracy into separate complaints that purport to address the application of that alleged conspiracy to different sets of drugs.

A.      **The States Fail to State An Overarching Conspiracy Claim**

The States' overarching conspiracy, as presented in the Third Complaint, lacks factual allegations supporting the inference that Defendants entered a single, broad conspiracy to allegedly depress competition across the generic drugs industry, rather than a series of alleged product-specific conspiracies.

"The existence of an agreement is the hallmark of a Section 1 claim[.]" *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir. 1999) (quoting *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir. 1994)).  Here, the States do not allege facts from which one could plausibly infer that all the Defendants entered into a single agreement with respect to their respective generic drug markets.  There are no facts alleged as to when, how, or where they did so.  The States offer only the conclusory allegation that the conspiracy was maintained through independent, product-specific conversations at trade shows and industry meetings.  That at most alleges discrete, product-specific conspiracies.  To sufficiently plead a vast, industry-wide conspiracy, the case law requires more, even at the motion to dismiss stage.  Further, the States' recycling of their well-worn fair share allegations from prior Complaints—which rest on the use of a common term used in many industries and business schools[14]—fails to supply either direct or circumstantial evidence of the vast overarching conspiracy they assert.  The States may not rely

---

[14]   "Fair share" is textbook economic and business terminology used across industries and throughout academia. *See, e.g.*, Matt Rosoff, "Pandora Wants Its 'Fair Share' of Ad Dollars," Business Insider (Nov. 17, 2011), available at https://www.businessinsider.com/pandora-should-be-making-480-million-a-year-in-ad-revenue-2011-11; "Ford Seeks Fair Share of Canada Utility Vehicle," Automotive News Canada (Feb. 17, 2017) available at https://canada.autonews.com/article/20170217/CANADA/170219834/ford-seeks-fair-share-ofcanadian-utility-vehicle-market.

on the volume of their product-specific allegations to support an inference of overarching agreement concerning all generic products. The Third Complaint, despite its length, is devoid of factual allegations tying those product-specific conspiracies to each other or to a larger agreement.

### 1. The States' Allegations Largely Describe Lawful, Parallel Conduct

"Liability [for a Sherman Act claim] is necessarily based on some form of 'concerted action.'" *Baby Food*, 166 F.3d at 117 (quoting *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir.1994). Allegations that merely reflect parallel conduct must be dismissed. *Id.* The States do not allege that the Defendants "got together and exchanged assurances of common action." *In re Flat Glass Antitrust Litig*, 385 F.3d 350, 361 (3d Cir. 2004). Instead, the States assert only conclusory allegations of parallel conduct of the Defendants, in lieu of allegations that all Defendants decided to take any concerted, industry-wide action at all:

- "The overarching conspiracy . . . is an agreed-upon code," ¶ 124, that is "generally understood," Am. Third Compl. ¶ 125;

- "The exact contours of this 'fair share' understanding, which has been in place for many years (and pre-dates any of the specific conduct detailed herein), ha[ve] evolved over time," *id.* ¶ 127; and

- "The other manufacturers of those products . . . understood the rules of the road and took the necessary steps" to follow them, *id.* ¶ 4.

Absent from any of these allegations are any facts about when, how or by whom the alleged "agreed-upon code" (*id.* ¶ 124) was agreed upon, when or how the "understanding" was reached or "evolved over time" (*id.* ¶ 127), or, when, how or by whom the "rules of the road" (*id.* ¶ 4) were adopted.

This is because the States do not allege that any agreement was reached. Rather than a conspiracy, the allegations concerning a "fair share understanding" describe nothing more than quintessential, independent, "oligopolistic rationality." *Valspar Corp. v. E.I. du Pont de Nemours & Co.*, 873 F.3d 185, 191 (3d Cir. 2017). That is, in concentrated markets, like the markets for

the generic drugs identified in the Third Complaint (often featuring "only two or three [generic] competitors," Am. Third Compl. ¶ 181), the States' basic premise—that competitors often followed each other's price increases and settled for less-than-maximum market share—shows rational, parallel conduct, not conspiracy.  Under *Twombly* and its progeny, "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007).

For example, the States observe that "[g]eneric drug manufacturers actively and routinely monitor their fair share and that of their competitors," Am. Third Compl. ¶ 147, and that when one competitor increased its price, "the other competitors in the same drug market would . . . [typically] decline to bid for [the price leader's] business . . . [and] follow with a price increase of [their] own," *id.* ¶ 7.  This should come as no surprise.  Courts have routinely observed that, in any oligopoly, competitors "watch each other like hawks." *In re Text Messaging Antitrust Litig.*, 782 F. 3d 867, 875 (7th Cir. 2015).  Each competitor cannot help but be keenly aware of—and make business decisions in response to—the choices of their handful of competitors. *Valspar*, 873 F.3d at 191 ("[A]ny rational decision [in an oligopoly] must take into account the anticipated reaction of the other firms.") (quoting *Flat Glass*, 385 F.3d at 360); *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 397 (3d Cir. 2015) (same).  When one firm increases its price, other market participants naturally consider whether the profit-maximizing course is to lower their prices to capture additional share or follow the first mover's price to increase margins on each sale. *Valspar*, 873 F.3d at 191.  In such situations, firms "will obviously choose the new price," *id.* (alterations omitted), because "a rational profit-maximizing seller does not care about the number of customers it has but about its total revenues relative to its total costs." *Text Messaging*, 782 F.3d at 877

13

(explaining that fewer customers at a higher price may well be worth more than more customers at a lower price).

Likewise, the States also acknowledge the economic rationality of Defendants' alleged choices, noting that the manufacturer Defendants made price increase decisions according to their specific and individualized business reality on a product-by-product basis, rather than according to any preset agreement.  Am. Third Compl. ¶ 171.  They allege that "generic drug manufacturers could not always follow a competitor's price increase quickly.  Various business reasons, including supply disruptions or contractual price protection terms with certain customers . . . could cause such delays."  *Id.*  In other words, the States allege that the manufacturer Defendants made pricing decisions according to their unique circumstances, which weighs against any inference of agreement.  *Valspar*, 873 F.3d at 191 ("a single firm's independent action, no matter how anticompetitive its aim, does not implicate § 1").

Allegations that Defendants, rational actors in oligopolistic markets, acted consistent with their own business incentives, raise no plausible inference of conspiracy.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 350 (3d Cir. 2010) ("Where, as here, the 'obvious alternative explanation'" for even a "pernicious industry practice" is that "each member of the industry believes its profits would suffer without the practice, it is not plausible to infer that each member's decision" to adopt the practice "is the product of agreement.").

### 2. The States Fail to Allege Sufficient Direct or Circumstantial Evidence of an Overarching Agreement

Beyond allegations of parallel conduct, the States make little effort to supply allegations of facts to support their overarching conspiracy theory.  The dearth of such allegations renders the States' complaint subject to dismissal at the motion to dismiss stage; it also previews the difficulties that the States will encounter in proving their claims, should their case move forward.

Direct evidence "is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Baby Food*, 166 F.3d at 118.  Where there is no direct evidence, plaintiffs may plead a conspiracy using circumstantial evidence, such as allegations of both parallel conduct and the existence of "'plus factors' that 'serve as proxies for direct evidence of an agreement.'" Op., at 20, No. 16-md-2724, ECF No. 1070 (E.D. Pa. Aug. 15, 2019) ("August MTD Op.") (quoting *Flat Glass*, 385 F.3d at 360).  Plus factors include: "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Id.*[15]  However, in the context of oligopolies, courts focus on "evidence implying a traditional conspiracy," deemphasizing the first two factors because they "largely restate the phenomenon of interdependence." *Flat Glass*, 385 F.3d at 360–61 (citation omitted).

Here, the States offer neither direct nor circumstantial facts sufficient to allege the existence of an overarching conspiracy.  In particular, the States do not adequately allege "plus factors."  The allegations that supported this Court's August MTD Opinion, which held that the States' First Complaint adequately alleged such "plus factors," are either missing from the States' Third Complaint or fail to support an inference of the decade-long, industry-wide overarching

---

[15]   Assessing whether particular "plus factor" allegations are sufficient to raise a plausible inference of conspiracy "is a context-specific task[.]" *Ins. Brokerage*, 618 F.3d at 361 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  As such, courts examining allegations of antitrust conspiracy follow precedent from every stage of litigation, even on consideration of a motion to dismiss.  For example, the *Twombly* Court looked to various cases at the post-pleading stages of litigation to identify what facts, if true, would support the existence of a conspiracy, including summary judgment decisions.  *Twombly*, 550 U.S. at 553-54 (citing, *inter alia*, *Theatre Enters.*, 346 U.S. 537, 540 (1954) (affirming denial of directed verdict); *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752 (1984) (same); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) (assessing sufficiency of evidence at summary judgment)); *see also Ins. Brokerage*, 618 F.3d at 321 (discussing relevance of antitrust precedent decided at post-pleading stages of litigation).  Likewise, here, in applying the well-established *Twombly* analysis, we look to cases at all litigation stages to explain why the States fail to allege a plausible industry-wide conspiracy.

conspiracy, implicating dozens of drugs.  August MTD Op. 20–23.  This Court's prior opinion pointed to allegations that it identified as "traditional evidence of a conspiracy:" "inter-defendant communications, trade association leadership, membership, and meeting attendance, and ongoing state and federal investigations into generic drug pricing."  *Id.* at 20–21.  Those allegations, to the extent they exist in the Third Complaint, do not support the overarching conspiracy claim.

First, this complaint lacks a coherent theory of inter-Defendant communications that would support an inference that an overarching agreement existed.  In the First Complaint, the States alleged that a "consistent participant," Heritage—a Defendant alleged to have participated in every specific drug conspiracy in the First Complaint—communicated with every one of the other manufacturer Defendants over the course of 15 months.  Am. First Compl. ¶ 94; August MTD Op. 15.  In contrast, in their Third Complaint, the States do not allege the presence of any "consistent participant" that communicated with the other Defendants in a way that could reasonably link the alleged, disconnected product-specific conspiracies.  In fact, in the Third Complaint, the States allege that the *absence* of such communications supports the overarching conspiracy claim:  "It was not essential for the competitors to communicate with each other in advance of price increase."  Am. Third Compl. ¶ 172; *see also id.* ¶ 137 ("This pattern is frequently followed even in the absence of direct communication between the competitors, demonstrating the universal code of conduct agreed to by Defendants.").  Thus, in the Third Complaint, the States seem to claim that both the presence *and* absence of communications among defendant-employees sustains their overarching conspiracy claims, describing a conspiracy that Defendants could not possibly avoid: participation *and* non-participation is participation.

Second, the Court's prior conclusion that the First Complaint's allegations concerning trade association membership and participation evidenced the existence of an overarching

conspiracy is not supported here. The States recycle those allegations in the Third Complaint but do nothing to tie trade association membership and participation to an overarching conspiracy. For example, the States allege that two employees from Taro and Sandoz met in 2009 and "had a high level discussion about Taro's and Sandoz's philosophies with respect to market share and pricing," which, as alleged, consisted of rational oligopolistic, profit-maximizing philosophies.[16] Am. Third Compl. ¶ 196. The States conclude that this reflected a broad "understanding" between Taro and Sandoz that led to agreements *between the two companies*—but not any other Defendant— concerning products that those two companies manufactured. *Id*. ¶ 197. The States likewise allege that G&W and Fougera employees engaged in a separate "high-level discussion" at a dinner in early 2012 (years after they had purportedly already formed a "fair share understanding"), but then allege that it was focused "on products that G&W and Fougera overlapped on," not some broader conspiracy in which all Defendants were engaged. *Id.* ¶ 399.

Even if taken as true, these allegations do not support an inference that Defendants entered into a single industry-wide agreement to conspire to inflate the prices of the 80 products alleged, which they supposedly concealed over a period of nearly 10 years. *See In re Auto. Parts Antitrust Litig.*, No. 12-md-2311, 2016 WL 8200512, at *3–4 (E.D. Mich. Apr. 13, 2016) (concluding that even allegations of "high-level meetings" of some defendants involving discussion of the "automotive parts industry generally" failed to raise an inference that all Defendants conspired together as part of a single "megaconspiracy"); *see also Precision Assocs., Inc. v. Panalpina*, No.

---

[16] According to the States, "[t]he two competitors agreed that both of their employers believed in price increases and maintaining higher pricing." Am. Third Compl. ¶ 196. The Taro employee then allegedly "explained that companies that compete on price to get more market share were bad for the market because they brought prices down." *Id.* That generics competitors sought higher prices and saw competing for market share as misguided reflects an awareness of oligopolistic economics.

08-cv-42(JG)(VVP), 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) (allegations of price-fixing at meetings of some defendants supported inference of some "local" conspiracies involving those specific defendants, but not a "global" conspiracy).

The majority of the States' allegations of in-person meetings between multiple Defendants assert simply that the meetings took place, and that some (but not all) Defendants attended those meetings, thereby creating an opportunity to collude.   *See e.g.*, Am. Third Compl. ¶ 117 (steakhouse dinner, no specific communications alleged); *id.* ¶ 119 (golf outing, no communications); *id.* ¶ 123 (women's networking events called "girls' night[s] out," no communications).[17]   Without more, such "opportunity" allegations do not establish conspiracy. *Valspar*, 873 F.3d at 199 (allegations of trade association membership and meetings, without more, do not raise inference of agreement); *Chocolate*, 801 F.3d at 409 ("[E]vidence . . . that the executives from the [alleged conspirators] were in the same place at the same time . . . is insufficient to support a reasonable inference of concerted activity."); *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 439 (E.D. Pa. 2018) (Rufe, J.) ("Participation in a trade group association and/or attending trade group meetings, even those meetings where key facets of the conspiracy allegedly were adopted or advanced, are not enough on their own to give rise to the inference of agreement to the conspiracy." (quoting *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 722 (E.D. Pa. 2011))).

Moreover, the States do not identify any meeting that all, or even most, of the Defendants attended.   In fact, there are no allegations that Teligent attended a single meeting, and the States allege that Lupin and Mallinckrodt each attended only a single event.   *See* Am. Third Compl.

---

[17]   Defendants Sandoz, Fougera, Glenmark, Mallinckrodt, Mylan, Sun, Taro, and Teligent are not alleged to have attended any of these meetings.  *Id.* ¶¶ 117, 119, 123.

¶¶ 123 (Lupin), 1276 (Mallinckrodt).  Most trade association meetings are alleged to have occurred during or after 2012, despite the States' allegations that the overarching conspiracy had been in place since at least 2009.  Am. Third Compl. ¶ 1.  These allegations provide no basis to infer an overarching, industry-wide conspiracy.

Third, here, criminal investigations provide far less support for the existence of an alleged overarching conspiracy than they did in the complaints this Court previously considered.  In 2019, this Court considered allegations in multiple private plaintiffs' complaints that referenced investigations by the DOJ that "resulted in price-fixing guilty pleas from two senior executives at Defendant Heritage," the single manufacturer at the heart of the overarching conspiracy asserted in the First Complaint.  August MTD Op. 17.  That is, those complaints referenced guilty pleas of individuals to whom every facet of the alleged overarching conspiracy was connected.

By contrast, the Third Complaint *does not* discuss those or other criminal antitrust proceedings.  This is unsurprising, given that the DOJ has not filed an indictment or information extending beyond the 2013–2015 time period, or charged participation in an overarching conspiracy like the one the States propound.  Rather, these same investigations have produced a handful of guilty pleas and deferred prosecution agreements related to drug-specific conspiracies, none of which comes close to supporting the Third Complaint's linking of Defendants together in a single conspiracy across 80 products.[18]  By divorcing the scope of their overarching conspiracy

---

[18]    *See* Heritage Deferred Prosecution Agreement ("DPA"), 19-cr-0316, ECF No. 4 (E.D. Pa. June 11, 2019) (one drug); Rising DPA, 19-cr-13448, ECF No. 1182-1 (Bankr. D.N.J. Dec. 3, 2019) (one drug); Armando Kellum Plea Agreement, 20-cr-0065, ECF No. 12 (Feb. 14, 2020) (two drugs); Sandoz DPA, No. 20-cr-0111, ECF No. 2 (E.D. Pa. Mar. 2, 2020) (five drugs); Apotex DPA, 20-cr-0169 (E.D. Pa. May 7, 2020) (one drug); Taro DPA, 20-cr-0214, ECF No. 2 (E.D. Pa. Aug. 23, 2020) (six drugs).

claim from the range of any relevant criminal investigations and their outcomes, the States fail to establish yet another potential plus factor.

> **3.**  **There Is No "Connective Tissue" Among the Alleged Discrete and Disconnected Product-Centered Conspiracies that Gives Credence to the Existence of an Overarching Conspiracy**

Many courts, including this one, have considered the viability of an overarching conspiracy claim that is based on allegations of multiple narrower sub-conspiracies. *E.g.*, *In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509 (E.D. Pa. 2019) (fifteen); *In re Magnesium Oxide Antitrust Litig.*, No. 10-cv-5943(DRD), 2011 WL 5008090 (D.N.J. Oct. 20, 2011) (two); *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 5 (D.D.C. 2004) (eighteen). Defendants are aware of none, however, that have suggested that dozens of individual conspiracies concerning different manufacturers operating in different product markets, over varying time periods, could be sufficiently interdependent to sustain a claim of a single conspiracy.

In assessing whether the States have alleged sufficient "connective tissue" among the constituent conspiracies, a consideration of scale is warranted. *See Alaska Dep't of Revenue, Treasury Div. v. Manku*, 2021 WL 3027170, at *4 (holding that alleged "super desk" conspiracy— "involving more than twenty entities in different countries . . . conspiring every day, nearly all day"—was "simply not plausible") (quotations and alterations omitted). With respect to scale, the *Auto Parts* decisions from 2016 ("*Auto Parts Decision*")[19] and 2018 ("*AC Systems Decision*")[20] discussed in the Court's August MTD Opinion provide a helpful measuring stick.

---

[19]   *In re Auto. Parts Antitrust Litig. ("Auto Parts Decision")*, No. 12-md-2311, 2016 WL 8200512 (E.D. Mich. Apr. 13, 2016).

[20]   *In re Auto. Parts Antitrust Litig. ("AC Systems Decision")*, No. 12-md-2311, 2018 WL 1138422 (E.D. Mich. Jan. 16, 2018).

In the *Auto Parts Decision*, the court evaluated a theoretical "macro" conspiracy uniting the *entire* auto parts industry, based on eighteen independent "systems" conspiracies.[21]  Rejecting plaintiffs' attempt to bundle all 18 systems together into a single "megaconspiracy," the court emphasized that the 18 individual conspiracies were "multiple, separate, and distinct," noting that plaintiffs had not alleged that "Defendants competed for the sales of all eighteen parts," or that "each Defendant knew of other Defendants' conduct," 2016 WL 8200512, at *4, across "twenty-two different Defendant Groups . . . and eighteen different product markets," *id.* at *2.  The court emphasized that simply rebranding the 18 individual parts as generalized "automotive parts," and the multiple part markets as a single "Auto Parts Market," could not create the kind of interrelationship between the systems necessary to support an inference of a "single agreement among all" of the defendants.  *Id.* at *3–4.  Nor could the plaintiffs' extensive allegations of individual deals within specific "systems" create an inference "of knowledge outside of each Defendants' own specific deals."  *Id.* at *4.

In contrast, in the *AC Systems Decision*, the court sustained allegations of a single conspiracy, with respect to just one auto part—"air conditioning systems."  There, the court held that plaintiffs alleged a system-wide conspiracy, uniting collusion by manufacturers of distinct component air conditioning parts, by highlighting "trade meetings involving the AC Systems market, in which they discussed the [AC System] market generally," as well as "admissions of guilt by some Defendants relative to AC systems."  *Id.* at *4.  However, the conspiracies alleged in the *Auto Parts Decision* and the *AC Systems Decision* can be easily distinguished by the disparate scale and relative interdependence of the component conspiracies at issue.  Whereas in

---

[21]   A single auto part "system" could be, for example, an air-conditioning system ("AC Systems"), or a wire harness.  Each of those systems constitutes a single market comprised of all the different subparts required to construct that auto part.

the *AC Systems Decision*, plaintiffs plausibly alleged a single conspiracy with respect to a single "system" composed of "necessary component" parts, *id.* at *4, in the *Auto Parts Decision*, plaintiffs could not sustain a "megaconspiracy" connecting 18 of those systems across an entire, complex, multifaceted industry.

Courts do not assume that there must be a single overarching conspiracy where there are several conspiracies.  Rather, as the Third Circuit reasoned in *Insurance Brokerage*, the fact that multiple similar individual conspiracies took place simultaneously merely constitutes "parallel conduct" and "does not qualify under *Twombly* as a basis for a plausible inference of horizontal agreement" linking the individual conspiracies.  618 F.3d at 350–51; *see also Panalpina*, 2011 WL 7053807, at *28 (dismissing all but one of plaintiffs' multi-conspiracy group claims, because, despite some overlapping details, plaintiffs had not alleged that the involved defendants had communicated about any "overarching regional conspiracy"); *In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-md-2670, 2017 WL 35571, at *6 (S.D. Cal. Jan. 3, 2017) (dismissing claims that "the alleged agreements reached with regard to tuna" on their own, were illustrative of a broader "industry-wide" conspiracy involving other seafood products").

Multiple conspiracies can only be combined where there is a measurable degree of interdependence.  *See, e.g.*, *Magnesium Oxide*, 2011 WL 5008090, at *11 (finding one conspiracy concerning two products (rather than two conspiracies) where an alleged agreement as to one product was "dependent on [the other agreement], and vice versa"); *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 996 (N.D. Cal. 2015) (assessing, *inter alia*, interdependence to determine "whether a single or multiple conspiracies have been shown").  "Interdependence . . . simply means that activities of one aspect of the scheme . . . were necessary or advantageous to the activities of another aspect of the scheme[.]"  *Polyurethane Foam*, 152 F. Supp. 3d at 996–97

(quotations omitted); *Staley v. Gilead Scis., Inc.*, No. 19-cv-2573-EMC, 2020 WL 5507555, at *8 (N.D. Cal. July 29, 2020); *In re K-Dur Antitrust Litig.*, No. 01-cv-1652, 2016 WL 755623, at *21 (D.N.J. Feb. 25, 2016).

Thus, in *Panalpina*, the court dismissed a claim that defendants joined a "global conspiracy" to fix prices of surcharges on freight forwarding services, noting that the complaint was "silent as to how, when, or where these sixty-five defendants or the conduct identified in the 10 Local Conspiracy claims became connected . . . into one Global Conspiracy."  2011 WL 7053807, at *27–28.  The court found that "[t]he underlying conspiracies [alleged] are wholly independent of one another, they occurred in different years, targeted different markets, and were imposed on different trade lanes." *Id.* at *31.  The *Panalpina* plaintiffs alleged "that the [individual constituent] conspiracies all involved the same 'designs and methods' because they used in person meetings, conference calls, and email communications to form and monitor the conspiracies." *Id.* at *27.  They also highlighted that "at least one [corporate affiliate] of the five largest freight forwarders was involved in each local conspiracy and thus provided 'leadership, cohesion and coordination' between and among the local conspiracies." *Id.* at *28.  Nevertheless, the court dismissed the "global conspiracy" claim, because the plaintiffs failed to identify any meaningful "connection" between the separate local conspiracies.  Like the plaintiffs in *Panalpina*, the States fail to demonstrate how many of the alleged individual product conspiracies were connected or interdependent.  There are no allegations that the pricing of any one product influenced the pricing of another, different product.  The States mention discussions of multiple products only in passing. *E.g.*, Am. Third Compl. ¶¶ 153–55.  These allegations fail to establish interdependence, especially on the scale of the overarching conspiracy the States assert.

Finally, the States fail to establish that—any, let alone each—Defendant was aware of an overarching conspiracy.  *United States v. McKee*, 506 F.3d 225, 241–42 (3d Cir. 2007) ("those having no knowledge of the conspiracy are not conspirators. . . . At a minimum, . . . it must be shown that . . . a person has knowledge of the conspiracy's illicit purpose when he performs acts which further that illicit purpose") (quotations and citations omitted); s*ee also Intel Corp. v. Fortress Inv. Grp. LLC*, No. 19-cv-7651, 2020 WL 6390499, at *17 (N.D. Cal. Jul. 15, 2020) (finding overarching conspiracy claim failed because of a lack of allegations "that each defendant had knowledge of an agreement as to the overall conspiracy"); *Staley*, 2020 WL 5507555, at *7 (dismissing overarching conspiracy claim because plaintiffs failed to establish that each defendant "had an understanding about the nature of the [overarching] conspiracy and its scope, which would include that there was more than just a bilateral conspiracy").  Instead, the States allege in conclusory fashion that an "industry-wide understanding" existed.  That is, the States allege that each Defendant recognized the general proposition that matching price increases and "playing nice in the sandbox" maximizes profits.  Am. Third Compl. ¶ 142.  But such allegations fail to demonstrate that any Defendant knew that its actions were part of an alleged overarching conspiracy over almost ten years.

Accordingly, the States' claim for joint and several liability based on an overarching conspiracy, should be dismissed.

### B.     The States' Overarching Conspiracy Claims Should Be Dismissed as Improper Claim-Splitting

The prohibition against claim-splitting forbids plaintiffs "from prosecuting [a] case piecemeal and requires that all claims arising out of a single alleged wrong be presented in one action."  *Prewitt v. Walgreens Co.*, No. 12-cv-6967, 2013 WL 6284166, at *5 (E.D. Pa. Dec. 2, 2013) (citing *United States v. Haytian Republic*, 154 U.S. 118, 123–24 (1894)).  It is a "rule against

duplicative litigation." *Id.* Under this rule, plaintiffs have "no right to maintain two separate actions involving the same subject matter at the same time in the same court against the same defendant." *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir. 1977); *see also Stark v. Starr*, 94 U.S. 477, 485 (1876) (a plaintiff is "not at liberty to split up his demand and prosecute it by piecemeal[] or present only a portion of the grounds upon which special relief is sought").

Like *res judicata*, which applies after a final judgment, the rule against claim-splitting promotes "judicial economy by protecting defendants from having to defend against multiple identical, or nearly identical, lawsuits and by protecting courts from having to expend judicial resources on piecemeal litigation." *Prewitt*, 2013 WL 6284166, at *5;[22] *see also Katz v. Gerardi*, 655 F.3d 1212, 1218 (10th Cir. 2011) (claim-splitting wastes "scarce judicial resources" and undermines "the efficient and comprehensive disposition of cases").[23]

Successive lawsuits violate the doctrine against claim-splitting if they arise from the same transaction or series of transactions, or involve "the same nucleus of operative facts." *Vanover v. NCO Financial Servs., Inc.*, 857 F.3d 833, 842 (11th Cir. 2017); *see Serlin v. Arthur Andersen & Co.*, 3 F.3d 221, 223 (7th Cir. 2012) ("[A] suit is duplicative if the claims, parties, and available relief do not significantly differ between the two actions."). Whether a series of multiple occurrences involves a single transaction or common nucleus of operative facts depends on "their logical relationship." *See* Restatement (Second) of Judgments § 24 Reporter's Note (1982)

---

[22] *See* Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4404 (noting that a "growing trend" among courts is to "import the tests of claim preclusion into a 'claim-splitting' doctrine … to dismiss an action that presents the same claim, as measured by claim-preclusion tests, as another pending action").

[23] Judicial economy is particularly relevant here where, following the States' lead, private plaintiffs have also split claims across a variety of complaints and continue to file new, overlapping complaints long after the initial deadlines set by the Court. The "moving target" from these various complaints has consumed significant time and resources of this Court and the parties.

(quoting *Moore v. N.Y. Cotton Exch.*, 270 U.S. 593, 610 (1926)); *see also Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059 (3d Cir. 1978) (a "logical relationship" exists where separate trials would involve duplication of effort and time by parties and courts).[24]   In this case, because of the manner in which the States brought their cases, the Court will have to address, repeatedly, the same questions of whether and when the alleged industry-wide understanding was reached and by whom.   The rule against claim-splitting exists to prevent such duplication.

### 1.    The States' First, Second, and Third Complaints Each Purport to Allege the Same "Fair Share"-Based "Overarching Conspiracy"

Courts have held that where, as here, the "same alleged conspiracy" is asserted in multiple complaints, the "operative facts" test is satisfied.  *See, e.g.*, *Agha-Khan v. United States*, No. 15-cv-0042, 2015 WL 5734380, at *3–4 (E.D. Cal. Sept. 29, 2015) (granting motion to dismiss with prejudice where the second complaint involved "the same alleged massive overarching conspiracy of fraud and the same alleged nucleus of facts"), *aff'd*, 683 F. App'x 628 (9th Cir. 2017); *Dubuc v. City of Tulsa*, No. 98-cv-5140, 1999 WL 668823, at *2 (10th Cir. Aug. 27, 1999) (same transaction where second action involves "same alleged conspiracy").   Moreover, alleged acts in furtherance of the "overarching conspiracy" are "substantially of the same sort and similarly motivated[.]"   Restatement (Second) of Judgments § 24, cmt. d; *see also United States v. Mississippi*, 380 U.S. 128, 142–43 (1965) (state registrars acting over time "as part of a state-wide

---

[24]   What "factual grouping" counts as a "transaction, or series of transactions" is "determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations."   Restatement (Second) of Judgments § 24 (2) & cmt. b (1982).   While no factor is dispositive, courts consider the overlap in witnesses and proof between the actions; if "there is substantial overlap, the second action should ordinarily be excluded[.]"  *Id.*

system designed to enforce registration laws" in a discriminatory manner constitutes one "series of transactions or occurrences").

By contrast, courts have held that a follow-on case involves a *separate* transaction or nucleus of operative facts where the latter complaint does *not* allege that "defendants acted pursuant to a common plan or scheme," *DIRECTV, Inc. v. Kitzmiller*, No. 03-cv-3296, 2004 WL 834703, at *1 n.1 (E.D. Pa. Mar. 31, 2004), or where the two complaints involve "separate alleged schemes with different financial incentives," *United States ex rel. Lisitza v. Par Pharm. Cos., Inc.*, 62 F. Supp. 3d 743, 750–52 (N.D. Ill. 2014). Those circumstances are not present here.

Here, the States have brought separate lawsuits asserting the existence of an "overarching understanding" that "permeate[s] every segment of the industry" to allocate customers and/or maintain and fix prices for generic products based on a common "fair share" understanding. *Compare, e.g.*, Am. First Compl. ¶ 11 *with* Am. Third Compl. ¶ 5; *see also* Am. Third Compl. ¶ 148 (alleging the "truly industry-wide nature of the agreement"). As a matter of logic, however, there can be only one *industry-wide* "overarching conspiracy." Indeed, in this Court's August MTD Opinion, the Court observed that the States' First Complaint purports to "reach[] beyond [Defendants'] individual drugs." August MTD Op. 18. The Third Complaint purports to do the same. Indeed, the States seek to hold the Defendants named in each complaint "jointly and severally" liable for all harm alleged in connection with the same overarching conspiracy claim in each complaint, just relating to different products. *See, e.g.*, Am. First Compl. ¶ 541; Am. Second Compl. ¶ 1153; Am. Third Compl. ¶ 1619. This is the very definition of improper claim-splitting. Restatement (Second) of Judgments § 25, (1982) ("The rule [against claim-splitting] applies to extinguish a claim by the plaintiff against the defendant even though the plaintiff is prepared in

the second action (1) [t]o present evidence or grounds or theories of the case not presented in the first action, or (2) to seek remedies or forms of relief not demanded in the first action.").

The States have pled no basis to distinguish the overarching conspiracy claimed in the First, Second, or Third Complaints.  In fact, in recent briefing before the Court, instead of describing a different conspiracy, the States explained that the Third Complaint "alleges a more complete story of the overarching conspiracy [than the States' prior Complaints], beginning at a much earlier point in time."  States' Memo. Relating to Revised Bellwether Selection at 2, No. 16-md-2724, ECF No. 1702 (Mar. 1, 2021).  Likewise, the Third Complaint alleges that allegations made in the Second Complaint are part of the same "larger pattern of conduct."  *See supra* at 6.  Thus, the States themselves confirm that they have presented the same overarching conspiracy claim in multiple complaints.

### 2.    The States' Actions Involve Many of the Same Parties

While the Third Complaint adds new defendants and omits a handful of defendants named only in the First Complaint, most of the entities—plaintiffs and defendants—are common to at least one other State complaints.[25]  It is irrelevant that the parties in each of the related actions are

---

[25]    The U.S. Virgin Islands is the only new State Plaintiff added to the litigation by way of the Third Complaint.  Overlapping State Plaintiffs include: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Guam, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Northern Mariana Islands, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, and Wisconsin.

Defendants that are in the First, Second, and Third Complaints include:  Actavis Holdco US, Inc.; Aurobindo Pharmaceuticals USA., Inc.; Lannett Company, Inc.; Mylan Pharmaceuticals, Inc.; Sandoz Inc.; and Zydus Pharmaceuticals (USA), Inc.

Other Defendants that are in at least one prior complaint and the Third Complaint include: Amneal Pharmaceuticals, Inc.; Ara Aprahamian; Aurobindo Pharma USA, Inc.; James Grauso;

not identical. *Fabics v. City of New Brunswick*, 629 F. App'x 196, 198 (3d Cir. 2015) (affirming district court's dismissal of a "second, duplicative complaint" with prejudice under *Walton* even though plaintiffs "added several defendants to the second complaint").

### 3. The Factual Allegations in the First and Second Complaints Overlap with Those in the Third Complaint

It is well-settled that plaintiffs must allege, in their first case, "all facts forming the underlying transactions;" plaintiffs cannot withhold information about additional acts arising out of the same "scheme" and later raise it in a new case. *See Protocomm Corp. v. Novell, Inc.*, No. 94-cv-7774, 1998 WL 351605, at *6 (E.D. Pa. June 30, 1998). Plaintiffs cannot maintain additional, subsequent actions if they could have raised those facts, grounds, or remedies in the related first action. Restatement (Second) of Judgments § 25, cmt. a.

Here, the factual allegations that underlie the States' overarching conspiracy claims in the States' three complaints are far more than "offshoots of the same basic controversy." *Xerox Corp.*, 576 F.2d at 1059. For example, each complaint alleges that (1) there is an industry-wide, overarching scheme to "fix . . . prices" and "allocate" customers or markets to "suppress" or "thwart competition," Am. First Compl. ¶ 11; Am. Second Compl. ¶¶ 15; Am. Third Compl. ¶¶ 20–22; (2) this overarching scheme arose from connections made at industry "trade shows," "customer conferences" and similar events, along with "industry dinners," "girls' night[s] out," and other communications, Am. First Compl. ¶¶ 9, 83, 85–86; Am. Second Compl. ¶¶ 101–14; Am. Third Compl. ¶¶ 110–23; (3) defendants agreed on how much market share any given participant would have in certain generic markets, Am. First Compl. ¶ 12; Am. Second Compl. ¶ 16; Am. Third Compl. ¶ 125; (4) defendants agreed to collectively raise or maintain specific

---

Glenmark Pharmaceuticals, Inc., USA; Greenstone LLC; Armando Kellum; Lupin Pharmaceuticals, Inc.; Pfizer Inc.; Taro Pharmaceuticals USA, Inc; and Wockhardt USA, LLC.

prices for particular generic pharmaceutical products, Am. First Compl. ¶ 13; Am. Second Compl. ¶ 116; Am. Third Compl. ¶ 7; and (5) the underlying conduct at issue is primarily alleged to have taken place in overlapping periods, and the allegations of the Third Complaint encompass the full time periods covered by the First and Second Complaints.  Am. First Compl. ¶ 110; Am. Second Compl. ¶¶ 3, 536; Third Am. Compl. ¶ 1.  An alleged "fair share" code of conduct is alleged in all complaints to define the same alleged conspiracy to divvy up market share and set or raise specific prices.  Am. First Compl. ¶ 14; Am. Second Compl. ¶ 1; Am. Third Compl. ¶ 5.  And all complaints seek to hold Defendants jointly and severally liable for all harm caused by this same alleged conspiracy.  Am. First Compl., at pp. 107–13, 114–29; Am. Second Compl., at pp. 343–74; Am. Third. Compl., at pp. 431–59.

The addition of facts that could have been presented in the first case is insufficient to overcome either "res judicata's bar," *see Egli v. Strimel*, 251 F. Supp. 3d 827, 839–40 (E.D. Pa. 2017) (Rufe, J.), or the related prohibition on claim-splitting.[26]  Nor should courts focus on "technical differences between" two actions; they instead should "take a broad view of the subject, and bear in mind the actual purpose to be attained."  *Gregory v. Chehi*, 843 F.2d 111, 117 (3d Cir. 1988) (citations omitted); *see Silva v. Yosemite Cmty. Coll. Dist.*, No. 19-cv-0795, 2019 WL 6878237, at *8 (E.D. Cal. Dec. 17, 2019) (actions furthering "the same alleged conspiracy" cannot overcome the res judicata, or claim-splitting, hurdle).

---

[26]  Although the two doctrines are related, the procedural posture of this case demonstrates why application of the rule against claim-splitting is the appropriate remedy here.  The Court's current bellwether schedule would result in a potential trial relating to claims that would have, in the normal course, been litigated after the First Complaint and thereby subject to preclusion. Because the Third Complaint has been selected as a bellwether case, it is even more imperative for the Court to apply the prohibition against claim-splitting to the Third Complaint without waiting for *res judicata* to attach to a final judgment.

So long as the alleged wrongs "occurred consecutively in time and prior to filing the [first] complaint," even if the timeframes differed somewhat, they are still substantially related.  *See Vanover*, 857 F.3d at 842–43; *see also Strader v. U.S. Bank*, No. 19-cv-118, 2020 WL 3447776 at *1, 3 (W.D. Pa. June 24, 2020) ("The cases need not be identical to involve the same subject matter.") (citing *McKenna v. City of Phila.*, 304 F. App'x 89, 92 (3d Cir. 2008)).  This applies even to new facts, still part of the same nucleus, that are discovered during the first case.  *See, e.g.*, *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 800 F. Supp. 2d 182, 192–93 (D.D.C. 2011), *aff'd*, 682 F.3d 1043 (D.C. Cir. 2012).

### 4.  At Minimum, the Court Should Dismiss the States' Duplicative Allegations and Overlapping Theories of Recovery

The proper remedy for Plaintiff States' improper claim-splitting is dismissal of the Third Complaint.  Defendants here request, at a minimum, that this Court dismiss the overarching conspiracy claim upon which the States' theory of joint and several liability is exclusively based.  *Schneider v. United States*, 301 F. App'x 187, 190 (3d Cir. 2008) (a district court has the "power to administer its docket and dismiss a suit that is duplicative of another suit in federal court"); *see Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045, 1059 (Fed. Cir. 2014) (affirming claim preclusion dismissal of some claims, but allowing other claims to continue); *Alyeska Pipeline Serv. Co. v. United States*, 688 F.2d 765, 770–71 (Cl. Ct. 1982) (dismissing one claim based on impermissible claim-splitting, but allowing other claims to go forward).

Dismissal is called for where, as here, plaintiffs "use the tactic of filing two substantially identical complaints to expand [their] procedural rights" including by "filing duplicative complaints for the purpose of circumventing the rules pertaining to the amendment of complaints."  *McKenna*, 304 F. App'x at 92 (rejecting plaintiff's attempt to circumvent impermissible amendment by filing second complaint (quoting *Walton*, 563, F.2d at 71)); *Hutchins v. United*

*Parcel Serv., Inc.*, 197 F. App'x 152, 160 (3d Cir. 2006) (dismissal of duplicative claims was appropriate because "the court's deadline for amendment of the complaint clearly put [the plaintiff] on notice that action was needed before [the deadline] to protect any other potential claims he wished to assert"); *Zisumbo v Ogden Reg'l Med. Ctr.*, 536 F. App'x 832, 832–33 (10th Cir. 2013) (Gorsuch, J.) (explaining that claim-splitting should not be used to "expand the procedural rights" plaintiffs "would have otherwise enjoyed").[27]

In this instance, the States had another opportunity to amend the First Complaint. This Court required all plaintiffs with outstanding complaints to amend them by December 31, 2018. PTO 61 ¶ I.1, ECF No. 775. But the States took no action because by amending, they would have forfeited the use of evidence obtained via investigative subpoenas issued after the First Complaint was filed. *See* ECF No. 758 (quoting Conn. Gen. Stat. § 35-42(a) (investigative subpoenas may only be issued "*prior to instituting* any action")).[28] Instead, they filed a Second Complaint, and

---

[27] *See also Sensormatic Sec. Corp. v. Sensormatic Elec. Corp.*, 273 F. App'x 256, 265 (4th Cir. 2008) (holding dismissal appropriate because second complaint was improper claim-splitting and "apparent" attempt to circumvent prior court's decision to deny leave to amend prior complaint); *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 362 (5th Cir. 1996) ("[W]e find no error in the district court's order dismissing [the plaintiff's] second complaint as duplicative of the first," particularly "where, as here, the plaintiff files the second complaint to achieve procedural advantage by 'circumventing the rules pertaining to the amendment of complaints.").

[28] *See also Brown & Brown, Inc. v. Blumenthal*, 1 A.3d 21, 25-26 (Conn. 2010) ("General Statutes § 35-42 . . . authorizes the attorney general to demand, *prior to the institution of any action or proceeding*, discovery from any person whom he has reason to believe has violated any portion of the Connecticut Antitrust Act") (emphasis added).

The States were aware of this limitation. During a hearing on Defendants' Motion to Enforce, counsel for the States represented to the Court that "[a]ny subpoenas that have been issued by the States since we initiated the lawsuit have not been intended to further discovery in [this] litigation." July 11, 2018 Tr., at 36:17-20, No. 16-md-2724, ECF No. 652. Nevertheless, as the Third Complaint confirms, the States used their investigative powers to allege broader versions of the same conspiracy after the filing of the First Complaint: "In July 2014, the State of Connecticut initiated a non-public investigation into suspicious pharmaceutical price increases. Over time, the investigation expanded to include the conduct alleged herein and Connecticut was joined in its efforts by more than 50 additional states and U.S. territories. The allegations in this Complaint are

then a Third Complaint.  Because other claim-splitting remedies would allow the States "to expand [their] procedural rights" and circumvent both this Court's deadline to amend and Connecticut's limitations on the use of investigatory subpoenas, dismissal is warranted.

Finally, certain Defendants face substantial prejudice because of the duplicative relief sought by the States.  For example, multiple states appear to be seeking duplicative statutory penalties based on both alleged participation in the "Heritage" conspiracy and again based on participation in the "Dermatology" conspiracy—even though those claims are, by the terms of the complaints, premised on the same industry-wide "overarching" conspiracy.  *See, e.g.*, N.Y. Gen. Bus. Law § 342-a (incorporating criminal penalties pursuant to N.Y. Gen. Bus. Law § 341 not to exceed $1,000,000 per corporate defendant); Am. First Compl. ¶¶ 770–71 (seeking penalties under New York law); Am. Third Compl. ¶¶ 1993–94 (same); Wis. Stat. § 133.03(1) (setting $100,000 maximum criminal or civil statutory fine for engaging in a conspiracy in restraint of trade); First Compl. ¶ 884 (seeking penalties under Wisconsin law); Am. Third Compl. ¶ 2109 (same).[29]  The Court should dismiss the duplicative relief sought in the Third Complaint premised on the "overarching conspiracy."

---

based on, and supported by, information and evidence gleaned directly from the investigation . . ." Am. Third Compl. ¶ 18.

[29]  To the extent that the States seek the enforcement of functionally criminal penalties against Defendants, seeking those punishments in two actions will likely implicate due process under the Double Jeopardy Clause.  *See Hudson v. United States*, 522 U.S. 93, 99 (1997) (where a punishment is labeled criminal, or where the punishment is plainly punitive in purpose or effect, Double Jeopardy applies).  For example, New York seeks application of NY Gen. Bus. Law § 342-a in each complaint, which incorporates criminal penalty levels set forth in § 341, including fines not to exceed $1,000,000 for corporations.  *See* Am. First Compl. ¶¶ 770–71; Am. Second Compl. ¶¶ 2000–01; Am. Third Compl. ¶¶ 1993–94.  The likely risk of significant constitutional issues that would arise if Defendants were subjected to duplicative penalties further counsels in favor of dismissing the Second and Third Complaints or striking overlapping elements.

**IV.     CONCLUSION**

For the foregoing reasons, Defendants respectfully move this Court to dismiss, with prejudice, the States' claim of overarching conspiracy as presented (for the third time) in the Third Complaint.

Dated:     New York, NY                    Respectfully submitted,
           November 12, 2021


*/s/ Sheron Korpus*
Sheron Korpus
Seth A. Moskowitz
Seth Davis
David M. Max
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
skorpus@kasowitz.com
smoskowitz@kasowitz.com
sdavis@kasowitz.com
dmax@kasowitz.com

*Counsel for Defendants Actavis Elizabeth, LLC,*
*Actavis Holdco U.S., Inc., and Actavis Pharma, Inc.*

*/s/ Raymond A. Jacobsen, Jr.*
Raymond A. Jacobsen, Jr.
Paul M. Thompson (Pa. Bar No. 82017)
Lisa (Peterson) Rumin
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, D.C. 20001
Telephone: (202) 756-8000
rayjacobsen@mwe.com
pthompson@mwe.com
lrumin@mwe.com


Nicole L. Castle
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 547-5400
ncastle@mwe.com

*Counsel for Defendants Amneal Pharmaceuticals,*
*Inc., Amneal Pharmaceuticals LLC*

/s/ Wayne A. Mack
Wayne A. Mack
Sean P. McConnell
Sarah O'Laughlin Kulik
DUANE MORRIS LLP
30 S. 17th Street
Philadelphia, PA 19103
Telephone: (215) 979-1152
wamack@duanemorris.com
spmcconnell@duanemorris.com
sckulik@duanemorris.com

*Counsel for Defendant Aurobindo Pharma USA,
Inc.*

/s/ Robin D. Adelstein
Robin D. Adelstein
Mark A. Robertson
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019-6022
Telephone: (212) 318-3000
Facsimile: (212) 408-5100
robin.adelstein@nortonrosefulbright.com
mark.robertson@nortonrosefulbright.com

*Counsel for Defendants Bausch Health Americas,
Inc. and Bausch Health US LLC*

/s/ Marguerite M. Sullivan
Marguerite M. Sullivan
Anna M. Rathbun
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
marguerite.sullivan@lw.com
anna.rathbun@lw.com

*Counsel for Defendant G&W Laboratories*

*/s/ Steven A. Reed*
Steven A. Reed
R. Brendan Fee
Melina R. DiMattio
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
Facsimile: (215) 963-5001
brendan.fee@morganlewis.com
steve.reed@morganlewis.com
melina.dimattio@morganlewis.com

Wendy West Feinstein
MORGAN, LEWIS & BOCKIUS LLP
One Oxford Centre
Thirty-Second Floor
Pittsburgh, PA 15219
Telephone: (412) 560-7455
Facsimile: (412) 560-7001
wendy.feinstein@morganlewis.com

*Counsel for Defendant Glenmark Pharmaceuticals Inc., USA*

*/s/ Gerald E. Arth*
Gerald E. Arth
Ryan T. Becker
Nathan M. Buchter
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
Telephone: (215) 299-2000
Fax: (215) 299-2150
garth@foxrothschild.com
rbecker@foxrothschild.com
nbuchter@foxrothschild.com

George G. Gordon
Julia Chapman
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994-2000
Fax: (215) 994-2222
george.gordon@dechert.com
julia.chapman@dechert.com

*Counsel for Defendant Lannett Company, Inc.*

*/s/ Leiv Blad*
Leiv Blad
Zarema Jaramillo
Meg Slachetka
LOWENSTEIN SANDLER LLP
2200 Pennsylvania Avenue
Washington, D.C. 20037
Telephone: (202) 753-3800
lblad@lowenstein.com
zjaramillo@lowenstein.com
mslachetka@lowenstein.com

*Counsel for Defendant Lupin Pharmaceuticals, Inc.*

*/s/ Benjamin F. Holt*
Benjamin F. Holt
Adam K. Levin
Justin W. Bernick
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600
benjamin.holt@hoganlovells.com
adam.levin@hoganlovells.com
justin.bernick@hoganlovells.com

Jasmeet K. Ahuja
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
Telephone: (267) 675-4600
jasmeet.ahuja@hoganlovells.com

*Counsel for Defendant Mylan Inc. and Mylan Pharmaceuticals Inc.*

*/s/ J. Clayton Everett, Jr.*
Scott A. Stempel
J. Clayton Everett, Jr.
Tracey F. Milich
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
Telephone: (202) 739-3000
Facsimile: (202) 739-3001
scott.stempel@morganlewis.com
clay.everett@morganlewis.com
tracey.milich@morganlewis.com

Harvey Bartle IV
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
Facsimile: (215) 963-5001
harvey.bartle@morganlewis.com

*Counsel for Defendant Perrigo New York, Inc.*

*/s/ Ilana H. Eisenstein*
Ilana H. Eisenstein
Ben C. Fabens-Lassen
DLA PIPER LLP (US)
1650 Market Street, Suite 5000
Philadelphia, PA 19103
Telephone: (215) 656-3300
ilana.eisenstein@dlapiper.com
ben.fabens-lassen@dlapiper.com

Edward S. Scheidman
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Telephone: (202) 799-4000
Edward.scheideman@dlapiper.com

*Counsel for Defendant Pfizer Inc. and Greenstone, LLC*

*/s/ Saul P. Morgenstern*

Saul P. Morgenstern
Margaret A. Rogers
Ada V. Añon
Kathryn L. Rosenberg
Andrew R. Hirschel
ARNOLD & PORTER KAYE SCHOLER LLP
250 W. 55th Street
New York, NY 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-8689
margaret.rogers@arnoldporter.com
saul.morgenstern@arnoldporter.com
ada.anon@arnoldporter.com
kathryn.rosenberg@arnoldporter.com
andrew.hirschel@arnoldporter.com

Laura S. Shores
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue
Washington, DC 20001
Telephone: (202) 942-5000
laura.shores@arnoldporter.com

*Counsel for Defendants Sandoz Inc. and Fougera
Pharmaceuticals Inc.*

*/s/ Erik T. Koons*
John M. Taladay
Erik T. Koons
Stacy L. Turner
Christopher P. Wilson
BAKER BOTTS LLP
700 K Street, NW
Washington, DC 20004
Telephone: (202) 639-7700
Facsimile: (202) 639-7890
erik.koons@bakerbotts.com
john.taladay@bakerbotts.com
stacy.turner@bakerbotts.com
christopher.wilson@bakerbotts.com

Lauri A. Kavulich
Ann E. Lemmo
CLARK HILL PLC
2001 Market St, Suite 2620
Philadelphia, PA 19103
Telephone: (215) 640-8500
Facsimile: (215) 640-8501
lkavulich@clarkhill.com
alemmo@clarkhill.com

Lindsay S. Fouse
CLARK HILL PLC
301 Grant St, 14th Floor
Pittsburgh, PA 15219
Telephone: (412) 394-7711
Facsimile: (412) 394-2555
lfouse@clarkhill.com

*Counsel for Defendants Sun Pharmaceutical
Industries, Inc. and Taro Pharmaceuticals U.S.A.,
Inc.*

*/s/ Damon W. Suden*
William A. Escobar
Damon W. Suden
Clifford Katz
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Telephone: (212) 808-7800
Facsimile:  (212) 808-7987
wescobar@kelleydrye.com
dsuden@kelleydrye.com
ckatz@kelleydrye.com

*Counsel for Defendant Wockhardt USA LLC*

*/s/ G. Robert Gage, Jr.*
G. Robert Gage, Jr.
GAGE SPENCER & FLEMING LLP
410 Park Avenue
New York, NY 10022
Telephone: (212) 768-4900
grgage@gagespencer.com

*Counsel for Defendant Ara Aprahamian*

*/s/ Elizabeth S. Fenton*
Elizabeth S. Fenton
Michelle N. Lipkowitz
SAUL EWING ARNSTEIN & LEHR LLP
1201 N. Market St.
Suite 2300
Wilmington, DE 19801
Telephone: (302) 421-6800
elizabeth.fenton@saul.com
michelle.lipkowitz@saul.com

*Counsel for Defendant Mitchell Blashinsky*

/s/ Guy Petrillo
Guy Petrillo
Christina Karam
PETRILLO KLEIN & BOXER LLP
655 Third Ave.
22nd Floor
New York, NY 10017
212-370-0330

*Counsel for Defendant Douglas Boothe*

/s/ Robert E. Connolly
Robert E. Connolly
LAW OFFICES OF ROBERT E. CONNOLLY
1735 Market Street
Suite A, #469
Philadelphia, Pa. 19103
Telephone: (215) 219-4418
bob@reconnollylaw.com

*Counsel for Defendant James Grauso*

/s/ Michael Weinstein
Michael Weinstein
COLE SCHOTZ P.C.
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey  07602-0800
201-489-3000
201-489-1536  Facsimile
mweinstein@coleschotz.com

*Counsel for Defendant Walter Kaczmarek*

*/s/ Erica S. Weisgerber*
Erica S. Weisgerber
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Telephone: 212-909-6000
Facsimile: 212-909-6836
eweisgerber@debevoise.com

Edward D. Hassi (D.C. Bar No. 1026776)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: 202-383-8000
Facsimile: 202-383-8118
thassi@debevoise.com

*Counsel for Defendant Armando Kellum*

*/s/ Richard L. Scheff*
Richard L. Scheff
Bianca A. Valcarce
ARMSTRONG TEASDALE LLP
2005 Market Street, 29th Floor
One Commerce Square
Philadelphia, PA 19103
Telephone: (267) 780-2000
Facsimile: (215) 405-9070
rlscheff@atllp.com
bvalcarce@atllp.com

*Counsel for Defendant Kurt Orlofski*

/s/ Adam S. Lurie
Adam S. Lurie
LINKLATERS LLP
601 Thirteenth Street NW
Suite 400S
Washington, DC 20005
Telephone: (202) 654-9200
Facsimile: (202) 654-9210
adam.lurie@linkaters.com

Michael Pilcher
LINKLATERS LLP
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 903-9000
Facsimile: (212) 903-9100
michael.pilcher@linklaters.com

*Counsel for Defendant Michael Perfetto*

/s/ Alexander R. Bilus
Alexander R. Bilus
Christopher R. Hall
SAUL EWING ARNSTEIN & LEHR LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-21086
Telephone: (215) 972-7180
Facsimile: (215) 972-7725
alexander.bilus@saul.com
chris.hall@saul.com

*Counsel for Defendant Erika Vogel-Baylor*