**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | MDL 2724<br>16-md-2724-CMR |
| **THIS DOCUMENT RELATES TO:**<br><br>*State of Connecticut, et al., v. Sandoz, Inc., et al.* | HON. CYNTHIA M. RUFE<br><br>Civil Action No.<br><br>20-cv-3539-CMR |

**PLAINTIFF STATES' OPPOSITION TO CERTAIN DEFENDANTS'
JOINT MOTION TO DISMISS THE STATES'
OVERARCHING CONSPIRACY CLAIMS IN THE DERMATOLOGY COMPLAINT**

## **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

BACKGROUND ......................................................................................................................3

I.     The States Have Filed Three Actions Containing Distinct Claims.....................................3

II.    The Overarching Conspiracy Linking The Market Allocation And Price Fixing Agreements In Individual Drug Markets Is Clearly And Sufficiently Plead Within The Dermatology Complaint. ................................................................................................5

ARGUMENT ..........................................................................................................................12

I.     Defendants Fail To Distinguish The Allegations In The Dermatology Complaint From The Materially Similar Allegations Already Found Sufficient By This Court Under *Twombly*.................................................................................................................12

      A.     Defendants' Use Of "Fair Share" And Similar Terms Supports The Plausibility Of The Overarching Agreement. ........................................................13

      B.     The Dermatology Complaint Alleges Ample Material Alleging "Plus Factors" That Coherently Explain The Overarching "Fair Share" Agreement.............................................................................................................15

      C.     The Dermatology Complaint Alleges Sufficient Material To Infer Defendants' Knowledge Of The Overarching Conspiracy. ...................................19

II.    The States' Dermatology Action Does Not Improperly Split Claims. .............................21

      A.     The "Overarching Conspiracy" Discussed In The States' Heritage, Teva, And Dermatology Complaints Is Not A Standalone Claim.................................22

      B.     The Dermatology Action Involves New And Different Drugs, And Combinations Of Parties. ..................................................................................23

      C.     The Factual Allegations In The Heritage And Teva Complaints Are Distinct From Those In The Dermatology Complaint.........................................25

      D.     This Court Should Reject Defendants' Motion To Dismiss Because The Claim-Splitting Doctrine Does Not Apply To The States' Actions. ...................31

            1.     Plaintiffs May Bring Separate Actions For Different Claims, And The States Chose To Do So. .................................................................31

            2.     The Defendants And This Court Knew That The States Would Bring Additional Actions. .......................................................................32

            3.     The Defendants Would Not Be Prejudiced By Maintaining These Actions Given The MDL Context.............................................................33

CONCLUSION........................................................................................................................34

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ..........................................................................................5, 15

*Dahl v. Bain Capital Partners, LLC*,
937 F. Supp. 2d 119 (D. Mass. 2013) ....................................................................14

*Edward Wisner Donation v. BP Expl. & Prod. (In re Oil Spill)*,
No. 14–cv–1525, 2014 U.S. Dist. LEXIS 132567 (E.D. La. Sept. 5, 2014) ...................33, 34

*Horia v. Nationwide Credit & Collection, Inc.*,
944 F.3d 970 (7th Cir. 2019) ................................................................26

*In re Auto. Parts Antitrust Litig.*,
No. 12-md-2311, 2016 WL 8200512 (E.D. Mich. Apr. 13, 2016) ........................................18

*In re Auto. Parts Antitrust Litig.*,
No. 12-md-2311, 2018 WL 1138422 (E.D. Mich. Jan. 16, 2018) ...................................18, 19

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ......................................................5

*In re Generic Pharm. Pricing Antitrust Litig.*,
394 F. Supp. 3d 509 (E.D. Pa. 2019) ……………………………..5, 7, 8, 9, 10, 12, 13, 15, 21

*In re Niaspan Antitrust Litig.*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) ......................................................5

*In re Processed Egg Prods. Antitrust Litig.*,
821 F. Supp. 2d 709 (E.D. Pa. 2011) ...................................................13

*Intel Corp. v. Fortress Inv. Grp., LLC*,
No. 19-cv-7651, 2020 WL 6390499 (N.D. Cal. Jul. 15, 2020) ...............................................20

*Lawlor v. Nat'l Screen Serv. Corp.*,
349 U.S. 322 (1955) .......................................................................21

*Live Face on Web, LLC v. Cremation Soc'y of Ill., Inc.*,
No. 18–cv–1718, 2019 WL 398938 (E.D. Pa. Jan. 31, 2019) ..............................21, 22, 24, 32

ii

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002) ..........................................................................................26

*Precision Assocs., Inc. v. Panalpina*,
    No. 08-cv-42(JG)(VVP), 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ..................................19

*Prewitt v. Walgreens Co.*,
    No. 12-6967, 2013 WL 6284166 (E.D. Pa. Dec. 2, 2013) ..............................................21, 33

*Staley v. Gilead Scis., Inc.*,
    No. 19-cv-02573, 2020 WL 5507555 (N.D. Cal. July 29, 2020) ....................................19, 20

*Stark v. Starr*,
    94 U.S. 477 (1876) ..........................................................................................2

*United States v. Kelly*,
    892 F.2d 255 (3d Cir. 1989) ............................................................................9, 10

*Walton v. Eaton Corp.*,
    563 F.2d 66 (3d Cir. 1977) ..............................................................................21

## Other Authorities

FED. R. CIV. P. 18(a) ..............................................................................31, 32

RESTATEMENT (SECOND) OF JUDGMENTS § 24 ............................................................32

## INTRODUCTION

In arguing that the Dermatology Complaint[1] fails to plead an overarching conspiracy, Defendants find themselves in a difficult place.  Although the Dermatology Complaint pleads distinct facts that involve different claims, parties, drugs, and factual allegations, the operation of the overarching conspiracy's "fair share" framework has already been found sufficient by this Court when considering materially similar allegations.  The Dermatology Complaint alleges voluminous facts that demonstrate the Defendants adhered to an overarching understanding that they could communicate with each other to allocate any drug market that they overlapped on to achieve "fair share," and once the market was "stable," increase prices.  The Defendants engaged in an overlapping web of inter-defendant communications, as well as coordinating at industry gatherings, to carry out their agreement.  The Dermatology Complaint's allegations relating to the overarching conspiracy undoubtedly meet the "plausibility" standard that is applied at this stage in the litigation.

The claims in the States' Heritage Complaint,[2] Teva Complaint,[3] and Dermatology Complaint do not overlap.  They are fundamentally different, and the lines between them are clear.  Although all three have similar allegations relating to the existence of an "overarching conspiracy," each Complaint asserts – and is expressly limited to – price fixing and/or market

---

[1] *See State of Connecticut, et al. v. Sandoz, Inc., et al.*, No. 2:20-cv-03539 (E.D. Pa.), ECF No. 1, *amended by* ECF No. 62 (the "Dermatology Complaint" or "Dermatology Action," or in citations "DC").

[2] *See State of Connecticut, et al. v. Aurobindo Pharma USA, Inc., et al.*, No. 2:17–cv–03768 (E.D. Pa.), ECF No. 1, *amended by* ECF Nos. 14, 15 (the "Heritage Complaint" or "Heritage Action," or in citations "HC").

[3] *See State of Connecticut, et al. v. Teva Pharmaceuticals USA, Inc., et al.*, No. 2:19–cv–02407 (E.D. Pa.), ECF No. 1, *amended by* ECF No. 106 (the "Teva Complaint" or "Teva Action," or in citations "TC").

1

allocation claims with respect to a specific set of *different* drugs and time periods. The States do not seek to hold the Defendants in the Dermatology Complaint liable for damages relating to drugs identified in the Heritage or in the Teva Complaints, or vice versa. The Heritage Complaint seeks to hold certain Defendants liable for damages relating to fifteen specific drugs. The Teva Complaint seeks to hold a different combination of Defendants liable for damages relating to more than 100 different generic drugs. The Dermatology Complaint seeks to hold another group of Defendants liable for damages concerning eighty distinct generic drugs (mostly topical dermatological products).

It is well-settled that a claimant may recover for each claim against a defendant. While "[i]t is undoubtedly a settled principle that a party seeking to enforce a claim . . . must present to the court . . . all the grounds upon which he expects a judgment in his favor," the Supreme Court recognized that "this principle does not require distinct causes of action, – that is to say, distinct matters, – each of which would authorize by itself independent relief, to be presented in a single suit, though they exist[ed] at the same time and might be considered together." *Stark v. Starr*, 94 U.S. 477, 485 (1876). The States have acted in accordance with this basic legal principle by filing actions that assert distinct claims.

Defendants, on the other hand, seem to fundamentally misunderstand the States' legal actions and claims therein, given Defendants' improper invocation of the claim-splitting doctrine in their Motion to Dismiss. The States' Heritage, Teva, and Dermatology Actions not only involve different claims, parties, drugs, and factual allegations, but Defendants also ignore other important realities of this litigation, including their own awareness – from the time that the Heritage Complaint was filed – that the States would bring additional actions.

The Defendants' Motion to Dismiss should be denied.

# BACKGROUND

## I.     The States Have Filed Three Actions Containing Distinct Claims.

On December 15, 2016, the States filed a two-drug complaint, related to doxycycline hyclate delayed release and glyburide, in the District of Connecticut.  *See State of Connecticut, et al. v. Aurobindo Pharma USA, Inc., et al.*, No. 3:16−cv−02056 (D. Conn.), ECF No. 1.  The case was transferred to MDL 2724 in August 2017.  *See State of Connecticut, et al. v. Aurobindo Pharma USA, Inc., et al.*, No. 3:16−cv−02056 (D. Conn.), ECF No. 343; *In re Generic Pharm. Pricing Antitrust Litig.*, No. 2:16–md–02724 (E.D. Pa.), ECF No. 417.  The States then made a motion to expand that complaint to include all the drugs on which defendant Heritage Pharmaceuticals, Inc. ("Heritage") colluded, and the complaint was amended in this first action to include fifteen total drugs and an "overarching conspiracy" as the *framework* in which the collusion on those drugs occurred.  *See State of Connecticut, et al. v. Aurobindo Pharma USA, Inc., et al.*, No. 2:17–cv–03768 (E.D. Pa.), ECF Nos. 14, 15.  The States made clear that "[this] Complaint describes conspiracies regarding the sale of **specific drugs**, and how these **specific conspiracies** are also part of the larger overarching conspiracy.  The Plaintiff States continue to investigate **additional conspiracies**, involving these and other generic manufacturers, **regarding the sale of other drugs not identified in this Complaint**, and **will likely bring additional actions based on those conspiracies** at the appropriate time in the future."  HC ¶ 3 (emphasis added).

The States thus went into court, asserted specific claims about conspiracies related to the Heritage drugs in the context of a broader "overarching conspiracy" framework, and noted ongoing investigations into other drug-specific conspiracies.  Though Defendants made a motion alleging the States were improperly using investigatory authority to gather discovery in the litigation, *see In re Generic Pharm. Pricing Antitrust Litig.*, No. 2:16–md–02724 (E.D. Pa.), ECF No. 593, this

Court stated it "[would] not prevent the [States] from continuing to investigate pursuant to the authority granted them under the relevant state laws, **particularly with regard to the possibility of claims concerning additional drugs and additional parties**."  Order, ECF No. 758 at 10 (emphasis added).

As the States continued to investigate, new claims regarding the sale of different drugs indeed arose.  The States therefore filed a second action that asserted these new claims and provided a more expansive description of how the "overarching conspiracy" framework was applied throughout the industry.  As with the Heritage Complaint, the Teva Complaint was filed in the District of Connecticut, transferred, and amended.  While the Heritage Complaint focuses on conduct by Heritage within the "overarching conspiracy" framework, the Teva Complaint describes collusion by Teva and other Defendants related to specific drugs as implemented through the broader "overarching conspiracy" across the industry.  *See State of Connecticut, et al. v. Teva Pharmaceuticals USA, Inc., et al.*, No. 2:19–cv–02407 (E.D. Pa.), ECF No. 106.[4]

On June 10, 2020, the States filed a third action that asserted new claims focused largely on generic topical products and further illuminated the "overarching conspiracy" understanding among generic drug manufacturers.  The Dermatology Complaint, like the Heritage and the Teva Complaints, was filed in the District of Connecticut, transferred, and amended.  The Dermatology Complaint alleges collusion by Sandoz and other Defendants with regard to certain drugs as effected through the industry-wide "overarching conspiracy."  *See State of Connecticut, et al. v. Sandoz, Inc., et al.*, No. 2:20-cv-03539 (E.D. Pa.), ECF No. 62.

---

[4] Though not at issue here, it is worth noting that, as with the Heritage Complaint, the Teva Complaint clearly asserted that the States "continue to investigate additional conspiracies" and "will likely bring additional actions based on those conspiracies . . . ."  TC ¶ 7.  It therefore should, again, have come as no surprise to Defendants when the States filed another complaint in June 2020.

II.     **The Overarching Conspiracy Linking The Market Allocation And Price Fixing Agreements In Individual Drug Markets Is Clearly And Sufficiently Plead Within The Dermatology Complaint.**

What the States are required to plead at this stage of the litigation has been plainly stated by this Court in its previous decision allowing the States' overarching conspiracy theory in the Heritage Complaint to proceed.  The States are required to allege "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 524 (E.D. Pa. 2019) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  Plaintiffs do not need to "plead facts that, if true, definitively rule out all possible innocent explanations," and it "is improper at this stage of the proceedings to weigh alternatives and [decide] which is more plausible."  *Id.* (*quoting In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 753 (E.D. Pa. 2014) and *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 788 (N.D. Ill. 2017)).  The allegations in the Dermatology Complaint – like the substantially similar allegations already found sufficient under this standard by this Court – "make plausible claims that the alleged individual drug conspiracies were connected by common goals, methods, or actors so as to form a broader overarching conspiracy."  *Id.* at 526.

Operation of the overarching conspiracy linking the various individual drug agreements is clearly described.  The States allege that Defendants agreed that each individual company was entitled to its approximate "fair share" of a given drug market, which generally meant each competitor received a proportionate share of the market based on the number of competitors (e.g., two competitors would each obtain approximately 50% of the market; three competitors would each obtain 33%; etc.).  DC ⁋ 130.  Competitors that entered a market first might receive a slightly larger share, while later entrants might receive a lesser share.  DC ⁋ 131.  Defendants would generally reach out to each other to allocate the market based on the number of competitors and

the timing of their entry, then agree on how to avoid competing on price and significantly increase prices.  DC ¶ 137.

That a new competitor enters a given generic drug market after it receives approval to market that drug by the Food and Drug Administration is important to the industry-wide nature of the conspiracy.  DC ¶ 83.  Thus, Defendants constantly faced different combinations of would-be competitors when branded pharmaceuticals came off-patent or new companies gained FDA approval on a particular drug.  As explained in the Complaint:

> This "fair share" understanding has been particularly effective when a new competitor enters the market – a time when, in a free-functioning, competitive market for generic drugs, prices would be expected to go down.  The new competitor will either approach or be approached by the existing competitors. . . . [N]ew and existing entrants know that they can call each other, as necessary, to discuss how to implement the "fair share" agreement to an expanded number of competitors. As a result of these communications, existing competitors will agree to "walk away" from a specific customer or customers by either refusing to bid or submitting a cover bid.  These agreements to allocate specific customers between incumbents and new entrants means that the new competitor's transition into the market is seamless; the new entrant is ceded market share and immediately charges a supra-competitive price. . . .

DC ¶ 138.  The Dermatology Complaint then goes on to allege, in detail, how Defendants executed this overarching agreement with respect to each drug.  As repeat players that face different sets of Defendants in a market as each new drug comes off-patent, or as new participants enter existing markets, the background understanding that each company could reach out to its ostensible competitors to allocate "fair share" was essential to the operation of each individual agreement.  Thus, like the allegations in the Heritage Complaint found sufficient by this Court, the Dermatology Complaint sets out "parallel conduct in the form of price increases across the market for generic drugs that are reasonably proximate in time and value" and why the "structure of the market for generic drugs motivated Defendants to enter into an antitrust conspiracy and undertake

actions against self interest in the form of pricing and bidding decisions that would be irrational in a competitive market for generic drugs." *In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 525 (quotation marks and citation omitted).

Likewise, the Dermatology Complaint also contains specific allegations demonstrating the linkage between agreements concerning individual drugs. Many of the traditional "facts implying the existence of a traditional conspiracy" previously recognized by this Court, *id.*, are alleged in the Dermatology Complaint. For instance, the Complaint contains specific allegations of hundreds of specifically-plead "inter-defendant communications" throughout the time period covered. *See* DC ¶ 129 (providing a visual aide of some Defendants communications with each other).[5] These communications notably include multiple instances when an employee of a company *that did not sell the drug at issue* acted as a go-between for other Defendants that did, demonstrating the investment Defendants had in the functioning of the overarching conspiracy. *See* DC ¶¶ 397, 465, 481, 483 (Defendant Grauso at Defendant Aurobindo passing messages from CW-6 of Fougera to Defendants Orlofski and Vogel-Bayor at G&W); DC ¶ 530 (CW-6 of Fougera passing information between G&W and Perrigo); DC ¶¶ 1397, 1458, 1510, 1540 (CW-6, now at Aurobindo, conveying information between G&W and Perrigo employees relating to market allocation and price fixing of multiple drugs, even though Aurobindo did not manufacture any of them). The States also allege that the Defendants communicated about the prices of products that one of them did not sell at the time; Defendants would then conspire on those drugs when the others' market entry occurred. DC ¶ 159 (Sandoz asking Perrigo for the prices of a number of drugs it did not sell in April 2013, including Halobetasol Cream, which Perrigo provided); DC ¶¶ 1408-1429 (starting in

---

[5] As noted in the Dermatology Complaint, "[f]or many of these [companies'] executives, there were hundreds of calls and texts with competitors, but the volume of those communications is not captured by this graph[]." DC ¶ 129.

December 2013, Sandoz prepares to launch Halobetasol Cream and coordinates its entry with Perrigo and G&W).

The Dermatology Complaint also contains detailed allegations of Defendants' trade association membership and meeting attendance. *In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 525. These association meetings and trade shows are described in the Dermatology Complaint, DC ¶¶ 111-114, in addition to the less formal industry dinners and private meetings that served as additional forums for collusion, DC ¶¶ 115-123. Contrary to Defendants' argument that the alleged meetings and trade shows only provided an "opportunity to collude," Defendants' Memo, 18, the Dermatology Complaint provides specific allegations of how multiple overlapping agreements were being organized while these meetings occurred; for instance, at the April 2013 NACDS Annual Meeting, multiple Defendants—Taro, Sandoz, Perrigo, Actavis, Mylan and Glenmark—were in attendance that were collaborating on Taro-lead price increases on a number of drugs that occurred in May 2013. *See* DC ¶ 741. Overlapping groups of conspirators were also in attendance at the time: Taro and Sandoz dividing the market for NT Cream, *see* DC ¶ 676; Sandoz, Mallinckrodt, Actavis, and Taro/Sun dividing the market for Methylphenidate IR, *see* DC ¶¶ 1276-1277; Sandoz, Perrigo and G&W dividing up the market for Ciclopirox Solution, *see* DC ¶¶ 1455-1457; G&W, Pfizer/Greenstone, and Upsher Smith dividing up the market for Prochlorperazine, *see* DC ¶¶ 1449-1450. The Complaint also contains allegations of conversations at these meetings where the overarching conspiracy's framework was discussed by Defendants in general terms without reference to specific drugs. *See* DC ¶¶ 196-197 (discussion between employees at Sandoz and Taro at an industry meeting discussing "the importance of maintaining a fair share balance, not being greedy about market share, and following price increases on

overlapping products.")[6]  The Dermatology Complaint's allegations support, at the very least, the inference that these meetings were consistently used by Defendants to coordinate their overarching understanding.[7]

Indeed, the Dermatology Complaint contains factual allegations that go further than *Twombly* requires at this stage in the litigation, demonstrating that the Defendants shared a common goal, that the individual drug conspiracies were interdependent, and that there was sufficient overlap among the participants in the individual drug conspiracies.  *See United States v. Kelly*, 892 F.2d 255 (3d Cir. 1989).  Though this Court held that "*Twombly* sets the bar for Plaintiffs' overarching conspiracy allegations, not *Kelly*," this Court also found that "[e]ven if *Kelly* were the proper measuring stick … their allegations plead an overarching conspiracy."  *In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 528.  Pursuant to this authority, the "connective tissue" alleged in the Dermatology Complaint more than sufficiently demonstrates the plausibility of the Defendants' coordinated overarching agreement.

---

[6] Defendants attempt to reframe this conversation that "competitors sought higher prices and saw competing for market share as misguided" as only "an awareness of oligopolistic economics." Defendants Memo, 17 n.16.  Even if one were to accept the questionable assertion that competitors should ever discuss their intentions not to compete against each other because they are in an oligopolistic market (a conversation which suggests they are no longer taking unconcerted independent action), the fact that Sandoz and Taro then went on to constantly conspire in various drug markets according to that *exact* understanding undercuts Defendants' attempted sanitation of this meeting.

[7] Defendants attempt a sleight of hand concerning another plus factor considered by this Court in its previous opinion, the "ongoing state and federal investigations into generic drug pricing."  *In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 525.  Defendants note that the "Court considered allegations in multiple *private plaintiffs'* complaints that referenced investigations by the DOJ that 'resulted in price-fixing guilty pleas from two senior executives at Defendant Heritage,'" but that the Dermatology Complaint does not contain such allegations.  Defendants' Memo, 19 (emphasis added).  That the States' Heritage Complaint did not contain these allegations – and yet was still held to sufficiently plead the overarching conspiracy – only demonstrates that the lack of such allegations in the Dermatology Complaint is not the blow Defendants believe it to be.  (Defendants then also go on to introduce facts outside the Complaint concerning other guilty pleas and deferred prosecution agreements.)

First, the Dermatology Complaint alleges that "[t]he common goal or purpose of this overarching agreement is to keep prices high, avoid price erosion, and serve as the basis for further supra-competitive price increases."  DC ⁋ 125.  As held by this Court, "[n]o more is required to allege a common goal at this stage of the case."  *In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 529.

Second, the Dermatology Complaint demonstrates how Defendants' conduct was intended to "bring to pass a continuous result that w[ould] not continue without the continuous cooperation of the conspirators."  *Id.* (*quoting Kelly*, 892 F.2d at 259).  Like the States' Heritage Complaint, the Dermatology Complaint explains:

> Adherence to the rules regarding "fair share" is critical to maintaining high prices.  Indeed, that is the primary purpose of the agreement.  If even one competitor does not participate (and thus behave in accordance with) the larger understanding, it can lead to unwanted competition and lower prices.  In the relatively few instances where a competitor prioritizes gaining market share over the larger understanding of maintaining "fair share," that competitor is viewed as "irresponsible," and may be spoken to by competitors.

DC ⁋ 145.  The Dermatology Complaint alleges multiple overlapping drug conspiracies where various companies are illegally cooperating to allocate markets and artificially increase prices at the same time.  For one of many examples, in May and June 2014, Taro was coordinating with Sandoz on Carbamazepine ER, Sandoz and Hi-Tech on various formulations of Clobetasol, and all of those companies and Wockhardt on the Clobetasol Solution.  *See* DC ⁋ 857.  It contains allegations of competitors discussing their cooperation broadly across multiple drugs:  Defendant Blashinsky of Glenmark approaching CW-3 of Sandoz and saying "we can make a lot of money" and "we can work together on pricing," DC ⁋ 1125, and going on to discuss multiple drugs on various occasions, *see* DC ⁋ 1143; Defendant Aprahamian of Taro constantly warning CW-3 of Sandoz to not "take my fucking customers," to not "take my business," and to not "be stupid"

during their collusive relationship over multiple drugs, DC ¶ 170.  It contains allegations of a Defendant not wanting to take a greater share in one drug market because it might disrupt the fair share agreement in other drug markets:  Defendant Kellum of Sandoz telling his team to avoid taking customers from Defendant Greenstone on Clindamycin Solution because of possible retribution from them on other Clindamycin formulations where they "share[d] a lot of cross over." DC ¶¶ 1344-1345.[8]  It alleges that Defendants asked each other for information about price increases on drugs they did not sell at the time, sometimes leading to a Defendant coordinating its entry into that market at that price.  *See* DC ¶¶ 159-160.  As mentioned above, it contains allegations of various instances where employees of companies *that did not compete in the market for the particular drug being conspired about* acted as a conduit for communications between competitors, demonstrating the broader investment in maintaining the overarching "fair share" framework across the industry.  *See* DC ¶¶ 465, 1397, 1458, 1510, 1540.

Third, the Defendants involved in the overarching agreement overlap with each other significantly.  Though Defendants argue that unlike the Heritage Complaint, this complaint does not have single "central actor," Defendants' Memo, 2, 7, the Dermatology Complaint describes a solid conspiratorial core from which each individual agreement radiates.  All but eight of the eighty different products conspired on involved at least one of Sandoz/Fougera[9] and Taro,[10] and often

---

[8] And when Sandoz and Greenstone went on to conspire on the other three formulations of Clindamycin where they were the only two competitors, they also coordinated their illegal price increase on Eplerenone Tablets on the same phone calls.  DC ¶ 1349.

[9] Sandoz acquired Fougera in 2012.  DC ¶ 30.  Prior to the acquisition, both Sandoz and Fougera participated in the "fair share" overarching conspiracy.  *See, e.g.*, DC ¶¶ 212-257 (describing Fougera's and Sandoz's, among others, conspiratorial activities relating to Imiquimod Cream).

[10] For one of those eight drugs, Ciclopirox Cream, CW-6 – then at Fougera – served as a conduit of communication between employees at G&W and Perrigo in May 2012, DC ¶ 530, even though Fougera had exited the Ciclopirox Cream market, DC ¶ 506.  Three of the eight are different formulations of Mometasone Furoate (Cream, Ointment, and Solution); Perrigo, G&W and Glenmark conspired in these drug markets.  DC ¶¶ 1535-1544.

both companies conspired with each other; indeed, the time period in the Dermatology Complaint begins with their discussion of the "fair share" framework at an industry event in 2009.  DC ¶¶ 196-197.  Of the eight remaining individual drug agreements, all eight involve G&W and seven involve Perrigo, both of which were also frequent conspirators with Sandoz/Fougera and Taro. The individual agreements alleged in the Dermatology Complaint were executed according to the overarching "fair share" understanding, commonly involving repeat players in varying combinations leading the way.  These allegations refute Defendants' insinuation (unsupported by any authority) that the lack of one "central actor" somehow reduces the plausibility of their agreement.

The Dermatology Complaint's allegations, taken as a whole, undoubtedly establish the plausibility of the Defendants' participation in the "fair share" overarching conspiracy.

## <u>ARGUMENT</u>

I.    **Defendants Fail To Distinguish The Allegations In The Dermatology Complaint From The Materially Similar Allegations Already Found Sufficient By This Court Under *Twombly*.**

Faced with the allegations described above – which are only a sample of the detailed allegations contained in the Dermatology Complaint – and this Court's existing decision on the sufficiency of materially similar allegations to plead an overarching conspiracy, Defendants make a number of feeble attempts to distinguish the present Complaint.  In their attempts, they reach for a familiar playbook:  to identify a few allegations in the Dermatology Complaint and argue that those allegations, in a vacuum, do not sufficiently allege an overarching conspiracy.  It is well established that this approach is improper; as this Court previously noted, "[t]he conspiracy must not be compartmentalized. The character and effect of [the] conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *In re Generic*

12

*Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 525 (quoting *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 718 (E.D. Pa. 2011)).  Taken as a whole, the Dermatology Complaint contains sufficient allegations to demonstrate the plausibility of the overarching conspiracy.

### A.   Defendants' Use Of "Fair Share" And Similar Terms Supports The Plausibility Of The Overarching Agreement.

A clear example of Defendants' unwillingness to engage with the Dermatology Complaint as a whole, as opposed to only in small parts, is their absurd assertion that "The States' Allegations Largely Describe Lawful, Parallel Conduct."  Defendants' Memo, 12.  Defendants point to two paragraphs describing what they call "oligopolistic rationality":

> "[g]eneric drug manufacturers actively and routinely monitor their fair share and that of their competitors," Am. Third Compl. ¶ 147, and that when one competitor increased its price, "the other competitors in the same drug market would . . . [typically] decline to bid for [the price leader's] business . . . [and] follow with a price increase of [their] own," *id.* ¶ 7.

Defendants' Memo, 13.  What Defendants willfully ignore are the hundreds of allegations demonstrating that the Defendants did not simply "watch each other like hawks" and "make business decisions in response to – the choices of their handful of competitors" like rational oligopolists might.  Defendants' Memo, 13.  The Defendants did much more than watch, they conspired to act jointly.  The Dermatology Complaint alleges in detail how Defendants, time and time again, conspired:  making hundreds of phone calls, sending numerous text messages and conducting in-person meetings to implement the understood "fair share" framework within various drug markets.  For example, Sandoz used the term "fair share" in an internal presentation concerning its target share for Clindamycin Solution in May 2014, explaining which companies' customers they planned to target based on the existing allocation of the market.  DC ¶ 1347.  While

it is possible, looking only at that document and nothing else, to believe that the term has no relation to collusive behavior, such a reading is contradicted by Sandoz's *contemporaneous communications with the other companies selling this drug to allocate the market*.  *See* DC ⟊ 1346.[11]  The Dermatology Complaint contains additional allegations from which the collusive meaning of fair share can be inferred; when asked by a colleague about what "fair share" meant, Defendant Aprahamian's answer was not that it is a "common term used in many industries and business schools," as Defendants frame it, Defendants' Memo, 11,[12] but rather "No emails please. Phone call. . . . let's discuss."  DC ⟊ 1596.

The many allegations documenting Defendants' persistent use of "fair share" and similar terms to describe the framework of the overarching conspiracy, in addition to the repeated execution of that framework by Defendants, undoubtedly supports the plausibility of the States' theory based on those allegations.  As described in previous briefing before this Court, overarching conspiracy theories have survived *summary judgment* based on less.  *See Dahl v. Bain Capital Partners, LLC*, 937 F. Supp. 2d 119, 137-38 (D. Mass. 2013) (denying summary judgment as to all defendants' involvement in an overarching conspiracy based on one comment by one defendant

---

[11] *See also* DC ⟊ 212-228 (CW-6, a Fougera employee, describing the company as "continuing [to] play[] nice in the sand box with Perrigo and Taro" in a document while *actively conspiring* with those two companies).

[12] Defendants' citations for this contention make no mention of academia, instead relying on media reports of two CEOs using the words "fair share" in a speech (one of whom does not use it in any way connected to a ratio of a market that his company "deserves," nor that his company would stop competing and raise prices once it achieved that market share, instead stating "We're really seeing a quick migration from cars to SUVs. It's part of my responsibility to get our fair share – or more than our fair share – of the market.").  *See* Defendants' Memo, 11 n. 14.  The Dermatology Complaint makes clear that the "fair share" framework was not a generic term but rather a specific set of rules adopted by Defendants, and that it was accepted that one could reach out to competitors to enact it when necessary.  In any event, Defendants' "factual" assertions concerning the use of the term "fair share" are outside the Complaint and therefore inappropriate to consider at this stage of the litigation; Defendants' repeated need to introduce factual disputes in their memorandum only demonstrates that the allegations are sufficient under *Twombly*.

of "club etiquette prevailing" in one deal and the fact that no defendant ever "jumped" another defendants' deal).[13]

### B. The Dermatology Complaint Alleges Ample Material Alleging "Plus Factors" That Coherently Explain The Overarching "Fair Share" Agreement.

As laid out in Section I.A above, the Dermatology Complaint alleges ample factual support for "implying a traditional conspiracy" – the plus factor Defendants focus on in their Memorandum – including an extensive web of inter-defendant communications and trade association membership and meeting attendance. Though these allegations are not identical to those found in the Heritage Complaint, they are similar enough in material ways to support this Court's previous conclusion that such allegations are sufficient to plead an overarching conspiracy. As with the Heritage Complaint, the Dermatology Complaint's "allegations are not mere 'labels and conclusions,' 'allegation[s] of parallel conduct and . . . bare assertion[s] of conspiracy.'" *In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 525 (*quoting Twombly*, 550 U.S. at 556).

Defendants attempt to distinguish the voluminous allegations of inter-defendant communications in the Dermatology Complaint from those in the Heritage Complaint by pointing to the lack of a "consistent participant" and asserting that this absence means that the Dermatology Complaint "lacks a coherent theory of inter-Defendant communication that would support an

---

[13] Defendants make a similar argument concerning their supposed independent economic rationality because they occasionally delayed a price increase that they arranged with their competitors to avoid contractual penalties. Defendants' Memo, 14. The fact that a Defendant delayed the implementation of that price increase for a few months to avoid penalties from its existing customers does not somehow erase the fact that Defendants *first violated the antitrust laws by agreeing to that price increase with its competitors*. *See* DC ¶¶ 1376-1382 (Defendants Kellum of Sandoz and Nailor and Hatosy of Greenstone coordinating price increase of Eplerenone Tablets; Greenstone increased price in June 2014 and Sandoz followed in October 2014 to avoid triggering customer's price protection terms).

inference that an overarching agreement existed."  Defendant's Memo, 16.  This fundamentally misunderstands the operation of the overarching "fair share" understanding.  As described above, the understanding was that all participating competitors could contact one another to allocate the market according to "fair share" principles and then, once the market was stable, agree not to compete and artificially raise prices.  As described above, the Dermatology Complaint alleges a tightly wound overlapping set of competitors in the dermatological product space[14] (Sandoz/Fougera, Taro, Perrigo, G&W) that were in constant communication with each other, often about multiple drugs, as well as with other competitors with product overlaps.  *See*, *e.g.*, DC ⁋ 1168 (Taro, Sandoz and Glenmark all communicating with each other about Desoximetasone Ointment in September 2013); DC ⁋ 1332 (Taro, Sandoz, Perrigo all communicating with each other concerning Clindamycin Solution in August 2013).  That no one Defendant was involved in all the individual agreements does not undermine the immense weight of the alleged constant, overlapping web of inter-defendant communication.[15]

---

[14] Defendants express a belief that because some of the products involved in the agreements detailed in the Dermatology Complaint are not dermatological products, it somehow undermines the theory of the overarching conspiracy.  Defendants' Memo, 7.  As explained elsewhere, the Defendants adhered to the overarching "fair share" framework because they knew next time they came into a market with any combination of competitors, they could feel confident they could coordinate their activities to avoid competition and artificially maintain prices.  *See supra* p. 6.  Whether that product was dermatological or not did not matter to Defendants and is not central to the operation of the overarching conspiracy.

[15] Defendants attempt to distract from the massive volume of inter-Defendant communication in the Dermatology Complaint by identifying two paragraphs that state the "fair share" principles that Defendants used to organize their individual drug conspiracies were sometimes deployed in the absence of advance communication about a particular drug.  Defendants' Memo, 16.  With such widespread conspiratorial conduct, and discussions between competitors generally to "work together" to "make a lot of money," DC ⁋ 11, it can be hard to find the exact edges of Defendants' illegal actions.  Defendants fail to mention that States do not seek any recovery on drug products where Defendants were not directly in communication with one another, and therefore while Defendants' commitment to fair share may be indicative of their "code of conduct" that undergirded the individual agreements, it is not relevant to States' theory of liability.

Defendants consistently refer to the fact that the allegations in the Dermatology Complaint cover a time period that is "nearly 10 years"[16] as though the mere length of Defendants' ongoing collusive behavior somehow reduces its plausibility.  *See* Defendants' Memo, 15, 17, 24.  No case law cited by Defendants stands for the principle that a longer conspiracy is less plausible.  During the pendency of the period that the Dermatology Complaint outlines, nothing changed that gave Defendants any motivation to alter the underlying structure the overarching conspiracy: Defendants continued to enter new markets together, and new entrants became authorized to enter existing markets, and therefore Defendants illegally benefitted from allocating the market according to fair share principles, avoiding price erosion and then artificially raising prices.  The Dermatology Complaint contains detailed allegations regarding multiple individual drug agreements that began each year from 2010 through 2015, with many demonstrating how the overarching agreement worked over the course of many years, such as Fluocinonide Solution.  *See* DC ¶¶ 314-321 (Fougera coordinates price increase with Taro in May 2011); DC ¶¶ 322-333 (the companies coordinate another price increase beginning in February 2012); DC ¶¶ 776-787 (Taro and Sandoz/Fougera coordinate with Actavis upon the latter's entry into the market in the summer of 2013).

The case law cited by Defendants does nothing to challenge the sufficiency of the Dermatology Complaint's overarching conspiracy allegations.  As noted previously, the closest precedent to the current matter is this Court's opinion evaluating the materially similar allegations in the Heritage Complaint, and Defendants' attempts to distinguish that decision (the various individual drug agreements do not have one consistent participant, the longer time period) fail.

---

[16] Defendant's Memo, 17.  The Complaint alleges conduct that occurred from around March 2009 through early 2016, which totals approximately seven years; whether that qualifies as nearly a decade may be in the eye of the beholder, but it does not seem like a reasonable assertion.

Defendants' attempt to analogize the Dermatology Complaint's allegations to those in the "Auto Parts Decision"[17] rather than the "AC Systems Decision,"[18] despite this Court's finding that the allegations relating to the overarching "fair share" agreement in the States' Heritage Complaint resemble the latter, have no merit.   Unlike the complaint in the "Auto Parts Decision," the Dermatology Complaint contains allegations of communications between Defendants about multiple drugs, including drugs that one of the Defendants did not sell at the time, and communications about the general framework of the overarching agreement.   Additionally, the structure of the generic drug industry provided the incentive for companies to have an interest in the ongoing overarching agreement, as they constantly were entering into new markets and benefitted from the ability to allocate those markets with the Defendants they otherwise would have had to compete against.   These are factors that compelled the court to find the complaint alleging a conspiracy across various components of the air conditioning systems sufficient when compared to the allegations in the Auto Parts Decision.[19]   *See AC Systems Decision*, 2018 WL 1138422 at *4-*5 (noting the allegations go beyond overlapping parties, including trade association meetings where they discussed the "market generally" and allege market conditions "supporting an inference the market was susceptible to collusion").

---

[17] *In re Auto. Parts Antitrust Litig.* ("Auto Parts Decision"), No. 12-md-2311, 2016 WL 8200512 (E.D. Mich. Apr. 13, 2016).

[18] *In re Auto. Parts Antitrust Litig.* ("AC Systems Decision"), No. 12-md-2311, 2018 WL 1138422 (E.D. Mich. Jan. 16, 2018).

[19] Defendants attempt to argue that the conspiracy in the AC Systems Decision concerned "just one auto part – 'air conditioning systems,'" Defendants' Memo, 21, despite the fact that the court itself clearly states that "Air Conditioning Systems ('AC Systems') [are] *a variety of auto parts* that are used to cool the interior environments of vehicles," *AC Systems Decision*, 2018 WL 1138422 at *1 (emphasis added), and that the defendants in that case, like Defendants here, unsuccessfully "dispute[d] whether these allegations plausibly suggest a conspiracy involving AC Systems as a whole by the various defendant companies rather than separate conspiracies involving different combinations of defendants for different individual AC System parts." *Id.* at *3.

Defendants' reliance on *Precision Assocs., Inc. v. Panalpina*, No. 08-cv-42(JG)(VVP), 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011), fares no better.  In that case, the court was clear that the plaintiffs failed to demonstrate how ten local conspiracies (carried out by sixty-five different rail freight defendants in different countries all over the world), which were "logically, temporally, and geographically distinct," were linked through the overlap of "key actors, methods and goals." *Id.* at *27.  Unlike in *Precision Associates*, the Dermatology Complaint shows an overlapping web of repeat players in the domestic generic drug industry enacting the same "fair share" framework through constant communication with each other, including at trade shows and association meetings.  The allegations in the Dermatology Complaint are clearly distinguishable from those in *Precision Associates*, which boiled down to no more than allegations that the defendants in the local conspiracies were "somewhat overlapping," that all the defendants "failed to ensure antitrust compliance," and that the local conspiracies were carried out using in-person meetings, conference calls and email communication.  *Id.*

### C.    The Dermatology Complaint Alleges Sufficient Material To Infer Defendants' Knowledge Of The Overarching Conspiracy.

Defendants argue that the Dermatology Complaint fails to "establish" that any Defendant had knowledge of the overarching conspiracy.  Defendants Memo, 24.  Defendants ignore the fact that knowledge is not an additional burden that plaintiffs must plead according to some special standard; it is routinely inferred by the courts on the same evidence discussed above.  *See AC Systems Decision*, 2018 WL 1138422, at *4-*5 (inferring knowledge of broader conspiracy for defendant who only allegedly conspired on one auto part based on attendance at meetings and market structure).

Defendants' citation to *Staley v. Gilead Scis., Inc.*, No. 19-cv-02573, 2020 WL 5507555 (N.D. Cal. July 29, 2020) is instructive.  In that case, Gilead had allegedly entered into

anticompetitive agreements with two other pharmaceutical companies, BMS and Janssen, to monopolize a particular drug market. *Id.* at *7. The court stated that to show there was an overarching conspiracy, the plaintiffs did not need to show that BMS and Janssen knew that "the other specifically was a part of the overarching conspiracy" but needed to have an understanding that "there was more than just a bilateral conspiracy between it and Gilead." *Id.* The court identified the "fundamental flaw" in plaintiffs' position as a "failure to show how [either BMS or Janssen] would benefit from an overarching conspiracy involving all three Defendants (as opposed to, *e.g.*, the bilateral conspiracy between it and Gilead alone)," and "therefore it cannot reasonably be inferred that BMS agreed to an overarching conspiracy." *Id.* at *8. In the Dermatology Complaint, the States have not only alleged why Defendants benefitted from the structure of the overarching conspiracy, but also how they benefitted in multiple examples when they were able to conspire to maintain high prices upon entry into various drug markets. Indeed, the Dermatology Complaint contains examples of Defendants participating in arrangements for individual drugs that they did not sell. And unlike the allegations in *Staley*, which follow a "hub-and-spoke" model[20] of conspiracy without any contact between BMS and Janssen, many of the Defendants in the Dermatology Complaint constantly overlapped with each other in arranging the allocation of market share and assurances not to compete after increasing prices.

---

[20] Defendants also cite *Intel Corp. v. Fortress Inv. Grp., LLC*, No. 19-cv-7651, 2020 WL 6390499 (N.D. Cal. Jul. 15, 2020), where the court found that it was "not clear from either Plaintiffs' complaint or their opposition whether Plaintiffs are asserting (1) an overarching conspiracy claim (*i.e.*, a claim that *all* Defendants are part of one big conspiracy); (2) a claim that Fortress and *each* of the other defendants was in a separate conspiracy; or (3) something in between," and found that plaintiffs had failed to plead either an overarching conspiracy or separate bilateral conspiracies. *Id.* at *17. As with *Staley*, Fortress was claimed to have a relationship with each of the other defendants, but there were no allegations that the other defendants had any contact with each other or "allegations indicating that the defendant[s] knew they were part of a broader scheme being facilitated by Fortress," the hub of the alleged conspiracies. *Id.*

The allegations in the Dermatology Complaint create the necessary plausible inference that "Defendants knew that they would need to enter into future agreements with other combinations of would-be competitors (in their existing markets or new markets) and therefore had a vested interest in 'playing fair' according to their shared code of conduct." *In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 530-31.  That is sufficient to satisfy the States pleading requirement under *Twombly*.

## II.     The States' Dermatology Action Does Not Improperly Split Claims.

Defendants correctly note that claim-splitting is recognized as a "rule against duplicative litigation," *see Prewitt v. Walgreens Co.*, No. 12–cv–6967, 2013 WL 6284166, at *5 (E.D. Pa. Dec. 2, 2013) (citation omitted), and plaintiffs have "no right to maintain [] separate actions involving the same subject matter at the same time in the same court and against the same defendant." *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir. 1977) (citations omitted).  However, Defendants incorrectly apply these principles to the States' separate actions.  The States do not dispute that each action refers to an "overarching conspiracy" in the industry.  But, as the Supreme Court held over sixty-five years ago in a *res judicata* analysis: "That [the] suits involved 'essentially the same course of wrongful conduct' is not decisive.  *Such a course of conduct . . . may frequently give rise to more than a single cause of action*," particularly where different violations, defendants, and facts are involved.  *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327-30 (1955) (emphasis added).  The States' Heritage, Teva, and Dermatology Actions assert distinct claims relating to different drugs, against different combinations of defendants, and "Defendants brush over the factual differences in each case."  *See Live Face on Web, LLC v. Cremation Soc'y of Ill., Inc.*, No. 18–cv–1718, 2019 WL 398938, at *6 (E.D. Pa. Jan. 31, 2019). "Taken together," this Court should "not [be] persuaded that the claims in the [separate] cases

involve the same subject matter," and "[t]hus . . . not find that [the States' Dermatology] case is barred by the doctrine against claim splitting." *Id.* (quotation marks and citation omitted).

A. **The "Overarching Conspiracy" Discussed In The States' Heritage, Teva, And Dermatology Complaints Is Not A Standalone Claim.**

A grave misconception of the "overarching conspiracy" appears to be at the heart of Defendants' confusion over the distinct claims in the States' Heritage, Teva, and Dermatology Actions. This is puzzling, given that Defendants cite portions of the Complaints which explain the "overarching conspiracy," how it is applied by industry participants, and how the specific claims arise out of it. For example, the fifth page of Defendants' memorandum quotes the following from the Heritage Complaint:

> Defendants here understood and acted upon an *underlying code of conduct that is widespread in the generics industry*: an expectation that any time a company is entering a particular generic drug market, it can contact its competitors and allocate the market according to a generally agreed-upon standard of "fair share" in order to avoid competing and keep prices high. . . . [**T**]**his background understanding remains constant and is an important component of the Defendants' ability to reach agreements for specific drugs**.

HC ¶ 14 (emphasis added).

As is clear from that text, the "overarching conspiracy" is not the claim. Rather, it is an underlying understanding upon which Defendants acted in relation to particular instances for different drugs. The "overarching conspiracy" makes up the contours of the industry's conduct, and the separate claims arose when Defendants used that framework to collude on specific drugs.

In and of itself, the "overarching conspiracy" has not been brought as a standalone claim. Using pure logic, the overarching conspiracy allegations only make sense when applied to Defendants' specific acts. The "overarching conspiracy" is a tool among industry participants, and the States' Heritage, Teva, and Dermatology Actions detail the collusion and how the

Defendants used this tool in each of the Complaints. This basic theory is explained in all three of the States' Complaints:

> The overarching conspiracy was **effectuated by a series of conspiracies** that affected and continue to affect the market **for [a number of/the] generic drugs identified** in this [] Complaint. . . . The [] Complaint describes conspiracies regarding the sale of specific drugs, and how these specific conspiracies are also part of the larger overarching conspiracy.

HC ¶¶ 2-3; TC ¶¶ 6-7; DC ¶¶ 20-21 (emphasis added).

The States have alleged that the "overarching conspiracy" framework is applied by the manufacturers to specific drugs, and it is the application of that framework to those drugs that comprises the distinct claims in the States' Heritage, Teva, and Dermatology Actions. For example, in the States' Heritage Complaint, Defendant Sandoz is alleged to have colluded with Heritage and others with regard to Fosinopril-Hydrochlorothiazide (Count 10). The States also seek to hold Sandoz jointly and severally liable with regard to additional drugs under the principles of the "overarching conspiracy." (*See* Counts 1-5, 7-9, and 11-18). In the States' Teva Complaint, and then again in the States' Dermatology Complaint, the States seek to hold Sandoz responsible for conduct relating to *different drugs*, involving different combinations of defendants.[21] While the bones of the Complaints may have similarities, the meat of the Heritage, Teva, and Dermatology Actions – the claims – are not the same.

## B. The Dermatology Action Involves New And Different Drugs, And Combinations Of Parties.

Defendants argue it is problematic that the States' Complaints include common parties. Defendants' Memo, 28. In doing so, Defendants ignore recent Eastern District of Pennsylvania

---

[21] This same analysis can be applied with equal force to any of the Defendants in the States' Heritage, Teva, and Dermatology Actions. None face duplicative exposure, even in the face of joint and several liability.

case law where the court found the claim-splitting doctrine did not bar multiple ongoing lawsuits against "several of the same defendants."  *Live Face on Web*, 2019 WL 398938, at *6.

Moreover, Defendants disregard the extent to which the States' Heritage, Teva, and Dermatology Actions involve different parties.  While there is some overlap, the Complaints do not name the same set of defendants.  Listed below are the defendants in the Heritage, Teva, and Dermatology Actions.  In the second bullet point, new defendants in the Teva Action that are not in the Heritage Action are in red, and defendants in the Heritage Action that are not included in the Teva Action are stricken.  In the third bullet point, new defendants in the Dermatology Action that are not in the Heritage and/or Teva Actions are in blue, and defendants in the Heritage and/or Teva Actions that are not included in the Dermatology Action are stricken.

- Defendants in the Heritage Action: Actavis Holdco, U.S., Inc.; Actavis Pharma, Inc.; Ascend Laboratories, LLC; Apotex Corp.; Aurobindo Pharma USA, Inc.; Citron Pharma, LLC; Dr. Reddy's Laboratories, Inc.; Emcure Pharmaceuticals, Ltd.; Glenmark Pharmaceuticals, Inc.; Heritage Pharmaceuticals, Inc.; Lannett Company, Inc.; Rajiv Malik; Mayne Pharma Inc.; Satish Mehta; Mylan Pharmaceuticals, Inc.; Par Pharmaceutical Companies, Inc.; Sandoz, Inc.; Sun Pharmaceutical Industries, Inc.; Teva Pharmaceuticals USA, Inc.; and Zydus Pharmaceuticals (USA), Inc.

- Defendants in the Teva Action: Actavis Holdco, U.S., Inc.; Actavis Pharma, Inc.; Amneal Pharmaceuticals, Inc.; Amneal Pharmaceuticals, LLC; Ascend Laboratories, LLC; Apotex Corp.; Ara Aprahamian; Aurobindo Pharma USA, Inc.; David Berthold; Breckenridge Pharmaceutical, Inc.; James (Jim) Brown; Citron Pharma, LLC; Maureen Cavanaugh; Tracy Sullivan Divalerio; Dr. Reddy's Laboratories, Inc.; Emcure Pharmaceuticals, Ltd.; Marc Falkin; Glenmark Pharmaceuticals, Inc.; James (Jim) Grauso; Kevin Green; Greenstone LLC; Robin Hatosy; Heritage Pharmaceuticals, Inc.; Armando Kellum; Lannett Company, Inc.; Lupin Pharmaceuticals, Inc.; Rajiv Malik; Mayne Pharma Inc.; Satish Mehta; Mylan Pharmaceuticals, Inc.; Jill Nailor; James (Jim) Nesta; Par Pharmaceutical Companies, Inc.; Nisha Patel; Pfizer, Inc.; Konstantin Ostaficiuk; David Rekenthaler; Richard (Rick) Rogerson; Sandoz, Inc.; Sun Pharmaceutical Industries, Inc.; Taro Pharmaceuticals USA, Inc.; Teva Pharmaceuticals USA, Inc.; Upsher-Smith Laboratories, LLC; Wockhardt USA LLC; and Zydus Pharmaceuticals (USA), Inc.

- Defendants in the Dermatology Action: Actavis Holdco, U.S., Inc.; Actavis Elizabeth LLC; Actavis Pharma, Inc.; Amneal Pharmaceuticals, Inc.; Amneal Pharmaceuticals,

LLC; ~~Ascend Laboratories, LLC; Apotex Corp.~~; Ara Aprahamian; Aurobindo Pharma USA, Inc.; Bausch Health Americas, Inc.; Bausch Health US, LLC; ~~David Berthold~~; Mitchell Blashinsky; Douglas Boothe; ~~Breckenridge Pharmaceutical, Inc.~~; ~~James (Jim) Brown~~; ~~Citron Pharma, LLC~~; ~~Maureen Cavanaugh~~; ~~Tracy Sullivan Divalerio~~; ~~Dr. Reddy's Laboratories, Inc.~~; ~~Emcure Pharmaceuticals, Ltd.~~; ~~Marc Falkin~~; Fougera Pharmaceuticals Inc.; Glenmark Pharmaceuticals Inc.; James (Jim) Grauso; ~~Kevin Green~~; Greenstone LLC; G&W Laboratories; ~~Robin Hatosy~~; ~~Heritage Pharmaceuticals, Inc.~~; Walter Kaczmarek; Armando Kellum; Lannett Company, Inc.; Lupin Pharmaceuticals, Inc.; ~~Rajiv Malik~~; Mallinckrodt Inc.; Mallinckrodt LLC; Mallinckrodt plc; ~~Mayne Pharma Inc.~~; ~~Satish Mehta~~; Mylan Inc.; Mylan Pharmaceuticals, Inc.; ~~Jill Nailor~~; ~~James (Jim) Nesta~~; Kurt Orlofski; ~~Par Pharmaceutical Companies, Inc.~~; ~~Nisha Patel~~; Michael Perfetto; Perrigo New York, Inc.; Pfizer, Inc.; ~~Konstantin Ostaficiuk~~; ~~David Rekenthaler~~; ~~Richard (Rick) Rogerson~~; Sandoz, Inc.; Sun Pharmaceutical Industries, Inc.; Taro Pharmaceuticals USA, Inc.; Teligent, Inc.; ~~Teva Pharmaceuticals USA, Inc.~~; ~~Upsher-Smith Laboratories, LLC~~; Erika Vogel-Baylor; John Wesolowski; Wockhardt USA LLC~~; and Zydus Pharmaceuticals (USA), Inc~~.

The States did not have to bring all their claims against Defendants in one action, because they are distinct claims. The States have separate causes of action against the defendants named in each lawsuit. Coupling the different claims, based on different drugs, with the different defendants in each action further illustrates that the States' Dermatology Action does not improperly split claims.

**C.      The Factual Allegations In The Heritage And Teva Complaints Are Distinct From Those In The Dermatology Complaint.**

Defendants' argument that the factual allegations in the Heritage, Teva, and Dermatology Actions are all simply part of a single cause of action and therefore must be included in one complaint flies in the face of reality. Simply put, the States brought separate actions because the States have different claims, which are directly supported by the distinct factual allegations asserted in each of the three Complaints.

The separate "transactions" in the States' separate Complaints give rise to separate claims – the specific products and related allegations in the three Complaints do not overlap.[22]  As discussed in this memorandum, the "overarching conspiracy" framework is the tool that allowed the many single-drug conspiracies to occur, and the three Complaints assert distinct claims related to the different drugs.  Like the Supreme Court held in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), an employment discrimination case involving the statute of limitations, "each discrete discriminatory act produces one claim[,]" and "[d]iscrete and independently wrongful acts produce different claims, even if the same wrongdoer commits both offenses and the second wrong is similar to the first." *Horia v. Nationwide Credit & Collection, Inc.*, 944 F.3d 970, 974 (7th Cir. 2019).  *Morgan* has been applied in the claim preclusion context, including in a recent case where the appellate court reversed a dismissal by the trial court which had ruled that a plaintiff's second case "split his claims impermissibly."  *Id.* at 973-74 ("Likewise with discrete violations of § 1692e(8).  Each time a debt collector fails to give a credit agency the required notice for a debt is a stand-alone wrong.  Disputes that have an independent existence may be litigated separately. *Joinder in federal practice is permissive, . . . not mandatory.*" *Id.* at 974 (emphasis added)).

The unique factual allegations and claims in the States' separate actions are evident from the beginning of the Complaints.  Defendants need only to look at the first few paragraphs of the three Complaints to see these distinctions.  For example, while the Heritage Complaint starts by referencing the fifteen separate drug conspiracies that emerged from the "overarching conspiracy,"

---

[22] Fifteen generic drugs are identified in the Heritage Action (Acetazolamide, Doxycycline Hyclate Delayed Release, Doxycycline Monohydrate, Fosinopril-HCTZ, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline, Verapamil, and Zoledronic Acid).  The Teva Action accounts for more than 100 different generic drugs, with specific allegations related to these drugs.  The Dermatology Action pertains to eighty different generic drugs, mostly topical dermatological products, and related particularized allegations distinct from those in the Heritage and in the Teva Actions.

the Teva Complaint begins with a discussion about how Teva and its co-conspirators participated in similar conduct but "to the next level" with 100+ different drugs, and the Dermatology Complaint begins with a discussion on the history of collusive behavior present in the generic topical products market and the key players at Taro, Fougera (now Sandoz), Perrigo, Actavis, and G&W that were responsible.  *See* HC ¶¶ 1-2; TC ¶¶ 1-6; DC ¶¶ 1-8.  The factual allegations in the Heritage, Teva, and Dermatology Complaints center on different drugs and companies and different instances, or "claims," related to the same general course of wrongful conduct, and the precedent is clear that the States have every right to bring these separate claims in separate actions.

The distinct claims in the Heritage, Teva, and Dermatology Actions are further apparent in the different evidence, details, and allegations detailed throughout the remainder of the three Complaints.  The Heritage Complaint, for example, focuses in large part on conduct in the spring and summer of 2014 when Heritage sought to increase prices on a specific list of products. Heritage senior executives held a discussion with sales executives, and the company then embarked on a campaign to communicate and reach agreement with its competitors on as many of those drugs as possible.  HC ¶¶ 268-453.  The Complaint identifies a wealth of direct evidence establishing agreements between Heritage and its competitors, including statements and admissions by Heritage employees that they had colluded with numerous competitors and confirmed that those competitors had "similar like minding on the pricing strategies we discussed," *see, e.g.*, HC ¶ 287, as well as text message communications directly between Heritage employees and competitors stating things such as: "We are raising the price [of Glyburide] right now – just letting you know.  Teva says they will follow. . . . Aurobindo agrees too," with a response from the competitor that "we are def[initely] in to raise pricing," HC ¶ 347; and a Heritage employee telling a different competitor that Actavis is "on board with" a price increase relating to the drugs

27

Glyburide/Metformin and Verapamil, HC ¶ 378.  To demonstrate that the agreements relating to the price increases were part of a larger understanding or course of conduct in the industry, the Heritage Complaint also describes a series of market allocation agreements involving Heritage and various competitors, relating to four different drugs, that were designed to maintain market share and avoid price erosion in the context of a common understanding among the Defendants in that case.  HC ¶¶ 115-148 (Nimodipine), 149-164 (Zoledronic Acid), 165-179 (Meprobamate), 180-242 (Doxy DR).  The "common understanding" prevalent in the industry was described by one of Heritage's competitors as follows: "If they [Dr. Reddy's] are first and others come out after, he deserves 60%.  If he launches with others on day [one], he considers fair share 2-50%, 3-33%, 4-25% etc."  HC ¶ 153.

The Teva Complaint, in contrast, tells a completely different story about Teva – a much larger company with a larger catalogue of products.  As of early 2013, Teva's generic drug business was struggling, and the company was looking for new ways to increase its profitability.  *See* TC ¶¶ 565-566.  One thing Teva did was hire a new employee, individual Defendant Nisha Patel, who – due to her prior work in the industry for a large wholesaler – had contacts with nearly every major competitor of Teva.  Teva hired Defendant Patel to identify potential generic drugs for which Teva could raise prices, and then utilize her relationships to effectuate price increases.  Patel immediately began communicating with competitors to secure agreements to lead and follow each other's price increases.  TC ¶¶ 567-577.  Patel also codified the strength of Teva's agreements with various competitors into what she referred to as a "Quality of Competition" ranking, where the competitors with which Teva had the strongest agreements to lead and follow each other's price increases received the highest rankings, and the competitors' rankings were directly affected by the success of their collusion with Teva.  *See, e.g.*, TC ¶¶ 578-601, 915-972.  Over the course of

the ensuing months and years, Teva successfully raised prices on nearly 100 different drugs.  The Teva Complaint describes in great detail the way that Teva systematically communicated with its competitors as it was identifying candidates for price increases and then again at or around the time of price increases, resulting in significant, often multi-drug price increase events on July 3, 2013, July 19, 2013, August 9, 2013, March 7, 2014, April 4, 2014, April 15, 2014, July 1, 2014, August 28, 2014, and January 28, 2015.  *See* TC ¶¶ 536-914.  The allegations in the Teva Complaint are supported and corroborated by a number of cooperating witnesses who were directly involved in the collusive conduct.  TC ¶ 68.

Like the Heritage Complaint, in order to demonstrate that the agreements relating to the price increases were part of a larger understanding or course of conduct in the industry, the Teva Complaint describes a series of market allocation agreements involving Teva and various competitors, relating to more than forty *different* drugs, involving *different* combinations of competitors and *different* time periods, that were designed to maintain market share and avoid price erosion in the context of a common understanding among the Defendants in that case.  TC ¶¶ 166-535.  As stated above, the claims in the Teva Complaint do not relate to any of the drugs specifically identified in the Heritage Complaint, and none of the Defendants in either case are at risk of duplicative judgments.

The Dermatology Complaint, like the prior two, discusses the background "overarching conspiracy" understanding among defendants, some of whom may have been named in the previous actions, and the similarities end there.  Specifically at issue in the Dermatology Complaint is the portion of the generic pharmaceuticals industry relating to topical products – a market segment that is ripe for collusive activity due to limited competition and significant product overlap, *see* DC ¶ 6 – and how the Defendants in this case allocated markets and drove up drug

prices.[23]  As the complaint explains, generic manufacturers have been colluding on price increases for topical products since at least 2009, and "the size and frequency of those increases grew exponentially in 2013 and 2014."  DC ¶ 8; *see also* DC ¶¶ 173-176.  This resulted in part from structural and personnel changes around that same time that increased opportunities for competitors to collude.  DC ¶ 9.  For example, after Sandoz acquired Fougera, several competitors proactively sought information from CW-3 – the only Fougera sales executive that Sandoz retained – because Sandoz was an active participant in many overlapping product markets in which these competitors could collude.  DC ¶¶ 11, 559.  CW-3 obliged, working to "prove his worth to Sandoz management" by using his relationships with competitors to allocate customers and increase prices on numerous products over the ensuing years.  DC ¶¶ 12, 564-576, 583-589, 609-723.

Similarly, three former Actavis executives – Defendants Douglas Boothe, Michael Perfetto, and Ara Aprahamian – left Actavis during this time period for senior positions at competing companies that manufacture topical products (Perrigo and Taro).  As detailed in the Dermatology Complaint, all three of these individuals – now competitors – would leverage their relationships to allocate markets and increase prices on numerous products over the ensuing years.  *See, e.g.*, DC ¶¶ 13, 557-558; DC ¶¶ 563-576 (detailing Defendant Aprahamian's relationship, communications, and collusion with CW-3 and approval of same from Defendant Perfetto); DC ¶¶ 590-591 (describing Defendant Perfetto's relationship, communications, and collusion with Defendant Boothe); DC ¶¶ 594-595 (further explaining Defendant Aprahamian's relationship and collusion with CW-3); DC ¶¶ 597-608 (describing the strong collusive relationships between

---

[23]  Although the Dermatology Complaint does focus largely on collusion relating to topical products, it is not exclusive.  Because each of the corporate Defendants also manufactures and sells non-dermatological products, and the overarching agreement between them extends beyond any specific market segment, there are certain additional instances of collusion alleged against these Defendants that do not specifically involve topical products.

Defendants Perfetto and Aprahamian and competitors as central to Taro implementing price increases and allocating "fair share" of drug markets); DC ¶¶ 653-1020 (detailing Defendant Aprahamian's collusion with CW-3 on products on which Sandoz and Taro overlap, as well as Defendants Aprahamian and Perfetto coordinating and leading price increases on several products "where they had strong relationships and ongoing understandings with individuals at the competitor companies"); DC ¶¶ 1110-1124 (describing Defendant Boothe's involvement in collusion between Sandoz and Perrigo on Tacrolimus Ointment and Methazolamide Tablets); DC ¶¶ 1167-1173 (detailing communications with Defendants Aprahamian and Perfetto to coordinate Glenmark's Desoximetasone launch); DC ¶¶ 1271-1277 (detailing communications with Defendants Aprahamian and Perfetto, among other competitors, related to Methylphenidate); DC ¶¶ 1326-1348 (describing communications among Defendants Aprahamian, Perfetto, and Boothe and other competitors related to Clindamycin Solution); DC ¶¶ 1404-1453 (explaining competitor coordination involving Defendants Boothe, Aprahamian, and Perfetto related to Halobetasol, as well as involving Defendant Boothe on Prochlorperazine).

While the Dermatology Complaint thus details market allocation agreements that show the price increase agreements were part of an underlying understanding or course of conduct in the industry, it addresses a different market segment, different drugs, different competitor groupings, and different time periods than those at issue in the prior complaints, with none of the Defendants in any of the actions at risk of duplicative exposure.

      **D.**    **This Court Should Reject Defendants' Motion To Dismiss Because The Claim-Splitting Doctrine Does Not Apply To The States' Actions.**

          **1.**    **Plaintiffs May Bring Separate Actions For Different Claims, And The States Chose To Do So.**

Rule 18 of the Federal Rules of Civil Procedure (on "Joinder of Claims") states: "A party asserting a claim, counterclaim, crossclaim, or third-party claim may join, as independent or

alternative claims, as many claims as it has against an opposing party." FED. R. CIV. P. 18(a). While plaintiffs are "under some compulsion not to split a claim," it is well-understood that "[t]here is no like compulsion on a plaintiff who has a number of claims against a defendant to join them in a single action; he may join them if he wishes, but he is not obliged to do so . . . Joinder of multiple claims is permissive, not compulsory." RESTATEMENT (SECOND) OF JUDGMENTS § 24(h) (1982). The States' Heritage, Teva, and Dermatology Actions are neither duplicative litigation, nor a means of duplicative recovery, against Defendants.

*Live Face on Web* provides a useful recent example in the Eastern District of Pennsylvania where the court rejected claim-splitting arguments similar to those made by Defendants and followed the basic principle that a plaintiff may file separate actions for distinct claims. *See Live Face*, 2019 WL 398938, at *6. As in *Live Face*, the States' Heritage, Teva, and Dermatology Actions are being litigated against some of the same defendants, and the factual differences in each of the States' cases demonstrate how the claims are distinct. Dismissal under the claim-splitting doctrine is not warranted when such circumstances are present. *Id.*

### 2. The Defendants And This Court Knew That The States Would Bring Additional Actions.

Not only are the claims distinct, the Defendants and this Court were aware that the States would bring additional actions. The Heritage Complaint expressly stated the States were continuing to investigate additional conspiracies and would file additional actions, putting both Defendants and this Court on notice. *See* HC ¶ 3. And this Court held that it would not prevent the States from continuing to investigate, "particularly with regard to the possibility of claims concerning additional drugs and additional parties." Order, *In re Generic Pharm. Pricing Antitrust Litig.*, No. 2:16–md–02724 (E.D. Pa.), ECF No. 758 at 10. Indeed, both the Teva and the Dermatology Complaints were filed after additional information was uncovered and the States

discovered new claims.  Despite Defendants' accusations that the States filed the Teva and the Dermatology Complaints as some sort of tactic to extend procedural rights or to avoid amending the Heritage Complaint, the facts prove otherwise.  The States were upfront with both Defendants and this Court from the start that investigations were ongoing and new complaints would come out.  That is precisely what happened.

### 3. The Defendants Would Not Be Prejudiced By Maintaining These Actions Given The MDL Context.

A foundational policy motivating the rule against claim-splitting is judicial economy by "protecting defendants" from duplicative litigation.  *See Prewitt*, 2013 WL 6284166, at *5.  In the multi-district litigation (MDL) context, separate actions that may overlap do not implicate the concerns underlying the claim-splitting doctrine, as the MDL court has the tools to manage such claims.  *See Edward Wisner Donation v. BP Expl. & Prod. (In re Oil Spill)*, No. 14–cv–1525, 2014 U.S. Dist. LEXIS 132567, at *14 (E.D. La. Sept. 5, 2014).

In *Edward Wisner Donation v. BP Exploration*, a landowner filed two separate lawsuits related to the BP Deepwater Horizon oil spill.  *See id.* at *5-*6.  The landowner's first lawsuit was similar to others within the MDL, alleging federal violations based on the oil spill.  *Id.* at *6.  The landowner's second lawsuit dealt with contractual violations that arose from BP's cleanup operations on the landowner's land.  *Id*.  The court held that, even though both claims "can be generically described as 'arising out of' the oil spill, this does not establish that [the plaintiff] has improperly split its claims," and permitted both causes of action to continue separately.  *Id*. at *13-*14.  The court found that "the two actions are not based on the same facts, do not involve the same subject matter and do not assert the same cause of action[,]" and concluded that "[t]he claim-splitting rule does not require dismissal of the instant action."  *Id*. at *14.  Despite those conclusions, the court separately barred application of the claim-splitting rule and explained:

> To the extent that some facts underlying plaintiff's separate complaints may overlap, . . . case management devices remain available to the court and the parties to manage [the plaintiff's] various claims.  The risks of "duplication, rulings that may trench upon the authority of sister courts, and piecemeal resolution of issues that call for a uniform result," which the rule against claim-splitting operates to prevent, are not implicated here.

*Id*. at \*14-\*15 (citation omitted).

In *Wisner*, the court did not apply the claim-splitting rule because, even though it concluded the two claims arose from dissimilar facts, the court had tools available to protect against the risks posed by the claim-splitting rule.  Here, and as explained above, the States' Complaints also arise from unique facts and present distinct claims.  And, much like in *Wisner*, the States' Heritage, Teva, and Dermatology Actions are pending in the same court, before the same judge, and are part of an MDL.  All these facts protect the Defendants from the risks and concerns underlying the claim-splitting doctrine.  Thus, this Court should find that the claim-splitting doctrine is inapplicable, and the States should be permitted to maintain their separate actions.

## **CONCLUSION**

For the foregoing reasons, this Court should deny the Defendants' Motion to Dismiss.

Respectfully submitted,

STATE OF MASSACHUSETTS
MAURA HEALEY
ATTORNEY GENERAL

By:     /s/ Michael MacKenzie
        Deputy Chief, Antitrust Division
        One Ashburton Place
        Boston, MA 02108
        Tel: (617) 727-2200

STATE OF CONNECTICUT
WILLIAM TONG
ATTORNEY GENERAL

STATE OF FLORIDA
ASHLEY MOODY
ATTORNEY GENERAL

By:     /s/ Lizabeth A. Brady
        Lizabeth A. Brady
        Interim Co-Director, Antitrust Division

        Nicole A. Sarrine
        Assistant Attorney General
        PL-01 The Capitol
        Tallahassee, FL 32399
        Tel: (850) 414-3300

By:   /s/ W. Joseph Nielsen
       Assistant Attorney General
       165 Capitol Avenue
       Hartford, CT 06106
       Tel: (860) 808-5040

*Liaison Counsel for the Plaintiff States*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of January, 2022, I caused Plaintiff States' Opposition to Certain Defendants' Joint Motion to Dismiss the States' Overarching Conspiracy Claims in the Dermatology Complaint to be filed with the Clerk of Court of the United States District Court for the Eastern District of Pennsylvania using the ECF system which will serve a copy on all interested parties registered for electronic filing, and is available for viewing and downloading from the ECF system.

/s/ Lizabeth A. Brady
Lizabeth A. Brady
Interim Co-Director, Antitrust Division